Notice of Inquiry
(released December 15, 2021)

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| Report on the Future of the Universal Service Fund | )    WC Docket No. 21-476 |
| | ) |
| | ) |
| | ) |
| | ) |

**NOTICE OF INQUIRY**

**Adopted:  December 15, 2021**                    **Released:  December 15, 2021**

**Comment Date: January 18, 2022**
**Reply Comment Date: January 31, 2022**

By the Commission: Commissioner Carr issuing a statement.

## TABLE OF CONTENTS

Heading                                                                      Paragraph #

I.    INTRODUCTION ...................................................................................................1
II.   BACKGROUND.....................................................................................................2
      A.  The Future of Universal Service Report ..........................................................2
      B.  Universal Service Goals for Broadband ...........................................................3
      C.  Broadband Provisions in the Infrastructure Act...............................................5
          1.  Broadband Equity, Access, and Deployment Program ................................5
          2.  The Affordable Connectivity Program ......................................................6
          3.  Additional NTIA Initiatives in the Infrastructure Act.................................7
          4.  Additional Infrastructure Act Provisions Impacting the Commission ...........9
      D.  Other Federal Programs Related to Broadband ...............................................13
      E.  Interagency Coordination.............................................................................16
III.  IMPACT OF THE INFRASTRUCTURE ACT ON EFFECTIVELY ACHIEVING
      UNIVERSAL SERVICE GOALS .........................................................................17
      A.  The Commission's Existing Universal Service Programs .................................20
      B.  Implications of the Act on the Commission's Universal Service Goals...............21
      C.  Impact on Other Federal Broadband Programs................................................28
IV.   POTENTIAL RECOMMENDATIONS FOR FUTURE COMMISSION ACTION ...........29
      A.  High-Cost Program ....................................................................................30
      B.  Lifeline and the Affordable Connectivity Program .........................................33
      C.  E-Rate and the Emergency Connectivity Fund Program...................................37
      D.  Rural Health Care ......................................................................................40
      E.  Sustaining the Universal Service Program .....................................................44
V.    POTENTIAL RECOMMENDATIONS FOR FUTURE CONGRESSIONAL ACTION...................46
VI.   PROCEDURAL MATTERS....................................................................................53
VII.  ORDERING CLAUSE............................................................................................58

## I.    INTRODUCTION

1.        In this Notice of Inquiry (Notice), we commence a proceeding, consistent with Congressional direction, seeking comment on issues related to the future of the Universal Service Fund (USF or Fund) in light of the broadband investments in the Infrastructure Investment and Jobs Act (Infrastructure Act or Act).  The Infrastructure Act includes the largest ever federal investment in broadband, totaling approximately $65 billion.[1]  We invite comment on the effect of the Infrastructure Act on existing USF programs and the ability of the Federal Communications Commission (Commission) to reach its goals of universal deployment, affordability, adoption, availability, and equitable access to broadband throughout the United States.  We also seek comment on recommended courses of action the Commission and Congress might take to further promote those goals so that everyone in the United States has a broadband connection that is so vitally necessary in our increasingly digital economy.

## II.    BACKGROUND

### A.    The Future of Universal Service Report

2.        On November 15, 2021, President Biden signed the Infrastructure Act.  Section 60104(c) of the Act directs the Commission to submit to Congress "a report on the options of the Commission for improving its effectiveness in achieving the universal service goals for broadband in light of this Act."[2]  In the report, the Commission "may make recommendations for Congress on further actions the Commission and Congress could take to improve the ability of the Commission to achieve the universal service goals for broadband."[3]  Section 60104(b) instructs the Commission to commence a proceeding "to evaluate the implications of this Act and the amendments made by the Act on how the Commission should achieve the universal service goals for broadband" within 30 days of enactment and submit the report within 270 days of enactment.[4]  Congress also directed that the Commission "not in any way reduce the congressional mandate to achieve the universal service goals for broadband."[5]

### B.    Universal Service Goals for Broadband

3.        The Infrastructure Act defines the Commission's "universal service goals for broadband" as those mandated by section 706 of the Telecommunications Act of 1996.[6]  Section 706 requires the Commission to "encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans (including, in particular, elementary and secondary schools and classrooms)…"[7] and to periodically examine the "availability" of such capability to all Americans.[8]

4.        For the purposes of the Report, we propose to consider as the Commission's broadband universal service goals universal deployment, affordability, adoption, availability, and equitable access to

---

[1] Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429 (2021) (Infrastructure Act).

[2] Infrastructure Act, div. F, tit. I, § 60104(c).

[3] *Id.* § 60104(c)(2).

[4] *Id*. § 60104(b), (c).

[5] *Id.* § 60104(c)(3)(A).

[6] 47 U.S.C. § 1302.

[7] 47 U.S.C. § 1302(a), (b).

[8] 47 U.S.C. § 1302(b).  *See also* 47 U.S.C. § 254(b)(1)-(3) (directing Commission to "base policies for the preservation and advancement of universal service" on principles including ensuring that "[q]uality services … be available at just, reasonable, and affordable rates" and that "[c]onsumers in all regions of the Nation . . . should have access to telecommunications and information services, including . . . advanced telecommunications and information services, that are reasonably comparable to those services provided in urban areas" and at reasonably comparable rates).

broadband throughout the United States, and we seek comment on this proposal.  The Report will focus on examining options and making recommendations for Commission and Congressional actions toward achieving those goals.  This Notice identifies multiple provisions in the Act intended to promote our universal service goals for broadband.  Parties should focus comments on how the various broadband-related provisions of the Act will impact the effectiveness of our efforts to achieve those goals.

### C. Broadband Provisions in the Infrastructure Act

#### 1. Broadband Equity, Access, and Deployment Program

5.      Section 60102 of the Act directs the National Telecommunications and Information Administration (NTIA) to establish the Broadband Equity, Access, and Deployment Program (BEAD Program), through which NTIA will allocate $42.45 billion to states for grants "to bridge the digital divide."[9]  NTIA will provide minimum allocations of $100 million for each state and $100 million to be divided equally among the U.S. Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands.[10]  Remaining funds will be allocated using a formula based on total unserved locations in each state.[11]  The Act instructs states to award funding in a way that gives priority to projects that will provide service to unserved locations, then to underserved locations, and next to community anchor institutions.[12]  Broadband networks funded by the BEAD Program must provide download speeds of at least 100 Mbps and upload speeds of at least 20 Mbps and "latency that is sufficiently low to allow reasonably foreseeable, real-time, interactive applications."[13]  Grant recipients must provide service to every customer that desires broadband service in the project area and offer at least one low-cost service option for eligible subscribers.[14]

#### 2. The Affordable Connectivity Program

6.      As part of the Act, Congress appropriated $14.2 billion for the Commission's new Affordable Connectivity Program, which will extend and replace the existing Emergency Broadband Benefit (EBB) Program that was created to help families and households struggling to afford internet service during the COVID-19 pandemic.[15]  The Affordable Connectivity Program modifies the EBB Program eligibility criteria[16] and reduces the maximum monthly subsidy from $50 to $30, but maintains the maximum $75 per month subsidy for qualifying households on Tribal lands.[17]  The Act also directs the Commission to establish a mechanism for service providers in high-cost areas to provide a benefit up to the $75 amount provided on Tribal lands if the service provider can show that the lower benefit would

---

[9] Infrastructure Act, div. F, tit. I, *Id.*, § 60102(b)(1).

[10] *Id.* § 60102(c)(2)(A), (B).  Puerto Rico is included in the Act's definition of State.  *Id.* § 60102(a)(2)(M) (*citing* 47 U.S.C. § 942).

[11] *Id.* § 60102(c)(3)(B).

[12] *Id.* § 60102(h)(1)(A).

[13] *Id.* § 60102(h)(4)(A)(i).  Networks must also be reliable, with outages not exceeding, on average, 48 hours over any 365-day period. *Id.*

[14] *Id.* § 60102(h)(4)(A)(ii), (B),(C).

[15] *Id.* § 60502.

[16] The Affordable Connectivity Program removes substantial loss of income and eligibility for a provider's COVID-19 program as qualifying criteria, adds participation in the Special Supplemental Nutrition Program for Women, Infants, and Children (WIC) as a qualifying program, and expands the income eligibility to those who are at or below 200% of the Federal Poverty Guidelines.  *Id.* § 60502(b)(1).

[17] The amendments removing and adding certain qualifying eligibility programs, changing the benefit level, and making other modifications to the EBB Program requirements are "delayed amendments" that do not take effect immediately.  *Id.* § 60502(b)(2).

cause economic hardship.[18]  The Affordable Connectivity Program retains the definition of connected device and the reimbursement rate for such devices used in the EBB Program and states that participating providers may be reimbursed up to $100 for a connected device delivered to the household, provided that the "charge to such eligible household is more than $10 but less than $50 for such connected device."[19] The Act makes several other modifications to the new Affordable Connectivity Program, including allowing consumers to apply the benefit to any internet service offering of a participating provider; banning credit check requirements; requiring participating providers to carry out public awareness campaigns and inform new or renewing subscribers about the existence of the Affordable Connectivity Program; requiring the Commission to establish a dedicated complaint process, expeditiously investigate complaints and enforce program compliance, and regularly issue reports about complaints; requiring service providers to inform consumers of the complaint process; and requiring the Commission to promulgate consumer protection rules related to the Affordable Connectivity Program.[20]  The Commission has initiated a proceeding to adopt final rules for the Affordable Connectivity Program and is seeking comment on the requirements for the program and a timeline for its rapid implementation.[21]

### 3.        Additional NTIA Initiatives in the Infrastructure Act

7.        The Act also directs NTIA to establish the State Digital Equity Capacity Grant Program to promote state-level broadband adoption programs and appropriates $60 million for state planning grants and $1.4 billion for state capacity grants.[22]  The Act further appropriates $1.25 billion for NTIA to establish the Digital Equity Competitive Grant Program within the Department of Commerce to fund eligible programs that do not otherwise receive funding from the State Digital Equity Capacity Grant Program.[23]  NTIA, in consultation with the Commission, is required to establish a website within two years that allows consumers to determine if they are eligible for federal or state broadband subsidies or low-income broadband service plans.[24]  The Act requires NTIA, in consultation with the Commission and other federal agencies, to submit annual reports to Congress detailing grants awarded under the equity programs and evaluating those grants.[25]

8.        Section 60401 of the Infrastructure Act provides $1 billion for NTIA to establish a program to make "grants on a technologically-neutral, competitive basis to eligible entities for the construction, improvement, or acquisition of middle mile infrastructure."[26]  Grant recipients must commit to a five-year buildout,[27] be able to support retail broadband service,[28] use the most recent mapping data

---

[18] Consolidated Appropriations Act, div. N, tit. IX, § 904(a)(7)(B), *amended by* Infrastructure Act, div. F, tit. V, § 60502(a)(2)(G)(i).

[19] Infrastructure Act, div. F, tit. V, §§ 60502(a)(1)(C)(iii), (a)(2)(D), (a)(2)(F); Consolidated Appropriations Act, div. N, tit. IX, § 904(b)(5) (2021).

[20] Infrastructure Act, div. F, tit. V, § 60502(a)(3)(B)(ii), Consolidated Appropriations Act, div. N, tit. IX, §§ 904(b)(7)(A)(i), 904(b)(7)(A)(ii), 904(b)(8), 904(b)(9), 904(b)(10), 904(b)(11).

[21] *Wireline Competition Bureau Seeks Comment on the Implementation of the Affordable Connectivity Program*, WC Docket No. 21-450, Public Notice, DA 21-1453 (WCB rel. Nov. 18, 2021).

[22] Infrastructure Act, div. F, tit. III, § 60304(k), div. J, tit. II.

[23] Infrastructure Act, div. F, tit. III, § 60305, div. J, tit. II.

[24] Infrastructure Act, div. F, tit. I, § 60102(j)(4)(A).

[25] Infrastructure Act, div. F, tit. III, § 60306(a),(c).

[26] Infrastructure Act, div. F, tit. IV, § 60401(c), (h), div. J, tit. II.

[27] Infrastructure Act, dif. F, tit. IV, § 60401(e)(2).

[28] *Id.* § 60401(e)(3)(A).

available from either Commission, state or Tribal sources, or speed and usage surveys,[29] and share the location of all middle mile infrastructure constructed with grant funds.[30]  Priority is to be given to applications that satisfy two or more conditions from the list in section 60401(d)(2).[31]  Entities receiving grants must agree to prioritize: (1) connecting to last mile networks that provide or plan to provide broadband service to households in unserved areas; (2) connecting non-contiguous trust lands; or (3) offering wholesale broadband service at reasonable rates on a carrier neutral basis.[32]

> **4.     Additional Infrastructure Act Provisions Impacting the Commission**

9.     Several additional provisions in the Infrastructure Act direct the Commission to take actions to promote the Commission's universal service goals of universal deployment, affordability, adoption, availability, and equitable access to broadband throughout the United States or direct other federal agencies to take actions that will impact the Commission's work to achieve our universal service goals.

10.     The Act includes provisions to aid the Broadband Data Collection.[33]  Service providers will be required to provide, with 60-days' notice, any information requested by the Commission that is necessary to augment the Broadband Data Collection or the Form 477 data collection.[34]  The Act also requires the Secretary of Commerce to provide the Commission with "a count of the aggregate number of housing units in each census block" for inclusion in the Broadband Serviceable Location Fabric.[35]

11.     Section 60504 directs the Commission to adopt rules requiring service providers to display "consumer broadband labels" that provide easy-to-understand information on broadband prices, speeds, and network practices.[36]  Section 60506 directs the Commission to combat digital discrimination by adopting rules to "facilitate equal access to broadband internet access service," working with the Department of Justice to prohibit deployment discrimination, developing best practices for states and localities, and amending Commission complaint procedures to accept digital discrimination complaints.[37]

12.     The Infrastructure Act also includes several provisions that direct other federal agencies to incorporate promoting broadband deployment and sharing broadband data into their work.  For example, the Act creates a new High Speed Broadband deployment initiative within the Appalachian

---

[29] *Id.* § 60401(e)(3)(B).

[30] *Id.* § 60401(e)(3)(B)(ii)(II).

[31] Applications that meet two or more of the following conditions must be given priority: (1) the eligible entity adopts fiscally sustainable middle mile strategies; (2) the eligible entity commits to offering non-discriminatory interconnect to terrestrial and wireless last mile broadband providers and any other party making a bona fide request; (3) the eligible entity identifies specific terrestrial and wireless last mile broadband providers that have expressed written interest in interconnecting with middle mile infrastructure planned to be deployed by the eligible entity and demonstrated sustainable business plans or adequate funding sources; (4) the eligible entity has identified supplemental investments or in-kind support (such as waived franchise or permitting fees) that will accelerate the completion of the planned project; and (5) the eligible entity has demonstrated that the middle mile infrastructure will benefit national security interests of the United States and the Department of Defense.  *Id.* § 60401(d)(2).

[32] *Id.* § 60401(e)(1).

[33] *See* FCC, *Broadband Data Collection*, https://www.fcc.gov/BroadbandData (last visited Dec. 15, 2021); 47 U.S.C. § 641 *et seq*.

[34] Infrastructure Act, div. F, tit. I, § 60103(b), (c).

[35] *Id.* § 60103(d)(1); *see also* 47 U.S.C. § 642(b)(1)(B).

[36] Infrastructure Act, div. F, tit. IV,. § 60504; *see also Consumer and Governmental Affairs, Wireline Competition, and Wireless Telecommunications Bureaus Approve Open Internet Broadband Consumer Labels*, Public Notice, 31 FCC Rcd 3358 (CGB, WCB, WTB 2016).

[37] Infrastructure Act, div. F, tit. I, § 60506.

Regional Commission,[38] requires the Department of Transportation to consider coordination with broadband infrastructure projects when making rural surface transportation grants,[39] and directs the U.S. Forest Service to allow the use of funding to counties from the Secure Rural Schools program to be used to extend broadband access to schools or fund technology to access the internet outside of school.[40]

### D.     Other Federal Programs Related to Broadband

13.     In addition to the Commission programs discussed, other pre-existing federal programs also are relevant to universal service, which we must factor into our analysis of how to best achieve our broadband goals.  The U.S. Department of Agriculture (USDA) has multiple programs to support broadband through the Rural Utilities Service (RUS).  Under the RUS, USDA provides loans, grants, and technical assistance to improve infrastructure in rural areas.  The Act provides an additional $2 billion to the RUS Distance Learning, Telemedicine, and Broadband Program.[41]  The Community Connect program provides grants to eligible applicants to fund broadband infrastructure and access to broadband service for facilities, such as public safety, health care, and education facilities, that serve communities in eligible rural areas.[42]  The ReConnect Program provides loans and grants for the costs of construction, improvement, or acquisition of facilities and equipment needed to provide broadband service in eligible rural areas.[43]  Other programs available under the RUS include the Rural Broadband Access Loan and Loan Guarantee Program,[44] the Telecommunications Infrastructure Program,[45] and the Distance Learning and Telemedicine Program.[46]  In addition, USDA has a Rural Health Care Pilot Grant Program.[47]  The Department of Health and Human Services (HHS) also has programs related to supporting broadband for telehealth purposes.[48]

---

[38] Infrastructure Act. div. A, tit. I, subtitle E, §11506(d).

[39] *Id.*§11132(a).

[40] Infrastructure Act, div. D, tit. XII, § 41202.

[41] Infrastructure Act, div. J, tit. II.

[42] *See* U.S. Department of Agriculture, Rural Development, Community Connect Grants, https://www.rd.usda.gov/programs-services/community-connect-grants (last visited Dec. 15, 2021).

[43] *See* U.S. Department of Agriculture, ReConnect Loan and Grant Program, https://www.usda.gov/reconnect (last visited Dec. 15, 2021).

[44] *See* U.S. Department of Agriculture, Rural Development, Rural Broadband Access Loan and Loan Guarantee, https://www.rd.usda.gov/programs-services/rural-broadband-access-loan-and-loan-guarantee (last visited Dec. 15, 2021).

[45] *See* U.S. Department of Agriculture, Rural Development, Telecommunications Infrastructure Loans & Loan Guarantees, https://www.rd.usda.gov/programs-services/telecommunications-infrastructure-loans-loan-guarantees (last visited Dec. 15, 2021).

[46] *See* U.S. Department of Agriculture, Rural Development, Distance Learning & Telemedicine Grants, https://www.rd.usda.gov/programs-services/distance-learning-telemedicine-grants (last visited Dec. 15, 2021).

[47] American Rescue Plan Act of 2021, P.L. 117-2, title I, § 1002 (Mar. 11, 2021) (American Rescue Plan Act).  *See* U.S. Department of Agriculture, Rural Development, Emergency Rural Health Care Grants, https://www.rd.usda.gov/erhc (last visited Dec. 15, 2021).

[48] HHS supports the Telehealth Broadband Pilot program, which is a three-year program aimed at improving access to healthcare and telehealth.  This program is the result of a joint effort between HHS, USDA, and the FCC.  *See* Health Resources & Services Administration, Office for the Advancement of Telehealth, https://www.hrsa.gov/rural-health/telehealth (last visited Dec. 15, 2021).  In addition, funding was awarded through the American Rescue Plan Act to the Indian Health Service (IHS) within HHS for information technology, telehealth infrastructure, and improving the IHS electronic health records system.  *See* https://www.ihs.gov/coronavirus/ (last visited Dec. 15, 2021).

14.     The Department of the Treasury has several programs created by the American Rescue Plan Act of 2021 that can be used to fund broadband projects.  Under the Coronavirus State and Local Fiscal Recovery Funds, funding is available to support state, local, and Tribal governments in responding to the impact of COVID-19 and efforts to contain COVID-19 in their communities, and such funding will be available for costs incurred by December 31, 2024.[49]  These funds can be used to make necessary investments in broadband, water, or sewer infrastructure.  The Coronavirus Capital Projects Fund is available to states, territories, and Tribal governments for funding critical capital projects that directly enable work, education, and health monitoring, including remote options, in response to the COVID-19 public health emergency.[50]

15.     Several NTIA programs created by the Consolidated Appropriations Act of 2021 also provide funding for broadband deployment, affordability, adoption, availability, and equitable access, including the Connecting Minority Communities Pilot Program, the Broadband Infrastructure Deployment Grant Program, and the Tribal Broadband Connectivity Program.[51]  The Connecting Minority Communities Pilot Program is focused on creating a pilot program that can be used to support broadband access and adoption for Historically Black Colleges and Universities (HBCUs), Tribal colleges and universities, minority-serving institutions, and anchor communities.[52]  The Broadband Infrastructure Deployment Grant Program will issue grants to covered partnerships for covered broadband projects that are competitively and technologically neutral.[53]  These "Covered Partnerships" are defined as partnerships between a state, or one or more political subdivisions of a state and providers of fixed broadband service.[54]  The Tribal Broadband Connectivity Program provides grants to entities, including Tribal governments, Tribal colleges or universities, and Tribal organizations, for the purposes of supporting broadband connectivity on Tribal lands.[55]

### E.     Interagency Coordination

16.     The Commission has a history of coordinating with RUS and NTIA on matters relating to broadband funding.[56]  In December 2020, Congress passed the Broadband Interagency Coordination Act

---

[49] American Rescue Plan Act, tit. IX, § 9901; *See* Indian Health Service, Coronavirus (COVID-19), https://home.treasury.gov/policy-issues/coronavirus/assistance-for-state-local-and-tribal-governments/state-and-local-fiscal-recovery-funds (last visited Dec. 15, 2021); 47 CFR §35.5.  There is not a specific application deadline except for Tribal governments, which must make the initial request for funds by June 21, 2021.  *See* U.S. Department of the Treasury, Coronavirus State and Local Fiscal Recovery Funds for Tribal Governments, https://home.treasury.gov/policy-issues/coronavirus/assistance-for-state-local-and-tribal-governments/state-and-local-fiscal-recovery-fund/tribal-governments (last visited Dec. 15, 2021).

[50] American Rescue Plan Act, tit. IX, § 9901.  *See* U.S. Department of the Treasury, Capital Projects Fund, https://home.treasury.gov/policy-issues/coronavirus/assistance-for-state-local-and-tribal-governments/capital-projects-fund (last visited Dec. 15, 2021).  The deadline for states, territories, and freely associated states to request funding is December 27, 2021.  *See id.*  The deadline for Tribal governments to request funding is June 22, 2022.

[51] The Act appropriates an additional $2 billion for the Tribal Broadband Connectivity Program.  Infrastructure Act, div. J, tit. II.

[52] Consolidated Appropriations Act, 2021, Public Law 116-260, div. N, tit. IX, § 902, 134 Stat. 2122 (Dec. 27, 2020) (Consolidated Appropriations Act).  Funding can be used to support devices, service, and adoption/digital literacy (but not infrastructure).  *See id.*

[53] *See* Consolidated Appropriations Act, div. N, tit. IX, § 905(d); https://www.grants.gov/web/grants/view-opportunity.html?oppId=333684 (last visited Dec. 15, 2021).

[54] Consolidated Appropriations Act, div. N, tit. IX, § 905(a)(5).

[55] *See* Consolidated Appropriations Act, div. N, tit. IX, § 905(c); https://www.grants.gov/web/grants/view-opportunity.html?oppId=333974 (last visited Dec. 15, 2021).

(BICA), as part of the Consolidated Appropriations Act of 2021.[57]  The BICA required the FCC, USDA, and NTIA to enter into an agreement within six months to provide for sharing information about existing or planned projects that have received, or will receive, funding through the FCC's High-Cost programs and programs administered by NTIA and the FCC.[58]  The BICA also mandates that the interagency agreement requires the agencies to "consider basing the distribution of funds for broadband deployment" under the referenced programs "on standardized data regarding broadband coverage."[59]  Additionally, the BICA requires the FCC to seek comment and release, within eighteen months of the BICA's enactment, a report on: (1) the effectiveness of the agreement in facilitating efficient use of funds for broadband deployment; (2) the availability of Tribal, State, and local data regarding broadband deployment and the inclusion of that data in interagency coordination; and (3) modifications to the agreement that would improve the efficiency of interagency coordination.[60]  On June 25, 2021, the agencies announced that they had entered into the agreement and representatives of the agencies have been meeting regularly pursuant to the agreement.[61]

## III.   IMPACT OF THE INFRASTRUCTURE ACT ON EFFECTIVELY ACHIEVING UNIVERSAL SERVICE GOALS

17.     In this section, we seek comment on how the Commission shall report on ways to "improve its effectiveness in achieving the universal service goals for broadband" as required by the Infrastructure Act as well as how to evaluate the impacts of the Act and other recent legislation on our work and the work of other federal agencies to achieve our universal service goals for broadband.  These evaluations will inform our recommendations for further action.

18.     As discussed, for the purpose of the Report, we propose to define the Commission's universal service goals to be universal deployment, affordability, adoption, availability, and equitable access to broadband throughout the United States.  These goals are consistent with the Act's definition of "universal service goals for broadband" as "the statutorily mandated goals for universal service for advanced telecommunications capability under section 706 of the Telecommunications Act of 1996"[62] and the Commission's previous interpretations of section 706.  We seek comment on the proposed universal service goals for broadband.  Is our proposed interpretation of section 706 appropriate in the context of the Report?  Should we consider additional or alternative goals for the purposes of the Report?  How should we measure progress toward the goals?

19.     We also seek comment on whether our universal service goals for broadband should evolve over time.  The USF programs as first established supported primarily voice services.[63]  In 2011,

---

(Continued from previous page)

[56] *See, e.g.*, NTIA, American Broadband Initiative, Milestone Report at 26 (2019), https://www.ntia.doc.gov/files/ntia/publications/american_broadband_initiative_milestones_report.pdf; and GAO, Broadband: Observations on Past and Ongoing Efforts to Expand Access and Improve Mapping Data at 30-31 (2020), https://www.gao.gov/products/gao-20-535.

[57] Consolidated Appropriations Act, div. FF, tit. IX, § 904.

[58] *Id*. § 904(b)(2).

[59] *Id.* § 904(b)(3)(C).

[60] *Id.* § 904(b)(4)(A), (B).

[61] Press Release, FCC, FCC, NTIA, and USDA Announce Interagency Agreement to Coordinate Broadband Funding Deployment (June 25, 2021), https://www.fcc.gov/document/fcc-ntia-usda-sign-interagency-pact-broadband-funding-deployment.

[62] Infrastructure Act, div. F, tit. I, § 60104(a)(2).

[63] *Federal-State Joint Board on Universal Service*, Report and Order, 12 FCC Rcd 8776, 8790, para. 22 (1997) (*First Report and Order*) (establishing as eligible telecommunications services "voice grade access to the public switched network, with the ability to place and receive calls; Dual Tone Multifrequency (DTMF) signaling or its

(continued....)

the Commission recognized that fixed and mobile broadband had become "crucial to our nation's economic growth, global competitiveness, and civic life,"[64] and as such, comprehensively transformed the High-Cost programs "from supporting just voice service to supporting voice and broadband, both fixed and mobile, through IP networks."[65]  Similar reforms followed in the other programs:  the Healthcare Connect Fund to provide support for broadband networks for rural healthcare providers;[66] the E-Rate program to increase its emphasis on supporting high-speed broadband and Wi-Fi;[67] and the Lifeline program to provide support for broadband for low-income consumers.[68]  Moreover, the Commission has increased the benchmark for "advanced telecommunications capability"—or broadband—under section 706 of Telecommunications Act from 200 kbps/200 kbps in 1997 to 4/1 Mbps in 2010 and to 25/3 Mbps in 2015.[69]  The Commission has also progressively increased the minimum required speed of broadband service in many of its High-Cost programs.[70]  We therefore seek comment on how our programs may continue to evolve in light of the Act, but "not in any way reduce the congressional mandate to achieve the universal service goals for broadband."[71]

A.     **The Commission's Existing Universal Service Programs**

20.     We first seek comment on how to best evaluate the effectiveness of the existing USF programs in achieving our universal service goals for broadband.[72]  We ask commenters to address

(Continued from previous page) ————————————————

functional equivalent; single-party service; access to emergency services, including in some instances, access to 911 and enhanced 911 (E911) services; access to operator services; access to interexchange services; access to directory assistance; and toll limitation services for qualifying low-income consumers."); *Connect America Fund et al.*, Report and Order and Further Notice of Proposed Rulemaking, 26 FCC Rcd 17663, 17667, para. 2 (2011) (*2011 Connect America Fund Order*) ("For decades, the Commission and the states have administered a complex system of explicit and implicit subsidies to support voice connectivity to our most expensive to serve, most rural, and insular communities.").

[64] *2011 Connect America Fund Order*, 26 FCC Rcd at 17667-68, para. 3.

[65] *Id.* at 17670, para. 10.

[66] *Rural Healthcare Support Mechanism*, Report and Order, 27 FCC Rcd 16678, 16681, para. 3 (2012) (*HCF Order*).

[67] *Modernizing the E-Rate Program for Schools and Libraries*, Report and Order and Further Notice of Proposed Rulemaking, 29 FCC 8870, 8873, para. 5 (2014)

[68] *See Lifeline and Link Up Reform and Modernization et al.*, Report and Order and Further Notice of Proposed Rulemaking, 27 FCC Rcd 6656 at 6662-3, para. 12 (2012) (*2012 Lifeline Order*); *Lifeline and Link Up Reform and Modernization*, Third Report and Order, Further Report and Order, Order on Reconsideration, 31 FCC Rcd 3962, 3964, para. 5 (2016) (*2016 Lifeline Order*).

[69] *See Inquiry Concerning the Deployment of Advanced Telecommunications Capability to All Americans in a Reasonable and Timely Fashion, and Possible Steps to Accelerate Such Deployment Pursuant to Section 706 of the Telecommunications Act of 1996, as Amended by the Broadband Data Improvement Act*, 2015 Broadband Progress Report and Notice of Inquiry on Immediate Action to Accelerate Deployment, 30 FCC Rcd 1375, 1378, para. 3 (2015); *Inquiry Concerning the Deployment of Advanced Telecommunications Capability to All Americans in a Reasonable and Timely Fashion, and Possible Steps to Accelerate Such Deployment Pursuant to Section 706 of the Telecommunications Act of 1996, as Amended by the Broadband Data Improvement Act; A National Broadband Plan for our Future*, Sixth Broadband Deployment Report, 25 FCC Rcd 9556, 9563, para. 11 (2010).

[70] *See, e.g.*, *Connect America Fund et al.*, Report and Order, 29 FCC Rcd 15644 (2014); *Rural Digital Opportunity Fund*, Report and Order, 35 FCC Rcd 686 (2020) (*RDOF Order*).

[71] Infrastructure Act, div. F, tit. I, § 60104(c)(3)(A).

[72] The four USF programs are High-Cost, Lifeline, Schools and Libraries (also known as E-Rate) and the Rural Health Care (RHC) programs.  With respect to the Connected Care Pilot Program, the COVID-19 Telehealth Program, the Emergency Broadband Benefit, and the Emergency Connectivity Fund, we recognize that these programs are likely too new to conduct a meaningful analysis, especially because the relevant data may not be

(continued….)

whether and how the current USF programs are achieving the proposed broadband goals of universal deployment, affordability, adoption, availability, and equitable access to broadband throughout the United States, and to identify any obstacles that stand in the way of accomplishing those goals. We also seek comment on whether and how the Commission should evaluate USF program performance.[73] How should we account for the role that non-permanent programs created by Congress in response to the COVID-19 pandemic (EBB, ECF, and the COVID-19 Telehealth Program) have played in supplementing the USF programs? We seek comment on data the Commission should use to evaluate and improve USF program performance. What additional data on USF programs, either from providers or participants, should the Commission be collecting? In addition to providing a rationale for why the Commission should collect any additional data, we encourage commenters to discuss the costs to either participants or providers from collecting the data. Would the benefits provided by the collection of any additional data outweigh the increased burden on program participants? Are there ways for the Commission to minimize data reporting burdens while still improving the quality of the USF data collected? Regarding the USF program data currently collected by the Commission, is there a need to standardize data collection either within or across USF programs? Should the Commission, to the extent possible, establish uniform guidelines for collecting, organizing, and storing data across USF programs? How do we balance the potential benefits from increased access to program data with the need to maintain confidentiality of Personal Identifiable Information (PII)?

### B.    Implications of the Act on the Commission's Universal Service Goals

21.    We next seek comment on how to analyze the Act's potential impacts on our proposed broadband goals of universal deployment, affordability, adoption, availability, and equitable access to broadband throughout the United States. Per Congressional direction, the Report must be submitted to Congress within 270 days of enactment of the Infrastructure Act.[74] The Report must consider the potential impacts of the Act and make recommendations for further actions without information on specific grants.

22.    In addition to funding the Commission's Affordable Connectivity Program, the Act contains numerous programs to be implemented by NTIA, such as the BEAD Program, the State Digital Equity Capacity Grant Program and its federal counterpart, the Middle Mile Infrastructure Grant Program, and the Tribal Broadband Connectivity Program, as well as the State and Local Cybersecurity Grant Program to be implemented by the Department of Homeland Security[75] and the RUS Distance Learning, Telemedicine, and Broadband Program.[76] We invite commenters to identify any other provisions in the Act or any other recent legislation that constitute "legislation that addresses [the broadband universal service] goals" that we should consider in this proceeding.[77] Please describe the relationships between these programs and our universal service programs. We note that the Report must be submitted to Congress by August 12, 2022. How much data from the BEAD Program, other programs created by the Infrastructure Act, and any other recent legislation will we able to incorporate meaningfully into the Report?

(Continued from previous page) ──────────────────

available within the time frame when we must complete the Report. Nevertheless, we welcome the submission of data from these programs to the extent it is available.

[73] For example, we could use a process evaluation approach, an outcome evaluation approach, or an impact analysis. S*ee, e.g.*, Chapter 7, "Evaluation as a Tool for Improving Federal Programs" in United States President and U.S. Council of Economic Advisers. *Economic Report of the President: Transmitted to the Congress*. March 2014. U.S. Govt. Printing Office, 2014.

[74] Infrastructure Act, div. F, tit. I, § 60104(c)(1).

[75] Infrastructure Act, div. G, tit. VI, subtitle B, § 70612.

[76] Infrastructure Act, div. J, tit. I.

[77] *See* Infrastructure Act, div. F, tit. I, § 60104(c)(1).

23.    We note that Congress indicated its preference that "Federal agencies responsible for supporting broadband deployment, including the Commission, the Department of Commerce, and the Department of Agriculture, to the extent possible, should align the goals, application and reporting processes, and project requirements with respect to broadband deployment supported by those agencies."[78]  To what extent is this possible?  Do our goals for universal service, affordability, adoption, availability and equitable access differ significantly from the goals of other agencies, and if so, how?  As noted above, pursuant to the Broadband Interagency Coordination Act, we have entered into an Interagency Agreement with USDA and NTIA to promote coordination of our respective broadband efforts.  We invite comment on what, if any, additional coordination efforts may be appropriate.  Are there opportunities that should be explored for interagency coordination for purposes of the Lifeline and Affordable Connectivity Programs, particularly with other agencies that have programs to assist low income consumers?[79]  We also invite commenters to identify differences between our application and reporting processes and project requirements from those of other agencies' procedures and requirements.  Could we make it easier and less costly for service providers and others to comply with each agency's procedures and requirements by making them more consistent?  If so, how?  How does this statutory directive intersect with other provisions in the Infrastructure Act that require coordination between the Commission, NTIA, and other agencies?

24.    How should the Report account for differences in program structures?  With minor exceptions, USF programs disburse funding pursuant to uniform nationwide rules.  By contrast, the BEAD Program, for instance, will operate pursuant to a framework established by NTIA, but each state will develop a different plan for disbursing funds.[80]  Thus, it may be difficult to develop "apples-to-apples" comparisons between the BEAD Program-funded projects and those funded by the USF.  How can the Commission reconcile these differences for the purposes of the Report?

25.    More broadly, how should the Report account for the relationship between projects to be funded by the Act and those funded by USF?  The Act expresses a general expectation that NTIA and the states will harmonize their grant processes with programs run by the Commission and RUS.[81]  We note that the Act does not set forth any specific mechanism for NTIA, the states, and the Commission to "coordinate" their programs or "align" their funding decisions.[82]  The agreement entered into under the BICA, however, calls for the Commission, NTIA, and USDA to "consider basing the distribution of funds for broadband deployment" under their relevant programs "on standardized data regarding broadband

---

[78] *Id.* § 60102(m).

[79] With respect to the Affordable Connectivity Program, the Act includes language specifying that the Secretary of Agriculture, the Secretary of Education, and the Secretary of Health and Human Services shall enter into a memorandum of understanding with the Universal Service Administrative Company (USAC) to provide for the expeditious sharing of data through the National Verifier, or any successor system, for the purposes of verifying consumer eligibility for the program.  *See* Infrastructure Act, div. F, title V, § 60502(e).

[80] *See* Infrastructure Act, div. F, tit. I, § 60102(e)(3), (4).

[81] *Id.* § 60102(j)(1)(D) (directing NTIA to coordinate with the Commission and RUS by providing reports "to be used when determining whether to award funds for the deployment of broadband under any program administered by those agencies."); § 60102(e)(4)(A)(iii) (directing states to "align the use of grant funds…with funds available from other Federal programs that support broadband deployment and access" in order to "ensure efficient and effective use of taxpayer funds."  *See also id.* § 60102(k) (Notwithstanding any other provision of law—(1) an entity that has received amounts from the Federal Government or a State or local government for the purpose of expanding access to broadband service may receive a subgrant … in accordance with this section; and (2) the receipt of a subgrant … shall not affect the eligibility of the entity to receive the amounts from the Federal Government or a State or local government"); *id.* § 60102(e)(4)(A)(i)(I)(bb) (directing states to "align the grant funds allocated to [an] eligible entity, where practicable, with the use of other funds that the eligible entity receives from the Federal Government … for related purposes.").

[82] *Id.* § 60102(j)(1)(D); § 60102(e)(4)(A)(iii).

coverage."[83]  Does the BICA standard provide a useful basis to inform harmonization of the agencies' respective funding programs?  Should the Report recommend an additional, or a different, voluntary framework for interagency coordination and coordination with states, both with respect to BEAD Program grants and future broadband policy initiatives?

26.     The Act contains numerous programs that are complementary to the Commission's USF programs.  How will the existence of the complementary programs impact our goals of universal deployment, affordability, adoption, availability, and equitable access to broadband throughout the United States?  For instance, the Middle Mile Infrastructure Grant Program provides funding for the construction and maintenance of middle mile segments in broadband networks, while the Commission's High-Cost program generally funds last-mile networks.  The BEAD Program requires recipients of support to offer a low-cost option, similar to offerings that might be supported by the Commission's Lifeline and Affordable Connectivity Programs.  In light of these complementary programs, how should the Commission evaluate its existing universal service programs and goals?

27.     Lastly, how can we cooperate with other federal agencies to prevent unnecessary duplication of broadband funding (*i.e.*, representing to both agencies that a particular activity is supported by that agency's program without disclosing that the same activity is supported by the other agency)?[84]  Are there measures we can take to further our goal of ensuring that finite support is used efficiently and complementarily?[85]  How can we harmonize funding to a single provider, for example, receiving grant funding for deployment from the BEAD Program and also receiving funding for operating expenses and maintenance from the USF High-Cost program?  How can we carry out enforcement efforts without unduly discouraging beneficial deployment or other activities that other agencies' programs seek to encourage?

### C.     Impact on Other Federal Broadband Programs

28.     As discussed above, a number of other programs administered by the USDA, Treasury Department, and NTIA are similarly designed to support broadband deployment.  What impact will the Act have on these federal broadband programs and how will that affect the Commission's ability to achieve its universal service goals?

## IV.     POTENTIAL RECOMMENDATIONS FOR FUTURE COMMISSION ACTION

29.     In this section, we seek comment on options for improving the Commission's effectiveness in achieving its universal service goals in light of the Infrastructure Act and request that commenters submit their feedback regarding recommendations on "further actions the Commission…could take to improve the ability of the Commission to achieve the universal service goals for broadband."[86]

---

[83] Interagency Agreement Between the Federal Communications Commission, U.S. Department of Agriculture, and the National Telecommunications and Information Administration of the U.S. Department of Commerce, Section 4, https://www.fcc.gov/document/fcc-ntia-usda-sign-interagency-pact-broadband-funding-deployment (June 25, 2021).

[84] For instance, the Rural Digital Opportunity Fund (RDOF) makes ineligible for support census blocks that are "served," including by CAF Phase II recipients, certain Rural Broadband Experiment support recipients, and by recipients of funding from a similar state or federal subsidy, including the U.S. Department of Agriculture's ReConnect Program.  *See RDOF Order*, 35 FCC Rcd at 690-92, paras. 9-13; *see also Rural Digital Opportunity Fund Phase I Auction Scheduled for October 29, 2020*, Public Notice, 35 FCC Rcd 6077, 6122, para. 119 (2020) (further requiring RDOF participants to certify compliance with all regulatory requirements needed to receive USF support).

[85] *See, e.g.*, *RDOF Order*, 35 FCC Rcd at 692, para. 13 & nn. 21-32; *see also id.* at 709, para. 45 n.135 ("A provider's deployment of broadband service in satisfaction of its Rural Digital Opportunity Fund obligation shall be independent from any other deployment obligation made as part of any other regulatory obligation or satisfy a provider's separate commitments made to the Commission or a state or local regulatory body as part of any other proceeding.").

### A.    High-Cost Program

30.    The universal service High-Cost program is designed to ensure that consumers in rural, insular, and high-cost areas have access to modern communications networks capable of providing voice and broadband service, both fixed and mobile, at rates that are reasonably comparable to those in urban areas.[87]  There are various mechanisms within the High-Cost program—each one tailored to the circumstances of the part of the United States and its territories being served.[88]  In general, the High-Cost program has supported both the initial construction and the ongoing operational expenses for supported networks.[89]  Support from the program goes to service providers over a certain term of years, and the support must be used to build and maintain voice and broadband capable networks meeting defined minimum speed and latency obligations.[90]  The Commission will disburse billions of dollars in support in the coming years for fixed network buildout and operations in unserved and underserved areas, through the various funds within the High-Cost program.[91]  The BEAD Program will focus on deploying new broadband infrastructure to unserved and underserved locations.  Even after the networks supported by these programs are constructed, providers will incur ongoing operating expenses as well as some capital

(Continued from previous page) ——————————————

[86] Infrastructure Act, div. F, tit. I, § 60104(c)(2).

[87] *See* 47 U.S.C. § 254(b)(3).

[88] The High-Cost programs mechanisms include: the Alternative Connect America Cost Model (ACAM), which provides funding based on a cost model to rate-of-return telephone companies to build broadband to a specific number of fixed locations in eligible areas; the Alternative Connect America Cost Model (ACAM) II, which provides funding to certain "rate-of-return" carriers to build broadband to a specific number of fixed locations in eligible areas; The Alaska Plan, which provides funding to "rate-of-return" and mobile carriers to build broadband to locations and populations in rural and remote parts of Alaska; the Connect America Fund Phase II (CAF Phase II) model-based support, which provides funding based on a cost model to telephone companies known as "price cap carriers" to build broadband to a specific number of fixed locations in eligible areas; the Connect America Fund Phase II Auction (CAF II Auction), which provides support to carriers and other entities that successfully bid in a 2018 auction to deploy broadband in areas where the incumbent price cap carrier did not accept CAF Phase II Model model-based funding and other price cap areas that are most costly to serve; the Connect America Fund Broadband Loop Support (CAF-BLS), which provides funding based on carrier costs and other financial data to smaller phone companies known as "rate-of-return" carriers to build broadband to a specific number of fixed locations in eligible areas; the Rural Broadband Experiments (RBE) program, which provides funding to telecommunications carriers that successfully bid for projects to deploy broadband in unserved price cap areas, including rural areas that are the most costly to serve; and the Rural Digital Opportunity Fund (RDOF), a fund to bring high speed fixed broadband service to rural homes and small businesses that lack it; and the Bringing Puerto Rico Together and Connect USVI Fund, which provides support for fixed and mobile services in Puerto Rico and the U.S. Virgin Islands.  In addition for mobile, frozen high-cost support is provided to legacy mobile Competition Eligible Telecommunications Carriers; and in October 2020, the Commission established the 5G Fund for Rural America.  *See generally 2011 Connect America Fund Order*, 26 FCC Rcd 17663; 47 CFR §§ 54.302-322, 801-806, 901-903, 1001-1021, 1301-1310, 1501-1515; *see also* Connect America Fund Broadband Map, *available at*: https://data.usac.org/publicreports/caf-map; Auction 904:  Rural Digital Opportunity Fund, *available at* https://www.fcc.gov/auction/904; 5G Fund, *available at* https://www.fcc.gov/5g-fund.

[89] *See, e.g.*, *First Report and Order*, 12 FCC Rcd at 8899, para 224 (stating that "the proper measure of cost for determining the level of universal service support is the forward-looking economic cost of constructing and operating the network facilities").

[90] For example, the CAF Phase II Auction provides support for buildouts for a 10-year term through 2025, but does not require carriers to deploy service to 100% of eligible populations or locations in a service area.  *2011 Connect America Fund Order*, 31 FCC Rcd at 5956, 5966, paras. 14, 45.  By contrast, the RDOF provides support for buildouts through 2027 via a reverse auction, and does require that carriers deploy service to 100% of eligible populations or locations in a service area.  *See RDOF Order*, 35 FCC Rcd at 688-89, paras. 6-7.

[91] The High-Cost program has a $4.5 billion annual budget.  *See* Universal Service Administrative Company, High Cost, Program Overview, https://www.usac.org/high-cost/program-overview/ (last visited Dec. 15, 2021).

expenses.  The High-Cost program currently funds mobile broadband deployment through support for legacy mobile Competitive Eligible Telecommunications Carriers, the Alaska Plan, and the Bringing Puerto Rico Together and Connect USVI Fund.

31.     We seek comment on the impact of the Infrastructure Act on the High-Cost program. What changes, if any, should we consider to the High-Cost program in light of the Infrastructure Act and other recent developments?  Are there changes that should be made in light of the additional funding provided by the Infrastructure Act?  How can we best coordinate the High-Cost program with the programs created by the Infrastructure Act to achieve our universal service goals, particularly the deployment of broadband to 100% of the people in the United States?  What role will the High-Cost program have in the future given the evolving level of universal service?  What data should be collected from recipients of the program, and how should this data collection take place?  How can we protect against waste, fraud, and abuse in the High-Cost program, particularly in light of the Infrastructure Act?

32.     Given that the networks deployed with funding from the BEAD program and other Infrastructure Act programs will still incur operational costs, particularly in the most difficult to serve areas, should we consider modifications to the High-Cost program to further support ongoing operating and maintenance costs of recently constructed broadband facilities to ensure that rates remain reasonably comparable?  Should the Commission coordinate with the BEAD Program to ensure that newly constructed networks have ongoing support?  At what point would support be necessary, if at all?  In light of the BEAD Program, how should the Commission approach next steps for the RDOF program or any successor program?[92]  Further, in light of the 100/20 Mbps service standard in the BEAD Program, should the Commission reconsider its service requirements for future High-Cost support?[93]  We seek comment on ways to allocate funding in the future, including reverse auctions.  Are there other incentive-based, competitive methods for allocating funding that would be effective and efficient?  Are there other distribution methodologies that the Commission should consider?  What impact should the BEAD Program have on the Commission's approach to high-cost support for mobile broadband?

**B.     Lifeline and the Affordable Connectivity Program**

33.     The Lifeline program was established in 1985 to help low-income consumers afford voice service[94] and has evolved to include support for broadband internet access service.[95]  The Commission first expanded Lifeline to support broadband in the *2012 Lifeline Order* by adopting the goal of ensuring the availability of broadband service for low-income Americans and amending program rules to permit the use of Lifeline support for bundled services that include broadband.[96]  In 2016, the Commission made further changes to shift the focus of Lifeline toward enabling low-income consumers to obtain and use broadband.[97]  The Commission allowed Lifeline support to be used for standalone fixed and mobile broadband and established minimum service standards to ensure those services would meet

---

[92] *RDOF Order*, 35 FCC Rcd at 689-90, paras. 8-9.

[93] *Id.* at 689-90, para. 8.

[94] *See 2012 Lifeline Order*, 27 FCC Rcd at 6662-63, para. 12.

[95] *2016 Lifeline Order*, 31 FCC Rcd at 3972, para. 30.

[96] *2012 Lifeline Order,* 27 FCC Rcd 6656 at 6673-74, 6792-23, paras. 33, 315.  The Commission also announced the creation a broadband pilot program "to gather data on whether and how the Lifeline program can be structured to promote the adoption and retention of broadband services by low-income households."  *Id.* at 6794-5, para. 323. The *2012 Lifeline Order* was adopted after a rulemaking proceeding acting on input from the Joint Board on Universal Service and recommendations presented in the 2010 National Broadband Plan.  *See 2012 Lifeline Order*, 27 FCC Rcd at 6658-59, para. 1.

[97] *2016 Lifeline Order*, 31 FCC Rcd at 3964, para. 6.

consumer needs.[98]  The Commission stated its actions were consistent with the universal service goals set forth in sections 254(b)(2) and (b)(3) of the Communications Act and also fulfilled the principle set forth in 254(c) that "[u]niversal service is an evolving level of telecommunications services that the Commission shall establish periodically under this section, taking into account advances in telecommunications and information technologies and services."[99]  Presently, Lifeline offers a discount of $5.25 for voice and $9.25 for broadband that meet the relevant minimum standards.[100]  In addition, in Tribal lands, an additional discount of $25.00 is available.

34.     In 2020, Congress appropriated $3.2 billion to make broadband more affordable to low-income consumers during the COVID-19 pandemic and directed the Commission to establish the EBB Program.[101]  As part of the Infrastructure Act, Congress appropriated an additional $14.2 billion for the new Affordable Connectivity Program, which extends the EBB Program and makes a number of changes.[102]  The EBB Program benefit provides up to $50/month discount for qualified consumers for broadband service and associated equipment rentals and up to $75/month for qualified consumers on Tribal lands.  It also provides a discount of up to $100 on certain internet-connected devices purchased through a participating provider if the household contributes toward the purchase price.  The Affordable Connectivity Program changes the support amount to $30/month but retains a $75/month discount for qualified consumers on Tribal lands and other consumers who receive service from providers in "high-cost areas" as defined by the Commission and NTIA.  The Affordable Connectivity Program maintains the one-time connected device reimbursement of up to $100 per household.

35.     The Lifeline program, the EBB Program and the upcoming Affordable Connectivity Program are similar in certain respects, but also fundamentally different in others.  While the EBB Program and Affordable Connectivity Program are funded through Congressional appropriations, Lifeline is funded through USF contributions.  Also, unlike Lifeline, the EBB Program is temporary in nature while the Affordable Connectivity Program is a longer term program.[103]  The EBB Program and Affordable Connectivity Program are designed to support broadband service only and, unlike Lifeline, cannot be used for standalone voice services.  In addition, the EBB Program and Affordable Connectivity Program offer a more substantial discount than the standard Lifeline discount, which is up to $9.25 per month for broadband, and up to an additional $25 per month for qualifying consumers on Tribal lands.[104]  Additionally, the EBB Program and Affordable Connectivity Program provide a discount for qualifying connected devices, and the Lifeline program does not offer any support for device purchases.  EBB Program and Affordable Connectivity Program benefits can also be applied toward services offered by

---

[98] *See id.*  Recently, the Bureau paused the increase in the minimum service standard requirements for mobile broadband data capacity for one year in order, "… to gather more relevant data and to consider whether a different long-term approach is warranted." *Lifeline and Link Up Reform and Modernization, et al.,* Docket Nos. 11-42 et al., Order, DA 21-1389, at p. 8, para. 19 (WCB rel. Nov. 5, 2021).

[99] *See 2016 Lifeline Order*, 31 FCC Rcd at 3972, para. 31; 47 U.S.C. §§ 254(b)(2)-(3).

[100] For bundled plans, a discount of $5.25 is available where the plan meets the voice minimum service standards only and a discount of $9.25 is available where the plan meets the broadband minimum service standards.

[101] Consolidated Appropriations Act, div. N, tit. IX, § 904(b)(1) (2020).  Section 904 of Division N – Additional Coronavirus Response and Relief, Title IX – Broadband Internet Access Service, in the Consolidated Appropriations Act established an Emergency Broadband Connectivity Fund of $3.2 billion.  *Id.* § 904(h)(2).

[102] Infrastructure Act, div. F, title V, § 60502(a); div. J, title IV.

[103] The EBB Program was implemented on a short-term, temporary basis and was designed to end once the program funds are exhausted or six months after the Department of Health and Human Services declares an end to the pandemic, whichever comes first.  Consolidated Appropriations Act, div. N, tit. IX, § 904(a)(8), (h)(2).  The Affordable Connectivity Program will remain available until the $14.2 billion appropriated for the program—more than four times the amount appropriated for the EBB Program—is expended.  *See* Infrastructure Act, div. J, tit. IV.

[104] *See* 47 CFR § 54.403.

service providers that have not been designated as Eligible Telecommunications Carriers (ETCs), whereas in Lifeline, the service provider must be a designated ETC by the states or, in limited circumstances, by the Commission.[105]  Under the new Affordable Connectivity Program, a participating provider is required to "allow an eligible household to apply the affordable connectivity benefit to any internet service offering of the participating provider, at the same terms available to households that are not eligible households."[106]  The Lifeline program rules do not contain a similar requirement.  We seek comment on how best to take into consideration these programmatic differences when formulating recommendations for the Report.

36.     We also seek comment on how the Commission can continue to ensure that the Lifeline program and Affordable Connectivity Program effectively achieve our universal service goals for broadband in light of the Infrastructure Act and other recent legislation.  What changes, if any, should we consider to the Lifeline program in light of the Infrastructure Act and other recent developments?  What, if any, of those changes would require changes in law in light of the Lifeline Program's statutory origin?[107]  What data should be collected from participants in the Lifeline program, and how should this data collection take place?  How can we best coordinate the Lifeline program and the Affordable Connectivity Program with the programs created by the Infrastructure Act to achieve the proposed universal service broadband goals, including ensuring affordable broadband to everyone?  What role will the Lifeline program and the Affordable Connectivity Program have in the future given the evolving level of universal service?  How can we protect against waste, fraud, and abuse in the Lifeline program and the Affordable Connectivity Program?

### C.     E-Rate and the Emergency Connectivity Fund Program

37.     The E-Rate program was authorized by Congress to, among other things, enhance, to the extent technically feasible and economically reasonable, access to advanced telecommunications and information services for all public and nonprofit elementary and secondary schools and libraries.[108]  Under the E-Rate program, eligible schools, libraries, and consortia (comprised of eligible schools and libraries) may request universal service discounts for eligible services and/or equipment (collectively, eligible services), including connections necessary to support broadband connectivity to and within eligible schools and libraries.[109]  Since 2014, the E-Rate program has succeeded in connecting more schools and libraries to much-needed broadband, but some eligible schools remain insufficiently connected.[110]

38.     Meanwhile, students in the "Homework Gap" have faced extraordinary hardship, and schools and libraries across the nation have stepped up to connect their students.  On a temporary basis, the Commission is working to address the needs for remote learning through the Emergency Connectivity Fund (ECF) program, a $7.171 billion program that provides eligible schools and libraries with funding to

---

[105] *See* 47 CFR § 54.401(b).

[106] Infrastructure Act, div. F, tit. V, sec. 60502(a)(3)(B)(ii); Consolidated Appropriations Act, div. N, tit. IX, § 904(b)(7)(A)(i) (2021).

[107] *See* 47 U.S.C. § 254(b)(1),(3); *see also* 47 U.S.C. § 214(e).

[108] *See* 47 U.S.C. § 254(h)(2)(A).

[109] 47 CFR §§ 54.501, 54.502.

[110] *See Inquiry Concerning Deployment of Advanced Telecommunications Capability to All Americans in a Reasonable and Timely Fashion*, Fourteenth Broadband Deployment Report, 36 FCC Rcd 836, 868, para. 48 (2021) (finding 47% of school districts meeting the long-term goals of 1 Gbps per 1,000 students and staff set out in the *2014 First E-Rate Order*, including 35% of the largest 1,000 school districts and 78% of the 1,000 smallest school districts).

purchase broadband connectivity and connected devices their communities need for remote learning during the COVID-19 emergency period.[111]

39.    We seek comment on the impact of the Infrastructure Act on the E-Rate program and the Emergency Connectivity Fund.  What changes, if any, should we consider to the E-Rate program in light of the Infrastructure Act and other recent developments?  How can we best coordinate the E-Rate program with the programs created by the Infrastructure Act to achieve our universal service goals, including ensuring high-speed broadband in schools and libraries?  What role will the E-Rate program have in the future given the evolving level of universal service?  What data should be collected from recipients of the program, and how should this data collection take place?  How can we protect against waste, fraud, and abuse in the E-Rate program, particularly in light of the Infrastructure Act?

### D.    Rural Health Care

40.    The RHC Program consists of two component programs: (1) the Telecom Program and (2) the Healthcare Connect Fund (HCF) Program.  The Commission established the Telecom Program in 1997 to subsidize the difference between urban and rural rates for telecommunications services.[112]  Under the Telecom Program, eligible rural health care providers can obtain rates on telecommunications services in rural areas that are reasonably comparable to rates charged for similar services in corresponding urban areas.[113]  The level of support in the Telecom Program is the difference between the rural rate and the urban rate.[114]  In 2012, the Commission established the HCF Program to promote the use of broadband services and facilitate the formation of health care provider consortia that include both rural and urban health care providers.[115]  The HCF Program provides a flat 65 percent discount on an array of advanced telecommunications and information services.[116]  The Commission also recently launched the Connected Care Pilot Program, which will provide up to $100 million in support over three years to eligible health care providers for connected care services.[117]

41.    The COVID-19 pandemic has put a significant strain on rural health care providers and accelerated the adoption of telehealth systems and processes.[118]  The BEAD Program and broadband-focused provisions in the Infrastructure Act and other recent legislation create opportunities to significantly improve the quality of the broadband networks available to many rural health care providers

---

[111] *Establishing Emergency Connectivity Fund to Close the Homework Gap*, Report and Order, 36 FCC Rcd 8696, 8697-98, paras. 3-4 (2021).  Congress authorized the ECF as part of the American Rescue Plan Act of 2021.  The Act also designates that $1 million from the Emergency Connectivity Fund be available for use by the Inspector General of the Commission to conduct oversight of support provided through the Emergency Connectivity Fund.  *Id.* § 7402(c)(2)(B).  Support provided under the ECF Program is provided through amounts made available from the Emergency Connectivity Fund and not from contributions under section 254(d) of the Communications Act of 1934. *Id.* § 7402(c)(4).

[112] *See* 47 U.S.C. § 254(h)(1)(A); *see also First Report and Order*, 12 FCC Rcd at 9093-9161, paras. 608-749.

[113] *See* 47 U.S.C. § 254(h)(1)(A); 47 CFR § 54.602.

[114] *See* 47 U.S.C. § 254(h)(1)(A); 47 CFR § 54.606.

[115] *See* 47 U.S.C. § 254(h)(2)(A); *HCF Order*, 27 FCC Rcd 16678.  The HCF Program replaced the existing Internet Access Program, also enacted pursuant to section 254(h)(2)(A), which provided healthcare providers with a 25% discount for Internet access service.  *See HCF Order*, 27 FCC Rcd at 16681, n.9.

[116] *See* 47 U.S.C. § 254(h)(2)(A); 47 CFR § 54.611; *HCF Order*, 27 FCC Rcd at 16680-81, paras. 1-3.

[117] *See, e.g.*, *Promoting Telehealth for Low Income Consumers*; *COVID-19 Telehealth Program*  Report and Order, 35 FCC Rcd 3366 (2020) (*2020 Connected Care and COVID-19 Telehealth Program Order*).

[118] *See, e.g.*, Judd Hollander, M.D. & Aaron Neinstein, M.D., *Maturation from Adoption-Based to Quality Based Telehealth Metric*, NEJM Catalyst (Sept. 9, 2020), https://catalyst.nejm.org/doi/full/10.1056/CAT.20.0408; *see also COVID-19 Telehealth Program*, Report and Order, 36 FCC Rcd 1613 (2021) (*February 2021 COVID-19 Telehealth Program Order*); *Promoting Telehealth in Rural America*,  Order, 36 FCC Rcd 7051, 7054, para. 8 (WCB 2021).

(HCPs).  In addition to issues identified here, we also invite comment on any other issues related to the impact of these provisions on the USF's ability to improve the quality of health care available to patients in rural communities by ensuring access to telecommunications and broadband services for rural HCPs.

42.     The Commission is also in the process of delivering a total of $449.95 million in funding to help rural and non-rural health care providers provide connected care services to patients at their homes or mobile locations through the COVID-19 Telehealth Program.[119]  This funding is not part of the USF and will not be renewed unless Congress appropriates additional funds.  However, we invite comment on the impact of the COVID-19 Telehealth Program on the goals of the RHC Program as well as any lessons learned from the COVID-19 Telehealth Program that could inform our recommendations in the Report.

43.     We seek general comment on the impact of the Infrastructure Act on the RHC Program.  What changes, if any, should we consider to the RHC program in light of the Infrastructure Act and other recent developments, including the COVID-19 Telehealth Program?  Are there changes that should be made in light of the additional funding provided by the Infrastructure Act?  How can we best coordinate the RHC program with the programs created by the Infrastructure Act to achieve our universal service goals?  What role will the RHC program have in the future given the evolving level of universal service?  What data should be collected from recipients of the program, and how should this data collection take place?  How can we protect against waste, fraud, and abuse in the RHC program, particularly in light of the Infrastructure Act?

### E.     Sustaining the Universal Service Program

44.     Today, telecommunications companies must pay a percentage of their interstate end-user revenues to the Universal Service Fund.  This percentage is called the contribution factor.  The contribution factor changes four times a year and is increased or decreased depending on the needs of USF programs.  The USF contribution factor for the fourth quarter of 2021 is 29.1 percent,[120] up from 6 percent in 2001.[121]  The Commission requests comment on proposals to improve the stability of the quarterly factor.[122]

45.     In addition to the USF program-specific topics discussed above we seek general comment on adjustments to our universal service priorities in light of the Infrastructure Act.  We seek comment on "further actions" that could be taken "to improve the ability of the Commission to achieve the universal service goals for broadband" that are applicable to each of the USF programs or some other aspect of the Fund.[123]  We also seek comment on issues raised in comments submitted with respect to the proposed universal service contribution factors for the fourth quarter of 2021 and the first quarter of 2022.[124]

---

[119] Congress allocated $200 million to the Commission in March 2020 to establish the COVID-19 Telehealth Program and an additional $249.95 million for a second round of funding in December 2020.  *See 2020 Connected Care and COVID-19 Telehealth Program Order*, 35 FCC Rcd 3366; *February 2021 COVID-19 Telehealth Program Order*, 36 FCC Rcd 1613.

[120] *Proposed Fourth Quarter 2021 Universal Service Contribution Factor*, CC Docket No. 96-45, Public Notice, DA 21-1134 (OMD rel. Sept. 10, 2021).

[121] *Proposed Fourth Quarter 2001 Universal Service Contribution Factor*, CC Docket No. 96-45, Public Notice, DA 01-2083 (CCB rel. Sept. 12, 2001).  *See* Federal-State Joint Board on Universal Service, Universal Service Monitoring Report, Table 1.6.

[122] *See infra* para. 51 and note 131.

[123] Infrastructure Act, div. F, tit. I, § 60104(c)(2).

[124] *See* Comments and Objections of Consumers' Research *et al.*, CC Docket No. 96-45 (filed Sept. 23, 2021) (Consumers' Research September Comments); Comments and Objections of Consumers' Research *et al.*, CC Docket No. 96-45 (filed Nov. 19, 2021) (Consumers' Research November Comments).  In particular, we seek comment on the assertions that (1) section 254 of the Communications Act unconstitutionally delegates Congress's legislative and taxing power to the Commission, (2) the Commission has violated the Constitution by delegating

(continued….)

## V.    POTENTIAL RECOMMENDATIONS FOR FUTURE CONGRESSIONAL ACTION

46.    In this section, we discuss potential recommendations for congressional action regarding the Commission's USF programs.  As the Act states, the Commission may make recommendations for future actions that Congress could take to improve the ability of the Commission to achieve the universal service goals for broadband.[125]  We therefore seek comment on modifications to our existing programs that may enable the Commission to advance the proposed goals of universal deployment, affordability, adoption, availability, and equitable access to broadband throughout the United States.

47.    We seek comment on whether congressional action is needed to ensure that the High-Cost program meets the Commission's universal service goals for broadband.  For instance, if the High-Cost program were to place additional emphasis on supporting operating costs in light of the influx of funding for capital expenditures, are the existing programs a sufficient vehicle to distribute that support?  If not, are there statutory changes that would help the Commission shift additional support to operating and maintenance costs for deployed networks?  Likewise, if the focus of the BEAD Program funding is on fixed broadband deployment, would congressional action be necessary to shift the focus of the High-Cost program, for example, to support mobile broadband?  Should Congress provide additional authority regarding the use of auctions, or price models, to allocate funding for operating costs?

48.    Both the EBB Program/Affordable Connectivity Program and Lifeline programs help make broadband service more affordable for low-income households.  As a result, there is some overlap in terms of the population of potentially eligible consumers and the types of service (broadband) for which reimbursement is provided.  For example, all consumers that are eligible for the Lifeline program are eligible for EBB/the Affordable Connectivity Program, though not all participate in both.  The 2021 Infrastructure Act provides that the Commission can rely on USAC to implement the Affordable Connectivity Program[126] and that the administration of the Affordable Connectivity Program and the reimbursements distributed through the program must be funded through appropriated funds and not from USF contributions.[127]  Would further integration between the programs require congressional action in order to fund the programs' administration and disbursements?  What other congressional action would be necessary to allow for the integration of these programs?  Are there other alternative approaches that could be considered to ensure these programs work seamlessly together to meet low-income consumers' needs?  Aside from efforts meant to integrate these programs, are there actions that Congress can take to improve the Lifeline program?  The Act includes language that allows the Commission to conduct outreach efforts to encourage households to enroll in the Affordable Connectivity Program and also permits the Commission to facilitate consumer research, conduct focus groups, engage in paid media, and provide grants to outreach partners to promote awareness of the Affordable Connectivity Program.[128]  To date, the Lifeline program has not expressly received comparable congressional approval to promote awareness of the Lifeline program, although ETCs are required to publicize the availability of Lifeline

(Continued from previous page) ────────────────

Congress's legislative and taxing power to USAC, (3) the appointment of USAC's board of directors by the FCC Chair violates the Constitution's appointments clause or (in the alternative) exceeds the Commission's statutory authority, and (4) the Commission violated the APA and the Federal Register Act by adopting a new contribution factor for each quarter without conducting a notice-and-comment rulemaking proceeding or publishing the contribution factor in the Federal Register.  *See* Consumers' Research September Comments at 31-51; Consumers' Research November Comments at 32-51.

[125] Infrastructure Act, div. F, tit. I, § 60104(c)(2).

[126] Infrastructure Act, div. F, title V, §§ 60502(a)(2)(C), (a)(2)(E); Consolidated Appropriations Act, div. N, tit. IX, § 904(i)(5) (2021).

[127] Infrastructure Act, div. F, title V, §§ 60502(a)(2)(C), (a)(2)(E); Consolidated Appropriations Act, div. N, tit. IX, § 904(i)(2)-(4) (2021).

[128] Infrastructure Act, div. F, tit. V, sec. 60502(a)(3)(B); Consolidated Appropriations Act, div. N, tit. IX, § 904(b)(10)(C)(i), (ii) (2021).

service.[129]  Would the Lifeline program benefit from express language regarding the Commission's ability to promote awareness of the program?  Are there other legislative changes that should be considered to improve the Affordable Connectivity Program, whether or not the Affordable Connectivity Program is integrated with the Lifeline program?

49.     We also seek comment on potential recommendations for Congress in connection to the E-Rate program.  We invite stakeholders to provide comment on what, if any, changes are advisable in light of the Infrastructure Act.

50.     The RHC Program's two component programs are rooted in separate statutory provisions. The Telecom Program is mandated by section 254(h)(1)(A) of the Communications Act, as amended by the Telecommunications Act of 1996, which requires that telecommunications carriers provide service to rural public or non-profit health care providers at rates that are reasonably comparable to rates charged for similar services in urban areas of the State and entitles telecommunication carriers providing that service to a subsidy in the amount of the difference between rural and urban rate.[130]  The HCF Program was enacted pursuant to section 254(h)(2)(A) of the Telecommunications Act of 1996, which directs the Commission to establish competitively neutral rules to "enhance…access to telecommunications and information services for all public and non-profit elementary and secondary school classrooms, health care providers, and libraries."[131]  We seek comment on whether we should recommend that Congress amend section 254(h)(1)(A) in a manner that would improve the ability of the Commission to achieve its universal service goals for broadband in light of the Infrastructure Act.  What potential RHC-related recommendations to Congress should we consider including in the Report?

51.     We seek comment on potential recommendations to Congress for other amendments to section 254 of the Communications Act or any other legislative actions related to USF.  We note that in recent legislation, including the Infrastructure Act, Congress provided significant support for several programs related to our universal service goals through the appropriations process whereas our universal service programs are supported through a system of contributions from telecommunications carriers and providers of interstate telecommunications.  We seek comment on whether we should provide recommendations to Congress on this issue.  For example, we seek comment on whether changes in law are necessary or appropriate to update the system of universal service contributions.[132]

52.     *Digital Equity and Inclusion.*  Finally, the Commission, as part of its continuing effort to advance digital equity for all,[133] including people of color, persons with disabilities, persons who live in rural or Tribal areas, and others who are or have been historically underserved, marginalized, or adversely affected by persistent poverty or inequality, invites comment on any equity-related considerations[134] and

---

[129] 47 CFR § 54.405(b).

[130] 47 U.S.C. § 254(h)(1)(A).

[131] 47 U.S.C. § 254(h)(2)(A).

[132] *See, e.g.*, Press Release, Office of Commissioner Brendan Carr, "Carr Calls for Ending Big Tech's Free Ride on the Internet" (May 24, 2021), https://docs.fcc.gov/public/attachments/DOC-372688A1.pdf.

[133] Section 1 of the Communications Act of 1934 as amended provides that the FCC "regulat[es] interstate and foreign commerce in communication by wire and radio so as to make [such service] available, so far as possible, to all the people of the United States, without discrimination on the basis of race, color, religion, national origin, or sex."  47 U.S.C. § 151.

[134] The term "equity" is used here consistent with Executive Order 13985 as the consistent and systematic fair, just, and impartial treatment of all individuals, including individuals who belong to underserved communities that have been denied such treatment, such as Black, Latino, and Indigenous and Native American persons, Asian Americans and Pacific Islanders and other persons of color; members of religious minorities; lesbian, gay, bisexual, transgender, and queer (LGBTQ+) persons; persons with disabilities; persons who live in rural areas; and persons otherwise adversely affected by persistent poverty or inequality.  *See* Exec. Order No. 13985, 86 Fed. Reg. 7009,

(continued….)

benefits (if any) that may be associated with the proposals and issues discussed herein.  Specifically, we seek comment on how our proposals may promote or inhibit advances in diversity, equity, inclusion, and accessibility, as well the scope of the Commission's relevant legal authority.

## VI.    PROCEDURAL MATTERS

53.    *Ex Parte Rules*.  This proceeding shall be treated as a "permit-but-disclose" proceeding in accordance with the Commission's *ex parte* rules.[135]  Persons making *ex parte* presentations must file a copy of any written presentation or a memorandum summarizing any oral presentation within two business days after the presentation (unless a different deadline applicable to the Sunshine period applies).  Persons making oral *ex parte* presentations are reminded that memoranda summarizing the presentation must (1) list all persons attending or otherwise participating in the meeting at which the *ex parte* presentation was made, and (2) summarize all data presented and arguments made during the presentation.  If the presentation consisted in whole or in part of the presentation of data or arguments already reflected in the presenter's written comments, memoranda, or other filings in the proceeding, the presenter may provide citations to such data or arguments in his or her prior comments, memoranda, or other filings (specifying the relevant page and/or paragraph numbers where such data or arguments can be found) in lieu of summarizing them in the memorandum.  Documents shown or given to Commission staff during *ex parte* meetings are deemed to be written *ex parte* presentations and must be filed consistent with Rule 1.1206(b), 47 CFR § 1.1206(b).  Participants in this proceeding should familiarize themselves with the Commission's *ex parte* rules.

54.    *Comment Filing Procedures*.  Interested parties may file comments and reply comments on or before the dates indicated on the first page of this document.  Comments may be filed using the Commission's Electronic Comment Filing System (ECFS) or by paper.  All filings must be addressed to the Commission's Secretary, Office of the Secretary, Federal Communications Commission.

- Electronic Filers:  Comments may be filed electronically by accessing ECFS at www.fcc.gov/ecfs.

- Paper Filers:  Parties who choose to file by paper must file an original and one copy of each filing.  Paper filings can be sent by hand or messenger delivery, by commercial overnight courier, or by first-class or overnight U.S. Postal Service mail.

    - Effective March 19, 2020, and until further notice, the Commission no longer accepts any hand or messenger delivered filings. This is a temporary measure taken to help protect the health and safety of individuals, and to mitigate the transmission of COVID-19.[136]

---

(Continued from previous page) ———————————————

Executive Order on Advancing Racial Equity and Support for Underserved Communities Through the Federal Government (January 20, 2021).

[135] 47 CFR § 1.1200(a).  Although the Rules do not generally require *ex parte* presentations to be treated as "permit but disclose" in Notice of Inquiry proceedings, *see* 47 CFR § 1.1204(b)(1), we exercise our discretion in this instance, and find that the public interest is served by making *ex parte* presentations available to the public, in order to encourage a robust record.  *See id.* § 1.1200(a).  In past section 706 inquiries, we have treated *ex parte* presentations similarly.  *See, e.g.*, *Inquiry Concerning Deployment of Advanced Telecommunications Capability to All Americans in a Reasonable and Timely Fashion* , Fourteenth Broadband Deployment Report Notice of Inquiry, 33 FCC Rcd 8386, 8397, para. 27 (2018); *Inquiry Concerning Deployment of Advanced Telecommunications Capability to All Americans in a Reasonable and Timely Fashion*, Thirteenth Section 706 Report Notice of Inquiry, 32 FCC Rcd 7029, 7046, para. 56 (2017); *Inquiry Concerning Deployment of Advanced Telecommunications Capability to All Americans in a Reasonable and Timely Fashion*, Twelfth Broadband Progress Notice of Inquiry, 31 FCC Rcd 9140, 9174, para. 86 (2016).

[136] *See* FCC Announces Closure of FCC Headquarters Open Window and Change in Hand-Delivery Policy, Public Notice, 35 FCC Rcd 2788 (2020), https://www.fcc.gov/document/fcc-closes-headquarters-open-window-and-changes-hand-delivery-policy.

- ▪ Commercial overnight mail (other than U.S. Postal Service Express Mail and Priority Mail) must be sent to 9050 Junction Drive, Annapolis Junction, MD 20701.

- ▪ U.S. Postal Service first-class, Express, and Priority mail must be addressed to 45 L Street NE, Washington, D.C. 20554.

55.     *Availability of Documents.*  Comments, reply comments, and *ex parte* submissions will be publicly available online via ECFS.[137]  These documents will also be available for public inspection during regular business hours in the FCC Reference Information Center, when FCC Headquarters reopen to the public.

56.     *People with Disabilities.*  To request materials in accessible formats for people with disabilities (braille, large print, electronic files, audio format), send an e-mail to fcc504@fcc.gov or call the Consumer & Governmental Affairs Bureau at 202-418-0530 (voice), 202-418-0432 (tty).

57.     *Contact Person.*  For further information about this proceeding, please contact Charles Eberle, FCC Wireline Competition Bureau, Telecommunications Access Policy Division, at Charles.Eberle@fcc.gov or 202-418-2248.

## VII.    ORDERING CLAUSE

58.     Accordingly, IT IS ORDERED, that pursuant to section 60104 of the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429 (2021), this Notice of Inquiry IS ADOPTED.

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

---

[137] Documents will generally be available electronically in ASCII, Microsoft Word Binary File (DOC), and/or Portable Document formats.

## STATEMENT OF
## COMMISSIONER BRENDAN CARR

Re:     *Report on the Future of the Universal Service Fund*, WC Docket No. 21-476, Notice of Inquiry
(December 15, 2021).

The FCC's $9 billion a year Universal Service Fund plays a key role in bridging the digital divide
for millions of Americans across this country.  It supports Internet infrastructure builds in rural
communities.  It ensures that low-income Americans can obtain an affordable connection.  And it
connects patients with health care providers that offer life-saving care.

Yet this vital program is stuck in a death spiral.  The USF program is funded through a
mechanism that made sense back in the dial up and screeching modem days of the 1990s—back when
you were far more likely to have a long-distance calling card in your wallet than an email address.
Generally speaking, the FCC funds USF through a line item charge that carriers add to consumers'
monthly bills for telephone service.  Those traditional phone revenues have declined sharply from a high
of around $80 billion in the 2000s to less than $30 billion today.  So the percentage charge or contribution
factor that consumers pay has been on the rise—steadily increasing from only 6% in 2001 to roughly 30%
today.

Time is running out to reform this antiquated funding model.  Indeed, a recent study by Ph.D.
economist Hal Singer and Ted Tatos determined that in just four years the contribution factor could
exceed 75%.  That is far in excess of a sustainable figure.

That is why earlier this year I proposed a new approach.  It would require Big Tech to start
paying a fair share into USF.  After all, large technology companies are reaping trillions of dollars of
revenues off of the networks that are supported and in many cases only exist because of USF
expenditures.  Indeed, one study shows that the online streaming services provided by just five
companies—Netflix, YouTube, Amazon Prime, Disney+ and Microsoft—account for a whopping 75% of
all traffic on rural broadband networks.  The same study shows that 77-94% of total network costs are
related to adding capacity or otherwise supporting the delivery of those streaming services.  Likewise, the
largest digital advertising behemoths—Facebook and Google—churn out over $100 billion a year in
revenues by delivering ads over networks supported by USF and yet contribute nothing based on those
revenues.  It is time to end this free ride.

There are several concrete ways to ensure that large technology companies start to contribute on a
fair and equitable basis.  Indeed, the Singer study looked at several options and concluded that assessing
large technology companies based on their digital advertising revenues represents the best policy option.
In fact, that idea could eliminate entirely the roughly 30% charge that consumers pay today and replace it
with a 7% charge on Google's and Facebook's digital advertising revenues.  That would place the USF
program on a stable and sustainable funding path.

It is no surprise that this proposal has garnered interest from a broad and bipartisan group of
stakeholders.  It is also very popular with consumers.  One study found that more than 71% of Americans
are in favor of the idea that large social media and search companies like Facebook and Google should
contribute to providing Internet access to Americans who cannot afford it.

Today's Notice is further evidence of the support for rethinking the contribution side of USF.
This Notice responds to a request by Congress for a report from the FCC on the future of this program.
So I am pleased that we are inviting comments today that will inform that report, including by seeking
comment on contributions reform and whether large technology companies should start to contribute.

Finally, it is more important than ever before that we ensure that the FCC's USF dollars and
federal broadband subsidies in general are spent wisely and efficiently given the unprecedented sums now
available.  I have been worried about the risk for waste, fraud, and abuse, and I have been raising the need
for strong oversight.  The recent FCC Inspector General report only underscores that point.  After all,

every dollar that is illegally siphoned off of USF is a dollar that cannot go towards connecting Americans and their households.  I hope that this proceeding allows an additional opportunity for the FCC to ferret out any waste, fraud, or abuse.

In closing, I want to recognize the staff of the Wireline Competition Bureau for their hard work on this item.  You have my thanks and the item has my support.