IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————

NO. 22-60008

———————

CONSUMERS' RESEARCH, ET AL.,

PETITIONERS,

V.

FEDERAL COMMUNICATIONS COMMISSION
AND UNITED STATES OF AMERICA,

RESPONDENTS.

———————

ON PETITION FOR REVIEW OF AN ACTION OF THE
FEDERAL COMMUNICATIONS COMMISSION

———————

BRIAN M. BOYNTON
PRINCIPAL DEPUTY ASSISTANT ATTORNEY
 GENERAL

SARAH E. HARRINGTON
DEPUTY ASSISTANT ATTORNEY GENERAL

MARK B. STERN
GERARD J. SINZDAK
ATTORNEYS

UNITED STATES
 DEPARTMENT OF JUSTICE
WASHINGTON, D.C. 20530

P. MICHELE ELLISON
GENERAL COUNSEL

JACOB M. LEWIS
DEPUTY GENERAL COUNSEL

JAMES M. CARR
ADAM G. CREWS
COUNSEL

FEDERAL COMMUNICATIONS COMMISSION
WASHINGTON, D.C. 20554
(202) 418-1740

## CERTIFICATE OF INTERESTED PERSONS
## REQUIRED BY 5TH CIR. R. 28.2.1

No. 22-60008, *Consumers' Research, et al. v. Federal Communications Commission and United States of America*

The undersigned counsel of record certifies that the following listed

persons and entities as described in the fourth sentence of Circuit Rule 28.2.1

have an interest in the outcome of this case. These representations are made

in order that the judges of this Court may evaluate possible disqualification or

recusal.

### Petitioners:
Consumers' Research
Cause Based Commerce, Inc.
Kersten Conway
Suzanne Bettac
Robert Kull
Kwang Ja Kerby
Tom Kirby
Joseph Bayly
Jeremy Roth
Deanna Roth
Lynn Gibbs
Paul Gibbs
Rhonda Thomas

### Petitioners' Counsel:
C. Boyden Gray
R. Trent McCotter
Jonathan Berry
Michael Buschbacher
Jared M. Kelson
Boyden Gray & Associates
801 17th Street, N.W., #350
Washington, D.C. 20006

**Respondents' Counsel:**
P. Michele Ellison
Jacob M. Lewis
James M. Carr
Adam G. Crews
Federal Communications Commission
Washington, D.C.  20554

Brian M. Boynton
Sarah E. Harrington
Mark B. Stern
Gerard Sinzdak
United States Department of Justice
Washington, D.C.  20530

**Intervenors:**
Benton Institute for Broadband & Society
Center for Media Justice
National Digital Inclusion Alliance
Schools, Health, & Libraries Broadband Coalition
USTelecom—The Broadband Association
NTCA—The Rural Broadband Association
Competitive Carriers Association

**Intervenors' Counsel:**
Andrew Jay Schwartzman
1341 G Street, N.W., Fifth Floor
Washington, D.C.  20005
*Counsel for Benton Institute for Broadband &Society, Center for Media
Justice, and National Digital Inclusion Alliance*

Jennifer Tatel
Craig E. Gilmore
Michael D. Miller
Wilkinson Barker Knauer, LLP
1800 M Street, N.W., Suite 800N
Washington, D.C.  20036
*Counsel for USTelecom—The Broadband Association, NTCA—The Rural
Broadband Association, and Competitive Carriers Association*

Stephanie Weiner
Jason Neal
Harris, Wiltshire & Grannis LLP
1919 M Street, N.W., 8th Floor
Washington, D.C.  20036
*Counsel for Schools, Health, & Libraries Broadband Coalition*

June 10, 2022                    /s/James M. Carr

                                 James M. Carr
                                 Counsel
                                 Federal Communications
                                 Commission
                                 Washington, D.C.  20554

## STATEMENT ON ORAL ARGUMENT

Respondents believe that the Court could find oral argument helpful in examining the claims raised by petitioners.

# TABLE OF CONTENTS

Table of Authorities..........................................................................................iii

Jurisdiction ....................................................................................................1

Statement Of The Issues...................................................................................2

Introduction ...................................................................................................2

Counterstatement.............................................................................................4

    A.    The FCC's Universal Service Mandate.................................................4

    B.    Section 254 Of The Communications Act ............................................5

    C.    The Implementation Of Section 254 .....................................................9

    D.    The FCC's Universal Service Contribution Rules...............................14

    E.    The First Quarter 2022 Universal Service Contribution
        Factor.................................................................................................17

Summary of Argument....................................................................................19

Standard of Review ........................................................................................24

Argument.......................................................................................................24

I.    The Court Lacks Jurisdiction Because The Petition For
    Review Is Untimely. ................................................................................24

    A.    The Hobbs Act's 60-Day Time Limit For Filing Pre-
        Enforcement Facial Challenges Has Long Expired. ...........................24

    B.    Petitioners Should Have Filed A Petition For Rulemaking
        Or Raised Their Claims As Defenses To Enforcement
        Action. ...............................................................................................28

II.    Section 254 Does Not Unconstitutionally Delegate
    Legislative Power To The FCC. ...............................................................30

i

A.  Congress Does Not Delegate Legislative Power When It
    Provides An "Intelligible Principle" To Guide
    Administrative Implementation Of Its Enactments. ...........................30

B.  Section 254 Satisfies The Intelligible Principle Standard
    By Providing Ample Legislative Guidance To The FCC
    To Implement The Universal Service Program. .................................32

    1.  Section 254(b)'s Universal Service Principles. ..............................33

    2.  Section 254(c)'s Limits On Defining Eligible Services. ................39

    3.  Section 254(d)'s Requirement That Contributions Be
        Equitable And Nondiscriminatory. .................................................42

    4.  Section 254(e)'s Requirement That Support Be
        Sufficient. ........................................................................................43

    5.  Section 254(h)'s Guidance For Calculating Support To
        Schools, Libraries, And Health Care Providers. .............................45

C.  Petitioners' Attempts To Avoid Controlling Separation
    Of Powers Law Are Unavailing. ..........................................................48

III. The FCC Has Not Impermissibly Delegated Government
     Power To USAC. .....................................................................................53

A.  USAC Merely Provides Ministerial Support To The
    FCC......................................................................................................53

B.  The FCC's Delegation To USAC Is Constitutional
    Because The Commission Supervises USAC And
    Retains Final Decisionmaking Authority. ............................................56

Conclusion......................................................................................................63

# TABLE OF AUTHORITIES

## CASES:

*A.L.A. Schechter Poultry Corp. v. United States*,
295 U.S. 495 (1935) ............................................................................ 32, 35

*Alenco Commc'ns, Inc. v. FCC*, 201 F.3d 608 (5th
Cir. 2000)............................................................. 4, 6, 22, 36, 37, 38, 39, 44

*Allnet Commc'n Serv., Inc. v. Nat'l Exchange
Carrier Ass'n*, 965 F.2d 1118 (D.C. Cir. 1992) ...........................................10

*Am. Power & Light v. SEC*, 329 U.S. 90 (1946)...................................... 31, 32

*Am. Road & Transp. Builders Ass'n v. EPA*, 588
F.3d 1109 (D.C. Cir. 2009) .........................................................................28

*Am. Stewards of Liberty v. Dep't of Interior*, 960
F.3d 223 (5th Cir. 2020)...............................................................................29

*AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366,
(1999) .............................................................................................................5

*AT&T, Inc. v. FCC*, 886 F.3d 1236 (D.C. Cir. 2018) ........................................8

*Ayoub v. INS*, 222 F.3d 214 (5th Cir. 2000)....................................................51

*Ballew v. Cont'l Airlines, Inc.*, 668 F.3d 777 (5th
Cir. 2012)......................................................................................................52

*Big Time Vapes, Inc. v. FDA*, 963 F.3d 436 (5th Cir.
2020)...................................................... 21, 23, 30, 31, 32, 37, 40, 48, 49, 50

*Boerschig v. Trans-Pecos Pipeline, LLC*, 872 F.3d
701 (5th Cir. 2017) .......................................................................................56

*Citizens' Util. Ratepayer Bd. v. State Corp.
Comm'n*, 264 Kan. 363, 956 P.2d 685 (Kan.
1998)..............................................................................................................51

*City of Arlington v. FCC*, 668 F.3d 229 (5th Cir.
2012), *aff'd*, 569 U.S. 290 (2013) ...............................................................24

*Comsat Corp. v. FCC*, 250 F.3d 931 (5th Cir. 2001)............................... 16, 43

*Conference Group, LLC v. FCC*, 720 F.3d 957
(D.C. Cir. 2013)............................................................................................14

*Consumers' Research v. FCC*, 5th Cir. No. 22-
60195 (filed April 6, 2022)..........................................................................18

iii

*Consumers' Research v. FCC*, 6th Cir. No. 21-3886
(filed Sept. 30, 2021) .......................................................................................18

*FCC v. Pottsville Broad. Co.*, 309 U.S. 134 (1940).........................................38

*Gen. Tel. Co. of the Sw. v. United States*, 449 F.2d
846 (5th Cir. 1971) ..........................................................................................41

*Growth Energy v. EPA*, 5 F.4th 1 (D.C. Cir. 2021)
(per curiam) .....................................................................................................27

*Gundy v. United States*, 139 S. Ct. 2116 (2019) ........ 21, 23, 30, 31, 32, 48, 49

*Huawei Tech. USA, Inc. v. FCC*, 2 F.4th 421 (5th
Cir. 2021)................................................................................ 12, 24, 37, 40

*In re FCC 11-161*, 753 F.3d 1015 (10th Cir. 2014)....................... 8, 37, 38, 45

*In re Incomnet, Inc.*, 463 F.3d 1064 (9th Cir. 2006)................................. 61, 62

*In re Tex. Wyo. Drilling, Inc.*, 647 F.3d 547 (5th
Cir. 2011)..........................................................................................................24

*J.W. Hampton, Jr., & Co. v. United States*, 276 U.S.
394 (1928) ............................................................................... 21, 31, 49

*Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022) ..................................................32

*JTB Tools & Oilfield Servs., LLC v. United States*,
831 F.3d 597 (5th Cir. 2016).........................................................................58

*Lewis v. Casey*, 518 U.S. 343 (1996) ...............................................................60

*Loving v. United States*, 517 U.S. 748 (1996)..................................................30

*Mistretta v. United States*, 488 U.S. 361 (1989)..............................................30

*N.Y. Cent. Sec. Corp. v. United States*, 287 U.S. 12
(1932) ................................................................................................................32

*NAACP v. Fed. Power Comm'n*, 425 U.S. 662
(1976) ................................................................................................................38

*Nat'l Broad. Co. v. United States*, 319 U.S. 190
(1943) ..................................................................................... 32, 37, 38, 41

*Nat'l Cable Television Ass'n v. United States*, 415
U.S. 336 (1974) ................................................................................................50

*Nat'l Coal. for Men v. Selective Serv. Sys.*, 969 F.3d
546 (5th Cir. 2020) ..........................................................................................52

*Nat'l Lifeline Ass'n v. FCC*, 983 F.3d 498 (D.C.
Cir. 2020)......................................................................................................11

*NLRB Union v. FLRA*, 834 F.2d 191 (D.C. Cir.
1987)..............................................................................................................28

*Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935) ............................... 32, 35

*PDR Network, LLC v. Carlton & Harris
Chiropractic, Inc.*, 139 S. Ct. 2051 (2019) .................................................25

*Perez v. Stephens*, 745 F.3d 174 (5th Cir. 2014) ...........................................50

*Pittston Co. v. United States*, 368 F.3d 385 (4th Cir.
2004).......................................................................................................56, 60

*Qwest Commc'ns Int'l, Inc. v. FCC*, 398 F.3d 1222
(10th Cir. 2005) ............................................................................. 35, 38, 39

*Qwest Corp. v. FCC*, 258 F.3d 1191 (10th Cir.
2001).........................................................................................................34, 35

*Rural Cellular Ass'n v. FCC*, 588 F.3d 1095 (D.C.
Cir. 2009)................................................................... 22, 36, 37, 38, 39, 45

*Rural Cellular Ass'n v. FCC*, 685 F.3d 1083 (D.C.
Cir. 2012).......................................................................... 16, 23, 51, 52, 57

*Rural Tel. Coal. v. FCC*, 838 F.2d 1307 (D.C. Cir.
1988)..............................................................................................................51

*Schumacher v. Johanns*, 272 Neb. 346, 722 N.W.2d
37 (Neb. 2006)..............................................................................................51

*Skinner v. Mid-America Pipeline Co.*, 490 U.S. 212
(1989) ..................................................................................................... 23, 52

*State of Tex. v. Rettig*, 987 F.3d 518 (5th Cir. 2021) .................. 24, 55, 57, 58

*Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S.
381 (1940) ....................................................................................................57

*Texas Office of Pub. Util. Counsel v. FCC*, 265 F.3d
313 (5th Cir. 2001) ......................................................................... 5, 34, 41

*Texas Office of Pub. Util. Counsel*, 183 F.3d 393
(5th Cir. 1999) ........ 4, 5, 6, 10, 16, 23, 25, 33, 35, 40, 41, 42, 43, 44, 45, 50

*Texas v. Biden*, 20 F.4th 928 (5th Cir. 2021), *cert.
granted*, 142 S. Ct. 1098 (2022)..................................................................27

*Trafigura Trading LLC v. United States*, 29 F.4th
286 (5th Cir. 2022) .......................................................................................51

*U.S. Telecom Ass'n v. FCC*, 359 F.3d 554 (D.C.
Cir. 2004).............................................................................................. 55, 56

*United States v. Arthrex, Inc.*, 141 S. Ct. 1970
(2021) ............................................................................................................58

*United States v. Frame*, 885 F.2d 1119 (3d Cir.
1989).................................................................................................... 60, 61

*United States v. Garcia*, 655 F.3d 426 (5th Cir.
2011)..............................................................................................................31

*United States v. Grimaud*, 220 U.S. 506 (1911) ..............................................30

*United States v. Jones*, 132 F.3d 232 (5th Cir. 1998) ......................................31

*United States v. Mecham*, 950 F.3d 257 (5th Cir.
2020).............................................................................................................49

*United States v. Mirza*, 454 F. Appx. 249 (5th Cir.
2011) (per curiam).......................................................................................31

*United States v. Stevens*, 691 F.3d 620 (5th Cir.
2012).............................................................................................................26

*Verizon Commc'ns Inc. v. FCC*, 535 U.S. 467
(2002) .............................................................................................................5

*Virgin Islands Tel. Corp. v. FCC*, 198 F.3d 921
(D.C. Cir. 1999)...........................................................................................14

*Voicestream GSM I Operating Co. v. La. Pub. Serv.
Comm'n*, 943 So. 2d 349 (La. 2006)...........................................................51

*Vonage Holdings Corp. v. FCC*, 489 F.3d 1232
(D.C. Cir. 2007)...........................................................................................14

*Vt. Pub. Serv. Bd. v. FCC*, 661 F.3d 54 (D.C. Cir.
2011)................................................................................................... 9, 16

*Wayman v. Southard*, 23 U.S. (10 Wheat.) 1 (1825) ......................... 30, 48, 49

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457
(2001) ................................................................................................... 31, 32

*Yakus v. United States*, 321 U.S. 414 (1944) ...................................................32

## ADMINISTRATIVE MATERIALS:

*Alpaugh Unified Sch. Dist.*, 22 FCC Rcd 6035
(2007) ..........................................................................................................54

*Changes to the Board of Directors of the National
Exchange Carrier Association, Inc.*, 12 FCC Rcd
18400 (1997) ................................................................................ 11, 14, 25

*Changes to the Board of Directors of the National
Exchange Carrier Association, Inc.*, 13 FCC Rcd
25058 (1998) ....................................................................................... 11, 25

*Connect America Fund*, 26 FCC Rcd 17663 (2011),
*pets. for review denied*, *In re FCC 11-161*, 753
F.3d 1015 (10th Cir. 2014)............................................................... 8, 37, 59

*Federal-State Joint Board on Universal Service*, 12
FCC Rcd 8776 (1997), *aff'd in part and rev'd in
part, Texas Office of Pub. Util. Counsel v. FCC*,
183 F.3d 393 .......................................................................................... 9, 10

*First Quarter 1998 Universal Service Contribution
Factors Revised and Approved*, 12 FCC Rcd
21881 (CCB 1997) ............................................................................. 58, 59

Notice of Proposed Rulemaking, *Universal Service
Contribution Methodology*, 34 FCC Rcd 4143
(2019) ..........................................................................................................59

*Revised Second Quarter 2003 Universal Service
Contribution Factor*, 18 FCC Rcd 5097 (WCB
2003)............................................................................................................58

*Streamlined Resolution of Requests Related to
Actions by the Universal Service Administrative
Company*, DA 22-448, 2022 WL 1302467 (WCB
rel. April 29, 2022).....................................................................................54

*Wireline Competition Bureau Provides Guidance to
the Universal Service Administrative Company
Regarding the High-Cost Service Mechanism
Budget*, 32 FCC Rcd 9243 (WCB 2017)......................................................59

## STATUTES:

28 U.S.C. § 2342(1) ............................................................................ 1, 24, 25

28 U.S.C. § 2344 ....................................................................... 20, 24, 25, 29

31 U.S.C. § 1341 ...........................................................................................62

47 U.S.C. § 151 ........................................................................................ 4, 33

47 U.S.C. § 153(51) .......................................................................................14

47 U.S.C. § 153(53) ................................................................................. 14, 39

47 U.S.C. § 254 ..........................................................................................2, 6

47 U.S.C. § 254(a)(1)-(2) ................................................................................9

47 U.S.C. § 254(a)(2) ...................................................................................39

47 U.S.C. § 254(b)........................................................................................33

47 U.S.C. § 254(b)(1) ............................................................................. 36, 47

47 U.S.C. § 254(b)(1)-(6) ......................................................................... 8, 33

47 U.S.C. § 254(b)(4).....................................................................................47

47 U.S.C. § 254(b)(5)........................................................................... 6, 47, 48

47 U.S.C. § 254(b)(7)................................................................... 8, 34, 37, 38

47 U.S.C. § 254(c)(1) ............................................................................ 6, 39, 41

47 U.S.C. § 254(c)(1)(A) ...............................................................................39

47 U.S.C. § 254(c)(1)(A)-(C)................................................................... 40, 47

47 U.S.C. § 254(c)(1)(A)-(D)...........................................................................7

47 U.S.C. § 254(c)(1)(B)...............................................................................40

47 U.S.C. § 254(c)(1)(C)...............................................................................40

47 U.S.C. § 254(c)(1)(D) ..............................................................................40

47 U.S.C. § 254(c)(3) ............................................................................... 7, 41

47 U.S.C. § 254(d)...................................................... 6, 22, 35, 42, 43, 47, 55

47 U.S.C. § 254(e)........................................................... 6, 22, 35, 43, 48

47 U.S.C. § 254(h)...........................................................................................7

47 U.S.C. § 254(h)(1)(A) ..............................................................................46

47 U.S.C. § 254(h)(1)(A)-(B)........................................................... 35, 45, 48

47 U.S.C. § 254(h)(1)(B) ..............................................................................46

47 U.S.C. § 254(h)(1)(B)(i)...........................................................................46

47 U.S.C. § 254(h)(2)......................................................................................47

47 U.S.C. § 254(h)(2)(A) ........................................................................ 47, 48

47 U.S.C. § 402(a).................................................................................... 1, 25

Consolidated Appropriations Act, 2022, Pub. L. No.
117-103, 136 Stat. 49 .................................................................................62

Tariff Act, 42 Stat. 858 (1922)........................................................................49

Telecommunications Act of 1996, Pub. L. No. 104-
104, 110 Stat. 56..........................................................................................5

Universal Service Antideficiency Temporary
Suspension Act, Pub. L. No. 108-494, 118 Stat.
3986 ...........................................................................................................62

## REGULATIONS:

47 C.F.R. § 1.106 ...........................................................................................28

47 C.F.R. § 54.101(a)......................................................................................10

47 C.F.R. §§ 54.302-54.321 ..............................................................................9

47 C.F.R. §§ 54.302-54.633 ............................................................................26

47 C.F.R. § 54.303(a)(1) .................................................................... 12, 54, 55

47 C.F.R. §§ 54.400-54.423 ..............................................................................9

47 C.F.R. §§ 54.500-54.523 ..............................................................................9

47 C.F.R. § 54.502(a)(1)-(2) ...........................................................................10

47 C.F.R. § 54.507(a) ............................................................................... 54, 55

47 C.F.R. §§ 54.600-54.633 ..............................................................................9

47 C.F.R. § 54.619(a)............................................................................... 54, 55

47 C.F.R. § 54.702(b)........................................................................ 12, 23, 53

47 C.F.R. § 54.702(c).................................................................. 12, 23, 53, 54

47 C.F.R. § 54.703(b)......................................................................................11

47 C.F.R. § 54.703(c)-(d)................................................................................11

47 C.F.R. § 54.706(a)......................................................................................14

47 C.F.R. § 54.706(a)(1)-(19) .........................................................................14

47 C.F.R. § 54.706(b)......................................................................................16

47 C.F.R. § 54.706(c) ............................................................................... 16, 43

47 C.F.R. § 54.709(a) ...................................................................................... 54

47 C.F.R. § 54.709(a)(2) ........................................................................... 15, 55

47 C.F.R. § 54.709(a)(3) ........................................... 1, 14, 15, 19, 29, 55, 56, 57

47 C.F.R. § 54.709(b) ...................................................................................... 57

47 C.F.R. § 54.711(a) ............................................................................... 15, 56

47 C.F.R. § 54.712(a) ...................................................................................... 16

47 C.F.R. § 54.713(c) ................................................................................ 29, 60

47 C.F.R. § 54.717 .......................................................................................... 13

47 C.F.R. § 54.717(b)-(g) ............................................................................... 13

47 C.F.R. § 54.717(k) ..................................................................................... 13

47 C.F.R. §§ 54.719-54.725 ........................................................................... 13

47 C.F.R. § 54.719 .......................................................................................... 23

47 C.F.R. § 54.719(b) ............................................................................... 54, 57

47 C.F.R. §§ 54.801-54.1515 ..................................................................... 9, 26

47 C.F.R. § 54.901(a) ...................................................................................... 12

47 C.F.R. § 54.1304(b) .................................................................................... 12

## LEGISLATIVE MATERIALS:

H.R. Rep. No. 103-560 (1994) ........................................................................ 10

## TREATISE:

PETER W. HUBER ET AL., FEDERAL
TELECOMMUNICATIONS LAW § 2.1.1 (2d ed.
1999) ................................................................................................................. 5

## OTHER MATERIALS:

FEDERAL-STATE JOINT BOARD ON UNIVERSAL
SERVICE, UNIVERSAL SERVICE MONITORING
REPORT (2021) ....................................................................................... 26, 27

Memorandum of Understanding Between the
Federal Communications Commission and the
Universal Service Administrative Company, Dec.
19, 2018 ............................................................................................. 12, 62

Order, *Consumers' Research v. FCC*, 5th Cir. No.
22-60195 (May 19, 2022).............................................................................18

Statement of Patricia A. Dalton, GAO, Before the
Senate Committee on Commerce, Science, and
Transportation, April 11, 2005, GAO-05-546T ..........................................62

U.S. CONST., art. I, § 1 ....................................................................................30

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————

No. 22-60008

———————

CONSUMERS' RESEARCH, ET AL.,

PETITIONERS,

V.

FEDERAL COMMUNICATIONS COMMISSION
AND UNITED STATES OF AMERICA,

RESPONDENTS.

———————

ON PETITION FOR REVIEW OF AN ACTION OF
THE FEDERAL COMMUNICATIONS COMMISSION

———————

BRIEF FOR RESPONDENTS

———————

## JURISDICTION

The universal service contribution factor for the first quarter of 2022

was deemed approved by the Federal Communications Commission on

December 27, 2021. JA100-04; 47 C.F.R. § 54.709(a)(3). Petitioners filed a

petition for review on January 5, 2022, invoking this Court's jurisdiction

under 47 U.S.C. § 402(a) and 28 U.S.C. § 2342(1). As we explain in Part I of

the Argument below, the Court lacks jurisdiction because the petition for

review is untimely.

## STATEMENT OF THE ISSUES

(1) Whether the Court lacks jurisdiction because the petition for review is untimely.

(2) Whether section 254 of the Communications Act, 47 U.S.C. § 254, which authorizes the FCC to preserve and advance universal service to all telecommunications subscribers, unconstitutionally delegates legislative power to the FCC.

(3) Whether the FCC can rely on a private company to engage in non-policy administration of the universal service funding mechanisms.

## INTRODUCTION

For the past quarter century, the FCC's universal service subsidy program authorized by section 254 of the Communications Act, 47 U.S.C. § 254, has benefited millions of Americans. It has made telephone service affordable for low-income consumers and residents of "high-cost" rural areas. It has also supported the provision of essential telehealth services by rural health care providers, as well as the deployment of internet access services to classrooms and libraries throughout the nation.

Pursuant to section 254, the FCC finances the universal service support program by collecting fees from providers of interstate telecommunications. Those companies typically pass on the fees to their customers. The FCC

2

distributes the collected funds to targeted populations through four programs it has established in detailed regulations.

Petitioners—a telephone service provider and several telephone service subscribers—contend that the FCC may not collect fees to support the universal service program because the program is unlawful. Specifically, petitioners maintain that section 254 unconstitutionally delegates legislative and taxing power to the FCC. In addition, they claim that the Commission improperly subdelegated its regulatory authority under section 254 to a private entity, the Universal Service Administrative Company (USAC).

As a threshold matter, this Court lacks jurisdiction to hear petitioners' claims. Petitioners are making a facial challenge to FCC rules that were adopted decades ago—rules on which countless parties have relied. The time period for seeking review of those rules has long expired.

Even if this case were properly before the Court, petitioners' claims lack merit. The delegation of authority to the FCC under section 254 is clearly constitutional under controlling Supreme Court precedent because Congress has provided an intelligible principle—indeed, several such principles—limiting the FCC's discretion in implementing the statute. Furthermore, it was entirely permissible for the FCC to rely on USAC (a private entity) for assistance in administering the universal service program.

3

USAC is subordinate to the Commission and performs only ministerial tasks.

The Commission makes all universal service policy decisions.

## COUNTERSTATEMENT

### A. The FCC's Universal Service Mandate

"Universal service"—the availability of affordable, reliable

telecommunications service nationwide—"has been a fundamental goal of

federal telecommunications regulation since the passage of the

Communications Act of 1934." *Alenco Commc'ns, Inc. v. FCC*, 201 F.3d

608, 614 (5th Cir. 2000). Section 1 of the Act, which created the Federal

Communications Commission, sets forth Congress's goals to "make

available, so far as possible, to all the people of the United States, … a rapid,

efficient, Nation-wide, and world-wide wire and radio communication service

with adequate facilities at reasonable charges." 47 U.S.C. § 151.

For the first several decades of its existence, the FCC was able to fulfill

its statutory mandate to promote universal service through ratemaking.

Specifically, the FCC engaged in "the manipulation of rates for some

customers to subsidize more affordable rates for others." *Texas Office of*

*Public Utility Counsel v. FCC*, 183 F.3d 393, 406 (5th Cir. 1999) (*TOPUC I*).

For example, "[u]rban users subsidize[d] rural ones, business subscribers

subsidize[d] residential, and long-distance service subsidize[d] local." PETER

4

W. HUBER ET AL., FEDERAL TELECOMMUNICATIONS LAW § 2.1.1, at 84 (2d ed. 1999); *see also Verizon Commc'ns Inc. v. FCC*, 535 U.S. 467, 480 (2002); *TOPUC I*, 183 F.3d at 406.

Such implicit subsidies would have been unsustainable if a telephone company that sought "to subsidize below-cost rates to rural customers with above-cost rates to urban customers" was "vulnerable to a competitor that offer[ed] at-cost rates to urban customers." *TOPUC I*, 183 F.3d at 406. Historically, however, local exchange carriers (providers of local telephone service) "had natural monopolies … in their respective regions." *Texas Office of Public Utility Counsel v. FCC*, 265 F.3d 313, 317 (5th Cir. 2001) (*TOPUC II*). Until the 1990s, States typically "granted an exclusive franchise" to one local carrier "in each local service area," *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 371 (1999), which enabled the FCC to support universal service with implicit subsidies embedded in the regulated rate structure.

## B. Section 254 Of The Communications Act

The Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (1996 Act), enacted in the wake of the court-mandated breakup of the Bell Telephone System, "ended the longstanding regime of state-sanctioned monopolies" in "local telephone markets." *AT&T*, 525 U.S. at 371. With the

5

introduction of competition in those markets, "Congress recognized that the

universal service system of implicit subsidies would have to be re-examined."

*TOPUC I*, 183 F.3d at 406. Consequently, Congress added a new provision

to the Communications Act: 47 U.S.C. § 254.

Section 254 "requires that universal service support be 'explicit.'"

*Alenco*, 201 F.3d at 614 (quoting 47 U.S.C. § 254(e)). Congress "directed the

FCC to replace" the existing "patchwork of explicit and implicit subsidies

with 'specific, predictable and sufficient … mechanisms to preserve and

advance universal service.'" *TOPUC I*, 183 F.3d at 406 (quoting 47 U.S.C.

§ 254(b)(5)). "Every telecommunications carrier that provides interstate

telecommunications services" must "contribute" to these mechanisms "on an

equitable and nondiscriminatory basis," and "[a]ny other provider of

interstate telecommunications may be required to contribute … if the public

interest so requires." 47 U.S.C. § 254(d).

The statute describes "[u]niversal service" as "an evolving level of

telecommunications services that the Commission shall establish periodically

…, taking into account advances in telecommunications and information

technologies and services." *Id.* § 254(c)(1). In defining "the services that are

supported by Federal universal service support mechanisms," the

6

Commission must "consider the extent to which such telecommunications

services"—

- (A) are essential to education, public health, or public safety;

- (B) have, through the operation of market choices by customers, been subscribed to by a substantial majority of residential customers;

- (C) are being deployed in public telecommunications networks by telecommunications carriers; and

- (D) are consistent with the public interest, convenience, and necessity.

*Id.* § 254(c)(1)(A)-(D). "In addition to the services included in the definition

of universal service" under section 254(c)(1), "the Commission may

designate additional services for such support mechanisms for schools,

libraries, and health care providers for the purposes of" section 254(h). *Id.*

§ 254(c)(3); *see id.* § 254(h).

Section 254(b) provides that "the Commission shall base policies for

the preservation and advancement of universal service on the following

principles":

- (1) Quality services should be available at just, reasonable, and affordable rates.

- (2) Access to advanced telecommunications and information services should be provided in all regions of the Nation.

- (3) Consumers in all regions of the Nation, including low-income consumers and those in rural, insular, and high cost areas, should have access to telecommunications and

> information services, including interexchange services and advanced telecommunications services, that are reasonably comparable to those services provided in urban areas and that are available at rates that are reasonably comparable to rates charged for similar services in urban areas.
>
> (4) All providers of telecommunications services should make an equitable and nondiscriminatory contribution to the preservation and advancement of universal service.
>
> (5) There should be specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service.
>
> (6) Elementary and secondary schools and classrooms, health care providers, and libraries should have access to advanced telecommunications services as described in section 254(h).

*Id.* § 254(b)(1)-(6). In addition, section 254(b)(7) permits the Commission to

base its universal service policies on any "other principles" that the agency

determines "are necessary and appropriate for the protection of the public

interest, convenience, and necessity and are consistent with" the

Communications Act. *Id*. § 254(b)(7).[1]

---

[1] The FCC has added two principles under section 254(b)(7). In 1997, it adopted the "principle of competitive neutrality among providers and technologies, requiring that specific universal [service] support mechanisms neither unfairly advantage nor disadvantage one provider [or technology] over another." *AT&T, Inc. v. FCC*, 886 F.3d 1236, 1243 (D.C. Cir. 2018) (cleaned up). In 2011, the agency adopted the principle of "support for advanced services." *Connect America Fund*, 26 FCC Rcd 17663, 17679 ¶45 (2011), *pets. for review denied*, *In re FCC 11-161*, 753 F.3d 1015 (10th Cir. 2014).

8

## C. The Implementation Of Section 254

To implement section 254, Congress directed the FCC to revise its
rules based on recommendations by a Federal-State Joint Board.[2] *See* 47
U.S.C. § 254(a)(1)-(2). After reviewing the Joint Board's recommendations
and public comments, the Commission created four universal service
programs to provide affordable service to (1) high-cost areas (remote areas
where the cost of providing service is high), 47 C.F.R. §§ 54.302-54.321,
54.801-54.1515; (2) low-income consumers who qualify for the FCC's
Lifeline program, *id*. §§ 54.400-54.423; (3) schools and libraries, *id*.
§§ 54.500-54.523; and (4) rural health care providers, *id*. §§ 54.600-54.633.
*See Vt. Pub. Serv. Bd. v. FCC*, 661 F.3d 54, 56-57 (D.C. Cir. 2011).

Pursuant to section 254(c)(1), the FCC adopted a rule designating the
telecommunications services that qualify for universal service support.
*Federal-State Joint Board on Universal Service*, 12 FCC Rcd 8776, 8809-22
¶¶61-82 (1997) (*Universal Service Order*), *aff'd in part and rev'd in part,
TOPUC I*, 183 F.3d 393. Under that rule, the only telecommunications

---

[2] The Federal-State Joint Board on Universal Service is comprised of FCC
Commissioners, State Utility Commissioners, and a consumer advocate
representative. *See* https://www.fcc.gov/general/universal-service-federal-
state-joint-board.

9

services eligible for support are voice telephony services that include certain specified features. 47 C.F.R. § 54.101(a).

Invoking its authority under sections 254(c)(3) and 254(h)(1)(B), the FCC designated two additional services provided to schools and libraries—internet access and the installation and maintenance of internal connections—as services eligible for support. *Universal Service Order*, 12 FCC Rcd at 9008-23 ¶¶436-463; 47 C.F.R. § 54.502(a)(1)-(2). This Court upheld the FCC's authority to subsidize these services. *TOPUC I*, 183 F.3d at 440-43.

In 1997, the FCC appointed the National Exchange Carrier Association (NECA) as the temporary administrator of the new universal service support mechanisms. *Universal Service Order*, 12 FCC Rcd at 9216-17 ¶866.[3] Later that year, the FCC directed NECA "to create an independently functioning, not-for-profit subsidiary"—the Universal Service Administrative Company (USAC)—to "administer temporarily" the high cost and low income support mechanisms, "as well as perform billing and collection functions" for all four universal service support mechanisms. *Changes to the Board of Directors of*

---

[3] NECA, "a nonprofit, non-stock membership corporation," was "formed pursuant to FCC orders." *Allnet Commc'n Serv., Inc. v. Nat'l Exchange Carrier Ass'n*, 965 F.2d 1118, 1119 (D.C. Cir. 1992). Prior to the 1996 Act, NECA administered several FCC programs designed to "keep local [telephone] rates affordable," including a "Universal Service Fund" and "two Lifeline Assistance Programs." H.R. Rep. No. 103-560, at 33 (1994).

10

*the National Exchange Carrier Association, Inc.*, 12 FCC Rcd 18400, 18415

¶25 (1997) (*Contribution Order*). In November 1998, the Commission made

USAC the permanent administrator of the universal service support

mechanisms as of January 1, 1999. *Changes to the Board of Directors of the*

*National Exchange Carrier Association, Inc.*, 13 FCC Rcd 25058, 25059-61,

25069-70 ¶¶2, 5, 20 (1998) (*USAC Order*).

USAC is an independent, not-for-profit private corporation. *See*

https://www.usac.org/about/. Its board of directors includes representatives

of private industry, recipients of universal service funding, and consumer

groups, as well as USAC's Chief Executive Officer. *See* 47 C.F.R.

§ 54.703(b) (describing the composition of USAC's board).[4]

USAC's role is "exclusively administrative," *USAC Order*, 13 FCC

Rcd at 25067 ¶16, and "relatively narrow," *Nat'l Lifeline Ass'n v. FCC*, 983

F.3d 498, 503 (D.C. Cir. 2020). USAC acts "as the Commission's agent,"[5]

---

[4] Except for USAC's Chief Executive Officer, USAC's directors are
appointed for three-year terms by the FCC Chair, who selects new directors
after reviewing nominations submitted by the groups represented on the
board. 47 C.F.R. § 54.703(c)-(d).

[5] *See* Memorandum of Understanding Between the Federal
Communications Commission and the Universal Service Administrative
Company, Dec. 19, 2018, at 2, § III.B (FCC-USAC MOU), available at
https://www.fcc.gov/sites/default/files/usac-mou.pdf.

11

with responsibility "for billing contributors, collecting contributions to the universal service support mechanisms, and disbursing universal service support funds." 47 C.F.R. § 54.702(b).

USAC "may not make policy, interpret unclear provisions of the statute or rules, or interpret the intent of Congress. Where the Act or the Commission's rules are unclear, or do not address a particular situation," USAC must "seek guidance from the Commission." *Id*. § 54.702(c). [6] The FCC is ultimately "responsible for the overall management, oversight, and administration" of the universal service program, "including all ... policy decisions." FCC-USAC MOU at 2, § III.A. And the FCC's policy decisions are often reflected in detailed regulations that govern USAC. For example, the FCC's rules for high-cost support provide precise formulas that USAC must use to calculate available support. *See, e.g.*, 47 C.F.R. § 54.303(a)(1) (total eligible annual operating expenses); *id*. § 54.1304(b) (safety net additive support); *id*. § 54.901(a) (Connect America Fund Broadband Loop Support).

---

[6] *See Huawei Tech. USA, Inc. v. FCC*, 2 F.4th 421, 448 n.60 (5th Cir. 2021) (USAC "administers the universal service fund with FCC policy guidance"); FCC-USAC MOU at 17, § IV.J (describing procedures for USAC to seek guidance from Commission staff).

12

Beyond these prescriptive rules, the FCC actively oversees USAC's administration of the universal service program. Any party aggrieved by a USAC decision may request de novo review by the Commission if USAC declines to reconsider the decision. *See* 47 C.F.R. §§ 54.719-54.725. In addition, the Commission periodically directs USAC to take specific actions to ensure the proper operation of the universal service support mechanisms (such as, for example, improving cybersecurity, reducing fraud, and making adjustments in response to audits).[7]

The FCC also requires USAC to "obtain and pay for an annual audit conducted by an independent auditor" to determine whether USAC "is properly administering the universal service support mechanisms to prevent fraud, waste, and abuse." *Id.* § 54.717. The FCC's Office of Managing Director (OMD) approves the audit's requirements, reviews the audit's preliminary findings, and makes recommendations to the auditor. *See id.* § 54.717(b)-(g). "Based on the final audit report," the OMD "may take any action necessary to ensure that the universal service support mechanisms operate in a manner consistent with" the Commission's rules and "the public interest." *Id.* § 54.717(k).

---

[7] These directives are available at https://www.fcc.gov/universal-service-fund-general-management-and-oversight.

13

## D. The FCC's Universal Service Contribution Rules

Consistent with section 254(d), FCC rules require all

"telecommunications carriers providing interstate telecommunications

services" and "[c]ertain other providers of interstate telecommunications" to

"contribute to the universal service support mechanisms." *Id.* § 54.706(a).[8]

In 1997, the Commission adopted a rule prescribing the procedures for

calculating the amount of each carrier's quarterly universal service

contribution. *See Contribution Order*, 12 FCC Rcd at 18424-28 ¶¶42-50.

Under that rule, at least 60 calendar days before each quarter, USAC "must

submit" to the FCC and the OMD "its projections of demand" and

"administrative expenses" for the universal service support mechanisms for

the upcoming quarter "and the basis for those projections." 47 C.F.R.

§ 54.709(a)(3). At least 30 days before the quarter, USAC "must submit the

---

[8] The FCC has construed the statutory term "telecommunications carrier" to mean a common carrier. *See Virgin Islands Tel. Corp. v. FCC*, 198 F.3d 921, 926-30 (D.C. Cir. 1999); 47 U.S.C. § 153(51), (53). The rule implementing section 254(d) requires all common carriers providing interstate telecommunications services to make universal service contributions. The rule also requires contributions by certain entities that provide interstate telecommunications on a non-common carrier basis. *See* 47 C.F.R. § 54.706(a)(1)-(19); *Conference Group, LLC v. FCC*, 720 F.3d 957, 959-60 (D.C. Cir. 2013); *Vonage Holdings Corp. v. FCC*, 489 F.3d 1232, 1238-41 (D.C. Cir. 2007).

14

total contribution base" (the projected collected interstate and international end-user telecommunications revenues for all carriers) to the OMD. *Ibid.*[9]

After receiving USAC's submissions, the FCC announces USAC's projections and proposes a "contribution factor" for the next quarter "in a public notice … available on the Commission's website." *Id.* § 54.709(a)(3). The "contribution factor" is "based on the ratio of total projected quarterly expenses of the universal service support mechanisms to the total projected collected end-user interstate and international telecommunications revenues, net of projected contributions." *Id.* § 54.709(a)(2).

At any point "within the fourteen-day period following release of the Commission's public notice," the FCC may revise USAC's projections and set them "at amounts that the Commission determines will serve the public interest." *Id.* § 54.709(a)(3). "If the Commission takes no action" within 14 days of the public notice, USAC's projections and the proposed contribution factor are "deemed approved by the Commission." *Ibid.*

USAC must "apply the quarterly contribution factor … approved by the Commission" to each carrier's contribution base "to calculate the amount of individual" carriers' quarterly "contributions." *Id.* § 54.709(a)(3); *see*

---

[9] To calculate the contribution base, USAC uses data self-reported by carriers every quarter. *See* 47 C.F.R. § 54.709(a)(3); *id.* § 54.711(a).

*Rural Cellular Ass'n v. FCC*, 685 F.3d 1083, 1086 (D.C. Cir. 2012) (*Rural Cellular II*). In general, a carrier's contribution base is its "projected collected interstate and international end-user telecommunications revenues, net of projected contributions." 47 C.F.R. § 54.706(b).[10]

The Commission's rules permit—but do not require—carriers to recover their federal universal service contribution costs "through interstate telecommunications-related charges to end users." *Id.* § 54.712(a); *see Vt. Pub. Serv. Bd.*, 661 F.3d at 57 (telephone companies "may pass [universal service] fees along to their customers, and almost always do"). If a carrier "chooses to recover its federal universal service contribution costs through a line item" on customers' bills, "the amount of the federal universal service line-item charge may not exceed the interstate telecommunications portion of [each] customer's bill times the relevant contribution factor." 47 C.F.R. § 54.712(a).

---

[10] In response to a remand from this Court, *see TOPUC I*, 183 F.3d at 433-35, the FCC revised its rules to exclude from the contribution base the international revenues of carriers with relatively small interstate revenues. *See Comsat Corp. v. FCC*, 250 F.3d 931, 934 (5th Cir. 2001); 47 C.F.R. § 54.706(c).

16

## E.    The First Quarter 2022 Universal Service Contribution Factor

On November 2, 2021, USAC submitted to the FCC its projections of

demand and administrative expenses for the universal service support

mechanisms for the first quarter of 2022.[11]

Petitioners filed comments in response to USAC's projections on

November 19, 2021. *See* JA113-210. They raised no specific objections to

USAC's projections. Instead, they argued that the Commission should set the

contribution factor at zero and suspend the collection of universal service

contributions because (according to petitioners) the FCC's universal service

program is unlawful. Among other things, petitioners maintained that section

254 violates the Constitution by delegating Congress's legislative and taxing

---

[11] *See* Federal Universal Service Support Mechanisms Fund Size
Projections for First Quarter 2022 (JA211), available at
https://www.usac.org/wp-content/uploads/about/documents/fcc-
filings/2022/first-quarter/financials/USAC-1Q2022-Federal-Universal-
Service-Mechanism-Quarterly-Demand-Filing_Final.pdf.

power to the FCC, and that the Commission improperly re-delegated this power to USAC. JA139-59.[12]

After USAC provided the FCC with the contribution base for the first quarter of 2022,[13] the OMD proposed a contribution factor of 25.2 percent for that quarter in a public notice issued on December 13, 2021. Public Notice, Proposed First Quarter 2022 Contribution Factor, DA 21-1550 (OMD Dec. 13, 2021) (JA100). The proposed contribution factor was based on USAC's cost and revenue projections, which were set forth in the public notice. *See id.* at 1-2 (JA100-01). The public notice stated that if the FCC took "no action" within 14 days, USAC's projections and the proposed contribution factor "shall be deemed approved by the Commission." *Id.* at 4 (JA103).

---

[12] Many of these petitioners made the same arguments in comments filed with the FCC on September 23, 2021, in response to the public notice proposing the contribution factor for the fourth quarter of 2021. After the Commission approved that contribution factor, the commenters petitioned for review in the Sixth Circuit. *See Consumers' Research v. FCC*, 6th Cir. No. 21-3886 (filed Sept. 30, 2021). Petitioners have also petitioned this Court for review of the contribution factor for the second quarter of 2022. *See Consumers' Research v. FCC*, 5th Cir. No. 22-60195 (filed April 6, 2022). That case has been stayed pending the disposition of this one. Order, No. 22-60195 (May 19, 2022).

[13] *See* Federal Universal Service Support Mechanisms Quarterly Contribution Base for the First Quarter 2022 (JA105), available at https://www.usac.org/wp-content/uploads/about/documents/fcc-filings/2022/first-quarter/financials/USAC-1Q2022-Universal-Service-Contribution-Base-Filing.pdf.

18

In response to the public notice, petitioners filed comments with the Commission on December 21, 2021. *See* JA1-99. Once again, they did not dispute any of USAC's projections; nor did they question the accuracy of the OMD's calculation of the contribution factor based on those projections. Instead, petitioners reiterated their claims that the FCC's universal service program is unlawful, and that the Commission should therefore suspend the collection of universal service contributions.

The FCC took no action within 14 days after the public notice was released. Accordingly, on December 27, 2021, the proposed contribution factor of 25.2 percent for the first quarter of 2022 was "deemed approved by the Commission." *See* 47 C.F.R. § 54.709(a)(3).

## SUMMARY OF ARGUMENT

For more than two decades, the FCC's universal service program has carried out a central goal of telecommunications regulation in the United States: to give every American access to affordable telecommunications. Countless consumers, including low-income families and those in high-cost areas, as well as schools, libraries, and health care providers, have relied on the program to support communications services that are critical to modern life.

Petitioners challenge the legality of the program on the basis of arguments that could have been raised long ago. They chiefly complain that section 254 of the Communications Act, which lays out a comprehensive set of guidelines for the Commission, nevertheless unconstitutionally delegates legislative power to the agency. They also claim that USAC, the program's administrator, is unlawfully vested with government power, even though USAC has no policymaking authority, performs ministerial functions, and is overseen by the FCC at every step. As we show below, the Court lacks jurisdiction to hear this case because the petition for review is untimely. In any event, petitioners' claims are baseless.

I. Under the Hobbs Act, facial, pre-enforcement challenges to FCC rules must be brought within 60 days after the rules' publication. 28 U.S.C. § 2344. The Commission adopted its universal service rules in the late 1990s, and the contribution factor rules were last amended in 2011. Petitioners' arguments that those rules are unlawful are thus at least a decade out of time.

Petitioners are not entitled to challenge the lawfulness of a multi-billion dollar program that has been in place for 25 years, and upon which countless telecommunications subscribers have long relied, by challenging the Commission's approval of a contribution factor that did nothing to reopen the agency's consideration of the issues raised by petitioners. The proper

way to raise claims that section 254 unconstitutionally delegates legislative power, or that the FCC impermissibly delegated government power to a private entity, is to file a petition for rulemaking to amend or repeal the FCC's contribution factor rules and then to seek review of any Commission disposition of that petition. Alternatively, petitioners can raise their constitutional challenges as a defense to an action to enforce contribution payments.

In any event, petitioners' claims fail on the merits.

II.a. The delegation of authority to the FCC under section 254 is constitutional if Congress has provided "an intelligible principle to which" the Commission "is directed to conform." *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928). The Supreme Court has applied this "intelligible principle" test for nearly a century, and it has upheld the vast majority of congressional delegations under that test. *See Gundy v. United States*, 139 S. Ct. 2116, 2129 (2019) (plurality opinion); *Big Time Vapes, Inc. v. FDA*, 963 F.3d 436, 441-43 (5th Cir. 2020).

b. Section 254 easily satisfies the intelligible principle test. Multiple provisions of the statute limit the FCC's discretion to implement the universal service program.

21

Section 254(b) requires the FCC to base its universal service policies

on certain specified principles. Section 254(c) directs the Commission to

consider particular factors when defining the services that will receive

universal service support. Section 254(d) constrains the FCC's authority to

assess universal service fees by requiring that carriers contribute to universal

service "on an equitable and nondiscriminatory basis." 47 U.S.C. § 254(d).

Section 254(e) mandates that universal service support be "sufficient to

achieve the purposes of" section 254. *Id*. § 254(e). Both the Commission

and this Court have construed this sufficiency requirement to prohibit

"excessive funding" of universal service. *See Alenco*, 201 F.3d at 620; *see*

*also Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1102-03, 1108 (D.C. Cir.

2009) (*Rural Cellular I*). Finally, section 254(h) provides detailed

instructions to the FCC concerning the establishment and funding of the

universal service support mechanisms for rural health care providers, schools,

and libraries. All of these provisions intelligibly confine the FCC's discretion

to increase the size and scope of its universal service program and the amount

of fees it collects to finance the program. Therefore, the delegation of

authority to the FCC under section 254 is constitutional.

c. Petitioners urge the Court to apply a different test based on the

"original understanding" of nondelegation. Br. 29-35. But as this Court has

22

recognized, *Big Time Vapes*, 963 F.3d at 447, a majority of the Supreme

Court recently declined to adopt such a test, choosing instead to adhere to the

intelligible principle test, which remains binding on the lower courts. *See*

*Gundy*, 139 S. Ct. at 2123-30 (plurality opinion); *id*. at 2130-31 (Alito, J.,

concurring in the judgment); *id*. at 2131-48 (Gorsuch, J., dissenting).

Petitioners also assert that the Court should apply a stricter standard of

review than the intelligible principle test because section 254 delegates

"taxing power" to the FCC. Br. 45-60. But universal service fees are not

"taxes." *See TOPUC I*, 183 F.3d at 427 n.52; *Rural Cellular II*, 685 F.3d at

1091. In any event, petitioners' argument for more rigorous scrutiny of

"taxing" delegations is foreclosed by Supreme Court precedent, which holds

that delegations of taxing power are "subject to no constitutional scrutiny

greater than that … applied to other" delegations. *Skinner v. Mid-America*

*Pipeline Co.*, 490 U.S. 212, 223 (1989).

III. Petitioners' private delegation challenge likewise fails for two

reasons. First, USAC does not exercise government power. USAC has no

policymaking role in administering the universal service program, *see* 47

C.F.R. § 54.702(b), (c), and it is subject to extensive FCC oversight. *See,*

*e.g.*, *id*. § 54.719 (providing for review of USAC decisions). The FCC

merely fashions its own policies around proposals and routine fact gathering

that USAC provides. *Cf. State of Tex. v. Rettig*, 987 F.3d 518, 531-32 (5th

Cir. 2021). In any event, USAC's role is permissible because the

Commission retains "final reviewing authority" and "review[s] and accept[s]"

USAC's input. *See id.* at 533.

## STANDARD OF REVIEW

The Court reviews jurisdictional and constitutional issues de novo.

*Huawei*, 2 F.4th at 434; *In re Tex. Wyo. Drilling, Inc.*, 647 F.3d 547, 550 (5th

Cir. 2011).

## ARGUMENT

## I. THE COURT LACKS JURISDICTION BECAUSE THE PETITION FOR REVIEW IS UNTIMELY.

### A. The Hobbs Act's 60-Day Time Limit For Filing Pre-Enforcement Facial Challenges Has Long Expired.

This case arises under the Hobbs Act, which provides pre-enforcement

review of FCC rules by granting the courts of appeals "exclusive jurisdiction

to enjoin, set aside, suspend (in whole or in part), or to determine the validity

of" certain FCC orders. 28 U.S.C. § 2342(1). A Hobbs Act challenge must

be filed "within 60 days" of a rule's publication. *Id.* § 2344. That deadline is

"jurisdictional," *City of Arlington v. FCC*, 668 F.3d 229, 237 (5th Cir. 2012),

*aff'd*, 569 U.S. 290 (2013), and it "force[s] parties who want to challenge

agency orders via facial, pre-enforcement challenges to do so promptly,"

thereby ensuring the swift resolution of any "uncertainty" surrounding the

lawfulness of agency rules. *PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, 139 S. Ct. 2051, 2059 (2019) (Kavanaugh, J., concurring).

Although petitioners purport to challenge the Commission's approval of a single quarterly contribution factor, they identify no calculation error, lack of evidence, or procedural defect. Petitioners are not challenging the rules' application; instead, petitioners attack the rules themselves. That facial challenge is well out of time.

The 60-day time limit to initiate suit "to enjoin, set aside, suspend (in whole or in part), or to determine the validity of" the universal service rules expired years ago. 28 U.S.C. § 2342(1). The Commission devised USAC's role and enacted the contribution factor rules in 1997 and 1998,[14] and those rules were last amended in 2011. After each of these proceedings, aggrieved parties had 60 days to file petitions challenging the universal service regime as facially unconstitutional. 28 U.S.C. § 2344; 47 U.S.C. § 402(a). No one did, even when other challenges were timely filed. *See, e.g.*, *TOPUC I*, 183 F.3d at 405 (addressing a "consolidated challenge" to the FCC's implementation of section 254). By trying "to raise [facial] challenges much

---

[14] *See Contribution Order*, 12 FCC Rcd at 18415 ¶25 (directing USAC's creation); *id.* at 18424-28 ¶¶42-50 (adopting 47 C.F.R. § 54.709); *USAC Order*, 13 FCC Rcd at 25069-70 ¶20 (designating USAC the permanent administrator).

later than they would have been required to had they followed the proper channels," petitioners attempt an improper "end run" around the Hobbs Act's time limits. *United States v. Stevens*, 691 F.3d 620, 623 (5th Cir. 2012).

Allowing such an end run would prejudice millions of Americans who have reasonably relied on universal service support for decades. Across the country, universal service subsidies support schools and libraries; service in rural, insular, and high-cost areas; low-income consumers; and health care services. 47 C.F.R. §§ 54.302-54.633, 54.801-54.1515. The FCC's Lifeline and Link Up programs for low-income subscribers assisted over 7 million households in 2020, and in years past have assisted over 18 million. *See* FEDERAL-STATE JOINT BOARD ON UNIVERSAL SERVICE, UNIVERSAL SERVICE MONITORING REPORT 29 (2021).[15] Also in 2020, the FCC's Connect America Fund, which subsidizes service in high-cost areas, received over $5 billion in claims to recover costs from building modern communications networks that are reasonably comparable to networks serving urban areas. *Id.* at 38-40. The FCC's E-Rate program for schools and libraries has disbursed over $43 billion since its inception, with another $4.277 billion made available in 2021. *See id.* at 47, 50. And the Rural Health Care Program has disbursed

---

[15] https://www.fcc.gov/general/federal-state-joint-board-monitoring-reports.

over \$3 billion, with another \$612 million made available in 2021. *Id.* at 51, 53.

The Commission's approval of the first quarter 2022 contribution factor (a straightforward application of longstanding rules) cannot be said to have "reopened" the validity of the universal service program and thereby provided a new opportunity to relitigate the issue. As this Court has recognized, an agency reopens the question of the validity of one of its substantive rules (and resets the clock for a facial challenge) "*only* if 'the entire context demonstrates that the agency has undertaken a serious, substantive reconsideration of the existing rule.'" *Texas v. Biden*, 20 F.4th 928, 952 (5th Cir. 2021), *cert. granted*, 142 S. Ct. 1098 (2022) (quoting *Growth Energy v. EPA*, 5 F.4th 1, 21 (D.C. Cir. 2021) (per curiam)).

Nothing like that occurred here. There was no rulemaking proceeding; no agency request for comment on the universal service program's lawfulness; and no agency response to petitioners' "unsolicited comments" (which by themselves could not force a reopening in any event). *See id.* at 953. In short, the Commission's approval of a contribution factor under existing rules "merely continued, rather than reopened," the universal service regime challenged here. *Id*. at 955 (rejecting a reopening argument).

## B. Petitioners Should Have Filed A Petition For Rulemaking Or Raised Their Claims As Defenses To Enforcement Action.

The Hobbs Act's 60-day window for pre-enforcement review does not bar petitioners from *ever* litigating their claims. They have at least two avenues to raise facial challenges.

*First*, petitioners could "petition for the issuance, amendment or repeal of a rule or regulation" of the Commission, 47 C.F.R. § 1.106, including the rules underlying the universal service program. As the D.C. Circuit has stated, "it is a perfectly valid 'method of obtaining judicial review of agency regulations once the limitations period has run . . . to petition the agency for amendment or rescission of the regulations and then to appeal the agency's decision.'" *Am. Road & Transp. Builders Ass'n v. EPA*, 588 F.3d 1109, 1112 (D.C. Cir. 2009) (quoting *NLRB Union v. FLRA*, 834 F.2d 191, 196 (D.C. Cir. 1987)). But petitioners here did not ask the FCC to amend or repeal its universal service rules, which would have given other interested parties ample time to comment and afforded the agency a fair opportunity to address petitioners' arguments. Petitioners cannot cure that failure by raising those claims in the contribution factor proceeding below, since the sole purpose of that proceeding is for the Commission "to set projections of demand and

28

administrative expenses at amounts that [it] determines will serve the public interest." 47 C.F.R. § 54.709(a)(3).

*Second*, petitioner Cause Based Commerce (a telecommunications carrier) might have asserted a facial challenge to the universal service program as a defense to an action by the Commission to enforce payment if Cause Based Commerce refused to make its quarterly contribution. *See id.* § 54.713(c). Although the Hobbs Act limits the time for filing pre-enforcement challenges to FCC rules, 28 U.S.C. § 2344, that limit does not bar *post*-enforcement facial challenges if the FCC "issues an order requiring [the company] to comply" or "imposes a fine or other sanction … for violating the regulation." *Am. Stewards of Liberty v. Dep't of Interior*, 960 F.3d 223, 229 (5th Cir. 2020). Here, however, Cause Based Commerce does not assert that it failed to pay its universal service contribution or that the Commission initiated an enforcement action against it. Instead, like the other petitioners, it seeks improperly to assert a facial challenge to the universal service program by means of a petition for review of the Commission's contribution factor determination.

In any event, as we show below, petitioners' facial challenge to the universal service program, and USAC's role in it, fails on the merits.

## II.  SECTION 254 DOES NOT UNCONSTITUTIONALLY DELEGATE LEGISLATIVE POWER TO THE FCC.

### A.  Congress Does Not Delegate Legislative Power When It Provides An "Intelligible Principle" To Guide Administrative Implementation Of Its Enactments.

The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. CONST., art. I, § 1. "Accompanying that assignment of power to Congress is a bar on its further delegation." *Big Time Vapes*, 963 F.3d at 441 (quoting *Gundy*, 139 S. Ct. at 2123 (plurality opinion)).

Although "Congress may not delegate the power to make laws," it may lawfully delegate "the authority to make policies and rules that implement its statutes." *Loving v. United States*, 517 U.S. 748, 771 (1996). *See United States v. Grimaud*, 220 U.S. 506, 517 (1911) (Congress may enact legislation that gives administrative agencies the power "to fill up the details") (quoting *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 43 (1825)). As a practical matter, "in our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives." *Mistretta v. United States*, 488 U.S. 361, 372 (1989). "[N]o statute can be entirely precise," and "some judgments, even some judgments involving policy considerations, must be left to the officers executing the law." *Id*. at 415 (Scalia, J., dissenting).

30

Given these considerations, the Supreme Court has long recognized

that Congress "may confer substantial discretion on executive agencies to

implement and enforce the laws" so long as it "has supplied an intelligible

principle to guide the delegee's use of discretion." *Gundy*, 139 S. Ct. at 2123

(plurality opinion). *Accord Big Time Vapes*, 963 F.3d at 441-42 (quoting

*J.W. Hampton*, 276 U.S. at 409); *United States v. Garcia*, 655 F.3d 426, 435

(5th Cir. 2011); *United States v. Jones*, 132 F.3d 232, 239 (5th Cir. 1998);

*United States v. Mirza*, 454 F. Appx. 249, 255 (5th Cir. 2011) (per curiam).

The intelligible principle test is "not demanding." *Big Time Vapes*, 963

F.3d at 442 (quoting *Gundy*, 139 S. Ct. at 2129 (plurality opinion)). "It is

'constitutionally sufficient if Congress clearly delineates the general policy,

the public agency which is to apply it, and the boundaries of the delegated

authority.'" *Ibid*. (quoting *Am. Power & Light v. SEC*, 329 U.S. 90, 105

(1946)). When applying this test, courts "have almost never felt qualified to

second-guess Congress regarding the permissible degree of policy judgment

that can be left to those executing or applying the law." *Whitman v. Am.

Trucking Ass'ns*, 531 U.S. 457, 474-75 (2001) (cleaned up). As a result, over

the years, the Supreme Court has upheld as constitutional congressional

delegations to the FCC and the ICC to regulate broadcasting and railroad

consolidations in the "public interest," *see Nat'l Broad. Co. v. United States*,

319 U.S. 190, 225-26 (1943); *N.Y. Cent. Sec. Corp. v. United States*, 287 U.S.

12, 24-25 (1932), to the EPA to regulate air quality to protect the "public

health," *Whitman*, 531 U.S. at 472, and to the wartime Price Administrator to

ensure that commodity prices are "fair and equitable," *Yakus v. United States*,

321 U.S. 414, 426-27 (1944).[16]

## B. Section 254 Satisfies The Intelligible Principle Standard By Providing Ample Legislative Guidance To The FCC To Implement The Universal Service Program.

To resolve a delegation challenge, the Court must construe section 254

to "figure out what task it delegates and what instructions it provides." *Big*

*Time Vapes*, 963 F.3d at 443 (quoting *Gundy*, 139 S. Ct. at 2123 (plurality

opinion)). In examining these questions, the Court must consider not only the

text of the relevant statute, but also its "purpose," its "factual background,"

and its "context." *Ibid*. (quoting *Am. Power & Light*, 329 U.S. at 104). Here,

---

[16] The Supreme Court has found a legislative delegation unconstitutional "[o]nly twice in this country's history" (both times in 1935); and in those cases, Congress "failed to articulate *any* policy or standard to confine discretion." *Gundy*, 139 S. Ct. at 2129 (plurality opinion) (cleaned up) (citing *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935), and *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935)). Likewise, a panel of this Court recently ruled that Congress unconstitutionally delegated legislative power because, in the panel's view, Congress "offered *no guidance* whatsoever" to the SEC as to whether to bring a securities fraud enforcement action in an Article III court or before an administrative law judge. *Jarkesy v. SEC*, 34 F.4th 446, 459-63 (5th Cir. 2022).

the text, purpose, and context of section 254—including its numerous

provisions governing the FCC's discretion to administer the universal service

program—provide more than enough guidance to the FCC to satisfy the

intelligible principle standard.

## 1. Section 254(b)'s Universal Service Principles.

When Congress enacted section 254 in 1996, it was not writing on a

blank slate. Long before 1996, the FCC had pursued universal service

policies designed "to make available, so far as possible, to all the people of

the United States, … a rapid, efficient, Nation-wide … wire and radio

communication service with adequate facilities at reasonable charges." 47

U.S.C. § 151; *see TOPUC I*, 183 F.3d at 405-06.

The FCC's previous universal service initiatives informed Congress's

adoption of the "principles" articulated in 47 U.S.C. § 254(b). That provision

requires the FCC to "base policies for the preservation and advancement of

universal service on" six specified "principles":

(1) the availability of "[q]uality services" at "affordable rates,"
*id*. § 254(b)(1);

(2) nationwide "[a]ccess to advanced telecommunications and
information services," *id*. § 254(b)(2);

(3) providing low-income and rural consumers with access to
telecommunications and information services "at rates that are
reasonably comparable to rates charged for similar services in
urban areas," *id*. § 254(b)(3);

33

(4) ensuring that all telecommunications carriers "make an equitable and nondiscriminatory contribution to the preservation and advancement of universal service," *id*. § 254(b)(4);

(5) the creation of "specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service," *id*. § 254(b)(5); and

(6) "access to advanced telecommunications services" for "schools and classrooms, health care providers, and libraries" in accordance with section 254(h), *id*. § 254(b)(6).

In addition, the FCC may adopt "other principles" that "are consistent with"

the Act and "are necessary and appropriate for the protection of the public

interest, convenience, and necessity." *Id*. § 254(b)(7).

These multiple principles constrain the Commission's discretion to

advance the statute's universal service goals. They are not simply

"aspirational," as petitioners would have it. Br. 42 (quoting *TOPUC II*, 265

F.3d at 321). On the contrary, section 254(b) imposes "a mandatory duty on

the FCC" to take the principles into account in establishing its universal

service policies. *Qwest Corp. v. FCC*, 258 F.3d 1191, 1200 (10th Cir. 2001)

(*Qwest I*).[17] While the statute "allows the FCC a considerable amount of

discretion" to "balance" these "competing" principles, "that discretion is not

absolute." *TOPUC I*, 183 F.3d at 434. Thus, while the FCC may "balance

the principles against one another when they conflict," it "may not depart

from them altogether to achieve some other goal." *Qwest I*, 258 F.3d at 1200;

*see also Qwest Commc'ns Int'l, Inc. v. FCC*, 398 F.3d 1222, 1234 (10th Cir.

2005) (*Qwest II*). And it is "impermissible" for the Commission to "ignore[]

all but one of the principles enumerated in [section] 254(b)" when assessing

whether universal service support is "sufficient." *Qwest II*, 398 F.3d at

1234.[18]

_____

[17] As we explain in Parts II.B.3-5 below, several of the principles are codified
as directives in other provisions of section 254. *See* 47 U.S.C. § 254(d)
(providers of interstate telecommunications services must "contribute, on an
equitable and nondiscriminatory basis," to the FCC's universal service
mechanisms); *id*. § 254(e) (mandating that universal service support be
"sufficient to achieve the purposes" of section 254); *id*. § 254(h)(1)(A)-(B)
(prescribing specific standards for subsidizing services provided to rural
health care providers, schools, and libraries). Those provisions further
restrict the FCC's discretion to implement section 254.

[18] Section 254(b) thus bears no resemblance to the statutes invalidated in
*Panama Refining* and *Schechter Poultry*, as petitioners claim. Br. 42-44.
The statutes in those cases gave the President "unlimited authority," *Panama
Refining*, 293 U.S. at 415, and "virtually unfettered" discretion, *Schechter
Poultry*, 295 U.S. at 542. In contrast, section 254(b) gives the FCC broad but
constrained authority to advance universal service.

35

In particular, section 254(b) cabins the FCC's discretion to assess universal service fees. In deciding the appropriate level of universal service funding, the agency must take account of the first principle listed in section 254(b): the affordability of telephone service. 47 U.S.C. § 254(b)(1). "[I]t is hard to imagine how the Commission could achieve the overall goal" of section 254—to preserve and advance universal service—if the agency allowed universal service fees to grow "so large" that telecommunications services became "less 'affordable,' in contravention of [section] 254(b)(1)." *Rural Cellular I*, 588 F.3d at 1103. "Because universal service is funded … by all telecommunications providers—and thus indirectly by [their] customers—excess subsidization in some cases may detract from universal service by causing rates unnecessarily to rise, thereby pricing some consumers out of the market." *Alenco*, 201 F.3d at 620. To address this

concern, the FCC has sometimes imposed caps or restrictions on universal service funding—cost controls that this Court and others have upheld.[19]

Petitioners argue that section 254(b) does not constrain the FCC because section 254(b)(7) allows the agency to adopt other principles as "necessary and appropriate for the protection of the public interest, convenience, and necessity." Br. 44 (quoting 47 U.S.C. § 254(b)(7)). But the Supreme Court has held that a "public interest" standard provides a sufficiently intelligible limiting principle to uphold a delegation of authority to the FCC when the purposes of the legislation are taken into account. *Nat'l Broad. Co.*, 319 U.S. at 216 ("the larger and more effective use of radio"); *see Big Time Vapes*, 963 F.3d at 442 n.18. The Commission's authority to act in the "public interest" is thus "not unlimited." *Huawei*, 2 F.4th at 437 (cleaned up). Instead, the reference to the public interest "must 'take meaning from the purposes of the regulatory legislation.'" *Id*. at 439 (quoting

---

[19] *See Alenco*, 201 F.3d at 620-21 (affirming a Commission "decision to impose cost controls to avoid excessive expenditures that will detract from universal service"); *Rural Cellular I*, 588 F.3d at 1103 (in capping high-cost support, the FCC reasonably balanced "the principle of providing sufficient funding mechanisms to advance universal service" and "the principle of affordability for consumers"); *In re FCC 11-161*, 753 F.3d at 1082 (in declining to subsidize broadband deployment by competitive carriers, the FCC considered the interests of "consumers and telecommunications providers who make payments to support" universal service) (quoting *Connect America Fund*, 26 FCC Rcd at 17732 ¶178).

*NAACP v. Fed. Power Comm'n*, 425 U.S. 662, 669 (1976)). Consequently,

any universal service principles adopted by the FCC "for the protection of the

public interest" must be "consistent with" the Communications Act, including

the goal of promoting universal service. 47 U.S.C. § 254(b)(7).[20]

Moreover, the FCC is not free to "ignore[ ] all" of the other principles

enumerated in section 254(b) to achieve any principles it adds under section

254(b)(7). *See Qwest II*, 398 F.3d at 1234. Most obviously, the Commission

may not disregard the principle of "affordable" telephone service under

section 254(b)(1). The agency has repeatedly found that considerations of

affordability warranted measures to curb the growth of the universal service

program in order to prevent sharp increases in universal service fees. *See*

*Alenco*, 201 F.3d at 620-21; *Rural Cellular I*, 588 F.3d at 1102-03; *In re FCC*

*11-161*, 753 F.3d at 1079-83.

---

[20] Petitioners suggest that the "public interest" cannot supply a limiting
principle here because the challenged delegation does not involve "complex,
technical determinations." Br. 40. But section 254 delegates "difficult policy
choices" to the FCC. *Alenco*, 201 F.3d at 615. Given the economic and
technological complexities inherent in setting universal service policy, the
public interest criterion "is as concrete as the complicated factors for
judgment in such a field of delegated authority permit." *Nat'l Broad. Co.*,
319 U.S. at 216 (quoting *FCC v. Pottsville Broad. Co.*, 309 U.S. 134, 138
(1940)).

Indeed, this Court and others have found the section 254(b) principles sufficiently specific to enable judicial review to ensure that the FCC's actions are consistent with those principles. *See, e.g., Rural Cellular I*, 588 F.3d at 1102-03; *Qwest II*, 398 F.3d at 1233-34; *Alenco*, 201 F.3d at 620-23. That alone defeats petitioners' claim that section 254(b) fails to provide a sufficiently intelligible principle to limit the FCC's discretion.

## 2. Section 254(c)'s Limits On Defining Eligible Services.

Beyond the general principles that the FCC must take into account in advancing Congress's universal service goals, other subsections of section 254 impose additional constraints on the Commission's discretion.

One such provision is section 254(c). The FCC's rules implementing section 254 must "include a definition of the services that are supported by Federal universal service support mechanisms," 47 U.S.C. § 254(a)(2), and section 254(c)(1) limits the FCC's discretion in defining such services. Under that provision, services that receive universal service funding must be "telecommunications services" as defined by the Act. *See id*. § 254(c)(1); *id*. § 153(53). Moreover, for purposes of defining which telecommunications services will receive support, section 254(c)(1) requires the Commission to "consider the extent to which" (1) the services "are essential to education, public health, or public safety," *id*. § 254(c)(1)(A); (2) "a substantial majority

of residential customers" subscribe to the services, *id*. § 254(c)(1)(B); (3)

carriers have "deployed" the services, *id*. § 254(c)(1)(C); and (4) the services

"are consistent with the public interest, convenience, and necessity," *id*.

§ 254(c)(1)(D).

The four factors that the FCC must consider when defining supported

services under section 254(c)(1) are not "vague" (Br. 44). The first three

factors require the Commission to examine specific factual issues—whether

the services are "essential" to education, health, or public safety, how many

persons have subscribed to the services, and how extensively the services

have been deployed. *See* 47 U.S.C. § 254(c)(1)(A)-(C). As for the fourth

factor, in assessing whether a service is "consistent with the public interest,"

*id*. § 254(c)(1)(D), the FCC must consider "the purpose" of section 254, "its

factual background, and the statutory context." *See Big Time Vapes*, 963

F.3d at 443 (cleaned up); *see also Huawei*, 2 F.4th at 439.

A primary purpose of section 254 was to preserve programs that the

FCC had previously established to subsidize service to high-cost areas and

low-income consumers. *See TOPUC I*, 183 F.3d at 406. This context

provides the Commission with clear guidance in evaluating whether

subsidization of a particular service would be "consistent with the public

interest." 47 U.S.C. § 254(c)(1)(D). That standard is sufficiently "concrete"

40

to ensure that the delegation here is constitutional. *See Nat'l Broad. Co.*, 319 U.S. at 216.

The statute does not permit the FCC to redefine universal service "as often as it chooses," as petitioners claim. Br. 44. Instead, the Commission is authorized to revise its definition of supported services only to account for "advances in telecommunications and information technologies and services." 47 U.S.C. § 254(c)(1). As this Court has recognized, "the telecommunications market" is "dynamic" and subject to "dramatic changes." *TOPUC II*, 265 F.3d at 322. Congress thus properly granted the FCC "sufficiently elastic powers" to adapt its policies and rules to "accommodate dynamic new developments in the field of communications." *Gen. Tel. Co. of the Southwest v. United States*, 449 F.2d 846, 853 (5th Cir. 1971); *see also Nat. Broad. Co.*, 319 U.S. at 219.

Section 254(c)(3) authorizes the Commission to "designate additional services for [the] support mechanisms for schools, libraries, and health care providers for the purposes of" section 254(h). 47 U.S.C. § 254(c)(3). This provision "restricts the FCC's authority" by specifying that services may be designated for support under section 254(c)(3) only if they serve "'the purposes of [section 254(h)].'" *TOPUC I*, 183 F.3d at 441 (quoting 47 U.S.C. § 254(c)(3)). Courts can enforce this restriction when reviewing

challenges to the FCC's designation of particular services. For example, this Court carefully considered—and ultimately rejected—a claim that the FCC exceeded its authority under section 254(c)(3) by designating internet access and internal connections provided to schools and libraries as "additional services" eligible for universal service support. *See id.* at 440-43.

### 3. Section 254(d)'s Requirement That Contributions Be Equitable And Nondiscriminatory.

Section 254(d) requires "[e]very telecommunications carrier that provides interstate telecommunications services" to "contribute, on an equitable and nondiscriminatory basis," to the FCC's universal service support mechanisms. 47 U.S.C. § 254(d). By requiring "that all universal service contributions be 'equitable and nondiscriminatory,'" *TOPUC I*, 183 F.3d at 433, section 254(d) restricts the Commission's discretion in assessing universal service fees.

In *TOPUC I*, 183 F.3d at 433-35, this Court held that the FCC violated section 254(d) by requiring all providers of interstate telecommunications services to contribute a percentage of their combined interstate and international revenues to universal service. The Court found that this contribution requirement "forced" carriers with minimal interstate revenues and large international revenues "to pay more in universal service contributions than [they] can generate in interstate revenues," effectively

requiring them "to incur a loss to participate in" the "interstate service"

market. *Id*. at 434-35. Given the disparate impact on these carriers, the Court

concluded that such contribution obligations were inequitable and

discriminatory, in violation of section 254(d). *Ibid*.[21]

As the Court's statutory analysis makes clear, the FCC does not have

unbounded discretion to assess universal service fees on carriers. To comply

with section 254(d), the Commission must ensure that carriers make universal

service payments "on an equitable and nondiscriminatory basis." 47 U.S.C.

§ 254(d). Contrary to petitioners' contention (Br. 41-44), this is yet another

"meaningful limitation[]" on the Commission's power to raise revenues to

support universal service.

### 4.    Section 254(e)'s Requirement That Support Be Sufficient.

Section 254(e) states that universal service "support should be explicit

and sufficient to achieve the purposes of this section." 47 U.S.C. § 254(e).

This Court has construed section 254(e) as a "statutory command" requiring

---

[21] In response to the Court's remand, the FCC "adopted a bright-line percentage rule" to determine "when a carrier's international revenues would be included in the base from which the agency calculates the carrier's universal service contribution." *Comsat*, 250 F.3d at 934. Under the amended rule, if a carrier's interstate revenues fall below 12 percent of its combined interstate and international revenues, its international revenues will be excluded from its contribution base. *See* 47 C.F.R. § 54.706(c).

the FCC to ensure the "sufficiency of universal service support." *TOPUC I*, 183 F.3d at 412; *see also Alenco*, 201 F.3d at 614 (section 254(e) "requires that universal service support be 'explicit and sufficient'"). This sufficiency requirement imposes an additional constraint on the FCC's discretion to increase the size of the universal service program and the level of funding necessary to sustain it.

In *Alenco*, when this Court upheld the FCC's adoption of cost controls to slow the growth of universal service subsidies, it noted that "excessive funding" of universal service can "violate the sufficiency requirements" of section 254(e). *Alenco*, 201 F.3d at 620. The Court explained that "[b]ecause universal service is funded … by all telecommunications providers—and thus indirectly by [their] customers—excess subsidization in some cases may detract from universal service by causing rates unnecessarily to rise, thereby pricing some consumers out of the market" and reducing the number of telephone service subscribers. *Ibid*.

As this Court recognized in *Alenco*, the FCC's authority under section 254 to assess fees to support universal service is not "limitless." Br. 29. Because "excessive funding" can trigger needless increases in telephone rates, it can thwart the universal service goals of section 254 by "pricing some consumers out of the market." *Alenco*, 201 F.3d at 620. To avert such

a counterproductive result, which would "violate the sufficiency

requirements" of section 254(e), the Commission has adopted—and the

courts have upheld—measures to restrain the growth of the universal service

program. *See id*. at 620-21; *Rural Cellular I*, 588 F.3d at 1101-08; *In re FCC*

*11-161*, 753 F.3d at 1079-83.

## 5. Section 254(h)'s Guidance For Calculating Support To Schools, Libraries, And Health Care Providers.

Finally, section 254(h) imposes further limits on the Commission's

discretion to provide universal service support to schools, libraries, and health

care providers.

Before Congress passed the 1996 Act, the FCC historically promoted

universal service by subsidizing the provision of telephone service to "high-

cost" areas and "low-income subscribers." *TOPUC I*, 183 F.3d at 406.

"Section 254(h) adds a new wrinkle to the concept of universal service by

directing the FCC to provide support to elementary and secondary schools,

libraries, and health care providers …, irrespective of whether they are high-

cost [or low-income] consumers." *Id*. at 440.

Section 254(h)(1) contains specific directives regarding the amount of

funding for the universal service mechanisms for rural health care providers,

schools, and libraries. *See* 47 U.S.C. § 254(h)(1)(A)-(B).

Carriers that are required to provide telecommunications services to rural health care providers under section 254(h)(1)(A) "shall be entitled" to a subsidy in "an amount equal to the difference, if any, between the rates for services provided to health care providers for rural areas in a State and the rates for similar services provided to other customers in comparable rural areas in that State." *Id*. § 254(h)(1)(A).

Carriers that are required to provide services to schools and libraries at discounted rates under section 254(h)(1)(B) shall "have an amount equal to the amount of the discount treated as an offset to [their] obligation to contribute" to universal service funding. *Id.* § 254(h)(1)(B)(i). "The discount" for such services "shall be an amount that the Commission, with respect to interstate services, and the States, with respect to intrastate services, determine is appropriate and necessary to ensure affordable access to and use of such services by" elementary schools, secondary schools, and libraries. *Id*. § 254(h)(1)(B).

Section 254(h)(1) thus articulates standards that the FCC must apply when deciding how much money to raise to subsidize services to rural health care providers, schools, and libraries.

In addition, section 254(h)(2)(A) directs the FCC to establish rules to enhance "access to advanced telecommunications and information services

46

for all public and nonprofit elementary and secondary school classrooms, health care providers, and libraries." *Id.* § 254(h)(2)(A). The statute requires that such rules be "competitively neutral," *id.* § 254(h)(2), as well as "technically feasible and economically reasonable," *id.* § 254(h)(2)(A).

\*\*\*\*\*

Whether considered separately or in combination, multiple provisions of section 254—including sections 254(b), (c), (d), (e), and (h)—intelligibly limit the FCC's authority to increase the size and scope of the universal service program and the fees that carriers must pay to support universal service. In developing universal service policies, the Commission must consider whether its policies promote the availability of "[q]uality services … at just, reasonable, and affordable rates" and are "sufficient … to preserve and advance universal service." 47 U.S.C. § 254(b)(1), (5). And in deciding which services should receive universal service support, the Commission must consider the extent to which such services (1) are "essential" to education, public health, or public safety, (2) have been adopted "by a substantial majority of residential customers," and (3) are being "deployed" by carriers. *Id.* § 254(c)(1)(A)-(C). The Commission must also ensure that telecommunications carriers make "equitable and nondiscriminatory" contributions to universal service, *id.* § 254(b)(4), 254(d), and that its

universal service mechanisms provide "sufficient" support to achieve the

statute's purposes, *id*. § 254(b)(5), 254(e). Finally, when the FCC subsidizes

services provided to schools, libraries, and rural health care providers, it must

comply with the terms of section 254(h), *id*. § 254(h)(1)(A)-(B),

254(h)(2)(A). These numerous considerations provide ample guidance to the

FCC in administering the universal service program.

In sum, because Congress "clearly delineate[d] its general policy, the

public agency which is to apply it, and the boundaries of the delegated

authority," *Big Time Vapes*, 963 F.3d at 442, the FCC's administration of the

universal service program under the authority granted by section 254 of the

Communications Act does not violate the constitutional separation of powers.

## C. Petitioners' Attempts To Avoid Controlling Separation Of Powers Law Are Unavailing.

1. Petitioners urge the Court to hold that section 254 violates "the

original understanding of nondelegation," and that the Constitution

"prohibit[s] any transfer of Congress's vested legislative powers to another

entity." Br. 30. But from the earliest days of the Republic, the Supreme

Court has recognized that Congress may delegate to an administrative agency

the power to "fill up the details" of a legislative program. *Wayman*, 23 U.S.

at 43. *Accord Gundy*, 139 S. Ct. at 2136 (Gorsuch, J., dissenting). In

determining how far "the maker of the law may commit something to the

48

discretion of other departments," *Wayman*, 23 U.S. at 46, it has long been

settled that a delegation is constitutional if Congress provides an "intelligible

principle" to guide administrative discretion, a standard that fixes the "extent

and character of that assistance . . . according to common sense and the

inherent necessities of the governmental coordination." *J.W. Hampton*, 276

U.S. at 404, 406. *See Gundy*, 139 S. Ct. at 2129 (plurality opinion); *id*. at

2130-31 (Alito, J., concurring in the judgment).[22]

Although several Justices have "recently expressed interest in

reexamining the nondelegation doctrine," this Court cannot get ahead of the

Supreme Court or "read tea leaves to predict where it might end up." *Big

Time Vapes*, 963 F.3d at 443, 447 (quoting *United States v. Mecham*, 950

F.3d 257, 265 (5th Cir. 2020)). Unless and until the Supreme Court abandons

---

[22] Even if one believed that the intelligible principle doctrine has
impermissibly "mutated" into something that no longer has any constitutional
basis, there is "a good argument . . . that the statute in *J.W. Hampton* passed
muster under the traditional tests." *Gundy*, 139 S. Ct. at 2139 (Gorsuch, J.,
dissenting). And the statute in *J.W. Hampton* is very much like section 254,
in that it sets forth a number of factors that, "so far as … practicable," are to
be taken into administrative consideration. *See J.W. Hampton*, 276 U.S. at
401-02 (quoting Tariff Act, § 315(c), 42 Stat. 858, 942-43 (1922)) (in
ascertaining the differences in costs of production of domestic and foreign
articles, the President shall "take into consideration" differences in
"conditions in production," differences in "wholesale selling prices,"
"advantages granted to a foreign producer by a foreign government," and
"any other advantages or disadvantages in competition").

or alters its current approach to nondelegation, this Court must "follow the law as it is, respecting the Supreme Court's singular role in deciding the continuing viability of its own precedents." *Perez v. Stephens*, 745 F.3d 174, 180 (5th Cir. 2014). Accordingly, the Court must uphold section 254's delegation of authority to the FCC if Congress has provided an intelligible principle constraining the Commission's discretion to implement the statute. *See Big Time Vapes*, 963 F.3d at 441-42.

2. Petitioners also urge the Court to "bar," or at a minimum "subject to strict guidelines," legislative delegations of the "taxing power." Br. 59. But universal service contributions are not taxes, and even if they were, the Supreme Court has made clear that no stricter nondelegation standard applies.

As the Supreme Court has explained, a federal agency does not exercise taxing power if it requires regulated entities to pay a "fee" that "bestows a benefit on the [payor], not shared by other members of society." *Nat'l Cable Television Ass'n v. United States*, 415 U.S. 336, 340-41 (1974). Both this Court and the D.C. Circuit have concluded that universal service contributions are fees, *not* taxes, because universal service "confers special benefits" on contributing carriers by (among other things) expanding the network they can serve. *See TOPUC I*, 183 F.3d at 427 n.52; *id*. at 428 (each contributing carrier "directly benefits from" the "larger network" produced by

"the provision of universal service"); *Rural Cellular II*, 685 F.3d at 1090-91 (because contributing carriers "provide Internet access over subscribers' telephone lines," they "will particularly benefit" from universal service, which increases the "utility of the Internet" by providing more users with "access to broadband").[23]

While the Taxing Clause analysis in *TOPUC I* was dicta, it should be given substantial weight. Dicta "can be persuasive authority," particularly when it is "bolstered by other circuits." *Ayoub v. INS*, 222 F.3d 214, 215 (5th Cir. 2000). And the Court's determination in *TOPUC I* that universal service payments are not taxes was later adopted by the D.C. Circuit in *Rural Cellular II*, 685 F.3d at 1091.[24]

---

[23] The D.C. Circuit also held that the FCC did not exercise "taxing power" when it adopted cost allocation requirements to subsidize universal service in the 1980s. *Rural Tel. Coal. v. FCC*, 838 F.2d 1307, 1314 (D.C. Cir. 1988). And state courts in Louisiana, Nebraska, and Kansas have ruled that charges levied on carriers to fund state universal service programs are not taxes. *See Voicestream GSM I Operating Co. v. La. Pub. Serv. Comm'n*, 943 So. 2d 349, 359-62 (La. 2006); *Schumacher v. Johanns*, 272 Neb. 346, 358-63, 722 N.W.2d 37, 47-51 (Neb. 2006); *Citizens' Util. Ratepayer Bd. v. State Corp. Comm'n*, 264 Kan. 363, 396-400, 956 P.2d 685, 708-10 (Kan. 1998).

[24] Although petitioners claim that universal service fees are "taxes" under "Fifth Circuit precedent" (Br. 51), they cite just one case for that proposition: *Trafigura Trading LLC v. United States*, 29 F.4th 286 (5th Cir. 2022). *Trafigura* "does not constitute precedent in this Circuit" because no opinion in that case obtained a quorum. *See id*. at 295 n.2 (Graves, J., dissenting).

In any event, for purposes of the nondelegation doctrine, it makes no difference whether universal service contributions are fees or taxes. Even assuming that those payments "are a form of taxation," the Supreme Court has held that "the delegation of discretionary authority under Congress' taxing power is subject to no constitutional scrutiny greater than that … applied to other nondelegation challenges." *Skinner*, 490 U.S. at 223; *see Rural Cellular II*, 685 F.3d at 1091. In light of *Skinner*'s controlling ruling, this Court must reject petitioners' assertion (Br. 59-60) that taxing delegations should receive stricter scrutiny than other delegations.

Petitioners concede as much, but baldly contend that "*Skinner* should be overruled or narrowed." Br. 59. Only the Supreme Court, however, has "authority to overrule" or narrow "its own decisions." *Ballew v. Cont'l Airlines, Inc.*, 668 F.3d 777, 782 (5th Cir. 2012). As a "strict stare decisis" court, the Fifth Circuit "cannot ignore a decision from the Supreme Court unless directed to do so by the Court itself." *Nat'l Coal. for Men v. Selective Serv. Sys.*, 969 F.3d 546, 549 (5th Cir. 2020) (cleaned up). Therefore, this Court must review the delegation in this case under the same standard applicable to all delegations: the intelligible principle test. And as we explained in Part II.B above, the delegation here plainly passes that test.

## III. THE FCC HAS NOT IMPERMISSIBLY DELEGATED GOVERNMENT POWER TO USAC.

Petitioners also contend that the FCC impermissibly delegated its

regulatory power to USAC, its private contractor. Br. 60-66. That argument

fails for two reasons: (1) It rests on the false premise that USAC exercises

government power, rather than providing ministerial assistance, and (2) any

delegation would be lawful even if USAC's role were more substantial

because the FCC retains final decisionmaking authority.

### A. USAC Merely Provides Ministerial Support To The FCC.

1. At the outset, petitioners overstate USAC's functions and role.

USAC is responsible for "billing" contributors, "collecting" universal service

contributions, and "disbursing" universal service funds. 47 C.F.R.

§ 54.702(b). In performing these tasks, USAC is subordinate to, and closely

supervised by, the FCC. Under FCC rules, USAC "may not make policy,

interpret unclear provisions of the statute or rules, or interpret the intent of

Congress." *Id*. § 54.702(c). When facing a gap or ambiguity, USAC must

"seek guidance from the Commission." *Ibid.* And USAC action is

reviewable at the FCC, *id.* § 54.719(b), where relief is common.[25]

Most importantly for present purposes, only the Commission has

power to adopt a quarterly contribution factor. USAC's role is simply to

provide the agency with projections of "demand" and "administrative

expenses" for the various universal service mechanisms, as well as the "total

contribution base." *Id.* § 54.709(a). USAC's projections account for FCC

rules that limit or cap available support; thus, USAC is constrained by the

FCC's universal service policy decisions. *See, e.g.*, *id.* § 54.303(a)(1) (high-

cost support monthly per-line limit); *id.* § 54.507(a) (schools and libraries

annual cap); *id.* § 54.619(a) (health care providers annual cap). The

contribution factor is announced in a Public Notice issued by the agency's

Office of Managing Director. *Id.* § 54.709(a). If, within 14 days of the

announcement, the Commission does not exercise its reserved power "to set

projections of demand and administrative expenses at amounts that [it]

---

[25] *See, e.g.*, *Streamlined Resolution of Requests Related to Actions by the Universal Service Administrative Company*, DA 22-448, 2022 WL 1302467 (WCB rel. April 29, 2022) (granting, dismissing, or denying numerous requests for review); *Alpaugh Unified Sch. Dist.*, 22 FCC Rcd 6035 (2007) (granting 78 appeals of USAC decisions).

determines will serve the public interest," the contribution factor is "deemed approved by the Commission." *Id*. § 54.709(a)(3).

2. As this Court has recognized, agencies can "reasonably condition" federal action "on an outside party's determination of some issue." *Rettig*, 987 F.3d at 531 (citing *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 566-67 (D.C. Cir. 2004)). The relevant question is whether there is "a reasonable connection between the outside entity's decision and the federal agency's determination." *Ibid.* (quoting *U.S. Telecom*, 359 F.3d at 567). That inquiry turns on the relationship between Congress's charge to the agency and the outside entity's input. *See id.* at 531-32. Any "private/public distinction" is "not relevant." *Id.* at 531 n.10.

USAC's input is reasonably related to the Commission's statutory charge to oversee carrier contributions. *See* 47 U.S.C. § 254(d). Contributions must be "equitable and nondiscriminatory," *ibid.*, which requires factfinding about real-world conditions. Each contribution factor is based on the "ratio" of (1) "projected quarterly expenses" of universal service support to (2) "projected collected end-user interstate and international telecommunications revenues." 47 C.F.R. § 54.709(a)(2). Commission policy constrains the expenses by limiting total available support, *e.g.*, *id.* §§ 54.303(a)(1), 54.507(a), 54.619(a), and the Commission reviews and

approves USAC's projected expenses "before they are used to calculate the quarterly contribution factor and individual contributions," *id.* § 54.709(a)(3). Carriers self-report their projected revenues to USAC. *Id.* § 54.711(a). Thus, USAC performs a "fact gathering" function for the FCC, which courts have recognized as "legitimate outside party input." *U.S. Telecom*, 359 F.3d at 566. USAC's proposed contribution factor inputs are not a policymaking decision. Instead, they are the figures used to calculate the contribution factor that the agency's Office of Managing Director adopts and the Commission approves. 47 C.F.R. § 54.709(a)(3). *Cf. Pittston Co. v. United States*, 368 F.3d 385, 397 (4th Cir. 2004) (upholding a private entity's "ministerial task of doing calculations"). In short, there is no delegation of government power, just ministerial assistance from USAC.

## B. The FCC's Delegation To USAC Is Constitutional Because The Commission Supervises USAC And Retains Final Decisionmaking Authority.

1. Even if USAC's role in determining the contribution factor were more substantial, there would be no impermissible delegation. At bottom, private nondelegation claims raise due process concerns about private power to deprive others of property, so such claims fail if the private party (1) has a government-imposed "standard" to guide it and (2) lacks "final say." *See Boerschig v. Trans-Pecos Pipeline, LLC*, 872 F.3d 701, 708 (5th Cir. 2017).

Put differently, agencies "may subdelegate to private entities so long as the

entities 'function subordinately to' the federal agency and the federal agency

'has authority and surveillance over their activities.'" *Rettig*, 987 F.3d at 532

(quoting *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940)).

Here, USAC simply applies the FCC's detailed regulations and calculates the

projected demand, expenses, and the contribution base for each quarter. 47

C.F.R. § 54.709(a)(3). The Commission approves the contribution factor,

which USAC then applies. *Ibid.*[26] And any "party aggrieved" by USAC

action may "seek review" from the FCC. *Id*. § 54.719(b). That governing

standard and opportunity for review defeat a due process claim.

Moreover, longstanding precedent allows private entities to "propose"

policy if the proposal is "approved, disapproved, or modified" by a

government authority. *Sunshine Anthracite Coal*, 310 U.S. at 388, 399. So

long as the agency retains "final reviewing authority" and "review[s] and

accept[s]" the outside entity's input, there is no unlawful delegation of

---

[26] If USAC's projections turn out to be wrong, the Commission retains
additional control. FCC rules provide that if "contributions for a particular
quarter exceed" universal service "disbursements" plus "USAC's
administrative costs for that quarter, the 'excess payments will be carried
forward,' thereby reducing the contribution factor for the subsequent
quarter." *Rural Cellular II*, 685 F.3d at 1086 (quoting 47 C.F.R.
§ 54.709(b)).

government power. *Rettig,* 987 F.3d at 533. Because USAC's work is

"closely superintended" by the Commission, there is no unlawful private

delegation merely because USAC proposes a policy that the Commission

ultimately adopts. *Ibid.* (cleaned up).[27]

2. Petitioners contend (Br. 63) that the Commission is a mere "rubber

stamp" that "[n]ever actually" oversees USAC and "has [n]ever rejected

USAC's proposals." Not so. The FCC has revised USAC's calculations to

account for changes in Commission policy. *See Revised Second Quarter*

*2003 Universal Service Contribution Factor*, 18 FCC Rcd 5097 (WCB 2003)

(adjusting rate from 9.0044% to 9.1%); *First Quarter 1998 Universal Service*

*Contribution Factors Revised and Approved*, 12 FCC Rcd 21881 (CCB 1997)

(setting "the approved contribution factors"). Thus, petitioners are wrong

---

[27] In a single sentence near the end of their brief, petitioners contend that the appointment of USAC's board members by the FCC Chair "fails to comply with" the Constitution's requirements for the appointment of "Officers" of the United States. Br. 66. That isolated contention is insufficient to preserve the issue, which they have forfeited; petitioners did not raise it in their statement of issues, and they "inadequately briefed" it by failing to "identify relevant legal standards [or] Fifth Circuit cases." *JTB Tools & Oilfield Servs., LLC v. United States*, 831 F.3d 597, 601 (5th Cir. 2016). Regardless, USAC's board members are not officers of the United States under the Constitution because, given the FCC's review and approval power, USAC's board members are not "exercising significant authority pursuant to the laws of the United States." *United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1980 (2021).

when they claim (Br. 64) that the Commission "has no option but to accept USAC's quarterly numbers" because of the "narrow window" to complete review. Indeed, the FCC has "extended the review period" when necessary. *See* 12 FCC Rcd at 21882-83 (recounting three extensions).

In any event, it is unsurprising that the Commission's revisions are relatively infrequent, given USAC's limited role and the Commission's additional oversight in advance of contribution factor announcements. For example, the Commission has acted "to avoid dramatic shifts in the contribution factor" by directing USAC to make certain collections "regardless of the projected quarterly demand."[28] And the FCC has "direct[ed]" USAC to retain certain funds "and not to take that amount into consideration when determining the contribution factor for the first quarter of 2018."[29] These examples further reflect the Commission's active oversight of the contribution factor process. Moreover, because USAC's calculations are

---

[28] *See* Notice of Proposed Rulemaking, *Universal Service Contribution Methodology*, 34 FCC Rcd 4143, 4144–45 ¶5 (2019) (citing *Connect America Fund*, 26 FCC Rcd at 17847 ¶561).

[29] *See Wireline Competition Bureau Provides Guidance to the Universal Service Administrative Company Regarding the High-Cost Service Mechanism Budget*, 32 FCC Rcd 9243 (WCB 2017).

guided by the FCC's detailed regulations, it is hardly surprising that the FCC would have little reason to override those calculations.

3. Petitioners also complain (Br. 62) about USAC's ability to "force" payments and "spend the money" in the universal service program, but any such power is irrelevant to this case. The agency action on review is neither enforcement nor a spending decision, and petitioners lack standing to complain about hypothetical powers unrelated to their asserted injuries. *See Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996) (a "citizen aggrieved in one respect" cannot "bring the whole structure … before the courts for review"). In any event, USAC cannot impose the "penalty of law" (Br. 62); only the Commission can "pursue enforcement action." 47 C.F.R. § 54.713(c).

USAC's role in collection and disbursement is similarly limited. The "collection of assessments" is a "ministerial" role that courts have consistently upheld. *Pittston*, 368 F.3d at 394–95, 397 (upholding trust fund's "collecting funds"); *United States v. Frame*, 885 F.2d 1119, 1129 (3d Cir. 1989) (upholding the private Cattleman's Board's collection of assessments). Petitioners try to distinguish these cases by noting that the FCC's approval is passive and USAC's collections are large. Br. 65. But *Pittston* upheld private assessments based only on statutory "guidance" with *no* pre-collection government review, 368 F.3d at 397, and *Frame* upheld

private collection of "$1.00 per head of cattle," 885 F.2d at 1128, which in 2020 totaled over $41.5 million.[30] The Commission's quarterly review and approval of the universal service budget entails far more agency involvement than either of those cases.

Petitioners' contrary claim (Br. 62) that "the Ninth Circuit has held" that the FCC "has essentially no power" over the collection and disbursement process misstates the Ninth Circuit's holding in *Incomnet* and ignores its rationale. That case addressed a narrow bankruptcy law issue: whether USAC was a "transferee" from which a bankruptcy estate could recover a preferential transfer. *In re Incomnet, Inc.*, 463 F.3d 1064, 1068 (9th Cir. 2006). Under the Ninth Circuit's "dominion" test, USAC was a transferee because it "holds legal title to the funds in the [universal service] account." *Id.* at 1073, 1076.

*Incomnet*'s bankruptcy holding is irrelevant here. Far from suggesting "no meaningful oversight" (Br. 60), the Ninth Circuit recounted how USAC exists "to collect, pool, and disburse" funds with its "operations [all] carried out pursuant to regulations promulgated by the FCC." *Id.* at 1067. Although USAC held legal title to the funds, the FCC had "substantial authority to

---

[30] https://www.beefboard.org/2020-annual-report/financials.

determine USAC's budget and approve its disbursements" as part of its responsibility for "overseeing USAC." *Id.* at 1074.

In any event, USAC no longer holds legal title to universal service funds. Those funds are now maintained at the U.S. Treasury, *see* USAC-FCC MOU, at 2, § III.B, and Congress treats them as permanent indefinite appropriations (*i.e.*, unlimited in duration or amount). *See* Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, 136 Stat. 49, tit. V, § 510; Universal Service Antideficiency Temporary Suspension Act, Pub. L. No. 108-494, 118 Stat. 3986, 3998, tit. III, § 302 (exempting universal service contributions and distributions from the Antideficiency Act, 31 U.S.C. § 1341); *see also* Statement of Patricia A. Dalton, GAO, Before the Senate Committee on Commerce, Science, and Transportation, April 11, 2005, GAO-05-546T, at 26-28, available at https://www.gao.gov/assets/gao-05-546t.pdf (like numerous other "permanent appropriation" statutes, section 254 "authorized collection of fees" by a federal agency to fund "expenditures for a specified purpose").

## **CONCLUSION**

The petition for review should be dismissed or, in the alternative,

denied.

Respectfully submitted,

BRIAN M. BOYNTON
PRINCIPAL DEPUTY ASSISTANT
  ATTORNEY
  GENERAL

P. MICHELE ELLISON
GENERAL COUNSEL

JACOB M. LEWIS
DEPUTY GENERAL COUNSEL

SARAH E. HARRINGTON
DEPUTY ASSISTANT ATTORNEY
  GENERAL

MARK B. Stern
Gerard J. SINZDAK
ATTORNEYS

/s/ James M. Carr

JAMES M. CARR
ADAM G. CREWS
COUNSEL

UNITED STATES
  DEPARTMENT OF JUSTICE
WASHINGTON, D.C. 20530

FEDERAL COMMUNICATIONS
  COMMISSION
WASHINGTON, D.C. 20554
(202) 418-1740

June 10, 2022

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

   ☒ this document contains 12,982 words, *or*

   ☐ this document uses a monospaced typeface and contains _ lines of text.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   ☒ this document has been prepared in a proportionally spaced typeface using Microsoft Word in Office 365 in 14-point Times New Roman, *or*

   ☐ this document has been prepared in a monospaced spaced typeface using _____ with _____.

/s/ *James M. Carr*

James M. Carr
Counsel

Federal Communications Commission
Washington, D.C.  20554
(202) 418-1740

## CERTIFICATE OF FILING AND SERVICE

I, James M. Carr, hereby certify that on June 10, 2022, I filed the foregoing

Brief for Respondents with the Clerk of the Court for the United States Court of

Appeals for the Fifth Circuit using the electronic CM/ECF system. Participants in

the case who are registered CM/ECF users will be served by the CM/ECF system.

*/s/ James M. Carr*

James M. Carr
Counsel

Federal Communications Commission
Washington, D.C.  20554
(202) 418-1740