No. 22-60008

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

CONSUMERS' RESEARCH; CAUSE BASED COMMERCE,
INCORPORATED; KERSTEN CONWAY; SUZANNE BETTAC;
ROBERT KULL; KWANG JA KERBY; TOM KIRBY; JOSEPH
BAYLY; JEREMY ROTH; DEANNA ROTH; LYNN GIBBS; PAUL
GIBBS; RHONDA THOMAS
*Petitioners*,

v.

FEDERAL COMMUNICATIONS COMMISSION;
UNITED STATES OF AMERICA,
*Respondents.*

---

On Petition for Review of FCC Proposed First Quarter 2022 Universal
Service Contribution Factor; CC Docket No. 96-45, DA21-1550

---

**BRIEF OF AMICUS CURIAE EMERITUS PROFESSOR
ROBERT FRIEDEN IN SUPPORT OF RESPONDENTS**

---

ERIC P. GOTTING
    *COUNSEL OF RECORD*
JAMES BALLER
KELLER AND HECKMAN LLP
1001 G ST., SUITE 500 WEST
WASHINGTON, D.C. 20001
(202) 434-4100 (PHONE)
(202) 434-4646 (FACSIMILE)
gotting@khlaw.com

# CERTIFICATE OF INTERESTED PARTIES

(1)  *Consumers' Research v. FCC*, Fifth Circuit Case No. 22-60008

(2)  The undersigned counsel of record certifies that the following listed persons and entities have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

## <u>Petitioners</u>

Consumers' Research

Caused Based Commerce

Kersten Conway

Suzanne Bettac

Robert Kull

Kwang Ja Kirby

Tom Kirby

Joseph Bayly

Jeremy Roth

Deanna Roth

Lynn Gibbs

Paul Gibbs

Rhonda Thomas

## <u>Respondents</u>

Federal Communications Commission

United States of America

**Intervenors**

Benton Institute for Broadband & Society

National Digital Inclusion Alliance

Center for Media Justice (d/b/a MediaJustice)

Schools, Health & Libraries Broadband Coalition

National Telecommunications Cooperative Association (d/b/a NTCA – The Rural Broadband Association)

Competitive Carriers Association

USTelecom – The Broadband Association

**Amicus Curiae**

Competitive Enterprise Institute

Free State Foundation

Christopher DeMuth

Harold Furchtgott-Roth

Michael S. Greve

Randolph J. May

TechFreedom

Robert Frieden

**Attorneys for Petitioners**

C. Boyden Gray

R. Trent McCotter

Jonathan Berry

Michael Buschbacher

Jared M. Kelson

Boyden Gray & Associates PLLC

**Attorneys for Respondents**

James M. Carr

Jacob M. Lewis

Adam Crews

P. Michelle Ellison

Gerard J. Sinzdak

Merrick Garland

**Attorneys for Intervenors**

Andrew Jay Schwartzman

Michael D. Miller

Jason Neal

Stephanie Weiner

Harris, Wiltshire & Grannis, LLP

Jennifer Tatel

Craig Gilmore

Wilkinson, Barker & Knauer LLP

**Attorneys for Amicus Curiae**

Jeffrey S. Beelaert

Michael Petrino

Stein Mitchell Beato Missner LLP

Sam Kazman

Competitive Enterprise Institute

Eric P. Gotting

James Baller

Keller and Heckman LLP

Corbin K. Barthold

Berin Szoka

James E. Dunstan

TechFreedom

/s/ *Eric P. Gotting*

Eric P. Gotting
*Counsel of Record for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................ii

INTEREST OF AMICUS CURIAE.............................................1

ARGUMENT ....................................................................................3

I. The United States and Countries Throughout the World
Have Prioritized Universal Access to Affordable
Telecommunications on Par with Electricity, Water,
and Other Essentials. ............................................................3

II. The FCC's Current USF Program Evolved From
Universal Service Funding Occurring Prior to 1996............11

III. The universal service mission spans decades and has
changed in terms of scope, technologies supported,
methods to promote widespread and affordable access,
who qualifies for financial support, and how to finance,
structure, and manage the subsidy process. ........................18

IV. Many national governments have created a separate or
affiliated entity to manage universal service funds
collection and distribution, subject to oversight by the
National Regulatory Authority or Ministry. ........................22

CONCLUSION ...............................................................................28

CERTIFICATE OF COMPLIANCE......................................31

CERTIFICATE OF SERVICE.................................................32

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Alenco Communications, Inc. v. F.C.C.,*
201 F.3d 608 (5th Cir. 2000) ................................................... 10, 15

*AT&T, Inc. v. Federal Communication Commission*, 886 F.3d 1236 (D.C. Cir. 2018)............................................................................21

*Duquesne Light Co. v. Barasch,*
488 U.S. 299 (1989) ...................................................................... 15

*In re FCC 11-161,* 753 F.3d 1015 (10th Cir. 2014) ................................. 18

*Huawei Technologies USA, Incorporated v. Federal Communications Commission*, 2 F.4th 421 (5th Cir. 2021)........................................7

*MCI Telecommunications Corp. v. F.C.C.,*
712 F.2d 517 (D.C. Cir. 1983)........................................................ 14

*National Ass'n of Regulatory Utility Comm'rs v. F.C.C.,*
737 F.2d 1095 (D.C. Cir. 1984)...................................................... 14

*Rural Telephone Coalition v. F.C.C.,*
838 F.2d 1307 (D.C. Cir. 1988)................................................ 15, 18

## Statutes

Secure and Trusted Communications Networks Act of 2019, Pub. L. 116-124, 133 Stat. 158 (2020)....................................................4

## Other Authorities

Digital Regulation Platform, Indonesia's Universal Service Obligation Fund (Sep. 24, 2020)....................................................................23

International Telecommunication Union, *Development Sector, Financing Universal Access to Digital Technologies and Services* (2021).................................................................................4, 11

ii

International Telecommunication Union, *How broadband, digitization and ICT regulation impact the global economy: Global econometric modelling* (November 2020) ............................................................5

International Telecommunication Union, *The Missing Link Report of the Independent Commission for World Wide Telecommunications Development*, Chapter 10 (1985) ......................................................6

ITU and The World Bank, *Digital Regulation Platform; Universal access and service funds*...................................................... 23

ITU, *Universal Service and Digital Inclusion for All* (2013)...............................................................................9, 29

ITU Universal Service Report, 2013............................................... 23

John D. Burrows, et al., *National Regulatory Research Institute, Universal Service in the United States: Dimensions of the Debate*, NRRI 94-08 (June, 1994)...........................................................4, 8

Milton L. Mueller, Jr., *Universal Service, Competition, Interconnection, and Monopoly in the Making of the American Telephone System* (1997)...........................................................................................6

Scott Wallsten, *Reverse Auctions and Universal Telecommunications Service: Lessons From Global Experience*, 61 Fed. Comm. L.J. 373 (March, 2009) ..............................................................................3

The Organization of American States, Inter-American Telecommunication Commission (CITEL), *Initiatives to Expand Telecommunications/ICT in Rural, Unserved or Underserved Areas* ................................................................................................5

United Nations, Department of Economic and Social Affairs, Poverty, *Information and communication technologies (ICTs)* .....................5

Universal Service Administrative Co., *Appeals and Audits*...........25, 27

Universal Service Administrative Co., *Board of Directors*.............24, 25

Universal Service Administrative Co., *Datasets*...............................27

*Report on The Future of the Universal Service Fund,* WC Docket No. 21-476, Notice of Inquiry, FCC 21-127 (rel. Dec. 15, 2021)........................................................................................25, 26

Verizon, *Understanding Your Bill*…………………………………………..17

## FCC Materials

*American Broadband & Telecommunications Company, Jeffrey S. Ansted*, DA 22-421, Order (June 3, 2022)…………………….….... 27

*Amendment to Part 69 of the Commission's Rules Relating to the Assessment of Charges for the Universal Service Fund and Lifeline Assistance*, CC Docket Nos. 78-72 and 80-286, Memorandum Opinion and Order, 4 FCC Rcd. 6134 (1989)…………………………13

*Changes to the Board of Directors of the National Exchange Carrier Association, Inc. and Federal-State Joint Board on Universal Service*, CC Docket No. 96-45, Report and Order and Second Order on Reconsideration, 12 FCC Rcd. 18400 (1997)……………………24

*Changes to the Board of Directors of the National Exchange Carrier Ass'n, Inc. and Federal-State Joint Board on Universal Service*, CC Docket Nos. 97-21 and 96-45, Third Report and Order, Fourth Order on Reconsideration in CC Docket No. 97-21 and Eighth Order on Reconsideration in CC Docket No. 96-45, 13 FCC Rcd. 25058 (1998) ………………………………………………………24

*Connect America Fund, et al.*, WC Docket No. 10-90, Report and Order and Further Notice of Proposed Rulemaking, 26 FCC Rcd. 17663 (2011) ……………………………………………………..……20

*DataConnex, LLC*, FCC 18-9, Notice of Apparent Liability for Forfeiture and Order, 33 FCC Rcd. 1575 (2018)…………………..……………..28

FCC, *Affordable Connectivity Program* …………………………………26

*High-Cost Universal Service Support,* WC Docket No. 05-337, Order on Remand and Report and Order and Further Notice of Proposed Rulemaking, 24 FCC Rcd. 6475 (2008) ………………………..…..3

*MTS and WATS Market Structure*, CC Docket Nos. 78-72 and 80-286, Report and Order, 2 FCC Rcd. 2953 (1987)……………………13

iv

*Network Services Solutions, LLC, Scott Madison*, FCC 17-70, Amendment to Notice of Apparent Liability for Forfeiture and Order, 32 FCC Rcd. 5169 (2017)………………….…………………28

*Promoting Telehealth in Rural America*, WC Docket No. 17-310, Report and Order, 32 FCC Rcd. 7335 (2019)………………………….……27

*Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs*, WC Docket No. 18-89, Second Report and Order, 35 FCC Rcd. 14284 (2020) ………………4

*Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs, Huawei Designation, ZTE Designation*, WC Docket No. 18-89, PS Docket Nos. 19-351, 19-352, Report and Order, Further Notice of Proposed Rulemaking, and Order, 34 FCC Rcd. 11423 (2019) ………………….………….…….7

*Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs*, WC Docket No. 18-89, Declaratory Ruling and Second Further Notice of Proposed Rulemaking, 35 FCC Rcd. 7821 (2020) ………………………….……..7

*Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs*, WC Docket No. 18-89, Third Report and Order, 836 FCC Rcd. 11958 (rel. July 14, 2021) ………………………….…..7

*Report on The Future of the Universal Service Fund*, WC Docket No. 21-476, Notice of Inquiry, FCC 21-127 (rel. Dec. 15, 2021)……………25

## INTEREST OF AMICUS CURIAE[1]

Amicus Robert Frieden holds the rank of Emeritus Professor of Telecommunications and Law at Penn State University.  His published work includes universal service funding reform with emphasis on new strategies for making access to voice and data services affordable and widely available.  Professor Frieden has published four books, over one hundred articles, and numerous book chapters and monographs on telecommunications policy and law.  He frequently makes pro bono contributions, including amicus briefs, filings in Federal Communications Commission (FCC) proceedings, and participation in forums organized by the International Telecommunication Union, the United Nations, the World Bank, universities, and other institutions. *See Curriculum Vitae* (Attachment A).

Petitioners ask this Court, in one fell swoop, to eliminate entirely the FCC's longstanding Universal Service Fund (USF).  Missing from

---

[1] This brief is submitted under Fed. R. App. P. 29 with the consent of all parties.  Undersigned counsel for amicus curiae certifies that this brief was not authored in whole or in part by counsel for any of the parties; no party or party's counsel contributed money for preparing or submitting this brief; and no one other than amicus curiae and its counsel have contributed money for preparing or submitting this brief.

Petitioners' opening brief, however, is virtually any historical context regarding universal service in this country, even before introduction of the USF program in 1996 and, in particular, almost a Century's worth of efforts by Congress, the FCC, and the telecommunications industry to ensure that rural areas, schools, libraries, healthcare facilities, and low-income segments of society have equal access to essential voice and data services.

Professor Frieden is well-positioned to provide this Court with the proper historical perspective about how universal service has played a crucial role in this country, including developments leading up to the formal establishment of the USF program in 1996. This filing briefly: (i) traces the purposes and goals of universal service, particularly in promoting access parity and affordability; (ii) summarizes the history of universal service in this country and abroad; (iii) identifies the technological and market forces underlying the significant expansion of the universal service mission for the benefit of residents everywhere in this country; and (iv) discusses the unappreciated advantages in relying on a non-governmental entity, in this case the Universal Service Administrative Company (USAC), to implement the USF program.

## ARGUMENT

I.  **The United States and Countries Throughout the World Have Prioritized Universal Access to Affordable Telecommunications on Par with Electricity, Water, and Other Essentials.**

In their zeal to wipe the FCC's current USF program completely off the books, Petitioners make little mention of the compelling reasons why most nations actively promote affordable and widely accessible voice and data services.[2] Soon after the introduction of telephone service, telecommunications company executives, elected representatives, and the public largely supported the goal of ubiquitous and affordable service:

> It is commonly thought that schools, businesses, hospitals, units of government, families, neighborhoods, and public safety institutions benefit and function more efficiently and effectively if all of society has telecommunications service.  John D. Burrows, *et al.*, National Regulatory Research

---

[2]    "Nearly every country in the world has universal service or access regulations in an attempt to ensure that everyone in the country can access telecommunications services at affordable prices . . .." Scott Wallsten, *Reverse Auctions and Universal Telecommunications Service: Lessons From Global Experience*, 61 Fed. Comm. L.J. 373 (March, 2009) (tracking use of reverse auctions to achieve universal service goals at the lowest cost). *See also High-Cost Universal Service Support,* WC Docket No. 05-337, Order on Remand and Report and Order and Further Notice of Proposed Rulemaking, 24 FCC Rcd. 6475 (2008) (early adoption in the U.S of reverse auctions to achieve more efficient disbursement of universal service funds).

3

Institute, *Universal Service in the United States: Dimensions of the Debate*, NRRI 94-08, 55 (June, 1994); retrieved from: https://pubs.naruc.org/pub/FA85D879-91E5-8025-F857-8CCD4395DC24.

Universal telephone service generates substantial societal, national security,[3] and economic dividends:

> Universal access in the digital era goes beyond extending networks, addressing the use of those networks and framing broadband as a key enabler of digitalization. Evidence of digitalization can be seen throughout society, whether in financial technology applications, such as mobile money and mobile wallets to ensure that anyone with a mobile phone can be banked, or in e-health and online education services, which have been transformative and had a significant economic impact. *Financing universal access to digital technologies and services*, 8 (2021); retrieved from: https://www.itu.int/dms_pub/itu-d/opb/pref/D-PREF-EF-2021-ECO_FIN-PDF-E.pdf.

---

[3]    In light of newly identified risks that equipment manufactured by Chinese companies may support government ordered surveillance and service disruption, Congress allocated funds for carriers, receiving universal service funding, to extract and replace such plant. Secure and Trusted Communications Networks Act of 2019, Pub. L. 116-124, 133 Stat. 158 (2020), *codified at* 47 U.S.C. § 1601 *et seq. See also Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs*, WC Docket No. 18-89, Second Report and Order, 35 FCC Rcd. 14284 (2020).

Several global and regional intergovernmental organizations,

including the International Telecommunication Union ["ITU"],[4] United

Nations,[5] and the Organization of American States,[6] have declared

universal access to both voice and broadband data services an essential,

---

[4] *See, e.g.*, International Telecommunication Union, *How broadband, digitization and ICT regulation impact the global economy: Global econometric modelling* (November 2020); retrieved from: https://www.itu.int/dms_pub/itu-d/opb/pref/D-PREF-EF.BDR-2020-PDF-E.pdf.

[5] "There is growing global consensus that the Information and communication technologies (ICTs), and particularly Internet are providing a new framework and huge opportunities for economic, political and social development. The World Summit for Social Development (WSSD, Copenhagen, 1995) recognized that the new information technologies and new approaches to, access to, and use of technologies by people living in poverty can help in fulfilling social development goals; and therefore recognize the need to facilitate access to such technologies. WSSD emphasized that promoting access for all to education, information, technology and know-how is an essential means for enhancing communication and participation in civil, political, economic, social and cultural life, and for ensuring respect for civil, political, economic, social and cultural rights." United Nations, Department of Economic and Social Affairs, Poverty, *Information and communication technologies (ICTs)*; retrieved from: https://www.un.org/development/desa/socialperspectiveondevelopment/issues/information-and-communication-technologies-icts.html.

[6] *See, e.g.,* The Organization of American States, Inter-American Telecommunication Commission (CITEL), *Initiatives to Expand Telecommunications/ICT in Rural, Unserved or Underserved Areas*; retrieved from: https://www.oas.org/ext/en/main/oas/our-structure/agencies-and-entities/citel.

core mission.[7]  In 1985, the ITU endorsed the goal to "bring all mankind

within easy reach of a telephone by the early part of the next century."[8]

Society benefits when residents in rural, high-cost areas can

accrue the same opportunities from accessing telecommunications and

information networks available to residents in densely populated areas

having much lower service costs.[9]  Telecommunications carriers and

governments long ago recognized the merits in generating a pool of

funds to stimulate greater geographical penetration of networks into

rural areas, beyond what marketplace resource allocation would

achieve.  Similarly, universal service funds defray the cost of

---

[7]     "Given the vital role telecommunications play not only in such obvious fields as emergency, health and other social services, administration and commerce, but also in stimulating economic growth and enhancing the quality of life, creating effective networks world wide will bring immense benefits."  International Telecommunication Union, *The Missing Link Report of the Independent Commission for World Wide Telecommunications Development*, Chapter 10, 65 (1985); retrieved from: https://www.itu.int/en/history/Pages/MaitlandReport.aspx.

[8]     *Id.* at 6.

[9]     "The importance of rapid, widespread telecommunications to government, business, and society can scarcely be overstated.  Because communications infrastructure coordinates and unifies a country in countless ways, the universal service concept spans the realms of economic and social policy."  Milton L. Mueller, Jr., *Universal Service, Competition, Interconnection, and Monopoly in the Making of the American Telephone System*, 1 (1997).

subscribing to telecommunications services making it possible for more people to connect, including individuals whose financial circumstances would have foreclosed access, absent a financial subsidy.

In addition to supply-side financial support, many countries stimulate demand for services by partially defraying the cost of equipment needed for network access, now including wireless handsets, personal computers, modems, and routers. Such demand-side promotion helps existing and prospective subscribers acquire the digital literacy skills needed for accessing the variety of new services available via broadband digital networks. Safe, secure, affordable, and ubiquitous access to telecommunications also enhance societal wellbeing, including the ability to communicate and transact personal and business matters without foreign surveillance and disruption.[10]

---

[10]     *See, e.g.*, *Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs, Huawei Designation, ZTE Designation*, WC Docket No. 18-89, PS Docket Nos. 19-351, 19-352, Report and Order, Further Notice of Proposed Rulemaking, and Order, 34 FCC Rcd. 11423 (2019); *Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs*, WC Docket No. 18-89, Declaratory Ruling and Second Further Notice of Proposed Rulemaking, 35 FCC Rcd. 7821 (2020), *petition for review denied*, *Huawei Technologies USA, Incorporated v. Federal Communications Commission*, 2 F.4th 421 (5th Cir. 2021); *Protecting Against National Security Threats to the*

Telecommunications networks increase in value as the number of connections and subscribers increase, what economists classify as a positive networking externality.[11]  Connectedness for all emphasizes parity, with less regard for the costs incurred in serving specific subscribers and locales.

To improve access, private actors, such as telephone companies and public actors, including legislatures and National Regulatory Authorities throughout the world, have relied on market countervailing or augmenting initiatives.  A key universal service strategy, used throughout many different phases and spanning decades, consists of subsidy funding, which creates a pool of funds available to support and

---

*Communications Supply Chain Through FCC Programs*, WC Docket No. 18-89, Third Report and Order, 836 FCC Rcd. 11958 (rel. July 14, 2021).

[11]    "It is widely accepted that the value received by the users of the public switched telecommunications network [a common reference to voice telephone lines] is increased by the addition of new users.  An externality occurs because more value or service is received because more people can call or be called by the user.  Extension or outreach actions designed to attract or maintain users on the system are cost justified, in part, because of these received externalities," John D. Borrows, *et al.*, National Regulatory Research Institute, *Universal Service in the United States: Dimensions of the Debate*, NRRI 94-08, 55 (June, 1994); retrieved from: https://pubs.naruc.org/pub/FA85D879-91E5-8025-F857-8CCD4395DC24.

reduce the price of services deemed worthy of such promotional pricing. Subsidy beneficiaries include carriers operating in expensive-to-serve rural areas, schools, libraries, healthcare facilities, the elderly, and people with low incomes regardless of location.

Most nations, including the United States, create subsidy funding pools without taxation:

> USFs are typically funded via some form of contribution mechanism from telecommunication service providers/operators. In the majority of cases, the operator contributions are in the form of a levy based on a percentage of annual operating revenues. International Telecommunication Union, *Universal Service and Digital Inclusion for All*, 1 (2013); retrieved from: https://www.itu.int/en/ITU-D/Regulatory-Market/Documents/USF_final-en.pdf.

As discussed below, U.S. carriers initially opted to price interstate, long distance telephone service at rates sufficient to subsidize infrastructure buildouts into locales with low population densities and to offer intrastate, local telephone service at low rates with an eye toward stimulating subscribership.  Later, governments and agencies, including the FCC, established rules, procedures, and regulations designed to achieve the same outcome:

> Universal service has been a fundamental goal of federal telecommunications regulation since the

passage of the Communications Act of 1934.  Indeed, the FCC's very purpose is "to make available, so far as possible, to all the people of the United States ... a rapid, efficient, Nation-wide, and world-wide wire and communication service with adequate facilities at reasonable charges." *Alenco Communications, Inc. v. F.C.C.*, 201 F.3d 608, 613 (5th Cir. 2000), *quoting* 47 U.S.C. § 151 (as amended) and *citing Texas Office of Pub. Util. Counsel v. F.C.C.*, 183 F.3d 393, 405–06 & n. 2 (5th Cir. 1999).

The recent Covid-19 epidemic provides clear evidence of the harms resulting from inferior or nonexistent access to essential services available via telecommunications lines, such as education, government and commercial transactions, health care, self-expression, and entertainment.  The need for unconnected people to seek a wireless broadband connection far from home dramatically evidences the importance of the universal service mission.[12]

---

[12]    "COVID-19 has led to unprecedented limitations on people's mobility as governments have sought to curb the spread of the airborne virus and avert crises in unprepared health systems across the world. Following the varying levels of restrictions put in place globally at different periods throughout 2020 and into 2021, people have been forced to turn to e-learning, remote working, online shopping and even virtual funerals. The pandemic has opened the door to the use of digital technology in ways never before imagined and given real meaning to the prefixes 'e-,' 'remote,' 'virtual,' 'online' and 'distance.' During this time, digital technology has been crucial – for those with access.  While on the one hand, the crisis has led to the fast-tracking of digital adoption in countries that already had some level of digitalization; on

## II.    The FCC's Current USF Program Evolved From Universal Service Funding Occurring Prior to 1996.

In their opening brief, Petitioners also give short shrift to the historical underpinnings of today's USF program.  In the U.S., universal service became a goal soon after the introduction of telephone service.  In 1907, AT&T President Theodore N. Vail highlighted the company's commitment with the phase "One Policy, One System, Universal Service."  In application, this goal included self-serving interests in promoting a Bell System "natural monopoly," bolstered by refusals to interconnect its network with other carriers and an aggressive campaign to acquire these independent companies.  On the other hand, AT&T expressed a commitment to serve the national interest by expanding service far and wide, thereby promoting economies of scale and accrual of positive network externalities.

In settling the first of several antitrust lawsuits filed by the Justice Department, AT&T Vice President Nathan Kingsbury, in 1913,

the other, it has exposed digital inequalities, which are particularly large in less developed economies.  Never has the impact of the digital divide been so glaring."  International Telecommunication Union, Development Sector, *Financing universal access to digital technologies and services*, 1 (2021); retrieved from: https://www.itu.int/dms_pub/itu-d/opb/pref/D-PREF-EF-2021-ECO_FIN-PDF-E.pdf.

announced a commitment to stop acquiring independent companies, to divest the company's investment in Western Union, the primary provider of text-based services, and to permit independent telephone companies to connect their networks with AT&T's long-distance facilities.

As AT&T's revenues grew, so too did market penetration of basic telephone services, albeit primarily in urban locales. On its own accord, AT&T sought to bolster network expansion into rural areas by charging high long-distance rates and using some of the profits to maintain or reduce local phone service subscription fees. Eight years after its commitment not to acquire competitors, AT&T resumed acquisition of independent telephone companies as permitted by the Willis Graham Act of 1921. The federal government treated AT&T as a natural monopoly subject to oversight by the Interstate Commerce Commission.

Eventually, AT&T's privately conceived and implemented universal service subsidy mechanism became federal regulatory policy. Starting in the 1950s, the FCC established universal service policies and rules based on a general mandate contained in Title I of the Communications Act of 1934, 47 U.S.C. §151 *et seq.*, to promote the

12

wider use of wire and radio. In consultation with the major telephone industry trade association, and later a Federal-State Joint Board on Universal Service, as authorized by 47 U.S.C. § 410(c), the FCC established as federal policy AT&T's previously implemented strategy of using long distant rates to subsidize local service and promote universal service objectives. *MTS and WATS Market Structure*, CC Docket Nos. 78-72 and 80-286, Report and Order, 2 FCC Rcd. 2953 (1987); *Amendment to Part 69 of the Commission's Rules Relating to the Assessment of Charges for the Universal Service Fund and Lifeline Assistance*, CC Docket Nos. 78-72 and 80-286, Memorandum Opinion and Order, 4 FCC Rcd. 6134 (1989).

The FCC sought to make the process clear, uncontroversial, and consistent with AT&T's prior decision to subsidize local rates. The Commission's new cost allocation methodology maintained the status quo by assigning a disproportionate share of AT&T's network costs to the interstate service sector. The Commission's action matched existing goals of incumbent telephone companies and took advantage of ample flexibility in allocating plant costs because most telecommunications capital expenditures constitute a "sunk cost" that does not vary with

usage.  A telephone company must invest in network infrastructure

capable of providing both intrastate and interstate services, and be able

to handle peak traffic volumes:

> Thus long-distance callers, charged on the basis of the
> frequency and distance of their calls, covered through
> their payments a significant portion of the costs of local
> subscriber plant.  Revenues paid in by long-distance
> callers were shared by AT & T with the local
> companies through a process called settlements and
> division of revenues.

> That basic system remains in effect today.  The FCC,
> working with a Federal-State Joint Board established
> pursuant to 47 U.S.C. § 410(c) (1976), allocates local
> plant costs between the interstate jurisdiction (FCC
> controls recovery of costs) and the intrastate
> jurisdiction (state commissions control recovery of
> costs).  This mode of allocation—the "separations
> process"—currently assigns roughly 26% of the costs of
> local exchange plant to the interstate jurisdiction.[13]

In close coordination with telephone companies, the FCC decided

to allocate 25% of non-traffic sensitive costs to interstate services, a

decision considered reasonable by a reviewing court:

> Allocating twenty-five percent of NTS costs to
> interstate jurisdiction in effect transfers those costs to

---

[13]    *National Ass'n of Regulatory Utility Com'rs v. F.C.C.*, 737 F.2d
1095, 1105 (D.C. Cir. 1984), *citing* Amendment of Part 67, 89 F.C.C.2d
1, 5, *modified*, 90 F.C.C.2d 522, *recon. denied*, 91 F.C.C.2d 558 (1982);
*MCI Telecommunications Corp. v. F.C.C.*, 712 F.2d 517, 523 & n. 4 (D.C.
Cir.1983).

the rate bases of interstate carriers, forces them to
recover those costs through their rates, and reduces
their profitability. The Supreme Court, however, has
reviewed statutorily authorized economic regulation
with great deference. . . .

In this case, nothing in the record suggests that the
Commission's allocation of twenty-five percent of NTS
costs to the interstate jurisdiction constitutes a
confiscation of MCI's property. . . .

[W]e can discern no difference rising to the level of a
Takings Clause objection. *Rural Telephone Coalition v.
F.C.C.*, 838 F.2d 1307, 1313-1314 (D.C. Cir. 1988).

The court in *Alenco Communications* also ruled that despite the

possible reduction in a carrier's profitability, compliance with FCC

universal service regulations did not constitute an unlawful confiscation

or taking of property:

[P]etitioners do not present credible evidence that the
Order ever will cause the drastic consequences for
rural LEC's articulated in *Duquesne* [*Duquesne Light
Co. v. Barasch*, 488 U.S. 299, 307 (1989)]. The mere
fact that, "[f]or many rural carriers, universal service
support provides a large share of the carriers'
revenues," Order ¶ 294, is not enough to establish that
the orders constitute a taking. The Fifth Amendment
protects against takings; it does not confer a
constitutional right to government-subsidized
profits. *Alenco Communications*, 201 F.3d at 624.

The onset of long-distance telephone service competition

eliminated the continuing use of a simple cost allocation methodology to

15

create a subsidy mechanism to promote universal service. When
companies, such as MCI, entered the long-distance market, AT&T could
no longer maintain the local service subsidy because MCI and other
market entrants offered much lower rates. MCI forced long distance
rates closer to being cost-based, despite having to interconnect with the
Bell System on terms, conditions, and rates designed by AT&T to
thwart competition. Then, with the 1984 divestiture of the Bell
Operating Companies, AT&T lost control over the terms and conditions
regarding access to the local exchanges used to originate and terminate
long distance calls. The newly independent Bell companies established
cost-based access charges applicable to both AT&T and its competitors.

As a result, between 1984 and enactment of the
Telecommunications Act of 1996, the FCC initiated numerous
regulatory proceedings to structure access pricing in a fair, transparent,
and cost-based manner. No longer able to rely on high long-distance
rates to generate a source for subsidization, the FCC shifted much of
the financial burden on accessing long distance networks via local
telephone exchanges directly onto consumers. The Commission opted to
apply flat-rate "access charges" that appeared on customers' local

telephone service bills as new line items, such as the Subscriber Line

Charge.[14]  This fee replaces retail long distance rates as the primary

source of compensation to local exchange carriers for their so-called first

mile delivery of long-distance calls to an interexchange carrier, such as

MCI and AT&T, and the last mile delivery from an interexchange

carrier to the intended call recipient.

Throughout this transition from monopoly to competitive

marketplace, the FCC adjusted universal service funding procedures

making it clear that consumers would directly compensate local

exchange carriers for the costs of providing access to their networks.

Reviewing courts largely deferred to the Commission's expertise and

determination that it needed to establish a multi-year transition from

long distance revenues, serving as the primary source of universal

---

[14]    Verizon, a major U.S. Local Exchange Carrier, offers the following description of this monthly charge: "The FCC has mandated an access charge (known as the FCC Line Charge) to partially reimburse telephone service providers for the cost of routing long distance calls made by local customers.  This charge is applied to all customers who have telephone lines in their home or business, whether they make long distance calls or not.  This is also known as the Federal Subscriber Line Charge and the Federal Line Cost Charge. Verizon, *Understanding Your Bill*; retrieved from https://www.verizon.com/business/support/billing/understanding-billing-charges/.

service subsidies, to new billing line items on subscribers' bills: "[I]t is reasonable to conclude that Congress left a gap to be filled by the FCC, i.e., for the FCC to determine and specify precisely how USF funds may or must be used." *In re FCC 11-161*, 753 F.3d 1015, 1046 (10th Cir. 2014).

Likewise, no court has embraced Petitioners' assertion that universal service contributions from carriers and their subscribers constitute an unconstitutional taking or tax: "We also find unacceptable MCI's argument that the twenty-five percent allocation [of carriers' non traffic sensitive plant investment] is an exercise of taxing power that Congress has not delegated to the Commission." *Rural Telephone Coalition*, 838 F.2d at 1314.

## III. The Universal Service Mission Spans Decades and Has Changed in Terms of Scope, Technologies Supported, Methods to Promote Widespread and Affordable Access, Who Qualifies for Financial Support, and How to Finance, Structure, and Manage the Subsidy Process.

While Petitioners characterize the growth of universal programs as largely a power grab by the FCC, in reality, legitimate technological and market forces have resulted in the broad USF program we see today. Achieving progress in terms of broader geographical reach,

affordability, and demand requires both creative thinking and skillful
accounting.  Telecommunications networks typically require very high
initial capital expenditures in infrastructure that carriers must install
and activate before accruing any revenues.  Having made these sunk
investments, carriers can accrue positive networking externalities
because low incremental cost to add a subscriber creates opportunities
to expand subscriber numbers quickly and inexpensively.  Universal
service subsidies help carriers extend their networks into rural areas,
where incremental costs remain high because of low population density,
difficult terrain, harsh climate, and other factors.

Over time, universal service goals and funding strategies have
changed because of technological innovations, diversifying consumer
requirements and interests, identification of new subsidy beneficiaries,
such as schools and healthcare facilities, and disruptions to the ability
of carriers to generate sufficient funds for subsidies due to the onset of
competition.  These factors collectively have made the universal service
mission more comprehensive, diversified, and expensive.

Even as universal service funding continues to improve
subscribership of voice telephone service, many nations have expanded

19

the mission to include broadband network access and the variety of services available via the Internet: "The universal service challenge of our time is to ensure that all Americans are served by networks that support high-speed Internet access—in addition to basic voice service— where they live, work, and travel." *Connect America Fund, et al.*, WC Docket No. 10-90, Report and Order and Further Notice of Proposed Rulemaking, 26 FCC Rcd. 17663, 17668 (2011).

Expanding the number and type of subsidy recipients greatly complicates the process of collecting and dispersing funds, and increases the total amount of necessary subsidies, because carriers must upgrade and eventually replace existing networks to provide broadband connections. Additionally, broadband subscribers need to rent or purchase new equipment to secure network access.

Conventional marketplace forces create incentives for telephone companies to install new wireless networks, and to retrofit, and later, to use new fiber optic lines to provide broadband service. However, these so-called next generation networks, equipped to handle ever increasing demand for broadband services, such as video and high-speed Internet access, first appear in densely populated areas where ample numbers of

prospective subscribers desire such enhanced service and are willing,

and able, to pay higher rates for them.

Additionally, most legacy wireline carriers, such as AT&T,

Verizon, CenturyLink, and Frontier, currently maintain two separate

networks: legacy voice telephone networks and newly installed

broadband networks.  The D.C. Circuit Court of Appeals rejected

telephone company assertions that they should not have to maintain

their legacy copper wire network, because new wireless networks offer

better service:

> [W]e owe deference to the FCC's decision to hold a
> preexisting regime in place for an interim period, so as
> to avoid commandeering agency resources and to
> respect the agency's judgments about how to maintain
> baseline universal service in the context of
> uncertainties attending a major regulatory transition.
> Second, in response to Petitioners' generalized
> allegations that vulnerable consumers do not need the
> disputed services and that the existing program leaves
> Petitioners with underfunded obligations, the FCC has
> made clear that it will grant case-by-case forbearance
> or supplemental funding in areas where providers can
> meet their burden to show that their services are not
> required or that they need additional financial help.
> Especially in the context of this systemic regulatory
> transition, no more is required.  *AT&T, Inc. v. Federal
> Communication Commission*, 886 F.3d 1236, 1241
> (D.C. Cir. 2018).

Telecommunications carriers and their subscribers understandably have concerns about increasing universal service funding requirements, occurring at the same time as other costs rise. However, a significant portion are either transitory or occasional. Carriers soon will retire their terrestrial, wireline networks as more subscribers migrate to wireless networks. Subscribers of broadband services can expect their newly acquired modems and routers to last for several years. Additionally, both Congress and the FCC can devise remedies to growing universal service financial burdens borne by telecommunications subscribers by expanding what types of services and service providers should be subject to the contribution requirement. However, the need for timely and effective reforms to the universal service funding process does not justify abandonment of the mission.

## IV. Many National Governments have Created a Separate or Affiliated Entity to Manage Universal Service Funds Collection and Distribution, Subject to Oversight by the National Regulatory Authority or Ministry.

Petitioners criticize the use of a separate non-governmental entity for managing universal service programs, but ignore the numerous benefits of such arrangements. A list of best practices in universal

service funding and management, compiled by the ITU, recommends

"[e]stablishment of the USF as [a] separate, independent (autonomous)

entity." 2013 ITU Universal Service Report at 21.  Creating an

independent and well-qualified fund administrator promotes efficiency,

impartiality, and professionalism.[15]

Because of the complexity in collecting and disbursing universal

service funds among a diverse and expanding array of beneficiaries,

most national governments have opted to rely on an organization

unaffiliated with the National Regulatory Authority or Ministry, but

subject to its oversight.  *See, e.g.*, 2013 ITU Universal Service Report at

24-117; Digital Regulation Platform, Indonesia's Universal Service

Obligation Fund (Sep. 24, 2020); retrieved from:

https://digitalregulation.org/indonesias-universal-service-obligation-

fund/ (a public service institution separate from the Directorate General

of Posts and Telecommunications regulator manages the Universal

Service Obligation Fund).  Such a separate entity can secure the

---

[15]    A joint program of the ITU and The World Bank recommends
"autonomous UASFs in administrative budgeting and allocation of
resources."  ITU and The World Bank, *Digital Regulation Platform*;
*Universal access and service funds*, retrieved from:
https://digitalregulation.org/access-for-all/.

services of people with the necessary expertise, but not at the expense of

adding hundreds, or even thousands more federal government

employees.

Having a separate organization, such as the Universal Service

Administrative Company in the United States, promotes greater

transparency, accountability, and efficiency in the collection and

disbursements of funds.[16] Additionally, such an organization can

maintain its independence from specific stakeholders and funding

beneficiaries that might attempt to lobby the telecommunications

regulator with an eye toward thwarting reforms.[17]  Similarly, an

---

[16]     The FCC designated USAC as the interim USF Administrator in 1997.  USAC became the permanent Fund Administrator in 1998.  *See Changes to the Board of Directors of the National Exchange Carrier Association, Inc. and Federal-State Joint Board on Universal Service,* CC Docket No. 96-45, Report and Order and Second Order on Reconsideration, 12 FCC Rcd. 18400, (1997); *Changes to the Board of Directors of the National Exchange Carrier Ass'n, Inc. and Federal-State Joint Board on Universal Service,* CC Docket Nos. 97-21 and 96-45, Third Report and Order, Fourth Order on Reconsideration in CC Docket No. 97-21 and Eighth Order on Reconsideration in CC Docket No. 96-45, 13 FCC Rcd. 25058 (1998).

[17]     The composition of USAC's nineteen Board of Directors represents a wide array of stakeholders including three directors from schools eligible to receive subsidies, one director from an eligible library, and two directors from eligible rural health care providers that are eligible to receive discounts.  Additionally, seven directors must represent one of the following constituencies: eligible consumers, state

independent body can offer unbiased forensic assessments whether a

carrier has achieved progress in reaching universal service goals,

conduct periodic audits of beneficiaries' use of funds,[18] and offer focused

diligence to identify waste, fraud, and other abuses.

As technology evolves and existing or prospective consumer

requirements change, an independent universal service funding

organization can readily adapt to new circumstances and implement

administrative refinements.[19]  Congress recently validated the

importance of having the USAC available to manage new universal

service funding initiatives in response to the Covid-19 pandemic.  The

---

telecommunications regulators, state consumer advocates, wireless
providers, competitive local exchange carriers, cable operators, and
information service providers.  Universal Service Administrative Co.,
*Board of Directors*; retrieved from:
https://www.usac.org/about/leadership/board-of-directors/.

[18]    *See* Universal Service Administrative Co, *Appeals and Audits*;
retrieved from: https://www.usac.org/lifeline/rules-and-
requirements/appeals-audits/.

[19]    On its own accord and at the direction of Congress, the FCC
regularly seeks to improve the universal service funding program, with
an eye toward reducing waste and adapting to changed circumstances.
*See, e.g.*, *Report on The Future of the Universal Service Fund,* WC
Docket No. 21-476, Notice of Inquiry, FCC 21-127 (rel. Dec. 15, 2021)
[hereinafter cited as USF Reform NOI].

2021 Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429 (2021) authorizes the FCC to rely on USAC for implementation of the Affordable Connectivity Program that allocates $14.2 billion[20] in additional universal service funding support during the Covid-19 pandemic. USF Reform NOI at ¶48, *citing* Infrastructure Investment and Jobs Act, div. F, title V, §§ 60502(a)(2)(C), (a)(2)(E); Consolidated Appropriations Act, div. N, tit. IX, § 904(i)(5) (2021).

Additionally, the Consolidated Appropriations Act recognizes the merits in having USAC evaluate and authenticate applicant qualifications for new universal service funding.  The Act "includes language specifying that the Secretary of Agriculture, the Secretary of Education, and the Secretary of Health and Human Services shall enter into a memorandum of understanding with USAC to provide for the expeditious sharing of data through the National Verifier, or any successor system, for the purposes of verifying consumer eligibility for

---

[20]     *See*, FCC, *Affordable Connectivity Program*; retrieved from: https://www.fcc.gov/acp; Universal Service Administrative Co*., Affordable Connectivity Program*; retrieved from: https://www.usac.org/about/affordable-connectivity-program/.

the program.  *Id.* at n. 79, *citing* Infrastructure Act, div. F, title V, §
60502(e).

USAC serves an ever-increasing number of beneficiaries,
including 8.1 million individuals, 1.2 million households qualifying for
discounted telecommunications and broadband service, 128,147 schools
and libraries, and 9,050 rural health care facilities.[21]  Predictably, the
amount of funds available and a large group of subsidy candidates
create incentives for criminal conduct and uncertainty about who
qualifies and how much they should receive.  Both USAC[22]
and the FCC[23] conscientiously work to identify and sanction abuses
through audits and investigations.

---

[21]    Universal Service Administrative Co., *Datasets*; retrieved from:
https://opendata.usac.org/.

[22]    *See* Universal Service Administrative Co., *Appeals & Audits*;
retrieved from: https://www.usac.org/about/appeals-audits/.

[23]    "[I]ncreased demand and resulting administrative challenges [has]
required us to take a closer look at whether the current rules and
procedures are cost-effective and efficient and adequately protect the
Universal Service Fund against waste, fraud, and abuse." *Promoting
Telehealth in Rural America*, WC Docket No. 17-310, Report and Order,
32 FCC Rcd. 7335, 7336 (2019). *See also, American Broadband &
Telecommunications Company, Jeffrey S. Ansted*, DA 22-421, Order (rel.
June 3, 2022) (recovering $16,618,235.44 for, *inter alia*, failing to
maintain proper procedures to ensure compliance with the

## CONCLUSION

Throughout the sequence of private, regulatory agency, and legislative initiatives, the United States has led the world in developing a funding and management system to achieve universal service goals. Private and public sector initiatives have made it possible for this nation to accrue economic development and societal benefits. Because circumstances change, the ongoing accrual of such benefits has required frequent reassessments and modifications of the universal service funding system. Reviewing courts have evaluated both the baseline foundations for creating a funding mechanism, as well as the many modifications and refinements undertaken by the FCC over decades. The Commission's initiatives have been affirmed, based on the prudent determination that a legislative mandate exists, and the FCC has

---

Commission's rules, and seeking subsidies for ineligible and duplicate accounts and deceased individuals); *DataConnex, LLC*, FCC 18-9, Notice of Apparent Liability for Forfeiture and Order, 33 FCC Rcd. 1575 (2018) (proposing an approximately $19 million forfeiture for filing forged, false, misleading, and unsubstantiated information to increase funding); *Network Services Solutions, LLC, Scott Madison*, FCC 17-70, Amendment to Notice of Apparent Liability for Forfeiture and Order, 32 FCC Rcd. 5169 (2017) (proposing an approximately $22 million forfeiture for alleged violations including preparing and transmitting forged and false documents).

reasonably interpreted how to generate the best outcomes consistent with congressional guidance.

Reviewing courts have rejected as misguided and illogical claims that the FCC has exceeded its statutory authority and has engaged in unconstitutional activities. The United States universal service funding system comports with global best practices.[24] When it becomes apparent that it must fine-tune and revise the funding and disbursement process, the FCC has made timely corrections. Such midcourse corrections have occurred because of changed circumstances, and occasionally, in response to newly enacted statutory requirements.

Surely the FCC must confront chronic and emerging challenges to the universal service regime, including inefficiency, fraud, declining subscriptions to services subject to a funding requirement, and an expanded mission that now includes broadband access. But none of this justifies a wholesale elimination of the USF program, or a credible basis

---

[24]    An important comparative study of national universal service funding regimes ranked the United States in the highest category for engagement and performance, a top designation assigned to only 38% of the 69 mostly developed nations studied. ITU, *Universal Service and Digital Inclusion for All* at 4, 112.

29

for challenging the lawfulness of the mission and recommending its abandonment.

Based on the foregoing, this Court should deny the petition for review and affirm as lawful the order of approval issued by the FCC authorizing the Universal Service Contribution Factor for the First Quarter of 2022.

Respectfully submitted,

/s/ *Eric P. Gotting*
Eric P. Gotting
    *Counsel of Record*
James Baller
Keller and Heckman LLP
1001 G Street, N.W.
Suite 500 West
Washington, D.C.  20001
(202) 434-4100 (Phone)
(202) 434-464 (Facsimile)
gotting@khlaw.com

*Counsel for Amicus Curiae*

Dated: June 17, 2022

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and Fifth Circuit Rule 29.3 because it contains 5,903 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook (14-point).

Dated: June 17, 2022

/s/ *Eric P. Gotting*
*Counsel of Record for Amicus Curiae*

## CERTIFICATE OF SERVICE

I certify that, on June 17, 2022, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit through the CM/ECF system, which will serve all parties, intervenors, and amici electronically.

Dated: June 17, 2022

/s/ *Eric P. Gotting*
*Counsel of Record for Amicus Curiae*

# ATTACHMENT C

## Curriculum Vitae of Rob Frieden

**Contact Information**

Penn State University
102 Carnegie Building
University Park, PA  16802
(814) 863-7996; email: rmf5@psu.edu
Web page: http://www.personal.psu.edu/rmf5/

**Education Background**

B.A., University of Pennsylvania, 1977 (cum laude with distinction in the major)

J.D. University of Virginia, 1980

**Professional Background**

| | |
|---|---|
| 1992-Present: | **PIONEERS CHAIR AND PROFESSOR OF TELECOMMUNICATIONS AND LAW**, Pennsylvania State University, University Park, Pennsylvania |
| | Teach courses and research issues in the law, regulation and business of telecommunications, information technologies, cybersecurity, intellectual property, electronic commerce and privacy.  Actively engaged in grant seeking, consulting, outreach, public policy advocacy and in administrative duties which have included serving as Department Head and Chair, promotion and tenure and graduate studies.  Published four books and over one hundred articles in law reviews and other academic journals. |
| 1991-1992: | **DEPUTY DIRECTOR-INTERNATIONAL RELATIONS**, Motorola Satellite Communications, Inc. Washington, D.C. and Chandler, Arizona |
| | Primary manager for spectrum allocation, business development, strategic planning and international regulatory liaison efforts of the IRIDIUM™ mobile satellite venture. |
| 1989-1991: | **CONSULTANT** |
| | Sole practitioner providing legal, regulatory and strategic counsel on telecommunications and information management issues including network interconnection, national regulatory policy, carrier disputes and next generation network development. |

1988-1989:          **ASSISTANT GENERAL COUNSEL**, Private Trans-Atlantic
                    Telecommunications System, Inc. McLean, Virginia

                    Primary in-house counsel for resolving corporate, legal, transactional and
                    regulatory problems affecting construction and operation of the nation's first
                    private international fiber optic cable; Principal negotiator for sale or lease of
                    transmission capacity and for terrestrial backhaul facility contracts to link the cable
                    with urban centers.

1986-1988:          **PROGRAM MANAGER FOR INTERNATIONAL FACILITY AND
                    SERVICE POLICY**, National Telecommunications and Information
                    Administration, Washington, D.C.

                    Chief liaison with other federal government agencies for executing
                    international telecommunications treaties and for multilateral coordination
                    on satellite and spectrum policies.  Managed Executive Branch filings at the
                    Federal Communications Commission.

1982-1986:          **ATTORNEY**

                    Associate in the communications departments of three prominent Washington,
                    D.C. law firms.  Performed transactional and regulatory services for satellite, fiber
                    optic and wireless carriers, cable television systems and broadcasters.  Prepared
                    pleadings in FCC and judicial cases; briefed clients and Congressional staff on
                    communications policy issues.

1980-1982:          **ATTORNEY ADVISOR,** Federal Communications Commission,
                    Washington, D.C.

                    Drafted international telecommunications policies and regulations for
                    public vote by FCC Commissioners. Presided over carrier facility
                    interconnection negotiations.

**Publications**

**Books or Parts of Books**

Rob Frieden,   *Operations of Internet Platform Intermediaries*, in APPLIED ECONOMICS IN THE DIGITAL ERA: ESSAYS IN HONOR OF GARY MADDEN, James Alleman, Mohsen Hamoudia & Paul Rappoport (eds.) (New York: Palgrave Macmillan, in production).

Rob Frieden, *An Introduction to Data Property Ownership Rights and Data Protection Responsibilities*, in RESEARCH ON COMPREHENSIVE NETWORK GOVERNANCE IN THE ERA OF DIGITAL ECONOMY, Bin Zhang, ed. (Beijing: BUPT Press, 2019).

Rob Frieden, *Achieving a Level Competitive Playing Field in a Convergent and Concentrating Telecommunications Marketplace*, in Jorge Pérez Martínez and Zoraida Frías Barroso, eds. A LEVEL PLAYING FIELD FOR THE DIGITAL ECOSYSTEM, 165- 196 (Madrid: Fundación Telefónica, 2016).

Rob Frieden, *Next-Generation Television and the Migration from Channels to Platforms*, in POLICY AND MARKETING STRATEGIES FOR DIGITAL MEDIA, Yu-li Liu and Robert G. Picard, eds., 60-72 (New York: Routledge, 2014).

Rob Frieden, *The Debate Over Network Neutrality in the United States*, in NET NEUTRALITY IN EUROPE, Alain Strowel, ed., 24-45 (Brussels: Bruylant, 2013).

Rob Frieden, *Case Studies in Results-Driven Decision Making at the FCC*, in BEYOND BROADBAND ACCESS, DEVELOPING DATA-BASED INFORMATION POLICY STRATEGIES, Richard D. Taylor and Amit M. Schejter eds., 143-157 (New York: Fordham University Press, 2013).

Rob Frieden, *Government Oversight of Next Generation Wireless Networks*, in REGULATION AND THE PERFORMANCE OF COMMUNICATION AND INFORMATION NETWORKS, Gerald R. Faulhaber, Gary Madden  and Jeffrey Petchey eds. 55-84 (Cheltenham, U.K.: Edward Elgar, 2012).

Rob Frieden, WINNING THE SILICON SWEEPSTAKES: CAN THE UNITED STATES COMPETE IN GLOBAL TELECOMMUNICATIONS?, (New Haven: Yale University Press 2010).

Rob Frieden, *The Way Forward for Wireless*, in … AND COMMUNICATIONS FOR ALL—A POLICY AGENDA FOR A NEW ADMINISTRATION, Amit M. Schejter, ed., 153-166 (Lanham, MD: Lexington Books 2009).

Rob Frieden, *Network Neutrality and Its Potential Impact on Digital Content Platforms*, in THE ECONOMICS OF DIGITAL MARKETS, Gary Madden and Russel Cooper, eds. 265-281(Cheltenham, U.K.: Edward Elgar Publishing 2009).

Rob Frieden, *Balancing Equity and Efficiency in Global Spectrum Management*, in GOVERNING GLOBAL ELECTRONIC NETWORKS—INTERNATIONAL PERSPECTIVES ON POLICY AND POWER, William J. Drake and Ernest J. Wilson III, eds., 127-148 (Cambridge, MA.: MIT Press 2008).

Rob Frieden, *Institutional Framework and Competitiveness of the U.S. Telecommunications Market*, in COMPETITIVENESS OF NEW INDUSTRIES--INSTITUTIONAL FRAMEWORK AND LEARNING IN INFORMATION TECHNOLOGY IN JAPAN, THE U.S AND GERMANY, Cornelia Storz and Andreas Moerke, eds., 103-123 (New York, N.Y.: Routledge 2007).

James Goodale & Rob Frieden, ALL ABOUT CABLE AND BROADBAND, (New York: Law Journal Press 2004-present)(bi-annual updates).

Rob Frieden, *Satellite Broadcasting*, in ENCYCLOPEDIA OF INTERNATIONAL MEDIA AND COMMUNICATIONS, Donald H. Johnston, ed., Vol. 4, 115-126 (San Diego, CA: Academic Press 2003).

Rob Frieden, *Regulation of Internet-mediated communication and commerce*, in Gary Madden, ed., EMERGING TELECOMMUNICATIONS NETWORKS, Vol. II, 107-128 (Cheltenham, U.K.: Edward Elgar 2003) (web promotion of this two volume work available at http://www.e-elgar.co.uk/.

Rob Frieden, MANAGING INTERNET-DRIVEN CHANGE IN INTERNATIONAL TELECOMMUNICATIONS, (Norwood, MA: Artech House, 2001).

Rob Frieden, *The Potential for Scrutiny of Internet Peering Policies in Multilateral Forums*, in Benjamin M. Compaine and Shane Greenstein, eds., COMMUNICATIONS POLICY IN TRANSITION: THE INTERNET AND BEYOND, 159-193(Cambridge, MA: MIT Press, 2001).

Robert M. Frieden, *Satellite Technology and Regulation*, in Kornel Terplan, ed., THE TELECOMMUNICATIONS HANDBOOK, 92-101 (Boca Raton, Florida: CRC Press, 2000).

Harvey Zuckman, Robert Corn-Revere, Robert M. Frieden & Charles Kennedy, MODERN COMMUNICATIONS LAW, (St. Paul, Minn.: West Publishing Co. 1999).(chapters on international telecommunications, spectrum management and common and private carriage, plus pocket part updates 2000-2006).

Robert M. Frieden, *Winning and Losing the Telecommunications Sweepstakes of 1996*, in E. Bohlin and S. Levin, eds., TELECOMMUNICATIONS TRANSFORMATION: TECHNOLOGY, STRATEGY AND POLICY, 373-396 (Washington, D.C.: IOS Press, 1998).

Patrick R. Parsons & Robert M. Frieden, THE CABLE AND SATELLITE TELEVISION INDUSTRIES, (Needham Heights, Ma.: Allyn & Bacon, 1998) (1999 Cable Book Award-National Cable Television Center and Museum, University of Denver).

Robert M. Frieden, *Satisfying the Radio Spectrum and Capital Requirements of Satellite Power Systems*, in P.E. Glaser, F.P. Davidson and K.I. Csigi, eds., SOLAR POWER SATELLITES, (New York: John Wiley & Sons, 1998).

Robert M. Frieden, *The Global Information Infrastructure*, in A GUIDE TO NEW TELECOMMUNICATIONS TECHNOLOGIES, (Washington, D.C.: United States Information Agency, 1997).

Robert M. Frieden, *Can and Should the FCC Regulate Internet Telephony?*, in D. Waterman and G. Reston, eds., SELECTED PAPERS OF TPRC 1996, 183-204 (Mahwah, N.J.: L. Erlbaum, 1997).

Robert M Frieden, INTERNATIONAL TELECOMMUNICATIONS HANDBOOK, (Norwood, MA: Artech House, 1996) (an extensive overview of international telecommunications from a number of perspectives including law, policy, economics and technology).

Robert M. Frieden, *Satellite Phones and Cross-Border Cellular Service: New Challenges for Incumbent Carriers*, in G. Staple, ed. TELEGEOGRAPHY 1993, (Washington, D.C.: International Inst. of Communications, 1993).

## Works in Progress

*WRC-19 and Spectrum Planning at the International Telecommunication Union*. This paper assesses how the November, 2019 World Radio Conference handled U.S. spectrum allocation proposals.

**Refereed and Law Review Articles**

Rob Frieden, *Challenges to the Conventional Wisdom About Mergers and Consumer Welfare in a Converging Internet Marketplace*, 65 VILLANOVA LAW REVIEW (2020) (in production).

Rob Frieden, *There's Probably a Blackout in Your Television Future: Tracking New Carriage Negotiation Strategies Between Video Content Programmers and Distributors*, 43 THE COLUMBIA JOURNAL OF LAW AND THE ARTS, No. 4, 487-515 (2020).

Rob Frieden, *The evolving 5G case study in spectrum management and industrial policy*, 43 TELECOMMUNICATIONS POLICY, No. 6, 49-62 (July, 2019); available at: https://www.sciencedirect.com/science/article/pii/S0308596119300783?via%3Dihub.

Rob Frieden, *Two-sided Internet Markets and the Need to Assess Both Upstream and Downstream Impacts*, 68 AMERICAN UNIVERSITY LAW REVIEW 713-760 (2019).

Rob Frieden, *How Internet Platforms Intermediaries Affect Competition and Consumers*, 20 NETWORK INDUSTRIES QUARTERLY, No. 3, 3-8 (June, 2018).

Rob Frieden, *The Internet of Platforms and Two-Sided Markets: Implications for Competition and Consumers*, 63 VILLANOVA LAW REVIEW 269-320 (2018).

Rob Frieden, *Freedom to Discriminate: Assessing the Lawfulness and Utility of Biased Broadband Networks*, 20 VANDERBILT JOURNAL OF ENTERTAINMENT AND TECHNOLOGY LAW, 655-708 (2018).

Rob Frieden, *The Mixed Blessing in Subsidized Internet Access*, 15 COLORADO TECHNOLOGY LAW JOURNAL 269-306 (2017).

Rob Frieden, *Grey nuances in the black and white debate over subsidized Internet access*, 41 TELECOMMUNICATIONS POLICY 1017-1026 (2017); http://dx.doi.org/10.1016/j.telpol.2016.10.002.

Rob Frieden, *Conflict in the Network of Networks: How Internet Service Providers Have Shifted from Partners to Adversaries*, 38 COMMUNICATIONS & ENTERTAINMENT LAW JOURNAL, No. 1, 63-90 (Winter, 2016).

Rob Frieden, *Network Neutrality and Consumer Demand for "Better Than Best Efforts" Traffic Management*, 26 FORDHAM INTELLECTUAL PROPERTY, MEDIA & ENTERTAINMENT LAW JOURNAL, 71-102 (Fall, 2015); available at: http://www.fordhamiplj.org/publications/network-neutrality-and-consumer-demand-for-better-than-best-efforts-traffic-management/.

Rob Frieden, *Ex Ante Versus Ex Post Approaches to Network Neutrality: A Comparative Assessment*, 30 BERKELEY TECHNOLOGY LAW JOURNAL, No. 2, 1562-1612 (2015); available at: http://btlj.org/data/articles2015/vol30/30_2/1561-1612_Frieden.pdf.

Rob Frieden, *Déjà vu All Over Again: Questions and a Few Suggestions on How the FCC Can Lawfully Regulate Internet Access*, 67 FEDERAL COMMUNICATIONS LAW JOURNAL, No. 3, 325-376 (2015).

Rob Frieden, *What's New in the Network Neutrality Debate*, 2015 MICHIGAN STATE LAW REVIEW 739-786; available at: http://digitalcommons.law.msu.edu/cgi/viewcontent.cgi?article=1123&context=lr.

Rob Frieden, *Internet Protocol Television and the Challenge of "Mission Critical" Bits*, 33 CARDOZO ARTS & ENTERTAINMENT LAW JOURNAL, No. 1, 47-87 (2015); available at: http://www.cardozoaelj.com/wp-content/uploads/2014/01/Frieden-FINAL.pdf.

Rob Frieden, *The Costs and Benefits of Regulatory Intervention in Internet Disputes: Lessons from Broadcast Signal Retransmission Consent Negotiations*, 37 COMMUNICATIONS & ENTERTAINMENT LAW JOURNAL, No. 1, 1-36 (Winter, 2015).

Rob Frieden, *New models and conflicts in the interconnection and delivery of Internet-mediated content*, 38 TELECOMMUNICATIONS POLICY, No. 11, 970-978 (Dec. 2014).

Rob Frieden, *The Impact of Next Generation Television on Consumers and the First Amendment*, 24 FORDHAM INTELLECTUAL PROPERTY, MEDIA & ENTERTAINMENT LAW JOURNAL. No. 1, 61-95 (2014).

Rob Frieden, *The Rise of Quasi-Common Carriers and Conduit Convergence*, 9 I/S: A JOURNAL OF LAW AND POLICY FOR THE INFORMATION SOCIETY, No. 3, 471-496 (2014).

Rob Frieden, *Identifying Best Practices in Financing Next Generation Networks*, 29 THE INFORMATION SOCIETY: AN INTERNATIONAL JOURNAL, No.4, 234-247 (2013).

Rob Frieden, *The Mixed Blessing of a Deregulatory Endpoint for the Public Switched Telephone Network*, 37 TELECOMMUNICATIONS POLICY, No. 4-5, 400-412 (May, 2013).

Rob Frieden, *Do Conduit Neutrality Mandates Promote or Hinder Trust in Internet-mediated Transactions?*, 28 COMPUTER, LAW & SECURITY REVIEW, 560-567 (2012).

Rob Frieden, *Rationales For and Against Regulatory Involvement in Resolving Internet Interconnection Disputes*, 14 YALE JOURNAL OF LAW AND TECHNOLOGY 266-313 (2012).

Rob Frieden, *From Bad to Worse: Assessing the Long Term Consequences of Four Controversial FCC Decisions*, 77 BROOKLYN LAW REVIEW, No. 3 959-1013 (2012).

Rob Frieden, *Assessing the Need for More Incentives to Stimulate Next Generation Network Investment*, 7 I/S: A JOURNAL OF LAW AND POLICY FOR THE INFORMATION SOCIETY, No. 2, 207-256 (2012).

Rob Frieden, *Legislative and Regulatory Strategies for Providing Consumer Safeguards in a Convergent Information and Communications Marketplace*, 33 HASTINGS COMMUNICATIONS & ENTERTAINMENT LAW JOURNAL, No. 1, 207-248 (Winter, 2011).

Rob Frieden, *Assessing the Merits of Network Neutrality Obligations at Low, Medium and High Network Layers*, 115 PENN STATE LAW REVIEW, No. 1, 49-82 (Summer, 2010).

Rob Frieden, *Invoking and Avoiding the First Amendment: How Internet Service Providers Leverage Their Status as Both Content Creators and Neutral Conduits*, 12 UNIVERSITY OF PENNSYLVANIA JOURNAL OF CONSTITUTIONAL LAW, No. 5, 1279-1323 (June, 2010).

Rob Frieden, *Case Studies in Abandoned Empiricism and the Lack of Peer Review at the Federal Communications Commission*, 8 JOURNAL ON TELECOMMUNICATIONS & HIGH TECHNOLOGY LAW 277-312 (2010); available at: http://www.jthtl.org/content/articles/V8I2/JTHTLv8i2_Frieden.PDF.

Rob Frieden, *Lock Down on the Third Screen: How Wireless Carriers Evade Regulation of Their Video Services*, 24 BERKELEY TECHNOLOGY LAW JOURNAL, No. 2 819-849 (Spring, 2009).

Rob Frieden, *Lies, Damn Lies and Statistics: Developing a Clearer Assessment of Market Penetration and Broadband Competition in the United States*, 14 VIRGINIA JOURNAL OF LAW AND TECHNOLOGY 100- 125(Summer, 2009); available at: http://www.vjolt.net/vol14/issue2/v14i2_100%20-%20Frieden.pdf.

Rob Frieden, *Hold the Phone: Assessing the Rights of Wireless Handset Owners and Carriers*, 69 PITTSBURGH LAW REVIEW, No. 4, 675-725 (2008).

Rob Frieden, *Neither Fish Nor Fowl:  New Strategies for Selective Regulation of Information Services*, 6 JOURNAL ON TELECOMMUNICATIONS AND HIGH TECHNOLOGY LAW, No. 2 373-423 (2008); available at: http://www.jthtl.org/content/articles/V6I2/JTHTLv6i2_Frieden.PDF.

Rob Frieden, *Internet Packet Sniffing and Its Impact on the Network Neutrality Debate and the Balance of Power Between Intellectual Property Creators and Consumers*, 18 FORDHAM INTELLECTUAL PROPERTY, MEDIA & ENTERTAINMENT LAW JOURNAL, No. 3. 633-675 (2008).

Rob Frieden, *A Primer on Network Neutrality*, 43 INTERECONOMICS REVIEW OF EUROPEAN ECONOMIC POLICY, No. 1, 4-15 (Jan./Feb. 2008).

Rob Frieden, *Keeping the Internet Neutral?: A Response to the Wu-Yoo Debate*, 59 FEDERAL COMMUNICATIONS LAW JOURNAL, No. 3, Forum (2007); available at: http://www.law.indiana.edu/fclj/pubs/forum/Frieden_v59i3_forum.pdf.

Rob Frieden, *Internet 3.0: Identifying Problems and Solutions to the Network Neutrality Debate*, 1 INTERNATIONAL JOURNAL OF COMMUNICATIONS, 461-492 (2007); available at: http://ijoc.org/ojs/index.php/ijoc/article/view/160/86.

Rob Frieden, *Network Neutrality or Bias?--Handicapping the Odds for a Tiered and Branded Internet*, 29 HASTINGS COMMUNICATIONS AND ENTERTAINMENT LAW JOURNAL, No. 2, 171-216 (2007).

Rob Frieden, *What Do Pizza Delivery and Information Services Have in Common? Lessons From Recent Judicial and Regulatory Struggles with Convergence*, 32 RUTGERS COMPUTER AND TECHNOLOGY LAW JOURNAL, No. 2, 247-296 (2006).

Rob Frieden, *Killing With Kindness: Fatal Flaws in the $6.5 Billion Universal Service Funding Mission and What Should be Done to Narrow the Digital Divide*, 24 CARDOZO ARTS AND ENTERTAINMENT LAW JOURNAL, No. 2, 447-490 (2006).

Rob Frieden, *Analog and Digital Must-Carry Obligations of Cable and Satellite Television Operators in the United States*, in European Audiovisual Observatory, IRIS SPECIAL, TO HAVE OR NOT TO HAVE—MUST CARRY RULES, 21-28 (2005); 15 MEDIA LAW & POLICY, No. 2, 230-246 (2005-06).

Rob Frieden, *Unbundling the Local Loop: A Cost/Benefit Analysis for Developing Nations*, 7 INFO, No. 4, 3-15 (2005).

Rob Frieden, *Lessons From Broadband Development in Canada, Japan, Korea and the United States*, 29 TELECOMMUNICATIONS POLICY, No. 8, 595-613 (Sept. 2005).

Rob Frieden, *The FCC's Name Game: How Shifting Regulatory Classifications Affect Competition*, 19 BERKELEY TECHNOLOGY LAW JOURNAL, No. 4, 1275-1314 (Fall, 2004).

Rob Frieden, *Regulatory Arbitrage Strategies and Tactics in Telecommunications*, 5 NORTH CAROLINA JOURNAL OF LAW & TECHNOLOGY, No. 2, 227-275 (2004); available at: http://www.jolt.unc.edu/Vol5_I2/pdf/Frieden%20v5i2.pdf.

Rob Frieden, *Balancing Equity and Efficiency Issues in the Management of Shared Global Radiocommunication Resources*, 24 UNIVERSITY OF PENNSYLVANIA JOURNAL OF INTERNATIONAL ECONOMIC LAW, No. 2, 289-327 (Summer, 2003).

Rob Frieden, *Fear and Loathing in Information and Telecommunications Industries: Reasons for and Solutions to the Current Financial Meltdown and Regulatory Quagmire*, 5 THE INTERNATIONAL JOURNAL ON MEDIA MANAGEMENT, No. 1, 25-38 (Spring, 2003).

Rob Frieden, *Adjusting the Horizontal and Vertical in Telecommunications Regulation: A Comparison of the Traditional and a New Layered Approach*, 55 FEDERAL COMMUNICATIONS LAW JOURNAL, No. 2, 207-250 (March, 2003).

Rob Frieden, *Revenge of the Bellheads: How the Netheads Lost Control of the Internet*, 26 TELECOMMUNICATIONS POLICY, No. 6, 125-144 (Sep./Oct. 2002).

Rob Frieden, *Wither Convergence: Legal, Regulatory, and Trade Opportunism in Telecommunications*, 18 SANTA CLARA COMPUTER AND HIGH TECHNOLOGY LAW JOURNAL, No. 2, 171-205 (May, 2002).

Rob Frieden, *Does a Hierarchical Internet Necessitate Multilateral Intervention?*, 26 NORTH CAROLINA JOURNAL OF INTERNATIONAL LAW AND COMMERCIAL REGULATION, No. 2, 361-405 (Spring, 2001).

Rob Frieden, *Regulatory Opportunism in Telecommunications: The Unlevel Competitive Playing Field*, 10 COMMLAW CONSPECTUS, No. 1, 81-102 (2001).

Robert M. Frieden, *Universal Service: When Technologies Converge and Regulatory Models Diverge*, 13 HARVARD JOURNAL OF LAW & TECHNOLOGY, No. 3, 395-433 (Summer, 2000).

Robert M. Frieden, M., *Last Days of the Free Ride?  The Consequences of Settlement-Based Interconnection for the Internet*, 1 INFO, No. 3, 225-238 (June, 1999).

Robert M. Frieden, *Falling Through the Cracks: International Accounting Rate Reform at the ITU and WTO*, 22 TELECOMMUNICATIONS POLICY, No. 11, 963-975 (December 1998).

Robert M. Frieden, *Without Public Peer: The Potential Regulatory and Universal Service Consequences of Internet Balkanization*, 3 VIRGINIA JOURNAL OF LAW & TECHNOLOGY, 8 (Fall, 1998) available at http://vjolt.student.virginia.edu/graphics/vol3/homeart8.html.

Robert M. Frieden, *That Pesky Last Mile: Call Termination Strategies for Mobile Satellite Systems*, 22 TELECOMMUNICATIONS POLICY, No. 2, 133-143. (1998).

Robert M. Frieden, *The Telecommunications Act of 1996: Predicting the Winners and Losers*, 20 HASTINGS COMMUNICATIONS & ENTERTAINMENT LAW JOURNAL, No. 1, 11-57 (Fall, 1997).

Robert M. Frieden, *The Impact of Call-Back and Arbitrage on the Accounting Rate Regime*, 21 TELECOMMUNICATIONS POLICY, No. 9/10, 819-827 (1997).

Robert M. Frieden, *Widespread Deployment of Wireless Telephony: Business, Legal, Regulatory and Spectrum Challenges*, 21 TELECOMMUNICATIONS POLICY, No. 5, 451-459 (June, 1997).

Robert M. Frieden, *Dialing for Dollars: Will the FCC Regulate Internet Telephony?*, 23 RUTGERS COMPUTER AND TECHNOLOGY LAW JOURNAL, 47-79 (1997).

Robert M. Frieden, *Schizophrenia Among Carriers: How Common Carriers and Private Carriers Trade Places*, 3 MICHIGAN TELECOMMUNICATIONS AND TECHNOLOGY LAW REVIEW, (1997), available at http://www.mttlr.org/volthree/frieden.html.

Robert M. Frieden, *Privatization of Satellite Cooperatives: Smothering a Golden Goose?*, 36 VIRGINIA JOURNAL OF INTERNATIONAL LAW, No. 4 1001-1019 (Summer, 1996).

Robert M. Frieden, *Contamination of the Common Carrier Concept in Telecommunications*, 19 TELECOMMUNICATIONS POLICY, No. 9, 685-697 (December, 1995).

Robert M. Frieden, *Universal Personal Communications in the New Telecommunications World Order--Access to Wireline Networks*, 19 TELECOMMUNICATIONS POLICY, No. 1, 43-49 (January, 1995).

Robert M. Frieden, *Should Intelsat and Inmarsat Privatize?*, 18 TELECOMMUNICATIONS POLICY, No. 9, 679-686 (December, 1994).

Robert M. Frieden, *International Toll Revenue Division--Tackling the Inequities and Inefficiencies*, 17 TELECOMMUNICATIONS POLICY, No. 3, 221-233 (April, 1993).

Robert M. Frieden, *Strategies for Market Entry by Private International Satellite Systems*, 16 TELECOMMUNICATIONS POLICY, No. 4, 354-363 (May/June 1992).

Robert M. Frieden, *Open Network Policies for the United States and Europe: Visions and Realities*, 31 JURIMETRICS JOURNAL, 319-328 (Spring 1991).

Robert M. Frieden, *Accounting Rates: The Business of International Telecommunications and the Incentive to Cheat*, 43 FEDERAL COMMUNICATIONS LAW JOURNAL, No. 2, 111-139 (1991).

Robert M. Frieden, *The Third Computer Inquiry: A Deregulatory Dilemma*, 38 FEDERAL COMMUNICATIONS LAW JOURNAL, No. 3, 383-410 (1987).

Robert M. Frieden, *Getting Closer to the Source: New Policies for International Satellite Access*, 37 FEDERAL COMMUNICATIONS LAW JOURNAL, No. 2. 293-323 (1985).

Robert M. Frieden, *The International Application of the Second Computer Inquiry*, 5 MICHIGAN YEARBOOK OF INTERNATIONAL LEGAL STUDIES, 189-218 (1984).

Robert M. Frieden, *International Telecommunications and the Federal Communications Commission*, 21 COLUMBIA JOURNAL OF TRANSNATIONAL LAW, No. 3, 423-485 (1983).

Robert M. Frieden, *The Computer Inquiries: Mapping the Communications/Information Processing Terrain*, 33 FEDERAL COMMUNICATIONS LAW JOURNAL, No. 1, 55-115 (1981).

## Refereed Proceedings and Referred Letters

Rob Frieden, *An Introduction to Data Property Ownership Rights and Data Protection Responsibilities*, monograph prepared for the Network Comprehensive Governance Capability Seminar, Beijing University of Posts and Telecommunications, School of Economics and Management (June 13, 2019).

Robert M. Frieden, *Lessons From Broadband Development in Canada, Japan and Korea*, in PROCEEDINGS OF THE PACIFIC TELECOMMUNICATIONS COUNCIL TWENTY-SEVENTH ANNUAL CONFERENCE, (Honolulu: Pacific Telecommunications Council, 2005); available at: http://www.ptc.org/PTC05/program/pdfs/8.pdf.

Robert M. Frieden, *Assessing the Regulatory Consequences When Content and Conduit Converge*, in PROCEEDINGS OF THE PACIFIC TELECOMMUNICATIONS COUNCIL TWENTY-FIFTH ANNUAL CONFERENCE, (Honolulu: Pacific Telecommunications Council, 2003).

Robert M. Frieden, *Bellheads Rule: How the Netheads Lost Control of the Internet*, in PROCEEDINGS OF THE PACIFIC TELECOMMUNICATIONS COUNCIL TWENTY-FOURTH ANNUAL CONFERENCE, (Honolulu: Pacific Telecommunications Council, 2002).

Robert M. Frieden, *The Potential Regulatory and Universal Service Consequences of Internet-Mediated Accounting Rate Arbitrage*, in Wedemeyer and R. Nickelson, eds. PROCEEDINGS OF THE PACIFIC TELECOMMUNICATIONS COUNCIL TWENTY-FIRST ANNUAL CONFERENCE, (Honolulu: Pacific Telecommunications Council, 2000).

Robert M. Frieden, *Variations on a Theme: The Three Phases of Competition Policy*, in PROCEEDINGS AND WHO IS WHO TELECOM 99/INTER@CTIVE99, (Geneva: International Telecommunication Union, 1999).

Robert M. Frieden, *The Potential Regulatory and Universal Service Consequences of Internet Balkanization*, in Wedemeyer and R. Nickelson, eds. PROCEEDINGS OF THE PACIFIC TELECOMMUNICATIONS COUNCIL TWENTY-FIRST ANNUAL CONFERENCE,   (Honolulu: Pacific Telecommunications Council, 1999).

Robert M. Frieden, *Call Origination and Termination Strategies for Mobile Satellite Systems*, in D. Wedemeyer and R. Nickelson, eds. PROCEEDINGS OF THE PACIFIC TELECOMMUNICATIONS COUNCIL TWENTIETH ANNUAL CONFERENCE, (Honolulu: Pacific Telecommunications Council, 1998).

Robert M. Frieden, *New Opportunities and Challenges When Regulators Change Course*, in D. Wedemeyer and R. Nickelson, eds., PROCEEDINGS OF THE PACIFIC TELECOMMUNICATIONS COUNCIL NINETEENTH ANNUAL CONFERENCE, (Honolulu: Pacific Telecommunications Council, 1997).

Robert M. Frieden, *The Impact of Boomerang Boxes and Callback Services on the Accounting Rate Regime*, in D. Wedemeyer and R. Nickelson, eds., PROCEEDINGS OF THE PACIFIC TELECOMMUNICATIONS COUNCIL EIGHTEENTH ANNUAL CONFERENCE, (Honolulu: Pacific Telecommunications Council, 1996).

Robert M. Frieden, *Social, Logistical and Developmental Issues in the Global Information Infrastructure*, in SPEAKERS PAPERS, 7TH WORLD TELECOMMUNICATION FORUM, Strategies Summit, Vol. 1, Session 5, 14 (Geneva: International Telecommunication Union, 1995).

Robert M. Frieden, *The Privatization Sweepstakes for Intelsat and Inmarsat*, in D. Wedemeyer, ed., PROCEEDINGS OF THE PACIFIC TELECOMMUNICATIONS COUNCIL SEVENTEENTH ANNUAL CONFERENCE, (Honolulu: Pacific Telecommunications Council, 1995).

Robert M. Frieden, *Assessing the Scope of Global Personal Communication Services*, in J. Savage and D. Wedemeyer, eds., PROCEEDINGS OF THE PACIFIC TELECOMMUNICATIONS COUNCIL SIXTEENTH ANNUAL CONFERENCE, (Honolulu: Pacific Telecommunications Council, 1994).

Robert M. Frieden, *Legal and Regulatory Challenges to Universal Personal Communication Services Provided by Low Earth Orbiting Satellites*, in PROCEEDINGS OF THE ANNUAL CONFERENCE OF THE AMERICAN INSTITUTE OF AERONAUTICS AND ASTRONAUTICS, (Washington, D.C., 1994).

Robert M. Frieden, *WARC-92 and Low Earth Orbiting Satellites: A Case Study of the Process for Accommodating Spectrum Requirements of New Technologies*, in J. Savage and D. Wedemeyer, eds., PROCEEDINGS OF THE PACIFIC TELECOMMUNICATIONS COUNCIL FIFTEENTH ANNUAL CONFERENCE, (Honolulu: Pacific Telecommunications Council, 1993).

Robert M. Frieden, *Strategies For Market Entry By International Separate Systems*, in M. Lofstrom  and D. Wedemeyer, eds., PROCEEDINGS OF THE PACIFIC TELECOMMUNICATIONS COUNCIL FOURTEENTH ANNUAL CONFERENCE, (Honolulu: Pacific Telecommunications Council, 1992).

Robert M. Frieden, *A Primer on International Accounting Rates*, in M. Lofstrom and D. Wedemeyer, eds., PROCEEDINGS OF THE PACIFIC TELECOMMUNICATIONS COUNCIL THIRTEENTH ANNUAL CONFERENCE , (Honolulu: Pacific Telecommunications Council, 1992).

Robert M. Frieden, *User Benefits From Private International Carriers*, in D. Wedemeyer and M. Lofstrom, eds., PROCEEDINGS OF THE PACIFIC TELECOMMUNICATIONS COUNCIL TWELTH ANNUAL CONFERENCE (Honolulu: Pacific Telecommunications Council, 1990).

Robert M. Frieden, *There's An ISDN in Your Telecommunications Future*, PROCEEDINGS OF THE PACIFIC TELECOMMUNICATIONS COUNCIL EIGHTH ANNUAL CONFERENCE, (Honolulu: Pacific Telecommunications Council, 1985).

## Other Publications

*Letter from America—Network Neutrality in the EU, Canada and the U.S.*, 50 INTERECONOMICS No.6, 363-364 (Nov./Dec. 2015).

*Verizon could learn a thing or two from Comcast about how to make most of its new cash cow*, THE CONVERSATION (May, 2015); available at: https://theconversation.com/profiles/rob-frieden-169813/articles.

Helped edit and co-signed an Amicus Brief from Law Professors commenting on the merits of Verizon's appeal of the FCC's Open Access rules.

*Threats and Opportunities From Next Generation Television*, 40 intermedia, No. 1, 18-25 (March, 2012).

Revised materials on telecommunications topics for the *World Book* encyclopedia (2008).

*Locking Down the Third Screen: How Wireless Firms Thwart Users' Access to Content*, 36 intermedia, No. 2, 18-21 (Spring, 2008).

*Wireless Carterfone--A Long Overdue Policy Promoting Consumer Choice and Competition*, New America Foundation, Wireless Future Program, Working Paper No. 20 (Jan. 2008); available at: http://www.newamerica.net/events/2008/free_my_phone.

*Internet 3.0: Assessing the Scope of a Non-Neutral and Tiered Web*, presented at the 29th Annual Conference of the Pacific Telecommunications Council (Honolulu, HI 2007); available at: http://www.ptc07.org/program/papers/M11_RobertFrieden.pdf.

Rapporteur, The Museum of Television and Radio, Media Center Dialogue, *Digital Rights Management*, Briefing Summary, Issue 1/2004 (2004).

Rapporteur, *Innovations in Customer Loyalty, Retention, And Advocacy: Powered By Technology*, Philadelphia, Pennsylvania (May 14-15, 2003), White Paper available at: http://www.smeal.psu.edu/ebrc/publications/w_papers.html.

Rapporteur, *Accelerating Global Commerce Through Technology and Policy* National Press Club, Washington, D.C. (September 20th, 2002), White Paper available at: http://www.ebrc.psu.edu/publications/index.html#conf.

Robert M. Frieden, *New World, New Realities–The Remaining Roles Of Government In International Telecommunications, A Report of the Fifth Annual Aspen Institute Roundtable on International Telecommunications*, Aspen, Colorado, ISBN 0-89843-277-4 (Feb., 2000).

Revised materials on several telecommunications topics for the Microsoft ENCARTA compact disk encyclopedia (2000-present).

Robert M. Frieden, Conference Report, *Real Convergence and Real Uncertainty*, 1 INFO, No. 6 (December 1999).

Rapporteur for Corporation for Public Broadcasting, *The Role of Public Service Media in the Digital Telecommunications Age*, Bethesda, Maryland (June, 1999). Report available at: http://nc.psu.edu/progress.html.

Robert M. Frieden, Conference Report, *Telecom Inter@ctive 97*, 22 TELECOMMUNICATIONS POLICY, No.  2 (March 1998).

Robert M. Frieden, Book Review of William Melody, ed., *Telecom Reform Policies, Policies and Regulatory Practices*, 21 TELECOMMUNICATIONS POLICY, No.  8 (Oct. 1997).

Senior Consultant on World Bank InfoDev and International Telecommunication Union ICT Regulation Toolkit project; see http://www.ictregulationtoolkit.org/ (extensive coverage of Voice over the Internet Protocol telephony and Internet network interconnection).

## Representative Research Projects, Grants, and Contracts

Sole preparer of a 200 page primer on broadband technologies primer included in *Broadband Strategies Toolkit* created by InfoDev, a global partnership program of the World Bank (2012-13); available at: http://broadbandtoolkit.org/en/home.

Prepared sections on best practices in information and communications technology regulation and broadband development in *ICT Regulation Toolkit*, http://www.ictregulationtoolkit.org/index; and *Broadband Strategies Handbook*, https://elibrary.worldbank.org/doi/book/10.1596/978-0-8213-8945-4; created by InfoDev, a global partnership program of the World Bank (2011).

Developed a template identifying best practices in broadband development and generated studies on national efforts for six nations, prepared for The World Bank (2009). See *Building broadband: Strategies and policies for the developing world*; available at: http://www.infodev.org/en/Document.756.pdf.

Contributor on wireless telecommunications regulatory reform for a book entitled . . . *And Communications for All: A Policy Agenda for the New Administration* (2008); supported by the Social Science Research Council.

Strategies for Repairing the Universal Service Fund (2007), funded by the Benton Foundation; available at: http://www.benton.org/node/6060.

Senior Consultant on Ford Foundation grant to the East-West Center for research on technology parks and technology incubation in China and Singapore; available at http://www2.eastwestcenter.org/research/itparks/ (2003).

Robert M. Frieden, *The Wired Village: Building Communities and Improving Government Services Through Advanced Telecommunications and Information Networks*, White Paper prepared for Nortel Networks, Inc. (February, 2001).

Timothy Denton, Rob Frieden and James Savage, *International Charging Arrangements for Internet Services*, Issues Paper prepared for the Asia Pacific Economic Cooperation organization. (March, 1999); Phase Two Data Collection and Analysis (January, 2000) available at http://www.apii.or.kr/telwg/ICAIS/ICAIS-frame.html.

## Representative Consulting Work

Prepared an analysis of California legislation mandating network neutrality for a major U.S. telecommunications carrier.

Briefed the California-based staff of a major U.S. telecommunications carrier on developments in next generation network law and regulation.

Provided background and perspective on U.S. antitrust policy for a report entitled *Challenges of competition policy in a digitalised economy*, prepared for the European Parliament, Directorate General for Internal Policies Policy.

Sole developer for a module on broadband technologies contained in a toolkit on broadband strategies commissioned by The World Bank.

Provided infoDev an analysis of broadband universal service policies in six representative nations.

Advised the ministry responsible for telecommunications policy in Trinidad and Tobago on a wide range of legislative, regulatory and organizational matters, including revising the existing telecommunications law, universal service policy, broadband development, the regulator's proposed costing methodology, a regulatory framework for "convergence," and ICT development incentives.

Co-directed regulatory toolkit on competition, interconnection and pricing for World Bank (infoDev) and ITU; lead author of VoIP sections of the toolkit as well as those dealing with international telephone charge settlements.

Advised regulators in Bermuda, Dominican Republic, Israel, Jamaica, Mexico, Northern Mariana Islands, Qatar, South Africa, Tanzania, Asia Pacific Economic Cooperation Group nations and the Caribbean Telecommunications Union on competition policy, interconnection and Internet peering, regulatory and legislative reform, international traffic settlements, telephone number portability, VoIP, etc.

Advised a Bermuda and Cayman Islands telecommunications service provider on VoIP service and interconnection strategies.

Predicted the impact of network neutrality policies on a major fabricator of deep packet inspection chips.

**Participation in Conferences, Seminars and Workshops (last four years)**

Panelist, *Legal and Policy,* presented at the 42d annual conference of the Pacific Telecommunications Council, Honolulu, HI (Jan 20, 2020); Panelist, *Industrial Policy and Competition Driving 5G* (Jan. 21, 2019); *World Radiocommunication Conference (WRC-19): Implications for the 5G World* (Jan. 21, 2020).

*WRC-19 and 5G Spectrum Planning*, A presentation at the 47th Annual Research Conference on Communications, Information and Internet Policy American University, Washington, D.C. (September 20, 2019).

*An Introduction to Data Property Rights*, A presentation at the Beijing University of Posts and Telecommunications (June 13, 2019).

*Platforms in the Courts of Public Opinion and Law*, A presentation at the 69th annual conference of the International Communications Association, Washington, D.C. (May 25, 2019).

*Two-sided Internet Markets in Courts of Law and Public Opinion*, presented at 9th annual Internet Law Works in Progress conference, Santa Clara Law School (March 2, 2019).

Panelist, *Update on current Legal Issues,* presented at the 41st annual conference of the Pacific Telecommunications Council, Honolulu, HI (Jan 21, 2019); Panelist, The International Telecommunications Union: Three Sectors at a Crossroad (Jan. 22, 2019).

*Two-sided Internet Markets and the Need to Assess Both Upstream and Downstream Impacts*, a presentation at the 46th annual Telecommunications Policy Research Conference, Washington College of Law, American University, Washington, D.C. (September 21, 2018); also presented at the 41st annual conference of the Pacific Telecommunications Council, Honolulu, HI (Jan 20, 2019).

*How Internet Platforms Intermediaries Affect Competition and Consumers*, a presentation at the European Union Institute 7th Conference on the Regulation of Infrastructures. New network structures: decentralization, prosumers and the role of online platforms, Florence, ITALY (June 21, 2018)(publication forthcoming in NETWORK INDUSTRIES QUARTERLY; 22nd Biennial Conference of the International Telecommunications Society, Seoul SOUTH KOREA (June 25, 2018).

*The Internet of Platforms and Two-Sided Markets: Implications for Competition and Consumers*, a presentation at the 40th annual conference of the Pacific Telecommunications Council, Honolulu, HI (Jan. 22, 2018); Internet Law Works-in-Progress, New York Law School, New York, N.Y. (March 24, 2018); State of Telecom 2017, Columbia Institute for Tele-Information, web-based event (Nov. 17, 2017); 45th annual Telecommunications Policy Research Conference Antonin Scalia Law School George Mason University, Arlington, VA (September 8, 2017).

*Zero Rating and the Potential for Enhanced Digital Literacy and Stimulated Broadband Demand*, a presentation at Broadband Research in a Changing World:  New Technologies, Ideologies and Priorities American University Washington College of Law, Washington, D.C. (September 10, 2017).

*Freedom to Discriminate: Assessing the Lawfulness and Utility of Biased Broadband Networks*, a presentation at the 28th European Regional Conference of the International Telecommunications Society, Passau, GERMANY (Aug. 1, 2017).

*Can Internet Service Providers Enhance, or Degrade Third Party Content?*, a presentation at: 4th TILEC Workshop on Competition Policy and Regulation in Media and Telecommunications: Bridging Law and Economics, Tilburg, THE NETHERLANDS (June 1, 2017)(via teleconference).

*Standards Prospective: Big Data and Internet of Things—Promoting Interoperability via Open Standards and Semantic Technologies*, ITU Workshop on Internet of Things Applications for Development Port of Spain, TRINIDAD and TOBAGO (April 25, 2017)

Northern Kentucky Law Review Symposium on Controversies and Issues in Internet Law, *The Open Internet's Future, U.S. and Worldwide*, Newport, KY (March 3, 2017).

**Speaking Engagements or Other Activities in Which There Was Significant Use of Expertise**

Interviewed on American Public Media's *Marketplace* piece on network neutrality and broadband access in the United States, June 11, 2018; see *Why the end of net neutrality might look good ... at first*; https://www.marketplace.org/2018/06/11/tech/end-net-neutrality-could-give-consumers-options-while-hurting-competition

Interviewed on National Public Radio's *All Things Considered* piece on the elimination of conventional copper wire telephone service, Nov. 18, 2013; see http://www.npr.org/blogs/alltechconsidered/2013/11/18/246001725/have-we-reached-the-end-of-the-landline.

Interviewed on several American Public Media Marketplace programs regarding telecommunications and Internet issues, see: http://www.marketplace.org/search/node/Rob%20Frieden.

Testified before the United States Senate, Commerce Committee on wireless telecommunications issues, June 17, 2009; see http://commerce.senate.gov/public/index.cfm?FuseAction=Hearings.Hearing&Hearing_ID=03b81ffd-ba9f-42e6-8331-7c28f6d112b0.

Interviewed on Public Broadcasting System's *News Hour With Jim Lehrer* piece on the Global Crossing bankruptcy (February 13, 2002), available at http://www.pbs.org/newshour/bb/business/jan-june02/global_crossing_2-13.html.

Interviewed on National Public Radio's *Morning Edition* piece on trouble in the telecommunications marketplace (February 8, 2002), available at http://search.npr.org/cf/cmn/cmnpd01fm.cfm?PrgDate=02/08/2002&PrgID=3.

Testified before the Pennsylvania House of Representatives, Judiciary Committee on House Bill 10, The Child Internet Protection Act (June 7, 2001).

Frequent source for dozens of newspaper, magazine and World Wide Web articles on telecommunications, including American Public Media Marketplace, Arstechnica, the Associated Press, Atlanta Constitution, Bloomberg News, BusinessWeek, CBS Market Watch, CNBC, Chicago Tribune, China Central Television, Christian Science Monitor, Communications Daily, Christian Science Monitor, Congressional Quarterly, Dow Jones News Retrieval Service, Forbes, Fort Lauderdale Sun-Sentinel, KYW Radio, Minnesota Public Radio, National Public Radio, Parade magazine, Philadelphia Inquirer, USA Today, Wharton Business on Sirius/XM, Wired, and the Wall Street Journal.

## New Courses or Cooperative Extension Programs Developed

Maintain an active blog site TeleFrieden, available at: http://telefrieden.blogspot.com/; This blog seeks to offer a provocative, unsponsored assessment of current legal, regulatory, marketplace and cultural issues affecting the information, communications and entertainment ("ICE") industries.

Developed and taught at the Dickinson School of Law courses on Internet law and policy and telecommunications law and regulation.

Developed new graduate and undergraduate courses in media and democracy, telecommunication policy analysis, telecommunications and information processing technologies, and international telecommunications and trade policy.

## Honors or Awards for Scholarship of Professional Activity

Pacific Telecommunications Council, Meheroo Jussawalla Research Paper Prize (2017, 2008).

Penn State, College of Communications, Dean's Excellence Award for Research (2016, 2012, 2004, 2000)

Academic Fellow, Harvard Berkman Center for Internet and Society (2015-16).

2014 ITERA Distinguished Research Award, Information and Telecommunications Education and Research Association.

Top Three Faculty Paper, Association for Education in Journalism and Mass Communications, Law and Policy Division (2013, 2009).

Top Three Faculty Paper, International Communications Association, Communications Law and Policy Division (2011, 2007).

Fulbright Specialist Program Registrant (2008-2009)(see http://www.cies.org/specialists/ProgramDescription.htm).

Winner, 1999 Cable Book Award, National Cable Television Center.

Penn State, College of Communications, Alumni Society Excellence in Teaching Award (1995).

Who's Who in America (various years).

Who's Who in American Education (various years).

Who's Who in American Law (various years).

Who's Who in Communications and the Mass Media (various years).

Who's Who in the World (various years).

**Membership and Active Participation in Professional and Learned Societies**

Associate Editor, *Telecommunications Policy* (July, 2019-present).

Faculty Associate, Berkman Center for Internet and Society at Harvard University (2015-2016).

Fellow, Columbia Institute for Tele-Information, Columbia University, School of Business (2012-present).

Pacific Telecommunications Council, elected to the Advisory Council (2005-2009); Program Committee (numerous years).

Telecommunications Policy Research Conference, Program Committee for the 29th, 30th, 34th, 35th and 36th Annual Conferences.

Fellow, Center for Strategic and International Studies, International Communications Studies Program (1999-2001).

Editorial Board, *Info: the journal of policy regulation and strategy for telecommunications information and media* (1998-present).

Editorial Board, *Telecommunications Policy* (1997-present).

Associate, Program on Information Resources Policy, Harvard University (1992-2011).

American Bar Association; Vice Chair, Communications Committee of the International Law Section (1992-1994).

Member Virginia, Supreme Court and 4th Circuit Court of Appeals Bars.

**Courses Taught**

**Undergraduate**

Advanced Telecommunications Topics: Case Studies in Information, Communications and Entertainment

Analysis of Broadcast-Cable Policy

Digital Literacy (Freshman Seminar)

Emerging Telecommunications and Information Processing Technologies

International Telecommunications and Trade Policy

Internet Law and Policy

Introduction to Broadcast/Cable Management

Law of Mass Communications (Honors and regular)

Media and Democracy

**Graduate**

Case Studies in Information, Communications and Entertainment

Colloquium

Constitutional Problems of the News Media

International Telecommunications and Trade Policy

Internet Law and Policy
(cross-listed as a Penn State Law School course)

Media and Democracy

Telecommunications Law and Regulation
(cross-listed as a Penn State Law School course)