## NO. 22-60008

## UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

CONSUMERS' RESEARCH; CAUSE BASED COMMERCE, INCORPORATED; KERSTEN CONWAY; SUZANNE BETTAC; ROBERT KULL; KWANG JA KERBY; TOM KIRBY; JOSEPH BAYLY; JEREMY ROTH; DEANNA ROTH; LYNN GIBBS; PAUL GIBBS; RHONDA THOMAS,
Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES OF AMERICA,

Respondents.

Petition for Review from the Federal Communications Commission Agency No. 96-45

## BRIEF OF *AMICI CURIAE* MEMBERS OF CONGRESS IN SUPPORT OF RESPONDENTS

Thaila K. Sundaresan
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, CA 94111
(415) 276-6500
thailasundaresan@dwt.com

MaryAnn T. Almeida
DAVIS WRIGHT TREMAINE LLP
920 Fifth Ave., Suite 3300
Seattle, WA 98104
(206) 622-3150
maryannalmeida@dwt.com

David M. Gossett
  *Counsel of Record*
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, D.C. 20005
(202) 973-4200
davidgossett@dwt.com

*Attorneys for Amici Curiae Members of Congress*

# CERTIFICATE OF INTERESTED PARTIES

No. 22-60008, *Consumers' Research, et al. v. Federal Communications Commission and United States of America*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Petitioners:**
Consumers' Research
Cause Based Commerce, Inc.
Kersten Conway
Suzanne Bettac
Robert Kull
Kwang Ja Kerby
Tom Kirby
Joseph Bayly
Jeremy Roth
Deanna Roth
Lynn Gibbs
Paul Gibbs
Rhonda Thomas

**Petitioners' Counsel:**
C. Boyden Gray
R. Trent McCotter
Jonathan Berry
Michael Buschbacher
Jared M. Kelson

**Respondents' Counsel:**
P. Michele Ellison
Jacob M. Lewis
James M. Carr
Adam G. Crews
Federal Communications Commission

Brian M. Boynton
Sarah E. Harrington
Mark B. Stern
Gerard Sinzdak
United States Department of Justice

**Intervenors:**
Benton Institute for Broadband & Society
Center for Media Justice
National Digital Inclusion Alliance
Schools, Health, & Libraries Broadband Coalition
USTelecom—The Broadband Association
NTCA—The Rural Broadband Association
Competitive Carriers Association

**Intervenors' Counsel:**

Andrew Jay Schwartzman

*Counsel for Benton Institute for Broadband &Society, Center for Media Justice, and National Digital Inclusion Alliance*

Jennifer Tatel

Craig E. Gilmore

Michael D. Miller

*Counsel for USTelecom—The Broadband Association, NTCA—The Rural Broadband Association, and Competitive Carriers Association*

Stephanie Weiner

Jason Neal

*Counsel for Schools, Health, & Libraries Broadband Coalition*

**Amici Curiae:**

TechFreedom

Competitive Enterprise Institute

Free State Foundation

Christopher DeMuth

Harold Furchtgott-Roth

Michael S. Greve

Randolph J. May

Senator John Thune

Senator Shelley Moore Capito

Senator Deb Fischer

Senator Amy Klobuchar

Senator Ben Ray Luján

Representative James E. Clyburn

Representative Mike Doyle

Representative Dusty Johnson

Representative Tom O'Halleran

Representative Peter Welch

**<u>Counsel for Amici:</u>**
Corbin K. Barthold
Berin Szóka
James E. Dunstan
*Counsel for TechFreedom*

Sam Kazman
1310 L Street NW, 7th Floor
Washington, D.C. 20005
Jeffrey S. Beelaert
Michael Petrino
*Counsel for Competitive Enterprise Institute, Free State Foundation,*
*Christopher DeMuth, Harold Furchtgott-Roth, Michael S. Greve, and*
*Randolph J. May*

David M. Gossett
Thaila K. Sundaresan
MaryAnn T. Almeida
*Counsel for Members of Congress*

Dated: June 17, 2022

/s/ David M. Gossett
David M. Gossett

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PARTIES............................................i

TABLE OF AUTHORITIES...................................................................vi

INTEREST OF *AMICI CURIAE*................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ...........................3

ARGUMENT ...........................................................................................5

AS ADMINISTERED, THE UNIVERSAL SERVICE FUND IS
      ESSENTIAL AND CONSISTENT WITH
      CONGRESSIONAL DIRECTION....................................................5

    A.    Congress Created The Universal Service Fund To
         Address Critical Needs............................................................5

    B.    The Universal Service Fund Fulfills Significant
         Telecommunications Needs Across The Country. ...............10

    C.    As Congress Directed, The Universal Service Fund Has
         Adapted To Changing Technology And Market
         Conditions. ...........................................................................20

    D.    A Ruling That The Universal Service Fund Is
         Unconstitutional As Currently Structured Would Have
         Catastrophic Effects Throughout The United States...........23

CONCLUSION ......................................................................................25

CERTIFICATE OF COMPLIANCE.......................................................27

CERTIFICATE OF SERVICE................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AT&T Corp. v. Pub. Util. Comm'n of Texas,*
  373 F.3d 641 (5th Cir. 2004)................................................................4

*Rural Cellular Ass'n v. FCC,*
  685 F.3d 1083 (D.C. Cir. 2012) .........................................................10

*Tex. Office of Pub. Util. Counsel v. FCC,*
  183 F.3d 393 (5th Cir. 1999).............................................................10

**Statutes**

American Rescue Plan Act of 2021, Pub. L. No. 117-2,
  135 Stat. 4 (2021)..............................................................................23

Communications Act of 1934, 47 U.S.C. § 1 *et seq.* ................................5

  47 U.S.C. § 1......................................................................................5

  47 U.S.C. § 254......................................................................... *passim*

Consolidated Appropriations Act, 2018, Pub. L. No. 115-141,
  132 Stat. 348 (2018)..........................................................................23

Consolidated Appropriations Act—FY 2001, Pub. L. No.
  106-554, 114 Stat. 2763 (2000)..........................................................23

Dep't's of Commerce, Justice, and State, the Judiciary, and
  Related Agencies Appropriations Act, 1998, § 623, Pub. L.
  No. 105-119, 111 Stat. 2521 (1997) ...................................................22

Frank R. Lautenberg Chemical Safety for the 21st Century
  Act, Pub. L. No. 114-182, 130 Stat. 448 (2016) .................................21

Infrastructure Investment and Jobs Act, Pub. L. No. 117-58,
  135 Stat. 429 (2021)....................................................................11, 22

Telecommunications Act of 1996, Pub. Law No. 104-104, 110
    Stat. 56 (1996) (1996 Act) ........................................... *passim*

**Agency Materials**

*In re Lifeline & Link Up Reform & Modernization
    Telecommunications Carriers Eligible for Universal Serv.
    Support Connect Am. Fund,*
    2020 WL 6779114 (Nov. 16, 2020) ...................................... 19

*In re Report on the Future of the Universal Serv. Fund,*
    2021 WL 5986835 (Dec. 15, 2021) ...................................... 22

*In re Rural Health Care Support Mechanism,*
    27 FCC Rcd. 16678 (2012) ........................................... 18, 19

*In re Sch. & Librs. Universal Serv. Support Mechanism,*
    *Statement of Chairwoman Jessica Rosenworcel, Schools
    and Libraries Universal Service Support Mechanism,*
    2022 WL 287893 (Jan. 27, 2022) ...................................... 17

**Legislative Materials**

Cong. Res. Serv., *Universal Service Fund: Background and
    Options for Reform* (June 30, 2011) .................................. 22

H.R. Rep. No. 104-204 (1995), *as reprinted in* 1996
    U.S.C.C.A.N. 10, 34 ................................................. 21

H.R. Rep. No.104-458 (1996) (Conf. Rep.), *as reprinted in*
    1996 U.S.C.C.A.N. 10, 144 .......................................... 8, 9

Rep. James E. Clyburn, Floor Speech (Sept. 28, 2021),
    available at
    https://twitter.com/i/web/status/1442915028324159489 ............... 12

S. Rep. No. 104-23 (1995) ............................................... *passim*

**Other Authorities**

Centers for Disease Control and Prevention, *About Rural Health*, available at https://www.cdc.gov/ruralhealth/about.html ..................................... 18

Department of Commerce, *Fact Sheet: Department of Commerce's Use of Bipartisan Infrastructure Deal Funding to Help Close the Digital Divide* (Nov. 10, 2021), available at https://www.commerce.gov/news/fact-sheets/2021/11/fact-sheet-department-commerces-use-bipartisan-infrastructure-deal-funding............................................. 11

FCC, *Consumer Guide: E-Rate: Universal Service Program for Schools and Libraries*, available at https://www.fcc.gov/sites/default/files/e-rate_universal_service_program_for_schools_and_libraries.pdf ................................................................................. 15

FCC, *Consumer Guide: Lifeline Support for Affordable Communications*, available at https://www.fcc.gov/sites/default/files/lifeline_support_for_affordable_communications.pdf......................................................... 19

FCC, *Summary of the Rural Health Care Program*, available at https://www.fcc.gov/general/rural-health-care-program ............... 18

National Center for Education Statistics, *Students' Access to the Internet and Digital Devices at Home* (June 9, 2021), available at https://nces.ed.gov/blogs/nces/post/students-access-to-the-internet-and-digital-devices-at-home.......................... 15

Steve G. Parsons & James Stegeman, *Rural Broadband Economics: A Review of Rural Subsidies* (July 11, 2018), available at https://www.ntca.org/sites/default/files/documents/2018-07/CQA-RuralBroadbandEconomics-AReviewofRuralSubsidies_FinalV07112018.pdf ........................ 12, 13

South Carolina State Library, *South Carolina Library Systems at a Glance*, available at https://www.statelibrary.sc.gov/south-carolina-library-systems-glance ................................................................. 16

South Dakota Telecommunications Association, *Connecting South Dakota's Future: A Report on the Deployment & Impact of Rural Broadband*, available at https://www.benchmarkdatalabs.org/wp-content/uploads/2020/03/FinalBroadbandReport-Web.pdf .......... 13, 14

Emily Stewart, Vox, *Give everybody the internet* (Sept. 10, 2020), available at https://www.vox.com/recode/2020/9/10/21426810/internet-access-covid-19-chattanooga-municipal-broadband-fcc ..................... 17

U.S. Census Bureau, *Presence and Types of Internet Subscriptions in Household*, available at https://data.census.gov/cedsci/table?q=B28&d=ACS%201-Year%20Estimates%20Detailed%20Tables&tid=ACSDT1Y2019.B28002&hidePreview=false ..................................................... 15

USAC, *2021 Annual Report*, available at https://www.usac.org/wp-content/uploads/about/documents/annual-reports/2021/2021_USAC_Annual_Report.pdf ............... 10, 14, 18, 20

USAC, *High Cost Program Overview*, available at https://www.usac.org/high-cost/program-overview/ ........................... 11

USAC, *High Cost Support Projected by State 3Q2022*, available at https://www.usac.org/wp-content/uploads/about/documents/fcc-filings/2022/third-quarter/high-cost/HC02-High-Cost-Support-Projected-by-State-%E2%80%93-3Q2022.xlsx ....................................................... 14

USAC, *Lifeline Consumer Eligibility*, available at https://www.usac.org/lifeline/consumer-eligibility/............................ 20

## INTEREST OF *AMICI CURIAE*

*Amici curiae* are a set of bipartisan, currently serving, elected members of the United States Senate and United States House of Representatives, who have deep knowledge about and expertise in the Telecommunications Act of 1996 and the Universal Service Fund (USF)— the statutory scheme Congress created to subsidize access to telecommunications services for low-income households, high-cost areas, rural health care systems, and schools and libraries.

*Amici* are Senator John Thune (R-SD), Senator Shelley Moore Capito (R-WV), Senator Deb Fischer (R-NE), Senator Amy Klobuchar (D-MN), Senator Ben Ray Luján (D-NM), Representative James E. Clyburn (D-SC 6th District), Representative Mike Doyle (D-PA 18th District), Representative Dusty Johnson (R-SD), Representative Tom O'Halleran (D-AZ 1st District), and Representative Peter Welch (D-VT).

Some of the *amici* either actively serve on, or have previously served on, committees with oversight of the Federal Communications Commission (FCC). Others have sponsored or voted for legislation involving the USF. Some have advocated for other legislation to advance universal service or participated in caucuses that do so. All *amici*

represent constituents who rely on the services the USF supports. *Amici* thus have an interest in this litigation involving challenges to the legitimacy of the USF system.[1]

---

[1] No party's counsel authored any part of this brief. No one, apart from *amici* and their counsel, contributed money intended to fund the brief's preparation or submission. All parties have consented to the filing of this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

As members of Congress, we have seen the immense benefits that Universal Service Fund programs provide in the communities we represent. Our constituents rely on affordable internet services funded by the USF to access information, to stay connected to family and friends, to learn at school, and to receive high-quality care from medical providers regardless of where they live. We will leave to the parties the specific arguments with respect to the non-delegation doctrine. But from our perspective as legislators, Petitioners' assertion that the FCC's and USAC's administration of the USF system lacks direction from Congress is historically baseless and simply incorrect. In this *amicus* brief, we explain that we and other members of Congress carefully set up the USF system to address pressing needs, that the system in fact does so, and that a ruling that the USF system is unconstitutional would have catastrophic effects on our constituents.

Before the Telecommunications Act of 1996, Pub. Law No. 104-104, 110 Stat. 56 (1996) (1996 Act), the country relied on monopolist telecommunications providers to offer services to everyone. In the 1996 Act, Congress established a competitive market for telecommunications

services and created the USF system to facilitate the important aim of universal service—that all Americans be able to access the communication services they need to participate fully in society. *See AT&T Corp. v. Pub. Util. Comm'n of Texas*, 373 F.3d 641, 643 (5th Cir. 2004). Recognizing that new technologies were being developed at an extraordinary pace, in the 1996 Act Congress directed the FCC to define and update the definition of universal service based on what the market for telecommunications embraced, keeping pace with new technologies as they became standard. The FCC has done just that—now subsidizing primarily broadband service, for example, rather than old-fashioned landline telephone service—and USF programs now serve millions of Americans.

Dismantling the USF system would not only run roughshod over Congress's explicit instructions to the FCC in the 1996 Act, but also would have disastrous consequences. Many people—and especially poor people and those living in rural areas—rely on USF programs, sometimes for their only means of connecting to the internet or maintaining phone service. The world is more interconnected than ever, and severing these

access links would leave millions of Americans behind. *Amici* urge the Court to reject the Petition and affirm the FCC's Order.

## ARGUMENT

## AS ADMINISTERED, THE UNIVERSAL SERVICE FUND IS ESSENTIAL AND CONSISTENT WITH CONGRESSIONAL DIRECTION

*Amici* have seen firsthand the importance of the USF system to the communities we represent. Since Congress created the Fund in 1996, the USF system has connected millions of Americans who might otherwise lack access to essential telecommunications services. Congress directed the FCC to update the programs within the USF system to evolve with developments in technology, and since the Fund's inception, the FCC has done just that. A ruling that the USF system is improperly structured has no legal basis and would cut off millions of Americans from the access they need.

### A.    Congress Created The Universal Service Fund To Address Critical Needs.

Congress has long recognized that "universal service is a cornerstone of the Nation's communications system." S. REP. NO. 104-23, at 25 (1995); *see also* Communications Act of 1934 § 1, 47 U.S.C. § 1 (The FCC was created "to make available, so far as possible, to *all* the people

of the United States, … a rapid, efficient, Nation-wide, and world-wide wire and radio communication service" (emphasis added)). The 1996 Act established the Universal Service Fund, codified in Section 254 of the Communications Act, "to make explicit the [previously] implicit authority of the FCC and the States to require common carriers to provide universal service." S. REP. NO. 104-23, at 25. In the 1996 Act, Congress directed the FCC not only to establish the USF system, but also to use a Federal-State Joint Board to "thoroughly review the existing universal service system" and "recommend appropriate transition mechanisms and timeframes for implementation of any new support mechanisms for universal service." *Id.* And it required the FCC to "define universal service, based on recommendations from the public, Congress, and the Joint Board." *Id.* at 26-27; *see* 47 U.S.C. § 254(c)(1).

"Universal service" under the 1996 Act "is an evolving level of telecommunications services that the Commission shall establish periodically under this section, taking into account advances in telecommunications and information technologies and services." 47 U.S.C. § 254(c)(1). Congress set forth four considerations for the

Commission to use, with input from the Joint Board, to define universal service. Those criteria are whether services:

> **(A)** are essential to education, public health, or public safety;
>
> **(B)** have, through the operation of market choices by customers, been subscribed to by a substantial majority of residential customers;
>
> **(C)** are being deployed in public telecommunications networks by telecommunications carriers; and
>
> **(D)** are consistent with the public interest, convenience, and necessity.

*Id.* These considerations guide the FCC in defining universal service and in implementing programs to further those needs. Section 254 also states seven principles on which "[t]he Joint Board and the Commission shall base policies for the preservation and advancement of universal service," including the direction that guiding principles must be "consistent with this chapter." 47 U.S.C. § 254(b).

The legislative history of the 1996 Act demonstrates Congress's direction that the FCC define universal service by reference to what Americans need "to keep pace with modern life" and what the market adopts—"to include, at a minimum, any telecommunications service that is subscribed to by a substantial majority of residential customers." S. REP. NO. 104-23, at 27. By way of illustration, the Senate Report

explained that "touch tone telephone service [was in 1996] widely available" and "used by a substantial majority of residential customers to access services like voice mail, telephone banking, and mail order shopping services," which could not "be accessed using rotary party line services that [we]re still used in some areas." While "rotary party line service [was] [in]sufficient to meet the minimum definition of universal service" then, the Senate Report hypothesized that "touch tone service might not satisfy the evolving definition of universal service" if, for instance, "two-way interactive full motion video service" replaced it "as the primary means of communicating" for most residential consumers. *Id.* Congress thus intentionally instructed the FCC to redefine universal service "periodically," and to ensure that that definition evolves along with technology adopted by the market. 47 U.S.C. § 254(c)(1).

Congress's purpose in enacting Section 254 go to the very heart of universal service. As the House Conference Report detailed, supporting "K-12 classrooms, libraries and rural health care providers … is critical to ensuring that these services are available on a universal basis." H.R. REP. NO. 104-458, at 132-33 (1996) (Conf. Rep.), *as reprinted in* 1996 U.S.C.C.A.N. 10, 144. Universal service supports would "help open new

worlds of knowledge, learning and education to all Americans—rich and poor, rural and urban" and "assure that no one is barred from benefiting from the power of the Information Age." *Id.* The programs were meant "to provide the ability to browse library collections, review the collections of museums, or find new information on the treatment of an illness, to Americans everywhere via schools and libraries." *Id.* As implemented, the programs under the USF do all those things and more.

Congress imposed the requirement that telecommunications providers contribute to the USF as a necessary corollary of its policy choice to enact in statute the universal service concepts the law had long embraced. Before the 1996 Act, monopolists provided telecommunications services with government support. "In a monopoly environment [the universal service] requirement took the form of an obligation to provide service throughout an entire area." S. REP. NO. 104-23, at 28. Congress recognized that in moving to a competitive market, "the public interest may be better served by having carriers contribute to a fund or other support mechanisms" to pay for the services of the "telecommunications carriers that agree to undertake the [universal] service obligation that might otherwise be imposed on all

providers." *Id.* "Through … network effects, the carriers whose contributions fund the [programs] will benefit from the use to which that reserve will be put"—as will their subscribers. *Rural Cellular Ass'n v. FCC*, 685 F.3d 1083, 1091 (D.C. Cir. 2012); *see also Tex. Office of Pub. Util. Counsel v. FCC*, 183 F.3d 393, 427-28 (5th Cir. 1999).

The changes enacted by the 1996 Act also shifted the method of providing for universal service from the "nontransparent internal cost-shifting by monopoly providers" to a system that was "transparent, explicit, equitable and nondiscriminatory to all telecommunications carriers"—and to the customers who ultimately paid the costs of these subsidies. S. REP. NO. 104-23, at 25. Indeed, Congress anticipated the transition to explicit subsidies would not change "the overall nationwide level of universal service support" previously provided. *Id.* at 25-26.

## B. The Universal Service Fund Fulfills Significant Telecommunications Needs Across The Country.

Today's economy depends on connection—the transmission of information from one person to another regardless of location. The Universal Service Fund is essential to enable many Americans to access affordable telecommunications services. The USF programs, which together distributed over $8.5 billion dollars in 2021 alone, *see* USAC,

*2021 Annual Report* at 5, available at https://www.usac.org/wp-content /uploads/about/documents/annual-reports/2021/2021_USAC_Annual_ Report.pdf (visited June 15, 2022), empower people to participate in society—connecting them with information, resources, and care.[2]

Each of the four USF programs serves different constituencies and meets distinct needs:

***High Cost Program.*** USF's largest program by expenditure is the High Cost Program, including the Connect America Fund (CAF). Among other goals, the High Cost Program supports the deployment of network infrastructure to rural areas where the market alone could not support the cost of doing so. *See* USAC, *High Cost Program Overview*, available at https://www.usac.org/high-cost/program-overview/ (visited June 15, 2022). And it ensures that rates for broadband and voice services are comparable, regardless of where users live.

---

[2] Other non-USF programs support many of the same purposes. In the Infrastructure Investment and Jobs Act, for example, Congress allocated $65 billion in funding for broadband infrastructure outside of the USF program. *See* Department of Commerce, *Fact Sheet: Department of Commerce's Use of Bipartisan Infrastructure Deal Funding to Help Close the Digital Divide* (Nov. 10, 2021), available at https://www.commerce. gov/news/fact-sheets/2021/11/fact-sheet-department-commerces-use-bi partisan-infrastructure-deal-funding (visited June 15, 2022). But the USF system remains critical, as this section explains.

Providing affordable connections helps Americans participate in society and access the information they need. "[T]he internet is as essential to the 21st century as electricity was to the 20th century."[3] But the cost of providing high-speed internet services would be prohibitive in many places without CAF assistance.

Networks like broadband have economies of density: In high-density areas the cost per user is lower, while in lower-density areas the cost per user is higher. *See* Steve G. Parsons & James Stegeman, *Rural Broadband Economics: A Review of Rural Subsidies* 5 (July 11, 2018), available at https://www.ntca.org/sites/default/files/documents/2018-07/CQA-RuralBroadbandEconomics-AReviewofRuralSubsidies_FinalV07112018.pdf (visited June 15, 2022). Because traditional wireline broadband service (including modern fiber-based service) requires running physical wires or cables to users, costs per customer depends on the number of customer locations for each mile of cable needed. *Id.* at 10. Eighty-six percent of the landmass of the contiguous United States has a linear density under 15 locations per road mile—although only 12

---

[3] Rep. James E. Clyburn, Floor Speech (Sept. 28, 2021), available at https://twitter.com/i/web/status/1442915028324159489 (visited June 15, 2022).

percent of business and residential locations are in those areas. *Id.* at 10-11. Thus, for rural areas, the capital investment alone is 5.6 times higher than in urban areas for conduit and poles, and 4.2 times higher for fiber optic cable. *Id.* at 20. Other costs—like long-term maintenance and the cost of capital—are also higher. And the same is true of wireless broadband service, which is more expensive to provide to lower-density areas. Due to these dynamics, the cost of providing broadband in some areas may be so high that no company could do it at rates consumers would pay.

An example demonstrates the stark nature of this problem. The average per-resident cost of installing fiber-optic lines for broadband in metro Sioux Falls, South Dakota, is $25.54. *See* South Dakota Telecommunications Association, *Connecting South Dakota's Future: A Report on the Deployment & Impact of Rural Broadband* 9, available at https://www.benchmarkdatalabs.org/wp-content/uploads/2020/03/Final BroadbandReport-Web.pdf (visited June 15, 2022). By contrast, the per-resident cost for the same infrastructure in rural South Dakota is $3,571—***almost 140 times higher***. *Id.* This extraordinary difference

between urban and rural areas means the market alone cannot deliver broadband to all users.

The USF system helps to fill the gap. Telecommunications companies in South Dakota receive over $117 million each year in High Cost Program funding, including support for infrastructure projects that bring broadband to rural areas. *See* USAC, *High Cost Support Projected by State 3Q2022*, available at https:// www.usac.org/wp-content/uploads/ about/documents/fcc-filings/2022/third-quarter/high-cost/HC02-High-Cost-Support-Projected-by-State-%E2%80%93-3Q2022.xlsx (visited June 15, 2022). In South Dakota and across the country, the USF brings broadband to all corners of America. In all, the USF disbursed more than $5 billion through the High Cost Program in 2021. USAC, *2021 Annual Report* at 5.

As members of Congress, we have advocated for the continued expansion of broadband, including support for rural broadband and affordable connections. Yet a great deal of need remains: the Census found some 13 million American households lack any kind of internet connection, and several hundred thousand rely on dial-up internet alone. U.S. Census Bureau, *Presence and Types of Internet Subscriptions in*

*Household*, available at https://data.census.gov/cedsci/table?q=B28&d =ACS%201-Year%20Estimates%20Detailed%20Tables&tid=ACSDT1Y 2019.B28002&hidePreview=false (visited June 15, 2022). The High Cost Program, including CAF, is helping to bridge the digital divide and ensure all Americans are included in our information economy, no matter where they live.

*E-Rate.* The E-Rate program provides telecommunications, internet access, and internal connections to eligible schools and libraries at discounts between 20 and 90 percent, based on the poverty level of the surrounding community. FCC, *Consumer Guide: E-Rate: Universal Service Program for Schools and Libraries* 1, available at https://www. fcc.gov/sites/default/files/e-rate_universal_service_program_for_schools_ and_libraries.pdf (visited June 15, 2022). When the FCC first implemented the E-Rate program, only 14 percent of K-through-12 classrooms had access to the internet. *Id.* at 2. Today, by contrast, nearly all public schools are connected—although many students continue to lack internet access at home. *See* National Center for Education Statistics, *Students' Access to the Internet and Digital Devices at Home* (June 9, 2021), available at https://nces.ed.gov/blogs/nces/post/students-

access-to-the-internet-and-digital-devices-at-home (visited June 15, 2022). As the internet has become increasingly essential in daily life, E-Rate ensures children have the opportunity to learn in the way that information is delivered today, developing critical skills for eventually entering the workforce as adults.

E-Rate also covers libraries, traditionally a sanctuary for Americans to access information. Americans use libraries to get online, including when they lack other means to do so. In 2020, libraries supported over two million wireless sessions in South Carolina alone. *See* South Carolina State Library, *South Carolina Library Systems at a Glance*, available at https://www.statelibrary.sc.gov/south-carolina-library-systems-glance (visited June 15, 2022). South Carolina libraries offer connections for the 21.5 percent of South Carolina households lacking internet access. *Id.* And in so doing, they "provide equal access to information, which creates opportunity." *Id.* E-Rate facilitates this critical service by making it affordable for public library systems.

The introduction of broadband at a library can have an incredible impact on the community it serves. A few years ago, for example, the San Felipe Pueblo library was one of the first tribal libraries in New Mexico

to be connected to broadband. *See In re Sch. & Librs. Universal Serv. Support Mechanism, Statement of Chairwoman Jessica Rosenworcel, Schools and Libraries Universal Service Support Mechanism*, 2022 WL 287893, at *14 (Jan. 27, 2022). For some residents, the library's broadband offered their first chance to access the internet reliably—with all the attendant opportunities it offers. *Id.* Demand was so high that San Felipe Pueblo built a porch so the community could sit outside and use the library's signal to connect at any time of the day. *Id.*

When indoor services shut down during the early days of the COVID-19 pandemic, libraries across the country reported similar phenomena. *See* Emily Stewart, Vox, *Give everybody the internet* (Sept. 10, 2020), available at https://www.vox.com/recode/2020/9/10/21426810/internet-access-covid-19-chattanooga-municipal-broadband-fcc (visited June 15, 2022) (describing "people gathering around to try to catch the wifi outside [library] doors"). E-Rate ensures libraries can provide this service, enabling Americans to rely on them as a way to get online.

In all, the E-Rate program approved funding for over 125,000 institutions in 2021, including more than 98,000 schools, 15,000 school facilities, and 11,000 libraries. USAC, *2021 Annual Report* at 10.

*Rural Health Care.* The USF Rural Health Care Program pays for high-capacity broadband connectivity for eligible health care providers and provides discounts on an array of communication services. FCC, *Summary of the Rural Health Care Program*, available at https://www.fcc.gov/general/rural-health-care-program (visited June 15, 2022). Support for rural health care has long been a concern, as health outcomes diverge between rural and urban populations. "In general, residents of rural areas in the United States tend to be older and sicker than their urban counterparts." Centers for Disease Control and Prevention, *About Rural Health*, available at https://www.cdc.gov/ruralhealth/about.html (visited June 15, 2022).

The services supported by the Rural Health Care Program save lives and improve health outcomes. As the FCC explained in its 2012 order modernizing the Rural Health Care Program, for example,

> Telemedicine can save stroke patients lasting damage, prevent premature births, and provide psychiatric treatment for patients in rural areas. Exchange of [electronic health records] avoids duplicative medical tests and errors in prescriptions, and gives doctors access to all of a patient's medical history on a moment's notice.

*In re Rural Health Care Support Mechanism*, 27 FCC Rcd. 16678, 16680 ¶ 1 (2012). These capabilities also often reduce costs by avoiding in-person treatment, including in emergency care clinics. *Id.*

*Lifeline.* Unlike the other programs in the USF, the Lifeline Program provides support directly to consumers needing assistance in order to afford telecommunications services. Lifeline offers a discount for low-income consumers of up to $9.25 (or $34.25 on tribal lands) for telephone service, broadband internet, or bundled voice-broadband packages. FCC, *Consumer Guide: Lifeline Support for Affordable Communications*, 1, available at https://www.fcc.gov/sites/default/files/ lifeline_support_for_affordable_communications.pdf (visited June 15, 2022). Many providers offer Lifeline customers service plans with no additional co-payment beyond these subsidies. *See In re Lifeline & Link Up Reform & Modernization Telecommunications Carriers Eligible for Universal Serv. Support Connect Am. Fund*, 2020 WL 6779114, at *7 ¶ 18 (Nov. 16, 2020). Consumers may be eligible for Lifeline support if they participate in qualifying programs (such as Medicaid) or if they have a household income below 135 percent of the poverty line. USAC, *Lifeline Consumer Eligibility*, available at https://www.usac.org/lifeline/

consumer-eligibility/ (visited June 15, 2022). In 2021, USAC disbursed more than $700 million in subsidies through the Lifeline Program. USAC, *2021 Annual Report* at 5.

## C.  As Congress Directed, The Universal Service Fund Has Adapted To Changing Technology And Market Conditions.

Petitioners contend that the FCC's and USAC's administration of the USF system lacks direction from Congress, *see* Pet. Br. 35-45, but from our perspective as legislators, this assertion is historically baseless and simply incorrect.

*First*, an evolving USF system is consistent with Congress's explicit direction in the statute that the FCC should over time modify the services the Fund covers. As discussed above, Section 254(c)(1) defines "universal service" as "an evolving level of telecommunications services … taking into account advances in telecommunications and information technologies and services." 47 U.S.C. § 254(c)(1). The plain terms of the statute direct the FCC to take exactly the approach it has to date: update "universal service" to suit the country's needs, based on a careful analysis of new technologies that become available and widely adopted.

Congress also anticipated that USF program expenditures would change as the meaning of universal service evolved. After analyzing the 1996 Act, the Congressional Budget Office stated that phasing out previous subsidies and phasing in USF would result in significantly increased outlays during the first five years of the USF alone. H.R. REP. NO. 104-204, at 69 (1995), *as reprinted in* 1996 U.S.C.C.A.N. 10, 34. And while USF expenditures have increased over time, so too have the programs' benefits.

Congress has supported these increases, including by passing legislation expanding eligibility for USF programs: In 2016, for example, Congress added skilled nursing facilities to the categories of health care providers eligible to receive USF funds under the Rural Health Care program. *See* Frank R. Lautenberg Chemical Safety for the 21st Century Act, Pub. L. No. 114-182, 130 Stat. 448 (2016) (amending 47 U.S.C. § 254(h)(7)(B)). The supposition that the growth of the USF indicates a lack of congressional direction thus is incorrect.

*Second*, Congress has always directed the FCC's implementation of Section 254 and the USF. Congress repeatedly has required the FCC to appear or submit information enabling Congress to review its activities.

Most recently, for instance, in the Infrastructure Investment and Jobs Act passed in November 2021, Congress directed the FCC to prepare a report on the future of universal service. Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429 (2021).[4] *See also*, *e.g.*, Dep'ts of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1998, § 623, Pub. L. No. 105-119, 111 Stat. 2521 (1997) (similarly requiring reporting to Congress). And Congress regularly holds oversight hearings about USF. *See, e.g.,* Cong. Res. Serv., *Universal Service Fund: Background and Options for Reform*, at 25-27 (June 30, 2011) (detailing oversight in the 111th and 112th Congresses). Reports and oversight like this demonstrate Congress's attention to the FCC's implementation of Section 254.

Congress has also repeatedly amended Section 254 since the 1996 Act. In addition to the skilled nursing facilities amendment discussed above (at p. 21), for example, Congress directed the FCC to promulgate regulations for E-Rate to cover equipment for remote learning during the COVID-19 emergency period, American Rescue Plan Act of 2021, Pub. L.

---

[4] The FCC has issued a notice of inquiry soliciting public comments on issues it will consider in its report. *In re Report on the Future of the Universal Serv. Fund*, 2021 WL 5986835, at *1 (Dec. 15, 2021).

No. 117-2, 135 Stat. 4 (2021); to promulgate regulations making uniform the methodology for collecting coverage data, Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, 132 Stat. 348 (2018); and to require internet safety policies by schools and libraries receiving E-Rate support, Consolidated Appropriations Act—FY 2001, Pub. L. No. 106-554, 114 Stat. 2763 (2000).

Thus, Congress has always been, and remains, closely attuned to the FCC's implementation of the USF system. Congress directs the FCC's administration of Section 254 by enacting changes to the statute, requiring reports, and monitoring the programs. The USF programs are absolutely essential for Americans in all corners of the country, and Congress consistently guides the FCC in administering them.

### D.    A Ruling That The Universal Service Fund Is Unconstitutional As Currently Structured Would Have Catastrophic Effects Throughout The United States.

As discussed, *see* Part B, *supra*, millions of Americans rely on the programs comprising the USF—for access to telecommunications services in areas that otherwise would be uneconomical to serve, for access to the internet at schools and libraries, for their health care providers to deliver the highest quality of care regardless of location,

and—in the case of the nation's most needy citizens—to access telecommunications at all. Many of these people live in the communities we represent. It is for these Americans that Congress set up the USF system, oversees the FCC's implementation of that system, and—when necessary—instructs the agency to modify that system. *See* Part C, *supra.*

Petitioners would have this Court hold that entire system unconstitutional. Whatever one thinks about the nondelegation doctrine generally—and signatories to this brief have diverse views on the subject—this is not even a close case given Congress's instructions and oversight. And if the Court concludes the USF system is improperly constituted based on Petitioners' essentially academic arguments, our constituents and other Americans will lose the essential services on which they rely. For schools, for students, for low- and fixed-income individuals, for citizens who live in rural and other areas where telecommunications service is expensive or unavailable, for people with limited access to medical care, and for tribal members, the loss of these USF programs would be devastating.

Accordingly, we respectfully request that the Court rule for Respondents in this case and allow Congress and the FCC to continue to ensure that our nation's universal service needs are met.

## CONCLUSION

Millions of Americans depend on the services the USF system supports—services authorized by Congress, which the FCC and USAC administer consistent with congressional direction. Concluding that the USF system is improperly structured would result in the loss of these essential services, cutting Americans off from the access they need to learn, to work, to get medical care, and to stay connected to society. The Court should reject the Petition challenging the FCC's order.

Respectfully submitted.

/s/ David M. Gossett

David M. Gossett
    *Counsel of Record*
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, D.C. 20005
(202) 973-4200
davidgossett@dwt.com

Thaila K. Sundaresan
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, CA 94111
(415) 276-6500
thailasundaresan@dwt.com

MaryAnn T. Almeida
DAVIS WRIGHT TREMAINE LLP
920 Fifth Ave., Suite 3300
Seattle, WA 98104
(206) 622-3150
maryannalmeida@dwt.com

 *Counsel for Amici Curiae*
 *Members of Congress*

June 17, 2022

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fifth Circuit Rules 29 and 32 and Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains 4,241 words, excluding the portions exempted by Rule 32(f).

This brief also complies with the typeface and type style requirements of Federal Rule of Appellate Procedure Rule 32(a)(5)–(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook and 14-point font.

*/s/ David M. Gossett*
David M. Gossett

## CERTIFICATE OF SERVICE

I certify that, on June 17, 2022, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. Participants in this case who are registered CM/ECF users will be served by the CM/ECF system.

*/s/ David M. Gossett*
David M. Gossett