No. 22-60008

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

**CONSUMERS' RESEARCH; CAUSE BASED COMMERCE,
INCORPORATED; KERSTEN CONWAY; SUZANNE BETTAC;
ROBERT KULL; KWANG JA KERBY; TOM KIRBY; JOSEPH
BAYLY; JEREMY ROTH; DEANNA ROTH; LYNN GIBBS; PAUL
GIBBS; RHONDA THOMAS,**

*Petitioners,*

v.

**FEDERAL COMMUNICATIONS COMMISSION; UNITED
STATES OF AMERICA,**

*Respondents.*

Petition for Review of an Order of the
Federal Communications Commission
Agency No. 96-45

**FIFTH CIRCUIT RULE 30.2 JOINT APPENDIX**

P. Michele Ellison
Jacob M. Lewis
James M. Carr
Adam G. Crews
FEDERAL COMMUNICATIONS
COMMISSION
Washington, DC 20554

Brian M. Boynton
Sarah E. Harrington
Mark B. Stern
Gerard J. Sinzdak
UNITED STATES DEPARTMENT OF
JUSTICE
Washington, DC 20530
*Counsel for Respondents*

C. Boyden Gray
R. Trent McCotter
Jonathan Berry
Michael Buschbacher
Jared M. Kelson
BOYDEN GRAY & ASSOCIATES
Washington, DC 20006
*Counsel for Petitioners*

Stephanie Weiner
Jason Neal
HARRIS, WILTSHIRE & GRANNIS
LLP
Washington, DC 20036
*Counsel for Intervenor Schools, Health, & Libraries Broadband Coalition*

Andrew Jay Schwartzman
Washington, DC 20005
*Counsel for Intervenors Benton Institute for Broadband & Society, National Digital Inclusion Alliance, and Center for Media Justice d/b/a MediaJustice*

Jennifer Tatel
Craig E. Gilmore
WILKINSON BARKER KNAUER, LLP
Washington, DC 20036
*Counsel for Intervenors USTelecom, NTCA, and CCA*

# TABLE OF CONTENTS

Tab 1: *Comments and Objections of Consumers' Research et al.* (filed December 21, 2021) .............................................................................. JA1

Tab 2: Public Notice, *Proposed First Quarter 2022 Universal Service Contribution Factor*, DA 21-1550 (released December 13, 2021).... JA100

Tab 3: USAC, *Contribution Base Filing for First Quarter 2022* (filed December 2, 2021) ........................................................................... JA105

Tab 4: *Comments and Objections of Consumers' Research et al.* (filed November 19, 2021)........................................................................ JA113

Tab 5: USAC, *Fund Size Projections for First Quarter 2022* (filed November 2, 2021).......................................................................... JA211

# TAB 1

<u>JA1</u>

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | § | |
| | § | |
| Proposed First Quarter 2022 | § | CC Docket No. 96-45 / DA21-1550 |
| Universal Service Contribution Factor | § | |

---

**COMMENTS AND OBJECTIONS OF CONSUMERS' RESEARCH, CAUSE BASED COMMERCE, INC., KERSTEN CONWAY, SUZANNE BETTAC, ROBERT KULL, KWANG JA KIRBY, TOM KIRBY, JOSEPH BAYLY, JEREMY ROTH, DEANNA ROTH, LYNN GIBBS, PAUL GIBBS, AND RHONDA THOMAS**

---

Commenters Consumers' Research, Cause Based Commerce, Inc., Kersten Conway, Suzanne Bettac, Robert Kull, Kwang Ja Kirky, Tom Kirby, Joseph Bayly, Jeremy Roth, Deanna Roth, Lynn Gibbs, Paul Gibbs, and Rhonda Thomas respectfully submit these comments and objections in response to the Office of Managing Director's December 13, 2021, Public Notice of Proposed First Quarter 2022 Universal Service Contribution Factor, pursuant to the proposal provided by the Universal Service Administrative Company. *See Proposed First Quarter 2022 Universal Service Contribution Factor*, Public Notice, DA Docket No. 21-1550, FCC 96-45 (rel. Dec. 13, 2021), *available at* https://docs.fcc.gov/public/attachments/DA-21-1550A1.pdf. If the Commission does not take separate action within 14 days of the release, the *Proposed First Quarter 2022 Universal Service Contribution Factor* will be "deemed approved by the Commission." 47 C.F.R. § 54.709(a)(3).

<u>JA2</u>

# I. INTRODUCTION

Commenters respectfully request that the Commission reject the proposed Universal Service Contribution Factor and instead set it at 0.000 (0 percent). *See* 47 C.F.R. § 54.709(a)(3) (giving the Commission authority to approve or reject the proposed contribution factor and its constituent proposed expenses). The Universal Service Fund is an unconstitutional tax raised and spent by an unaccountable federal agency—which in turn has delegated almost all authority over this revenue-raising scheme to a private company registered in Delaware. And the cost of this tax is ultimately borne by consumers via a separate line item on nearly every phone bill in the country. The Commission should reject the *Proposed First Quarter 2022 Universal Service Contribution Factor* and refuse to permit additional revenue to be collected and paid into the Fund, which is unconstitutional, violates statutory authority, and is otherwise illegal for numerous reasons:

(1)     In Section 254 of the 1996 Telecommunications Act, which established the Universal Service Fund, Congress delegated its legislative powers to the Commission, in violation of the original understanding of constitutional separation of powers and also in violation of the more-recent prohibition on delegations that lack an adequate intelligible principle to guide the agency's actions. Under the Act, the Commission is empowered to raise and spend billions of dollars on subsidies for "universal service" (a term defined only generically by statute and which the Commission itself has authority to re-define as often as it chooses), thereby violating Article I, Section 1 of the U.S. Constitution. Because the Universal Service Fund has

2

been established and operates in an unconstitutional manner, the Commission should not permit further collections.

(2)     To the extent Congress authorized the Commission to re-delegate (or de facto re-delegate) legislative powers over raising and spending revenue to a private company, namely the Universal Service Administrative Company ("USAC"), Congress delegated legislative power to a private entity, thereby separately violating Article I, Section 1 of the U.S. Constitution, which prohibits improper delegations of authority to private persons and entities. Because the Universal Service Fund has been established and operates in an unconstitutional manner, the Commission should not permit further collections.

(3)     In Section 254, Congress also delegated its taxing power to the Commission, thereby violating Article I, Section 8 of the U.S. Constitution. The charges imposed for Universal Service are taxes because they, at least in part, provide benefits for the general public—indeed, the term "universal service" confirms the goal of providing benefits for as many people as possible from this pot of money. Even if Congress can delegate taxing power to an agency, Congress must impose meaningful limitations on the rates or amounts that could be raised by the Commission, which Congress failed to do here. Because the Universal Service Fund has been established and operates in an unconstitutional manner, the Commission should not permit further collections.

(4)     To the extent Congress authorized the Commission to re-delegate (or de facto re-delegate) taxing power to a private company, namely USAC, Congress

<u>JA4</u>

delegated its taxing power to a private entity, thereby violating Article I, Section 8 of the U.S. Constitution. Because the Universal Service Fund has been established and operates in an unconstitutional manner, the Commission should not permit further collections.

(5)    To the extent Congress did *not* authorize the Commission to re-delegate (or de facto re-delegate) legislative or taxing powers to a private company, the Universal Service Fund has been established and operates in excess of statutory authority, and the Commission should not permit further collections pursuant to that re-delegation.

(6)    If USAC board directors are not considered private officials, and to the extent Congress authorized the Commission Chair alone (and not the entire Commission) to appoint those USAC board directors, then Congress vested the power to appoint officers of the United States in someone who is not "the President alone, … the Courts of Law, or … the Heads of Departments," thereby violating Article II, Section 2 of the U.S. Constitution. Because USAC's board is illegally constituted, the Universal Service Fund has been established and operates in violation of the Constitution, and the Commission should not permit further collections.

(7)    To the extent Congress did *not* authorize the Commission Chair alone to appoint USAC board directors, USAC's board is illegally constituted, the Universal Service Fund has been established and operates in excess of statutory authority, and the Commission should not permit further collections.

<u>JA5</u>

(8)     The Proposed Quarterly Universal Service Contribution factor is a legislative rule that dictates future conduct, but the Commission has not complied with any of the Administrative Procedure Act's requirements for promulgating such rules. *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 95-96 (2015). Likewise, the Commission has not published the proposal in the Federal Register in advance of rulemaking, nor has the Commission published prior Quarterly Proposals in the Federal Register. *See* 44 U.S.C. § 1505. If the Commission does not reject the *Proposed First Quarter 2022 Quarterly Contribution Factor*, the Commission would violate the APA and the Federal Register Act. The Proposed Quarterly Universal Service Contribution factor is therefore unlawful, and the Commission should reject it and not permit any collections pursuant to it.

\* \* \*

Any one of these grounds provides a sufficient basis for the Commission to reject the *Proposed First Quarter 2022 Universal Service Contribution Factor* as illegal. The Commission should reject the Proposed Factor and enter a factor of 0.000 (0%). The failure to do so would result in numerous constitutional and statutory violations.

## II. BACKGROUND

### A.     Universal Service Before 1996

"Since the inception of the Federal Radio Commission in 1928, and continuing with the creation of the Federal Communications Commission in 1934, the federal government has pursued a policy of providing 'universal' telephone service to all residents and businesses in the United States," regardless of whether they are located

in major metropolitan areas where service is easily provided, or isolated rural communities where service is expensive to provide. Ronald J. Krotoszynski, Jr., *Reconsidering the Nondelegation Doctrine: Universal Service, the Power to Tax, and the Ratification Doctrine*, 80 IND. L.J. 239, 279 (2005) (outlining history of universal service).

Until the 1960s, universal service was addressed via the monopoly power of incumbent telephone companies like American Telephone & Telegraph ("AT&T"). *Id.* at 279-81. In exchange for its monopoly, for example, AT&T agreed "not [to] discriminate among 'similarly situated' users, which in practice meant that [AT&T] had a limited capacity to price service as a function of demand and marketplace conditions rather than being subject to a regulator-managed calculation of carrier costs and a fair rate of return." Robert M. Frieden, *Universal Service: When Technologies Converge and Regulatory Models Diverge*, 13 HARV. J.L. & TECH. 395, 401 (2000). In short, AT&T's monopoly power allowed it to charge some consumers an above-market rate, in order to subsidize the higher costs of providing service to other consumers.

"Until 1983, AT&T's internal rate structure largely funded the universal service program." Krotoszynski, Jr., *Reconsidering the Nondelegation Doctrine*, 80 Ind. L.J. at 279. But AT&T was broken up in 1984, and the Regional Bell Operating Companies that resulted were no longer able to subsidize local service via artificially increased long-distance rates. *Id.*

The Commission addressed this by creating the initial Universal Service Fund, which raised funds by imposing interconnection fees on long-distance carriers. *See Rural Tel. Coalition v. FCC*, 838 F.2d 1307, 1310-15 (D.C. Cir. 1988).

## B.    1996 Telecommunications Act

When Congress passed the 1996 Telecommunications Act, 47 U.S.C. § 1, *et seq.*, it opened local telephone service markets to competition, *see* Krotoszynski, Jr., *Reconsidering the Nondelegation Doctrine*, 80 Ind. L.J. at 282. "By opening up the local telephone market to competition, the last remaining part of the old universal service program, based on a system of pervasive cross-subsidies, fell." *Id.*

In response, Congress enacted 47 U.S.C. § 254, which expressly created a funding system to facilitate universal access, which was defined far more expansively than its predecessors. Beyond basic service for consumers, universal service now included "'advanced telecommunications and information services,' particularly high-speed internet access, for schools (as well as for libraries and rural health care providers)." *City of Springfield v. Ostrander (In re LAN Tamers, Inc.)*, 329 F.3d 204, 206 (1st Cir. 2003) (quoting 47 U.S.C. § 254(b)(6), (h)(1)). This was a major part of the Act. Courts have held that Congress passed the "1996 Telecommunications Act ... to encourage universal telecommunications service." *Id.*

To accomplish its goal of universal service, the 1996 Telecommunications Act requires telecommunications carriers providing interstate telecommunications services to financially support the cost of providing telecommunications services to

schools, libraries, health-care providers, low-income consumers, and subscribers in high-cost areas. *See* 47 U.S.C. § 254(b).

In particular, "[e]very telecommunications carrier that provides interstate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, to the specific, predictable, and sufficient mechanisms established by the Commission to preserve and advance universal service." *Id.* § 254(d). As discussed below, the Commission subsequently established several such "mechanisms," including a High-Cost and Low-Income program (which includes the Connect America Fund to mandate provision of broadband internet across the country, and the Lifeline program), a Schools and Libraries program, and a Rural Health Care program. 47 C.F.R. §§ 54.101, 54.701(c); *see also id.*, §§ 54.304, 54.308, 54.404, 54.501, 54.601.

Congress imposed no formula or limitation on how much money the Commission can raise through these mechanisms. And although the money must be spent on "universal service," that term is generically defined as "an evolving level of telecommunications services that the Commission shall establish periodically under this section, taking into account advances in telecommunications and information technologies and services." 47 U.S.C. § 254(c).

## C.    Section 254 Mandatory "Contributions" Are Taxes

"Congress cannot change whether an exaction is a tax or a penalty for constitutional purposes simply by describing it as one or the other." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 544 (2012).

<u>JA9</u>

Despite euphemistically being labeled as "contributions" or "mechanisms" in Section 254, the charges imposed pursuant to Section 254 are widely recognized as taxes because "some of the administrative costs at issue inure[] to the benefit of the public." *Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 214 (1989); *see also Nat'l Cable Television Ass'n, Inc. v. United States*, 415 U.S. 336, 340-41 (1974) (a tax is where the charge yields "a benefit … shared by other members of society"). The Universal Service Fund "contribution is a tax in all but name. It has no relation to any benefit conferred by the FCC; instead, it is based on the agency's self-determined funding needs for its subsidy schemes." Christopher C. DeMuth, Sr. & Michael S. Greve, *Agency Finance in the Age of Executive Government*, 24 GEO. MASON L. REV. 555, 566 (2017). The very title of the program—"Universal Service"—provides direct textual proof that the funds are designed to benefit the public in such a broad manner that it is considered "universal."

Indeed, Congress directed that funds could be used to provide telecommunication services to nearly the entire general public: "[c]onsumers in all regions of the Nation, including low-income consumers and those in rural, insular, and high cost areas"; "any public or nonprofit health care provider that serves person who reside in rural areas"; and "elementary schools, secondary schools, and libraries for educational purposes." 47 U.S.C. §§ 254(b)(3), (h)(1); *see also* Universal Service Administrative Co., *Universal Service*, https://www.usac.org/about/universal-service/ ("Universal service is based on the principle that all Americans should have access to

a baseline level of telecommunications service and further the public interest of keeping all Americans connected.").

Upon implementation, Section 254 was widely recognized as a tax. Then-Senator John McCain, Chairman of the U.S. Senate Commerce Committee, said, "Of course, it's a tax. It walks like a duck. It talks like a duck." Doug Abrahms, *Phone Rates Will Rise for Firms, Some Homes*, WASH. TIMES, December 11, 1997 (quoting then-Senator McCain). Industry insiders, think tanks, and journalists all agreed. *See* Barbara A. Cherry & Donald D. Nystrom, *Universal Service Contributions: An Unconstitutional Delegation of Taxing Power*, 2000 L. REV. MICH. ST. U. DET. C.L. 107, 109 & nn.9-11 (2000) (citing Richard C. Notebaert, CEO of Ameritech, *Speech Before the American Enterprise Institute*, Washington, D.C. (May 19, 1998); James Glassman, *A New Tax for the New Year*, WASH. POST, Dec. 2, 1997, at A1 (Fellow at the American Enterprise Institute); Paul Craig Roberts, *Congress Should Grab Back the Reins of Power*, BUS. WEEK, Jan. 26, 1998, at 18 (John M. Olin Fellow at the Institute for Political Economy); Robert Sarvis, *Al Gore's Hidden Phone Tax: Bad Economics, Bad Politics*, CAPITOL COMMENT, No. 197, July 24, 1998 (publication of the Citizens for a Sound Economy); *New Phone Tax*, WALL ST. J., Dec. 9, 1997, at A22; *Phone Tax, Continued*, WALL ST. J., Dec. 23, 1997, at A14; Catherine Yang, *The Hidden Tax in Your Phone Bill*, BUS. WEEK, May 4, 1998, at 46).

## D.    Carriers Pass Through Section 254 Taxes To Consumers

Nearly every telecommunications carrier is required to contribute to the Universal Service Fund based on the carrier's interstate and international

telecommunications revenue. *See* 47 C.F.R. § 54.709(a). The Commission devises a formula that each carrier must adhere to in calculating its contribution. 47 C.F.R. § 54.409; *In re Incomnet, Inc.*, 463 F.3d 1064, 1066 (9th Cir. 2006).

Carriers typically "pass this cost through to their subscribers." *Incomnet*, 463 F.3d at 1066; *see* 47 C.F.R. § 54.712(a). Indeed, the Commission's regulations expressly permit this pass-through. *See, e.g.*, 47 C.F.R. § 54.407(c). The "charge generally appears on phone bills as the 'Universal Service Fund Fee.'" *Incomnet*, 463 F.3d at 106.

The Commission itself has acknowledged that consumers bear the costs of the Universal Service Program through increased telephone rates. *See USF Contribution Methodology*, 27 F.C.C. Rcd. 5357, 5362-63, ¶ 9 (2012); *In re Matter of Federal-State Joint Board on Universal Service*, 17 F.C.C. Rcd. 3752, 3792, ¶ 91 (2002) (noting carriers' common use of line item surcharges on customers' monthly statements to recoup USF assessments); *In re Federal-State Joint Board on Universal Service*, 12 F.C.C. Rcd. 8766, 9199, ¶ 828, 9211-12, ¶ 855 (1997) (permitting carriers subject to USF assessments to recoup such assessments by passing costs on to customers, provided that those carriers disclose "complete and truthful information regarding their contribution amount"); *see also* Expert Report of Dr. George Ford (attached as Exhibit A) at 3-4 n.7.

Members of Congress have also acknowledged that the Universal Service Fund is financed by "virtually every American's money"; "at the end of the day, it is still the same taxpaying people who bear the cost, since 96 percent of the country has phone

service and see a fee on their bill." Opening Statement of Hon. Greg Walden, *The Lifeline Fund: Money Well Spent?*, House Subcommittee on Communications and Technology, House Committee on Energy and Commerce, No. 113-36, at 1-2 (Apr. 25, 2013), https://www.govinfo.gov/content/pkg/CHRG-113hhrg82189/pdf/CHRG-113hhrg82189.pdf.

## E.    The Commission Re-Delegates Its Powers To A Private Company

Congress gave the Commission the authority to implement the universal service support provisions of the 1996 Telecommunications Act. 47 U.S.C. § 254(b), (d). Without express statutory authority to do so, the Commission subsequently re-delegated this authority to the Universal Service Administrative Company ("USAC"), a Delaware-registered non-profit company. 47 C.F.R. § 54.701(a) ("The Universal Service Administrative Company is appointed the permanent Administrator of the federal universal service support mechanisms ...."); *id.*, § 54.5 ("The term 'Administrator' shall refer to the Universal Service Administrative Company that ... has been appointed the permanent Administrator of the federal universal service support mechanisms."); *Incomnet*, 463 F.3d at 1067.

USAC is an "independent subsidiary of the National Exchange Carrier Association, Inc.," 47 C.F.R. § 54.5, which "is a membership organization of telecommunications carriers." *Blanca Tel. Co. v. FCC*, 991 F.3d 1097, 1105 (10th Cir. 2021). USAC has a 19-member Board of Directors comprised of individuals from various "interest groups that are interested in and affected by universal service programs" and who were nominated "by their respective interest groups." Universal

Service Administrative Co., *Leadership*, https://www.usac.org/about/leadership/; 47 C.F.R. § 54.703(b).

After their nomination by these interest groups, USAC board members are approved by the chair of the Commission, but not by the entire Commission. 47 C.F.R. § 54.703(c)(3). Board directors are not nominated by the President nor confirmed by the Senate.

USAC is charged with establishing the budget for the Universal Service Fund. Each quarter, USAC's board announces a proposed contribution amount—essentially how much money USAC wants for "universal service" for the next quarter—which the Commission's Office of Managing Director then ministerially calculates as a percentage of all telecommunication carriers' expected interstate and international end-user revenues. 47 C.F.R. § 54.709(a); *see id.*, § 54.706(a) (listing 19 types of taxed services). This proposed taxing rate is "deemed approved" by the Commission unless it acts within 14 days of publication. *Id.*, § 54.709(a)(3). It appears the Commission has never rejected USAC's proposed budget—a rubber stamp is not even needed, as the rate is deemed approved merely by the Commission's inaction.

Neither the specific recipients nor the specific beneficiaries of the funds are named in the 1996 Telecommunications Act, nor did Congress impose any formulas or limitations on the rate or how much money can be collected (beyond a requirement that it be "equitable and nondiscriminatory"), nor how to spend it (beyond that it be on "universal service," which the Commission is then expressly permitted to define). *Incomnet*, 463 F.3d at 1075; 47 U.S.C. §§ 254(c), (d).

JA14

USAC takes legal title to the contributions it receives from carriers and deposits them into the Universal Service Fund, then disburses funds to subsidize the general welfare via provision of service to libraries, schools, rural areas, and high-cost areas. *Incomnet*, 463 F.3d at 1072. USAC generally divides these funds among its High-Cost and Low-Income Program, the Schools and Libraries Program, and the Rural Health Care Program. 47 C.F.R. §§ 54.101, 54.701(c); *see also id.*, §§ 54.304, 54.308, 54.404, 54.501, 54.601.

USAC does not simply hold funds in the Universal Service Fund as the Commission's agent. *Incomnet*, 463 F.3d at 1074 (citing 47 C.F.R. § 54.715(c)). The Commission exercises power over the fund only indirectly, essentially by overseeing USAC. *Id.* The Commission has no ability to control the funds in the Universal Service Fund through direct seizure or discretionary spending. *Id.*

In short, a private company registered in Delaware decides how much to collect from carriers (amounting to nearly $10 billion annually, as discussed below), effectively mandates payments under penalty of law, and then "decides if, when, and how it disburses funds on behalf of the [Fund's] beneficiaries." *Incomnet*, 463 F.3d at 1076 (citing 47 C.F.R. §§ 54.701(a), 54.704(a), 54.705, 54.715).

## F.  USAC Imposes Skyrocketing Rates, Raising Tens Of Billions Of Dollars

Without congressionally imposed formulas or limits on the amounts or rates the Commission or USAC can raise for the Universal Service Fund, the costs have predictably skyrocketed.

In the second quarter of 2000, USAC's budget imposed a tax rate of 5.7% on all end-user interstate telecommunication revenues, amounting to an expected $1.1 billion in forced "contributions" to the Universal Service Fund by carriers in that one quarter alone. *Proposed Second Quarter 2000 Universal Service Contribution Factor*, Mar. 7, 2000, *available at* https://docs.fcc.gov/public/attachments/DA-00-517A1.pdf.

By the second quarter of 2008, USAC had doubled the tax rate to 11.3%, amounting to an expected quarterly contribution of $1.9 billion. *Proposed Second Quarter 2008 Universal Service Contribution Factor*, Mar. 14, 2008, *available at* https://docs.fcc.gov/public/attachments/DA-08-576A1.pdf.

By the second quarter of 2012, the rate had increased to 17.4%, amounting to an expected quarterly contribution of $2.4 billion. *Proposed Second Quarter 2012 Universal Service Contribution Factor*, Mar. 13, 2012, *available at* https://docs.fcc.gov/public/attachments/DA-12-396A1.pdf.

The rate slowly continued climbing, with a 17.9% tax rate for the second quarter of 2016, amounting to $2.2 billion in collections for the quarter, and up to 19.6% in the second quarter of 2020. *Proposed Second Quarter 2016 Universal Service Contribution Factor*, Mar. 10, 2016, *available at* https://docs.fcc.gov/public/attachments/DA-16-266A1.pdf; *Proposed Second Quarter 2020 Universal Service Contribution Factor*, Mar. 13, 2020, *available at* https://docs.fcc.gov/public/attachments/DA-20-269A1_Rcd.pdf.

Just one quarter later (third quarter of 2020), the rate spiked to 26.5%, followed by 27.1% in the fourth quarter of 2020. *Proposed Third Quarter 2020*

*Universal Service Contribution Factor*, June 12, 2020, *available at* https://docs.fcc.gov/public/attachments/DA-20-617A1_Rcd.pdf; *Proposed Fourth Quarter 2020 Universal Service Contribution Factor*, Sept. 14, 2020, *available at* https://docs.fcc.gov/public/attachments/DA-20-1075A1_Rcd.pdf.

And in 2021, the numbers jumped to unprecedented levels. For the first quarter 2021, USAC set the tax rate at 31.8% ($2.4 billion collected), for the second quarter it was 33.4% ($2.5 billion collected), and for the third quarter it was 31.8% ($2.3 billion collected). *Proposed First Quarter 2021 Universal Service Contribution Factor*, Dec. 14, 2020, *available at* https://docs.fcc.gov/public/attachments/DA-20-1480A1_Rcd.pdf; *Proposed Second Quarter 2021 Universal Service Contribution Factor*, Mar. 12, 2021, *available at* https://docs.fcc.gov/public/attachments/DA-21-308A1_Rcd.pdf; *Proposed Third Quarter 2021 Universal Service Contribution Factor*, June 10, 2021, *available at* https://docs.fcc.gov/public/attachments/DA-21-676A1.pdf. The factor for the fourth quarter of 2021 was 29.1% ($2.1 billion collected). *See Proposed Fourth Quarter 2021 Universal Service Contribution Factor*, Sept. 10, 2021, *available at* https://docs.fcc.gov/public/attachments/DA-21-1134A1.pdf.

For first quarter 2022, USAC has proposed to set the tax rate at 25.2%, a drop from the all-time highs in early 2021 but still a dramatic increase from the original rates. *See Proposed First Quarter 2022 Universal Service Contribution Factor*, Dec. 13, 2021, *available at* https://docs.fcc.gov/public/attachments/DA-21-1550A1.pdf

Thus, since 2000, the tax rate has increased by 500% and now yields nearly $10 billion annually.

JA17



The Commission's entire annual budget for 2021, by comparison, was just over $500 million, dwarfed by the nearly $10 billion USAC expects to collect over that same period. FCC, *2022 Budget Estimates to Congress*, May 2021, https://docs.fcc.gov/public/attachments/DOC-372853A1.pdf.



G.      **Rampant Abuse, Fraud, And Waste In The Universal Service Fund**

The failures of the Universal Service Fund confirm the wisdom of the Framers in vesting control over the purse in a politically accountable legislature. As St. George Tucker recognized, legislative control of the purse is "a salutary check, not only upon the extravagance, and profusion, in which the executive department might otherwise indulge itself, and its adherents and dependents; but also against any misappropriation, which a rapacious, ambitious, or otherwise unfaithful executive might be disposed to make." ST. GEORGE TUCKER, VIEWS OF THE CONSTITUTION OF THE UNITED STATES 298 (1803) (Clyde N. Wilson ed. 1999). Congress's "power to control, and direct appropriations," Story observed, "constitutes a most useful and salutary check … upon corrupt influence and public peculation." JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 1342 (1833).  Justice Story was right. And extravagance, profusion, corruption, peculation, and misappropriation are the hallmarks of the Universal Service Fund.

Given its lack of accountability and the fact that USAC is populated with self-acknowledged industry insiders, the Universal Service Fund has predictably demonstrated—in the words of then-Senator Claire McCaskill—a "history of extensive waste and abuse." Opening Statement of Hon. Greg Walden, *The Lifeline Fund: Money Well Spent?*, Subcommittee on Communications and Technology, House Committee on Energy and Commerce, No. 113-36, at 2   (Apr. 25, 2013), https://www.govinfo.gov/content/pkg/CHRG-113hhrg82189/pdf/CHRG-113hhrg82189.pdf (quoting then-Sen. McCaskill).

For example, a November 2008 report by the Commission's Inspector General found that 23.3% of payments made from the Universal Service Fund from 2007 to 2008 were "erroneous"—amounting to nearly $1 billion wasted. Office of the Inspector General, Federal Communications Commission, *The High Cost Program* (Nov. 26, 2008), *available at* http://hraunfoss.fcc.gov/edocs_public/attachmatch/DOC-286971A1.pdf.

An October 2010 Government Accountability Office report concluded that the Universal Service Fund "lacks key features of effective internal controls," e.g., "the number and scope of USAC's audits have been limited and there is no systematic process in place to review the findings of those audits that are conducted," nor had the Commission or USAC even considered looking for risks like "the possibility that multiple carriers may claim support for the same telephone line and that households may receive more than one discount, contrary to program rules." Government Accountability Office, *Report to Congressional Requesters: Improved Management Can Enhance FCC Decision Making for the Universal Service Fund Low-Income Program* (Oct. 2010), *available at* http://www.gao.gov/assets/320/312708.pdf.

In March 2015, the Government Accountability Office issued another report critical of the Universal Service Fund's Lifeline program, designed to ensure availability of telephone voice service for low-income Americans, and recommended improvements to the program to reduce waste and fraud. Government Accountability Office, Report to the Chairman, Committee on Commerce, Science and Transportation, U.S. Senate, *The FCC Should Evaluate the Efficiency and*

*Effectiveness of the Lifeline Program* (Mar. 2015), *available at* http://www.gao.gov/assets/670/669209.pdf.

In May 2017, the Government Accountability Office issued yet another report, finding that USAC had largely failed to implement the recommendations from the 2015 report. Government Accountability Office, *Additional Action Needed to Address Significant Risks in FCC's Lifeline Program*, May 30, 2017, https://www.gao.gov/assets/gao-17-538.pdf.

The GAO found that USAC relied "on over 2,000 Eligible Telecommunication Carriers that are Lifeline providers to implement key program functions, such as verifying subscriber eligibility," an unnecessarily "complex internal control environment [that] is susceptible to risk of fraud, waste, and abuse as companies may have financial incentives to enroll as many customers as possible." *Id.*

Nationwide, "GAO was unable to confirm whether about 1.2 million individuals of the 3.5 million it reviewed, or 36 percent, participated in a qualifying benefit program, such as Medicaid, as stated on their Lifeline enrollment application." *Id.* In some states, nearly 80% of actual Lifeline users may be legally ineligible for the service. *See id.* at 42 (in Georgia, for example, 79% of users could not be confirmed as eligible; in North Carolina, it was 77%). The Lifeline program was estimated to have spent $1.2 million *annually* on users confirmed to have been deceased. *Id.* at 43.

Fraud continues, nonetheless. For example, in 2018 the CEO of a provider for low-income broadband service apparently embezzled "at least $10 million" from a Universal Service Fund program to pay for, among other things:

a.  "[A] $1.3 million condominium in Florida";

b.  "[A] $250,000 convertible Ferrari 458 Spider";

c.  "[T]ens of thousands in dollars in landscaping fees";

d.  "[C]ountry club and yacht memberships in Florida, and boat slips in Michigan";

e.  "[A]n $8 million Cessna 525 jet" used for personal travel like attending lacrosse games and flying to the Cayman Islands.

*In Re American Broadband & Telecomm. Co.*, FCC 18-144 ¶¶ 135-140 (Oct. 23, 2020), https://docs.fcc.gov/public/attachments/DA-20-493A1.pdf.

In the same case, the company "receiv[ed] funding for tens of thousands of ineligible Lifeline customer accounts. The company's sales agents apparently created fake or duplicate accounts by using the names of deceased people; modifying the names, dates of birth, and Social Security Numbers of actual Lifeline subscribers; reusing the same proof-of-eligibility documents for multiple accounts; listing the same single-family home addresses for dozens of accounts; and using addresses where nobody actually lived." *Id.* at 71, Statement of Chairman Ajit Pai; *see also id.* at 72. The company received Lifeline support for dead people "more than 45,000 times over just one five-month period." *Id.* at 72, Statement of Commissioner Brendan Carr. In one case, it signed up the same person's name "more than 20 times." *Id.*

<u>JA22</u>

In 2019, the Commission's Managing Director reviewed an Inspector General report and found that USAC was *still* out of compliance in numerous critical aspects, resulting in substantial wasted money. Mark Stephens, FCC Managing Director, Letter to Ron Johnson, Chair of U.S. Senate Committee on Homeland Security and Governmental Affairs, Aug. 27, 2019, https://www.fcc.gov/sites/default/files/improper-payments-compliance-report-fy2018.pdf.

USAC is led by members of the same industries that receive the funds, which inherently leads to cronyism and waste. During one oversight hearing, the Commission's Inspector General agreed that "applicants view this program as a big candy jar, free money." Sam Dillon, *School Internet Program Lacks Oversight, Investigator Says*, N.Y. TIMES, June 18, 2004, at A22; *see also* Sam Dillon, *Waste and Fraud Besiege U.S. Program to Link Poor Schools to Internet*, N.Y. TIMES, June 17, 2004, at A20.

Moreover, the Commission does not open its quarterly Universal Service Contribution Factor process to a meaningful notice-and-comment process or period, making it even more difficult for the public to exercise any level of influence or oversight. Nor does the Commission publish the Quarterly Factor in the Federal Register, either before or after adoption.

As James Madison warned in Federalist 62: "Every new regulation concerning commerce or revenue … presents a new harvest to those who watch the change, and can trace its consequences; a harvest, reared not by themselves, but by the toils and

22

cares of the great body of their fellow-citizens." The Federalist 62 (James Madison). Except unlike with unpopular Congressional appropriations, there is no mechanism for citizens to vote out the board members of USAC.

## H.    The Universal Service Fund Hurts The People It Is Supposed To Help

The Universal Service Fund is a reverse Robinhood: take from the poor and give to the rich—or (as noted above) to the fraudsters. "USF taxes are the most regressive taxes in America, so families just above the eligibility threshold will suffer most." TechFreedom, *Broadband Subsidies for Some, Broadband Taxes for Everyone*, May 28, 2015, https://techfreedom.org/broadband-subsidies-for-some-broadband-taxes-for/ (quoting Berin Szoka).

Even in the best light, the Universal Service Fund "arguably hurts as many poor consumers as it benefits. 'Because the burden of this funding is concentrated on certain telecommunications services, rather than drawn from general revenues, the base of the 'tax' is relatively narrow, and the markups on the prices of services generating the subsidy are quite high.' A single, low-income mother, living in the Bronx, with a cell phone for personal safety, pays 10% or more of her monthly wireless telephone bill to support universal service for wealthy Montana residents living on ranchettes." Krotoszynski, Jr., *Reconsidering the Nondelegation Doctrine*, 80 Ind. L.J. at 314.

A recent GAO report acknowledged the universal wisdom among economists that the Universal Service charge "functions like a 'regressive tax,' which is a tax that is not sensitive to the income levels of consumers and businesses." Government

Accountability Office, *FCC Should Enhance Performance Goals and Measures for Its Program to Support Broadband Service in High-Cost Areas* 17, Oct. 2020, https://www.gao.gov/assets/gao-21-24.pdf. Additionally, the high-cost program "has focused relatively more on broadband than on voice services in recent years," but "lower income and older Americans may be more likely to rely solely on voice connections than other demographic groups." *Id.* The Universal Service Fund is not focused on providing the services that low-income Americans actually use—but it is still making them pay for advanced telecommunications for wealthier Americans.

Indeed, a separate GAO report found that the Commission had not even bothered to evaluate the Universal Service Fund's effectiveness in achieving certain goals. For example, the low-income Lifeline program may not have played any meaningful role in improving the "level of low-income households' subscribing to telephone service over the past 30 years," despite costing billions of dollars ultimately passed along to consumers. Government Accountability Office, Report to the Chairman, Committee on Commerce, Science and Transportation, U.S. Senate, *The FCC Should Evaluate the Efficiency and Effectiveness of the Lifeline Program* (Mar. 2015), *available at* http://www.gao.gov/assets/670/669209.pdf.

## I.    Consumers—Like Commenters—Foot The Bill

Commenter Consumers' Research is an independent educational 501(c)(3) nonprofit organization whose mission is to increase the knowledge and understanding of issues, policies, products, and services of concern to consumers and to promote the freedom to act on that knowledge and understanding. Consumers'

Research believes that the cost, quality, availability, and variety of goods and services used or desired by American consumers — from both the private and public sectors — are improved by greater consumer knowledge and freedom. Consumers' Research has Verizon phone service in its own name, paid with its own funds. The monthly bill contains the Universal Service Charge as a separate line item entitled "Federal Universal Service Fee."

Commenter Cause Based Commerce, Inc., founded in 1996 with its principal office in Cincinnati, is a reseller of telecommunications services. Caused Based Commerce sends 5% of customers' monthly plan price to a cause/charity of the customer's choosing. As a reseller of telecommunications services, Cause Based Commerce collects from consumers money associated with the Universal Service Fund, and pays into the Universal Service Fund.

Commenter Kersten Conway is an art teacher who resides in League City, Texas. She has Verizon phone service in her own name and pays the monthly bill herself. Her monthly bill contains the Universal Service Charge tax as a separate line-item titled "Fed Universal Service Charge." Ms. Conway has been a teacher for 35 years across Texas, rural South Dakota, and Minnesota. Many of her former students are from the Lakota Sioux Nation and still keep in contact with her. She has been divorced for almost 20 years and is currently co-raising three young grandchildren. Every penny counts, and retirement is not an option for her at this time.

Commenter Suzanne Bettac lives in San Antonio, Texas, and has Sprint/T-Mobile phone service in her own name and pays the monthly bill herself. Her monthly bill contains the Universal Service Charge tax as a separate line-item titled "Federal Univ. Service Assess Non-LD."

Commenter Robert Kull lives in San Antonio, Texas, and has Verizon phone service in his own name and pays the monthly bill himself. His monthly bill contains the Universal Service Charge tax as a separate line-item titled "Fed Universal Service Charge."

Commenters Kwang Ja Kirby and Tom Kirby live in San Antonio, Texas, and have AT&T phone service in Kwang Ja's name and pay the monthly bill using their joint credit card. Their monthly bill contains the Universal Service Charge tax as a separate line-item titled "Federal Universal Service Charge."

Commenter Joseph Bayly is a pastor and editor who resides in Maineville, Ohio, with his wife and six children. He has spent more than a decade in ministry in the Midwest, and currently serves as the founding pastor of Christ Church in Cincinnati. Mr. Bayly provides the sole income for his family. He has AT&T phone service in his own name and pays the bill himself. His monthly bill contains the Universal Service Charge as a separate line item entitled "Federal Universal Service Charge."

Commenters Jeremy and Deanna Roth are a married couple who reside in Akron, Ohio. Mr. Roth is a civil designer who provides the sole income for his family. Mrs. Roth is a homemaker and mother of their two young children. Like many

families, they have numerous financial demands, and every penny counts. The Roths have T-Mobile phone service in Jeremy's name. They pay the bill from their mutual checking account. The monthly bill contains the Universal Service Charge as a separate line-item entitled "Federal Universal Service Fund."

Commenters Lynn and Paul Gibbs are a retired couple that reside in the city of Oregon, Ohio. They are in their late sixties and have had their cell phone service for years, most recently over two years with AT&T. They use Auto-pay tied to their checking account to pay their monthly bill, which contains the Universal Service Charge as a separate line item entitled "Federal Universal Service Charge."

Commenter Rhonda Thomas resides in Milton, Georgia. She has Cricket phone service in her own name, and her monthly bill includes the Federal Universal Service "fee."

On November 14, 2021, Commenters Consumers' Research, Cause Based Commerce, Inc., Bayly, the Roths, the Gibbs, Thomas, and Conway filed a comment/objection with the FCC, urging OMD to set the rate at 0.0%, but OMD ignored the comment/objection and proposed a tax rate of 25.2%.

## J.     An Easy Solution

Rather than the wasteful, crony-filled, Rube Goldberg procedures of passing money back and forth through a Delaware-registered private company run by unaccountable interest groups to subsidize a general welfare program at consumers' expense, there is an easy and transparent solution that also complies with the Constitution: Congress can fund universal service via a standard tax appropriation.

27

The Commission can begin this process by refusing to accept the *Proposed First Quarter 2022 Universal Service Contribution Factor* and setting it at zero.

Commentators have noted that using congressional tax appropriations to fund the Universal Service Fund—rather than allowing the Commission to raise its own taxes "off-book"—would address many of the problems with the Fund, would be simpler, and (unlike the current scheme) would not violate the Constitution. In the words of Professor Daniel Lyons, "For over a decade, policymakers have agreed that our USF funding mechanism is unsustainable. But year after year, the program limps along without change — and American consumers are paying the price. The time is long past for Congress to adopt outgoing Commission Chairman Ajit Pai's recommendation: Move the universal service program on-budget, which will shore up its precarious financial state and cure many of the real or perceived problems with the existing program." Daniel Lyons, *A Common-Sense Opportunity to Reform the Universal Service Fund*, Jan. 28, 2021, https://www.aei.org/technology-and-innovation/a-common-sense-opportunity-to-reform-the-universal-service-fund/; *see also* Joel Thayer, *Congress's Infrastructure Bill Could Give the FCC an Upgrade*, Newsweek, July 26, 2021, https://www.newsweek.com/congresss-infrastructure-bill-could-give-fcc-upgrade-opinion-1612556 ("For one thing, Congress could transform USF funding into a static $8 billion line item (the high end of the current USF budget) in annual appropriations bills to ensure stability for the fund and its services.").

## III. DISCUSSION

The Commission should reject the *Proposed First Quarter 2022 Universal Service Contribution Factor* because the Universal Service Fund and the process for imposing its charges are unconstitutional, in excess of statutory authority, and otherwise illegal.

### A.    Legal Background

The power to tax was not always the province of the legislature. And much of the history of how representative democracy emerged—particularly in England— concerns the ways in which representative legislators sought to wrest the taxing power away from kings. In England, the kings often sought to avoid Parliament's claims on taxing authority by means of a "royal prerogative," and they typically referred to their collections not as taxes but as compulsory loans and even "benevolences." All told, it took the English Civil War and the Glorious Revolution of 1688 to finally and conclusively establish that the representative legislature—and the representative legislature *alone*—had the authority to levy taxes on the people. *See* An Act Declaring the Rights and Liberties of the Subject, and Settling the Succession of the Crown (Bill of Rights), 1689, 1 W. & M., Sess. 2, c. 2, § 4.

This principle—neatly summarized by the American colonists (who had no voice in Parliament) as "no taxation without representation"—played a decisive role not only in the Revolution, but also in the framing of the Constitution. As James Madison observed in Federalist 58, Parliament's claim to exclusive legislative authority was rightly understood as a stroke of constitutional genius: it was only by

29

taking plenary control over "the supplies requisite for the support of government" that "an infant and humble representation of the people" in English Parliament had been able to triumph over the "overgrown prerogatives" of the British monarchy. The Federalist No. 58 (James Madison).

Article I of the Constitution therefore closely followed the English formula, providing that "[a]ll legislative Powers herein granted"—including the power "to lay and collect Taxes, Duties, Imposes, and Excises"—"shall be vested in a Congress of the United States" and nowhere else. U.S. Const. art. I, § 8, cl. 1. The same is true regarding the power to spend. Article I commands that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. Thus, "the erstwhile prerogative powers to tax, borrow, and spend were denied to the executive and instead vested in Congress. Congress thus not only controls how much revenue to raise and how, but what to spend it on, and under what conditions." MICHAEL W. MCCONNELL, THE PRESIDENT WHO WOULD NOT BE KING 103 (2020); *see also Hart v. United States*, 16 Ct. Cl. 459, 484 (1880), *aff'd*, 118 U.S. 62 (1886) ("[A]bsolute control of the moneys of the United States is in Congress.").

The benefits of this arrangement are significant. As Chief Justice Marshall observed, an "unlimited power to tax" is "a power to destroy." *M'Culloch v. Maryland*, 4 Wheat. 428, 432 (1819). The need for representative accountability is therefore at its highest when it comes to taxing and spending, which is why the framers ensured that "the legislative department alone has access to the pockets of the people." The Federalist No. 48 (James Madison). And accessing the pockets of the people is hard

by design. To legislate a tax, Congress must act through "Laws of the United States," in accordance with a "finely wrought" constitutional procedure. *INS v. Chadha*, 462 U.S. 919, 951 (1983).

"[B]y directing that legislating be done only by elected representatives in a public process, the Constitution sought to ensure that the lines of accountability would be clear: The sovereign people would know, without ambiguity, whom to hold accountable for the laws they would have to follow." *Gundy v. United States*, 139 S. Ct. 2116, 2134 (2019) (Gorsuch, J., dissenting, joined by Roberts, C.J., and Thomas, J.). Giving Congress the power of the purse also ensures that Congress—like Parliament of old—can serve as an effective check on the executive. In Madison's typically striking phrase, control over the purse strings is "the most complete and effectual weapon with which any constitution can arm the immediate representatives of the people." The Federalist No. 58 (James Madison).

Thus, as Supreme Court has long held, Congress may not "delegate ... powers which are strictly and exclusively legislative." *Wayman v. Southard*, 10 Wheat. 1, 42-43 (1825). And both text and constitutional history show that no powers are more strictly and exclusively legislative than the Article I power to lay and collect taxes; as the Supreme Court has explained, Article I's "text permits no delegation of those powers." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001).

For over two centuries Congress largely complied with this constitutional procedure. It enacted detailed taxes, provided mechanisms for the collection of taxes, and appropriated funds from the Treasury on an annual basis, through "Laws of the

United States." But in recent years, "the general assumption that Congress will jealously guard the powers of the purse as its ultimate means of checking and balancing the executive has become open to serious doubt." DeMuth, Sr. & Greve, *Agency Finance in the Age of Executive Government*, 24 GEO. MASON L. REV. at 566. "Congress has increasingly empowered agencies to calculate and impose outright taxes—charges unrelated to any service provided—and to exercise wide discretion in how the revenues are spent." *Id.* at 563. The delegation at issue in this case is a stark example of this recent trend toward an unaccountable, self-funding executive.

## B.   The Universal Service Fund's Illegality

In 47 U.S.C. §§ 254(c) and (d), Congress delegated its taxing power to the Commission to raise unlimited funds from telecommunication carriers to subsidize the Universal Service Fund, a multi-billion-dollar slush fund putatively for providing expanded telecommunications services to underserved communities. As the name expressly indicates, the goal of Universal Service is to provide service universally to the benefit of the general public.

Congress placed no formula or limitations on the amount or rate that the Commission can raise for the Universal Service Fund, and placed only the most generic limitations on how the money can be spent, even allowing the Commission itself to define what "universal service" means. *See* 47 U.S.C. §§ 254(c) and (d). Telecommunications carriers then pass along these costs to consumers, who foot the bill for these agency-created taxes designed to benefit the general public through expanded services. 47 C.F.R. § 54.712(a).

The Commission has re-delegated this taxing and spending power to a private, Delaware-registered company, USAC, which is run by members of industry interest groups and decides how much money to raise each year and how to spend it, with no meaningful oversight by the Commission. 47 C.F.R. § 54.701; *see Incomnet*, 463 F.3d at 1066-67 (describing USAC's powers and its effective independence from the Commission).

"Unlike the thousands of responsibilities carried out by governmental agencies on behalf of Congress, this delegation is unique because of the unfettered power given to the Commission in defining the scope of universal service, and because Congress delegated the power to levy a tax to pay for the service with no limits, knowing that the end user, the American public, would ultimately be saddled with the burden." Cherry & Nystrom, *Universal Service Contributions: An Unconstitutional Delegation of Taxing Power*, 2000 L. REV. MICH. ST. U. DET. C.L. at 110.

This framework results in numerous constitutional and statutory violations.

### 1.    Nondelegation Of Legislative Power

The universal service scheme violates both the original understanding of nondelegation and the more modern caselaw requiring a so-called intelligible principle.

The original understanding prohibited any transfer of Congress's vested legislative powers to any other entity. *See Gundy*, 139 S. Ct. at 2135-37 (Gorsuch, J., dissenting, joined by Roberts, C.J., and Thomas, J.). This meant that Congress must "make[] the policy decisions when regulating private conduct," but Congress could

still "authorize another branch to 'fill up the details'" or "make the application of that rule depend on executive fact-finding." *Id.*; *see also Paul v. United States*, 140 S. Ct. 342, 342 (2019) (Kavanaugh, J., statement respecting the denial of certiorari) ("[M]ajor national policy decisions must be made by Congress and the President in the legislative process, not delegated by Congress to the Executive Branch.").

Section 254 undoubtedly fails this properly understood test of nondelegation. Rather than make policy choices itself, Congress—via Section 254—intentionally "'delegate[d] difficult policy choices to the Commission's discretion.'" *Tex. Off. of Pub. Util. Couns. v. F.C.C.*, 265 F.3d 313, 321 (5th Cir. 2001). Although spending is ostensibly limited to projects that improve "universal service," Congress defined this goal using only the most generic terminology and then allowed the Commission to redefine "universal service" for itself as often as the Commission wishes. 47 U.S.C. § 254(c)(1). The Commission does far more than merely "fill up the details"—the Commission creates the entire scheme, defines the terms, raises the money, and then spends it, all based on what the Commission believes to be the most prudent course of achieving its policy goals. This violates the Framers' understanding "that it would frustrate 'the system of government ordained by the Constitution' if Congress could merely announce vague aspirations and then assign others the responsibility of adopting legislation to realize its goals." *Gundy*, 139 S. Ct. at 2133 (Gorsuch, J., dissenting, joined by Roberts, C.J. and Thomas, J.).

The Commission's unfettered power under Section 254 runs afoul even of the more-lenient modern interpretations of the nondelegation doctrine, which broadly

permit an agency to undertake legislative action as long as Congress provided an "intelligent principle." *See Gundy*, 139 S. Ct. at 2139 (Gorsuch, J., dissenting, joined by Roberts, C.J. and Thomas, J.) (noting that "[t]his mutated version of the 'intelligible principle' remark has no basis in the original meaning of the Constitution, in history, or even in the decision from which it was plucked"). By providing no meaningful formulas or limits on how much money the Commission can raise or what the Commission can spend the money on, Congress failed to provide a meaningful intelligible principle to guide the Commission's policy choices involving billions of dollars.

To be sure, the Commission theoretically is limited to raising and spending revenue for "universal service," but that definition is intentionally so broad (indeed, "universal") as to serve as no limit at all. The definition is little more than a list of platitudes that restate "universal service" in different words and—critically—allow the Commission to redefine those principles and include anything it considers relevant, ensuring that all policymaking is done by the Commission: "Quality service should be available at just, reasonable, and affordable rates"; "Access to advanced telecommunications and information services should be provided in all regions of the Nation"; "Consumers in all regions of the Nation … should have access to telecommunications and information services, including interexchange services and advanced telecommunications and information services, that are reasonably comparable to those services provided in urban areas and that are available at rates that are reasonably comparable to rates charged for similar services in urban areas":

and, of course, "Such other principles as the Joint Board and the Commission determine are necessary and appropriate for the protection of the public interest, convenience, and necessity and are consistent with this chapter." 47 U.S.C. § 254(b).

Indeed, even if these "vague aspirations," *Gundy*, 139 S. Ct. at 2133, were an intelligible principle, the statute still violates the Constitution because Congress lets the Commission itself redefine "universal service" as often as it chooses, 47 U.S.C. § 254(c)(1), meaning Congress allows the Commission to change the scope of Congress's delegated power. That is certainly illegal. An improper delegation of power from Congress to an executive agency cannot survive merely on the hope that the agency will restrain itself within the nearly limitless power granted by Congress. *See Whitman*, 531 U.S. at 473 ("The idea that an agency can cure an unconstitutionally standardless delegation of power by declining to exercise some of that power seems to us internally contradictory."). And, relatedly, as Judge Ho stated in his dissent from rehearing en banc in *Texas v. Rettig*, 993 F.3d 408 (5th Cir. 2021), the notion that an improper delegation could be saved by the possibility that Congress might "claw back its delegated power" would "render the nondelegation doctrine a dead letter. We might as well say that Congress can never violate the nondelegation doctrine, because the American people can always petition Congress to pass a new law and claw back its lawmaking power from an agency." *Id.* at 416-17 (Ho, J., dissenting from denial of rehearing en banc, joined by Jones, Smith, Elrod, and Duncan, JJ.).

In sum, the Commission has nearly unlimited authority to self-fund tens of billions of dollars' worth of its own policy objectives, in perpetuity, with the unilateral power to re-define the scope of those objectives. The Founders "separated powers within the Federal Government: The legislative power went to Congress; the executive to the president; and the judicial to the courts. That is the equilibrium the Constitution demands. And when one branch impermissibly delegates its powers to another, that balance is broken." *Tiger Lily, LLC v. U.S. Dep't of Hous. & Urb. Dev.*, 5 F.4th 666, 673 (6th Cir. 2021) (Thapar, J., concurring). The uniquely broad delegation at issue here upsets that balance—and violates the nondelegation doctrine—under any test.

Finally, if all this weren't bad enough, the Commission is a so-called "independent agency," meaning its leaders are also putatively insulated from Executive control via limitations on their removal. *See, e.g., Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2212 (2020) (Thomas, J., concurring in part and dissenting in part) ("Because independent agencies wield substantial power with no accountability to either the President or the people, they 'pose a significant threat to individual liberty and to the constitutional system of separation of powers and checks and balances.'" (quoting *PHH Corp. v. CFPB*, 881 F.3d 75, 164-65 (D.C. Cir. 2018) (Kavanaugh, J., dissenting)). *Cf. Seila Law LLC*, 140 S. Ct. at 2204 (Maj. Op.) ("The CFPB's receipt of funds outside the appropriations process further aggravates the agency's threat to Presidential control."). This means that the egregious transfer of power from the Legislature to the Executive cannot even be defended on the (admittedly

unpersuasive) ground that at least *some* political branch oversees this administrative legislature.

### 2.    Nondelegation Of Taxing Power

Congress's issuance of such limitless power to the democratically unaccountable Commission is all the worse because it involves the power to raise (and spend) *taxes*, meaning the Commission quite literally has a blank check to self-fund its policy goals through its vision for "an evolving level of telecommunications services that the Commission" itself "shall establish."

This delegation of taxing power is unconstitutional. As noted above, "[t]axation is a legislative function, and Congress … is the sole organ for levying taxes." *NCTA*, 415 U.S. at 340. More than any other power, the taxing power is uniquely legislative and nondelegable, as discussed above. Indeed, the Constitution's Origination Clause, which requires the House of Representatives to originate all taxing bills, prohibits the House even from delegating certain taxing power to the Senate—rendering it unthinkable that such power could be delegated to an Executive agency. U.S. Const. art. I, § 7, cl. 1.

### i.    As A Matter Of Law, Universal Service Fund Charges Are Taxes Under Supreme Court Precedent.

The funds raised for the Universal Service Fund are indeed taxes. As the Supreme Court has held, whether an assessment is a "tax" (as opposed to a "fee") for constitutional purposes depends not on the label, but on how the money is used. A "fee" is where the party paying the agency receives in exchange, as "incident to a voluntary act," a "benefit not shared by other members of society," such as an

application processing charge. *NCTA*, 415 U.S. at 340-41. But it is a "tax" where "some of the administrative costs at issue inure[] to the benefit of the public." *Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 214 (1989).

The relevant statutes confirm that the Universal Service Fund assessments are undoubtedly used to provide a benefit for the public—i.e., shared by other members of society beyond those who paid into the Fund. The goal of providing such benefits universally is literally in its name. And the funds are raised in order to provide infrastructure for telecommunications services to extensive groups of individuals regardless of whether or how much they pay into the Fund: "[c]onsumers in all regions of the Nation, including low-income consumers and those in rural, insular, and high cost areas"; "any public or nonprofit health care provider that serves persons who reside in rural areas"; and "elementary schools, secondary schools, and libraries for educational purposes." 47 U.S.C. §§ 254(b)(3), (h)(1). The general purpose is also reflected by the sheer dollar values involved. The Universal Service Fund charges nearly $10 billion a year—certainly nothing like the "incident[al]" fees that the Supreme Court has authorized executive agencies to collect from applicants without concerns about agencies imposing and collecting taxes. *NCTA*, 415 U.S. at 340-41.

Given all this, there can be no doubt that these charges are "taxes" imposed by the Commission.

###### ii.    Expert Economic Analysis Confirms That Universal Service Fund Charges Are Taxes.

Even if the relevant statutes and caselaw did not settle the matter, economic experts recognize that the Universal Service Fund—in its real-world application—has all the economic hallmarks of a tax, not a fee. *See* Expert Report of Dr. George Ford (attached as Exhibit A). As Dr. George Ford—a former FCC economist with a Ph.D. in Economics and decades of experience in the telecommunications industry—explains in his attached report, economics can be used to identify whether a particular levy has the characteristics of a tax, or of a fee.

Dr. Ford identifies two economic conditions that "permit one to distinguish between a tax and a fee." *Id.* at 5. First, to qualify as a "fee," "the payer of the levy must be the primary, if not the exclusive, beneficiary of the services justifying the levy. The more the benefits of the government expenditures advantage the public, the less the levy has the character of a fee." *Id.* And second, "economists would characterize a 'fee' by saying that, on average at least, there should be a positive increasing relationship (or a 'monotonic' relationship) between payer liability and the benefits the payer expects from the program(s) the fee is designed to support." *Id.* In other words, the more someone pays, the more he gets back in exchange. A prototypical example of a "fee" is the charge for obtaining a passport: applicants can pay a higher charge and receive more benefits (e.g., expedited processing), and the revenues from these fees "offset the cost of processing a passport (at least, in part), the benefits of which are 'not shared by other members of society.'" *Id.*

40

But taxes share neither of these characteristics. A tax "is a compulsory contribution to the state for services rendered by the state for the general benefit of its people," not uniquely for the person who paid. *Id.* at 4-5. And taxes do not have positive monotonicity, either: "a tax has no particular relationship between payer liability and the benefits the payer expects from that liability. For example, tax dollars used to fund food stamps levy taxes on higher income Americans that do not qualify for food stamps, to the benefit of lower-income Americans that often pay no income tax at all." *Id.* at 5.

This economic distinction is the same that appears in the Supreme Court's caselaw, which asks whether the payor receives some unique benefit not shared by other members of the public. *Id.*; *see NCTA*, 415 U.S. at 340-41; *Skinner*, 490 U.S. at 214.

Dr. Ford confirms that Universal Service Fund levies satisfy neither of the requirements of a fee—and instead have all the hallmarks of a tax. Carriers pay into the Fund, but the benefits of the Fund do not accrue exclusively to those same carriers. Nor is there a monotonically positive relationship between contributions and benefits.

Most significantly, most of the money spent by the Universal Service Fund is used for "a galaxy of policy concerns with no obvious connection to carrier liabilities." Expert Report of George S. Ford at 8-9. Substantial sums of money go to projects "to support digital learning in schools and robust connectivity for all libraries" and "to improve the quality of health care available to patients in rural communities." *Id.* at

41

9. "These are broad social goals that benefit the public, not the telecommunications providers that support the program by paying levies. For these programs, there is no linkage between liabilities and benefits; the benefits are for the public at large." *Id.* And this aspect "is not limited to these programs," as the "Commission's stated goal of the USF Program broadly is to promote 'economic growth, jobs and opportunities.' Such concerns are not benefits to telecommunications providers but to the public at large." *Id.*

This focus on the general public, rather than on providing a distinct service in return to the payor in exchange for the payment, is a hallmark of a tax. *Id.* at 5; *NCTA*, 415 U.S. at 340-41; *Skinner*, 490 U.S. at 214.

Moreover, far from receiving benefits in exchange for levies they pay to the Universal Service Fund, many carriers are actually *harmed* in exchange. Because the charges increase the price of phone service, they encourage people to switch to communication services that do not have to pay into the Fund, thereby "reducing the demand for interstate and international calling." Expert Report of Dr. George S. Ford at 8. Thus, "[t]hose liable for USF contributions are harmed." *Id.* This can never be true of a fee—i.e., that the person paying actually gets harmed in exchange for paying. Only a tax works that way.

To be sure, some carriers do receive some benefits from the Universal Service Fund in the form of subsidies paid out by USAC. But even here, the necessary positive monotonic relationship is missing. The "companies that contribute large sums to the program receive few benefits, and companies that contribute little to the fund receive

large benefits." *Id.* at 8 (demonstrating this point with data from numerous carriers). Again, this is a classic characteristic of a tax: the payor may get zero or minimal benefits despite a large contribution, or the payor may get a tremendous benefit despite a small contribution. *Id.* at 5.

The Commission may claim there is a benefit to carriers in the form of the so-called "network effect," where a network may be (but is not necessarily) marginally more valuable as more users join it. *Id.* at 6-7. The network effect "may have been important at the turn of [the] 20th century when telecommunications networks were not always interconnected," as phone companies back then could charge users more money for access to a proprietary network that had the most other users. *Id.* at 6. But "[t]oday, network effects are likely to be small if not zero." *Id.* Networks today are almost always interconnected, meaning that a carrier's ability to offer a large network is not a valuable characteristic: a consumer with Verizon can interconnect with a consumer with any other phone service (and *vice versa*), regardless of the fact that Verizon has a large network and the other carrier may have a very small network.

Further, even if network effects were theoretically a viable benefit, payments to the Universal Service Fund have not *actually* yielded a network effect. Despite the seeming importance of the question, the Commission "has made no attempt to quantify the presence or magnitude of network effects as a benefit to telecommunications providers"—and thus has no evidence it could use to support such a claim, either in response to this Comment or in a subsequent judicial proceeding. *Id.* at 7. In fact, "[a]cademic research suggests that the USF Programs

43

have done little, if anything, to increase the adoption of telecommunications services beyond" what would have happened anyway. *Id.* Nor will Universal Service charges yield network effects in the future. Today, 97% of American adults have a cell phone, and at least 95% would have a cellphone even absent subsidies from the Universal Service Fund, meaning that only the most minimal additional increases in network size are even possible with more subsidies—and the network effect of such a small increase in subscribership to a network that is nearly universally adopted is "presumably very small or possibly zero." *Id.*

Finally, even if network effect benefits did exist, there still is no monotonic relationship with Universal Service Fund contributions—thereby further demonstrating that the charges are taxes. A carrier can pay more and more into the Fund, but may receive no benefit at all, let alone a benefit greater than that received by a carrier that pays very little. *Id.*

The Universal Service Fund charges are a tax from consumers' perspective, as well. Many consumers pay money into the Fund (collected by their carriers), yet almost none of them receive, in exchange, a benefit unique to them. *NCTA*, 415 U.S. at 340-41; *Skinner*, 490 U.S. at 214. As discussed above, most of the money goes to broad public welfare programs. To be sure, some of those subsidies end up benefitting consumers who paid money for the Universal Service Fund, but there is no positive relationship between what someone paid and what he gets, meaning there is a lack of positive monotonicity. Again, these are the tell-tale signs of a tax under both the law and economic theory.

44

### iii.    Congress Placed No Meaningful Limits On This Agency Tax.

For all these reasons, the Universal Service charge is a tax imposed by an executive agency, in violation of the Constitution's strict assignment of that power to Congress. Even if Congress could delegate such power to an agency like the Commission, Congress must impose meaningful limitations like how much money the Commission could collect, or rates or formulas to use. But Congress did none of this here—making it a far cry from the regime upheld in *Skinner*, which involved a congressionally imposed ceiling rate. *See Skinner*, 490 U.S. at 214 ("[T]he Secretary has no discretion whatsoever to expand the budget for administering the Pipeline Safety Acts because the ceiling on aggregate fees that may be collected in any fiscal year is set at 105 percent of the aggregate appropriations made by Congress for that fiscal year.").

To be sure, as discussed above, the Commission theoretically is limited to raising and spending these taxes for "universal service," but that definition is intentionally so broad as to serve as no limit at all. And, in any event, the Commission can choose to change the scope of its own delegated power, as Congress chose to let the Commission redefine "universal service" as often as it chooses. 47 U.S.C. § 254(c)(1). An illegal delegation of power from Congress to an executive agency cannot survive merely on the hope that the agency will restrain itself within the nearly limitless power granted by Congress. *See Whitman*, 531 U.S. at 473 ("The idea that an agency can cure an unconstitutional standardless delegation of power by declining to exercise some of that power seems to us internally contradictory."); *see*

*also Rettig*, 993 F.3d at 416-17 (Ho, J., dissenting from denial of rehearing en banc, joined by Jones, Smith, Elrod, and Duncan, JJ.).

For all these reasons, the Universal Service Fund violates Article I, section 8 of the Constitution—which prohibits Congress from delegating its taxing power to any other entity.

### 3.    Private Nondelegation

To top it off, "this case involves a delegation of lawmaking power, not to another governmental entity, but to private bodies wholly unaccountable to the citizenry." *Rettig*, 993 F.3d at 410 (Ho, J., dissenting from denial of rehearing en banc, joined by Jones, Smith, Elrod, and Duncan, JJ.). The Commission's re-delegation of these enormous powers to USAC—a private company registered in Delaware and run by self-acknowledged representatives of industry interest groups—is without precedent. This private company has the power of a full-fledged sovereign: it can decide how much money to raise, force the collection of that money under penalty of law, and then decide precisely how to spend the money. The Commission, meanwhile, has essentially no power over this process, as the Ninth Circuit has held. *Incomnet*, 463 F.3d at 1074.

It is unclear what statutory authority the Commission relies upon for the power to delegate such important work to a private company. To the extent Congress permitted this, it "is delegation running riot." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 553 (1935). Delegation to "private persons" is "legislative delegation in its most obnoxious form," *Carter v. Carter Coal Co.*, 298 U.S. 238, 311

(1936), because "it is not even delegation to an official or an official body, presumptively disinterested, but to private persons whose interests may be and often are adverse to the interests of others in the same business." *Id.* In such cases, "there is not even a fig leaf of constitutional justification." *Dep't of Transp. v. Ass'n of Am. R.Rs.*, 575 U.S. 43, 62 (2015) (Alito, J., concurring). "Private entities are not vested with 'legislative Powers.' Nor are they vested with the 'executive Power,' which belongs to the President." *Id.* (citations omitted).

Nor can the Commission claim that USAC is merely some advisor. USAC does not simply hold funds in the Universal Service Fund as the Commission's agent. *Incomnet*, 463 F.3d at 1074 (citing 47 C.F.R. § 54.715(c)). The Commission exercises power over the fund only indirectly, essentially by overseeing USAC (not that the Commission ever actually does this). *Id.* The Commission has no ability to control the funds in the Universal Service Fund through direct seizure or discretionary spending. *Id.* USAC devises the figures that the Commission then ministerially uses to calculate the quarterly rate charged to carriers, and it does not appear that the Commission has ever rejected USAC's proposals. 47 C.F.R. § 54.709(a). As the Fifth Circuit has long held, when an agency delegates a statutory duty, the agency may not "reflexively rubber stamp[]" action prepared by a private entity but instead must "independently perform its reviewing, analytical and judgmental function and participate actively and significantly in the preparation and drafting process." *Sierra Club v. Lynn*, 502 F.2d 43, 59 (5th Cir. 1974). If the Commission allows the Contribution Factor to

become effective through inaction, as it has always done in the past, it would violate this core requirement of constitutional oversight.

Indeed, the Commission's latent authority (apparently never exercised) to reject USAC's proposals cannot cure the illegality of delegating such power to a private entity. "If all it reserves for itself is 'the extreme remedy of totally terminating the [delegation agreement],' an agency abdicates its 'final reviewing authority.'" *Fund for Animals v. Kempthorne*, 538 F.3d 124, 133 (2d Cir. 2008) (citation omitted). Stated another way, it is of course true that "any agency can always claw back its delegated power by issuing a new rule. But that would render the nondelegation doctrine a dead letter" because an agency can always "claw back" the power it delegated to a private entity. *Rettig*, 993 F.3d at 416-17 (Ho, J., dissenting from denial of rehearing en banc, joined by Jones, Smith, Elrod, and Duncan, JJ.). USAC's authority over the entire Universal Service Fund is therefore a far cry from cases where courts have allowed agencies to "employ private entities for *ministerial or advisory roles*," as distinguished from the prohibited act of giving private entities "governmental power over others" like USAC undoubtedly possesses here. *Pittston Co. v. United States*, 368 F.3d 385, 395 (4th Cir. 2004) (citing *United States v. Frame*, 885 F.2d 1119, 1129 (3d Cir. 1989)).

For these reasons, if Congress permitted the Commission to re-delegate the powers to legislate by raising and spend revenues, or the power to impose and collect taxes, then Congress violated the private nondelegation doctrine for both legislation and taxation, contrary to Article I, sections 1 and 8 of the U.S. Constitution.

Alternatively, to the extent Congress did *not* permit the Commission to re-delegate (or de facto re-delegate) such authority to USAC, the Commission has acted in excess of its statutory authority in doing so, and therefore USAC's actions are all illegal and void.

### 4.    Appointments Clause

Moreover, if USAC is determined to be some form of public entity (despite its private nature), its board directors have been unconstitutionally appointed. They would be officers of the United States, given their extensive powers and discretion. *See Edmond v. United States*, 520 U.S. 651, 661 (1997); Jennifer L. Mascott, *Who Are "Officers of the United States?"*, 70 STAN. L. REV. 443, 454 (2018) ("Officials likely falling within the original public meaning of 'officer' include, among others: (i) officials overseeing federal disaster relief preparations; (ii) tax collectors; (iii) officials authorizing federal benefits payments…."). All officers of the United States must be nominated by the President and confirmed by the Senate, except Congress can expressly authorize inferior officers to be appointed by "the President alone," by "the Courts of Law," or by "the Heads of Departments." U.S. Const. art. II, § 2, cl. 2.

To the extent Congress permitted the Commission Chair to appoint USAC board directors, Congress violated the Appointments Clause. The Chair is not the "President, a Court of Law, or a Head of Department"—indeed, only the "full Commission" is a Head of Department. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 511-12 (2010). Accordingly, if USAC is a non-private entity, Congress could not authorize the Commission Chair alone to appoint USAC board

49

directors, who therefore are subject to the default rule of Presidential nomination and Senate confirmation. That did not happen. This means USAC directors' appointments are invalid under the Appointments Clause, regardless of whether they are principal officers or inferior officers. And USAC's actions are illegal and void.

Alternatively, to the extent Congress did *not* statutorily permit the Commission Chair to appoint USAC board directors, the Commission has acted in excess of its statutory authority in doing so, meaning those directors are invalidly appointed, and USAC's actions are illegal and void.

### 5.   Administrative Procedure And Federal Register Acts

In a final insult to transparency and the democratic process, the Commission has not complied with the Administrative Procedure Act's requirements for issuing binding legislative rules. The APA establishes the procedures federal administrative agencies use for "rule making," defined as the process of "formulating, amending, or repealing a rule." 5 U.S.C. § 551(5). "Rule," in turn, is defined broadly to include "statement[s] of general or particular applicability and future effect" that are designed to "implement, interpret, or prescribe law or policy." § 551(4). The *Proposed First Quarter 2022 Universal Service Contribution Factor* is a rule (at least upon its becoming effective after 14 days) because it has future effect and general applicability—indeed, by its very terms, it has nearly "universal" applicability and involves billions of dollars in forced contributions.

But the Commission has not followed the three-step procedure for notice-and-comment rulemaking: (1) "the agency must issue a general notice of proposed rule

making, ordinarily by publication in the Federal Register"; (2) if "notice is required, the agency must give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments," and the "agency must consider and respond to significant comments received during the period for public comment"; (3) "when the agency promulgates the final rule, it must include in the rule's text a concise general statement of its basis and purpose." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 95-96 (2015) (internal quotation marks, brackets, and citations omitted).

The Commission has performed none of these steps for the *Proposed First Quarter 2022 Universal Service Contribution Factor*, nor did the Commission find that any limited exception applies. *See* 5 U.S.C. § 553(b)(A)-(B).

First, there has been no Federal Register notice.

Second, the Commission has not formally opened the process to public comment. Commenters are filing this particular Comment with the Commission despite the lack of any dedicated docket or invitation to do so. Presumably the Commission will not respond to "significant comments" such as this one before the 14-day "deemed approved" period passes. OMD refused to respond to the comment that Commenters filed with the FCC on November 14, 2021.

Third, the Commission's decision to establish such a shortened review process does not excuse the Commission from issuing a reasoned decision for its action, *see, e.g.*, *Wollschlager v. Fed. Deposit Ins. Corp.*, 992 F.3d 574, 580-81 (6th Cir. 2021) (Sutton, J.), although it presumably will not comply with this requirement, either, as

the Commission has apparently never done so for prior quarterly reviews. Indeed, under *S.E.C. v. Chenery Corp.*, 318 U.S. 80 (1943), the Commission can defend its action in court only on those grounds provided by the Commission itself in its administrative decision—which presumably will not exist here despite this Comment's attempt to trigger the Commission into complying with the basic safeguards of the APA. The Commission has no one to blame but itself for any difficulty in responding to comments in such a short period, given that it established this entire process, including the 14-day window and the "deemed approved" provision.

For all these reasons, the Commission has already violated the APA and will do so again if the Commission fails to reject the *Proposed First Quarter 2022 Universal Service Contribution Factor*.

Relatedly, because the Commission did not publish its proposal in the Federal Register, the Commission would also violate the Federal Register Act if the Commission fails to reject the Proposed Factor. *See* 44 U.S.C. § 1505. And the Commission presumably will violate the Federal Register Act again by failing to publish the Proposed Factor after the expiration of the 14-day "deemed approved" period (assuming the Commission did not issue its own order on the matter, which itself would then need to be published in the Federal Register). *Id.*

\* \* \*

From start to finish, it seems every aspect of the Universal Service Fund is designed to be as obscure, unresponsive, and opaque as possible. Congress hides behind the Commission, which hides behind USAC operating through a silent

"deemed approved" process, which then hides behind carriers passing along the levies to customers. Any customer who wishes to challenge this universal tax would not know where to start. The carrier? USAC? The Commission? Congress? Each would blame the other—precisely as is intended, to ensure that this scheme continues as long as possible without any kind of oversight. "Congress passes problems to the executive branch and then engages in finger-pointing for any problems that might result. The bureaucracy triumphs—while democracy suffers." *Rettig*, 993 F.3d at 409 (Ho, J., dissenting from denial of rehearing en banc, joined by Jones, Smith, Elrod, and Duncan, JJ.) (alterations and citations omitted).

One struggles to find analogous exercises of unaccountable authority even in the reigns of the prerogative-wielding Stuart kings of the 17th century. But the label of these forced payments as "contributions" to the executive, 47 U.S.C. § 254(d), is reminiscent of the abusive history of English "benevolences," where the King would demand "voluntary" payments from subjects under the euphemistic title of "loving contributions," enforced by penalty of imprisonment. *See* "Benevolence," 3 ENCYCLOPEDIA BRITANNICA 728 (1911), *available at* https://en.wikisource.org/wiki/Page%3AEB1911_-_Volume_03.djvu/748.

If Congress believes these programs are worthy of funding, it should have to endure the public scrutiny and beneficial debate of raising money and proposing an appropriation for them. Congress cannot short-circuit the critical legislative process by allowing an independent agency (really, a private company registered in Delaware) to raise and spend however much money it wants, at consumers' expense.

The Universal Service Fund is a paradigmatic example of the runaway and unresponsive government that the Constitution was designed to prevent.

If allowed to stand, Congress's off-boarding of general revenue-raising to agencies (and the agencies' subsequent off-boarding to private companies) would only encourage imitation. Billions or even trillions of dollars could be raised every year by agencies and private companies under penalty of law, limited only by their imaginations and utterly standardless congressional "guidelines." Congress could even transfer its taxation authority entirely to agencies, who then transfer it entirely to private companies. It would be a politician's dream: faux-balanced budgets with faux-low taxes, but with all social welfare programs still funded and flush with subsidies and waste. The people paying these taxes would have no recourse to change the system, which is ultimately run by a board of private individuals who can never be defeated at the ballot box—or are even appointed by someone who can. "By shifting responsibility to a less accountable branch, Congress protects itself from political censure—and deprives the people of the say the framers intended them to have." *Tiger Lily*, 5 F.4th at 675 (Thapar, J., concurring).

## IV. CONCLUSION

In sum, there are numerous legal infirmities in the Universal Service Fund and its mechanisms, which the Commission should not countenance by allowing further collections via the *Proposed First Quarter 2022 Universal Service Contribution Factor*. Specifically, and as noted throughout already, the collections under this proposal would be illegal for at least eight reasons:

*First*, regardless of whether the revenues raised for the Universal Service Fund pursuant to 47 U.S.C. § 254 are considered "taxes," Congress's delegation to the Commission of the legislative authority to raise and spend nearly unlimited money violates Article I, section 1, of the U.S. Constitution under both the original understanding of constitutional separation of powers and also the more-recent prohibition on delegations that lack a sufficient "intelligible principle" to guide the Commission's actions in defining "universal service" or in raising and spending revenue, especially given the Commission's power to redefine the scope of universal service. *See Gundy*, 139 S. Ct. at 2133, 2141 (Gorsuch, J., dissenting, joined by Roberts, C.J., and Thomas, J.).

*Second*, to the extent Congress permitted the Commission to re-delegate (or de facto re-delegate) to a private company the authority to raise and spend nearly unlimited money for Commission-defined "universal service," Congress performed an unconstitutional delegation of Congress's legislative power to a private entity in contravention of the United States Constitution, Article I, section 1. *See also Whitman*, 531 U.S. at 473 ("The idea that an agency can cure an unconstitutionally standardless delegation of power by declining to exercise some of that power seems to us internally contradictory.").

*Third*, the revenues raised for the Universal Service Fund pursuant to 47 U.S.C. § 254 are not just revenue but in fact are taxes and therefore Congress's delegation to the Commission of authority to raise and spend nearly unlimited taxes for Commission-defined "universal service" violates Article I, section 8, of the U.S.

Constitution, which gives Congress the sole "power to lay and collect taxes." U.S. Const. art. I, § 8. Even if Congress is permitted to delegate its taxing authority, it should be allowed to do so only pursuant to a detailed delegation that contains formulas or limits on the rate or total revenue that can be collected, *Gundy*, 139 S. Ct. at 2133, 2136, 2144 (Gorsuch, J., dissenting, joined by Roberts, C.J., and Thomas, J.)—which Congress did not do here.

*Fourth*, to the extent Congress permitted the Commission to re-delegate (or de facto re-delegate) to a private company the authority to raise and spend nearly unlimited taxes for Commission-defined "universal service," Congress performed an unconstitutional delegation, to a private entity, of Congress's authority to raise taxes, in violation of Article I, section 8, of the U.S. Constitution, which gives Congress the sole "power to lay and collect taxes." U.S. Const. art. I, § 8.

*Fifth*, to the extent Congress did *not* to permit the Commission to delegate to a private company the authority to raise and spend nearly unlimited money for Commission-defined "universal service," the Commission's subsequent re-delegation to USAC is beyond the Commission's lawful statutory authority, regardless of whether the charges are deemed to be "taxes." *See also Whitman*, 531 U.S. at 473.

*Sixth*, if USAC is determined *not* to be a private entity, and to the extent Congress permitted the Commission Chair to appoint USAC board directors, Congress violated the Appointments Clause. The Chair is not a "Head[] of Department[]"—only the "full Commission" is. *Free Enter. Fund*, 561 U.S. at 511-12.

The illegally constituted USAC effectively establishes the *Proposed First Quarter 2022 Universal Service Contribution Factor*. 47 C.F.R. § 54.709(a).

*Seventh*, to the extent Congress did *not* statutorily permit the Commission Chair to appoint USAC board directors, the Commission has acted in excess of its statutory authority in doing so.

*Eighth*, the Proposed Quarterly Universal Service Contribution factor is a binding legislative rule, but the Commission has not complied with the APA's requirements for rulemaking (such as a meaningful notice-and-comment period and a proper explanation of the agency's decision), nor with the Federal Register Act's requirements for publication. *Perez*, 575 U.S. at 95-96; 44 U.S.C. § 1505.

* * *

The Commission should reject the *Proposed First Quarter 2022 Universal Contribution Factor* and instead enter a factor of 0.000 (0%). The Commission should do the same for all future proposed Universal Service contribution factors due to the illegality of this entire scheme and process.

JA58

Dated:        December 21, 2021

**Submitted via ECFS**

Respectfully submitted,

/s/ R. Trent McCotter

C. Boyden Gray
Jonathan Berry
R. Trent McCotter
Michael Buschbacher
Jordan E. Smith
BOYDEN GRAY & ASSOCIATES
801 17th Street N.W.
Suite 350
Washington, DC 20006
(202) 706-5488
mccotter@boydengrayassociates.com

# EXHIBIT A

# REPORT OF DR. GEORGE S. FORD

# EXPERT REPORT OF DR. GEORGE S. FORD

**Professional Qualifications & Experience**

My name is George S. Ford. I am the President of Applied Economic Studies—an economic consulting firm. I hold a Ph.D. in Economics from Auburn University. After receiving a Ph.D. in Economics in 1994, I have worked as a professional economist in government, industry, the non-profit sector, and as a private consultant. In 1994, I became an economist in the Competition Division of the Federal Communications Commission, an organization located in the General Counsel's Office that provided legal and economic analysis to the many bureaus of the Commission. My work at the Commission covered a wide range of topics from multichannel video services, broadcasting policies, wireline and wireless telecommunications services, international policy, radio interference standards, and general financial, statistical, and econometric analysis. After my government tenure, I became an economist at MCI Communications, a large provider of local and long-distance telecommunications services to households and businesses, where my work focused on telecommunications regulation and policy at both the federal and state levels. I also conducted analysis of entry into new markets and merger and acquisition activity. In April 2000, I became the Chief Economist of Z-Tel Communications in Tampa, Florida, a small competitive telephone company. At Z-Tel, I performed regulatory and business analysis, overseeing a team that ensured the company's compliance with regulatory requirements and cost management. I also participated in the development of financial models for business plans and investments and represented the company as an expert in proceedings before state regulatory commissions and at the Federal Communications Commission. In the summer of 2004, I founded Applied Economic Studies, a private consulting firm.

I am also the Chief Economist of the Phoenix Center for Advanced Legal & Economic Policy Studies, a Washington, D.C. based 501(c)(3) research organization that specializes in the legal and economic analysis of public policy issues involving the communications, technology, and infrastructure industries. The Phoenix Center does not do consulting work, and the views expressed in this testimony do not represent the views of the Phoenix Center or its staff. For several years I served as an Adjunct Professor at Samford University where I taught Economics to graduate students.

My areas of specialty are the application of microeconomics and econometrics to industry and public policy with particular emphasis on the telecommunications industry. Over the years I have written many papers on a variety of topics, publishing over eighty papers in economic and law journals including the *Antitrust Bulletin*, the *Journal of Law & Economics*, *Energy Economics*, *Telecommunications Policy*, the *Journals of Gerontology*, *Empirical Economics*, the *Journal of Business*, the *Journal of Regulatory Economics*, the *Southern Economic Journal*, the *Quarterly Review of Economics and Finance*, the *Journal of Public Choice and Finance*, *Communications in Statistics*, the *Yale Journal on Regulation*, the *Federal Communications Law Journal*, and many others. My work has been cited in nearly 1,900 articles (according to Google Scholar). I have also published book chapters on telecommunications policy and financial econometrics. My curriculum vitae is attached.

**Assignment**

I was retained as an expert by Boyden Gray & Associates to provide my expert opinion as an economist on the question of whether levies on telecommunications providers by the Federal Communications Commission (FCC) for purposes of its Universal Service Fund Programs possess the characteristics of a "fee," or a "tax."

**Summary of Opinions**

In both law and economics, the difference between a "tax" and a "fee" goes to the question of whether the payer or the public benefits most from the levies. A "fee" bestows benefits on the payer not shared by other members of the public. A fee is paid for a business license or a passport. Contrariwise, a "tax" defrays the costs of programs that benefit the public, and the payer may receive no benefit at all. Today, the FCC uses the USF Program to subsidize schools to "promote digital learning," to subsidize rural health care providers "to improve the quality of health care," and subsidizes individuals and corporations to promote "economic growth" and "jobs." These are public benefits that offer no special benefit to the telecommunications providers whose revenues support such expenditures. It is my opinion, therefore and at the present time, that the collection of levies from telecommunications providers for some if not all USF Programs possess the characteristics of a "tax" rather than a "fee."

**Background: The USF Programs**

The Universal Service Fund Program (USF), authorized by Section 254 of the Telecommunications Act of 1996, directs the Federal Communications Commission (FCC) to implement policies that ensure that all regions of the Nation have access to advanced telecommunications and information services at just, reasonable, and affordable rates.[1] Congress provided the Commission wide discretion to determine both how to collect and spend the dollars necessary to support the program.

The USF Program existed prior to the Telecommunications Act of 1996. The program was then limited to subsidizing the deployment and maintenance of voice-grade services in high-cost rural areas and stimulating adoption by low-income Americans through subsidized, discounted services. The revenues required to support the subsidies were collected in a complex regulatory scheme including many implicit cross subsidies among telecommunications providers and their customers. After the passage of the Telecommunications Act of 1996, the FCC modernized the USF Program in several ways. First, at the direction of the 1996 Act, the Commission established two new subsidy programs: (1) the *Schools & Libraries Program* (or the *E-Rate Program*), which provided financial support to obtain discounted telecommunications and Internet services for schools and libraries; and (2) the *Rural Healthcare Program*, which provided financial support to rural health providers for telecommunications and Internet services. Second, in 2011, the Commission extended USF subsidy support to Internet services (or "broadband service") to those USF programs previously limited to voice-grade services.[2] These reforms, among other factors,

---

[1]     Prior to the 1996 Telecommunications Act, "universal service" was funded through a complex system of cross-subsidies among service providers. In the 1996 Act, Congress replaced the regulatory cross-subsidies with direct subsidies. The universal service program is administered for the FCC by the Universal Service Administrative Company (or USAC), a not-for-profit corporation (http://www.usac.org/).

[2]     Recipients of these subsidy dollars must also provide voice-grade services.

expanded the size of the USF Program as the FCC began pursuing broad, social goals beyond increasing telephone subscriptions. Between 1995 and 2005, the budget of the USF Program increased from $1.37 billion to $8.4 billion in 2019 dollars.[3]

In 2019, the USF Program redistributed $8.35 billion in subsidy dollars across four programs:[4]

(1) the *High-Cost Program* provides subsidies to providers serving high-cost, mostly rural areas;

(2) the *Lifeline Program* provides subsidies to providers offering monthly discounts to qualifying low-income consumers for voice and broadband services;

(3) the *Schools and Libraries Program* provides subsidies to eligible schools and libraries for telecommunications and Internet services; and

(4) the *Rural Health Care Program* that provides subsidies rural healthcare providers for providing telecommunications and Internet services.[5]

Funding levels for each program are summarized in Table 1. The largest program is the High-Cost Fund accounting for 61.6% of funding dollars with Schools & Libraries Program in second at 23.6% of funding.

| Table 1. USF Funding by Program (2019) | | |
|---|---|---|
| Program | Funding ('000) | Share |
| High-Cost | $5,146,679 | 61.6% |
| Schools & Libraries | $1,968,776 | 23.6% |
| Lifeline/Linkup | $982,005 | 11.8% |
| Rural Healthcare | $251,516 | 3.0% |
| Total | $8,348,976 | 100% |
| * Source: Table 1.9. Numbers may not sum due to rounding. | | |

Where do these billions in subsidies come from? The revenues required to support these four subsidy programs are collected using an ad valorem assessment (the "contribution factor") on the interstate and international revenues of nearly all telecommunications providers. In 2019, retail interstate and international revenues (the contribution base) equaled 9.2% of total industry revenues.[6] Providers are neither required nor prohibited from passing these costs onto their customers, though collections from consumers may not exceed the provider's contributions. Most providers directly pass these costs through to consumers as a line-item on their bills. In many respects, the providers serve as a collection agent of the government, in the same way a retail store collects sales taxes for state and local governments.[7]

---

[3]    *Universal Service Monitoring Reports*, Federal-State Joint Board on Universal Service (1996, 2020), (available at: https://www.fcc.gov/general/federal-state-joint-board-monitoring-reports). Nominal values are $1.4 billion and $6.5 billion. The Gross Domestic Product deflator is used for the conversion: https://fred.stlouisfed.org/series/USAGDPDEFAISMEI.

[4]    Is some years, the subsidy levels approached $10 billion. *Universal Service Monitoring Report*, Federal-State Joint Board on Universal Service (Sept. 2020), at Table 1.2 (available at: https://docs.fcc.gov/public/attachments/DOC-369262A1.pdf).

[5]    For a description of the programs, see https://www.fcc.gov/general/universal-service.

[6]    *Universal Service Monitoring Report* (2020), *supra* n. 3, at Tables 1.1 and 1.2.

[7]    Passing the contributions through to consumers as a line-item (or in the form of higher prices) does not imply that providers are unharmed by the levies. Higher levies increase costs, reduce quantity demanded, and thus reduce

With the rapid growth of Internet-based communications, the contribution base of voice-grade interstate and international service revenues materially declined but USF obligations rose. Between 2001 and 2019, the contribution base for the USF Program (interstate and international revenues) declined by 40% while the USF subsidies rose by 83%. Consequently, the contribution factor (the ad valorem levy) increased sharply. In 2001, the contribution factor averaged 6.8% while in 2021 the average assessment averaged 31.5%, a near five-fold increase.[8] The high assessment rate has furthered the decline in the contribution base by reducing demand for interstate and international voice services and incentivizing consumers and providers to find alternative modes of communication not subject to the levies. The declining contribution base, rising contribution factor, and high subsidy levels of the USF Program have led many analysts and policymakers to worry about the sustainability of the current program.[9]

**Distinguishing a Tax from a Fee**

Among other reasons, the increasing burden on the interstate and international voice services and the expanding scope of the USF Program have led to questions about whether the USF Program's levies constitute a "fee" or a "tax." In legal matters, it is often important to distinguish between different kinds of government levies, mainly because taxation is a legislative function.[10] In distinguishing between a "fee" and "tax," whether a legislature or government agency labels a particular levy a "fee" or a "tax" is largely immaterial.[11] Rather, it is the characteristics of the levy that determines its nature, and those characteristics may change over time when a government agency lacks clear legislative guidance, oversight, or constraint.

Definitions of "tax" and "fee" are common between law and economics. A tax, as defined by Pflen in the classic *Introduction to Public Finance*, is a compulsory contribution of wealth levied upon persons or corporations "to defray the expenses incurred in conferring a common benefit upon the residents of the State. A tax is justified, but not necessarily measured, by the common benefit conferred."[12] Similarly, Seligman defines a tax as a "compulsory contribution from a person to the government to defray the expenses incurred in the common interest of all."[13] Dalton defines a "tax" as "a compulsory contribution imposed by the public authority, irrespective of the exact amount of service rendered to the taxpayer in return."[14] A tax, therefore, is a

---

profits. Also, if the ad valorem levy leads providers to lower service prices (excluding the levy), the providers will bear some of the burden of the levies. But empirical evidence indicates that telecommunications consumers are price insensitive, implying the consumer will bear the bulk of the levies through higher gross prices (net prices plus the levy). Also, as time progresses and consumers and providers divert traffic away from the contribution base, what is left is consumers with few options and thus very inelastic demands. On tax incidence, *see, e.g.*, C.R. McConnell, S.L. Brue, and S.M. Flynn, ECONOMICS: PRINCIPLES, PROBLEMS, AND POLICIES (2015), at pp. 416-423.

[8]    Data available at: https://www.fcc.gov/general/contribution-factor-quarterly-filings-universal-service-fund-usf-management-support.

[9]    *See, e.g.*, C.D. Jarrett, *Nearing a Tipping Point on USF Contribution Reform*? 11 NATIONAL LAW REVIEW (Feb. 19, 2021) (available at: https://www.natlawreview.com/article/nearing-tipping-point-usf-contribution-reform).

[10]    *See, e.g.*, J. Henchman, *How Is the Money Used? Federal and State Cases Distinguishing Taxes and Fees*, National Tax Foundation, Background Paper No. 63 (2013) (available at: https://files.taxfoundation.org/20190103161206/TaxesandFeesBook.pdf).

[11]    Henchman, *id.*; *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 544 (2012) ("Congress cannot change whether an exaction is a tax or a penalty for constitutional purposes simply by describing it as one or the other.").

[12]    C.C. Pflen, INTRODUCTION TO PUBLIC FINANCE (1891), at p. 87.

[13]    M.M.J. Kennedy, PUBLIC FINANCE (2012), at p. 34.

[14]    *Id.*

compulsory contribution to the state for services rendered by the state for the general benefit of its people.[15]  That is, taxes benefit the public, not necessarily the taxpayer.

In contrast, a fee, is a payment to the government by an entity seeking a beneficial service from the government.  Pflen states a fee "has a different justification from a tax.  A fee never exceeds the cost of the special service rendered [and] confirms a special benefit" on the payer.[16]  Seligman defines a fee as a "payment to defray the cost of each recurring service undertaken by the government primarily in the public interest, but conferring a measurable special advantage on the fee payer."[17]  Or, a "fee" is "only paid by those persons who enjoy the special benefit of the services rendered by the state."[18]  For instance, the "Application Fee" for a U.S. passport is $110 and applicants may pay an "Expedite Fee" of $60.[19]  Revenue from these fees offset the cost of processing a passport (at least, in part), the benefits of which are "not shared by other members of society."

From the economic perspective, the distinction between a "tax" and a "fee" turns on whether the benefits supported by levies flow to the payer (a fee), or to the public (a tax).  The same distinction appears in law.  For instance, in *National Cable Television Association v. U.S.* (1974), the Supreme Court observed, "A fee . . . is incident to a voluntary act, e. g., a request that a public agency permit an applicant to practice law or medicine or construct a house or run a broadcast station. The public agency performing those services normally may exact a fee for a grant which, presumably, bestows a benefit on the applicant, not shared by other members of society."[20]  Similarly, in *Skinner v. Mid-Am. Pipeline Co.* (1989), the Court observes that a levy may be more like a "tax" than a "fee" when "some of the administrative costs at issue inure[] to the benefit of the public, rather than directly to the benefit of those parties."[21]  A "fee" benefits the payer and not the public.

There are two conditions, therefore, that permit one to distinguish between a tax and a fee.  First, to qualify as a "fee," the payer of the levy must be the primary, if not the exclusive, beneficiary of the services justifying the levy.  The more the benefits of the government expenditures advantage the public, the less the levy has the character of a fee.  Second, an economists would characterize a "fee" by saying that, on average at least, there should be a positive increasing relationship (or a "monotonic" relationship) between payer liability and the benefits the payer expects from the program(s) the fee is designed to support.  A "tax" does not have this property; a tax has no particular relationship between payer liability and the benefits the payer expects from that liability.  For example, tax dollars used to fund food stamps levy taxes on higher income Americans that do not qualify for food stamps to the benefit of lower-income Americans that often pay no income tax at all.

---

15       *Types of Taxes*, economicconcepts.com (last viewed Sept. 22, 2021).

16       Pflen, *supra* n. 12, at p. 88.

17       Kennedy, *supra* n. 13.

18       *Types of Taxes*, supra n. 15.

19       https://travel.state.gov/content/dam/passports/forms-fees/Passport%20Fees%20Chart_TSG_JAN2021.pdf.

20       *National Cable Television Association v. U.S.*, 415 U.S. 336, 340-41 (1974).

21       *Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 214 (1989).

**Do USF Liabilities Possess the Characteristics of Taxes, or of Fees?**

Given the above, whether the levies on telecommunications providers constitute a "fee" or a "tax," or at least lean one way or the other, depends on the distribution of liabilities and benefits. Who pays and who benefits? If the benefits largely accrue to the public at large rather than to the telecommunications providers or the specific telecommunications services funding the program, then USF liabilities have the properties of tax.

Telecommunications providers are the immediate payers in the USF Program. Their liabilities are equal to the contribution factor (now about 30%) multiplied by telecommunications providers' revenues obtained only from the sale of interstate and international telecommunications services.[22] At present, the liabilities are just over $8 billion dollars. For these liabilities to have the character of a fee, then almost all the benefits of the $8 billion in expenditures must accrue to the payers. Also, the relationship between the liability and the benefits must be monotonically positive. If these conditions do not apply, then the USF liabilities have the characteristics of a tax.

There are two possible channels from which telecommunications providers—the parties immediately liable for the subsidy funds—may benefit from their liabilities. First, there is the issue of network effects. That is, a network is more valuable as more consumers are connected to it, so expanding the size of the Public Switched Telephone Network (PSTN) arguably benefits providers and their customers. Today, network effects are likely to be small if not zero. Second, providers making contributions to the program may benefit directly by receiving payments from the one or more of the four USF programs.

Aside from telecommunications providers, there may be benefits that flow to third parties — schools and libraries, rural health care providers, employers, job seekers—and such benefits to the public give the levies the character of a tax. Moreover, since liability adheres only to interstate and international revenues, and the mix of such revenues vary by provider, there may be third-party benefits even among telecommunications providers. Some providers receiving direct payments from the program pay little to nothing into the system, so that liabilities and benefits may not be monotonically related.

*Network Effects*

A larger communications network is sometimes (but not always) more valuable than a smaller one. These network effects (or network externalities), to the extent they exist, are subject to diminishing marginal returns. A small increase in subscribers to a small network has a larger network effect than does a small increase in subscribers to a network that is nearly universally adopted. While network effects may have been important at the turn of 20th century when telecommunications networks were not always interconnected, for several reasons the presence

---

[22]     Larger providers typically face large liabilities. In 2019, the largest ten payers accounted for 78% of USF liabilities and 76% of total telecommunications revenues. *Universal Service Monitoring Report* (2020), *supra* n. 3, Tables 1.3 and 1.7.

of sizable network effects today is questionable, especially for the voice-grade services that fund the USF Program.[23]

The presence or magnitude of network effects is an empirical question. The FCC has made no attempt to quantify the presence or magnitude of network effects as a benefit to telecommunications providers, and there are reasons to suspect the size of such effects is now small. Academic research suggests that the USF Programs have done little, if anything, to increase the adoption of telecommunications services beyond the market outcome.[24] Also, given the high adoption rates absent such programs, the network effects created by such programs are likely absent or small.[25]

Also, the liabilities to the USF Program need not bear a direct relation to a network effect. Say, for instance, a customer of a telecommunications provider makes one more interstate call, thereby increasing the liability of the provider. The caller and the called are both on the network, so there is no network effect from expanded adoption but there is an increase in liability.

Furthermore, today about 97% of American adults (about 258.3 million persons) have a cellphone, which permits nearly everyone to be contacted over the PSTN.[26] There are about 6.2 million Lifeline accounts and almost all are mobile wireless accounts. Thus, about 95% of Americans have a cellphone absent any subsidy, assuming Lifeline subscribers would not have service absent the program.[27] With near universal adoption absent USF support, network effects are presumably very small or possibly zero. With a near universal adoption of mobile services, neither the High-Cost Fund nor the Lifeline Program can be said to produce meaningful network effects. As far as I am aware, there is no claim that the Schools & Libraries Fund or the Rural Healthcare Fund produce network effects for the telecommunications providers.

*Receipt of Subsidies*

Given the confidentiality of USF liabilities, it not possible to directly evaluate the relationship between liability and USF support for individual providers. Assuming that interstate and

---

[23]    G. Woroch, *Local Network Competition*, in HANDBOOK OF TELECOMMUNICATIONS ECONOMICS (eds. M. Cave, S. Majundar, and I. Vogelsang) (2012); M.K. Kellog, J. Thorne, and P.W. Huber, FEDERAL TELECOMMUNICATIONS LAW (1992).

[24]    D.L. Kaserman, J.W. Mayo, and J.E. Flynn, *Cross-Subsidization in Telecommunications: Beyond the Universal Service Fairytale*, 2 JOURNAL OF REGULATORY ECONOMICS 231-249 (1990); J. Hausman, T. Tardiff, and A. Belinfante, *The Effects of the Breakup of AT&T on Telephone Penetration in the United States*, 83 AMERICAN ECONOMIC REVIEW 178-184 (1993); C. Garbacz and H.G. Thompson, Jr., *Assessing the Impact of FCC Lifeline and Link-Up Programs on Telephone Penetration*, 11 JOURNAL OF REGULATORY ECONOMICS 67-78 (1997).

[25]    A.H. Barnett and D.L. Kaserman, *The Simple Welfare Economics of Network Externalities and the Uneasy Case for Subscribership Subsidies*, 13 JOURNAL OF REGULATORY ECONOMICS 245-524 (2998).

[26]    Mobile penetration is from Pew Research (https://www.pewresearch.org/internet/fact-sheet/mobile/); Adult population from the U.S. Census Bureau (https://www.census.gov/library/stories/2021/08/united-states-adult-population-grew-faster-than-nations-total-population-from-2010-to-2020.html#:~:text=In%202020%2C%20the%20U.S.%20Census,from%20234.6%20million%20in%202010).

[27]    Lifeline Subscribers is from Universal Service Administrative Company (USAC) (https://www.usac.org/lifeline/resources/program-data/#Participation). The FCC's Mobility Fund subsidizes mobile wireless network deployment in rural areas but only small distributions have been made to date. More meaningful distributions are planned for Phase II of the program. *See, e.g.*, *FCC Should Improve the Accountability and Transparency of High-Cost Program Funding*, Government Accountability Office, GAO-14-587 (July 2014) (available at: https://www.gao.gov/assets/gao-14-587.pdf).

international revenues are correlated with total revenues, it becomes possible to say something about the relationship between liability and benefits. In Table 2, the total revenues and High-Cost support received by several providers is summarized.[28] The list includes companies with public financial data; many recipients of High-Cost funding are cooperatives or privately-held small companies that do not report formal financial results.

#### Table 2.  Examples of Liability and High-Cost Support

| Company | Total Revenues | High-Cost Support | Support/Revenues |
|---------|---------------|-------------------|------------------|
| AT&T | 181,193,000,000 | 548,000,000 | 0.30% |
| Verizon | 131,868,000,000 | 72,000,000 | 0.05% |
| CenturyLink | 22,401,000,000 | 516,000,000 | 2.30% |
| Frontier | 8,107,000,000 | 339,000,000 | 4.18% |
| TDS | 5,176,000,000 | 211,000,000 | 4.08% |
| Consolidated Comm. | 1,336,542,000 | 60,000,000 | 4.49% |
| LICT Corp. | 117,958,000 | 36,000,000 | 30.5% |

For the nation's largest providers of telecommunications services, AT&T and Verizon, the High-Cost support is a trivially small share of revenues—about 0.3% for AT&T and 0.05% for Verizon. For smaller providers that serve more rural markets, the share of High-Cost support to revenues is much higher. Setting aside network effects, the companies that contribute large sums to the program receive few benefits, and companies that contribute little to the fund receive large benefits. In terms of direct benefits, there is no monotonic relationship between liabilities and subsidy receipts.

The subsidization of broadband service introduces third-party benefits in the subsidy scheme. Revenues from broadband services are not subject to the USF levy. Only retail interstate and international services are in the contribution base. Consequently, a service that provides no financial support to the USF Program is a beneficiary of the subsidy program. Since the revenue sources of providers vary, often substantially, the discrepancy between the source of subsidy dollars and the recipients of subsidy dollars gives the USF levies the character of taxes. Broadband service is a "third party" beneficiary to levies placed on voice-grade service.

Making matters worse, the funding of broadband services creates additional substitutes for the voice-grade services that support the USF Program, reducing the demand for interstate and international calling. Providers with relatively high shares of interstate and international revenues are subject to liabilities the proceeds of which are used to harm their interstate and international businesses. Those liable for USF contributions are harmed by the program. Like taxation, liabilities may be spent in ways that harm the taxpayer.

*Third Party Beneficiaries*

When the FCC modernized the USF Program after the Telecommunications Act of 1996, the Commission largely abandoned the notion that it was telecommunications providers that benefit from the programs' subsidies. Today, USF spending represents a galaxy of policy concerns with

---

[28]    *Universal Service Monitoring Report* (2020), *supra* n. 3, at Table 3.7. Revenues from Yahoo Finance or company Annual Reports.

8

no obvious connection to carrier liabilities so that a large portion of the benefits of USF payments go to third parties.

Take, for instance, the Schools & Libraries Fund and the Rural Healthcare Fund. The FCC's stated goal of the Schools & Libraries Fund is "to support digital learning in schools and robust connectivity for all libraries."[29]  The FCC's stated goal of the Rural Healthcare Fund is "to improve the quality of health care available to patients in rural communities."[30]  These are broad social goals that benefit the public, not the telecommunications providers that support the program by paying levies.  For these programs, there is no linkage between liabilities and benefits; the benefits are for the public at large.  This inclusive perspective is not limited to these programs.  The Commission's stated goal of the USF Program broadly is to promote "economic growth, jobs and opportunities."[31]   Such concerns are not benefits to telecommunications providers but to the public at large.

**Conclusion**

From the economic perspective, it seems clear that the contributions to the USF Program, and especially for certain of its components, possess the characteristics of a "tax" rather than a "fee." Today, USF spending represents a galaxy of policy concerns with no obvious connection to providers' liabilities.  In distributing the program's funds, the FCC aims "to support digital learning," "to improve the quality of health care," to promote "economic growth" and "jobs," and to provide "educational, employment, civic, social, and other benefits."  Such broad goals are beyond the scope of a fee-based system as the benefits accrue to the public at large and not those responsible for funding the program.  The primary benefit of USF Programs that may accrue to telecommunications providers is from the network effects of a more connected society, but such effects, if any, are likely to be small in modern times as consumers are able to communicate across a variety of broadly-deployed and widely-adopted communications modalities.  Whether in whole or in part, the modern USF Program is social policy, the benefits of which largely serve the public and not the telecommunications providers that immediately pay for the scheme.

---

[29]     *Summary of the E-Rate Modernization Order*, Federal Communications Commission (2014) (available at: https://www.fcc.gov/general/summary-e-rate-modernization-order#:~:text=The%20Order%20adopts%20three%20goals,making%20the%20E%2Drate%20application).

[30]     *Rural Health Care Program*, Federal Communications Commission (undated) (available at: https://www.fcc.gov/general/rural-health-care-program).

[31]     *In the Matter of Universal Service Contribution Methodology; A National Broadband Plan For Our Future*, Federal Communications Commission, WC Docket No. 06-122, FCC 12-46 (Rel. April 30, 2012), at ¶ 1.

<u>JA69</u>

I declare under penalty of perjury that the foregoing testimony is true and correct.

September 23, 2021
_____
Date

_____
George S. Ford

# EXHIBIT B

# CURRICULUM VITAE OF DR. GEORGE S. FORD

# George S. Ford, Ph.D.
ford@phoenix-center.org

**Phoenix Center for Advanced Legal &
Economic Public Policy Studies**
5335 Wisconsin Avenue NW, Suite 440
Washington, DC 20015
www.phoenix-center.org

## EDUCATION:

Ph.D., Economics, Auburn University, 1994.

B.S., Economics (magna cum laude), Auburn University, 1990.

## EXPERIENCE:

| | |
|---|---|
| 2000 - Present | **PHOENIX CENTER FOR ADVANCED LEGAL AND ECONOMIC PUBLIC POLICY STUDIES** <br> **Washington, DC** <br> <u>Chief Economist</u> |
| 2016 - Present | **AUBURN UNIVERSITY, Auburn, Alabama** <br> <u>Adjunct Professor</u> |
| 2004 – Present | **APPLIED ECONOMIC STUDIES, Birmingham, Alabama** <br> <u>President</u> |
| 2006 - 2016 | **SAMFORD UNIVERSITY, Birmingham, Alabama** <br> <u>Adjunct Professor</u> |
| 2000 – 2004 | **Z-TEL COMMUNICATIONS** <br> **Tampa, FL** <br> <u>Chief Economist, Strategic Policy and Planning</u> |
| 1996 - 2000 | **MCI WORLDCOM CORPORATION** <br> **Washington, D.C.** <br> <u>Senior Economist, Office of Policy and Strategic Planning</u> |
| 1994 - 1996 | **FEDERAL COMMUNICATIONS COMMISSION** <br> **Washington, D.C.** <br> <u>Economist, Office of the General Counsel & Cable Bureau, Competition Division</u> |

**PUBLISHED RESEARCH:**

"Testing the Economics of the Net Neutrality Debate: A Comment," *Telecommunications Policy*, Vol. 45, 2021.

"Spatial Competition in Automobile Retailing," with T.R. Beard and L.J. Spiwak, *Applied Economics*, Vol. 53, 2021.

"Confusing Relevance and Price: Interpreting and Improving Surveys On Internet Non-Adoption," *Telecommunications Policy*, Vol. 45, 2021.

"Subsidies and Substitution: An Empirical Study of The Lifeline Program," *Telecommunications Policy*, Vol. 45, 2021.

"Interference, Sunk investment, and the Repurposing of Radio Spectrum," with T.R. Beard and M.L. Stern, *Information & Communications Technology Law*, Vol. 29, 2020.

"Net Neutrality and Investment in the US: A Review of Evidence from the 2018 Restoring Internet Freedom Order," *Review of Network Economics*, Vol. 17, 2019.

"Promotional Effects and the Determination of Royalty Rates for Music," with T.R. Beard and M. Stern, *Journal of Media Economics*, Vol. 31, 2018.

"Regulation and Investment in the U.S. Telecommunications Industry," *Applied Economics*, Vol. 50, 2018.

"Is Faster Better? Quantifying the Relationship Between Broadband Speed and Economic Growth," *Telecommunications Policy*, Vol. 42, 2018.

"Regulating, Joint Bargaining, and the Demise of Precedent," with T.R. Beard, L.J. Spiwak, and M. Stern, *Managerial and Decision Economics*, Vol. 39, 2018.

"Safe Harbors and the Evolution of Online Platform Markets: An Economic Analysis," with T.R. Beard and M. Stern, *Cardozo Arts & Entertainment Law Journal*, Vol. 36, 2018.

"Fair Use in the Digital Age," with T.R. Beard and M. Stern, *Journal of the Copyright Society of the USA*, Vol. 65, 2018.

"Piracy, Imitation, and Optimal Copyright Policy," with T.R. Beard and G. Sorek, *Southern Economic Journal*, Vol. 84, 2018.

"Private Solutions to Broadband Adoption: An Economic Analysis, forthcoming," with T.R. Beard, L.J. Spiwak, and M. Stern, *Federal Communications Law Journal*, Vol. 69, 2017.

"Taxation by Regulation: Spectrum Repurposing at the FCC and the Prolonging of Spectrum Exhaust," with T.R. Beard, L.J. Spiwak, and M. Stern, *Hastings Journal of Law & Technology*, Vol. 8, 2016.

"Reflecting on Twenty Years Under the Telecommunications Act of 1996," *Federal Communications Law Journal*, Vol. 68, 2016.

"Lessons Learned from the U.S. Unbundling Experience," with Lawrence J. Spiwak, *Federal Communications Law Journal*, Vol. 68, 2016.

"Value-based Pricing of Music," with T.R. Beard and M. Stern, *Review of Economic Research on Copyright Issues*, Vol. 12 (2015).

"Tariffing Internet Termination: Pricing Implications of Classifying Broadband as a Title II Telecommunications Service," with Lawrence J. Spiwak, *Federal Communications Law Journal*, Vol. 67, 2015.

"Section 10 Forbearance: Asking the Right Questions to Get The Right Answers," with Lawrence J. Spiwak, *CommLaw Conspectus*, Vol. 23, 2014.

"Market Mechanisms and the Efficient Use and Management of Scarce Spectrum Resources," with T. Randolph Beard, Lawrence J. Spiwak, and Michael Stern, *Federal Communications Law Journal*, Vol. 66, 2014.

"Market Definition and the Economic Effects of Special Access Price Regulation," with T. Randolph Beard and Lawrence J. Spiwak, *Commlaw Conspectus*, Vol. 22, 2014.

"Internet Use and Depression among Retired Older Adults in the U.S.: A Longitudinal Analysis," with S. Cotten, S. Ford, and T. Hale, *Journals of Gerontology: Social Sciences*, Vol. 69, 2014.

"Capital Investment and Employment in the Information Sector," with T. Randolph Beard and H. Kim, *Telecommunications Policy*, Vol. 38, 2014.

"Secularism, Religion and Political Choice," with R. Ekelund Jr., T. R. Beard, R. Gaskins, and R. Tollison, *Politics & Religion*, Vol. 6, 2013.

"Theft and Welfare in General Equilibrium: A Theoretical Note," with T. R. Beard, M. Stern, and L. Stern, *Theoretical Economic Letters*, Vol. 2, 2012.

"Justifying the Ends: Section 706 and the Regulation of Broadband," with L. J. Spiwak, *Journal of Internet Law*, Vol. 16, 2013.

"Wobbling Back to the Fire: Economic Efficiency and the Creation of a Retail Market for Set-Top Boxes," with T. R. Beard, L. J. Spiwak, and M. Stern, *Commlaw Conspectus*, Vol. 21, 2012.

"Wireless Competition Under Spectrum Exhaust," with T. R. Beard, L. J. Spiwak, and M. Stern, *Federal Communications Bar Journal*, Vol. 65, 2012.

"Endogenous Sunk Costs, Quality Competition and Welfare," with M. Stern, *Theoretical Economic Letters*, Vol. 1, 2011.

"Internet Use and Job Search," with T. R. Beard, R. Seals, and R. Saba, *Telecommunications Policy*, Vol. 36, 2012.

"Internet Use and Depression Among Older Adults," with S. Cotten, S. Ford, and T. Hale, *Computers in Human Behavior*, Vol. 28, 2012.

"The Economics of Religious Schism and Switching," with T. R. Beard, R. B. Ekelund Jr., and R. D. Tollison (Forthcoming in *Oxford Handbook on the Economics of Religion* 2012).

"Broadband Expectations and the Convergence of Ranks," *Telecommunications Policy*, Vol. 35, 2011.

"The Frontier of Broadband Adoption Across the OECD:  A Comparison of Performance," *International Economic Journal*, Vol. 25, 2011.

"The Pricing of Pole Attachments: Implications and Recommendations," with T. R. Beard and L. J. Spiwak, *Review of Network Economics*, Vol. 9, 2010.

"The Broadband Credibility Gap," with L. J. Spiwak and M. L. Stern, *Commlaw Conspectus*, Vol. 75, 2010.

"The Burden of Network Neutrality Mandates on Rural Broadband Deployment," with T. M. Koutsky and L. J. Spiwak, *Journal of Applied Economy*, 2010.

"An Investigation into the Relationship of Retail Gas Prices on Oil Company Profitability," *Applied Economics*, Vol. 43, 2011.

"The Need for Better Analysis of High Capacity Services," with L. J. Spiwak. *John Marshall Journal of Computer & Information Law*, Vol. 28, 2010.

"Tort Liability for Software Developers: A Law & Economics Perspective," with T. R. Beard, T. M. Koutsky and L. J. Spiwak, *John Marshall Journal of Computer & Information Law*, XXVII, 2010.

"Quantifying the Cost of Substandard Patents: Some Preliminary Evidence," with T. R. Beard, T. M. Koutsky and L. J. Spiwak, *Yale Journal on Law and Technology*, Vol. 12, 2010.

"The Broadband Adoption Index: Improving Measurements and Comparisons of Broadband Deployment and Adoption," with T. R. Beard, L. J. Spiwak, and M. L. Stern, *Federal Communications Bar Journal*, Vol. 62, 2010.

"A Valley of Death in the Innovation Sequence," with T. R. Beard, T. M. Koustky, and L. J. Spiwak, *Research Evaluation*, Vol. 18, 2009.

"A Policy and Economic Exploration of Wireless Carterfone Regulation," with T. M. Koutsky, and L. J. Spiwak, *Santa Clara Computer & High Technology Law Journal*, Vol. 25, 2009.

"HAC Standard Errors and the Event Study Methodology: A Cautionary Note," with J. Jackson. *Applied Economics Letters*, Vol. 16, 2009.

"Sample Size and the Accuracy of the Generalized Lambda Distribution," with S. Skinner. *Communications in Statistics - Simulation and Computation*, Vol. 38, 2009.

"Network Neutrality and Foreclosing Market Exchange," with T. R. Beard, T. M. Koutsky, and L. J. Spiwak. *International Journal of Management and Network Economics*, Vol. 1, 2009.

"Developing a National Wireless Regulatory Framework: A Law and Economics Approach," with T. R. Beard, T. M. Koutsky, and L. J. Spiwak. *Commlaw Conspectus*, Vol. 16, 2008.

"Constituency Size and the Growth of Public Expenditures: The Case of the United Kingdom," with M. Thornton and M. Ulrich. *Journal of Public Choice and Finance*, Vol. 24, 2006 (published in 2008).

"The Competitive Effects of Quantity Discounts," with T. R. Beard and D. L. Kaserman. *Antitrust Bulletin*, Vol. 52, 2007.

"Network Neutrality and Industry Structure," with T. R. Beard, Thomas M. Koutsky and Lawrence J. Spiwak. *Hastings Communications and Entertainment (Comm/Ent) Law Journal*, Vol. 29, 2007.

"A La Carte and 'Family Tiers' as a Response to a Market Defect in the Multichannel Video Programming Market," with T. R. Beard and Thomas M. Koutsky. *CommLaw Conspectus*, Vol. 15, 2006.

"The Impact of Video Service Regulation on the Construction of Broadband Networks to Low-Income Households," with Thomas M. Koutsky and Lawrence J. Spiwak. *I/S: A Journal of Law and Policy for the Information Society*, Vol. 3, 2007.

"Competition After Unbundling: Entry, Industry Structure and Convergence," with Thomas M. Koutsky and Lawrence J. Spiwak. *The Federal Communications Law Journal*, Vol. 59, 2007.

"Does Municipal Supply of Communications Crowd-Out Private Communications Investment? An Empirical Study," *Energy Economics*, Vol. 29, 2007.

"Broadband and Economic Development: A Municipal Case Study from Florida," with T. M. Koutsky. *Review of Urban and Regional Development Studies*, Vol. 17, 2006.

"The Economics of Build-out Rules in Cable Television," with T. M. Koutsky and L. W. Spiwak. *Hastings Communications and Entertainment (Comm/Ent) Law Journal*, Vol. 28, 2006.

"Issues in Empirical Merger Analysis," with T. Randolph Beard Introductory article by the Guest Editors in a Special Issue of the *International Journal of the Economics of Business*, Vol. 13, 2006.

"Empirical Simulation of Mergers: The Cingular and AT&T Wireless Merger," with T. Randolph Beard and Richard P. Saba, *International Journal of the Economics of Business*, Vol. 13, 2006.

"Event Studies for Merger Analysis: An Evaluation of the Effects of Non-Normality on Hypothesis Testing," with Audrey D. Kline. In *Antitrust Policy Issues*, Nova Publishers, 2006.

"Are Unbundled and Self-Supplied Telecommunications Switching Substitutes? An Empirical Study," with T. Randolph Beard. *International Journal of the Economics of Business*, Vol. 12, 2005.

"Misleading Inferences from Panel Unit-Root Tests: A Comment," with John Jackson and Audrey Kline. *Review of International Economics*, Vol. 14, 2006.

"Splitting the Baby: An Empirical Test of Rules of Thumb in Regulatory Price Setting," with T. Randolph Beard. *Kyklos*, Vol. 58, 2005.

"Mandated Access and the Make-or-Buy Decision: The Case of Local Telecommunications Competition," with T. Randolph Beard and Thomas W. Koutsky. *Quarterly Review of Economics and Finance*, Vol. 45, 2005. Presented at *The Drivers and Significance of Local Telecommunications Competition*, United States Department of Justice, July 23, 2002 as "Facilities-based Entry in Local Telecommunications: An Empirical Investigation").

"On the Relationship between Telecommunications Investment and Economic Growth: Three Empirical Studies," with R. Beil and J. Jackson. In *Economic Growth Issues*, Nova Publishers, 2005.

"On the Relationship between Telecommunications Investment and Economic Growth in the United States," with R. Beil and J. Jackson. *International Economic Journal*, Vol. 19, 2005.

"Access Charge Reductions and Long Distance Rates: A Bootstrap Analysis," with T. Randolph Beard, R. Carter Hill, and Richard P. Saba. *Empirical Economics*, Vol. 30, 2005.

"Fragmented Duopoly: A Conceptual and Empirical Investigation," with T. Randolph Beard, R. Carter Hill, and R. Saba. *Journal of Business*, Vol. 78, 2005.

"Competition and Investment in Telecommunications," with John D. Jackson. *Atlantic Economic Journal*, Vol. 32, 2004.

"Pursuing Competition in Local Telephony: The Law and Economics of Unbundling and Impairment," with T. R. Beard and R. B. Ekelund Jr., *Journal of Law, Technology and Policy*, Vol. 2003, Fall 2003.

The Financial Implications of the UNE-Platform: A Review of the Evidence," with T. Randolph Beard and Christopher C. Klein *CommLaw Conspectus: Journal of Communications Law and Policy*, Vol. 12, 2004. Also published in the handbook for the *21st Annual Institute on Telecommunications Policy & Regulation*, Practicing Law Institute, New York, 2003.

"Innovation, Investment, and Unbundling: An Empirical Update," with Robert B. Ekelund Jr., *Yale Journal on Regulation*, Vol. 20, 2003.

"Discrimination and Minority Ownership in Radio Broadcasting," with Audrey B. Davidson and Barry Hayworth, *International Journal of the Economics of Business*, Vol. 10, 2003.

"Preliminary Evidence on the Demand for Unbundled Elements in Telephony," with Robert B. Ekelund, Jr., *Atlantic Economic Journal*, Vol. 30, 2002.

"Demand Elasticities for International Message Telephone Service," with John D. Jackson, *Applied Economics*, Vol. 36, 2004.

"Competition and Market Structure in Local Exchange and Long Distance Telecommunications Markets," with T. Randolph Beard. *International Handbook on Telecommunications Economics*, Vol. I, Ch. 6, Gary Madden ed., Edward Elgar: 2002.

"Why Adco? Why Now? An Economic Exploration into the Future of Industry Structure in Local Telecommunications Markets," with T. Randolph Beard and Lawrence Spiwak. *Federal Communications Law Journal*, Vol. 54, 2002.

"Price, Quality, and Consumer Welfare in the Cable Television Industry," with T. Randolph Beard, Robert B. Ekelund, Jr., and Richard P. Saba. *Journal of Regulatory Economics*, Vol. 20, 2001

"The Fallacy of Regulatory Symmetry: An Economic Analysis of the "Level Playing Field" in Cable TV Franchising Statutes," with Thomas W. Hazlett. *Business & Politics*, Vol. 3, 2001.

"The Measurement of Merger Delay in Regulated and Restructuring Industries," with Robert B. Ekelund Jr. and Mark Thornton. *Applied Economics Letters*, Vol. 8, 2001.

"Changing Industry Structure: The Economics of Entry and Price Competition" with Jerry B. Duvall. *Telecommunications and Space Journal*, Vol. 7, 2000.

"Market Power in Radio Markets: An Empirical Analysis of Local and National Concentration," with Robert B. Ekelund, Jr. and Thomas Koutsky. *Journal of Law and Economics*, Vol. XLIII, 2000.

"TV Advertising, Local Markets and Merger Guidelines: An Empirical Study," with Robert B. Ekelund, Jr. and John D. Jackson. *International Journal of the Economics of Business*, Vol. 7, 2000.

"Preserving Free Television? Some Empirical Evidence on the Efficacy of Must Carry," with John D. Jackson. *Journal of Media Economics*, Vol. 13, 2000.

"Is Radio Advertising a Distinct Local Market: An Empirical Analysis," with R. B. Ekelund, Jr. and John D. Jackson. *Review of Industrial Organization*, Vol. 14, 1999.

"On the Interpretation of Policy Effects from the Estimates of Simultaneous Systems of Equations," with John D. Jackson. *Applied Economics*, Vol. 30, 1998.

"Information Costs and Nirvana Revisited: Edwin Chadwick on Nineteenth Century Urban Funeral Markets," with Robert B. Ekelund, Jr. *Journal of Regulatory Economics*, Vol. 12, 1997. Reprinted in the *The Foundations of Regulatory Economics*, Ed. R. B. Ekelund, Jr., Edward Elgar Publishing.

"Horizontal Concentration and Vertical Integration in the Cable Television Industry" with John D. Jackson. *Review of Industrial Organization*, Vol. 12, 1997.

**EXAMPLES OF LITIGATION, REGULATORY DOCUMENTS, TESTIMONY:**

*Testimony in Madison County Communications District, et al., v. Earthlink Business, LLC, Civil Action CV-2014-904855* (2018).

*Testimony on SDARS Royalties* (Multiple proceedings in years 2009-17): Client: SoundExchange, Inc.

"The Impact of Government-Owned Broadband Networks on Private Investment and Consumer Welfare," written for the State Government Leadership Foundation (April 6, 2016).

*Alabama Attorney General, Consumer Advocate Office* (Rate Proceeding before the Alabama Public Service Commission, Summer 2013, 2018).

*Testimony of Phoenix Center Chief Economist Dr. George S. Ford before the United States Senate Committee on Commerce, Science and Transportation - Subcommittee on Communications, Technology, and the Internet, Hearing on the "State of Wireless Communications"* (June 4, 2013).

*Testimony of Phoenix Center Chief Economist Dr. George S. Ford before the United States the House of Representatives Committee on Energy and Commerce Subcommittee Communications and Technology, Hearing on "Health Information Technologies: Harnessing Wireless Innovation"* (March 19, 2013).

*A Legal and Economic Review of the U.S. Unbundling Experience,* Prepared for USAID under contract No. EEM-I-00-07-00009-00; Order No. AID-527-TO-10-00002, for the Peru Andean Trade Capacity Building (PATCB) (May 2012). Presentation of the Report to OSIPTEL in Lima, Peru, in a two-day seminar in October 2012.

*Testimony on Copyright Royalties* (Proceeding in 2012, Canada): Client: Re:Sound.

*Testimony on Webcasting Copyright Royalties* (Multiple proceedings in years 2009-12): Client: Soundexchange, Inc.

*Testimony on Cable Retransmission Copyright Royalties 2004-2005* (Proceeding in years 2009-10), Client: Motion Picture Association of America.

*National Telecommunications and Information Administration: Broadband Data Transparency Workshop,* U.S. Department of Commerce, National Telecommunications and Information Administration, Herbert C. Hoover Building, Washington, DC (October 30, 2009).

*Business News Network's Market Morning Talk Time: How Much Americans and Canadians Really Pay for Cell Phone Use,* Television Appearance, (September 18, 2009).

9

*Federal Communications Commission Workshop: Deployment Unserved/Underserved,* Federal Communications Commission, Washington, DC (August 12, 2009).

*OECD Expert Workshop on Measuring Mobile/Wireless Service Data, Evaluating Broadband Adoption,* Lisbon, Portugal (February 19-20, 2009).

*Autoridade Nacional de Comuniçacões (ANACOM), Agência Nacional de Telecomunicações (ANATEL)* (Broadband Adoption Project, 2009).

*17th ANACOM Seminar, Study and Presentation, The Broadband Efficiency Index: What Really Drives Broadband Adoption Across the OECD* (September 25, 2009).

*Developing a "National Broadband Strategy" - Understanding the OECD Rankings and the Drivers of Broadband Adoption.* Presentation at the U.S. Congress Rayburn House Office Building (July 28, 2008).

*Testimony Before the Federal Communications Commission's Open Meeting on Network Neutrality and Broadband Network Management,* Stanford University (April 17, 2008).

*A Valley of Death in the Innovation Sequence: An Economic Investigation,* United States Department of Commerce, Technology Administration (September 2007).

*Testimony Before the House Committee on Commerce and Energy - Subcommittee on Telecommunications and the Internet Hearing on "Digital Future of the United States: Part IV: Broadband Lessons from Abroad"* (April 24, 2007).

*Testimony Before the House Committee on Commerce and Energy - Subcommittee on Telecommunications:  A Discussion Draft Addressing Broadband Mapping and Data Collection* (May 17, 2007).

*Capitol Hill Inter-Active Workshop: Sound Internet Policy for the 21st Century: Understanding the Economic Fundamentals* (Feb. 2007).

*Broadband Connectivity Competition Policy, Federal Trade Commission* (Feb. 2007).

*3rd Annual State of the Net Conference 2007, Advisory Committee to the Congressional Internet Caucus* (Jan. 2007).

*Carter Estate v. CSXT, Louisville, Kentucky* (2006).

*Ken Hecht v. Comcast of Indiana, Inc., et al, Indianapolis, Indiana* (2005/6).

JA81

*"Crummy Duopoly" or Vigorous Inter-Modal Competition? The Impact of Cable Franchise Requirements on New Fiber Builds.* Phoenix Center Congressional Briefing (July 21, 2005).

*Florida Bill HB 1325 and SB 1322* (Municipal Broadband). Testimony before numerous Committees of the Florida House of Representatives (Spring 2005).

*Z-Tel Communications, Inc. v. SBC Communications, Inc.,* Texarkana, Texas (2003).

*A Response to Olbeter and Robinson's 'Breaking the Backbone',* released by MCI Worldcom (August 1999).

*An Economic Analysis of the FCC's Notice of Inquiry on Flat Rate Charges in the Long Distance Industry,* filed in CC Docket No. 99-249 (September 1999).

*Further Thoughts on Payphone Compensation,* filed in CC Docket No. 96-128 (November 1998).

*Effective Enforcement of Non-Discriminatory Performance by Incumbent Local Exchange Carriers,* with John D. Jackson (filed with New York Public Service Commission, October 1999).

*A Review of the Texas Performance Plan,* with John D. Jackson filed with the Federal Communications Commission (2000).

*Investigation into Pricing of Unbundled Network Elements,* Testimony filed before the State of Florida Public Service Commission, Docket No. 990649-TP (2000).

*Investigation into Pricing of Unbundled Network Elements,* Testimony filed before the State of Florida Public Service Commission, Docket No. 990649-TP (2000).

*Investigation into Pricing of Unbundled Network Elements,* Testimony filed before the State of New York Public Service Commission, Docket No. 98-C-1357 (2000).

*In the Matter of US West Communications, Inc.'s Compliance with Sec 271 of the Telecommunications Act of 1996,* Statement before the Arizona Corporation Commission, Docket No. T-00000B-97-0238 (2000).

*Performance Measurements for Telecommunications Interconnection, Unbundling and Resale,* Testimony before the Georgia Public Service Commission, Docket No. 7892-U (2000).

JA82

*Investigation and Generic Proceeding on Ameritech Indiana's rates for Interconnection, Service, Unbundled Elements, and Transport and Termination,* Declaration and Reply before the Indiana Public Service Commission, Cause No. 40611 (2000 2000).

*Inquiry by the Department of Telecommunications and Energy Pursuant to Section 271 of the Telecommunications Act of 1996,* Comments filed before the Massachusetts Department of Telecommunications and Energy, Docket No. DTE 99-271 (2000).

*Commission Review of Various Submissions of Ameritech Indiana to Show Compliance with Section 271(C) of the Telecommunications Act of 1996,* Multiple filings before the Indiana Utility Regulatory Commission (2000).

*In the Matter of US West Communications, Inc.'s, Compliance with §271 of the Telecommunications Act of 1996,* Comments and studies filed before the Arizona Corporation Commission (2000).

*In the Matter of Investigation into US West Communications, Inc.'s Compliance with Certain Wholesale Pricing Requirements for Unbundled Network Elements and Resale Discounts,* Docket No.T-00000A-00-0194 (2001).

*In the Matter of the Commission Investigation and Generic Proceeding on Ameritech Indiana's Rates for Interconnection, Service, Unbundled Elements, and Transport and Termination Under the Telecommunications Act of 1996 and Related Indiana Statutes,* Cause No. 40611-S1 (2001).

*In the Matter of the Petition of Indiana Bell Telephone Company, Incorporated d/b/a Ameritech Indiana Pursuant to I.C. 8-1-2-61 For a Three Phase Process For Commission Review of Various Submissions of Ameritech Indiana to Show Compliance with Section 271(c) of The Telecommunications Act of 1996,* Cause No. 41657 (2001).

*Application by Bell Atlantic New York for Authorization Under Section 271 of the Communications Act To Provide In-Region, InterLATA Service in the State of New York,* Federal Communications Commission, CC Docket No. 99-295 (1999).

*Application by SBC Communications Inc., Southwestern Bell Telephone Company, And Southwestern Bell Communications Services, Inc. d/b/a Southwestern Bell Long Distance Pursuant to Section 271 of the Telecommunications Act of 1996 To Provide In-Region, InterLATA Services In Texas,* Federal Communications Commission, CC Docket No. 00-65 (2000)

*Joint Application by SBC Communications Inc., Southwestern Bell Telephone Company, and Southwestern Bell Communications Services, Inc. d/b/a Southwestern Bell Long Distance for Provision of In-Region, InterLATA Services*

*in Kansas and Oklahoma,* Federal Communications Commission, CC Docket No. 00-217 (2000/2001).

*Joint Application by SBC Communications Inc., Southwestern Bell Telephone Company, and Southwestern Bell Communications Services, Inc. d/b/a Southwestern Bell Long Distance Pursuant to Section 271 of the Telecommunications Act of 1996 To Provide In-Region, InterLATA Services in Arkansas and Missouri,* Federal Communications Commission, CC Docket No. 01-194 (2001).

*Joint Application by BellSouth Corporation, BellSouth Telecommunications, Inc., And BellSouth Long Distance, Inc for Provision of In-Region, InterLATA Services In Georgia and Louisiana,* Federal Communications Commission, CC Docket No. 02-35 (2002).

*Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers,* Federal Communications Commission, CC Docket No. 01-338 (2003).

*In Through the Back Door: Embedded Cost and the FLC,* Working Paper (June 2002).

*How Many Days in a Year? Creative Cost Modeling and the Cost to Competition,* Working Paper (June 2002).

*A Fox in the Hen House: An Evaluation of Bell Company Proposals to Eliminate Their Monopoly Positions in Local Telecommunications,* Working Paper, June 2002.

## PHOENIX CENTER WORKS (Author/Co-Author):

*Policy Papers*

"Bridging the Digital Divide: What Has Not Worked But What Just Might," PHOENIX CENTER POLICY PAPER No. 56 (June 2020).

"A Fresh Look at the Lifeline Program," PHOENIX CENTER POLICY PAPER No. 55 (July 2019).

"The Rewards of Municipal Broadband: An Econometric Analysis of the Labor Market," PHOENIX CENTER POLICY PAPER No. 54 (May 2019).

"Quarry Operations and Property Values: Revisiting Old and Investigating New Empirical Evidence," PHOENIX CENTER POLICY PAPER No. 53 (March 2018).

"Fixing Safe Harbor: An Economic Analysis," PHOENIX CENTER POLICY PAPER No. 52 (August 2016).

"Fair Use in the Digital Age," PHOENIX CENTER POLICY PAPER No. 51 (September 2016).

"How (and How Not) to Measure Market Power Over Business Data Services," PHOENIX CENTER POLICY PAPER No. 50 (September 2016).

"Eroding the Rule of Law: Regulation as Cooperative Bargaining at the FCC," PHOENIX CENTER POLICY PAPER No. 49 (October 2015).

"The Price Effects of Intra-Brand Competition in the Automobile Industry: An Econometric Analysis," PHOENIX CENTER POLICY PAPER No. 48 (March 2015).

"An Economic Framework for Retransmission Consent," PHOENIX CENTER POLICY PAPER No. 47 (December 2013).

"Market Mechanisms and the Efficient Use and Management of Scarce Spectrum Resources," PHOENIX CENTER POLICY PAPER No. 46 (December 2013).

"Lessons Learned from the U.S. Unbundling Experience," PHOENIX CENTER POLICY PAPER No. 45 (June 2013).

"Taxation by Condition: Spectrum Repurposing at the FCC and the Prolonging of Spectrum Exhaust," PHOENIX CENTER POLICY PAPER No. 44 (September 2012).

"Wireless Competition Under Spectrum Exhaust," PHOENIX CENTER POLICY PAPER No. 43 (February 2012).

"A Policy Framework for Spectrum Allocation in Mobile Communications," PHOENIX CENTER POLICY PAPER No. 42 (March 2011).

Wobbling Back to the Fire: Economic Efficiency and the Creation of a Retail Market for Set-Top Boxes," PHOENIX CENTER POLICY PAPER No. 41 (December 2010).

"The Broadband Credibility Gap," PHOENIX CENTER POLICY PAPER No. 40 (June 2010).

"Internet Use and Job Search," PHOENIX CENTER POLICY PAPER No. 39 (January 2010).

"Internet Use and Depression Among the Elderly," PHOENIX CENTER POLICY PAPER No. 38 (October 2009).

"Market Definition and the Economic Effects of Special Access Price Regulation," PHOENIX CENTER POLICY PAPER No. 37 (October 2009).

"The Broadband Adoption Index: Improving Measurements and Comparisons of Broadband Deployment and Adoption," PHOENIX CENTER POLICY PAPER No. 36 (July 2009).

"The Need for Better Analysis of High-Capacity Services," PHOENIX CENTER POLICY PAPER No. 35 (June 2009).

"The Pricing of Pole Attachments: Implications and Recommendations," PHOENIX CENTER POLICY PAPER No. 34 (December 2008).

"The Broadband Efficiency Index: What Really Drives Broadband Adoption Across the OECD?" PHOENIX CENTER POLICY PAPER No. 33 (May 2008).

"The Welfare Impacts of Broadband Network Management: Can Broadband Service Providers Be Trusted?" PHOENIX CENTER POLICY PAPER No. 32 (March 2008).

"The Demographic and Economic Drivers of Broadband Adoption in the United States," PHOENIX CENTER POLICY PAPER No. 31 (November 2007).

"Quantifying the Cost of Substandard Patents: Some Preliminary Evidence," PHOENIX CENTER POLICY PAPER No. 30 (September 2007).

"The Broadband Performance Index: A Policy-Relevant Method of Comparing Broadband Adoption Among Countries," PHOENIX CENTER POLICY PAPER No. 29 (July 2007).

"Network Neutrality and Foreclosing Market Exchange: A Transaction Cost Analysis," PHOENIX CENTER POLICY PAPER No. 28 (March 2007).

"Tort Liability for Software Developers: A Law & Economics Perspective," PHOENIX CENTER POLICY PAPER No. 27 (January 2007).

"An Investigation into the Influence of Retail Gas Prices on Oil Company Profits," PHOENIX CENTER POLICY PAPER No. 26 (August 2006).

"The Burden of Network Neutrality Mandates on Rural Broadband Deployment," PHOENIX CENTER POLICY PAPER No. 25 (July 2006).

"Network Neutrality and Industry Structure," PHOENIX CENTER POLICY PAPER No. 24 (April 2006).

"The Impact of Video Service Regulation on the Construction of Broadband Networks to Low-Income Households," PHOENIX CENTER POLICY PAPER No. 23 (September 2005).

"The Consumer Welfare Cost of Cable "Build-out" Rules," PHOENIX CENTER POLICY PAPER No. 22 (July 2005).

"Competition After Unbundling: Entry, Industry Structure and Convergence," PHOENIX CENTER POLICY PAPER No. 21 (July 2005).

"Quantity-Discount Contracts as a Barrier to Entry," PHOENIX CENTER POLICY PAPER No. 20 (November 2004).

"The Positive Effects of Unbundling on Broadband Deployment," PHOENIX CENTER POLICY PAPER No. 19 (September 2004).

"Set It and Forget It? The Consequences of Market Power and Deregulation in Telecommunications Markets Services," PHOENIX CENTER POLICY PAPER No. 18 (June 2003).

"What Determines Wholesale Prices for Network Elements in Telephony? An Econometric Evaluation," PHOENIX CENTER POLICY PAPER NO. 16 (September 2002).

"A Fox in the Hen House: An Evaluation of Bell Company Proposals to Eliminate their Monopoly Position in Local Telecommunications Markets," PHOENIX CENTER POLICY PAPER No. 15 (September 2002).

"Make or Buy? Unbundled Elements as Substitutes for Competitive Facilities in the Local Exchange Network," PHOENIX CENTER POLICY PAPER No. 14 (September 2002).

"Why Adco? Why Now? An Economic Exploration into the Future of Industry Structure in Local Telecommunications Markets," PHOENIX CENTER POLICY PAPER No. 12 (November 2001).

"An Economic Analysis of the FCC's Notice of Inquiry on Flat Rate Charges in the Long Distance Industry," PHOENIX CENTER POLICY PAPER No. 11 (May 2001).

"Changing Industry Structure: The Economics of Entry and Price Competition" PHOENIX CENTER POLICY PAPER No. 10 (April 2001).

"Flow Through and Competition in the International Message Telephone Service Market," PHOENIX CENTER POLICY PAPER No. 7 (September 2000).

*Policy Bulletins*

"The Day the Music Died (in California): An Analysis of California Assembly Bill AB-1385," PHOENIX CENTER POLICY BULLETIN No. 51 (May 2021).

"Innovation, Exit, and Restrictions on Tech Mergers and Acquisitions," PHOENIX CENTER POLICY BULLETIN No. 50 (March 2021).

"COVID-19 and Broadband Speeds: A Multi-Country Analysis," PHOENIX CENTER POLICY BULLETIN No. 49 (May 2020).

"'Relevance' and 'Price' as Determinants of Internet Non-Adoption: A Review of the Evidence, PHOENIX CENTER POLICY BULLETIN No. 48 (April 2020).

"Innovation in Spectrum Repurposing: The C-Band as A Principal-Agent Problem," PHOENIX CENTER POLICY BULLETIN No. 47 (September 2019).

"Addressing Spectrum Holdouts with A Transaction Threshold: A Theoretical Analysis," PHOENIX CENTER POLICY BULLETIN No. 46 (July 2019).

"Infrastructure Investment and Franchise Fee Abuse: A Theoretical Analysis," PHOENIX CENTER POLICY BULLETIN No. 45 (April 2019).

"Is Faster Better? Quantifying the Relationship between Broadband Speed and Economic Growth," PHOENIX CENTER POLICY BULLETIN No. 44 (February 2018).

"A Retrospective Analysis of Vertical Mergers in Multichannel Video Programming Distribution Markets: The Comcast-NBCU Merger," PHOENIX CENTER POLICY BULLETIN No. 43 (December 2017).

"Safe Harbors and the Evolution of Music Retailing," PHOENIX CENTER POLICY BULLETIN No. 41 (March 2017).

"Skin in the Game: Interference, Sunk Investment, and the Repurposing of Radio Spectrum," PHOENIX CENTER POLICY BULLETIN No. 40 (March 2017).

"Promotional Effects and the Determination of Royalty Rates for Music," PHOENIX CENTER POLICY BULLETIN No. 39 (November 2016).

"Private Solutions to Broadband Adoption: An Economic Analysis," PHOENIX CENTER POLICY BULLETIN No. 38 (September 2016).

"Section 10 Forbearance: Asking the Right Questions to Get the Right Answers," PHOENIX CENTER POLICY BULLETIN No. 37 (November 2014).

"Tariffing Internet Termination: Pricing Implications of Classifying Broadband as a Title II Telecommunications Service," PHOENIX CENTER POLICY BULLETIN No. 36 (September 2014).

"Will Bidder Exclusion Rules Lead to Higher Auction Revenue? A Review of the Evidence," PHOENIX CENTER POLICY BULLETIN No. 34 (April 2014).

"Equalizing Competition Among Competitors: A Review of the DOJ's Spectrum Screen Ex Parte Filing," PHOENIX CENTER POLICY BULLETIN No. 33 (May 2013).

"Social Well-Being and IP Theft: A Dynamic Economic Analysis," PHOENIX CENTER POLICY BULLETIN No. 32 (March 2012).

"Can Government Spending Get America Working Again? An Empirical Investigation," PHOENIX CENTER POLICY BULLETIN No. 31 (November 2011).

"Shocks to the Broadband Ecosystem: Implications for Competition and Market Structure," PHOENIX CENTER POLICY BULLETIN No. 30 (September 2011).

"Ending the Section 629 Problem: A Law and Economics Argument," PHOENIX CENTER POLICY BULLETIN No. 29 (June 2011).

"Regulatory Expenditures, Economic Growth and Jobs: An Empirical Study," PHOENIX CENTER POLICY BULLETIN No. 28 (April 2011).

"Challenges in Using the National Broadband Map's Data, PHOENIX CENTER POLICY BULLETIN No. 27 (March 2011).

"Public Safety or Commercial Use? A Cost/Benefit Framework for the D Block," PHOENIX CENTER POLICY BULLETIN No. 26 (March 2011).

"Jobs, Jobs, Jobs: Communications Policy and Employment Effects in the Information Sector," PHOENIX CENTER POLICY BULLETIN No. 25 (October 2010).

"Evaluating Broadband Stimulus and the National Broadband Plan: Establishing Expectations for Broadband Rankings," PHOENIX CENTER POLICY BULLETIN No. 24 (March 2010).

"Expanding the Digital Divide: Network Management Regulations and the Size of Providers," PHOENIX CENTER POLICY BULLETIN No. 23 (October 2009).

"Do High Call Termination Rates Deter Broadband Deployment?" PHOENIX CENTER POLICY BULLETIN No. 22 (October 2008).

"Consumers and Wireless Carterfone: An Economic Perspective," PHOENIX CENTER POLICY BULLETIN No. 21 (September 2008).

"Using Auction Results to Forecast the Impact of Wireless Carterfone Regulation on Wireless Networks," PHOENIX CENTER POLICY BULLETIN No. 20 (May 2008).

"An Economic Approach to Evaluating a National Wireless Regulatory Framework," PHOENIX CENTER POLICY BULLETIN No. 19 (October 2007).

"Wireless Net Neutrality: From Carterfone to Cable Boxes," PHOENIX CENTER POLICY BULLETIN No. 17 (April 2007).

"The Efficiency Risk of Network Neutrality Rules," PHOENIX CENTER POLICY BULLETIN No. 16 (May 2006).

"Unnecessary Regulations and the Value of Spectrum: An Economic Evaluation of Lease Term Limits for the Educational Broadband Service," PHOENIX CENTER POLICY BULLETIN No. 15 (February 2006).

"A La Carte and 'Family Tiers' as a Response to a Market Defect in the Multichannel Video Programming Market," PHOENIX CENTER POLICY BULLETIN No. 14 (February 2006).

"In Delay There Is No Plenty: The Consumer Welfare Cost of Franchise Reform Delay," PHOENIX CENTER POLICY BULLETIN No. 13 (January 2006).

"Franchise Fee Revenues After Video Competition: The 'Competition Dividend' for Local Governments," PHOENIX CENTER POLICY BULLETIN No. 12 (November 2005).

"Higher Prices Expected from the Cingular/AT&T Wireless Merger," PHOENIX CENTER POLICY BULLETIN No. 11 (May 26, 2004).

"Fixed-Mobile "Intermodal" Competition in Telecommunications: Fact or Fiction?," PHOENIX CENTER POLICY BULLETIN No. 10 (March 30, 2004).

"Federalism in Telecommunications Regulation: Effectiveness and Accuracy of State Commission Implementation of TELRIC in Local Telecoms Markets," PHOENIX CENTER POLICY BULLETIN No. 9 (March 9, 2004).

"The $10 Billion Benefit of Unbundling: Consumer Surplus Gains from Competitive Pricing Innovations," PHOENIX CENTER POLICY BULLETIN No. 8 (January 27, 2004).

"The Positive Effects of Competition on Employment in the Telecommunications Industry," PHOENIX CENTER POLICY BULLETIN No. 7 (October 15, 2003).

"UNE-P Drives Bell Investment - A Synthesis Model," PHOENIX CENTER POLICY BULLETIN No. 6 (September 17, 2003).

"Competition and Bell Company Investment in Telecommunications Plant: The Effects of UNE-P," PHOENIX CENTER POLICY BULLETIN No. 5 (Originally released July 9, 2003 and updated September 17, 2003).

"The Truth About Telecommunications Investment after the Telecommunications Act of 1996," PHOENIX CENTER POLICY BULLETIN No. 4 (June 24, 2003).

*Policy Perspectives*

"Form 477, Speed-Tests, and the American Broadband User's Experience," PHOENIX CENTER POLICY PERSPECTIVE No. 21-03 (March 31, 2021).

"Updating the Minimum Wage: Setting a Uniform Wage Across a Diverse America," PHOENIX CENTER POLICY PERSPECTIVE No. 21-01 (February 16, 2021).

"Are Broadband Prices Declining? A Look at the FCC's Price Survey Data," PHOENIX CENTER POLICY PERSPECTIVE No. 20-07 (October 26, 2020).

"The Open Technology Institute's Cost of Connectivity 2020 Report: A Critical Review," PHOENIX CENTER POLICY PERSPECTIVE No. 20-06 (July 20, 2020).

"Subsidizing Broadband: Price, Relevance, and the Digital Divide," PHOENIX CENTER POLICY PERSPECTIVE No. 20-05 (July 7, 2020).

"Trends in Lifeline Reform: A Look at the Evidence, Not the Politics," PHOENIX CENTER POLICY PERSPECTIVE No. 20-04 (July 1, 2020).

"Is France a Broadband Nirvana? A Look at the Data," PHOENIX CENTER POLICY PERSPECTIVE No. 20-03 (June 18, 2020).

"Could Acceleration Payments Increase Funding for Broadband? A Review of the FCC's C-Band Plan," PHOENIX CENTER POLICY PERSPECTIVE No. 20-01 (February 18, 2020).

"Infrastructure Investment in the Railroad Industry: An Econometric Analysis," PHOENIX CENTER POLICY PERSPECTIVE No. 19-07 (December 9, 2019).

"Does Title II Reduce Infrastructure Investment? Repairing Hooton's Analysis," PHOENIX CENTER POLICY PERSPECTIVE No. 19-06 (October 15, 2019).

JA91

"Statistical Negligence in Title II Impact Analysis," PHOENIX CENTER POLICY PERSPECTIVE No. 19-05 (October 1, 2019).

"Cost-Benefit Analysis at the FCC: A Look at the 900 MHz Band," PHOENIX CENTER POLICY PERSPECTIVE No. 19-04 (September 16, 2019).

"Quantifying the Overstatement in Broadband Availability from the Form 477 Data: An Econometric Approach," PHOENIX CENTER POLICY PERSPECTIVE No. 19-03 (July 11, 2019).

"Broadband as a Source of Rural Decline: A Look at the Data," PHOENIX CENTER POLICY PERSPECTIVE No. 19-02 (June 13, 2019).

"Estimating Betas in Practice: Alternatives that Matter and Those that Do Not," PHOENIX CENTER POLICY PERSPECTIVE No. 19-01 (January 9, 2019).

"Addressing Holdouts in the Repurposing of Spectrum for Broadband Services," PHOENIX CENTER POLICY PERSPECTIVE No. 18-10 (December 19, 2018).

"Infrastructure Investment After Title II," PHOENIX CENTER POLICY PERSPECTIVE No. 18-09 (November 1, 2018).

"Expediting Spectrum Repurposing Through Market Transactions," PHOENIX CENTER POLICY PERSPECTIVE No. 18-08 (October 12, 2018).

"Rhetoric Aside: What the Data Actually Say About Broadband Deployment," PHOENIX CENTER POLICY PERSPECTIVE No. 18-07 (September 4, 2018).

"Potential Implications of the Sprint/T-Mobile Merger on Wholesale Markets," PHOENIX CENTER POLICY PERSPECTIVE No. 18-06 August 27, 2018).

"Fair Use and the Economy: A Review of CCIA's Estimate," PHOENIX CENTER POLICY PERSPECTIVE No. 18-05 (June 27, 2018).

"Stock Market Reactions to the Sprint-TMO Merger," PHOENIX CENTER POLICY PERSPECTIVE No. 18-04 (May 23, 2018).

"Comcast's Capital Spending After Reclassification: A Check on Claims," PHOENIX CENTER POLICY PERSPECTIVE No. 18-03 (April 25, 2018).

"Reclassification and the Availability of 'Broadband' Service: A Counterfactual Check on Recent Claims," PHOENIX CENTER POLICY PERSPECTIVE No. 18-02 (April 19, 2018).

"A Review of the Berkman Center's Price Survey of Municipal Broadband Markets," PHOENIX CENTER POLICY PERSPECTIVE No. 18-01 (January 24, 2018).

"The Vanishing Benefits of Fair Use: A Review of the Flynn-Palmedo Study on 'User Rights' in Copyright Law," PHOENIX CENTER POLICY PERSPECTIVE No. 17-12 (December 18, 2017).

"Financial Implications of Opelika's Municipal Broadband Network," PHOENIX CENTER POLICY PERSPECTIVE No. 17-11 (August 24, 2017).

"A Further Review of the Internet Association's Empirical Study on Network Neutrality and Investment," PHOENIX CENTER POLICY PERSPECTIVE No. 17-10 (August 14, 2017).

"A Review of the Internet Association's Empirical Study on Network Neutrality and Investment," PHOENIX CENTER POLICY PERSPECTIVE No. 17-09 (July 24, 2017).

"Reclassification and Investment: A Statistical Look at the 2016 Data," PHOENIX CENTER POLICY PERSPECTIVE No. 17-08 (July 13, 2017).

"Broadband Speeds Post-Reclassification: An Empirical Approach," PHOENIX CENTER POLICY PERSPECTIVE No. 17-07 (June 27, 2017).

"Below the Belt: A Review of Free Press and the Internet Association's Investment Claims," PHOENIX CENTER POLICY PERSPECTIVE No. 17-06 (June 20, 2017).

"Regulatory Revival and Employment in Telecommunications," PHOENIX CENTER POLICY PERSPECTIVE No. 17-05 (June 12, 2017).

"Reclassification and Investment: An Analysis of Free Press' 'It's Working' Report," PHOENIX CENTER POLICY PERSPECTIVE No. 17-04 (May 22, 2017).

"Net Neutrality, Reclassification and Investment: A Further Analysis," PHOENIX CENTER POLICY PERSPECTIVE No. 17-03 (May 16, 2017).

"Net Neutrality, Reclassification and Investment: A Counterfactual Analysis," PHOENIX CENTER POLICY PERSPECTIVE No. 17-02 (April 25, 2017).

"What is the "Cost per Regulator" on GDP and Private Sector Job Creation? An Update on Prior Research," PHOENIX CENTER POLICY PERSPECTIVE No. 17-01 (February 22, 2017).

"Learning from Bad Technique: The WIK-Consult Report on Business Data Services," PHOENIX CENTER POLICY PERSPECTIVE No. 16-07 (August 4, 2016).

"State Automobile Franchise Laws: Public or Private Interests?" PHOENIX CENTER POLICY PERSPECTIVE No. 16-06 (July 12, 2016).

"Proper Incentives? The Economics of Spam Management by the Mobile Wireless Industry," PHOENIX CENTER POLICY PERSPECTIVE No. 16-05 (May 4, 2016).

"Cost or Benefit? A Review of the Consumer Federation of America's Report on Regulating Special Access Services," PHOENIX CENTER POLICY PERSPECTIVE No. 16-04 (April 18, 2016).

"Are Government-Owned Networks Abusing Market Power in the Set-Top Box Market? A Review of Rates," PHOENIX CENTER POLICY PERSPECTIVE No. 16-03 (April 14, 2016).

"The Road to Nowhere: Regulatory Implications of the FCC's Special Access Data Request," PHOENIX CENTER POLICY PERSPECTIVE No. 16-02 (February 23, 2016).

"The Economic Impact of Expanding Fair Use in Singapore: More Junk Science for Copyright Reform," PHOENIX CENTER POLICY PERSPECTIVE No. 16-01 (February 16, 2016).

"Ugly is Only Skin Deep: An Analysis of the DE Program in Auction 97," PHOENIX CENTER POLICY PERSPECTIVE No. 15-04 (July 20, 2015).

"The Lisbon Council's 2015 Intellectual Property and Economic Growth Index: A Showcase of Methodological Blunder," PHOENIX CENTER POLICY PERSPECTIVE No. 15-03 (June 29, 2015).

"Auction 97 and the Value of Spectrum," PHOENIX CENTER POLICY PERSPECTIVE No. 15-02 (February 4, 2015).

"Why Chattanooga is not the "Poster Child" for Municipal Broadband," PHOENIX CENTER POLICY PERSPECTIVE No. 15-01 (January 20, 2015).

"Movie Leaks, Box Office Success and Child's Play: Using an On-Line Game is No Way to Quantify the Effects of Piracy," PHOENIX CENTER POLICY PERSPECTIVE No. 14-07 (October 28, 2014).

"Have We Got It All Wrong? Forecasting Mobile Data Use and Spectrum Exhaust," PHOENIX CENTER POLICY PERSPECTIVE No. 14-06 (October 21, 2014).

"The Unpredictable FCC: Politicizing Communications Policy and its Threat to Broadband Investment," PHOENIX CENTER POLICY PERSPECTIVE No. 14-05 (October 14, 2014).

"Free Markets, Monopolies, and Copyright," PHOENIX CENTER POLICY PERSPECTIVE No. 14-04 (June 25, 2014).

"Should the Internet Tax Moratorium be Made Permanent?" PHOENIX CENTER POLICY PERSPECTIVE No. 14-03 (June 2, 2014).

"What is the Effect of File Sharing on the Creation of New Music? A Critical Review of *A Case Study of File Sharing and Music Output*," PHOENIX CENTER POLICY PERSPECTIVE No. 14-02 (March 6, 2014).

"Do Municipal Networks Offer More Attractive Service Offerings than Private Sector Providers? A Review and Expansion of the Evidence," PHOENIX CENTER POLICY PERSPECTIVE No. 14-01 (January 27, 2014).

"Piracy and Movie Revenues: A Critical Review of "A Tale of the Long Tail," PHOENIX CENTER POLICY PERSPECTIVE No. 13-05 (September 16, 2013).

"The Economics of Bidder Exclusion Rules: A Response to Dr. Baker," PHOENIX CENTER POLICY PERSPECTIVE No. 13-04 (July 18, 2013).

"Will Bidder Exclusions Increase Auction Revenue? A Review of the Arguments," PHOENIX CENTER POLICY PERSPECTIVE No. 13-03 (June 11, 2013).

"Revisiting Internet Use and Depression Among the Elderly," PHOENIX CENTER POLICY PERSPECTIVE No. 13-02 (June 7, 2013).

"Searching for a New Regulatory Paradigm: A Comment on AT&T's Petition for Wire Center Trials," PHOENIX CENTER POLICY PERSPECTIVE No. 13-01 (February 25, 2013).

"What is the Effect of Regulation on Broadband Investment? Regulatory Certainty and the Expectation of Returns," PHOENIX CENTER POLICY PERSPECTIVE No. 12-05 (September 19, 2012).

"Justifying the Ends: Section 706 and the Regulation of Broadband," PHOENIX CENTER POLICY PERSPECTIVE No. 12-04 (August 13, 2012).

"Approximating the Distribution of Broadband Usage from Publicly-Available Data," PHOENIX CENTER POLICY PERSPECTIVE No. 12-03 (May 31, 2012).

"A Most Egregious Act? The Impact on Consumers of Usage-Based Pricing," PHOENIX CENTER POLICY PERSPECTIVE No. 12-02 (May 23, 2012).

"Regulatory Expenditures, Economic Growth and Jobs: A Reply to Comments," PHOENIX CENTER POLICY PERSPECTIVE No. 12-01 (April 24, 2012).

"On the Road to More Efficient Pricing of Telecommunications Services: A Look at the Evidence," PHOENIX CENTER POLICY PERSPECTIVE No. 11-06 (October 5, 2011).

"What is the Effect of Regulation on Broadband Investment? Regulatory Certainty and the Expectation of Returns," PHOENIX CENTER POLICY PERSPECTIVE No. 12-05 (September 19, 2011).

"Mobile Broadband and Job Search: An Empirical Test," PHOENIX CENTER POLICY PERSPECTIVE No. 11-05 (September 6, 2011).

"Internet Use and Labor Market Participation: Additional Insights from New and Old Data," PHOENIX CENTER POLICY PERSPECTIVE No. 11-04 (August 18, 2011).

"Justifying the Ends: Section 706 and the Regulation of Broadband," PHOENIX CENTER POLICY PERSPECTIVE No. 12-04 (August 13, 2011).

"Re-Auction of the D Block: A Review of the Arguments," PHOENIX CENTER POLICY PERSPECTIVE No. 11-03 (May 24, 2011).

"Wireless Mergers and Employment: A Look at the Evidence," PHOENIX CENTER PERSPECTIVE No. 11-02 (May 10, 2011).

"The Impossible Dream: Forbearance After the Phoenix Order," PHOENIX CENTER PERSPECTIVE No. 10-08 (December 2010).

"Endogenous Sunk Costs, Quality Competition and Welfare: A Technical Note," PHOENIX CENTER PERSPECTIVE No. 10-07 (December 2010).

"Be Careful What You Ask For (Redux): A Comment on the New America Foundation's Mobile Price Metrics," PHOENIX CENTER PERSPECTIVE No. 10-06 (November 2010).

"Fabricating a Broadband Crisis? More Evidence on the Misleading Inferences from OECD Rankings," PHOENIX CENTER PERSPECTIVE No. 10-05 (July 2010).

"Substantial Profits in the Broadband Ecosystem: A Look at the Evidence," PHOENIX CENTER PERSPECTIVE No 10-04 (April 2010).

"Non-Discrimination or Just Non-Sense:  A Law and Economics Review of the FCC's New Net Neutrality Principle," PHOENIX CENTER PERSPECTIVE No. 10-03 (March 2010).

"Sabotaging Content Competition: Do Proposed Net Neutrality Regulations Promote Exclusion?" PHOENIX CENTER PERSPECTIVE No. 10-02 (March 2010).

"Internet Use and Job Search: More Evidence," PHOENIX CENTER PERSPECTIVES No. 10-01 (January 2010).

"Internet Use and Job Search: More Evidence," PHOENIX CENTER PERSPECTIVE No. 10-01 (January 2010).

"Whoops! Berkman Study Shows "Open Access" Reduces Broadband Consumption," PHOENIX CENTER PERSPECTIVES No. 09-05 (November 2009).

"Finding the Bottom: A Review of Free Press's Analysis of Network Neutrality and Investment," PHOENIX CENTER PERSPECTIVES No. 09-04 (October 2009).

"Expanding the Digital Divide: Network Management Regulations and the Size of Providers," PHOENIX CENTER POLICY BULLETIN No. 23 (October 2009).

"Be Careful What You Ask For: A Comment on the OECD's Mobile Price Metrics," PHOENIX CENTER PERSPECTIVES No. 09-03 (September 16, 2009).

"Econometric Analysis of Broadband Subscriptions: A Note on Specification," PHOENIX CENTER PERSPECTIVES No. 09-02 (May 12, 2009).

"Normalizing Broadband Connections," PHOENIX CENTER PERSPECTIVES No. 09-01 (May 12, 2009).

"Broadband Expectations and the Convergence of Ranks," PHOENIX CENTER PERSPECTIVES No. 08-03 (October 1, 2008).

"Valuing the AWS-3 Spectrum: A Response to Comments," PHOENIX CENTER POLICY PERSPECTIVE No. 08-02 (July 2008).

"Calculating the Value of Unencumbered AWS-III Spectrum," PHOENIX CENTER POLICY PERSPECTIVE No. 08-01 (June 2008).

"University of Florida Study Shows Only Winners from Network Neutrality Regulation to be Content Providers, Consumers Lose." PHOENIX CENTER POLICY PERSPECTIVE No. 07-01 (March 2007).

**OTHER WRITINGS:**

"The Perils of a $15 Federal Minimum Wage," *Delaware Valley Journal* (February 22, 2021).

"Beware of Calls for a New Digital Regulator," *Notice & Comment – Yale Journal on Regulation* (February 19, 2021).

"INSIGHT: FCC Must Move Quickly on 12 GHz Mid-Band Spectrum for 5G Goals," *Bloomberg Law* (July 30, 2020).

"Getting Broadband Subsidies Right This Time," *Federalist Society Blog* (July 8, 2020).

"INSIGHT: Clock Ticks on Congress and STELAR Reauthorization," *Bloomberg Law* (November 21, 2019).

"Proposed Reforms to FCC's Lifeline Program Require A Bit More Thought," *Federalist Society Blog* (July 22, 2019).

"Insight: Is the Sprint, T-Mobile Merger Deal Dead?" *Bloomberg Law* (April 25, 2019).

"Should Electric Co-Ops Provide Broadband?" *Federalist Society Blog* (March 21, 2019).

"Sometimes 'No' is the Right Answer for Market Transactions," *Federalist Society Blog* (July 17, 2018)

"Putting 'Fair' Back in 'Fair Use'," *Federalist Society Blog* (June 26, 2018).

"'Hipster' Antitrust Meets Two-Sided Markets," *Bloomberg Law* (April 17, 2018).

"Kentucky Wired – Get Out, And Get Out Now," *TheLevisaLazer.com* (March 26, 2018).

"Let's Not Leave America's Small Businesses Behind in Tax Reform," *The Hill* (November 27, 2017).

"Repurposing Spectrum for Mobile Broadband Is Great, But Interference Issues Must Be Resolved First," *Bloomberg BNA* (October 16, 2017).

"FCC Must Dump Obama's Net Neutrality Rules for Broadband," *The Hill* (September 5, 2017).

"Public Broadband Projects Can Leave Taxpayers Holding the Bag," *AL.com* (August 30, 2017).

"Overbroad Safe Harbors—A Threat to a Healthy Internet," *Bloomberg BNA* (August 30, 2017).

<u>JA98</u>

"Not Ready to Ride into the Sunset: Chairman Wheeler and the Fight for Internet Regulation," *Bloomberg BNA* (August 10, 2017).

"Revisiting the 'Virtuous Circle' Two Years Later," *Bloomberg BNA* (July 10, 2017).

"The Real Story Behind Internet Regulation," *Real Clear Policy* (June 29, 2017).

"Is Now the Right Time to Expand Opelika's Broadband Service?" *AL.com* (April 11, 2017).

"Stopping the Surface Transportation Board from Running off the Rails," *The Hill* (January 18, 2017).

"Fair Use Does Not Mean a Fair Market," *Content Café* (September 19, 2016).

"Questionable Economic Benefits of Chattanooga's Gig," *The Tennessean* (August 17, 2016).

"What is the True Cost of a Set-Top Box?" *Bloomberg BNA* (May 31, 2016).

"Statutory Damages are a Vital Part of the Copyright System," *The Hill* (May 25, 2016).

"The Obama Administration is Misleading Consumers on Set-Top Box Prices," *The Hill* (April 22, 2016).

"The FCC's Cynical Set-Top Box Play," *The Hill* (February 3, 2016).

"FTC Staff Bias on Intra-Brand Car Competition is a Bad Deal for Consumers," *The Hill* (January 19, 2016).

"Is the FCC's Regulatory Revival Deterring Infrastructure Investment?" *Bloomberg BNA* (November 13, 2015).

"How Congress Lost Control of the Regulators," *The Hill* (October 27, 2015).

"Bait-and-Switch—Or Why the FCC's 'Virtuous Circle' Theory is Nonsense," *Bloomberg BNA* (May 18, 2015).

"Tax Unfairness Is A Job Killer," *The Hill* (December 3, 2014).

"The Unpredictable FCC: Politicizing Communications Policy and its Threat to Broadband Investment," *Bloomberg BNA* (October 30, 2014).

"Will Net Neutrality Politics Scuttle the FCC's Upcoming Incentive Auction?" *The Hill* (September 3, 2014).

"Congressional Gridlock Threatens to Tax the Internet," *The Hill* (June 05, 2014).

"FCC Puts Funding for Public Safety Network and Debt Reduction in Jeopardy," *The Hill* (April 24, 2014).

"Shared Spectrum is a Pipe Dream," *The Hill* (February 6, 2014).

"Opportunities for Local Exchange Competition Are Greatly Exaggerated." *Electric Light & Power* (April 1998).

"Book Review: Welfare Economics and Externalities in an Open-Ended Universe: A Modern Austrian Perspective," by Roy E. Cordato. *Southern Economic Journal* (April 1994).

"Book Review: Toward Competition in Local Telephony," by William J. Baumol and Gregory Sidak.  *Southern Economic Journal* (April 1996).

"Competition Will Decrease Cable Rates: On Curbing Cable Costs," with Audrey B. Davidson. *Business First* (September 6, 1993).

"TKR Cable Not Living Up to Promises To Cut Rates," with Audrey B. Davidson. *The Louisville Cardinal* (September 2, 1993).

"The Cable Television Industry: An Annotated Bibliography" Published and Funded by the *Auburn Utilities Research Center* (Summer 1994).

# TAB 2

JA100

# PUBLIC NOTICE

**Federal Communications Commission**
**445 12th St., S.W.**
**Washington, D.C. 20554**

News Media Information 202 / 418-0500
Internet: http://www.fcc.gov
TTY: 1-888-835-5322

DA 21-1550
Released:  December 13, 2021

### Proposed First Quarter 2022 Universal Service Contribution Factor

CC Docket No. 96-45

In this Public Notice, the Office of Managing Director (OMD) announces that the proposed universal service contribution factor for the first quarter of 2022 will be 0.252 or 25.2 percent.[1]

## Rules for Calculating the Contribution Factor

Contributions to the federal universal service support mechanisms are determined using a quarterly contribution factor calculated by the Federal Communications Commission (Commission).[2] The Commission calculates the quarterly contribution factor based on the ratio of total projected quarterly costs of the universal service support mechanisms to contributors' total projected collected end-user interstate and international telecommunications revenues, net of projected contributions.[3]

## USAC Projections of Demand and Administrative Expenses

Pursuant to section 54.709(a)(3) of the Commission's rules,[4] the Universal Service Administrative Company (USAC) submitted projections of demand and administrative expenses for the first quarter of 2022.[5]  Accordingly, the projected demand and expenses are as follows:

---

[1] *See* 47 C.F.R. § 54.709(a).

[2] *See id.*

[3] *See* 47 C.F.R. § 54.709(a)(2).

[4] *See* 47 C.F.R. § 54.709(a)(3).

[5] *See* Federal Universal Service Support Mechanisms Fund Size Projections for the First Quarter 2022, available at <https://www.usac.org/fcc-filings> (filed November 2, 2021) (*USAC Filing for First Quarter 2022 Projections*; *See also* Federal Universal Service Support Mechanisms Quarterly Contribution Base for the First Quarter 2022, available at <https://www.usac.org/fcc-filings> (filed December 2, 2021) (*USAC Filing for First Quarter 2022 Contribution Base*).

($ millions)

| Program Demand | Projected Program Support | Admin. Expenses | Application of True-Ups & Adjustments | Total Program Collection (Revenue Requirement) |
|---|---|---|---|---|
| Schools and Libraries | 573.39 | 18.98 | 45.58 | 637.95 |
| Rural Health Care[6] | 0 | 0 | 11.72 | 11.72 |
| High-Cost | 994.00 | 15.30 | 35.22 | 1,044.52 |
| Lifeline | 206.10 | 15.18 | (83.77) | 137.51 |
| Connected Care | 8.33 | 0.17 | 0.71 | 9.21 |
| TOTAL | 1,781.82 | 49.63 | 9.46 | 1,840.91 |

**USAC Projections of Industry Revenues**

USAC submitted projected collected end-user telecommunications revenues for January 2022 through March 2022 based on information contained in the First Quarter 2022 Telecommunications Reporting Worksheet (FCC Form 499-Q).[7]  The amount is as follows:

Total Projected Collected Interstate and International End-User Telecommunications Revenues for First Quarter 2022:  $9.235846 billion.

**Adjusted Contribution Base**

To determine the quarterly contribution base, we decrease the first quarter 2022 estimate of projected collected interstate and international end-user telecommunications revenues by the projected revenue requirement to account for circularity and decrease the result by one percent to account for uncollectible contributions.  Accordingly, the quarterly contribution base for the first quarter of 2022 is as follows:

Adjusted Quarterly Contribution Base for Universal Service Support Mechanism

(First Quarter 2022 Revenues - Projected Revenue Requirement) * (100% - 1%)

---

[6] Rural Health Care administrative costs of $5.94 million are funded within the program cap.  *See* Federal Universal Service Support Mechanisms Fund Size Projections for the First Quarter 2022, available at http://www.usac.org/fcc-filings> (filed November 2, 2021) (*USAC Filing for First Quarter 2022 Projections)*.

[7] *USAC Filing for First Quarter 2022 Contribution Base* at 4.

$$= (\$9.235846 \text{ billion} - \$1.840910 \text{ billion}) * 0.99$$

$$=\$7.320987 \text{ billion}.$$

**Unadjusted Contribution Factor**

Using the above-described adjusted contribution base and the total program collection (revenue requirement) from the table above, the proposed unadjusted contribution factor for the first quarter of 2022 is as follows:

Contribution Factor for Universal Service Support Mechanisms

Total Program Collection / Adjusted Quarterly Contribution Base

$$=\$1.840910 \text{ billion} / \$7.320987 \text{ billion}$$

$$=0.251457$$

**Unadjusted Circularity Factor**

USAC will reduce each provider's contribution obligation by a circularity discount approximating the provider's contributions in the upcoming quarter.  Accordingly, the proposed unadjusted circularity factor for the first quarter of 2022 is as follows:

Unadjusted Circularity Factor for Universal Service Support Mechanisms

= Total Program Collection / Projected First Quarter 2022 Revenues
= $1.840910 billion / $9.235846 billion
= 0.199322

**Proposed Contribution Factor**

The Commission has directed OMD to announce the contribution factor as a percentage rounded up to the nearest tenth of one percent.[8]  Accordingly, the proposed contribution factor for the first quarter of 2022 is as follows:

---

[8] *See Federal-State Joint Board on Universal Service, 1998 Biennial Regulatory Review – Streamlined Contributor Reporting Requirements Associated with Administration of Telecommunications Relay Service, North American Numbering Plan, Local Number Portability, and Universal Service Support Mechanisms, Telecommunications Services for Individuals with Hearing and Speech Disabilities, and the Americans with Disabilities Act of 1990, Administration of the North American Numbering Plan and North American Numbering Plan Cost Recovery Contribution Factor and Fund Size, Number Resource Optimization, Telephone Number Portability, Truth-in-*

JA103

25.2%

**Proposed Circularity Discount Factor**

The Commission also has directed OMD to account for contribution factor rounding when calculating the circularity discount factor.[9]  Accordingly, the proposed circularity factor for the first quarter of 2022 is as follows:

0.201049[10]

**Conclusion**

If the Commission takes no action regarding the projections of demand and administrative expenses and the proposed contribution factor within the 14-day period following release of this Public Notice, they shall be deemed approved by the Commission.[11]  USAC shall use the contribution factor to calculate universal service contributions for the first quarter of 2022.  USAC will reduce each provider's contribution obligation by a circularity discount approximating the provider's contributions in the upcoming quarter.[12]  USAC includes contribution obligations less the circularity discount in invoices sent to contributors.  Contribution payments are due on the dates shown on the invoice.  Contributors will pay interest for each day for which the payments are late.  Contributors failing to pay contributions in a timely fashion may be subject to the enforcement provisions of the Communications Act of 1934, as amended, and any other applicable law.  In addition, contributors may be billed by USAC for reasonable costs of collecting overdue contributions.[13]

We also emphasize that carriers may not mark up federal universal service line-item amounts above the contribution factor.[14]  Thus, carriers may not, during the first quarter of 2022, recover through a

---

*Billing and Billing Format*, CC Docket Nos. 96-45, 98-171, 90-571, 92-237, 99-200, 95-116, 98-170, Order and Second Order on Reconsideration, 18 FCC Rcd 4818, 4826, para. 22 (2003) (*Second Order on Reconsideration*).

[9] *Id*.

[10] The proposed circularity discount factor = 1 + [(unadjusted circularity discount factor – 1) * (unadjusted contribution factor / proposed contribution factor)].  The proposed circularity discount factor is calculated in a spreadsheet program, which means that internal calculations are made with more than 15 decimal places.

[11] *See* 47 C.F.R. § 54.709(a)(3).

[12] USAC will calculate each individual contributor's contribution in the following manner: (1-Circulatory Factor) * (Contribution Factor*Revenue)

[13] *See* 47 C.F.R. § 54.713.

[14] *See* 47 C.F.R. § 54.712.

4

federal universal service line item an amount that exceeds 25.2 percent of the interstate telecommunications charges on a customer's bill.

In addition, under the limited international revenues exception (LIRE) in section 54.706(c) of the Commission's rules, a contributor to the universal service fund whose projected collected interstate end-user telecommunications revenues comprise less than 12 percent of its combined projected collected interstate and international end-user telecommunications revenues shall contribute based only on projected collected interstate end-user telecommunications revenues, net of projected contributions.[15]  The rule is intended to exclude from the contribution base the international end-user telecommunications revenues of any entity whose annual contribution, based on the provider's interstate and international end-user telecommunications revenues, would exceed the amount of its interstate end-user revenues.[16]  The proposed contribution factor exceeds 12 percent, which we recognize could result in a contributor being required to contribute to the universal service fund an amount that exceeds its interstate end-user telecommunications revenue.  Should a contributor face this situation, the contributor may petition the Commission for waiver of the LIRE threshold.[17]

For further information, contact Thomas Buckley at (202) 418-0725 or Kim Yee at (202) 418-0805, TTY (888) 835-5322, in the Office of Managing Director.

---

[15] *See* 47 C.F.R. § 54.706.

[16] *See Federal-State Joint Board on Universal Service*, Sixteenth Order on Reconsideration, CC Docket No. 96-45, Eighth Report and Order, CC Docket No. 96-45, Sixth Report and Order, Docket No. 96-262, 15 FCC Rcd 1679, 1687-1692, paras. 17-29 (1999) (*Fifth Circuit Remand Order*).

[17] Generally, the Commission's rules may be waived for good cause shown.  47 C.F.R. § 1.3.  The Commission may exercise its discretion to waive a rule where the particular facts make strict compliance inconsistent with the public interest.  *Northeast Cellular Telephone Co. v. FCC*, 897 F.2d 1164, 1166 (D.C. Cir. 1990) (*Northeast Cellular*).  In addition, the Commission may consider considerations of hardship, equity, or more effective implementation of overall policy on an individual basis.  *WAIT Radio v. FCC*, 418 F.2d 1153, 1159 (D.C. Cir. 1969); *Northeast Cellular*, 897 F.2d at 1166.  Waiver of the Commission's rules is therefore appropriate only if special circumstances warrant a deviation from the general rule, and such deviation will serve the public interest.  *Northeast Cellular*, 897 F.2d at 1166; 47 C.F.R. § 54.802(a).

# TAB 3

<u>JA105</u>

**B e f o r e   t h e**
# FEDERAL COMMUNICATIONS COMMISSION
**W a s h i n g t o n ,   D . C .**

## UNIVERSAL SERVICE ADMINISTRATIVE COMPANY

Federal Universal Service Support Mechanisms
Quarterly Contribution Base for the First Quarter 2022

UNIVERSAL SERVICE
ADMINISTRATIVE COMPANY
700 12TH STREET N.W., SUITE 900
WASHINGTON, D.C. 20005
VOICE: 202.776.0200
FAX: 202.776.0080
www.usac.org

December 2, 2021

JA106

**INTRODUCTION** ....................................................................................... 1

**CONTRIBUTION BASE** ............................................................................ 3

**FIRST QUARTER 2022 PROJECTED COLLECTED REVENUE BASE TO BE USED FOR 2022 CONTRIBUTIONS** ....................................................... 4

**TELECOMMUNICATIONS ENTITIES WHICH REPORTED ON FORM 499-Q AS OF NOVEMBER 19, 2021** .........................................................**M05**

# BEFORE THE FEDERAL COMMUNICATIONS COMMISSION
# WASHINGTON, D.C.

# FEDERAL UNIVERSAL SERVICE SUPPORT MECHANISMS FUND SIZE QUARTERLY CONTRIBUTION BASE FOR THE FIRST QUARTER 2022

## *INTRODUCTION*

The Universal Service Administrative Company (USAC) is the not-for-profit corporation appointed by the Federal Communications Commission (FCC or Commission) to administer the federal Universal Service Fund (USF) and the four federal Universal Service Support Mechanisms: High Cost, Lifeline, Rural Health Care, and Schools and Libraries.[1] USAC hereby submits the contribution base amount to be used for the first quarter of calendar year 2022 (1Q2022) in accordance with Section 54.709 of the Commission's rules.[2] USAC is filing this contribution base report pursuant to the Commission's 2002 *Projected Collected Contribution Methodology Order*, updating the 2001 *Contribution Methodology Order*.[3] In the 2002 Order, the Commission changed the universal service contribution base methodology from actual contributor revenues billed to projected collected revenues.[4] On March 14, 2003, the Commission released an *Order and Second Order on Reconsideration*, which, *inter alia*, directed the Wireline

---

[1] *See* 47 C.F.R. § 54.701(a)*; see also Changes to the Board of Directors of the National Exchange Carrier Association, Inc. et al.,* CC Docket Nos. 97-21 *et al.*, Third Report and Order, Fourth Order on Reconsideration and Eighth Order on Reconsideration, 13 FCC Rcd 25058 (1998); *Access Charge Reform et al.*, CC Docket Nos. 96-262 *et al.*, Sixth Report and Order, Report and Order, Eleventh Report and Order, 15 FCC Rcd 12962 (2000) (*CALLS Order*); *Federal-State Joint Board on Universal Service et al.*, CC Docket No. 96-45, 16 FCC Rcd 5748 (2001) (*Contribution Methodology Order*).

[2] *See* 47 C.F.R. § 54.709(a)(3).

[3] *See Contribution Methodology Order*, 16 FCC Rcd at 5752-53, paras. 10-13; *Federal-State Joint Board on Universal Service et al.*, CC Docket Nos. 96-45 *et al.*, Report and Order and Second Further Notice of Proposed Rulemaking, 17 FCC Rcd 24952 (2002) (*Projected Collected Contribution Methodology Order*).

[4] *Projected Collected Contribution Methodology Order*, 17 FCC Rcd at 24952, 24969, paras. 1, 29-30.

Competition Bureau (WCB) to announce the universal service contribution factor as a percentage rounded up to the nearest tenth of one percent.[5] The Commission also directed the Wireline Competition Bureau to account for contribution factor rounding when calculating the "circularity" discount factor.[6]

On June 23, 2006, the Commission issued an order realigning oversight responsibilities within the FCC for the USF, the universal service support mechanisms and USAC.[7] Pursuant to that order, the FCC's Office of the Managing Director is now responsible for calculating the quarterly contribution factor and issuing related public notices.[8]

Consistent with Commission regulations and orders, on November 2, 2021, USAC filed the Federal Universal Service Support Mechanisms Fund Size and Administrative Cost Projections for 1Q2022.

Upon approval of the universal service support mechanisms quarterly funding requirements, projected administrative costs and the contribution base, the Commission will establish a quarterly contribution factor and a circularity factor.[9] USAC will then bill contributors on a monthly basis for their individual obligations based on the approved contribution factor and circularity factor.[10]

---

[5] See Federal-State Joint Board on Universal Service et al., CC Docket Nos. 96-45 et al., Order and Second Order on Reconsideration, 18 FCC Rcd 4818, 4826, para. 22 (2003) (Second Order on Reconsideration); see also Revised Second Quarter 2003 Universal Service Contribution Factor, CC Docket No. 96-45, Public Notice, 18 FCC Rcd 5097, 5097 n.3 (Wireline Comp. Bur. 2003) ("Although the Second Order on Reconsideration has not yet been published in the Federal Register and accordingly has not yet become effective, we expect it will be published before the start of the second quarter of 2003. Absent release of this Public Notice, the six-digit contribution factor announced on March 7, 2003 would be deemed approved by the Commission on March 21, 2003. However, the six-digit contribution factor would be inconsistent with the Second Order on Reconsideration. Therefore, the Bureau takes this limited action today to ensure the implementation of the Second Order on Reconsideration for the second quarter of 2003.").
[6] Second Order on Reconsideration, 18 FCC Rcd at 4826, para. 22.
[7] See Amendment of Part 54 of the Commission's Rules, Order, 21 FCC Rcd 7422, 7423, and para. 4 (2006).
[8] Id.
[9] See 47 C.F.R. § 54.709(a)(3).
[10] Id.

## *CONTRIBUTION BASE*

USAC collects interstate and international projected revenue information from carriers on the FCC Form 499-Q (Form 499-Q) four times each year and submits aggregate information on a quarterly basis to the FCC.[11]

Carriers also file the FCC Form 499-A (Form 499-A) in April of each year to report actual annual revenues from the prior year. USAC uses revenue data provided by carriers on the FCC Form 499-A to perform annual true-ups of actual revenue to the quarterly projected revenue data submitted by carriers on FCC Form 499-Q during the prior calendar year.[12] As necessary, USAC will refund or collect from carriers any over-payments or underpayments. As mandated by the Commission, if the combined quarterly revenues reported by a carrier on its Forms 499-Q are greater than those reported on its annual revenue report on Form 499-A, then a refund will be provided to the carrier based on an average of the two lowest contribution factors for the year.[13] If the combined quarterly revenues reported by a carrier are less than those reported on its annual revenue report on Form 499-A, then USAC will collect the difference from the carrier using an average of the two highest contribution factors from that year.[14]

Carriers were required to file the Form 499-Q with 1Q2022 projected collected revenue information on or before November 1, 2021.[15] By December 2, 2021, USAC is

---

[11] The FCC Form 499-Q includes a box for each of the quarterly filing submissions. Carriers check the appropriate box to indicate the quarter for which revenue information is being reported. Data is due to USAC approximately one month before the filing is due to the FCC.

[12] In addition, carriers may file a revised Form 499-Q within 45 days of the original filing due date for the current quarter. *See Projected Collected Contribution Methodology Order*, 17 FCC Rcd at 24972, para. 36.

[13] *Id.*

[14] *Id.*

[15] *See* FCC Form 499-Q, *available at* https://www.usac.org/service-providers/contributing-to-the-usf/forms-to-file/ ; *see also* 47 C.F.R. § 54.711.

required to file revenue data with the FCC based on the November 1, 2021 carrier filings.[16] The Commission will use the program demand data and the projected collected revenue to calculate the universal service contribution factor for 1Q2022.[17] The following chart provides the current Form 499-Q filing schedule:

| Due Dates | Projected Collected Revenue for USF contributions |
|---|---|
| November 1, 2021 | 1Q: January – March 2022 |
| February 1, 2022 | 2Q: April – June 2022 |
| May 2, 2022 | 3Q: July – September 2022 |
| August 1, 2022 | 4Q: October – December 2022 |

Telecommunications providers qualifying for the *de minimis* exemption from contribution requirements are not required to complete the Form 499-Q.[18] However, for providers required to contribute to the Universal Service support mechanisms, the Form 499-Q must be submitted by the due date for each quarter listed above.[19]

## FIRST QUARTER 2022 PROJECTED COLLECTED REVENUE BASE TO BE USED FOR FIRST QUARTER 2022 CONTRIBUTIONS

The total projected collected interstate and international end-user revenue base to be used in determining the contribution factor for the Universal Service support mechanisms for 1Q2022 is $9,235,845,776. This amount was derived using the projected collected revenue reported on the FCC Form 499-Q submissions. Interstate telecommunications service providers were required to complete this form reporting January to March 2022 projected collected revenue information and return it by

---

[16] *See* 47 C.F.R. § 54.709(a).
[17] *Id.* USAC files projected program demand data at least 60 days prior to the start of a quarter and total contribution base revenue data at least 30 days prior to the start of a quarter.
[18] *See* 47 C.F.R. § 54.708.
[19] 47 C.F.R. §§ 54.711, 54.713.

November 1, 2021.[20]  USAC has included complete revenue data from 4,775 carriers

(3,112 contributors and 1,663 *de minimis* carriers).

The funding base for 1Q2022 is developed from the projected collected revenues

for 1Q2022 that were reported by carriers in November 2021.  As of November 19, 2021,

USAC has yet to receive information from 132 non-*de minimis* telecommunications

service providers that had previously submitted information to USAC.  For the FCC's

review of the 1Q2022 funding base for the support mechanisms, USAC includes

estimated revenues based on prior submissions for those carriers that failed to submit a

Form 499-Q.[21]

Appendix M05 provides a list of non-*de minimis* companies that have or should

have filed the November 1, 2021 Form 499-Q data as of November 19, 2021.


Respectfully submitted,

UNIVERSAL SERVICE
ADMINISTRATIVE COMPANY


Michelle Garber,
Vice President of Finance and
Chief Financial Officer

---

[20] 47 C.F.R. § 54.711(a).
[21] *See* 47 C.F.R. § 54.709(d).

# TAB 4

JA113

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | § | |
| | § | |
| Proposed First Quarter 2022 | § | CC Docket No. 96-45 |
| Universal Service Contribution Factor | § | |

---

**COMMENTS AND OBJECTIONS OF CONSUMERS' RESEARCH, CAUSE BASED COMMERCE, INC., JOSEPH BAYLY, JEREMY ROTH, DEANNA ROTH, LYNN GIBBS, PAUL GIBBS, RHONDA THOMAS, AND KERSTEN CONWAY**

---

Commenters Consumers' Research, Cause Based Commerce, Inc., Joseph Bayly, Jeremy Roth, Deanna Roth, Lynn Gibbs, Paul Gibbs, Rhonda Thomas, and Kersten Conway respectfully submit these comments and objections in response to the Universal Service Administrative Company's ("USAC") *Federal Universal Service Support Mechanisms Fund Size Projections for First Quarter 2022*,[1] which the Office of Managing Director ("OMD") will use to prepare a *Public Notice of Proposed First Quarter 2022 Universal Service Contribution Factor*. 47 C.F.R. § 54.709(a). OMD should set the *Proposed First Quarter 2022 Contribution Factor* at 0.000.

## I. INTRODUCTION

Commenters respectfully request that OMD set the *Proposed First Quarter 2022 Contribution Factor* at 0.000 (0 percent). The Universal Service Fund is an unconstitutional tax raised and spent by an unaccountable federal agency—which in

---

[1] *Available at* https://www.usac.org/wp-content/uploads/about/documents/fcc-filings/2022/first-quarter/financials/USAC-1Q2022-Federal-Universal-Service-Mechanism-Quarterly-Demand-Filing_Final.pdf.

1

turn has delegated almost all authority over this revenue-raising scheme to a private company registered in Delaware. And the cost of this tax is ultimately borne by consumers via a separate line item on nearly every phone bill in the country. OMD should set the *Proposed First Quarter 2022 Universal Service Contribution Factor* at 0.000 because the Fund is unconstitutional, violates statutory authority, and is otherwise illegal for numerous reasons:

(1)     In Section 254 of the 1996 Telecommunications Act, which established the Universal Service Fund, Congress delegated its legislative powers to the Commission, in violation of the original understanding of constitutional separation of powers and also in violation of the more-recent prohibition on delegations that lack an adequate intelligible principle to guide the agency's actions. Under the Act, the Commission is empowered to raise and spend billions of dollars on subsidies for "universal service" (a term defined only generically by statute and which the Commission itself has authority to re-define as often as it chooses), thereby violating Article I, Section 1 of the U.S. Constitution. Because the Universal Service Fund has been established and operates in an unconstitutional manner, the Commission (through OMD in this instance) should not permit further collections.

(2)     To the extent Congress authorized the Commission to re-delegate (or de facto re-delegate) legislative powers over raising and spending revenue to a private company, namely USAC, Congress delegated legislative power to a private entity, thereby separately violating Article I, Section 1 of the U.S. Constitution, which prohibits improper delegations of authority to private persons and entities. Because

2

the Universal Service Fund has been established and operates in an unconstitutional manner, the Commission (through OMD in this instance) should not permit further collections.

(3)    In Section 254, Congress also delegated its taxing power to the Commission, thereby violating Article I, Section 8 of the U.S. Constitution. The charges imposed for Universal Service are taxes because they, at least in part, provide benefits for the general public—indeed, the term "universal service" confirms the goal of providing benefits for as many people as possible from this pot of money. Even if Congress can delegate taxing power to an agency, Congress must impose meaningful limitations on the rates or amounts that could be raised by the Commission, which Congress failed to do here. Because the Universal Service Fund has been established and operates in an unconstitutional manner, the Commission (through OMD in this instance) should not permit further collections.

(4)    To the extent Congress authorized the Commission to re-delegate (or de facto re-delegate) taxing power to a private company, namely USAC, Congress delegated its taxing power to a private entity, thereby violating Article I, Section 8 of the U.S. Constitution. Because the Universal Service Fund has been established and operates in an unconstitutional manner, the Commission (through OMD in this instance) should not permit further collections.

(5)    To the extent Congress did *not* authorize the Commission to re-delegate (or de facto re-delegate) legislative or taxing powers to a private company, the Universal Service Fund has been established and operates in excess of statutory

authority, and the Commission (through OMD in this instance) should not permit further collections pursuant to that re-delegation.

(6)    If USAC board directors are not considered private officials, and to the extent Congress authorized the Commission Chair alone (and not the entire Commission) to appoint those USAC board directors, then Congress vested the power to appoint officers of the United States in someone who is not "the President alone, … the Courts of Law, or … the Heads of Departments," thereby violating Article II, Section 2 of the U.S. Constitution. Because USAC's board is illegally constituted, the Universal Service Fund has been established and operates in violation of the Constitution, and the Commission (through OMD in this instance) should not permit further collections.

(7)    To the extent Congress did *not* authorize the Commission Chair alone to appoint USAC board directors, USAC's board is illegally constituted, the Universal Service Fund has been established and operates in excess of statutory authority, and the Commission (through OMD in this instance) should not permit further collections.

(8)    The *Proposed Quarterly Universal Service Contribution Factor* is a legislative rule that dictates future conduct, but the Commission has never complied with any of the Administrative Procedure Act's requirements for promulgating such rules. *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 95-96 (2015). Likewise, the Commission has never published the proposals in the Federal Register in advance of rulemaking. *See* 44 U.S.C. § 1505. If the Commission does not follow this procedure

for the *Proposed First Quarter 2022 Quarterly Contribution Factor*, the Commission would violate the APA and the Federal Register Act.

\* \* \*

Any one of these grounds provides a sufficient basis for OMD to set the *Proposed First Quarter 2022 Universal Service Contribution Factor* at 0.000 (0%). The failure to do so would result in numerous constitutional and statutory violations.

## II. BACKGROUND

### A.    Universal Service Before 1996

"Since the inception of the Federal Radio Commission in 1928, and continuing with the creation of the Federal Communications Commission in 1934, the federal government has pursued a policy of providing 'universal' telephone service to all residents and businesses in the United States," regardless of whether they are located in major metropolitan areas where service is easily provided, or isolated rural communities where service is expensive to provide. Ronald J. Krotoszynski, Jr., *Reconsidering the Nondelegation Doctrine: Universal Service, the Power to Tax, and the Ratification Doctrine*, 80 IND. L.J. 239, 279 (2005) (outlining history of universal service).

Until the 1960s, universal service was addressed via the monopoly power of incumbent telephone companies like American Telephone & Telegraph ("AT&T"). *Id.* at 279-81. In exchange for its monopoly, for example, AT&T agreed "not [to] discriminate among 'similarly situated' users, which in practice meant that [AT&T] had a limited capacity to price service as a function of demand and marketplace conditions rather than being subject to a regulator-managed calculation of carrier

5

costs and a fair rate of return." Robert M. Frieden, *Universal Service: When Technologies Converge and Regulatory Models Diverge*, 13 HARV. J.L. & TECH. 395, 401 (2000). In short, AT&T's monopoly power allowed it to charge some consumers an above-market rate, in order to subsidize the higher costs of providing service to other consumers.

"Until 1983, AT&T's internal rate structure largely funded the universal service program." Krotoszynski, Jr., *Reconsidering the Nondelegation Doctrine*, 80 Ind. L.J. at 279. But AT&T was broken up in 1984, and the Regional Bell Operating Companies that resulted were no longer able to subsidize local service via artificially increased long-distance rates. *Id.*

The Commission addressed this by creating the initial Universal Service Fund, which raised funds by imposing interconnection fees on long-distance carriers. *See Rural Tel. Coalition v. FCC*, 838 F.2d 1307, 1310-15 (D.C. Cir. 1988).

## B.    1996 Telecommunications Act

When Congress passed the 1996 Telecommunications Act, 47 U.S.C. § 1, *et seq.*, it opened local telephone service markets to competition, *see* Krotoszynski, Jr., *Reconsidering the Nondelegation Doctrine*, 80 Ind. L.J. at 282. "By opening up the local telephone market to competition, the last remaining part of the old universal service program, based on a system of pervasive cross-subsidies, fell." *Id.*

In response, Congress enacted 47 U.S.C. § 254, which expressly created a funding system to facilitate universal access, which was defined far more expansively than its predecessors. Beyond basic service for consumers, universal service now

6

included "'advanced telecommunications and information services,' particularly high-speed internet access, for schools (as well as for libraries and rural health care providers)." *City of Springfield v. Ostrander (In re LAN Tamers, Inc.)*, 329 F.3d 204, 206 (1st Cir. 2003) (quoting 47 U.S.C. § 254(b)(6), (h)(1)). This was a major part of the Act. Courts have held that Congress passed the "1996 Telecommunications Act ... to encourage universal telecommunications service." *Id.*

To accomplish its goal of universal service, the 1996 Telecommunications Act requires telecommunications carriers providing interstate telecommunications services to financially support the cost of providing telecommunications services to schools, libraries, health-care providers, low-income consumers, and subscribers in high-cost areas. *See* 47 U.S.C. § 254(b).

In particular, "[e]very telecommunications carrier that provides interstate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, to the specific, predictable, and sufficient mechanisms established by the Commission to preserve and advance universal service." *Id.* § 254(d). As discussed below, the Commission subsequently established several such "mechanisms," including a High-Cost and Low-Income program (which includes the Connect America Fund to mandate provision of broadband internet across the country, and the Lifeline program), a Schools and Libraries program, and a Rural Health Care program. 47 C.F.R. §§ 54.101, 54.701(c); *see also id.*, §§ 54.304, 54.308, 54.404, 54.501, 54.601.

Congress imposed no formula or limitation on how much money the Commission can raise through these mechanisms. And although the money must be spent on "universal service," that term is generically defined as "an evolving level of telecommunications services that the Commission shall establish periodically under this section, taking into account advances in telecommunications and information technologies and services." 47 U.S.C. § 254(c).

## C.   Section 254 Mandatory "Contributions" Are Taxes

"Congress cannot change whether an exaction is a tax or a penalty for constitutional purposes simply by describing it as one or the other." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 544 (2012).

Despite euphemistically being labeled as "contributions" or "mechanisms" in Section 254, the charges imposed pursuant to Section 254 are widely recognized as taxes because "some of the administrative costs at issue inure[] to the benefit of the public." *Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 214 (1989); *see also Nat'l Cable Television Ass'n, Inc. v. United States*, 415 U.S. 336, 340-41 (1974) (a tax is where the charge yields "a benefit … shared by other members of society"). The Universal Service Fund "contribution is a tax in all but name. It has no relation to any benefit conferred by the FCC; instead, it is based on the agency's self-determined funding needs for its subsidy schemes." Christopher C. DeMuth, Sr. & Michael S. Greve, *Agency Finance in the Age of Executive Government*, 24 GEO. MASON L. REV. 555, 566 (2017). The very title of the program—"Universal Service"—provides direct

8

textual proof that the funds are designed to benefit the public in such a broad manner that it is considered "universal."

Indeed, Congress directed that funds could be used to provide telecommunication services to nearly the entire general public: "[c]onsumers in all regions of the Nation, including low-income consumers and those in rural, insular, and high cost areas"; "any public or nonprofit health care provider that serves person who reside in rural areas"; and "elementary schools, secondary schools, and libraries for educational purposes." 47 U.S.C. §§ 254(b)(3), (h)(1); *see also* Universal Service Administrative Co., *Universal Service*, https://www.usac.org/about/universal-service/ ("Universal service is based on the principle that all Americans should have access to a baseline level of telecommunications service and further the public interest of keeping all Americans connected.").

Upon implementation, Section 254 was widely recognized as a tax. Then-Senator John McCain, Chairman of the U.S. Senate Commerce Committee, said, "Of course, it's a tax. It walks like a duck. It talks like a duck." Doug Abrahms, *Phone Rates Will Rise for Firms, Some Homes*, WASH. TIMES, December 11, 1997 (quoting then-Senator McCain). Industry insiders, think tanks, and journalists all agreed. *See* Barbara A. Cherry & Donald D. Nystrom, *Universal Service Contributions: An Unconstitutional Delegation of Taxing Power*, 2000 L. REV. MICH. ST. U. DET. C.L. 107, 109 & nn.9-11 (2000) (citing Richard C. Notebaert, CEO of Ameritech, *Speech Before the American Enterprise Institute*, Washington, D.C. (May 19, 1998); James Glassman, *A New Tax for the New Year*, WASH. POST, Dec. 2, 1997, at A1 (Fellow at

the American Enterprise Institute); Paul Craig Roberts, *Congress Should Grab Back the Reins of Power*, BUS. WEEK, Jan. 26, 1998, at 18 (John M. Olin Fellow at the Institute for Political Economy); Robert Sarvis, *Al Gore's Hidden Phone Tax: Bad Economics, Bad Politics*, CAPITOL COMMENT, No. 197, July 24, 1998 (publication of the Citizens for a Sound Economy); *New Phone Tax*, WALL ST. J., Dec. 9, 1997, at A22; *Phone Tax, Continued*, WALL ST. J., Dec. 23, 1997, at A14; Catherine Yang, *The Hidden Tax in Your Phone Bill*, BUS. WEEK, May 4, 1998, at 46).

**D.    Carriers Pass Through Section 254 Taxes To Consumers**

Nearly every telecommunications carrier is required to contribute to the Universal Service Fund based on the carrier's interstate and international telecommunications revenue. *See* 47 C.F.R. § 54.709(a). The Commission devises a formula that each carrier must adhere to in calculating its contribution. 47 C.F.R. § 54.409; *In re Incomnet, Inc.*, 463 F.3d 1064, 1066 (9th Cir. 2006).

Carriers typically "pass this cost through to their subscribers." *Incomnet*, 463 F.3d at 1066; *see* 47 C.F.R. § 54.712(a). Indeed, the Commission's regulations expressly permit this pass-through. *See, e.g.*, 47 C.F.R. § 54.407(c). The "charge generally appears on phone bills as the 'Universal Service Fund Fee.'" *Incomnet*, 463 F.3d at 106.

The Commission itself has acknowledged that consumers bear the costs of the Universal Service Program through increased telephone rates. *See USF Contribution Methodology*, 27 F.C.C. RCD. 5357, 5362-63, ¶ 9 (2012); *In re Matter of Federal-State Joint Board on Universal Service*, 17 F.C.C. RCD. 3752, 3792, ¶ 91 (2002) (noting

10

carriers' common use of line item surcharges on customers' monthly statements to recoup USF assessments); *In re Federal-State Joint Board on Universal Service*, 12 F.C.C. Rᴄᴅ. 8766, 9199, ¶ 828, 9211-12, ¶ 855 (1997) (permitting carriers subject to USF assessments to recoup such assessments by passing costs on to customers, provided that those carriers disclose "complete and truthful information regarding their contribution amount"); *see also* Expert Report of Dr. George Ford (attached as Exhibit A) at 3-4 n.7.

Members of Congress have also acknowledged that the Universal Service Fund is financed by "virtually every American's money"; "at the end of the day, it is still the same taxpaying people who bear the cost, since 96 percent of the country has phone service and see a fee on their bill." Opening Statement of Hon. Greg Walden*, The Lifeline Fund: Money Well Spent?*, House Subcommittee on Communications and Technology, House Committee on Energy and Commerce, No. 113-36, at 1-2 (Apr. 25, 2013), https://www.govinfo.gov/content/pkg/CHRG-113hhrg82189/pdf/CHRG-113hhrg82189.pdf.

## E.    The Commission Re-Delegates Its Powers To A Private Company

Congress gave the Commission the authority to implement the universal service support provisions of the 1996 Telecommunications Act. 47 U.S.C. § 254(b), (d). Without express statutory authority to do so, the Commission subsequently re-delegated this authority to the Universal Service Administrative Company ("USAC"), a Delaware-registered non-profit company. 47 C.F.R. § 54.701(a) ("The Universal Service Administrative Company is appointed the permanent Administrator of the

federal universal service support mechanisms ...."); *id.*, § 54.5 ("The term 'Administrator' shall refer to the Universal Service Administrative Company that ... has been appointed the permanent Administrator of the federal universal service support mechanisms."); *Incomnet*, 463 F.3d at 1067.

USAC is an "independent subsidiary of the National Exchange Carrier Association, Inc.," 47 C.F.R. § 54.5, which "is a membership organization of telecommunications carriers." *Blanca Tel. Co. v. FCC*, 991 F.3d 1097, 1105 (10th Cir. 2021). USAC has a 19-member Board of Directors comprised of individuals from various "interest groups that are interested in and affected by universal service programs" and who were nominated "by their respective interest groups." Universal Service Administrative Co., *Leadership*, https://www.usac.org/about/leadership/; 47 C.F.R. § 54.703(b).

After their nomination by these interest groups, USAC board members are approved by the chair of the Commission, but not by the entire Commission. 47 C.F.R. § 54.703(c)(3). Board directors are not nominated by the President nor confirmed by the Senate.

USAC is charged with establishing the budget for the Universal Service Fund. Each quarter, USAC's board announces a proposed contribution amount—essentially how much money USAC wants for "universal service" for the next quarter—which the Commission's Office of Managing Director then ministerially calculates as a percentage of all telecommunication carriers' expected interstate and international end-user revenues. 47 C.F.R. § 54.709(a); *see id.*, § 54.706(a) (listing 19 types of taxed

services).  This proposed taxing rate is "deemed approved" by the Commission unless it acts within 14 days of publication. *Id.*, § 54.709(a)(3). It appears the Commission has never rejected USAC's proposed budget—a rubber stamp is not even needed, as the rate is deemed approved merely by the Commission's inaction.

Neither the specific recipients nor the specific beneficiaries of the funds are named in the 1996 Telecommunications Act, nor did Congress impose any formulas or limitations on the rate or how much money can be collected (beyond a requirement that it be "equitable and nondiscriminatory"), nor how to spend it (beyond that it be on "universal service," which the Commission is then expressly permitted to define). *Incomnet*, 463 F.3d at 1075; 47 U.S.C. §§ 254(c), (d).

USAC takes legal title to the contributions it receives from carriers and deposits them into the Universal Service Fund, then disburses funds to subsidize the general welfare via provision of service to libraries, schools, rural areas, and high-cost areas. *Incomnet*, 463 F.3d at 1072. USAC generally divides these funds among its High-Cost and Low-Income Program, the Schools and Libraries Program, and the Rural Health Care Program. 47 C.F.R. §§ 54.101, 54.701(c); *see also id.*, §§ 54.304, 54.308, 54.404, 54.501, 54.601.

USAC does not simply hold funds in the Universal Service Fund as the Commission's agent. *Incomnet*, 463 F.3d at 1074 (citing 47 C.F.R. § 54.715(c)). The Commission exercises power over the fund only indirectly, essentially by overseeing USAC. *Id.* The Commission has no ability to control the funds in the Universal Service Fund through direct seizure or discretionary spending. *Id.*

13

In short, a private company registered in Delaware decides how much to collect from carriers (amounting to nearly $10 billion annually, as discussed below), effectively mandates payments under penalty of law, and then "decides if, when, and how it disburses funds on behalf of the [Fund's] beneficiaries." *Incomnet*, 463 F.3d at 1076 (citing 47 C.F.R. §§ 54.701(a), 54.704(a), 54.705, 54.715).

## F.    USAC Imposes Skyrocketing Rates, Raising Tens Of Billions Of Dollars

Without congressionally imposed formulas or limits on the amounts or rates the Commission or USAC can raise for the Universal Service Fund, the costs have predictably skyrocketed.

In the second quarter of 2000, USAC's budget imposed a tax rate of 5.7% on all end-user interstate telecommunication revenues, amounting to an expected $1.1 billion in forced "contributions" to the Universal Service Fund by carriers in that one quarter alone. *Proposed Second Quarter 2000 Universal Service Contribution Factor*, Mar. 7, 2000, *available at* https://docs.fcc.gov/public/attachments/DA-00-517A1.pdf.

By the second quarter of 2008, USAC had doubled the tax rate to 11.3%, amounting to an expected quarterly contribution of $1.9 billion. *Proposed Second Quarter 2008 Universal Service Contribution Factor*, Mar. 14, 2008, *available at* https://docs.fcc.gov/public/attachments/DA-08-576A1.pdf.

By the second quarter of 2012, the rate had increased to 17.4%, amounting to an expected quarterly contribution of $2.4 billion. *Proposed Second Quarter 2012 Universal Service Contribution Factor*, Mar. 13, 2012, *available at* https://docs.fcc.gov/public/attachments/DA-12-396A1.pdf.

14

The rate slowly continued climbing, with a 17.9% tax rate for the second quarter of 2016, amounting to $2.2 billion in collections for the quarter, and up to 19.6% in the second quarter of 2020. *Proposed Second Quarter 2016 Universal Service Contribution Factor*, Mar. 10, 2016, *available at* https://docs.fcc.gov/public/attachments/DA-16-266A1.pdf; *Proposed Second Quarter 2020 Universal Service Contribution Factor*, Mar. 13, 2020, *available at* https://docs.fcc.gov/public/attachments/DA-20-269A1_Rcd.pdf.

Just one quarter later (third quarter of 2020), the rate spiked to 26.5%, followed by 27.1% in the fourth quarter of 2020. *Proposed Third Quarter 2020 Universal Service Contribution Factor*, June 12, 2020, *available at* https://docs.fcc.gov/public/attachments/DA-20-617A1_Rcd.pdf; *Proposed Fourth Quarter 2020 Universal Service Contribution Factor*, Sept. 14, 2020, *available at* https://docs.fcc.gov/public/attachments/DA-20-1075A1_Rcd.pdf.

And in 2021, the numbers jumped to unprecedented levels. For the first quarter 2021, USAC set the tax rate at 31.8% ($2.4 billion collected), for the second quarter it was 33.4% ($2.5 billion collected), and for the third quarter it was 31.8% ($2.3 billion collected). *Proposed First Quarter 2021 Universal Service Contribution Factor*, Dec. 14, 2020, *available at* https://docs.fcc.gov/public/attachments/DA-20-1480A1_Rcd.pdf; *Proposed Second Quarter 2021 Universal Service Contribution Factor*, Mar. 12, 2021, *available at* https://docs.fcc.gov/public/attachments/DA-21-308A1_Rcd.pdf; *Proposed Third Quarter 2021 Universal Service Contribution Factor*, June 10, 2021, *available at* https://docs.fcc.gov/public/attachments/DA-21-676A1.pdf.

<u>JA128</u>

The factor for the fourth quarter of 2021 is 29.1% ($2.1 billion collected). *See Proposed Fourth Quarter 2021 Universal Service Contribution Factor*, Sept. 10, 2021, *available at* https://docs.fcc.gov/public/attachments/DA-21-1134A1.pdf.

Thus, since 2000, the tax rate has increased by more than 600% and now yields nearly $10 billion annually.



The Commission's entire annual budget for 2021, by comparison, was just over $500 million, dwarfed by the nearly $10 billion USAC expects to collect over that same period. FCC, *2022 Budget Estimates to Congress*, May 2021, https://docs.fcc.gov/public/attachments/DOC-372853A1.pdf.



## G.     Rampant Abuse, Fraud, And Waste In The Universal Service Fund

The failures of the Universal Service Fund confirm the wisdom of the Framers in vesting control over the purse in a politically accountable legislature. As St. George Tucker recognized, legislative control of the purse is "a salutary check, not only upon the extravagance, and profusion, in which the executive department might otherwise indulge itself, and its adherents and dependents; but also against any misappropriation, which a rapacious, ambitious, or otherwise unfaithful executive might be disposed to make." ST. GEORGE TUCKER, VIEWS OF THE CONSTITUTION OF THE UNITED STATES 298 (1803) (Clyde N. Wilson ed. 1999). Congress's "power to control, and direct appropriations," Story observed, "constitutes a most useful and salutary check … upon corrupt influence and public peculation." JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 1342 (1833).  Justice Story was right. And extravagance, profusion, corruption, peculation, and misappropriation are the hallmarks of the Universal Service Fund.

Given its lack of accountability and the fact that USAC is populated with self-acknowledged industry insiders, the Universal Service Fund has predictably

17

demonstrated—in the words of then-Senator Claire McCaskill—a "history of extensive waste and abuse." Opening Statement of Hon. Greg Walden, *The Lifeline Fund: Money Well Spent?*, Subcommittee on Communications and Technology, House Committee on Energy and Commerce, No. 113-36, at 2 (Apr. 25, 2013), https://www.govinfo.gov/content/pkg/CHRG-113hhrg82189/pdf/CHRG-113hhrg82189.pdf (quoting then-Sen. McCaskill).

For example, a November 2008 report by the Commission's Inspector General found that 23.3% of payments made from the Universal Service Fund from 2007 to 2008 were "erroneous"—amounting to nearly $1 billion wasted. Office of the Inspector General, Federal Communications Commission, *The High Cost Program* (Nov. 26, 2008), *available at* http://hraunfoss.fcc.gov/edocs_public/attachmatch/DOC-286971A1.pdf.

An October 2010 Government Accountability Office report concluded that the Universal Service Fund "lacks key features of effective internal controls," e.g., "the number and scope of USAC's audits have been limited and there is no systematic process in place to review the findings of those audits that are conducted," nor had the Commission or USAC even considered looking for risks like "the possibility that multiple carriers may claim support for the same telephone line and that households may receive more than one discount, contrary to program rules." Government Accountability Office, *Report to Congressional Requesters: Improved Management Can Enhance FCC Decision Making for the Universal Service Fund Low-Income Program* (Oct. 2010), *available at* http://www.gao.gov/assets/320/312708.pdf.

18

In March 2015, the Government Accountability Office issued another report critical of the Universal Service Fund's Lifeline program, designed to ensure availability of telephone voice service for low-income Americans, and recommended improvements to the program to reduce waste and fraud. Government Accountability Office, Report to the Chairman, Committee on Commerce, Science and Transportation, U.S. Senate, *The FCC Should Evaluate the Efficiency and Effectiveness of the Lifeline Program* (Mar. 2015), *available at* http://www.gao.gov/assets/670/669209.pdf.

In May 2017, the Government Accountability Office issued yet another report, finding that USAC had largely failed to implement the recommendations from the 2015 report. Government Accountability Office, *Additional Action Needed to Address Significant Risks in FCC's Lifeline Program*, May 30, 2017, https://www.gao.gov/assets/gao-17-538.pdf.

The GAO found that USAC relied "on over 2,000 Eligible Telecommunication Carriers that are Lifeline providers to implement key program functions, such as verifying subscriber eligibility," an unnecessarily "complex internal control environment [that] is susceptible to risk of fraud, waste, and abuse as companies may have financial incentives to enroll as many customers as possible." *Id.*

Nationwide, "GAO was unable to confirm whether about 1.2 million individuals of the 3.5 million it reviewed, or 36 percent, participated in a qualifying benefit program, such as Medicaid, as stated on their Lifeline enrollment application." *Id.* In some states, nearly 80% of actual Lifeline users may be legally

ineligible for the service. *See id.* at 42 (in Georgia, for example, 79% of users could not be confirmed as eligible; in North Carolina, it was 77%). The Lifeline program was estimated to have spent $1.2 million *annually* on users confirmed to have been deceased. *Id.* at 43.

Fraud continues, nonetheless. For example, in 2018 the CEO of a provider for low-income broadband service apparently embezzled "at least $10 million" from a Universal Service Fund program to pay for, among other things:

    a. "[A] $1.3 million condominium in Florida";

    b. "[A] $250,000 convertible Ferrari 458 Spider";

    c. "[T]ens of thousands in dollars in landscaping fees";

    d. "[C]ountry club and yacht memberships in Florida, and boat slips in Michigan";

    e. "[A]n $8 million Cessna 525 jet" used for personal travel like attending lacrosse games and flying to the Cayman Islands.

*In Re American Broadband & Telecomm. Co.*, FCC 18-144 ¶¶ 135-140 (Oct. 23, 2020), https://docs.fcc.gov/public/attachments/DA-20-493A1.pdf.

In the same case, the company "receiv[ed] funding for tens of thousands of ineligible Lifeline customer accounts. The company's sales agents apparently created fake or duplicate accounts by using the names of deceased people; modifying the names, dates of birth, and Social Security Numbers of actual Lifeline subscribers; reusing the same proof-of-eligibility documents for multiple accounts; listing the same single-family home addresses for dozens of accounts; and using addresses where

nobody actually lived." *Id.* at 71, Statement of Chairman Ajit Pai; *see also id.* at 72. The company received Lifeline support for dead people "more than 45,000 times over just one five-month period." *Id.* at 72, Statement of Commissioner Brendan Carr. In one case, it signed up the same person's name "more than 20 times." *Id.*

In 2019, the Commission's Managing Director reviewed an Inspector General report and found that USAC was *still* out of compliance in numerous critical aspects, resulting in substantial wasted money. Mark Stephens, FCC Managing Director, Letter to Ron Johnson, Chair of U.S. Senate Committee on Homeland Security and Governmental Affairs, Aug. 27, 2019, https://www.fcc.gov/sites/default/files/improper-payments-compliance-report-fy2018.pdf.

USAC is led by members of the same industries that receive the funds, which inherently leads to cronyism and waste. During one oversight hearing, the Commission's Inspector General agreed that "applicants view this program as a big candy jar, free money." Sam Dillon, *School Internet Program Lacks Oversight, Investigator Says*, N.Y. TIMES, June 18, 2004, at A22; *see also* Sam Dillon, *Waste and Fraud Besiege U.S. Program to Link Poor Schools to Internet*, N.Y. TIMES, June 17, 2004, at A20.

Moreover, the Commission does not open its quarterly Universal Service Contribution Factor process to a meaningful notice-and-comment process or period, making it even more difficult for the public to exercise any level of influence or

oversight. Nor does the Commission publish the Quarterly Factor in the Federal Register, either before or after adoption.

As James Madison warned in Federalist 62: "Every new regulation concerning commerce or revenue … presents a new harvest to those who watch the change, and can trace its consequences; a harvest, reared not by themselves, but by the toils and cares of the great body of their fellow-citizens." The Federalist 62 (James Madison). Except unlike with unpopular Congressional appropriations, there is no mechanism for citizens to vote out the board members of USAC.

## H.     The Universal Service Fund Hurts The People It Is Supposed To Help

The Universal Service Fund is a reverse Robinhood: take from the poor and give to the rich—or (as noted above) to the fraudsters. "USF taxes are the most regressive taxes in America, so families just above the eligibility threshold will suffer most." TechFreedom, *Broadband Subsidies for Some, Broadband Taxes for Everyone*, May 28, 2015, https://techfreedom.org/broadband-subsidies-for-some-broadband-taxes-for/ (quoting Berin Szoka).

Even in the best light, the Universal Service Fund "arguably hurts as many poor consumers as it benefits. 'Because the burden of this funding is concentrated on certain telecommunications services, rather than drawn from general revenues, the base of the 'tax' is relatively narrow, and the markups on the prices of services generating the subsidy are quite high.' A single, low-income mother, living in the Bronx, with a cell phone for personal safety, pays 10% or more of her monthly wireless telephone bill to support universal service for wealthy Montana residents living on

ranchettes." Krotoszynski, Jr., *Reconsidering the Nondelegation Doctrine*, 80 Ind. L.J. at 314.

A recent GAO report acknowledged the universal wisdom among economists that the Universal Service charge "functions like a 'regressive tax,' which is a tax that is not sensitive to the income levels of consumers and businesses." Government Accountability Office, *FCC Should Enhance Performance Goals and Measures for Its Program to Support Broadband Service in High-Cost Areas* 17, Oct. 2020, https://www.gao.gov/assets/gao-21-24.pdf. Additionally, the high-cost program "has focused relatively more on broadband than on voice services in recent years," but "lower income and older Americans may be more likely to rely solely on voice connections than other demographic groups." *Id.* The Universal Service Fund is not focused on providing the services that low-income Americans actually use—but it is still making them pay for advanced telecommunications for wealthier Americans.

Indeed, a separate GAO report found that the Commission had not even bothered to evaluate the Universal Service Fund's effectiveness in achieving certain goals. For example, the low-income Lifeline program may not have played any meaningful role in improving the "level of low-income households' subscribing to telephone service over the past 30 years," despite costing billions of dollars ultimately passed along to consumers. Government Accountability Office, Report to the Chairman, Committee on Commerce, Science and Transportation, U.S. Senate, *The FCC Should Evaluate the Efficiency and Effectiveness of the Lifeline Program* (Mar. 2015), *available at* http://www.gao.gov/assets/670/669209.pdf.

## I.    Consumers—Like Commenters—Foot The Bill

Commenter Consumers' Research is an independent educational 501(c)(3) nonprofit organization whose mission is to increase the knowledge and understanding of issues, policies, products, and services of concern to consumers and to promote the freedom to act on that knowledge and understanding. Consumers' Research believes that the cost, quality, availability, and variety of goods and services used or desired by American consumers — from both the private and public sectors — are improved by greater consumer knowledge and freedom. Consumers' Research has Verizon phone service in its own name, paid with its own funds monthly. The bill contains the Universal Service Charge as a separate line item entitled "Federal Universal Service Fee."

Commenter Cause Based Commerce, Inc., founded in 1996 with its principal office in Cincinnati, is a reseller of telecommunications services. Caused Based Commerce sends 5% of customers' monthly plan price to a cause/charity of the customer's choosing. As a reseller of telecommunications services, Cause Based Commerce collects from consumers money associated with the Universal Service Fund, and pays into the Universal Service Fund.

Commenter Joseph Bayly is a pastor and editor who resides in Maineville, Ohio, with his wife and six children. He has spent more than a decade in ministry in the Midwest, and currently serves as the founding pastor of Christ Church in Cincinnati. Mr. Bayly provides the sole income for his family. He has AT&T phone service in his own name and pays the monthly bill himself. His bill contains the

Universal Service Charge as a separate line item entitled "Federal Universal Service Charge."

Commenters Jeremy and Deanna Roth are a married couple who reside in Akron, Ohio. Mr. Roth is a civil designer who provides the sole income for his family. Mrs. Roth is a homemaker and mother of their two young children. Like many families, they have numerous financial demands, and every penny counts. The Roths have T-Mobile phone service in Jeremy's name. They pay the monthly bill from their mutual checking account. The bill contains the Universal Service Charge as a separate line-item entitled "Federal Universal Service Fund."

Commenters Lynn and Paul Gibbs are a retired couple that reside in the city of Oregon, Ohio. They are in their late sixties and have had their cell phone service for years, most recently over two years with AT&T. They use Auto-pay tied to their checking account to pay their monthly bill, which contains the Universal Service Charge as a separate line item entitled "Federal Universal Service Charge."

Commenter Rhonda Thomas resides in Milton, Georgia. She has Cricket phone service in her own name, and her bill includes the Federal Universal Service "fee."

Commenter Kersten Conway is an art teacher who resides in League City, Texas. She has Verizon phone service in her own name and pays the monthly bill herself. Her bill contains the Universal Service Charge tax as a separate line-item titled "Fed Universal Service Charge." Ms. Conway has been a teacher for 35 years across Texas, rural South Dakota, and Minnesota. Many of her former students are from the Lakota Sioux Nation and still keep in contact with her. She has been

divorced for almost 20 years and is currently co-raising three young grandchildren. Every penny counts, and retirement is not an option for her at this time.

## J. An Easy Solution

Rather than the wasteful, crony-filled, Rube Goldberg procedures of passing money back and forth through a Delaware-registered private company run by unaccountable interest groups to subsidize a general welfare program at consumers' expense, there is an easy and transparent solution that also complies with the Constitution: Congress can fund universal service via a standard tax appropriation. OMD can begin this process by setting the *Proposed First Quarter 2022 Universal Service Contribution Factor* at zero.

Commentators have noted that using congressional tax appropriations to fund the Universal Service Fund—rather than allowing the Commission to raise its own taxes "off-book"—would address many of the problems with the Fund, would be simpler, and (unlike the current scheme) would not violate the Constitution. In the words of Professor Daniel Lyons, "For over a decade, policymakers have agreed that our USF funding mechanism is unsustainable. But year after year, the program limps along without change — and American consumers are paying the price. The time is long past for Congress to adopt outgoing Commission Chairman Ajit Pai's recommendation: Move the universal service program on-budget, which will shore up its precarious financial state and cure many of the real or perceived problems with the existing program." Daniel Lyons, *A Common-Sense Opportunity to Reform the Universal Service Fund*, Jan. 28, 2021, https://www.aei.org/technology-and-

innovation/a-common-sense-opportunity-to-reform-the-universal-service-fund/; *see also* Joel Thayer, *Congress's Infrastructure Bill Could Give the FCC an Upgrade*, NEWSWEEK, July 26, 2021, https://www.newsweek.com/congresss-infrastructure-bill-could-give-fcc-upgrade-opinion-1612556 ("For one thing, Congress could transform USF funding into a static $8 billion line item (the high end of the current USF budget) in annual appropriations bills to ensure stability for the fund and its services.").

### III. DISCUSSION

OMD should set the *Proposed First Quarter 2022 Universal Service Contribution Factor* at 0.000 because the Universal Service Fund and the process for imposing its charges are unconstitutional, in excess of statutory authority, and otherwise illegal.

### A.    Legal Background

The power to tax was not always the province of the legislature. And much of the history of how representative democracy emerged—particularly in England—concerns the ways in which representative legislators sought to wrest the taxing power away from kings. In England, the kings often sought to avoid Parliament's claims on taxing authority by means of a "royal prerogative," and they typically referred to their collections not as taxes but as compulsory loans and even "benevolences." All told, it took the English Civil War and the Glorious Revolution of 1688 to finally and conclusively establish that the representative legislature—and the representative legislature *alone*—had the authority to levy taxes on the people.

27

*See* An Act Declaring the Rights and Liberties of the Subject, and Settling the Succession of the Crown (Bill of Rights), 1689, 1 W. & M., Sess. 2, c. 2, § 4.

This principle—neatly summarized by the American colonists (who had no voice in Parliament) as "no taxation without representation"—played a decisive role not only in the Revolution, but also in the framing of the Constitution. As James Madison observed in Federalist 58, Parliament's claim to exclusive legislative authority was rightly understood as a stroke of constitutional genius: it was only by taking plenary control over "the supplies requisite for the support of government" that "an infant and humble representation of the people" in English Parliament had been able to triumph over the "overgrown prerogatives" of the British monarchy. The Federalist No. 58 (James Madison).

Article I of the Constitution therefore closely followed the English formula, providing that "[a]ll legislative Powers herein granted"—including the power "to lay and collect Taxes, Duties, Imposes, and Excises"—"shall be vested in a Congress of the United States" and nowhere else. U.S. Const. art. I, § 8, cl. 1. The same is true regarding the power to spend. Article I commands that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. Thus, "the erstwhile prerogative powers to tax, borrow, and spend were denied to the executive and instead vested in Congress. Congress thus not only controls how much revenue to raise and how, but what to spend it on, and under what conditions." MICHAEL W. MCCONNELL, THE PRESIDENT WHO WOULD NOT BE KING 103

28

(2020); *see also Hart v. United States*, 16 Ct. Cl. 459, 484 (1880), *aff'd*, 118 U.S. 62 (1886) ("[A]bsolute control of the moneys of the United States is in Congress.").

The benefits of this arrangement are significant. As Chief Justice Marshall observed, an "unlimited power to tax" is "a power to destroy." *M'Culloch v. Maryland*, 4 Wheat. 428, 432 (1819). The need for representative accountability is therefore at its highest when it comes to taxing and spending, which is why the framers ensured that "the legislative department alone has access to the pockets of the people." The Federalist No. 48 (James Madison). And accessing the pockets of the people is hard by design. To legislate a tax, Congress must act through "Laws of the United States," in accordance with a "finely wrought" constitutional procedure. *INS v. Chadha*, 462 U.S. 919, 951 (1983).

"[B]y directing that legislating be done only by elected representatives in a public process, the Constitution sought to ensure that the lines of accountability would be clear: The sovereign people would know, without ambiguity, whom to hold accountable for the laws they would have to follow." *Gundy v. United States*, 139 S. Ct. 2116, 2134 (2019) (Gorsuch, J., dissenting, joined by Roberts, C.J., and Thomas, J.). Giving Congress the power of the purse also ensures that Congress—like Parliament of old—can serve as an effective check on the executive. In Madison's typically striking phrase, control over the purse strings is "the most complete and effectual weapon with which any constitution can arm the immediate representatives of the people." The Federalist No. 58 (James Madison).

Thus, as Supreme Court has long held, Congress may not "delegate ... powers which are strictly and exclusively legislative." *Wayman v. Southard*, 10 Wheat. 1, 42-43 (1825). And both text and constitutional history show that no powers are more strictly and exclusively legislative than the Article I power to lay and collect taxes; as the Supreme Court has explained, Article I's "text permits no delegation of those powers." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001).

For over two centuries Congress largely complied with this constitutional procedure. It enacted detailed taxes, provided mechanisms for the collection of taxes, and appropriated funds from the Treasury on an annual basis, through "Laws of the United States." But in recent years, "the general assumption that Congress will jealously guard the powers of the purse as its ultimate means of checking and balancing the executive has become open to serious doubt." DeMuth, Sr. & Greve, *Agency Finance in the Age of Executive Government*, 24 GEO. MASON L. REV. at 566. "Congress has increasingly empowered agencies to calculate and impose outright taxes—charges unrelated to any service provided—and to exercise wide discretion in how the revenues are spent." *Id.* at 563. The delegation at issue in this case is a stark example of this recent trend toward an unaccountable, self-funding executive.

## B.    The Universal Service Fund's Illegality

In 47 U.S.C. §§ 254(c) and (d), Congress delegated its taxing power to the Commission to raise unlimited funds from telecommunication carriers to subsidize the Universal Service Fund, a multi-billion-dollar slush fund putatively for providing expanded telecommunications services to underserved communities. As the name

expressly indicates, the goal of Universal Service is to provide service universally to the benefit of the general public.

Congress placed no formula or limitations on the amount or rate that the Commission can raise for the Universal Service Fund, and placed only the most generic limitations on how the money can be spent, even allowing the Commission itself to define what "universal service" means. *See* 47 U.S.C. §§ 254(c) and (d). Telecommunications carriers then pass along these costs to consumers, who foot the bill for these agency-created taxes designed to benefit the general public through expanded services. 47 C.F.R. § 54.712(a).

The Commission has re-delegated this taxing and spending power to a private, Delaware-registered company, USAC, which is run by members of industry interest groups and decides how much money to raise each year and how to spend it, with no meaningful oversight by the Commission. 47 C.F.R. § 54.701; *see Incomnet*, 463 F.3d at 1066-67 (describing USAC's powers and its effective independence from the Commission).

"Unlike the thousands of responsibilities carried out by governmental agencies on behalf of Congress, this delegation is unique because of the unfettered power given to the Commission in defining the scope of universal service, and because Congress delegated the power to levy a tax to pay for the service with no limits, knowing that the end user, the American public, would ultimately be saddled with the burden." Cherry & Nystrom, *Universal Service Contributions: An Unconstitutional Delegation of Taxing Power*, 2000 L. Rev. Mich. St. U. Det. C.L. at 110.

This framework results in numerous constitutional and statutory violations.

### 1.    Nondelegation Of Legislative Power

The universal service scheme violates both the original understanding of nondelegation and the more modern caselaw requiring a so-called intelligible principle.

The original understanding prohibited any transfer of Congress's vested legislative powers to any other entity. *See Gundy*, 139 S. Ct. at 2135-37 (Gorsuch, J., dissenting, joined by Roberts, C.J., and Thomas, J.). This meant that Congress must "make[] the policy decisions when regulating private conduct," but Congress could still "authorize another branch to 'fill up the details'" or "make the application of that rule depend on executive fact-finding." *Id.*; *see also Paul v. United States*, 140 S. Ct. 342, 342 (2019) (Kavanaugh, J., statement respecting the denial of certiorari) ("[M]ajor national policy decisions must be made by Congress and the President in the legislative process, not delegated by Congress to the Executive Branch.").

Section 254 undoubtedly fails this properly understood test of nondelegation. Rather than make policy choices itself, Congress—via Section 254—intentionally "'delegate[d] difficult policy choices to the Commission's discretion.'" *Tex. Off. of Pub. Util. Couns. v. F.C.C.*, 265 F.3d 313, 321 (5th Cir. 2001). Although spending is ostensibly limited to projects that improve "universal service," Congress defined this goal using only the most generic terminology and then allowed the Commission to redefine "universal service" for itself as often as the Commission wishes. 47 U.S.C. § 254(c)(1). The Commission does far more than merely "fill up the details"—the

Commission creates the entire scheme, defines the terms, raises the money, and then spends it, all based on what the Commission believes to be the most prudent course of achieving its policy goals. This violates the Framers' understanding "that it would frustrate 'the system of government ordained by the Constitution' if Congress could merely announce vague aspirations and then assign others the responsibility of adopting legislation to realize its goals." *Gundy*, 139 S. Ct. at 2133 (Gorsuch, J., dissenting, joined by Roberts, C.J. and Thomas, J.).

The Commission's unfettered power under Section 254 runs afoul even of the more-lenient modern interpretations of the nondelegation doctrine, which broadly permit an agency to undertake legislative action as long as Congress provided an "intelligent principle." *See Gundy*, 139 S. Ct. at 2139 (Gorsuch, J., dissenting, joined by Roberts, C.J. and Thomas, J.) (noting that "[t]his mutated version of the 'intelligible principle' remark has no basis in the original meaning of the Constitution, in history, or even in the decision from which it was plucked"). By providing no meaningful formulas or limits on how much money the Commission can raise or what the Commission can spend the money on, Congress failed to provide a meaningful intelligible principle to guide the Commission's policy choices involving billions of dollars.

To be sure, the Commission theoretically is limited to raising and spending revenue for "universal service," but that definition is intentionally so broad (indeed, "universal") as to serve as no limit at all. The definition is little more than a list of platitudes that restate "universal service" in different words and—critically—allow

the Commission to redefine those principles and include anything it considers relevant, ensuring that all policymaking is done by the Commission: "Quality service should be available at just, reasonable, and affordable rates"; "Access to advanced telecommunications and information services should be provided in all regions of the Nation"; "Consumers in all regions of the Nation … should have access to telecommunications and information services, including interexchange services and advanced telecommunications and information services, that are reasonably comparable to those services provided in urban areas and that are available at rates that are reasonably comparable to rates charged for similar services in urban areas": and, of course, "Such other principles as the Joint Board and the Commission determine are necessary and appropriate for the protection of the public interest, convenience, and necessity and are consistent with this chapter." 47 U.S.C. § 254(b).

Indeed, even if these "vague aspirations," *Gundy*, 139 S. Ct. at 2133, were an intelligible principle, the statute still violates the Constitution because Congress lets the Commission itself redefine "universal service" as often as it chooses, 47 U.S.C. § 254(c)(1), meaning Congress allows the Commission to change the scope of Congress's delegated power. That is certainly illegal. An improper delegation of power from Congress to an executive agency cannot survive merely on the hope that the agency will restrain itself within the nearly limitless power granted by Congress. *See Whitman*, 531 U.S. at 473 ("The idea that an agency can cure an unconstitutionally standardless delegation of power by declining to exercise some of that power seems to us internally contradictory."). And, relatedly, as Judge Ho stated in his dissent

34

from rehearing en banc in *Texas v. Rettig*, 993 F.3d 408 (5th Cir. 2021), the notion that an improper delegation could be saved by the possibility that Congress might "claw back its delegated power" would "render the nondelegation doctrine a dead letter. We might as well say that Congress can never violate the nondelegation doctrine, because the American people can always petition Congress to pass a new law and claw back its lawmaking power from an agency." *Id.* at 416-17 (Ho, J., dissenting from denial of rehearing en banc, joined by Jones, Smith, Elrod, and Duncan, JJ.).

In sum, the Commission has nearly unlimited authority to self-fund tens of billions of dollars' worth of its own policy objectives, in perpetuity, with the unilateral power to re-define the scope of those objectives. The Founders "separated powers within the Federal Government: The legislative power went to Congress; the executive to the president; and the judicial to the courts. That is the equilibrium the Constitution demands. And when one branch impermissibly delegates its powers to another, that balance is broken." *Tiger Lily, LLC v. U.S. Dep't of Hous. & Urb. Dev.*, 5 F.4th 666, 673 (6th Cir. 2021) (Thapar, J., concurring). The uniquely broad delegation at issue here upsets that balance—and violates the nondelegation doctrine—under any test.

Finally, if all this weren't bad enough, the Commission is a so-called "independent agency," meaning its leaders are also putatively insulated from Executive control via limitations on their removal. *See, e.g., Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2212 (2020) (Thomas, J., concurring in part and dissenting in part)

("Because independent agencies wield substantial power with no accountability to either the President or the people, they 'pose a significant threat to individual liberty and to the constitutional system of separation of powers and checks and balances.'" (quoting *PHH Corp. v. CFPB*, 881 F.3d 75, 164-65 (D.C. Cir. 2018) (Kavanaugh, J., dissenting)). *Cf. Seila Law LLC*, 140 S. Ct. at 2204 (Maj. Op.) ("The CFPB's receipt of funds outside the appropriations process further aggravates the agency's threat to Presidential control."). This means that the egregious transfer of power from the Legislature to the Executive cannot even be defended on the (admittedly unpersuasive) ground that at least *some* political branch oversees this administrative legislature.

## 2.    Nondelegation Of Taxing Power

Congress's issuance of such limitless power to the democratically unaccountable Commission is all the worse because it involves the power to raise (and spend) *taxes*, meaning the Commission quite literally has a blank check to self-fund its policy goals through its vision for "an evolving level of telecommunications services that the Commission" itself "shall establish."

This delegation of taxing power is unconstitutional. As noted above, "[t]axation is a legislative function, and Congress … is the sole organ for levying taxes." *NCTA*, 415 U.S. at 340. More than any other power, the taxing power is uniquely legislative and nondelegable, as discussed above. Indeed, the Constitution's Origination Clause, which requires the House of Representatives to originate all taxing bills, prohibits the House even from delegating certain taxing power to the Senate—rendering it

unthinkable that such power could be delegated to an Executive agency. U.S. Const. art. I, § 7, cl. 1.

### i. As A Matter Of Law, Universal Service Fund Charges Are Taxes Under Supreme Court Precedent.

The funds raised for the Universal Service Fund are indeed taxes. As the Supreme Court has held, whether an assessment is a "tax" (as opposed to a "fee") for constitutional purposes depends not on the label, but on how the money is used. A "fee" is where the party paying the agency receives in exchange, as "incident to a voluntary act," a "benefit not shared by other members of society," such as an application processing charge. *NCTA*, 415 U.S. at 340-41. But it is a "tax" where "some of the administrative costs at issue inure[] to the benefit of the public." *Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 214 (1989).

The relevant statutes confirm that the Universal Service Fund assessments are undoubtedly used to provide a benefit for the public—i.e., shared by other members of society beyond those who paid into the Fund. The goal of providing such benefits universally is literally in its name. And the funds are raised in order to provide infrastructure for telecommunications services to extensive groups of individuals regardless of whether or how much they pay into the Fund: "[c]onsumers in all regions of the Nation, including low-income consumers and those in rural, insular, and high cost areas"; "any public or nonprofit health care provider that serves persons who reside in rural areas"; and "elementary schools, secondary schools, and libraries for educational purposes." 47 U.S.C. §§ 254(b)(3), (h)(1). The general purpose is also reflected by the sheer dollar values involved. The Universal Service Fund

37

charges nearly $10 billion a year—certainly nothing like the "incident[al]" fees that the Supreme Court has authorized executive agencies to collect from applicants without concerns about agencies imposing and collecting taxes. *NCTA*, 415 U.S. at 340-41.

Given all this, there can be no doubt that these charges are "taxes" imposed by the Commission.

### ii. Expert Economic Analysis Confirms That Universal Service Fund Charges Are Taxes.

Even if the relevant statutes and caselaw did not settle the matter, economic experts recognize that the Universal Service Fund—in its real-world application— has all the economic hallmarks of a tax, not a fee. *See* Expert Report of Dr. George Ford (attached as Exhibit A). As Dr. George Ford—a former FCC economist with a Ph.D. in Economics and decades of experience in the telecommunications industry— explains in his attached report, economics can be used to identify whether a particular levy has the characteristics of a tax, or of a fee.

Dr. Ford identifies two economic conditions that "permit one to distinguish between a tax and a fee." *Id.* at 5. First, to qualify as a "fee," "the payer of the levy must be the primary, if not the exclusive, beneficiary of the services justifying the levy. The more the benefits of the government expenditures advantage the public, the less the levy has the character of a fee." *Id.* And second, "economists would characterize a 'fee' by saying that, on average at least, there should be a positive increasing relationship (or a 'monotonic' relationship) between payer liability and the benefits the payer expects from the program(s) the fee is designed to support." *Id.* In

38

other words, the more someone pays, the more he gets back in exchange. A prototypical example of a "fee" is the charge for obtaining a passport: applicants can pay a higher charge and receive more benefits (e.g., expedited processing), and the revenues from these fees "offset the cost of processing a passport (at least, in part), the benefits of which are 'not shared by other members of society.'" *Id.*

But taxes share neither of these characteristics. A tax "is a compulsory contribution to the state for services rendered by the state for the general benefit of its people," not uniquely for the person who paid. *Id.* at 4-5. And taxes do not have positive monotonicity, either: "a tax has no particular relationship between payer liability and the benefits the payer expects from that liability. For example, tax dollars used to fund food stamps levy taxes on higher income Americans that do not qualify for food stamps, to the benefit of lower-income Americans that often pay no income tax at all." *Id.* at 5.

This economic distinction is the same that appears in the Supreme Court's caselaw, which asks whether the payor receives some unique benefit not shared by other members of the public. *Id.*; *see NCTA*, 415 U.S. at 340-41; *Skinner*, 490 U.S. at 214.

Dr. Ford confirms that Universal Service Fund levies satisfy neither of the requirements of a fee—and instead have all the hallmarks of a tax. Carriers pay into the Fund, but the benefits of the Fund do not accrue exclusively to those same carriers. Nor is there a monotonically positive relationship between contributions and benefits.

Most significantly, most of the money spent by the Universal Service Fund is used for "a galaxy of policy concerns with no obvious connection to carrier liabilities." Expert Report of George S. Ford at 8-9. Substantial sums of money go to projects "to support digital learning in schools and robust connectivity for all libraries" and "to improve the quality of health care available to patients in rural communities." *Id.* at 9. "These are broad social goals that benefit the public, not the telecommunications providers that support the program by paying levies. For these programs, there is no linkage between liabilities and benefits; the benefits are for the public at large." *Id.* And this aspect "is not limited to these programs," as the "Commission's stated goal of the USF Program broadly is to promote 'economic growth, jobs and opportunities.' Such concerns are not benefits to telecommunications providers but to the public at large." *Id.*

This focus on the general public, rather than on providing a distinct service in return to the payor in exchange for the payment, is a hallmark of a tax. *Id.* at 5; *NCTA*, 415 U.S. at 340-41; *Skinner*, 490 U.S. at 214.

Moreover, far from receiving benefits in exchange for levies they pay to the Universal Service Fund, many carriers are actually *harmed* in exchange. Because the charges increase the price of phone service, they encourage people to switch to communication services that do not have to pay into the Fund, thereby "reducing the demand for interstate and international calling." Expert Report of Dr. George S. Ford at 8. Thus, "[t]hose liable for USF contributions are harmed." *Id.* This can never be

40

true of a fee—i.e., that the person paying actually gets harmed in exchange for paying. Only a tax works that way.

To be sure, some carriers do receive some benefits from the Universal Service Fund in the form of subsidies paid out by USAC. But even here, the necessary positive monotonic relationship is missing. The "companies that contribute large sums to the program receive few benefits, and companies that contribute little to the fund receive large benefits." *Id.* at 8 (demonstrating this point with data from numerous carriers). Again, this is a classic characteristic of a tax: the payor may get zero or minimal benefits despite a large contribution, or the payor may get a tremendous benefit despite a small contribution. *Id.* at 5.

The Commission may claim there is a benefit to carriers in the form of the so-called "network effect," where a network may be (but is not necessarily) marginally more valuable as more users join it. *Id.* at 6-7. The network effect "may have been important at the turn of [the] 20th century when telecommunications networks were not always interconnected," as phone companies back then could charge users more money for access to a proprietary network that had the most other users. *Id.* at 6. But "[t]oday, network effects are likely to be small if not zero." *Id.* Networks today are almost always interconnected, meaning that a carrier's ability to offer a large network is not a valuable characteristic: a consumer with Verizon can interconnect with a consumer with any other phone service (and *vice versa*), regardless of the fact that Verizon has a large network and the other carrier may have a very small network.

41

JA154

Further, even if network effects were theoretically a viable benefit, payments to the Universal Service Fund have not *actually* yielded a network effect. Despite the seeming importance of the question, the Commission "has made no attempt to quantify the presence or magnitude of network effects as a benefit to telecommunications providers"—and thus has no evidence it could use to support such a claim, either in response to this Comment or in a subsequent judicial proceeding. *Id.* at 7. In fact, "[a]cademic research suggests that the USF Programs have done little, if anything, to increase the adoption of telecommunications services beyond" what would have happened anyway. *Id.* Nor will Universal Service charges yield network effects in the future. Today, 97% of American adults have a cell phone, and at least 95% would have a cellphone even absent subsidies from the Universal Service Fund, meaning that only the most minimal additional increases in network size are even possible with more subsidies—and the network effect of such a small increase in subscribership to a network that is nearly universally adopted is "presumably very small or possibly zero." *Id.*

Finally, even if network effect benefits did exist, there still is no monotonic relationship with Universal Service Fund contributions—thereby further demonstrating that the charges are taxes. A carrier can pay more and more into the Fund, but may receive no benefit at all, let alone a benefit greater than that received by a carrier that pays very little. *Id.*

The Universal Service Fund charges are a tax from consumers' perspective, as well. Many consumers pay money into the Fund (collected by their carriers), yet

42

almost none of them receive, in exchange, a benefit unique to them. *NCTA*, 415 U.S. at 340-41; *Skinner*, 490 U.S. at 214. As discussed above, most of the money goes to broad public welfare programs. To be sure, some of those subsidies end up benefitting consumers who paid money for the Universal Service Fund, but there is no positive relationship between what someone paid and what he gets, meaning there is a lack of positive monotonicity. Again, these are the tell-tale signs of a tax under both the law and economic theory.

### iii. Congress Placed No Meaningful Limits On This Agency Tax.

For all these reasons, the Universal Service charge is a tax imposed by an executive agency, in violation of the Constitution's strict assignment of that power to Congress. Even if Congress could delegate such power to an agency like the Commission, Congress must impose meaningful limitations like how much money the Commission could collect, or rates or formulas to use. But Congress did none of this here—making it a far cry from the regime upheld in *Skinner*, which involved a congressionally imposed ceiling rate. *See Skinner*, 490 U.S. at 214 ("[T]he Secretary has no discretion whatsoever to expand the budget for administering the Pipeline Safety Acts because the ceiling on aggregate fees that may be collected in any fiscal year is set at 105 percent of the aggregate appropriations made by Congress for that fiscal year.").

To be sure, as discussed above, the Commission theoretically is limited to raising and spending these taxes for "universal service," but that definition is intentionally so broad as to serve as no limit at all. And, in any event, the Commission

43

can choose to change the scope of its own delegated power, as Congress chose to let the Commission redefine "universal service" as often as it chooses. 47 U.S.C. § 254(c)(1). An illegal delegation of power from Congress to an executive agency cannot survive merely on the hope that the agency will restrain itself within the nearly limitless power granted by Congress. *See Whitman*, 531 U.S. at 473 ("The idea that an agency can cure an unconstitutionally standardless delegation of power by declining to exercise some of that power seems to us internally contradictory."); *see also Rettig*, 993 F.3d at 416-17 (Ho, J., dissenting from denial of rehearing en banc, joined by Jones, Smith, Elrod, and Duncan, JJ.).

For all these reasons, the Universal Service Fund violates Article I, section 8 of the Constitution—which prohibits Congress from delegating its taxing power to any other entity.

### 3.    Private Nondelegation

To top it off, "this case involves a delegation of lawmaking power, not to another governmental entity, but to private bodies wholly unaccountable to the citizenry." *Rettig*, 993 F.3d at 410 (Ho, J., dissenting from denial of rehearing en banc, joined by Jones, Smith, Elrod, and Duncan, JJ.). The Commission's re-delegation of these enormous powers to USAC—a private company registered in Delaware and run by self-acknowledged representatives of industry interest groups—is without precedent. This private company has the power of a full-fledged sovereign: it can decide how much money to raise, force the collection of that money under penalty of law, and then decide precisely how to spend the money. The Commission, meanwhile,

has essentially no power over this process, as the Ninth Circuit has held. *Incomnet*, 463 F.3d at 1074.

It is unclear what statutory authority the Commission relies upon for the power to delegate such important work to a private company. To the extent Congress permitted this, it "is delegation running riot." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 553 (1935). Delegation to "private persons" is "legislative delegation in its most obnoxious form," *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936), because "it is not even delegation to an official or an official body, presumptively disinterested, but to private persons whose interests may be and often are adverse to the interests of others in the same business." *Id.* In such cases, "there is not even a fig leaf of constitutional justification." *Dep't of Transp. v. Ass'n of Am. R.Rs.*, 575 U.S. 43, 62 (2015) (Alito, J., concurring). "Private entities are not vested with 'legislative Powers.' Nor are they vested with the 'executive Power,' which belongs to the President." *Id.* (citations omitted).

Nor can the Commission claim that USAC is merely some advisor. USAC does not simply hold funds in the Universal Service Fund as the Commission's agent. *Incomnet*, 463 F.3d at 1074 (citing 47 C.F.R. § 54.715(c)). The Commission exercises power over the fund only indirectly, essentially by overseeing USAC (not that the Commission ever actually does this). *Id.* The Commission has no ability to control the funds in the Universal Service Fund through direct seizure or discretionary spending. *Id.* USAC devises the figures that the Commission then ministerially uses to calculate the quarterly rate charged to carriers, and it does not appear that the Commission

45

has ever rejected USAC's proposals. 47 C.F.R. § 54.709(a). As the Fifth Circuit has long held, when an agency delegates a statutory duty, the agency may not "reflexively rubber stamp[]" action prepared by a private entity but instead must "independently perform its reviewing, analytical and judgmental function and participate actively and significantly in the preparation and drafting process." *Sierra Club v. Lynn*, 502 F.2d 43, 59 (5th Cir. 1974). If the Commission allows the Contribution Factor to become effective through inaction, as it has always done in the past, it would violate this core requirement of constitutional oversight.

Indeed, the Commission's latent authority (apparently never exercised) to reject USAC's proposals cannot cure the illegality of delegating such power to a private entity. "If all it reserves for itself is 'the extreme remedy of totally terminating the [delegation agreement],' an agency abdicates its 'final reviewing authority.'" *Fund for Animals v. Kempthorne*, 538 F.3d 124, 133 (2d Cir. 2008) (citation omitted). Stated another way, it is of course true that "any agency can always claw back its delegated power by issuing a new rule. But that would render the nondelegation doctrine a dead letter" because an agency can always "claw back" the power it delegated to a private entity. *Rettig*, 993 F.3d at 416-17 (Ho, J., dissenting from denial of rehearing en banc, joined by Jones, Smith, Elrod, and Duncan, JJ.). USAC's authority over the entire Universal Service Fund is therefore a far cry from cases where courts have allowed agencies to "employ private entities for *ministerial or advisory roles*," as distinguished from the prohibited act of giving private entities "governmental power over others"

JA159

like USAC undoubtedly possesses here. *Pittston Co. v. United States*, 368 F.3d 385, 395 (4th Cir. 2004) (citing *United States v. Frame*, 885 F.2d 1119, 1129 (3d Cir. 1989)).

For these reasons, if Congress permitted the Commission to re-delegate the powers to legislate by raising and spend revenues, or the power to impose and collect taxes, then Congress violated the private nondelegation doctrine for both legislation and taxation, contrary to Article I, sections 1 and 8 of the U.S. Constitution.

Alternatively, to the extent Congress did *not* permit the Commission to re-delegate (or de facto re-delegate) such authority to USAC, the Commission has acted in excess of its statutory authority in doing so, and therefore USAC's actions are all illegal and void.

### 4.    Appointments Clause

Moreover, if USAC is determined to be some form of public entity (despite its private nature), its board directors have been unconstitutionally appointed. They would be officers of the United States, given their extensive powers and discretion. *See Edmond v. United States*, 520 U.S. 651, 661 (1997); Jennifer L. Mascott, *Who Are "Officers of the United States?"*, 70 STAN. L. REV. 443, 454 (2018) ("Officials likely falling within the original public meaning of 'officer' include, among others: (i) officials overseeing federal disaster relief preparations; (ii) tax collectors; (iii) officials authorizing federal benefits payments…."). All officers of the United States must be nominated by the President and confirmed by the Senate, except Congress can expressly authorize inferior officers to be appointed by "the President alone," by "the Courts of Law," or by "the Heads of Departments." U.S. Const. art. II, § 2, cl. 2.

47

To the extent Congress permitted the Commission Chair to appoint USAC board directors, Congress violated the Appointments Clause. The Chair is not the "President, a Court of Law, or a Head of Department"—indeed, only the "full Commission" is a Head of Department. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 511-12 (2010). Accordingly, if USAC is a non-private entity, Congress could not authorize the Commission Chair alone to appoint USAC board directors, who therefore are subject to the default rule of Presidential nomination and Senate confirmation. That did not happen. This means USAC directors' appointments are invalid under the Appointments Clause, regardless of whether they are principal officers or inferior officers. And USAC's actions are illegal and void.

Alternatively, to the extent Congress did *not* statutorily permit the Commission Chair to appoint USAC board directors, the Commission has acted in excess of its statutory authority in doing so, meaning those directors are invalidly appointed, and USAC's actions are illegal and void.

### 5.    Administrative Procedure And Federal Register Acts

In a final insult to transparency and the democratic process, the Commission has never previously complied with the Administrative Procedure Act's requirements when issuing proposed quarterly rates for the Universal Service Fund. The APA establishes the procedures federal administrative agencies use for "rule making," defined as the process of "formulating, amending, or repealing a rule." 5 U.S.C. § 551(5). "Rule," in turn, is defined broadly to include "statement[s] of general or particular applicability and future effect" that are designed to "implement, interpret,

or prescribe law or policy." § 551(4). Any forthcoming *Proposed First Quarter 2022 Universal Service Contribution Factor* would be a rule (at least upon its becoming effective after 14 days) because it has future effect and general applicability—indeed, by its very terms, it has nearly "universal" applicability and involves billions of dollars in forced contributions.

Accordingly, the Commission would be required to follow the three-step procedure for notice-and-comment rulemaking: (1) "the agency must issue a general notice of proposed rule making, ordinarily by publication in the Federal Register"; (2) if "notice is required, the agency must give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments," and the "agency must consider and respond to significant comments received during the period for public comment"; (3) "when the agency promulgates the final rule, it must include in the rule's text a concise general statement of its basis and purpose." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 95-96 (2015) (internal quotation marks, brackets, and citations omitted).

If past is prelude, the Commission will perform none of these steps for the *Proposed First Quarter 2022 Universal Service Contribution Factor*, nor will the Commission find that any limited exception applies. *See* 5 U.S.C. § 553(b)(A)-(B).

First, there presumably will be no Federal Register notice.

Second, the Commission presumably will not formally open the process to public comment. Commenters are filing this particular Comment with the Commission despite the lack of any dedicated docket or invitation to do so. And even

49

after OMD acts, the window for comments is an illegally short 14 days, which will prejudice Commenters by forcing them to rush to finalize any Comment within that short period. And presumably the Commission will not respond to "significant comments" before the 14-day "deemed approved" period passes.

Third, the Commission's decision to establish such a shortened review process does not excuse the Commission from issuing a reasoned decision for its action, *see, e.g., Wollschlager v. Fed. Deposit Ins. Corp.*, 992 F.3d 574, 580-81 (6th Cir. 2021) (Sutton, J.), although it presumably will not comply with this requirement, either, as the Commission has apparently never done so for prior quarterly reviews. Indeed, under *S.E.C. v. Chenery Corp.*, 318 U.S. 80 (1943), the Commission can defend its action in court only on those grounds provided by the Commission itself in its administrative decision—which presumably will not exist here despite this Comment's attempt to trigger the Commission into complying with the basic safeguards of the APA. The Commission has no one to blame but itself for any difficulty in responding to comments in such a short period, given that it established this entire process, including the 14-day window and the "deemed approved" provision.

For all these reasons, the Commission has repeatedly violated the APA for past Contribution Factors and will do so again unless it complies with the requirements outlined above for any *Proposed First Quarter 2022 Universal Service Contribution Factor*.

Relatedly, if the Commission does not publish its proposal in the Federal Register, the Commission would also violate the Federal Register Act. *See* 44 U.S.C. § 1505. And the Commission presumably will violate the Federal Register Act again by failing to publish any Proposed Factor after the expiration of the 14-day "deemed approved" period (assuming the Commission did not issue its own order on the matter, which itself would then need to be published in the Federal Register). *Id.*

\* \* \*

From start to finish, it seems every aspect of the Universal Service Fund is designed to be as obscure, unresponsive, and opaque as possible. Congress hides behind the Commission, which hides behind USAC operating through a silent "deemed approved" process, which then hides behind carriers passing along the levies to customers. Any customer who wishes to challenge this universal tax would not know where to start. The carrier? USAC? The Commission? Congress? Each would blame the other—precisely as is intended, to ensure that this scheme continues as long as possible without any kind of oversight. "Congress passes problems to the executive branch and then engages in finger-pointing for any problems that might result. The bureaucracy triumphs—while democracy suffers." *Rettig*, 993 F.3d at 409 (Ho, J., dissenting from denial of rehearing en banc, joined by Jones, Smith, Elrod, and Duncan, JJ.) (alterations and citations omitted).

One struggles to find analogous exercises of unaccountable authority even in the reigns of the prerogative-wielding Stuart kings of the 17th century. But the label of these forced payments as "contributions" to the executive, 47 U.S.C. § 254(d), is reminiscent of the abusive history of English "benevolences," where the King would

demand "voluntary" payments from subjects under the euphemistic title of "loving contributions," enforced by penalty of imprisonment. *See* "Benevolence," 3 ENCYCLOPEDIA BRITANNICA 728 (1911), *available at* https://en.wikisource.org/wiki/Page%3AEB1911_-_Volume_03.djvu/748.

If Congress believes these programs are worthy of funding, it should have to endure the public scrutiny and beneficial debate of raising money and proposing an appropriation for them. Congress cannot short-circuit the critical legislative process by allowing an independent agency (really, a private company registered in Delaware) to raise and spend however much money it wants, at consumers' expense. The Universal Service Fund is a paradigmatic example of the runaway and unresponsive government that the Constitution was designed to prevent.

If allowed to stand, Congress's off-boarding of general revenue-raising to agencies (and the agencies' subsequent off-boarding to private companies) would only encourage imitation. Billions or even trillions of dollars could be raised every year by agencies and private companies under penalty of law, limited only by their imaginations and utterly standardless congressional "guidelines." Congress could even transfer its taxation authority entirely to agencies, who then transfer it entirely to private companies. It would be a politician's dream: faux-balanced budgets with faux-low taxes, but with all social welfare programs still funded and flush with subsidies and waste. The people paying these taxes would have no recourse to change the system, which is ultimately run by a board of private individuals who can never be defeated at the ballot box—or are even appointed by someone who can. "By shifting

JA165

responsibility to a less accountable branch, Congress protects itself from political censure—and deprives the people of the say the framers intended them to have." *Tiger Lily*, 5 F.4th at 675 (Thapar, J., concurring).

## IV. CONCLUSION

In sum, there are numerous legal infirmities in the Universal Service Fund and its mechanisms, which the Commission should not countenance by allowing further collections via a *Proposed First Quarter 2022 Universal Service Contribution Factor*. OMD should therefore set the rate at 0.000. As noted throughout already, the collections under this proposal would be illegal for at least eight reasons:

*First*, regardless of whether the revenues raised for the Universal Service Fund pursuant to 47 U.S.C. § 254 are considered "taxes," Congress's delegation to the Commission of the legislative authority to raise and spend nearly unlimited money violates Article I, section 1, of the U.S. Constitution under both the original understanding of constitutional separation of powers and also the more-recent prohibition on delegations that lack a sufficient "intelligible principle" to guide the Commission's actions in defining "universal service" or in raising and spending revenue, especially given the Commission's power to redefine the scope of universal service. *See Gundy*, 139 S. Ct. at 2133, 2141 (Gorsuch, J., dissenting, joined by Roberts, C.J., and Thomas, J.).

*Second*, to the extent Congress permitted the Commission to re-delegate (or de facto re-delegate) to a private company the authority to raise and spend nearly unlimited money for Commission-defined "universal service," Congress performed an unconstitutional delegation of Congress's legislative power to a private entity in

contravention of the United States Constitution, Article I, section 1. *See also Whitman*, 531 U.S. at 473 ("The idea that an agency can cure an unconstitutionally standardless delegation of power by declining to exercise some of that power seems to us internally contradictory.").

*Third*, the revenues raised for the Universal Service Fund pursuant to 47 U.S.C. § 254 are not just revenue but in fact are taxes and therefore Congress's delegation to the Commission of authority to raise and spend nearly unlimited taxes for Commission-defined "universal service" violates Article I, section 8, of the U.S. Constitution, which gives Congress the sole "power to lay and collect taxes." U.S. Const. art. I, § 8. Even if Congress is permitted to delegate its taxing authority, it should be allowed to do so only pursuant to a detailed delegation that contains formulas or limits on the rate or total revenue that can be collected, *Gundy*, 139 S. Ct. at 2133, 2136, 2144 (Gorsuch, J., dissenting, joined by Roberts, C.J., and Thomas, J.)—which Congress did not do here.

*Fourth*, to the extent Congress permitted the Commission to re-delegate (or de facto re-delegate) to a private company the authority to raise and spend nearly unlimited taxes for Commission-defined "universal service," Congress performed an unconstitutional delegation, to a private entity, of Congress's authority to raise taxes, in violation of Article I, section 8, of the U.S. Constitution, which gives Congress the sole "power to lay and collect taxes." U.S. Const. art. I, § 8.

*Fifth*, to the extent Congress did *not* to permit the Commission to delegate to a private company the authority to raise and spend nearly unlimited money for

Commission-defined "universal service," the Commission's subsequent re-delegation to USAC is beyond the Commission's lawful statutory authority, regardless of whether the charges are deemed to be "taxes." *See also Whitman*, 531 U.S. at 473.

*Sixth*, if USAC is determined *not* to be a private entity, and to the extent Congress permitted the Commission Chair to appoint USAC board directors, Congress violated the Appointments Clause. The Chair is not a "Head[] of Department[]"—only the "full Commission" is. *Free Enter. Fund*, 561 U.S. at 511-12. The illegally constituted USAC effectively establishes the *Proposed First Quarter 2022 Universal Service Contribution Factor*. 47 C.F.R. § 54.709(a).

*Seventh*, to the extent Congress did *not* statutorily permit the Commission Chair to appoint USAC board directors, the Commission has acted in excess of its statutory authority in doing so.

*Eighth*, the Proposed Quarterly Universal Service Contribution factor is a binding legislative rule, but the Commission has never complied with the APA's requirements for rulemaking (such as a meaningful notice-and-comment period and a proper explanation of the agency's decision), nor with the Federal Register Act's requirements for publication—and presumably will not comply with it for any *Proposed First Quarter 2022 Universal Contribution Factor*. *Perez*, 575 U.S. at 95-96; 44 U.S.C. § 1505.

JA168

\* \* \*

OMD should set the *Proposed First Quarter 2022 Universal Contribution Factor* at 0.000 (0%). OMD should do the same for all future proposed Universal Service contribution factors due to the illegality of this entire scheme and process.

Dated:         November 19, 2021

**Submitted via ECFS**

Respectfully submitted,

/s/ R. Trent McCotter

C. Boyden Gray
Jonathan Berry
R. Trent McCotter
Michael Buschbacher
Jordan E. Smith
BOYDEN GRAY & ASSOCIATES
801 17th Street N.W.
Suite 350
Washington, DC 20006
(202) 706-5488
mccotter@boydengrayassociates.com

<u>JA170</u>

# EXHIBIT A

# REPORT OF DR. GEORGE S. FORD

# EXPERT REPORT OF DR. GEORGE S. FORD

## Professional Qualifications & Experience

My name is George S. Ford. I am the President of Applied Economic Studies—an economic consulting firm. I hold a Ph.D. in Economics from Auburn University. After receiving a Ph.D. in Economics in 1994, I have worked as a professional economist in government, industry, the non-profit sector, and as a private consultant. In 1994, I became an economist in the Competition Division of the Federal Communications Commission, an organization located in the General Counsel's Office that provided legal and economic analysis to the many bureaus of the Commission. My work at the Commission covered a wide range of topics from multichannel video services, broadcasting policies, wireline and wireless telecommunications services, international policy, radio interference standards, and general financial, statistical, and econometric analysis. After my government tenure, I became an economist at MCI Communications, a large provider of local and long-distance telecommunications services to households and businesses, where my work focused on telecommunications regulation and policy at both the federal and state levels. I also conducted analysis of entry into new markets and merger and acquisition activity. In April 2000, I became the Chief Economist of Z-Tel Communications in Tampa, Florida, a small competitive telephone company. At Z-Tel, I performed regulatory and business analysis, overseeing a team that ensured the company's compliance with regulatory requirements and cost management. I also participated in the development of financial models for business plans and investments and represented the company as an expert in proceedings before state regulatory commissions and at the Federal Communications Commission. In the summer of 2004, I founded Applied Economic Studies, a private consulting firm.

I am also the Chief Economist of the Phoenix Center for Advanced Legal & Economic Policy Studies, a Washington, D.C. based 501(c)(3) research organization that specializes in the legal and economic analysis of public policy issues involving the communications, technology, and infrastructure industries. The Phoenix Center does not do consulting work, and the views expressed in this testimony do not represent the views of the Phoenix Center or its staff. For several years I served as an Adjunct Professor at Samford University where I taught Economics to graduate students.

My areas of specialty are the application of microeconomics and econometrics to industry and public policy with particular emphasis on the telecommunications industry. Over the years I have written many papers on a variety of topics, publishing over eighty papers in economic and law journals including the *Antitrust Bulletin*, the *Journal of Law & Economics*, *Energy Economics*, *Telecommunications Policy*, the *Journals of Gerontology*, *Empirical Economics*, the *Journal of Business*, the *Journal of Regulatory Economics*, the *Southern Economic Journal*, the *Quarterly Review of Economics and Finance*, the *Journal of Public Choice and Finance*, *Communications in Statistics*, the *Yale Journal on Regulation*, the *Federal Communications Law Journal*, and many others. My work has been cited in nearly 1,900 articles (according to Google Scholar). I have also published book chapters on telecommunications policy and financial econometrics. My curriculum vitae is attached.

## Assignment

I was retained as an expert by Boyden Gray & Associates to provide my expert opinion as an economist on the question of whether levies on telecommunications providers by the Federal Communications Commission (FCC) for purposes of its Universal Service Fund Programs possess the characteristics of a "fee," or a "tax."

## Summary of Opinions

In both law and economics, the difference between a "tax" and a "fee" goes to the question of whether the payer or the public benefits most from the levies.  A "fee" bestows benefits on the payer not shared by other members of the public.  A fee is paid for a business license or a passport.  Contrariwise, a "tax" defrays the costs of programs that benefit the public, and the payer may receive no benefit at all.  Today, the FCC uses the USF Program to subsidize schools to "promote digital learning," to subsidize rural health care providers "to improve the quality of health care," and subsidizes individuals and corporations to promote "economic growth" and "jobs."  These are public benefits that offer no special benefit to the telecommunications providers whose revenues support such expenditures.  It is my opinion, therefore and at the present time, that the collection of levies from telecommunications providers for some if not all USF Programs possess the characteristics of a "tax" rather than a "fee."

## Background:  The USF Programs

The Universal Service Fund Program (USF), authorized by Section 254 of the Telecommunications Act of 1996, directs the Federal Communications Commission (FCC) to implement policies that ensure that all regions of the Nation have access to advanced telecommunications and information services at just, reasonable, and affordable rates.[1]  Congress provided the Commission wide discretion to determine both how to collect and spend the dollars necessary to support the program.

The USF Program existed prior to the Telecommunications Act of 1996.  The program was then limited to subsidizing the deployment and maintenance of voice-grade services in high-cost rural areas and stimulating adoption by low-income Americans through subsidized, discounted services. The revenues required to support the subsidies were collected in a complex regulatory scheme including many implicit cross subsidies among telecommunications providers and their customers.  After the passage of the Telecommunications Act of 1996, the FCC modernized the USF Program in several ways.  First, at the direction of the 1996 Act, the Commission established two new subsidy programs: (1) the *Schools & Libraries Program* (or the *E-Rate Program*), which provided financial support to obtain discounted telecommunications and Internet services for schools and libraries; and (2) the *Rural Healthcare Program*, which provided financial support to rural health providers for telecommunications and Internet services.  Second, in 2011, the Commission extended USF subsidy support to Internet services (or "broadband service") to those USF programs previously limited to voice-grade services.[2]  These reforms, among other factors,

---

[1]      Prior to the 1996 Telecommunications Act, "universal service" was funded through a complex system of cross-subsidies among service providers.  In the 1996 Act, Congress replaced the regulatory cross-subsidies with direct subsidies.  The universal service program is administered for the FCC by the Universal Service Administrative Company (or USAC), a not-for-profit corporation (http://www.usac.org/).

[2]      Recipients of these subsidy dollars must also provide voice-grade services.

expanded the size of the USF Program as the FCC began pursuing broad, social goals beyond increasing telephone subscriptions.  Between 1995 and 2005, the budget of the USF Program increased from $1.37 billion to $8.4 billion in 2019 dollars.[3]

In 2019, the USF Program redistributed $8.35 billion in subsidy dollars across four programs:[4]

(1) the *High-Cost Program* provides subsidies to providers serving high-cost, mostly rural areas;

(2) the *Lifeline Program* provides subsidies to providers offering monthly discounts to qualifying low-income consumers for voice and broadband services;

(3) the *Schools and Libraries Program* provides subsidies to eligible schools and libraries for telecommunications and Internet services; and

(4) the *Rural Health Care Program* that provides subsidies rural healthcare providers for providing telecommunications and Internet services.[5]

Funding levels for each program are summarized in Table 1.  The largest program is the High-Cost Fund accounting for 61.6% of funding dollars with Schools & Libraries Program in second at 23.6% of funding.

| Table 1.  USF Funding by Program (2019) | | |
| --- | --- | --- |
| Program | Funding ('000) | Share |
| High-Cost | $5,146,679 | 61.6% |
| Schools & Libraries | $1,968,776 | 23.6% |
| Lifeline/Linkup | $982,005 | 11.8% |
| Rural Healthcare | $251,516 | 3.0% |
| Total | $8,348,976 | 100% |
| * Source: Table 1.9.  Numbers may not sum due to rounding. | | |

Where do these billions in subsidies come from?  The revenues required to support these four subsidy programs are collected using an ad valorem assessment (the "contribution factor") on the interstate and international revenues of nearly all telecommunications providers.  In 2019, retail interstate and international revenues (the contribution base) equaled 9.2% of total industry revenues.[6]  Providers are neither required nor prohibited from passing these costs onto their customers, though collections from consumers may not exceed the provider's contributions.  Most providers directly pass these costs through to consumers as a line-item on their bills.  In many respects, the providers serve as a collection agent of the government, in the same way a retail store collects sales taxes for state and local governments.[7]

---

[3]    *Universal Service Monitoring Reports*, Federal-State Joint Board on Universal Service (1996, 2020), (available at: https://www.fcc.gov/general/federal-state-joint-board-monitoring-reports).  Nominal values are $1.4 billion and $6.5 billion.    The    Gross    Domestic    Product    deflator    is    used    for    the    conversion: https://fred.stlouisfed.org/series/USAGDPDEFAISMEI.

[4]    Is some years, the subsidy levels approached $10 billion.  *Universal Service Monitoring Report*, Federal-State Joint    Board    on    Universal    Service    (Sept.    2020),    at    Table    1.2    (available    at: https://docs.fcc.gov/public/attachments/DOC-369262A1.pdf).

[5]    For a description of the programs, see https://www.fcc.gov/general/universal-service.

[6]    *Universal Service Monitoring Report* (2020), *supra* n. 3, at Tables 1.1 and 1.2.

[7]    Passing the contributions through to consumers as a line-item (or in the form of higher prices) does not imply that providers are unharmed by the levies.  Higher levies increase costs, reduce quantity demanded, and thus reduce

With the rapid growth of Internet-based communications, the contribution base of voice-grade interstate and international service revenues materially declined but USF obligations rose. Between 2001 and 2019, the contribution base for the USF Program (interstate and international revenues) declined by 40% while the USF subsidies rose by 83%. Consequently, the contribution factor (the ad valorem levy) increased sharply. In 2001, the contribution factor averaged 6.8% while in 2021 the average assessment averaged 31.5%, a near five-fold increase.[8] The high assessment rate has furthered the decline in the contribution base by reducing demand for interstate and international voice services and incentivizing consumers and providers to find alternative modes of communication not subject to the levies. The declining contribution base, rising contribution factor, and high subsidy levels of the USF Program have led many analysts and policymakers to worry about the sustainability of the current program.[9]

**Distinguishing a Tax from a Fee**

Among other reasons, the increasing burden on the interstate and international voice services and the expanding scope of the USF Program have led to questions about whether the USF Program's levies constitute a "fee" or a "tax." In legal matters, it is often important to distinguish between different kinds of government levies, mainly because taxation is a legislative function.[10] In distinguishing between a "fee" and "tax," whether a legislature or government agency labels a particular levy a "fee" or a "tax" is largely immaterial.[11] Rather, it is the characteristics of the levy that determines its nature, and those characteristics may change over time when a government agency lacks clear legislative guidance, oversight, or constraint.

Definitions of "tax" and "fee" are common between law and economics. A tax, as defined by Pflen in the classic *Introduction to Public Finance*, is a compulsory contribution of wealth levied upon persons or corporations "to defray the expenses incurred in conferring a common benefit upon the residents of the State. A tax is justified, but not necessarily measured, by the common benefit conferred."[12] Similarly, Seligman defines a tax as a "compulsory contribution from a person to the government to defray the expenses incurred in the common interest of all."[13] Dalton defines a "tax" as "a compulsory contribution imposed by the public authority, irrespective of the exact amount of service rendered to the taxpayer in return."[14] A tax, therefore, is a

---

profits. Also, if the ad valorem levy leads providers to lower service prices (excluding the levy), the providers will bear some of the burden of the levies. But empirical evidence indicates that telecommunications consumers are price insensitive, implying the consumer will bear the bulk of the levies through higher gross prices (net prices plus the levy). Also, as time progresses and consumers and providers divert traffic away from the contribution base, what is left is consumers with few options and thus very inelastic demands. On tax incidence, *see, e.g.*, C.R. McConnell, S.L. Brue, and S.M. Flynn, ECONOMICS: PRINCIPLES, PROBLEMS, AND POLICIES (2015), at pp. 416-423.

[8]     Data available at: https://www.fcc.gov/general/contribution-factor-quarterly-filings-universal-service-fund-usf-management-support.

[9]     *See, e.g.*, C.D. Jarrett, *Nearing a Tipping Point on USF Contribution Reform*? 11 NATIONAL LAW REVIEW (Feb. 19, 2021) (available at: https://www.natlawreview.com/article/nearing-tipping-point-usf-contribution-reform).

[10]     *See, e.g.*, J. Henchman, *How Is the Money Used? Federal and State Cases Distinguishing Taxes and Fees*, National Tax Foundation, Background Paper No. 63 (2013) (available at: https://files.taxfoundation.org/20190103161206/TaxesandFeesBook.pdf).

[11]     Henchman, *id.*; *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 544 (2012) ("Congress cannot change whether an exaction is a tax or a penalty for constitutional purposes simply by describing it as one or the other.").

[12]     C.C. Pflen, INTRODUCTION TO PUBLIC FINANCE (1891), at p. 87.

[13]     M.M.J. Kennedy, PUBLIC FINANCE (2012), at p. 34.

[14]     *Id.*

compulsory contribution to the state for services rendered by the state for the general benefit of its people.[15]  That is, taxes benefit the public, not necessarily the taxpayer.

In contrast, a fee, is a payment to the government by an entity seeking a beneficial service from the government.  Pflen states a fee "has a different justification from a tax.  A fee never exceeds the cost of the special service rendered [and] confirms a special benefit" on the payer.[16]  Seligman defines a fee as a "payment to defray the cost of each recurring service undertaken by the government primarily in the public interest, but conferring a measurable special advantage on the fee payer."[17]  Or, a "fee" is "only paid by those persons who enjoy the special benefit of the services rendered by the state."[18]  For instance, the "Application Fee" for a U.S. passport is $110 and applicants may pay an "Expedite Fee" of $60.[19]  Revenue from these fees offset the cost of processing a passport (at least, in part), the benefits of which are "not shared by other members of society."

From the economic perspective, the distinction between a "tax" and a "fee" turns on whether the benefits supported by levies flow to the payer (a fee), or to the public (a tax).  The same distinction appears in law.  For instance, in *National Cable Television Association v. U.S.* (1974), the Supreme Court observed, "A fee . . . is incident to a voluntary act, e. g., a request that a public agency permit an applicant to practice law or medicine or construct a house or run a broadcast station.  The public agency performing those services normally may exact a fee for a grant which, presumably, bestows a benefit on the applicant, not shared by other members of society."[20]  Similarly, in *Skinner v. Mid-Am. Pipeline Co.* (1989), the Court observes that a levy may be more like a "tax" than a "fee" when "some of the administrative costs at issue inure[] to the benefit of the public, rather than directly to the benefit of those parties."[21]  A "fee" benefits the payer and not the public.

There are two conditions, therefore, that permit one to distinguish between a tax and a fee.  First, to qualify as a "fee," the payer of the levy must be the primary, if not the exclusive, beneficiary of the services justifying the levy.  The more the benefits of the government expenditures advantage the public, the less the levy has the character of a fee.  Second, an economists would characterize a "fee" by saying that, on average at least, there should be a positive increasing relationship (or a "monotonic" relationship) between payer liability and the benefits the payer expects from the program(s) the fee is designed to support.  A "tax" does not have this property; a tax has no particular relationship between payer liability and the benefits the payer expects from that liability.  For example, tax dollars used to fund food stamps levy taxes on higher income Americans that do not qualify for food stamps to the benefit of lower-income Americans that often pay no income tax at all.

---

[15]     *Types of Taxes*, economicconcepts.com (last viewed Sept. 22, 2021).
[16]     Pflen, *supra* n. 12, at p. 88.
[17]     Kennedy, *supra* n. 13.
[18]     *Types of Taxes*, supra n. 15.
[19]     https://travel.state.gov/content/dam/passports/forms-fees/Passport%20Fees%20Chart_TSG_JAN2021.pdf.
[20]     *National Cable Television Association v. U.S.*, 415 U.S. 336, 340-41 (1974).
[21]     *Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 214 (1989).

**Do USF Liabilities Possess the Characteristics of Taxes, or of Fees?**

Given the above, whether the levies on telecommunications providers constitute a "fee" or a "tax," or at least lean one way or the other, depends on the distribution of liabilities and benefits. Who pays and who benefits? If the benefits largely accrue to the public at large rather than to the telecommunications providers or the specific telecommunications services funding the program, then USF liabilities have the properties of tax.

Telecommunications providers are the immediate payers in the USF Program. Their liabilities are equal to the contribution factor (now about 30%) multiplied by telecommunications providers' revenues obtained only from the sale of interstate and international telecommunications services.[22] At present, the liabilities are just over $8 billion dollars. For these liabilities to have the character of a fee, then almost all the benefits of the $8 billion in expenditures must accrue to the payers. Also, the relationship between the liability and the benefits must be monotonically positive. If these conditions do not apply, then the USF liabilities have the characteristics of a tax.

There are two possible channels from which telecommunications providers—the parties immediately liable for the subsidy funds—may benefit from their liabilities. First, there is the issue of network effects. That is, a network is more valuable as more consumers are connected to it, so expanding the size of the Public Switched Telephone Network (PSTN) arguably benefits providers and their customers. Today, network effects are likely to be small if not zero. Second, providers making contributions to the program may benefit directly by receiving payments from the one or more of the four USF programs.

Aside from telecommunications providers, there may be benefits that flow to third parties — schools and libraries, rural health care providers, employers, job seekers—and such benefits to the public give the levies the character of a tax. Moreover, since liability adheres only to interstate and international revenues, and the mix of such revenues vary by provider, there may be third-party benefits even among telecommunications providers. Some providers receiving direct payments from the program pay little to nothing into the system, so that liabilities and benefits may not be monotonically related.

*Network Effects*

A larger communications network is sometimes (but not always) more valuable than a smaller one. These network effects (or network externalities), to the extent they exist, are subject to diminishing marginal returns. A small increase in subscribers to a small network has a larger network effect than does a small increase in subscribers to a network that is nearly universally adopted. While network effects may have been important at the turn of 20th century when telecommunications networks were not always interconnected, for several reasons the presence

---

[22]    Larger providers typically face large liabilities. In 2019, the largest ten payers accounted for 78% of USF liabilities and 76% of total telecommunications revenues. *Universal Service Monitoring Report* (2020), *supra* n. 3, Tables 1.3 and 1.7.

of sizable network effects today is questionable, especially for the voice-grade services that fund the USF Program.[23]

The presence or magnitude of network effects is an empirical question. The FCC has made no attempt to quantify the presence or magnitude of network effects as a benefit to telecommunications providers, and there are reasons to suspect the size of such effects is now small. Academic research suggests that the USF Programs have done little, if anything, to increase the adoption of telecommunications services beyond the market outcome.[24] Also, given the high adoption rates absent such programs, the network effects created by such programs are likely absent or small.[25]

Also, the liabilities to the USF Program need not bear a direct relation to a network effect. Say, for instance, a customer of a telecommunications provider makes one more interstate call, thereby increasing the liability of the provider. The caller and the called are both on the network, so there is no network effect from expanded adoption but there is an increase in liability.

Furthermore, today about 97% of American adults (about 258.3 million persons) have a cellphone, which permits nearly everyone to be contacted over the PSTN.[26] There are about 6.2 million Lifeline accounts and almost all are mobile wireless accounts. Thus, about 95% of Americans have a cellphone absent any subsidy, assuming Lifeline subscribers would not have service absent the program.[27] With near universal adoption absent USF support, network effects are presumably very small or possibly zero. With a near universal adoption of mobile services, neither the High-Cost Fund nor the Lifeline Program can be said to produce meaningful network effects. As far as I am aware, there is no claim that the Schools & Libraries Fund or the Rural Healthcare Fund produce network effects for the telecommunications providers.

*Receipt of Subsidies*

Given the confidentiality of USF liabilities, it not possible to directly evaluate the relationship between liability and USF support for individual providers. Assuming that interstate and

---

[23]     G. Woroch, *Local Network Competition*, in HANDBOOK OF TELECOMMUNICATIONS ECONOMICS (eds. M. Cave, S. Majundar, and I. Vogelsang) (2012); M.K. Kellog, J. Thorne, and P.W. Huber, FEDERAL TELECOMMUNICATIONS LAW (1992).

[24]     D.L. Kaserman, J.W. Mayo, and J.E. Flynn, *Cross-Subsidization in Telecommunications: Beyond the Universal Service Fairytale*, 2 JOURNAL OF REGULATORY ECONOMICS 231-249 (1990); J. Hausman, T. Tardiff, and A. Belinfante, *The Effects of the Breakup of AT&T on Telephone Penetration in the United States*, 83 AMERICAN ECONOMIC REVIEW 178-184 (1993); C. Garbacz and H.G. Thompson, Jr., *Assessing the Impact of FCC Lifeline and Link-Up Programs on Telephone Penetration*, 11 JOURNAL OF REGULATORY ECONOMICS 67-78 (1997).

[25]     A.H. Barnett and D.L. Kaserman, *The Simple Welfare Economics of Network Externalities and the Uneasy Case for Subscribership Subsidies*, 13 JOURNAL OF REGULATORY ECONOMICS 245-524 (2998).

[26]     Mobile penetration is from Pew Research (https://www.pewresearch.org/internet/fact-sheet/mobile/); Adult population from the U.S. Census Bureau (https://www.census.gov/library/stories/2021/08/united-states-adult-population-grew-faster-than-nations-total-population-from-2010-to-2020.html#:~:text=In%202020%2C%20the%20U.S.%20Census,from%20234.6%20million%20in%202010).

[27]     Lifeline Subscribers is from Universal Service Administrative Company (USAC) (https://www.usac.org/lifeline/resources/program-data/#Participation). The FCC's Mobility Fund subsidizes mobile wireless network deployment in rural areas but only small distributions have been made to date. More meaningful distributions are planned for Phase II of the program. *See, e.g., FCC Should Improve the Accountability and Transparency of High-Cost Program Funding*, Government Accountability Office, GAO-14-587 (July 2014) (available at: https://www.gao.gov/assets/gao-14-587.pdf).

international revenues are correlated with total revenues, it becomes possible to say something about the relationship between liability and benefits. In Table 2, the total revenues and High-Cost support received by several providers is summarized.[28] The list includes companies with public financial data; many recipients of High-Cost funding are cooperatives or privately-held small companies that do not report formal financial results.

**Table 2. Examples of Liability and High-Cost Support**

| Company | Total Revenues | High-Cost Support | Support/Revenues |
|---|---|---|---|
| AT&T | 181,193,000,000 | 548,000,000 | 0.30% |
| Verizon | 131,868,000,000 | 72,000,000 | 0.05% |
| CenturyLink | 22,401,000,000 | 516,000,000 | 2.30% |
| Frontier | 8,107,000,000 | 339,000,000 | 4.18% |
| TDS | 5,176,000,000 | 211,000,000 | 4.08% |
| Consolidated Comm. | 1,336,542,000 | 60,000,000 | 4.49% |
| LICT Corp. | 117,958,000 | 36,000,000 | 30.5% |

For the nation's largest providers of telecommunications services, AT&T and Verizon, the High-Cost support is a trivially small share of revenues—about 0.3% for AT&T and 0.05% for Verizon. For smaller providers that serve more rural markets, the share of High-Cost support to revenues is much higher. Setting aside network effects, the companies that contribute large sums to the program receive few benefits, and companies that contribute little to the fund receive large benefits. In terms of direct benefits, there is no monotonic relationship between liabilities and subsidy receipts.

The subsidization of broadband service introduces third-party benefits in the subsidy scheme. Revenues from broadband services are not subject to the USF levy. Only retail interstate and international services are in the contribution base. Consequently, a service that provides no financial support to the USF Program is a beneficiary of the subsidy program. Since the revenue sources of providers vary, often substantially, the discrepancy between the source of subsidy dollars and the recipients of subsidy dollars gives the USF levies the character of taxes. Broadband service is a "third party" beneficiary to levies placed on voice-grade service.

Making matters worse, the funding of broadband services creates additional substitutes for the voice-grade services that support the USF Program, reducing the demand for interstate and international calling. Providers with relatively high shares of interstate and international revenues are subject to liabilities the proceeds of which are used to harm their interstate and international businesses. Those liable for USF contributions are harmed by the program. Like taxation, liabilities may be spent in ways that harm the taxpayer.

*Third Party Beneficiaries*

When the FCC modernized the USF Program after the Telecommunications Act of 1996, the Commission largely abandoned the notion that it was telecommunications providers that benefit from the programs' subsidies. Today, USF spending represents a galaxy of policy concerns with

---

[28]     *Universal Service Monitoring Report* (2020), *supra* n. 3, at Table 3.7. Revenues from Yahoo Finance or company Annual Reports.

no obvious connection to carrier liabilities so that a large portion of the benefits of USF payments go to third parties.

Take, for instance, the Schools & Libraries Fund and the Rural Healthcare Fund. The FCC's stated goal of the Schools & Libraries Fund is "to support digital learning in schools and robust connectivity for all libraries."[29]  The FCC's stated goal of the Rural Healthcare Fund is "to improve the quality of health care available to patients in rural communities."[30]  These are broad social goals that benefit the public, not the telecommunications providers that support the program by paying levies.  For these programs, there is no linkage between liabilities and benefits; the benefits are for the public at large.  This inclusive perspective is not limited to these programs.  The Commission's stated goal of the USF Program broadly is to promote "economic growth, jobs and opportunities."[31]   Such concerns are not benefits to telecommunications providers but to the public at large.

**Conclusion**

From the economic perspective, it seems clear that the contributions to the USF Program, and especially for certain of its components, possess the characteristics of a "tax" rather than a "fee." Today, USF spending represents a galaxy of policy concerns with no obvious connection to providers' liabilities.  In distributing the program's funds, the FCC aims "to support digital learning," "to improve the quality of health care," to promote "economic growth" and "jobs," and to provide "educational, employment, civic, social, and other benefits."  Such broad goals are beyond the scope of a fee-based system as the benefits accrue to the public at large and not those responsible for funding the program.  The primary benefit of USF Programs that may accrue to telecommunications providers is from the network effects of a more connected society, but such effects, if any, are likely to be small in modern times as consumers are able to communicate across a variety of broadly-deployed and widely-adopted communications modalities.  Whether in whole or in part, the modern USF Program is social policy, the benefits of which largely serve the public and not the telecommunications providers that immediately pay for the scheme.

---

[29]    *Summary of the E-Rate Modernization Order*, Federal Communications Commission (2014) (available at: https://www.fcc.gov/general/summary-e-rate-modernization-order#:~:text=The%20Order%20adopts%20three%20goals,making%20the%20E%2Drate%20application).

[30]    *Rural Health Care Program*, Federal Communications Commission (undated) (available at: https://www.fcc.gov/general/rural-health-care-program).

[31]    *In the Matter of Universal Service Contribution Methodology; A National Broadband Plan For Our Future*, Federal Communications Commission, WC Docket No. 06-122, FCC 12-46 (Rel. April 30, 2012), at ¶ 1.

<u>JA180</u>

I declare under penalty of perjury that the foregoing testimony is true and correct.


September 23, 2021
_____                    _____
Date                                                            George S. Ford

**EXHIBIT B**

**CURRICULUM VITAE OF DR. GEORGE S. FORD**

# George S. Ford, Ph.D.

ford@phoenix-center.org

Phoenix Center for Advanced Legal &
Economic Public Policy Studies
5335 Wisconsin Avenue NW, Suite 440
Washington, DC 20015
www.phoenix-center.org

**EDUCATION:**

Ph.D., Economics, Auburn University, 1994.

B.S., Economics (magna cum laude), Auburn University, 1990.

**EXPERIENCE:**

| | |
|---|---|
| 2000 - Present | **PHOENIX CENTER FOR ADVANCED LEGAL AND ECONOMIC PUBLIC POLICY STUDIES**<br>**Washington, DC**<br>Chief Economist |
| 2016 - Present | **AUBURN UNIVERSITY, Auburn, Alabama**<br>Adjunct Professor |
| 2004 – Present | **APPLIED ECONOMIC STUDIES, Birmingham, Alabama**<br>President |
| 2006 - 2016 | **SAMFORD UNIVERSITY, Birmingham, Alabama**<br>Adjunct Professor |
| 2000 – 2004 | **Z-TEL COMMUNICATIONS**<br>**Tampa, FL**<br>Chief Economist, Strategic Policy and Planning |
| 1996 - 2000 | **MCI WORLDCOM CORPORATION**<br>**Washington, D.C.**<br>Senior Economist, Office of Policy and Strategic Planning |
| 1994 - 1996 | **FEDERAL COMMUNICATIONS COMMISSION**<br>**Washington, D.C.**<br>Economist, Office of the General Counsel & Cable Bureau, Competition Division |

**PUBLISHED RESEARCH:**

"Testing the Economics of the Net Neutrality Debate: A Comment,"
*Telecommunications Policy*, Vol. 45, 2021.

"Spatial Competition in Automobile Retailing," with T.R. Beard and L.J.
Spiwak, *Applied Economics*, Vol. 53, 2021.

"Confusing Relevance and Price: Interpreting and Improving Surveys On
Internet Non-Adoption," *Telecommunications Policy*, Vol. 45, 2021.

"Subsidies and Substitution: An Empirical Study of The Lifeline
Program," *Telecommunications Policy*, Vol. 45, 2021.

"Interference, Sunk investment, and the Repurposing of Radio
Spectrum," with T.R. Beard and M.L. Stern, *Information & Communications
Technology Law*, Vol. 29, 2020.

"Net Neutrality and Investment in the US: A Review of Evidence from
the 2018 Restoring Internet Freedom Order," *Review of Network Economics*,
Vol. 17, 2019.

"Promotional Effects and the Determination of Royalty Rates for Music,"
with T.R. Beard and M. Stern, *Journal of Media Economics*, Vol. 31, 2018.

"Regulation and Investment in the U.S. Telecommunications Industry,"
*Applied Economics*, Vol. 50, 2018.

"Is Faster Better? Quantifying the Relationship Between Broadband
Speed and Economic Growth," *Telecommunications Policy*, Vol. 42, 2018.

"Regulating, Joint Bargaining, and the Demise of Precedent," with T.R.
Beard, L.J. Spiwak, and M. Stern, *Managerial and Decision Economics*, Vol.
39, 2018.

"Safe Harbors and the Evolution of Online Platform Markets: An
Economic Analysis," with T.R. Beard and M. Stern, *Cardozo Arts &
Entertainment Law Journal*, Vol. 36, 2018.

"Fair Use in the Digital Age," with T.R. Beard and M. Stern, *Journal of the
Copyright Society of the USA*, Vol. 65, 2018.

"Piracy, Imitation, and Optimal Copyright Policy," with T.R. Beard and
G. Sorek, *Southern Economic Journal*, Vol. 84, 2018.

"Private Solutions to Broadband Adoption: An Economic Analysis,
forthcoming," with T.R. Beard, L.J. Spiwak, and M. Stern, *Federal
Communications Law Journal*, Vol. 69, 2017.

"Taxation by Regulation: Spectrum Repurposing at the FCC and the Prolonging of Spectrum Exhaust," with T.R. Beard, L.J. Spiwak, and M. Stern, *Hastings Journal of Law & Technology*, Vol. 8, 2016.

"Reflecting on Twenty Years Under the Telecommunications Act of 1996," *Federal Communications Law Journal*, Vol. 68, 2016.

"Lessons Learned from the U.S. Unbundling Experience," with Lawrence J. Spiwak, *Federal Communications Law Journal*, Vol. 68, 2016.

"Value-based Pricing of Music," with T.R. Beard and M. Stern, *Review of Economic Research on Copyright Issues*, Vol. 12 (2015).

"Tariffing Internet Termination: Pricing Implications of Classifying Broadband as a Title II Telecommunications Service," with Lawrence J. Spiwak, *Federal Communications Law Journal*, Vol. 67, 2015.

"Section 10 Forbearance: Asking the Right Questions to Get The Right Answers," with Lawrence J. Spiwak, *CommLaw Conspectus*, Vol. 23, 2014.

"Market Mechanisms and the Efficient Use and Management of Scarce Spectrum Resources," with T. Randolph Beard, Lawrence J. Spiwak, and Michael Stern, *Federal Communications Law Journal*, Vol. 66, 2014.

"Market Definition and the Economic Effects of Special Access Price Regulation," with T. Randolph Beard and Lawrence J. Spiwak, *Commlaw Conspectus*, Vol. 22, 2014.

"Internet Use and Depression among Retired Older Adults in the U.S.: A Longitudinal Analysis," with S. Cotten, S. Ford, and T. Hale, *Journals of Gerontology: Social Sciences*, Vol. 69, 2014.

"Capital Investment and Employment in the Information Sector," with T. Randolph Beard and H. Kim, *Telecommunications Policy*, Vol. 38, 2014.

"Secularism, Religion and Political Choice," with R. Ekelund Jr., T. R. Beard, R. Gaskins, and R. Tollison, *Politics & Religion*, Vol. 6, 2013.

"Theft and Welfare in General Equilibrium: A Theoretical Note," with T. R. Beard, M. Stern, and L. Stern, *Theoretical Economic Letters*, Vol. 2, 2012.

"Justifying the Ends: Section 706 and the Regulation of Broadband," with L. J. Spiwak, *Journal of Internet Law*, Vol. 16, 2013.

"Wobbling Back to the Fire: Economic Efficiency and the Creation of a Retail Market for Set-Top Boxes," with T. R. Beard, L. J. Spiwak, and M. Stern, *Commlaw Conspectus*, Vol. 21, 2012.

"Wireless Competition Under Spectrum Exhaust," with T. R. Beard, L. J. Spiwak, and M. Stern, *Federal Communications Bar Journal*, Vol. 65, 2012.

3

"Endogenous Sunk Costs, Quality Competition and Welfare," with M. Stern, *Theoretical Economic Letters*, Vol. 1, 2011.

"Internet Use and Job Search," with T. R. Beard, R. Seals, and R. Saba, *Telecommunications Policy*, Vol. 36, 2012.

"Internet Use and Depression Among Older Adults," with S. Cotten, S. Ford, and T. Hale, *Computers in Human Behavior*, Vol. 28, 2012.

"The Economics of Religious Schism and Switching," with T. R. Beard, R. B. Ekelund Jr., and R. D. Tollison (Forthcoming in *Oxford Handbook on the Economics of Religion* 2012).

"Broadband Expectations and the Convergence of Ranks," *Telecommunications Policy*, Vol. 35, 2011.

"The Frontier of Broadband Adoption Across the OECD: A Comparison of Performance," *International Economic Journal*, Vol. 25, 2011.

"The Pricing of Pole Attachments: Implications and Recommendations," with T. R. Beard and L. J. Spiwak, *Review of Network Economics*, Vol. 9, 2010.

"The Broadband Credibility Gap," with L. J. Spiwak and M. L. Stern, *Commlaw Conspectus*, Vol. 75, 2010.

"The Burden of Network Neutrality Mandates on Rural Broadband Deployment," with T. M. Koutsky and L. J. Spiwak, *Journal of Applied Economy*, 2010.

"An Investigation into the Relationship of Retail Gas Prices on Oil Company Profitability," *Applied Economics*, Vol. 43, 2011.

"The Need for Better Analysis of High Capacity Services," with L. J. Spiwak. *John Marshall Journal of Computer & Information Law*, Vol. 28, 2010.

"Tort Liability for Software Developers: A Law & Economics Perspective," with T. R. Beard, T. M. Koutsky and L. J. Spiwak, *John Marshall Journal of Computer & Information Law*, XXVII, 2010.

"Quantifying the Cost of Substandard Patents: Some Preliminary Evidence," with T. R. Beard, T. M. Koutsky and L. J. Spiwak, *Yale Journal on Law and Technology*, Vol. 12, 2010.

"The Broadband Adoption Index: Improving Measurements and Comparisons of Broadband Deployment and Adoption," with T. R. Beard, L. J. Spiwak, and M. L. Stern, *Federal Communications Bar Journal*, Vol. 62, 2010.

"A Valley of Death in the Innovation Sequence," with T. R. Beard, T. M. Koustky, and L. J. Spiwak, *Research Evaluation*, Vol. 18, 2009.

"A Policy and Economic Exploration of Wireless Carterfone Regulation," with T. M. Koutsky, and L. J. Spiwak, *Santa Clara Computer & High Technology Law Journal*, Vol. 25, 2009.

"HAC Standard Errors and the Event Study Methodology: A Cautionary Note," with J. Jackson. *Applied Economics Letters*, Vol. 16, 2009.

"Sample Size and the Accuracy of the Generalized Lambda Distribution," with S. Skinner. *Communications in Statistics - Simulation and Computation*, Vol. 38, 2009.

"Network Neutrality and Foreclosing Market Exchange," with T. R. Beard, T. M. Koutsky, and L. J. Spiwak. *International Journal of Management and Network Economics*, Vol. 1, 2009.

"Developing a National Wireless Regulatory Framework: A Law and Economics Approach," with T. R. Beard, T. M. Koutsky, and L. J. Spiwak. *Commlaw Conspectus*, Vol. 16, 2008.

"Constituency Size and the Growth of Public Expenditures: The Case of the United Kingdom," with M. Thornton and M. Ulrich. *Journal of Public Choice and Finance*, Vol. 24, 2006 (published in 2008).

"The Competitive Effects of Quantity Discounts," with T. R. Beard and D. L. Kaserman. *Antitrust Bulletin*, Vol. 52, 2007.

"Network Neutrality and Industry Structure," with T. R. Beard, Thomas M. Koutsky and Lawrence J. Spiwak. *Hastings Communications and Entertainment (Comm/Ent) Law Journal*, Vol. 29, 2007.

"A La Carte and 'Family Tiers' as a Response to a Market Defect in the Multichannel Video Programming Market," with T. R. Beard and Thomas M. Koutsky. *CommLaw Conspectus*, Vol. 15, 2006.

"The Impact of Video Service Regulation on the Construction of Broadband Networks to Low-Income Households," with Thomas M. Koutsky and Lawrence J. Spiwak. *I/S: A Journal of Law and Policy for the Information Society*, Vol. 3, 2007.

"Competition After Unbundling: Entry, Industry Structure and Convergence," with Thomas M. Koutsky and Lawrence J. Spiwak. *The Federal Communications Law Journal*, Vol. 59, 2007.

"Does Municipal Supply of Communications Crowd-Out Private Communications Investment? An Empirical Study," *Energy Economics*, Vol. 29, 2007.

"Broadband and Economic Development: A Municipal Case Study from Florida," with T. M. Koutsky. *Review of Urban and Regional Development Studies*, Vol. 17, 2006.

"The Economics of Build-out Rules in Cable Television," with T. M. Koutsky and L. W. Spiwak. *Hastings Communications and Entertainment (Comm/Ent) Law Journal*, Vol. 28, 2006.

"Issues in Empirical Merger Analysis," with T. Randolph Beard Introductory article by the Guest Editors in a Special Issue of the *International Journal of the Economics of Business*, Vol. 13, 2006.

"Empirical Simulation of Mergers: The Cingular and AT&T Wireless Merger," with T. Randolph Beard and Richard P. Saba, *International Journal of the Economics of Business*, Vol. 13, 2006.

"Event Studies for Merger Analysis: An Evaluation of the Effects of Non-Normality on Hypothesis Testing," with Audrey D. Kline. In *Antitrust Policy Issues*, Nova Publishers, 2006.

"Are Unbundled and Self-Supplied Telecommunications Switching Substitutes? An Empirical Study," with T. Randolph Beard. *International Journal of the Economics of Business*, Vol. 12, 2005.

"Misleading Inferences from Panel Unit-Root Tests: A Comment," with John Jackson and Audrey Kline. *Review of International Economics*, Vol. 14, 2006.

"Splitting the Baby: An Empirical Test of Rules of Thumb in Regulatory Price Setting," with T. Randolph Beard. *Kyklos*, Vol. 58, 2005.

"Mandated Access and the Make-or-Buy Decision: The Case of Local Telecommunications Competition," with T. Randolph Beard and Thomas W. Koutsky. *Quarterly Review of Economics and Finance*, Vol. 45, 2005. Presented at *The Drivers and Significance of Local Telecommunications Competition*, United States Department of Justice, July 23, 2002 as "Facilities-based Entry in Local Telecommunications: An Empirical Investigation").

"On the Relationship between Telecommunications Investment and Economic Growth: Three Empirical Studies," with R. Beil and J. Jackson. In *Economic Growth Issues*, Nova Publishers, 2005.

"On the Relationship between Telecommunications Investment and Economic Growth in the United States," with R. Beil and J. Jackson. *International Economic Journal*, Vol. 19, 2005.

"Access Charge Reductions and Long Distance Rates: A Bootstrap Analysis," with T. Randolph Beard, R. Carter Hill, and Richard P. Saba. *Empirical Economics*, Vol. 30, 2005.

"Fragmented Duopoly: A Conceptual and Empirical Investigation," with T. Randolph Beard, R. Carter Hill, and R. Saba. *Journal of Business*, Vol. 78, 2005.

"Competition and Investment in Telecommunications," with John D. Jackson. *Atlantic Economic Journal*, Vol. 32, 2004.

"Pursuing Competition in Local Telephony: The Law and Economics of Unbundling and Impairment," with T. R. Beard and R. B. Ekelund Jr., *Journal of Law, Technology and Policy*, Vol. 2003, Fall 2003.

The Financial Implications of the UNE-Platform: A Review of the Evidence," with T. Randolph Beard and Christopher C. Klein *CommLaw Conspectus: Journal of Communications Law and Policy*, Vol. 12, 2004. Also published in the handbook for the *21st Annual Institute on Telecommunications Policy & Regulation*, Practicing Law Institute, New York, 2003.

"Innovation, Investment, and Unbundling: An Empirical Update," with Robert B. Ekelund Jr., *Yale Journal on Regulation*, Vol. 20, 2003.

"Discrimination and Minority Ownership in Radio Broadcasting," with Audrey B. Davidson and Barry Hayworth, *International Journal of the Economics of Business*, Vol. 10, 2003.

"Preliminary Evidence on the Demand for Unbundled Elements in Telephony," with Robert B. Ekelund, Jr., *Atlantic Economic Journal*, Vol. 30, 2002.

"Demand Elasticities for International Message Telephone Service," with John D. Jackson, *Applied Economics*, Vol. 36, 2004.

"Competition and Market Structure in Local Exchange and Long Distance Telecommunications Markets," with T. Randolph Beard. *International Handbook on Telecommunications Economics*, Vol. I, Ch. 6, Gary Madden ed., Edward Elgar: 2002.

"Why Adco? Why Now? An Economic Exploration into the Future of Industry Structure in Local Telecommunications Markets," with T. Randolph Beard and Lawrence Spiwak. *Federal Communications Law Journal*, Vol. 54, 2002.

"Price, Quality, and Consumer Welfare in the Cable Television Industry," with T. Randolph Beard, Robert B. Ekelund, Jr., and Richard P. Saba. *Journal of Regulatory Economics*, Vol. 20, 2001

"The Fallacy of Regulatory Symmetry: An Economic Analysis of the "Level Playing Field" in Cable TV Franchising Statutes," with Thomas W. Hazlett. *Business & Politics*, Vol. 3, 2001.

"The Measurement of Merger Delay in Regulated and Restructuring Industries," with Robert B. Ekelund Jr. and Mark Thornton. *Applied Economics Letters*, Vol. 8, 2001.

"Changing Industry Structure: The Economics of Entry and Price Competition" with Jerry B. Duvall. *Telecommunications and Space Journal*, Vol. 7, 2000.

"Market Power in Radio Markets: An Empirical Analysis of Local and National Concentration," with Robert B. Ekelund, Jr. and Thomas Koutsky. *Journal of Law and Economics*, Vol. XLIII, 2000.

"TV Advertising, Local Markets and Merger Guidelines: An Empirical Study," with Robert B. Ekelund, Jr. and John D. Jackson. *International Journal of the Economics of Business*, Vol. 7, 2000.

"Preserving Free Television? Some Empirical Evidence on the Efficacy of Must Carry," with John D. Jackson. *Journal of Media Economics*, Vol. 13, 2000.

"Is Radio Advertising a Distinct Local Market: An Empirical Analysis," with R. B. Ekelund, Jr. and John D. Jackson. *Review of Industrial Organization*, Vol. 14, 1999.

"On the Interpretation of Policy Effects from the Estimates of Simultaneous Systems of Equations," with John D. Jackson. *Applied Economics*, Vol. 30, 1998.

"Information Costs and Nirvana Revisited: Edwin Chadwick on Nineteenth Century Urban Funeral Markets," with Robert B. Ekelund, Jr. *Journal of Regulatory Economics*, Vol. 12, 1997. Reprinted in the *The Foundations of Regulatory Economics*, Ed. R. B. Ekelund, Jr., Edward Elgar Publishing.

"Horizontal Concentration and Vertical Integration in the Cable Television Industry" with John D. Jackson. *Review of Industrial Organization*, Vol. 12, 1997.

**EXAMPLES OF LITIGATION, REGULATORY DOCUMENTS, TESTIMONY:**

*Testimony in Madison County Communications District, et al., v. Earthlink Business, LLC, Civil Action CV-2014-904855* (2018).

*Testimony on SDARS Royalties* (Multiple proceedings in years 2009-17): Client: SoundExchange, Inc.

"The Impact of Government-Owned Broadband Networks on Private Investment and Consumer Welfare," written for the State Government Leadership Foundation (April 6, 2016).

*Alabama Attorney General, Consumer Advocate Office* (Rate Proceeding before the Alabama Public Service Commission, Summer 2013, 2018).

*Testimony of Phoenix Center Chief Economist Dr. George S. Ford before the United States Senate Committee on Commerce, Science and Transportation - Subcommittee on Communications, Technology, and the Internet, Hearing on the "State of Wireless Communications"* (June 4, 2013).

*Testimony of Phoenix Center Chief Economist Dr. George S. Ford before the United States the House of Representatives Committee on Energy and Commerce Subcommittee Communications and Technology, Hearing on "Health Information Technologies: Harnessing Wireless Innovation"* (March 19, 2013).

*A Legal and Economic Review of the U.S. Unbundling Experience,* Prepared for USAID under contract No. EEM-I-00-07-00009-00; Order No. AID-527-TO-10-00002, for the Peru Andean Trade Capacity Building (PATCB) (May 2012). Presentation of the Report to OSIPTEL in Lima, Peru, in a two-day seminar in October 2012.

*Testimony on Copyright Royalties* (Proceeding in 2012, Canada): Client: Re:Sound.

*Testimony on Webcasting Copyright Royalties* (Multiple proceedings in years 2009-12): Client: Soundexchange, Inc.

*Testimony on Cable Retransmission Copyright Royalties 2004-2005* (Proceeding in years 2009-10), Client: Motion Picture Association of America.

*National Telecommunications and Information Administration: Broadband Data Transparency Workshop,* U.S. Department of Commerce, National Telecommunications and Information Administration, Herbert C. Hoover Building, Washington, DC (October 30, 2009).

*Business News Network's Market Morning Talk Time: How Much Americans and Canadians Really Pay for Cell Phone Use,* Television Appearance, (September 18, 2009).

*Federal Communications Commission Workshop: Deployment Unserved/Underserved,* Federal Communications Commission, Washington, DC (August 12, 2009).

*OECD Expert Workshop on Measuring Mobile/Wireless Service Data, Evaluating Broadband Adoption,* Lisbon, Portugal (February 19-20, 2009).

*Autoridade Nacional de Comuniçacões (ANACOM), Agência Nacional de Telecomunicações (ANATEL)* (Broadband Adoption Project, 2009).

*17th ANACOM Seminar, Study and Presentation, The Broadband Efficiency Index: What Really Drives Broadband Adoption Across the OECD* (September 25, 2009).

*Developing a "National Broadband Strategy" - Understanding the OECD Rankings and the Drivers of Broadband Adoption.* Presentation at the U.S. Congress Rayburn House Office Building (July 28, 2008).

*Testimony Before the Federal Communications Commission's Open Meeting on Network Neutrality and Broadband Network Management,* Stanford University (April 17, 2008).

*A Valley of Death in the Innovation Sequence: An Economic Investigation,* United States Department of Commerce, Technology Administration (September 2007).

*Testimony Before the House Committee on Commerce and Energy - Subcommittee on Telecommunications and the Internet Hearing on "Digital Future of the United States: Part IV: Broadband Lessons from Abroad"* (April 24, 2007).

*Testimony Before the House Committee on Commerce and Energy - Subcommittee on Telecommunications:  A Discussion Draft Addressing Broadband Mapping and Data Collection* (May 17, 2007).

*Capitol Hill Inter-Active Workshop: Sound Internet Policy for the 21st Century: Understanding the Economic Fundamentals* (Feb. 2007).

*Broadband Connectivity Competition Policy, Federal Trade Commission* (Feb. 2007).

*3rd Annual State of the Net Conference 2007, Advisory Committee to the Congressional Internet Caucus* (Jan. 2007).

*Carter Estate v. CSXT, Louisville, Kentucky* (2006).

*Ken Hecht v. Comcast of Indiana, Inc., et al, Indianapolis, Indiana* (2005/6).

*"Crummy Duopoly" or Vigorous Inter-Modal Competition? The Impact of Cable Franchise Requirements on New Fiber Builds.* Phoenix Center Congressional Briefing (July 21, 2005).

*Florida Bill HB 1325 and SB 1322* (Municipal Broadband). Testimony before numerous Committees of the Florida House of Representatives (Spring 2005).

*Z-Tel Communications, Inc. v. SBC Communications, Inc.,* Texarkana, Texas (2003).

*A Response to Olbeter and Robinson's 'Breaking the Backbone',* released by MCI Worldcom (August 1999).

*An Economic Analysis of the FCC's Notice of Inquiry on Flat Rate Charges in the Long Distance Industry,* filed in CC Docket No. 99-249 (September 1999).

*Further Thoughts on Payphone Compensation,* filed in CC Docket No. 96-128 (November 1998).

*Effective Enforcement of Non-Discriminatory Performance by Incumbent Local Exchange Carriers,* with John D. Jackson (filed with New York Public Service Commission, October 1999).

*A Review of the Texas Performance Plan,* with John D. Jackson filed with the Federal Communications Commission (2000).

*Investigation into Pricing of Unbundled Network Elements,* Testimony filed before the State of Florida Public Service Commission, Docket No. 990649-TP (2000).

*Investigation into Pricing of Unbundled Network Elements,* Testimony filed before the State of Florida Public Service Commission, Docket No. 990649-TP (2000).

*Investigation into Pricing of Unbundled Network Elements,* Testimony filed before the State of New York Public Service Commission, Docket No. 98-C-1357 (2000).

*In the Matter of US West Communications, Inc.'s Compliance with Sec 271 of the Telecommunications Act of 1996,* Statement before the Arizona Corporation Commission, Docket No. T-00000B-97-0238 (2000).

*Performance Measurements for Telecommunications Interconnection, Unbundling and Resale,* Testimony before the Georgia Public Service Commission, Docket No. 7892-U (2000).

*Investigation and Generic Proceeding on Ameritech Indiana's rates for Interconnection, Service, Unbundled Elements, and Transport and Termination,* Declaration and Reply before the Indiana Public Service Commission, Cause No. 40611 (2000 2000).

*Inquiry by the Department of Telecommunications and Energy Pursuant to Section 271 of the Telecommunications Act of 1996,* Comments filed before the Massachusetts Department of Telecommunications and Energy, Docket No. DTE 99-271 (2000).

*Commission Review of Various Submissions of Ameritech Indiana to Show Compliance with Section 271(C) of the Telecommunications Act of 1996,* Multiple filings before the Indiana Utility Regulatory Commission (2000).

*In the Matter of US West Communications, Inc.'s, Compliance with §271 of the Telecommunications Act of 1996,* Comments and studies filed before the Arizona Corporation Commission (2000).

*In the Matter of Investigation into US West Communications, Inc.'s Compliance with Certain Wholesale Pricing Requirements for Unbundled Network Elements and Resale Discounts,* Docket No.T-00000A-00-0194 (2001).

*In the Matter of the Commission Investigation and Generic Proceeding on Ameritech Indiana's Rates for Interconnection, Service, Unbundled Elements, and Transport and Termination Under the Telecommunications Act of 1996 and Related Indiana Statutes,* Cause No. 40611-S1 (2001).

*In the Matter of the Petition of Indiana Bell Telephone Company, Incorporated d/b/a Ameritech Indiana Pursuant to I.C. 8-1-2-61 For a Three Phase Process For Commission Review of Various Submissions of Ameritech Indiana to Show Compliance with Section 271(c) of The Telecommunications Act of 1996,* Cause No. 41657 (2001).

*Application by Bell Atlantic New York for Authorization Under Section 271 of the Communications Act To Provide In-Region, InterLATA Service in the State of New York,* Federal Communications Commission, CC Docket No. 99-295 (1999).

*Application by SBC Communications Inc., Southwestern Bell Telephone Company, And Southwestern Bell Communications Services, Inc. d/b/a Southwestern Bell Long Distance Pursuant to Section 271 of the Telecommunications Act of 1996 To Provide In-Region, InterLATA Services In Texas,* Federal Communications Commission, CC Docket No. 00-65 (2000)

*Joint Application by SBC Communications Inc., Southwestern Bell Telephone Company, and Southwestern Bell Communications Services, Inc. d/b/a Southwestern Bell Long Distance for Provision of In-Region, InterLATA Services*

*in Kansas and Oklahoma,* Federal Communications Commission, CC Docket No. 00-217 (2000/2001).

*Joint Application by SBC Communications Inc., Southwestern Bell Telephone Company, and Southwestern Bell Communications Services, Inc. d/b/a Southwestern Bell Long Distance Pursuant to Section 271 of the Telecommunications Act of 1996 To Provide In-Region, InterLATA Services in Arkansas and Missouri,* Federal Communications Commission, CC Docket No. 01-194 (2001).

*Joint Application by BellSouth Corporation, BellSouth Telecommunications, Inc., And BellSouth Long Distance, Inc for Provision of In-Region, InterLATA Services In Georgia and Louisiana,* Federal Communications Commission, CC Docket No. 02-35 (2002).

*Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers,* Federal Communications Commission, CC Docket No. 01-338 (2003).

*In Through the Back Door: Embedded Cost and the FLC,* Working Paper (June 2002).

*How Many Days in a Year? Creative Cost Modeling and the Cost to Competition,* Working Paper (June 2002).

*A Fox in the Hen House: An Evaluation of Bell Company Proposals to Eliminate Their Monopoly Positions in Local Telecommunications,* Working Paper, June 2002.

## PHOENIX CENTER WORKS (Author/Co-Author):

*Policy Papers*

"Bridging the Digital Divide: What Has Not Worked But What Just Might," PHOENIX CENTER POLICY PAPER No. 56 (June 2020).

"A Fresh Look at the Lifeline Program," PHOENIX CENTER POLICY PAPER No. 55 (July 2019).

"The Rewards of Municipal Broadband: An Econometric Analysis of the Labor Market," PHOENIX CENTER POLICY PAPER No. 54 (May 2019).

"Quarry Operations and Property Values: Revisiting Old and Investigating New Empirical Evidence," PHOENIX CENTER POLICY PAPER No. 53 (March 2018).

"Fixing Safe Harbor: An Economic Analysis," PHOENIX CENTER POLICY PAPER No. 52 (August 2016).

"Fair Use in the Digital Age," PHOENIX CENTER POLICY PAPER No. 51 (September 2016).

"How (and How Not) to Measure Market Power Over Business Data Services," PHOENIX CENTER POLICY PAPER No. 50 (September 2016).

"Eroding the Rule of Law: Regulation as Cooperative Bargaining at the FCC," PHOENIX CENTER POLICY PAPER No. 49 (October 2015).

"The Price Effects of Intra-Brand Competition in the Automobile Industry: An Econometric Analysis," PHOENIX CENTER POLICY PAPER No. 48 (March 2015).

"An Economic Framework for Retransmission Consent," PHOENIX CENTER POLICY PAPER No. 47 (December 2013).

"Market Mechanisms and the Efficient Use and Management of Scarce Spectrum Resources," PHOENIX CENTER POLICY PAPER No. 46 (December 2013).

"Lessons Learned from the U.S. Unbundling Experience," PHOENIX CENTER POLICY PAPER No. 45 (June 2013).

"Taxation by Condition: Spectrum Repurposing at the FCC and the Prolonging of Spectrum Exhaust," PHOENIX CENTER POLICY PAPER No. 44 (September 2012).

"Wireless Competition Under Spectrum Exhaust," PHOENIX CENTER POLICY PAPER No. 43 (February 2012).

"A Policy Framework for Spectrum Allocation in Mobile Communications," PHOENIX CENTER POLICY PAPER No. 42 (March 2011).

Wobbling Back to the Fire: Economic Efficiency and the Creation of a Retail Market for Set-Top Boxes," PHOENIX CENTER POLICY PAPER No. 41 (December 2010).

"The Broadband Credibility Gap," PHOENIX CENTER POLICY PAPER No. 40 (June 2010).

"Internet Use and Job Search," PHOENIX CENTER POLICY PAPER No. 39 (January 2010).

"Internet Use and Depression Among the Elderly," PHOENIX CENTER POLICY PAPER No. 38 (October 2009).

"Market Definition and the Economic Effects of Special Access Price Regulation," PHOENIX CENTER POLICY PAPER No. 37 (October 2009).

"The Broadband Adoption Index: Improving Measurements and Comparisons of Broadband Deployment and Adoption," PHOENIX CENTER POLICY PAPER No. 36 (July 2009).

"The Need for Better Analysis of High-Capacity Services," PHOENIX CENTER POLICY PAPER No. 35 (June 2009).

"The Pricing of Pole Attachments: Implications and Recommendations," PHOENIX CENTER POLICY PAPER No. 34 (December 2008).

"The Broadband Efficiency Index: What Really Drives Broadband Adoption Across the OECD?" PHOENIX CENTER POLICY PAPER No. 33 (May 2008).

"The Welfare Impacts of Broadband Network Management: Can Broadband Service Providers Be Trusted?" PHOENIX CENTER POLICY PAPER No. 32 (March 2008).

"The Demographic and Economic Drivers of Broadband Adoption in the United States," PHOENIX CENTER POLICY PAPER No. 31 (November 2007).

"Quantifying the Cost of Substandard Patents: Some Preliminary Evidence," PHOENIX CENTER POLICY PAPER No. 30 (September 2007).

"The Broadband Performance Index: A Policy-Relevant Method of Comparing Broadband Adoption Among Countries," PHOENIX CENTER POLICY PAPER No. 29 (July 2007).

"Network Neutrality and Foreclosing Market Exchange: A Transaction Cost Analysis," PHOENIX CENTER POLICY PAPER No. 28 (March 2007).

"Tort Liability for Software Developers: A Law & Economics Perspective," PHOENIX CENTER POLICY PAPER No. 27 (January 2007).

"An Investigation into the Influence of Retail Gas Prices on Oil Company Profits," PHOENIX CENTER POLICY PAPER No. 26 (August 2006).

"The Burden of Network Neutrality Mandates on Rural Broadband Deployment," PHOENIX CENTER POLICY PAPER No. 25 (July 2006).

"Network Neutrality and Industry Structure," PHOENIX CENTER POLICY PAPER No. 24 (April 2006).

"The Impact of Video Service Regulation on the Construction of Broadband Networks to Low-Income Households," PHOENIX CENTER POLICY PAPER No. 23 (September 2005).

"The Consumer Welfare Cost of Cable "Build-out" Rules," PHOENIX CENTER POLICY PAPER No. 22 (July 2005).

"Competition After Unbundling: Entry, Industry Structure and Convergence," PHOENIX CENTER POLICY PAPER No. 21 (July 2005).

"Quantity-Discount Contracts as a Barrier to Entry," PHOENIX CENTER POLICY PAPER No. 20 (November 2004).

"The Positive Effects of Unbundling on Broadband Deployment," PHOENIX CENTER POLICY PAPER No. 19 (September 2004).

"Set It and Forget It? The Consequences of Market Power and Deregulation in Telecommunications Markets Services," PHOENIX CENTER POLICY PAPER No. 18 (June 2003).

"What Determines Wholesale Prices for Network Elements in Telephony? An Econometric Evaluation," PHOENIX CENTER POLICY PAPER NO. 16 (September 2002).

"A Fox in the Hen House: An Evaluation of Bell Company Proposals to Eliminate their Monopoly Position in Local Telecommunications Markets," PHOENIX CENTER POLICY PAPER No. 15 (September 2002).

"Make or Buy? Unbundled Elements as Substitutes for Competitive Facilities in the Local Exchange Network," PHOENIX CENTER POLICY PAPER No. 14 (September 2002).

"Why Adco? Why Now? An Economic Exploration into the Future of Industry Structure in Local Telecommunications Markets," PHOENIX CENTER POLICY PAPER No. 12 (November 2001).

"An Economic Analysis of the FCC's Notice of Inquiry on Flat Rate Charges in the Long Distance Industry," PHOENIX CENTER POLICY PAPER No. 11 (May 2001).

"Changing Industry Structure: The Economics of Entry and Price Competition" PHOENIX CENTER POLICY PAPER No. 10 (April 2001).

"Flow Through and Competition in the International Message Telephone Service Market," PHOENIX CENTER POLICY PAPER No. 7 (September 2000).

*Policy Bulletins*

"The Day the Music Died (in California): An Analysis of California Assembly Bill AB-1385," PHOENIX CENTER POLICY BULLETIN No. 51 (May 2021).

"Innovation, Exit, and Restrictions on Tech Mergers and Acquisitions," PHOENIX CENTER POLICY BULLETIN No. 50 (March 2021).

"COVID-19 and Broadband Speeds: A Multi-Country Analysis," PHOENIX CENTER POLICY BULLETIN No. 49 (May 2020).

"'Relevance' and 'Price' as Determinants of Internet Non-Adoption: A Review of the Evidence, PHOENIX CENTER POLICY BULLETIN No. 48 (April 2020).

"Innovation in Spectrum Repurposing: The C-Band as A Principal-Agent Problem," PHOENIX CENTER POLICY BULLETIN No. 47 (September 2019).

"Addressing Spectrum Holdouts with A Transaction Threshold: A Theoretical Analysis," PHOENIX CENTER POLICY BULLETIN No. 46 (July 2019).

"Infrastructure Investment and Franchise Fee Abuse: A Theoretical Analysis," PHOENIX CENTER POLICY BULLETIN No. 45 (April 2019).

"Is Faster Better? Quantifying the Relationship between Broadband Speed and Economic Growth," PHOENIX CENTER POLICY BULLETIN No. 44 (February 2018).

"A Retrospective Analysis of Vertical Mergers in Multichannel Video Programming Distribution Markets: The Comcast-NBCU Merger," PHOENIX CENTER POLICY BULLETIN No. 43 (December 2017).

"Safe Harbors and the Evolution of Music Retailing," PHOENIX CENTER POLICY BULLETIN No. 41 (March 2017).

"Skin in the Game: Interference, Sunk Investment, and the Repurposing of Radio Spectrum," PHOENIX CENTER POLICY BULLETIN No. 40 (March 2017).

"Promotional Effects and the Determination of Royalty Rates for Music," PHOENIX CENTER POLICY BULLETIN No. 39 (November 2016).

"Private Solutions to Broadband Adoption:  An Economic Analysis," PHOENIX CENTER POLICY BULLETIN No. 38 (September 2016).

"Section 10 Forbearance:  Asking the Right Questions to Get the Right Answers," PHOENIX CENTER POLICY BULLETIN No. 37 (November 2014).

"Tariffing Internet Termination:  Pricing Implications of Classifying Broadband as a Title II Telecommunications Service," PHOENIX CENTER POLICY BULLETIN No. 36 (September 2014).

"Will Bidder Exclusion Rules Lead to Higher Auction Revenue? A Review of the Evidence," PHOENIX CENTER POLICY BULLETIN No. 34 (April 2014).

"Equalizing Competition Among Competitors: A Review of the DOJ's Spectrum Screen Ex Parte Filing," PHOENIX CENTER POLICY BULLETIN No. 33 (May 2013).

"Social Well-Being and IP Theft: A Dynamic Economic Analysis," PHOENIX CENTER POLICY BULLETIN No. 32 (March 2012).

"Can Government Spending Get America Working Again? An Empirical Investigation," PHOENIX CENTER POLICY BULLETIN No. 31 (November 2011).

"Shocks to the Broadband Ecosystem: Implications for Competition and Market Structure," PHOENIX CENTER POLICY BULLETIN No. 30 (September 2011).

"Ending the Section 629 Problem: A Law and Economics Argument," PHOENIX CENTER POLICY BULLETIN No. 29 (June 2011).

"Regulatory Expenditures, Economic Growth and Jobs: An Empirical Study," PHOENIX CENTER POLICY BULLETIN No. 28 (April 2011).

"Challenges in Using the National Broadband Map's Data, PHOENIX CENTER POLICY BULLETIN No. 27 (March 2011).

"Public Safety or Commercial Use? A Cost/Benefit Framework for the D Block," PHOENIX CENTER POLICY BULLETIN No. 26 (March 2011).

"Jobs, Jobs, Jobs: Communications Policy and Employment Effects in the Information Sector," PHOENIX CENTER POLICY BULLETIN No. 25 (October 2010).

"Evaluating Broadband Stimulus and the National Broadband Plan: Establishing Expectations for Broadband Rankings," PHOENIX CENTER POLICY BULLETIN No. 24 (March 2010).

"Expanding the Digital Divide: Network Management Regulations and the Size of Providers," PHOENIX CENTER POLICY BULLETIN No. 23 (October 2009).

"Do High Call Termination Rates Deter Broadband Deployment?" PHOENIX CENTER POLICY BULLETIN No. 22 (October 2008).

"Consumers and Wireless Carterfone: An Economic Perspective," PHOENIX CENTER POLICY BULLETIN No. 21 (September 2008).

"Using Auction Results to Forecast the Impact of Wireless Carterfone Regulation on Wireless Networks," PHOENIX CENTER POLICY BULLETIN No. 20 (May 2008).

"An Economic Approach to Evaluating a National Wireless Regulatory Framework," PHOENIX CENTER POLICY BULLETIN No. 19 (October 2007).

"Wireless Net Neutrality:  From Carterfone to Cable Boxes," PHOENIX CENTER POLICY BULLETIN No. 17 (April 2007).

"The Efficiency Risk of Network Neutrality Rules," PHOENIX CENTER POLICY BULLETIN No. 16 (May 2006).

"Unnecessary Regulations and the Value of Spectrum: An Economic Evaluation of Lease Term Limits for the Educational Broadband Service," PHOENIX CENTER POLICY BULLETIN No. 15 (February 2006).

"A La Carte and 'Family Tiers' as a Response to a Market Defect in the Multichannel Video Programming Market," PHOENIX CENTER POLICY BULLETIN No. 14 (February 2006).

"In Delay There Is No Plenty:  The Consumer Welfare Cost of Franchise Reform Delay," PHOENIX CENTER POLICY BULLETIN No. 13 (January 2006).

"Franchise Fee Revenues After Video Competition: The 'Competition Dividend' for Local Governments," PHOENIX CENTER POLICY BULLETIN No. 12 (November 2005).

"Higher Prices Expected from the Cingular/AT&T Wireless Merger," PHOENIX CENTER POLICY BULLETIN No. 11 (May 26, 2004).

"Fixed-Mobile "Intermodal" Competition in Telecommunications: Fact or Fiction?," PHOENIX CENTER POLICY BULLETIN No. 10 (March 30, 2004).

"Federalism in Telecommunications Regulation: Effectiveness and Accuracy of State Commission Implementation of TELRIC in Local Telecoms Markets," PHOENIX CENTER POLICY BULLETIN No. 9 (March 9, 2004).

"The $10 Billion Benefit of Unbundling: Consumer Surplus Gains from Competitive Pricing Innovations," PHOENIX CENTER POLICY BULLETIN No. 8 (January 27, 2004).

"The Positive Effects of Competition on Employment in the Telecommunications Industry," PHOENIX CENTER POLICY BULLETIN No. 7 (October 15, 2003).

19

"UNE-P Drives Bell Investment - A Synthesis Model," PHOENIX CENTER POLICY BULLETIN No. 6 (September 17, 2003).

"Competition and Bell Company Investment in Telecommunications Plant: The Effects of UNE-P," PHOENIX CENTER POLICY BULLETIN No. 5 (Originally released July 9, 2003 and updated September 17, 2003).

"The Truth About Telecommunications Investment after the Telecommunications Act of 1996," PHOENIX CENTER POLICY BULLETIN No. 4 (June 24, 2003).

*Policy Perspectives*

"Form 477, Speed-Tests, and the American Broadband User's Experience," PHOENIX CENTER POLICY PERSPECTIVE No. 21-03 (March 31, 2021).

"Updating the Minimum Wage: Setting a Uniform Wage Across a Diverse America," PHOENIX CENTER POLICY PERSPECTIVE No. 21-01 (February 16, 2021).

"Are Broadband Prices Declining? A Look at the FCC's Price Survey Data," PHOENIX CENTER POLICY PERSPECTIVE No. 20-07 (October 26, 2020).

"The Open Technology Institute's Cost of Connectivity 2020 Report: A Critical Review," PHOENIX CENTER POLICY PERSPECTIVE No. 20-06 (July 20, 2020).

"Subsidizing Broadband: Price, Relevance, and the Digital Divide," PHOENIX CENTER POLICY PERSPECTIVE No. 20-05 (July 7, 2020).

"Trends in Lifeline Reform: A Look at the Evidence, Not the Politics," PHOENIX CENTER POLICY PERSPECTIVE No. 20-04 (July 1, 2020).

"Is France a Broadband Nirvana? A Look at the Data," PHOENIX CENTER POLICY PERSPECTIVE No. 20-03 (June 18, 2020).

"Could Acceleration Payments Increase Funding for Broadband? A Review of the FCC's C-Band Plan," PHOENIX CENTER POLICY PERSPECTIVE No. 20-01 (February 18, 2020).

"Infrastructure Investment in the Railroad Industry: An Econometric Analysis," PHOENIX CENTER POLICY PERSPECTIVE No. 19-07 (December 9, 2019).

"Does Title II Reduce Infrastructure Investment? Repairing Hooton's Analysis," PHOENIX CENTER POLICY PERSPECTIVE No. 19-06 (October 15, 2019).

"Statistical Negligence in Title II Impact Analysis," PHOENIX CENTER POLICY PERSPECTIVE No. 19-05 (October 1, 2019).

"Cost-Benefit Analysis at the FCC: A Look at the 900 MHz Band," PHOENIX CENTER POLICY PERSPECTIVE No. 19-04 (September 16, 2019).

"Quantifying the Overstatement in Broadband Availability from the Form 477 Data: An Econometric Approach," PHOENIX CENTER POLICY PERSPECTIVE No. 19-03 (July 11, 2019).

"Broadband as a Source of Rural Decline: A Look at the Data," PHOENIX CENTER POLICY PERSPECTIVE No. 19-02 (June 13, 2019).

"Estimating Betas in Practice: Alternatives that Matter and Those that Do Not," PHOENIX CENTER POLICY PERSPECTIVE No. 19-01 (January 9, 2019).

"Addressing Holdouts in the Repurposing of Spectrum for Broadband Services," PHOENIX CENTER POLICY PERSPECTIVE No. 18-10 (December 19, 2018).

"Infrastructure Investment After Title II," PHOENIX CENTER POLICY PERSPECTIVE No. 18-09 (November 1, 2018).

"Expediting Spectrum Repurposing Through Market Transactions," PHOENIX CENTER POLICY PERSPECTIVE No. 18-08 (October 12, 2018).

"Rhetoric Aside: What the Data Actually Say About Broadband Deployment," PHOENIX CENTER POLICY PERSPECTIVE No. 18-07 (September 4, 2018).

"Potential Implications of the Sprint/T-Mobile Merger on Wholesale Markets," PHOENIX CENTER POLICY PERSPECTIVE No. 18-06 August 27, 2018).

"Fair Use and the Economy: A Review of CCIA's Estimate," PHOENIX CENTER POLICY PERSPECTIVE No. 18-05 (June 27, 2018).

"Stock Market Reactions to the Sprint-TMO Merger," PHOENIX CENTER POLICY PERSPECTIVE No. 18-04 (May 23, 2018).

"Comcast's Capital Spending After Reclassification: A Check on Claims," PHOENIX CENTER POLICY PERSPECTIVE No. 18-03 (April 25, 2018).

"Reclassification and the Availability of 'Broadband' Service: A Counterfactual Check on Recent Claims," PHOENIX CENTER POLICY PERSPECTIVE No. 18-02 (April 19, 2018).

"A Review of the Berkman Center's Price Survey of Municipal Broadband Markets," PHOENIX CENTER POLICY PERSPECTIVE No. 18-01 (January 24, 2018).

"The Vanishing Benefits of Fair Use: A Review of the Flynn-Palmedo Study on 'User Rights' in Copyright Law," PHOENIX CENTER POLICY PERSPECTIVE No. 17-12 (December 18, 2017).

"Financial Implications of Opelika's Municipal Broadband Network," PHOENIX CENTER POLICY PERSPECTIVE No. 17-11 (August 24, 2017).

"A Further Review of the Internet Association's Empirical Study on Network Neutrality and Investment," PHOENIX CENTER POLICY PERSPECTIVE No. 17-10 (August 14, 2017).

"A Review of the Internet Association's Empirical Study on Network Neutrality and Investment," PHOENIX CENTER POLICY PERSPECTIVE No. 17-09 (July 24, 2017).

"Reclassification and Investment: A Statistical Look at the 2016 Data," PHOENIX CENTER POLICY PERSPECTIVE No. 17-08 (July 13, 2017).

"Broadband Speeds Post-Reclassification: An Empirical Approach," PHOENIX CENTER POLICY PERSPECTIVE No. 17-07 (June 27, 2017).

"Below the Belt: A Review of Free Press and the Internet Association's Investment Claims," PHOENIX CENTER POLICY PERSPECTIVE No. 17-06 (June 20, 2017).

"Regulatory Revival and Employment in Telecommunications," PHOENIX CENTER POLICY PERSPECTIVE No. 17-05 (June 12, 2017).

"Reclassification and Investment: An Analysis of Free Press' 'It's Working' Report," PHOENIX CENTER POLICY PERSPECTIVE No. 17-04 (May 22, 2017).

"Net Neutrality, Reclassification and Investment: A Further Analysis," PHOENIX CENTER POLICY PERSPECTIVE No. 17-03 (May 16, 2017).

"Net Neutrality, Reclassification and Investment: A Counterfactual Analysis," PHOENIX CENTER POLICY PERSPECTIVE No. 17-02 (April 25, 2017).

"What is the "Cost per Regulator" on GDP and Private Sector Job Creation? An Update on Prior Research," PHOENIX CENTER POLICY PERSPECTIVE No. 17-01 (February 22, 2017).

"Learning from Bad Technique: The WIK-Consult Report on Business Data Services," PHOENIX CENTER POLICY PERSPECTIVE No. 16-07 (August 4, 2016).

"State Automobile Franchise Laws: Public or Private Interests?" PHOENIX CENTER POLICY PERSPECTIVE No. 16-06 (July 12, 2016).

"Proper Incentives? The Economics of Spam Management by the Mobile Wireless Industry," PHOENIX CENTER POLICY PERSPECTIVE No. 16-05 (May 4, 2016).

"Cost or Benefit? A Review of the Consumer Federation of America's Report on Regulating Special Access Services," PHOENIX CENTER POLICY PERSPECTIVE No. 16-04 (April 18, 2016).

"Are Government-Owned Networks Abusing Market Power in the Set-Top Box Market? A Review of Rates," PHOENIX CENTER POLICY PERSPECTIVE No. 16-03 (April 14, 2016).

"The Road to Nowhere: Regulatory Implications of the FCC's Special Access Data Request," PHOENIX CENTER POLICY PERSPECTIVE No. 16-02 (February 23, 2016).

"The Economic Impact of Expanding Fair Use in Singapore: More Junk Science for Copyright Reform," PHOENIX CENTER POLICY PERSPECTIVE No. 16-01 (February 16, 2016).

"Ugly is Only Skin Deep: An Analysis of the DE Program in Auction 97," PHOENIX CENTER POLICY PERSPECTIVE No. 15-04 (July 20, 2015).

"The Lisbon Council's 2015 Intellectual Property and Economic Growth Index: A Showcase of Methodological Blunder," PHOENIX CENTER POLICY PERSPECTIVE No. 15-03 (June 29, 2015).

"Auction 97 and the Value of Spectrum," PHOENIX CENTER POLICY PERSPECTIVE No. 15-02 (February 4, 2015).

"Why Chattanooga is not the "Poster Child" for Municipal Broadband," PHOENIX CENTER POLICY PERSPECTIVE No. 15-01 (January 20, 2015).

"Movie Leaks, Box Office Success and Child's Play: Using an On-Line Game is No Way to Quantify the Effects of Piracy," PHOENIX CENTER POLICY PERSPECTIVE No. 14-07 (October 28, 2014).

"Have We Got It All Wrong? Forecasting Mobile Data Use and Spectrum Exhaust," PHOENIX CENTER POLICY PERSPECTIVE No. 14-06 (October 21, 2014).

"The Unpredictable FCC: Politicizing Communications Policy and its Threat to Broadband Investment," PHOENIX CENTER POLICY PERSPECTIVE No. 14-05 (October 14, 2014).

"Free Markets, Monopolies, and Copyright," PHOENIX CENTER POLICY PERSPECTIVE No. 14-04 (June 25, 2014).

"Should the Internet Tax Moratorium be Made Permanent?" PHOENIX CENTER POLICY PERSPECTIVE No. 14-03 (June 2, 2014).

"What is the Effect of File Sharing on the Creation of New Music? A Critical Review of *A Case Study of File Sharing and Music Output*," PHOENIX CENTER POLICY PERSPECTIVE No. 14-02 (March 6, 2014).

"Do Municipal Networks Offer More Attractive Service Offerings than Private Sector Providers? A Review and Expansion of the Evidence," PHOENIX CENTER POLICY PERSPECTIVE No. 14-01 (January 27, 2014).

"Piracy and Movie Revenues: A Critical Review of "A Tale of the Long Tail," PHOENIX CENTER POLICY PERSPECTIVE No. 13-05 (September 16, 2013).

"The Economics of Bidder Exclusion Rules: A Response to Dr. Baker," PHOENIX CENTER POLICY PERSPECTIVE No. 13-04 (July 18, 2013).

"Will Bidder Exclusions Increase Auction Revenue? A Review of the Arguments," PHOENIX CENTER POLICY PERSPECTIVE No. 13-03 (June 11, 2013).

"Revisiting Internet Use and Depression Among the Elderly," PHOENIX CENTER POLICY PERSPECTIVE No. 13-02 (June 7, 2013).

"Searching for a New Regulatory Paradigm: A Comment on AT&T's Petition for Wire Center Trials," PHOENIX CENTER POLICY PERSPECTIVE No. 13-01 (February 25, 2013).

"What is the Effect of Regulation on Broadband Investment? Regulatory Certainty and the Expectation of Returns," PHOENIX CENTER POLICY PERSPECTIVE No. 12-05 (September 19, 2012).

"Justifying the Ends: Section 706 and the Regulation of Broadband," PHOENIX CENTER POLICY PERSPECTIVE No. 12-04 (August 13, 2012).

"Approximating the Distribution of Broadband Usage from Publicly-Available Data," PHOENIX CENTER POLICY PERSPECTIVE No. 12-03 (May 31, 2012).

"A Most Egregious Act? The Impact on Consumers of Usage-Based Pricing," PHOENIX CENTER POLICY PERSPECTIVE No. 12-02 (May 23, 2012).

"Regulatory Expenditures, Economic Growth and Jobs: A Reply to Comments," PHOENIX CENTER POLICY PERSPECTIVE No. 12-01 (April 24, 2012).

"On the Road to More Efficient Pricing of Telecommunications Services: A Look at the Evidence," PHOENIX CENTER POLICY PERSPECTIVE No. 11-06 (October 5, 2011).

"What is the Effect of Regulation on Broadband Investment? Regulatory Certainty and the Expectation of Returns," PHOENIX CENTER POLICY PERSPECTIVE No. 12-05 (September 19, 2011).

"Mobile Broadband and Job Search: An Empirical Test," PHOENIX CENTER POLICY PERSPECTIVE No. 11-05 (September 6, 2011).

"Internet Use and Labor Market Participation: Additional Insights from New and Old Data," PHOENIX CENTER POLICY PERSPECTIVE No. 11-04 (August 18, 2011).

"Justifying the Ends: Section 706 and the Regulation of Broadband," PHOENIX CENTER POLICY PERSPECTIVE No. 12-04 (August 13, 2011).

"Re-Auction of the D Block: A Review of the Arguments," PHOENIX CENTER POLICY PERSPECTIVE No. 11-03 (May 24, 2011).

"Wireless Mergers and Employment: A Look at the Evidence," PHOENIX CENTER PERSPECTIVE No. 11-02 (May 10, 2011).

"The Impossible Dream: Forbearance After the Phoenix Order," PHOENIX CENTER PERSPECTIVE No. 10-08 (December 2010).

"Endogenous Sunk Costs, Quality Competition and Welfare: A Technical Note," PHOENIX CENTER PERSPECTIVE No. 10-07 (December 2010).

"Be Careful What You Ask For (Redux): A Comment on the New America Foundation's Mobile Price Metrics," PHOENIX CENTER PERSPECTIVE No. 10-06 (November 2010).

"Fabricating a Broadband Crisis? More Evidence on the Misleading Inferences from OECD Rankings," PHOENIX CENTER PERSPECTIVE No. 10-05 (July 2010).

"Substantial Profits in the Broadband Ecosystem: A Look at the Evidence," PHOENIX CENTER PERSPECTIVE No 10-04 (April 2010).

"Non-Discrimination or Just Non-Sense: A Law and Economics Review of the FCC's New Net Neutrality Principle," PHOENIX CENTER PERSPECTIVE No. 10-03 (March 2010).

"Sabotaging Content Competition: Do Proposed Net Neutrality Regulations Promote Exclusion?" PHOENIX CENTER PERSPECTIVE No. 10-02 (March 2010).

"Internet Use and Job Search: More Evidence," PHOENIX CENTER PERSPECTIVES No. 10-01 (January 2010).

"Internet Use and Job Search: More Evidence," PHOENIX CENTER PERSPECTIVE No. 10-01 (January 2010).

"Whoops! Berkman Study Shows "Open Access" Reduces Broadband Consumption," PHOENIX CENTER PERSPECTIVES No. 09-05 (November 2009).

"Finding the Bottom: A Review of Free Press's Analysis of Network Neutrality and Investment," PHOENIX CENTER PERSPECTIVES No. 09-04 (October 2009).

"Expanding the Digital Divide: Network Management Regulations and the Size of Providers," PHOENIX CENTER POLICY BULLETIN No. 23 (October 2009).

"Be Careful What You Ask For: A Comment on the OECD's Mobile Price Metrics," PHOENIX CENTER PERSPECTIVES No. 09-03 (September 16, 2009).

"Econometric Analysis of Broadband Subscriptions: A Note on Specification," PHOENIX CENTER PERSPECTIVES No. 09-02 (May 12, 2009).

"Normalizing Broadband Connections," PHOENIX CENTER PERSPECTIVES No. 09-01 (May 12, 2009).

"Broadband Expectations and the Convergence of Ranks," PHOENIX CENTER PERSPECTIVES No. 08-03 (October 1, 2008).

"Valuing the AWS-3 Spectrum: A Response to Comments," PHOENIX CENTER POLICY PERSPECTIVE No. 08-02 (July 2008).

"Calculating the Value of Unencumbered AWS-III Spectrum," PHOENIX CENTER POLICY PERSPECTIVE No. 08-01 (June 2008).

"University of Florida Study Shows Only Winners from Network Neutrality Regulation to be Content Providers, Consumers Lose." PHOENIX CENTER POLICY PERSPECTIVE No. 07-01 (March 2007).

OTHER WRITINGS:

"The Perils of a $15 Federal Minimum Wage," *Delaware Valley Journal* (February 22, 2021).

"Beware of Calls for a New Digital Regulator," *Notice & Comment – Yale Journal on Regulation* (February 19, 2021).

"INSIGHT: FCC Must Move Quickly on 12 GHz Mid-Band Spectrum for 5G Goals," *Bloomberg Law* (July 30, 2020).

"Getting Broadband Subsidies Right This Time," *Federalist Society Blog* (July 8, 2020).

"INSIGHT: Clock Ticks on Congress and STELAR Reauthorization," *Bloomberg Law* (November 21, 2019).

"Proposed Reforms to FCC's Lifeline Program Require A Bit More Thought," *Federalist Society Blog* (July 22, 2019).

"Insight: Is the Sprint, T-Mobile Merger Deal Dead?" *Bloomberg Law* (April 25, 2019).

"Should Electric Co-Ops Provide Broadband?" *Federalist Society Blog* (March 21, 2019).

"Sometimes 'No' is the Right Answer for Market Transactions," *Federalist Society Blog* (July 17, 2018)

"Putting 'Fair' Back in 'Fair Use'," *Federalist Society Blog* (June 26, 2018).

"'Hipster' Antitrust Meets Two-Sided Markets," *Bloomberg Law* (April 17, 2018).

"Kentucky Wired – Get Out, And Get Out Now," *TheLevisaLazer.com* (March 26, 2018).

"Let's Not Leave America's Small Businesses Behind in Tax Reform," *The Hill* (November 27, 2017).

"Repurposing Spectrum for Mobile Broadband Is Great, But Interference Issues Must Be Resolved First," *Bloomberg BNA* (October 16, 2017).

"FCC Must Dump Obama's Net Neutrality Rules for Broadband," *The Hill* (September 5, 2017).

"Public Broadband Projects Can Leave Taxpayers Holding the Bag," *AL.com* (August 30, 2017).

"Overbroad Safe Harbors — A Threat to a Healthy Internet," *Bloomberg BNA* (August 30, 2017).

"Not Ready to Ride into the Sunset: Chairman Wheeler and the Fight for Internet Regulation," *Bloomberg BNA* (August 10, 2017).

"Revisiting the 'Virtuous Circle' Two Years Later," *Bloomberg BNA* (July 10, 2017).

"The Real Story Behind Internet Regulation," *Real Clear Policy* (June 29, 2017).

"Is Now the Right Time to Expand Opelika's Broadband Service?" *AL.com* (April 11, 2017).

"Stopping the Surface Transportation Board from Running off the Rails," *The Hill* (January 18, 2017).

"Fair Use Does Not Mean a Fair Market," *Content Café* (September 19, 2016).

"Questionable Economic Benefits of Chattanooga's Gig," *The Tennessean* (August 17, 2016).

"What is the True Cost of a Set-Top Box?" *Bloomberg BNA* (May 31, 2016).

"Statutory Damages are a Vital Part of the Copyright System," *The Hill* (May 25, 2016).

"The Obama Administration is Misleading Consumers on Set-Top Box Prices," *The Hill* (April 22, 2016).

"The FCC's Cynical Set-Top Box Play," *The Hill* (February 3, 2016).

"FTC Staff Bias on Intra-Brand Car Competition is a Bad Deal for Consumers," *The Hill* (January 19, 2016).

"Is the FCC's Regulatory Revival Deterring Infrastructure Investment?" *Bloomberg BNA* (November 13, 2015).

"How Congress Lost Control of the Regulators," *The Hill* (October 27, 2015).

"Bait-and-Switch—Or Why the FCC's 'Virtuous Circle' Theory is Nonsense," *Bloomberg BNA* (May 18, 2015).

"Tax Unfairness Is A Job Killer," *The Hill* (December 3, 2014).

"The Unpredictable FCC: Politicizing Communications Policy and its Threat to Broadband Investment," *Bloomberg BNA* (October 30, 2014).

"Will Net Neutrality Politics Scuttle the FCC's Upcoming Incentive Auction?" *The Hill* (September 3, 2014).

"Congressional Gridlock Threatens to Tax the Internet," *The Hill* (June 05, 2014).

"FCC Puts Funding for Public Safety Network and Debt Reduction in Jeopardy," *The Hill* (April 24, 2014).

"Shared Spectrum is a Pipe Dream," *The Hill* (February 6, 2014).

"Opportunities for Local Exchange Competition Are Greatly Exaggerated." *Electric Light & Power* (April 1998).

"Book Review: Welfare Economics and Externalities in an Open-Ended Universe: A Modern Austrian Perspective," by Roy E. Cordato. *Southern Economic Journal* (April 1994).

"Book Review: Toward Competition in Local Telephony," by William J. Baumol and Gregory Sidak. *Southern Economic Journal* (April 1996).

"Competition Will Decrease Cable Rates: On Curbing Cable Costs," with Audrey B. Davidson. *Business First* (September 6, 1993).

"TKR Cable Not Living Up to Promises To Cut Rates," with Audrey B. Davidson. *The Louisville Cardinal* (September 2, 1993).

"The Cable Television Industry: An Annotated Bibliography" Published and Funded by the *Auburn Utilities Research Center* (Summer 1994).

# TAB 5

<u>JA211</u>

Before the
# FEDERAL COMMUNICATIONS COMMISSION
**Washington, D.C.**

UNIVERSAL SERVICE ADMINISTRATIVE COMPANY

Federal Universal Service Support Mechanisms Fund Size
Projections for First Quarter 2022

UNIVERSAL SERVICE
ADMINISTRATIVE COMPANY
700 12TH STREET N.W., SUITE 900
WASHINGTON, D.C. 20005
VOICE:  202.776.0200
FAX:  202.776.0080
www.usac.org

November 2, 2021

INTRODUCTION ...............................................................................................1

ADMINISTRATIVE EXPENSES AND INTEREST INCOME PROJECTION ......2

ADMINISTRATIVE EXPENSES ....................................................................2

FUND ACTIVITY ............................................................................................3

EFFORTS TO PREVENT AND REDUCE IMPROPER PAYMENTS ..................3

FUNDING REQUIREMENTS .............................................................................8

HIGH COST SUPPORT MECHANISM .........................................................8

Connect America Fund Phase II .............................................................8

Connect America Fund Phase II Auction ...............................................10

Connect America Fund/Intercarrier Compensation Support....................10

Rural Broadband Experiments ...............................................................10

Mobility Fund Phase I ............................................................................11

Rate-of-Return Carriers..........................................................................11

High Cost Loop Support (including Safety Net Additive and Safety Valve Support) ..................................................................................................12

Alaska Plan Support ...............................................................................12

Connect America Broadband Loop Support ...........................................12

Alternative Connect America Model (A-CAM) .........................................13

A-CAM II .................................................................................................13

Price Cap Carriers .................................................................................14

Competitive Eligible Telecommunications Carriers ................................14

Uniendo a Puerto Rico Fund/Connect USVI Fund ..................................15

Rural Digital Opportunity Fund...............................................................15

High Cost Support Mechanism Summary................................................16

LOW INCOME SUPPORT MECHANISM ....................................................16

Lifeline Support ......................................................................................16

Link-up Support ......................................................................................17

LOW INCOME SUPPORT MECHANISM SUMMARY ...............................17

RURAL HEALTH CARE SUPPORT MECHANISM ......................................18

Funding Year 2008..................................................................................19

Funding Year 2009..................................................................................19

Funding Year 2010..................................................................................19

Funding Year 2011..................................................................................20

Funding Year 2012..................................................................................20

Funding Year 2013..................................................................................21

Funding Year 2014..................................................................................21

Funding Year 2015..................................................................................22

Funding Year 2016..................................................................................22

Funding Year 2017..................................................................................22

Funding Year 2018..................................................................................23

Funding Year 2019..................................................................................24

Funding Year 2020..................................................................................24

Funding Year 2021..................................................................................25



**RURAL HEALTH CARE SUPPORT MECHANISM SUMMARY** ........................25

**CONNECTED CARE PILOT PROGRAM** ..........................................................26

**CONNECTED CARE PILOT PROGRAM SUMMARY** ....................................26

**SCHOOLS AND LIBRARIES SUPPORT MECHANISM** ...............................27

    **Funding Year 1998** ...........................................................................................27

    **Funding Year 1999** ...........................................................................................27

    **Funding Year 2000** ...........................................................................................28

    **Funding Year 2001** ...........................................................................................28

    **Funding Year 2002** ...........................................................................................29

    **Funding Year 2003** ...........................................................................................29

    **Funding Year 2004** ...........................................................................................30

    **Funding Year 2005** ...........................................................................................30

    **Funding Year 2006** ...........................................................................................31

    **Funding Year 2007** ...........................................................................................31

    **Funding Year 2008** ...........................................................................................32

    **Funding Year 2009** ...........................................................................................32

    **Funding Year 2010** ...........................................................................................33

    **Funding Year 2011** ...........................................................................................33

    **Funding Year 2012** ...........................................................................................34

    **Funding Year 2013** ...........................................................................................34

    **Funding Year 2014** ...........................................................................................35

    **Funding Year 2015** ...........................................................................................35

    **Funding Year 2016** ...........................................................................................36

    **Funding Year 2017** ...........................................................................................37

    **Funding Year 2018** ...........................................................................................37

    **Funding Year 2019** ...........................................................................................38

    **Funding Year 2020** ...........................................................................................39

    **FCC Decisions and Unused Funds** ...................................................................39

    **SCHOOLS AND LIBRARIES SUPPORT MECHANISM SUMMARY** ........51

**AUTHORIZATION TO FILE WITH THE COMMISSION** ...................................52

## HIGH COST

High Cost Support Projected by State by Study Area – 1Q2022.................HC01

High Cost Support Projected by State – 1Q2022 ........................HC02

Alaska Plan Support Projected by State by Study Area – 1Q2022...............HC03

High Cost Loop Support Projected by State by Study Area – 1Q2022 ........HC04

Safety Valve Support Projected by State by Study Area – 1Q2022 .............HC05

Frozen High Cost Support Projected by State by Study Area – 1Q2022 .....HC06

Connect America Fund Broadband Loop Support Projected by State by Study Area – 1Q2022 ...................................................................HC07

Connect America Fund Broadband Loop Support Projected by State – 1Q2022...........................................................................................HC08

Connect America Fund Intercarrier Compensation Support Projected by State by Study Area – 1Q2022 ....................................................HC09

Mobility Fund Phase I by State by Study Area – 1Q2022…………………… .HC10

Connect America Fund Phase II Frozen Support (ACS) Projected by State by Study Area – 1Q2022 ...............................................................HC11

Rural Broadband Experiments Support Projected by State by Study Area –1Q2022 ............................................................................HC12

Alternative Connect America Cost Model Support Projected by State by Study Area – 1Q2022 ...................................................................HC13

Rate of Return Budget Control Support Projected – 1Q2022......................HC14

Connect America Fund Broadband Loop Support by State by Study Area – 2019 True – Up – 1Q2022.................................................HC15

Connect America Fund Phase II Auction Support Projected by State by Study Area – 1Q2022 ...................................................................HC16

Alternative Connect America Cost Model II Support Projected by State by Study Area – 1Q2022 ...................................................................HC17

Uniendo Puerto Rico Fund Support Projected by State by Study Area – 1Q2022........................................................................................HC18

Connect USVI Fund Support Projected by State by Study Area – 1Q2022   ......................................................................................HC19

## LOW INCOME

Low Income Support Projected by State by Study Area – 1Q2022...............LI01

[RESERVED]...............................................................................LI02

Eligible Telecommunications Carriers – 3Q2021 ...........................LI03

Quarterly Low Income Disbursement Amounts by Company – 3Q2021.......LI04

Annual Low Income Support Claimed by State and Company –
  January 2018 through September 2021 ................................................LI05
Historical Data: Support Claimed by ETCs Each Month –
  January 1998 through September 2021 ................................................LI06
Low Income Support Claimed by State or Jurisdiction –
  January 2018 through September 2021 ................................................LI07
Lifeline Subscribers by State or Jurisdiction –
  January 2021 through September 2021 ................................................LI08
Link-Up Beneficiaries by State or Jurisdiction –
  January 2021 through September 2021 ................................................LI09
[RESERVED]................................................................................................LI10

## RURAL HEALTH CARE

[RESERVED]............................................................................................. RH01
[RESERVED]............................................................................................. RH02
Funding Year 2008 Disbursements to Service Providers through – 3Q2021 RH03
[RESERVED]............................................................................................. RH04
[RESERVED]............................................................................................. RH05
Funding Year 2009 Disbursements to Service Providers through – 3Q2021 RH06
[RESERVED]............................................................................................. RH07
[RESERVED]............................................................................................. RH08
Funding Year 2010 Disbursements to Service Providers through – 3Q2021 RH09
[RESERVED]............................................................................................. RH10
[RESERVED]............................................................................................. RH11
Funding Year 2011 Disbursements to Service Providers through – 3Q2021 RH12
[RESERVED] ............................................................................................ RH13
Funding Year 2012 Authorizations – 3Q2021 ........................................... RH14
Funding Year 2012 Disbursements to Service Providers through – 3Q2021 RH15
[RESERVED]............................................................................................. RH16
Funding Year 2013 Authorizations – 3Q2021 ........................................... RH17
Funding Year 2013 Disbursements to Service Providers through – 3Q2021 RH18
[RESERVED]............................................................................................. RH19
Funding Year 2014 Authorizations – 3Q2021 ........................................... RH20
Funding Year 2014 Disbursements to Service Providers through – 3Q2021 RH21
[RESERVED]............................................................................................. RH22
Funding Year 2015 Authorizations – 3Q2021 ........................................... RH23
Funding Year 2015 Disbursements to Service Providers through – 3Q2021 RH24
[RESERVED]............................................................................................. RH25
Funding Year 2016 Authorizations – 3Q2021 ........................................... RH26

Funding Year 2016 Disbursements to Service Providers through – 3Q2021 RH27
Funding Year 2017 Commitments – 3Q2021 ................................................. RH28
Funding Year 2017 Authorizations – 3Q2021 ............................................... RH29
Funding Year 2017 Disbursements to Service Providers through – 3Q2021 RH30
Funding Year 2018 Commitments – 3Q2021 ................................................. RH31
Funding Year 2018 Authorizations – 3Q2021 ............................................... RH32
Funding Year 2018 Disbursements to Service Providers through – 3Q2021 RH33
Funding Year 2019 Commitments – 3Q2021 ................................................. RH34
Funding Year 2019 Authorizations – 3Q2021 ............................................... RH35
Funding Year 2019 Disbursements to Service Providers through – 3Q2021 RH36
Funding Year 2020 Commitments – 3Q2021 ................................................. RH37
Funding Year 2020 Authorizations – 3Q2021 ............................................... RH38
Funding Year 2020 Disbursements to Service Providers through – 3Q2021 RH39

## SCHOOLS AND LIBRARIES

Funding Year 2005 Commitments – 3Q2021 ................................................. SL01
Funding Year 2010 Commitments – 3Q2021 ................................................. SL02
Funding Year 2010 Authorizations – 3Q2021 ............................................... SL03
Funding Year 2010 Disbursements to Service Providers through – 3Q2021 SL04
Funding Year 2012 Commitments – 3Q2021 ................................................. SL05
Funding Year 2012 Authorizations  – 3Q2021 .............................................. SL06
Funding Year 2012 Disbursements to Service Providers through – 3Q2021 SL07
Funding Year 2013 Authorizations – 3Q2021 ............................................... SL08
Funding Year 2013 Disbursements to Service Providers through – 3Q2021 SL09
Funding Year 2014 Commitments – 3Q2021 ............................................. SL10
Funding Year 2014 Authorizations – 3Q2021 ............................................... SL11
Funding Year 2014 Disbursements to Service Providers through – 3Q2021 SL12
Funding Year 2015 Commitments – 3Q2021 ................................................. SL13
Funding Year 2015 Authorizations – 3Q2021 ............................................... SL14
Funding Year 2015 Disbursements to Service Providers through – 3Q2021 SL15
Funding Year 2016 Commitments  – 3Q2021 ............................................. SL16
Funding Year 2016 Authorizations – 3Q2021 ............................................... SL17
Funding Year 2016 Disbursements to Service Providers through – 3Q2021 SL18
Funding Year 2017 Commitments – 3Q2021 ................................................. SL19
Funding Year 2017 Authorizations – 3Q2021 ............................................... SL20
Funding Year 2017 Disbursements to Service Providers through – 3Q2021 SL21
Funding Year 2018 Commitments – 3Q2021 ................................................. SL22

Funding Year 2018 Authorizations – 3Q2021 ................................................. SL23
Funding Year 2018 Disbursements to Service Providers through – 3Q2021 SL24
Funding Year 2019 Commitments – 3Q2021................................................. SL25
Funding Year 2019 Authorizations – 3Q2021 ................................................. SL26
Funding Year 2019 Disbursements to Service Providers through – 3Q2021 SL27
Funding Year 2020 Commitments – 3Q2021................................................. SL28
Funding Year 2020 Authorizations – 3Q2021 ................................................. SL29
Funding Year 2020 Disbursements to Service Providers through – 3Q2021 SL30
Funding Year 2021 Commitments – 3Q2021................................................. SL31
Funding Year 2021 Authorizations – 3Q2021 ................................................. SL32
Funding Year 2021 Disbursements to Service Providers through – 3Q2021 SL33

## OTHER APPENDICES

Universal Service Administrative Company 1Q2022 Budget.......................... M01
Fund Size Projection for 1Q2022 .................................................... M02
Schedule of USF Receipts, Interest Income, and Cash Outlays:
    January 1 through September 30, 2021 – Cash Basis........................................ M03
    January 1 through September 30, 2021 – Accrual Basis................................................. M04

**BEFORE THE FEDERAL COMMUNICATIONS COMMISSION
WASHINGTON, D.C.**

## FEDERAL UNIVERSAL SERVICE SUPPORT MECHANISMS FUND SIZE PROJECTIONS FOR FIRST QUARTER 2022

### INTRODUCTION

The Universal Service Administrative Company (USAC) hereby submits the federal Universal Service Support Mechanisms fund size and administrative cost projections for the first quarter of calendar year 2022 (1Q2022), in accordance with Section 54.709 of the Federal Communications Commission's (FCC or Commission) rules.[1]

USAC is the not-for-profit corporation responsible for administering the federal Universal Service Fund (USF) and the following Universal Service Support Mechanisms (also referred to as "Support Mechanisms" or "Programs"): High Cost, Low Income, Rural Health Care, Schools and Libraries, and Connected Care Pilot.[2] USAC also performs the billing, collection, and disbursement functions for the Support Mechanisms.[3]

Upon approval of the quarterly funding requirements for the Support Mechanisms, the projected administrative expenses, and the submission of the contribution base amount, the Commission will establish a quarterly contribution factor. USAC will bill USF contributors on a monthly basis for their individual obligations based on the approved contribution factor, collect amounts owed from contributors, and distribute funds to eligible recipients based on the schedules filed herein.[4]

---

[1] 47 C.F.R. § 54.709(a)(3).
[2] 47 C.F.R. § 54.701.
[3] 47 C.F.R. § 54.702(b)
[4] *See* 47 C.F.R. §§ 54.709(a)(3), 54.201, 54.203, 54.301-54.307, 54.407, 54.413, 54.515.

## *ADMINISTRATIVE EXPENSES AND INTEREST INCOME PROJECTION*

## ADMINISTRATIVE EXPENSES

Section 54.709(a) (3) of the Commission's rules requires USAC to submit its projected quarterly budget at least 60 days prior to the start of the quarter.[5] USAC includes any costs that can be directly attributed to the High Cost, Low Income, Rural Health Care, and Schools and Libraries Support Mechanisms, as well as the Connected Care Pilot Program, in the projected administrative expenditures of each mechanism. USAC's remaining joint and common costs, including costs associated with the billing, collection, and disbursement of funds, are included in the projected administrative expenditures of the respective support mechanisms based on USAC's methodology for allocating costs submitted to the Commission.[6]

USAC projects a consolidated budget of $55.57 million for 1Q2022. Direct costs for all support mechanisms total $30.37 million and are listed for each mechanism in the chart provided below. Joint and common costs (including billing, collection, and disbursement activities) total $25.20 million and are listed in the chart below based on the allocation methodology on file with the Commission.

---

[5] 47 C.F.R. § 54.709(a)(3).

[6] On January 1, 2006, USAC implemented a revised methodology for allocating joint and common costs that was filed with the Commission on October 3, 2005. *See* Letter from D. Scott Barash, USAC, to Marlene Dortch, FCC, CC Docket Nos. 97-21 *et al.* (Oct. 3, 2005) (explaining revisions to USAC's method for allocating joint and common administrative costs among the four Universal Service Support Mechanisms). On January 1, 2021, USAC applied this methodology to the Connected Care Pilot Program. *See* Letter from Charles Salvator, USAC, to Marlene Dortch, FCC, CC Docket Nos. 97-21 *et al.* (Dec. 21, 2020) (confirming the method for allocating USAC common costs among the four universal service support mechanisms and the Connected Care Pilot Program).

*1Q2022 Administrative Expenses (in millions) – Budgeted*

| USF Mechanism | Direct Costs | USAC Common Costs | Total |
|---|---|---|---|
| High Cost | $5.98 | $9.32 | $15.30 |
| Low Income | 9.87 | 5.31 | 15.18 |
| Rural Health Care | 3.63 | 2.31 | 5.94 |
| Schools & Libraries | 10.79 | 8.19 | 18.98 |
| Connected Care Pilot | 0.10 | 0.07 | 0.17 |
| Total | $30.37 | $25.20 | $55.57 |

Appendix M01 provides USAC's administrative expenditures budget for 1Q2022.

## FUND ACTIVITY

Appendix M02 provides the fund size projections for 1Q2022. Appendices M03 and M04 provide 2021 year-to-date statements of fund activity on a cash and accrual basis, respectively.

## EFFORTS TO PREVENT AND REDUCE IMPROPER PAYMENTS

USAC has established a foundation of processes, systems, procedures, and outreach activities to prevent or reduce "improper" payments as defined by the Improper Payments Information Act of 2002 (Pub. L. No. 107-300).[7] USAC initiated efforts, consistent with its February 28, 2008 letter to the Commission, to identify additional measures to prevent or reduce potential improper payments and to allocate the additional resources needed to implement such measures.[8] Commission staff directed USAC to report its progress in implementing proposed actions to prevent or reduce improper payments and to project the anticipated administrative costs of such actions on a quarterly basis.[9]

---

[7] *See* Improper Payments Information Act of 2002, Pub. L. No. 107-300, 116 Stat 2350 (2002).
[8] *See* Letter from D. Scott Barash, Acting Chief Executive Officer, USAC, to Anthony Dale, FCC Managing Director (Feb. 28, 2008) (concerning suggested additional steps to reduce or prevent improper payments).
[9] *See* Letter from Anthony Dale, FCC Managing Director, to D. Scott Barash, Acting Chief Executive Officer, USAC (Aug. 18, 2008).

The steps initiated by USAC include additional oversight and managerial controls, strengthened audit and investigative techniques, improved information technology tools, and more effective use of outreach resources. In 1Q2022, USAC will continue efforts identified and initiated during the previous years. These efforts include, but are not limited to:

1. *Assessing and strengthening USAC's internal controls*

USAC's Finance Internal Controls Team is responsible for testing key controls of USAC's processes. USAC's Audit and Assurance Division (AAD) has a Strategic Audit function that is responsible for assessing business operations. USAC's Office of the Chief Administrative Officer (OCAO) tracks the completion of the remediation activities and corrective action plans for all control deficiencies developed in response to internal and external testing results. OCAO established a framework for an Enterprise Risk Management (ERM) program at USAC. The Finance, OCAO, and AAD groups meet with USAC Leadership quarterly through the Risk Management Council to report on risk-related functions in the enterprise.

2. *Strengthening audit and investigative techniques*

The FCC's Office of Managing Director (OMD) directed USAC to implement an assessment program to determine the rate of improper payments made to universal service support mechanism beneficiaries to support the FCC's improper payment reporting requirements and to assess universal service support mechanism beneficiary compliance with FCC regulations.[10] USAC successfully implemented an assessment program, known as the Payment Quality Assurance (PQA) Program, in August 2010.

---

[10] Letter from Steven Van Roekel, FCC Managing Director, to Scott Barash, USAC Acting Chief Executive Officer (Feb. 12, 2010) (discussing the implementation of the Improper Payments Information Act of 2002 (IPIA) assessment program and companion audit program). Although not subject to improper payment reporting, USF contributor compliance with FCC regulations is assessed as part of the Beneficiary and Contributor Audit Program (BCAP).

The FCC also directed USAC to establish a comprehensive support mechanism Beneficiary and USF contributor audit program, which is known as BCAP ("Beneficiary and Contributor Audit Program"). The BCAP plans are designed to:

- Assess beneficiaries' and contributors' compliance with FCC Rules;

- Identify correct contribution obligations (for contributor audits);

- Identify overpayments that must be recaptured (for beneficiary audits);

- Deter waste, fraud and abuse; and

- Identify FCC Rules that may require the attention of USAC or FCC management.

In 2021, AAD, OMD and WCB developed an audit plan for fiscal year 2022 that incorporates a hybrid approach for selecting beneficiaries and contributors for audit. The selection methodology is based on a combination of high risk factors, high dollar, random selection and targeted entities selected as a result of whistleblower allegations or FCC request.

The status of all audits in process as of September 30, 2021 is summarized in the table below.

| Audit Status As of September 30, 2021 | | | | |
|---|---|---|---|---|
| **Program** | **Announced** | **Fieldwork** | **Reporting** | **Total** |
| Contributor Revenue | 1 | 8 | 2 | **11** |
| High Cost | 16 | 18 | 4 | **38** |
| Low Income | 1 | 16 | 20 | **37** |
| Schools & Libraries | 2 | 21 | 36 | **59** |
| Rural Health Care | 5 | 18 | 15 | **38** |
| **Total** | **25** | **81** | **77** | **183** |

As noted above, USAC implemented the PQA Program in 2010 to test improper payments and compliance with FCC regulations. The testing results for the two most recent

years are noted below. Using a statistically drawn sample, support mechanism disbursements are selected each month and reviewed to verify that payments were made at the correct amount in accordance with FCC rules. The table below summarizes the error rates noted and the improper payment amounts reported for fiscal years (FYs) 2020 and 2019:

| | FY 2020 | | FY 2019 | |
|---|---|---|---|---|
| Support Mechanism | Estimated Improper Payment Rate | Estimated Improper Payment Amount *(millions)* | Estimated Improper Payment Rate | Estimated Improper Payment Amount *(millions)* |
| High Cost | 0.01% | $0.75 | 0.01% | $0.65 |
| Low Income | 13.81% | $135.84 | 9.32% | $108.92 |
| Schools & Libraries | 4.46% | $88.43 | 6.33% | $139.67 |
| Rural Health Care | 6.24% | $15.67 | 11.46% | $34.19 |

The sample size and status of FY 2021 PQA assessments in process as of September 30, 2021 are summarized in the table below.

| PQA Testing Status As of September 30, 2021 | | | | |
|---|---|---|---|---|
| Program | Sample Size | Announced | In Process | Completed |
| High Cost | NA | NA | NA | NA |
| Low Income | 240 | 240 | 0 | 240 |
| Schools & Libraries | 350 | 350 | 0 | 350 |
| Rural Health Care | 375 | 375 | 0 | 375 |
| **Total** | **965** | **965** | **0** | **965** |

3.  *Improving information technology tools*

USAC has undertaken a systematic review of the capabilities of its current financial systems to determine whether additional functionality can be added to improve financial operations, and has made several improvements to its financial systems and is working on other systems enhancement initiatives.

*Expanding and enhancing outreach and education*

In the last quarter, USAC conducted extensive outreach, including:

- The High Cost program conducted outreach to ensure state and Tribal access to FCC Form 481 data filed by carriers as of July 1, helped state PUCs navigate the annual Oct. 1 certification of Eligible Telecommunications Carriers under their jurisdiction and helped carriers that self-certify perform their annual ETC certifications. In addition, High Cost conducted extensive outreach and provided ongoing customer service support to help carriers conduct quarterly speed and latency testing/pre-testing and report the results to USAC in order to comply with the FCC Performance Measures order;

- The Rural Health Care program conducted outreach to HCF and Telecom program participants to provide updates for FY2021 applicants and to prepare program participants for Funding Year 2022 as they anticipate the opening of the FY2022 filing window on December 1, 2021. This included three webinars, website updates, and creating resources for HCF and Telecom participants. Separate outreach went to Connected Care Pilot Program selected projects. This included three webinars; a kick-off webinar, providing general information about next steps, and two additional webinars specific to sections of the application process. The RHC program continued to communicate important funding process information to the selected projects through emails and the Connected Care Pilot Learn page on the website;

- Schools and Libraries (E-rate) program outreach included the weekly SL News Brief (through July), monthly and mid-month stakeholder calls to participants and Tribal audiences, and one webinar event for E-rate participants of all experience levels. The E-rate program updated two invoicing (BEAR and SPI) walkthrough videos;

- The Lifeline program released a redesign of LifelineSupport.org—the consumer website for Lifeline eligible consumers and current subscribers, communicated extensions for the temporary changes based on the FCC's Lifeline waiver released in response to COVID-19, communicated Hurricane Ida relief for Lifeline participants, and sent targeted outreach to carriers for updates on program processes, systems, and changes; and

- The Contributors team hosted seven webinars to train service providers how to fill out the FCC Form 499-Q and basic 499 Filer ID training. During the course of the quarter, 645 participants joined the webinars.

USAC conducted 23 webinars: six monthly webinars for Lifeline carriers, one webinar for Tribal Lifeline partners, one webinar for Schools and Libraries' audiences, eight webinars for Rural Health Care participants, and seven webinars for Contributors.

---

## FUNDING REQUIREMENTS

### HIGH COST SUPPORT MECHANISM

Appendix HC01 provides projected High Cost Support by State by Study Area for 1Q2022. HC01 also provides the projected amount of individual company support, and projected per-month amounts for the components of High Cost support that each Eligible Telecommunications Carrier (ETC)[11] may be eligible to receive. HC02 provides the total projected amount of annualized High Cost Support for 1Q2022 for each state.

#### CONNECT AMERICA FUND PHASE II

The FCC released an Order on June 10, 2014 adopting rules, among other things, to institute the foundation for the award of Phase II (model-based) support through a

---

[11] *See* 47 C.F.R. § 54.1310; 47 C.F.R. §§ 54.301-54.303.

competitive bidding process in price cap areas where the price cap carrier declines the offer

of model-based support.[12] The Order also permits price cap carriers that decline model-

based support to participate in the 2016 competitive bidding process.[13] On April 29, 2015,

the FCC released a Public Notice announcing the offers of model-based Phase II support to

price cap carriers to fund voice and broadband-capable networks in their service areas.[14]

The total offer is $1.675 billion annually, for six calendar years, 2015-2020.[15] Next, on June

16, 2015, the Bureau released a Public Notice announcing acceptance by Frontier

Communications of model-based support for each of the 28 states it serves.[16] For states

where their model-based support is greater than Phase I Frozen support, Frontier elected to

receive the lump sum payment associated with prior months that reflects the difference

between Phase II model support and Phase I Frozen support. Finally in August 2015, the

Bureau released public notices for Consolidated Communications, AT&T, CenturyTel, Inc.

dba CenturyLink, Cincinnati Bell, Fairpoint Communications, Inc., Hawaiian Telecom, Inc.,

Micronesian, and Windstream Corporation for announcement of acceptance of model-based

support.[17]

---

[12] *See generally Connect America Fund Omnibus Order and FNPRM*, WC Docket Nos. 10-90 *et al.*, Report and Order, Declaratory Ruling, Order, Memorandum Opinion and Order, Seventh Order on Reconsideration, and Further Notice of Proposed Rulemaking, 29 FCC Rcd 7051 (2014) (*CAF Omnibus Order*).

[13] *Id.* at 7062-7063, para. 37.

[14] *See Wireline Competition Bureau Announces Connect America Phase II Support Amounts Offered to Price Cap Carriers to Expand Rural Broadband*, WC Docket No. 10-90, Public Notice, 30 FCC Rcd 3905 (2015).

[15] *Id.*

[16] *See Wireline Competition Bureau Authorizes Frontier Communications Corporation to Receive $283 Million in Connect America Phase II Support to Serve 1.3 Million Rural Americans in 28 States*, WC Docket No. 10-90, Public Notice, 30 FCC Rcd 6310 (2015).

[17] *See* Wireline Competition Bureau Authorizes Windstream to Receive Over $ 174 Million in Connect America Phase II Support in 17 States, WC Docket No. 10-90, Public Notice, 30 FCC Rcd 8245 (2015); Wireline Competition Bureau Authorizes Fairpoint to Receive Over $37 Million in Connect America Phase II Support in 14 States, WC Docket No. 10-90, 30 FCC Rcd 8245 (2015); Wireline Competition Bureau Authorizes the Micronesian Telecommunications Corporation to Receive Over $2.5 Million and Hawaiian Telecom, Inc. to Receive Over $ 4 Million in Connect America Phase II Support, WC Docket No. 10-90, 30 FCC Rcd 8471 (2015); Wireline Competition Bureau Authorizes Additional Cap Carriers to Receive Almost $950 Million in Phase II Connect America Support *et al.*, WC Docket No. 10-90, Public Notice, 30 FCC Rcd 8577 (2015).

For 1Q2022, CAF Phase II projected support is estimated to be $4.92 million. Appendix HC11 provides projected CAF Phase II Frozen Support (ACS) by State by Study Area for 1Q2022.

### CONNECT AMERICA FUND PHASE II AUCTION

The Wireline Competition Bureau released a Public Notice on August 28, 2018 announcing the winners of the Connect America Find Phase II auction.[18]

For 1Q2022, total CAF Phase II auction projected support is estimated to be $38.70 million. Appendix HC16 provides projected CAF Phase II Auction Support by State by Study Area for 1Q2022.

### CONNECT AMERICA FUND/INTERCARRIER COMPENSATION SUPPORT

In the *USF/ICC Transformation Order*, the FCC adopted a transitional recovery mechanism with an effective date of July 1, 2012 to facilitate incumbent carriers' gradual transition away from intercarrier compensation (ICC) revenues.[19] Eligible incumbent carriers may receive additional support through this recovery mechanism.

For 1Q2022, total CAF/ICC Support is estimated to be $92.07 million. Appendix HC09 provides projected CAF/ICC Support by State by Study Area for 1Q2022.

### RURAL BROADBAND EXPERIMENTS

On July 11, 2014, the FCC adopted the *Rural Broadband Experiments* (RBE) *Order* to advance the deployment of voice and broadband networks in high-cost areas and help design the Phase II competitive bidding process and Remote Areas Fund.[20] The FCC established a budget of $100 million over ten years for funding experiments in price cap

---

[18] *See Connect America Fund Phase II Auction (Auction 903) Closes Winning Bidders Announced FCC Form 683 Due October 15, 2018*, WC Docket Nos. 10-90 *et al*, Public Notice, 29 FCC Rcd 7051 (2018).

[19] *See* 47 C.F.R. § 54.304(b).

[20] *See Connect America Fund, ETC Annual Reports and Certifications*, WC Docket No. 10-90 *et al*, Report and Order and Further Notice of Proposed Rulemaking, 29 FCC Rcd 8769 (2014) (*Rural Broadband Experiments Order*).

areas that are not served by unsubsidized competitors.[21]

For 1Q2022, total RBE support is estimated to be $0.72 million, all of which will be paid from cash reserved in the High Cost account. Thus, there is no 1Q2022 collection requirement for RBE. Appendix HC12 provides projected RBE Support by State by Study Area for 1Q2022.

### MOBILITY FUND PHASE I

In accordance with the Public Notice issued by the Wireline Competition Bureau on November 1, 2017, Mobility Fund Phase I support of $6.78 million for 1Q2022 will be paid with funds available in the High Cost account; thus, there is no 1Q2022 collection requirement for Mobility Fund Phase I.[22] Appendix HC10 provides projected Mobility Fund Phase I Support by State by Study Area for 1Q2022.

### RATE-OF-RETURN CARRIERS

Rate-of-return carriers not affiliated with price cap carriers may continue to receive legacy High Cost Program support.[23] In the *December 2018 Rate-of-Return Reform Order*, the FCC established a new budget for legacy carriers of $1.42 billion, to be increased annually by inflation.[24] However, the FCC has waived the budget for July 2021-June 2022.[25]

Appendix HC14 provides the rate-of-return budget control projected support amounts due to the budget control mechanism for 1Q2022.

---

[21] *See id.* at 8772, para. 9.
[22] *See Wireline Competition Bureau Provides Guidance to the Universal Service Administrative Company Regarding the High-Cost Universal Services Mechanism Budget*, WC Docket No. 10-90, Public Notice, 32 FCC Rcd 9243 (WCB 2017).
[23] *See USF/ICC Transformation Order*, 26 FCC Rcd at 17740, para. 206.
[24] *See Connect America Fund et al*, WC Docket Nos. 10-90 et al., Report and Order, Further Notice of Proposed Rulemaking, and Order on Reconsideration, FCC 18-176, para. 79, 84 (2018) (*December 2018 Rate of Return Reform Order*)
[25] *See Connect America Fund*, WC Docket No. 10-90, Order, FCC 21-67 (2021)

**HIGH COST LOOP SUPPORT (INCLUDING SAFETY NET ADDITIVE AND SAFETY VALVE SUPPORT)**

HCL support is calculated based on the results of the annual collection of 2012 incumbent local exchange carrier (LEC) loop cost and expense adjustment data that was submitted to the FCC and USAC on October 1, 2013.[26] Growth in total HCL support for rural carriers is limited under Section 54.1302 of the Commission's rules to the current level of funding adjusted yearly by the annual growth in supported rural loops.[27] The *Rural Task Force (RTF) Order* increased HCL support for rural carriers effective July 1, 2001.[28]

For 1Q2022, projected HCL support is $92.24 million, which includes $0.15 million for SVS. Appendix HC04 provides projected monthly HCL support payments by State by Study Area for 1Q2022. Appendix HC05 displays projected SVS payments by State by Study Area for 1Q2022.

**ALASKA PLAN SUPPORT**

In the *Alaska Plan Order*, the FCC approved for Alaska rate-of-return carriers to receive frozen support for 10 years and be obligated to offer voice and broadband services at specified speeds to a specified number of locations while meeting certain service obligations.[29]

For 1Q2022, projected Alaska Plan Support is $32.08 million. Appendix HC03 provides 1Q2022 projections for Alaska Plan Support by State by Study Area.

**CONNECT AMERICA BROADBAND LOOP SUPPORT**

Connect America Broadband Loop Support (CAF BLS) replaces what was

---

[26] Universal Service Fund (USF) 2012 Submission of 2011 Study Results (filed Oct. 1, 2012) (*USF Data Submission*).
[27] 47 C.F.R § 54.1302(a); *see also* 47 C.F.R. § 54.1303.
[28] *Federal-State Joint Board on Universal Service et al.,* CC Docket Nos. 96-45 *et al*, Fourteenth Report and Order, Twenty-Second Order on Reconsideration, and Further Notice of Proposed Rulemaking, and Report and Order, 16 FCC Rcd 11244 (2001) (*RTF Order*).
[29] See WC-Docket Nos. 10-90 and 16-271 DA 16-425

previously known as Interstate Common Line Support (ICLS).[30]  The FCC made modifications to modernize ICLS rules to provide support in situations where the customer no longer subscribes to traditional regulated local exchange voice service.[31]  CAF BLS will provide support for broadband-capable loops, regardless of whether the customer chooses traditional voice, bundle of voice and broadband, or only broadband.[32]

For 1Q2022, CAF BLS is projected to be $232.57 million.  Appendix HC07 provides USAC's 1Q2022 projections of CAF BLS by State by Study Area and Appendix HC08 provides USAC's 1Q2022 projections of CAF BLS by State.  Appendix HC15 provides USAC's 1Q2022 projections of the CAF BLS true-up by State by Study Area.

### ALTERNATIVE CONNECT AMERICA MODEL (A-CAM)

Alternative Connect America Model (A-CAM) allows carriers the option of electing a set amount of monthly support over a fixed term, or remaining with a reformed version of legacy support mechanisms with CAF-BLS and HCL support.

For 1Q2022, A-CAM support is projected to be $156.61 million, of which $48.75 million will be paid from funds available in the High Cost account.  Appendix HC13 provides Alternative Connect America Cost Model Support Projected by State by Study Area for 1Q2022.

### A-CAM II

On December 13, 2018, the FCC released the *December 2018 Rate-of-Return Order*, which directed the FCC to make model offers of up to $200.00 per location to all legacy rate-of-return carriers that did not previously elect model support or support pursuant to the

---

[30] *See Rate-of-Return Reform Order*, 31 FCC Rcd at 3091, para. 5.
[31] *Id.*
[32] *Id.*

Alaska Plan.[33] To implement the increase, the FCC has released a Public Notice with the support amounts.[34]

For 1Q2022, A-CAM II support is projected to be $126.58 million. Appendix HC17 provides projected A-CAM II Support by State by Study Area for 1Q2022.

### PRICE CAP CARRIERS

For 1Q2022, total frozen high cost support for price cap carriers is estimated to be $10.95 million. Appendix HC06 provides frozen high cost support for price cap carriers by State by Study Area for 1Q2022.

### COMPETITIVE ELIGIBLE TELECOMMUNICATIONS CARRIERS

The *USF/ICC Transformation Order* transitioned existing Competitive Eligible Telecommunications Carriers (CETCs) support to the CAF over a five-year period beginning January 1, 2012.[35] For the transition, the FCC set each CETC's baseline support at its total 2011 support in a given study area, or an amount equal to 3,000 times the number of reported lines as of year-end 2011, whichever was lower.[36] That monthly baseline amount was provided from January 1, 2012 to September 30, 2012.[37] Beginning July 1, 2012, each CETC's support was reduced by 20 percent for each July to June time period.[38] However, consistent with FCC rules, since Mobility Fund Phase II was not implemented by September 30, 2014, CETC support was not subject to an additional 20 percent reduction in support beginning July 2014.[39]

---

[33] *See Id.*, para. 34.
[34] *See Wireline Competition Bureau Authorizes 171 Rate-Of-Return Companies to Receive $491 Million Annually in Alternative Connect America Cost Model II Support to Expand Rural Broadband*, WC Docket No. 10-90, Public Notice, 34 FCC Rcd at 7271 (2019).
[35] *See id.* at 17830, para. 513.
[36] *See id.* at 17831, para. 515.
[37] *See id.*
[38] *See id.*
[39] *USF/ICC Transformation Order*, 26 FCC Rcd at 17831, para. 515; *see also* 47 C.F.R. § 54.307.

For 1Q2022, total frozen high cost support for CETCs is $91.89 million.  Appendix HC06 provides frozen high cost support for CETCs by State by Study Area for 1Q2022.

### UNIENDO A PUERTO RICO FUND/CONNECT USVI FUND

On September 30, 2019, the FCC released the *Uniendo a Puerto Rico Fund and the Connect USVI Fund Order*, which allocated nearly a billion dollars in federal universal service support to Puerto Rico and the U.S. Virgin Islands.  These funds will facilitate the improvement and expansion of existing fixed and mobile networks in the Puerto Rico and the U.S. Virgin Islands.[40]

For 1Q2022, Uniendo a Puerto Rico Fund/Connect USVI Fund support is projected to be $26.86 million.  Appendix HC18 provides the Uniendo Puerto Rico Fund Mobile and Fixed Support Projected by State by Study Area for 1Q2022.  Appendix HC19 provides the Connect USVI Fund Mobile and Fixed Support Projected by State by Study Area for 1Q2022.

### RURAL DIGITAL OPPORTUNITY FUND

On February 7, 2020, the FCC released the *Rural Digital Opportunity Fund Order*, which provided up to $20.4 billion to fund the deployment of up to gigabit speed broadband networks in unserved rural communities through a two-phase reverse auction mechanism.[41]

For 1Q2022, Rural Digital Opportunity Fund support is projected to be $137.28 million.

---

[40] *See The Uniendo a Puerto Rico Fund and the Connect USVI Fund et al.,* WC Docket No. 18-143 et al., Report and Order and Order on Reconsideration, FCC 19-95, para. 3 (2019) *(Uniendo a Puerto Rico Fund and the Connect USVI Fund Order).*
[41] *See Rural Digital Opportunity Fund et al.,* WC Docket No. 19-126 et al., Report and Order, FCC 20-5 (2020) *(Rural Digital Opportunity Fund Order).*

**HIGH COST SUPPORT MECHANISM SUMMARY**

The 1Q2022 High Cost Support Mechanism funding requirements are projected as follows: $92.24 million for HCL support, $232.57 million for CAF BLS, $10.95 million for frozen Price Cap Carrier Support, $4.92 million for CAF Phase II, $38.70 million for CAF Phase II Auction, $91.89 million for frozen CETC Support, $92.07 million for CAF/ICC Support, $32.08 million for Alaska Plan Support, $107.86 million for A-CAM, $126.58 million for A-CAM II, $26.86 million for Uniendo a Puerto Rico/Connect USVI, and $137.28 million for Rural Digital Opportunity Fund. This results in base projected demand of $994.00 million.

The following funding requirements will be paid from funds available in the High Cost account: Rural Broadband Experiments ($0.72 million), Mobility Fund Phase I ($6.78 million), and incremental A-CAM support ($48.75 million).

The total funding requirement of $994.00 million is adjusted as follows: increased by prior period adjustments of $35.22 million[42] and increased by administrative costs of $15.30 million; resulting in a total projected 1Q2022 funding requirement for the High Cost Support Mechanism of $1,044.52 million.

## LOW INCOME SUPPORT MECHANISM

**LIFELINE SUPPORT**

ETCs providing Lifeline support are entitled to receive funding for the waiver of charges and reduced rates provided to qualified low-income subscribers.[43] In the *Lifeline*

---

[42] Prior period adjustments reconcile projections to actual results and include adjustments for billings, interest income, bad debt, and administrative expenses.
[43] 47 C.F.R. §§ 54.401-54.417.

*Reform Order*, all non-tribal Lifeline support was set to a flat rate of $9.25 for all subscribers.[44]

As established in the *Tribal Order*, tribal support makes available each month up to an

additional $25 per low-income subscriber to eligible residents of tribal lands.[45] The *2016*

*Lifeline Order* extended Lifeline support to broadband services and adopted a phase-down of

support for voice-only service beginning in 2019.[46]

For 1Q2022, USAC projects $206.06 million will be required for Lifeline support.

**LINK-UP SUPPORT**

Link-Up support is available for ETCs that provide support on tribal lands, but is

limited to those ETCs receiving High Cost Program support.[47] ETCs may claim a 100

percent reduction up to $100 of the customary charge for commencing telephone service for

a single telecommunication connection at a subscriber's principal place of residence.[48]

For 1Q2022, USAC projects that $0.04 million will be required for Link-Up support.

**LOW INCOME SUPPORT MECHANISM SUMMARY**

The estimated 1Q2022 Low Income Support Mechanism funding requirements are

projected as follows: $206.06 million for Lifeline and $0.04 million for Link-Up, resulting in

a total of $206.10 million.

The total fund requirement of $206.10 million is adjusted as follows: decreased by

prior period adjustment of $83.77 million[49] and increased for administrative costs of $15.18

---

[44] *See Lifeline and Link Up Reform and Modernization et al,* WC Docket Nos. 11-42 *et al,* CC Docket No. 96-45, Report and Order and Further Notice of Proposed Rule Making, 27 FCC Rcd 6656, 6683, para. 58 (2012) (*Lifeline Reform Order*).
[45] *See* 47 C.F.R. § 54.400(e); *Federal-Joint Board on Universal Service et al,* CC Docket 96-45, Twenty-Fifth Order on Reconsideration, Report and Order, Order, and Further Notice of Proposed Rulemaking, 18 FCC Rcd 10958 (2003) (*Tribal Order*). On August 31, 2000, the FCC stayed the implementation of the federal Lifeline and Link-up rule amendments only to the extent that they apply to qualifying low-income consumers living near reservations.
[46] *See Lifeline and Link Up Reform and Modernization, et al,* WC Docket Nos. 11-42, Third Report and Order and Further Report and Order, and Order on Reconsideration, 31 FCC Rcd 3962, 3985-87, paras. 62-66 (2016) (*2016 Lifeline Order*).
[47] *See id.* at 6767, para. 254.
[48] 47 C.F.R. § 54.413(a)(1).
[49] Prior period adjustments reconcile projections to actual results and include adjustments for billings, disbursements, interest income, bad debt, and administrative expenses.

million; resulting in a total projected 1Q2022 funding requirement for the Low Income Support Mechanism of $137.51 million.

Appendix LI01 provides projected Low Income support amounts by State and Study Area for 1Q2022.[50] LI03 provides a list of ETCs for 3Q2021.[51] LI04 provides detail on company specific Low Income disbursement amounts for 3Q2021. LI05 provides detail on annual company-specific Low Income support claimed by state and company for January 2018 through September 2021. LI06 provides historical data of monthly support amounts claimed by ETCs from January 1998 through September 2021. LI07 provides detail on Low Income support claimed by state or jurisdiction for January 2018 through September 2021. LI08 and LI09 provide subscriber and beneficiary information by state or jurisdiction for Lifeline and Link-Up support, respectively, for January 2021 through September 2021.

## RURAL HEALTH CARE SUPPORT MECHANISM

In the *2018 Rural Health Care Program Funding Cap Order*, the Commission amended its rules to allow unused funds from previous funding years to be carried forward for use in subsequent funding years, beginning in Funding Year 2018.[52] On an annual basis, unused funds will be made available in the second quarter of each calendar year for use in the next full funding year of the Rural Health Care Program.[53]

In the *2018 Rural Health Care Program Funding Cap Order*, the Commission also required USAC to file quarterly estimates of unused funds that will be available for carryover in subsequent funding years.[54] The following is a summary of estimated unused funds as of

---

[50] Companies that are no longer ETCs have been removed from LI01.

[51] Companies that are no longer ETCs have been removed from LI03.

[52] *Promoting Telehealth in Rural America,* WC Docket No. 17-310, Report and Order, FCC 18-82, para. 25 (2018) *(2018 Rural Health Care Program Funding Cap Order).*

[53] *Id.,* para. 27.

[54] *Id.,* para. 26.

September 30, 2021 for Funding Years 2008 through 2020. Funding years prior to Funding Year 2008 are closed.

**FUNDING YEAR 2008**

Funding Year 2008 began on July 1, 2008 and ended on June 30, 2009. Balances as of September 30, 2021 are as follows:

| Funding Year 2008 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $205.92 |
| Amount Carried Forward / Backward | ($124.97) |
| Amount Authorized for Disbursement | ($80.95) |
| Reserve for Outstanding Obligations | $0.00 |
| Reserve for Pending Applications | $0.00 |
| Reserve for USAC Appeals | $0.00 |
| Reserve for FCC Appeals | $0.00 |
| **Estimated Remaining Balance** | **$0.00** |

Cumulative payments to service providers through 3Q2021 are listed in Appendix RH03.

**FUNDING YEAR 2009**

Funding Year 2009 began on July 1, 2009 and ended on June 30, 2010. Balances as of September 30, 2021 are as follows:

| Funding Year 2009 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $211.02 |
| Amount Carried Forward / Backward | $145.02 |
| Amount Authorized for Disbursement | ($354.45) |
| Reserve for Outstanding Obligations | ($0.33) |
| Reserve for Pending Applications | $0.00 |
| Reserve for USAC Appeals | $0.00 |
| Reserve for FCC Appeals | ($1.26) |
| **Estimated Remaining Balance** | **$0.00** |

Cumulative payments to service providers through 3Q2021 are listed in Appendix RH06.

**FUNDING YEAR 2010**

Funding Year 2010 began on July 1, 2010 and ended on June 30, 2011. Balances as of September 30, 2021 are as follows:

| Funding Year 2010 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $87.39 |
| Amount Carried Forward / Backward | $0.00 |
| Amount Authorized for Disbursement | ($87.32) |
| Reserve for Outstanding Obligations | ($0.06) |
| Reserve for Pending Applications | $0.00 |
| Reserve for USAC Appeals | $0.00 |
| Reserve for FCC Appeals | $0.00 |
| **Estimated Remaining Balance** | **$0.01** |

Cumulative payments to service providers through 3Q2021 are listed in Appendix RH09.

### FUNDING YEAR 2011

Funding Year 2011 began on July 1, 2011 and ended on June 30, 2012. Balances as of September 30, 2021 are as follows:

| Funding Year 2011 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $101.33 |
| Amount Carried Forward / Backward | $0.00 |
| Amount Authorized for Disbursement | ($101.29) |
| Reserve for Outstanding Obligations | ($0.04) |
| Reserve for Pending Applications | $0.00 |
| Reserve for USAC Appeals | $0.00 |
| Reserve for FCC Appeals | $0.00 |
| **Estimated Remaining Balance** | **$0.00** |

Cumulative payments to service providers through 3Q2021 are listed in Appendix RH12.

### FUNDING YEAR 2012

Funding Year 2012 began on July 1, 2012 and ended on June 30, 2013. Balances as of September 30, 2021 are as follows:

| Funding Year 2012 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $118.32 |
| Amount Carried Forward / Backward | $0.09 |
| Amount Authorized for Disbursement | ($116.95) |
| Reserve for Outstanding Obligations | ($1.27) |
| Reserve for Pending Applications | $0.00 |
| Reserve for USAC Appeals | $0.00 |
| Reserve for FCC Appeals | ($0.18) |
| **Estimated Remaining Balance** | **$0.01** |

Authorized funding by applicant during 3Q2021 and cumulative payments to service providers through 3Q2021 are listed in Appendices RH14 and RH15, respectively.

**FUNDING YEAR 2013**

Funding Year 2013 began on July 1, 2013 and ended on June 30, 2014. Balances as of September 30, 2021 are as follows:

| Funding Year 2013 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $178.76 |
| Amount Carried Forward / Backward | ($1.98) |
| Amount Authorized for Disbursement | ($175.16) |
| Reserve for Outstanding Obligations | ($1.55) |
| Reserve for Pending Applications | $0.00 |
| Reserve for USAC Appeals | $0.00 |
| Reserve for FCC Appeals | ($0.07) |
| **Estimated Remaining Balance** | **$0.00** |

Authorized funding by applicant during 3Q2021 and cumulative payments to service providers through 3Q2021 are listed in Appendices RH17 and RH18, respectively.

**FUNDING YEAR 2014**

Funding Year 2014 began on July 1, 2014 and ended on June 30, 2015. Balances as of September 30, 2021 are as follows:

| Funding Year 2014 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $232.88 |
| Amount Carried Forward / Backward | $3.82 |
| Amount Authorized for Disbursement | ($224.25) |
| Reserve for Outstanding Obligations | ($0.95) |
| Reserve for Pending Applications | $0.00 |
| Reserve for USAC Appeals | $0.00 |
| Reserve for FCC Appeals | ($11.51) |
| **Estimated Remaining Balance** | **($0.01)** |

Authorized funding by applicant during 3Q2021 and cumulative payments to service providers through 3Q2021 are listed in Appendices RH20 and RH21, respectively.

**FUNDING YEAR 2015**

Funding Year 2015 began on July 1, 2015 and ended on June 30, 2016. Balances as of September 30, 2021 are as follows:

| Funding Year 2015 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $294.16 |
| Amount Carried Forward / Backward | $0.45 |
| Amount Authorized for Disbursement | ($269.02) |
| Reserve for Outstanding Obligations | ($7.62) |
| Reserve for Pending Applications | ($0.03) |
| Reserve for USAC Appeals | ($0.00) |
| Reserve for FCC Appeals | ($17.90) |
| **Estimated Remaining Balance** | **$0.04** |

Authorized funding by applicant during 3Q2021 and cumulative payments to service providers through 3Q2021 are listed in Appendices RH23 and RH24, respectively.

**FUNDING YEAR 2016**

Funding Year 2016 began on July 1, 2016 and ended on June 30, 2017. Balances as of September 30, 2021 are as follows:

| Funding Year 2016 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $402.70 |
| Amount Carried Forward / Backward | ($48.68) |
| Amount Authorized for Disbursement | ($304.04) |
| Reserve for Outstanding Obligations | ($5.47) |
| Reserve for Pending Applications | ($0.05) |
| Reserve for USAC Appeals | ($0.15) |
| Reserve for FCC Appeals | ($32.06) |
| Administrative Expenses | ($12.29) |
| **Estimated Remaining Balance** | **($0.04)** |

Authorized funding by applicant during 3Q2021 and cumulative payments to service providers through 3Q2021 are listed in Appendices RH26 and RH27, respectively.

**FUNDING YEAR 2017**

Funding Year 2017 began on July 1, 2017 and ended on June 30, 2018. Balances as of September 30, 2021 are as follows:

| Funding Year 2017 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $367.59 |
| Amount Carried Forward / Backward | $34.21 |
| Amount Authorized for Disbursement | ($334.06) |
| Reserve for Outstanding Obligations | ($4.56) |
| Reserve for Pending Applications | ($6.56) |
| Reserve for USAC Appeals | ($3.91) |
| Reserve for FCC Appeals | ($42.78) |
| Administrative Expenses | ($10.37) |
| **Estimated Remaining Balance** | **($0.44)** |

Funding commitments made to applicants during 3Q2021 are included in Appendix RH28. Authorized funding by applicant during 3Q2021 and cumulative payments to service providers through 3Q2021 are listed in Appendices RH29 and RH30, respectively.

FUNDING YEAR 2018

Funding Year 2018 began on July 1, 2018 and ended on June 30, 2019. Balances as of September 30, 2021 are as follows:

| Funding Year 2018 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $581.28 |
| Amount Carried Forward / Backward | ($225.76) |
| Amount Authorized for Disbursement | ($296.76) |
| Reserve for Outstanding Obligations | ($8.72) |
| Reserve for Pending Applications | ($6.25) |
| Reserve for USAC Appeals | ($18.56) |
| Reserve for FCC Appeals | ($3.96) |
| Administrative Expenses | ($12.09) |
| **Estimated Remaining Balance** | **$9.18** |

Funding commitments made to applicants during 3Q2021 are included in Appendix RH31. Authorized funding by applicant during 3Q2021 and cumulative payments to service providers through 3Q2021 are listed in Appendices RH32 and RH33, respectively.

**FUNDING YEAR 2019**

Funding Year 2019 began on July 1, 2019 and ended on June 30, 2020. Balances as of September 30, 2021 are as follows:

| Funding Year 2019 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $594.07 |
| Amount Carried Forward / Backward | ($66.74) |
| Amount Authorized for Disbursement | ($389.23) |
| Reserve for Outstanding Obligations | ($63.10) |
| Reserve for Pending Applications | ($2.96) |
| Reserve for USAC Appeals | ($17.23) |
| Reserve for FCC Appeals | ($3.87) |
| Administrative Expenses | ($16.34) |
| **Estimated Remaining Balance** | **$34.60** |

Funding commitments made to applicants during 3Q2021 are included in Appendix RH34. Authorized funding by applicant during 3Q2021 and cumulative payments to service providers through 3Q2021 are listed in Appendices RH35 and RH36, respectively.

**FUNDING YEAR 2020**

Funding Year 2020 began on July 1, 2020 and ended on June 30, 2021. Balances as of September 30, 2021 are as follows:

| Funding Year 2020 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $604.76 |
| Amount Carried Forward / Backward | $43.37 |
| Amount Authorized for Disbursement | ($199.80) |
| Reserve for Outstanding Obligations | ($253.71) |
| Reserve for Pending Applications | ($5.58) |
| Reserve for USAC Appeals | ($70.99) |
| Reserve for FCC Appeals | $(1.55) |
| Administrative Expenses | ($19.75) |
| **Estimated Remaining Balance** | **$96.75** |

Funding commitments made to applicants during 3Q2021 are included in Appendix RH37. Authorized funding by applicant during 3Q2021 and cumulative payments to service providers through 3Q2021 are listed in Appendices RH38 and RH39, respectively.

**FUNDING YEAR 2021**

On March 19, 2021, the Commission announced a funding cap for Funding Year 2021 of $612.02 million for the Rural Health Care Program.[55] This reflects a 1.2 percent inflation-adjusted increase in the $604.76 million cap from Funding Year 2020. The filing window for Funding Year 2021 closed on June 1, 2021.

For Funding Year 2021, USAC will collect an amount equal to the Rural Health Care Funding Cap of $612.02 million less funds available for roll forward from prior years, as directed by the Commission.[56] The collection is inclusive of administrative costs.

## RURAL HEALTH CARE SUPPORT MECHANISM SUMMARY

The 1Q2022 Rural Health Care Support Mechanism collection requirement of $153.01 million represents one quarter of the cap for Funding Year 2021. The amount includes collection requirements for the Telecommunications Program, the Healthcare Connect Fund, and administrative costs. The collection requirement of $153.01 million is adjusted as follows: decreased by funds available for roll forward from prior years of $153.01 million, increased by prior period adjustment of $11.72 million[57]; resulting in a total projected 1Q2022 funding requirement for the Rural Health Care Support Mechanism of $11.72 million.

---

[55] *See Wireline Competition Bureau Announces E-Rate and RHC Programs' Inflation-Based Caps for Funding Year 2021,* CC Docket No. 02-6, WC Docket No. 02-60, Public Notice, DA 21-332 (2021).

[56] 47 CFR § 54.619(a)(5).

[57] Prior period adjustments reconcile projections to actual results and include adjustments for billings, interest income, and bad debt.

## CONNECTED CARE PILOT PROGRAM

On April 2, 2020, the FCC issued Order FCC 20-44, establishing the Connected Care Pilot Program within the USF, making an additional $100 million available over three years to help defray health care providers' qualifying costs of providing connected care services, which focused primarily to low-income or veteran patients.[58]  The Order authorized collections of $100 million over three years (12 quarters) at $8.33 million per quarter beginning in 4Q2020.[59]  The Order states that the purpose of the Pilot Program is to examine how the Fund can help support the trend towards connected care services, particularly for low income consumers and veterans.[60]  The Order indicates that $100 million funding for the Pilot Program will be separate from the budgets of the other existing universal service programs and directs USAC to separately collect funds for the Pilot Program.[61]

## CONNECTED CARE PILOT PROGRAM SUMMARY

The 1Q2022 Connected Care Pilot Program collection requirement of $8.33 million is adjusted as follows: increased by prior period adjustment of $0.71 million[62] and increased by $0.17 million for administrative expenses, resulting in a total projected 1Q2022 funding requirement for the Connected Care Pilot Program of $9.21 million.

---

[58] *See Promoting Telehealth for Low-Income Consumers, COVID-19 Telehealth Program,* WC Docket Nos. 18-213 and 20-89, Report and Order, FCC 20-44, para. 37 (2020).
[59] *Id*, para. 42.
[60] *Id*, para. 5.
[61] *Id*, paras. 38, 42.
[62] Prior period adjustments reconcile projections to actual results and include adjustments for billings, interest income, and bad debt.

## SCHOOLS AND LIBRARIES SUPPORT MECHANISM

Following is a summary of Schools and Libraries Support Mechanism net

commitments[63] and net authorized for payment[64] by Funding Year as of September 30, 2021.

**FUNDING YEAR 1998**

| FUNDING YEAR 1998 | | | | | |
|---|---|---|---|---|---|
| | Net Commitments | | Net Authorized for Payment | | Auth/Com |
| | Millions of Dollars | % of Total Commitments | Millions of Dollars | % of Total Authorized for Payment | % of Committed Authorized for Payment |
| Telecommunications | $678.95 | 39.97% | $507.76 | 36.30% | 74.79% |
| Internet Access | $134.10 | 7.89% | $94.82 | 6.78% | 70.71% |
| Internal Connections | $885.71 | 52.14% | $796.39 | 56.93% | 89.91% |
| **TOTAL** | $1,698.76 | 100.00% | $1,398.97 | 100.00% | 82.35% |
| Deobligations due to Expired FRNs | ($299.79) | | | | |
| **Net Commitments** | $1,398.97 | | | | |

**FUNDING YEAR 1999**

| FUNDING YEAR 1999 | | | | | |
|---|---|---|---|---|---|
| | Net Commitments | | Net Authorized for Payment | | Auth/Com |
| | Millions of Dollars | % of Total Commitments | Millions of Dollars | % of Total Authorized for Payment | % of Committed Authorized for Payment |
| Telecommunications | $634.28 | 29.54% | $452.16 | 27.40% | 71.29% |
| Internet Access | $148.64 | 6.92% | $95.38 | 5.78% | 64.17% |
| Internal Connections | $1,364.15 | 63.54% | $1,102.44 | 66.82% | 80.82% |
| **TOTAL** | $2,147.07 | 100.00% | $1,649.98 | 100.00% | 76.85% |
| Deobligations due to Expired FRNs | ($497.09) | | | | |

[63] Net Commitments are the amount of total funding commitments (including appeals, less funding commitment adjustments (COMADs) and other recaptures) reduced by the remaining dollar amount of commitments that had not been fully disbursed by their invoicing deadline.
[64] Net authorized for payment is the amount of total approved invoices less any returned funds. Authorized payments may be greater than net commitments due to recoveries in the process of collection.

| Net Commitments | $1,649.98 | | | | |
|---|---|---|---|---|---|

## FUNDING YEAR 2000

| FUNDING YEAR 2000 | | | | | |
|---|---|---|---|---|---|
| | Net Commitments | | Net Authorized for Payment | | Auth/Com |
| | Millions of Dollars | % of Total Commitments | Millions of Dollars | % of Total Authorized for Payment | % of Committed Authorized for Payment |
| Telecommunications | $718.74 | 34.58% | $481.21 | 29.22% | 66.95% |
| Internet Access | $218.72 | 10.52% | $131.92 | 8.01% | 60.32% |
| Internal Connections | $1,140.97 | 54.90% | $1,033.81 | 62.77% | 90.61% |
| **TOTAL** | $2,078.43 | 100.00% | $1,646.94 | 100.00% | 79.24% |
| Deobligations due to Expired FRNs | ($431.49) | | | | |
| **Net Commitments** | $1,646.94 | | | | |

## FUNDING YEAR 2001

| FUNDING YEAR 2001 | | | | | |
|---|---|---|---|---|---|
| | Net Commitments | | Net Authorized for Payment | | Auth/Com |
| | Millions of Dollars | % of Total Commitments | Millions of Dollars | % of Total Authorized for Payment | % of Committed Authorized for Payment |
| Telecommunications | $766.34 | 35.32% | $540.87 | 32.26% | 70.58% |
| Internet Access | $224.65 | 10.35% | $146.93 | 8.76% | 65.40% |
| Internal Connections | $1,178.96 | 54.33% | $988.97 | 58.98% | 83.89% |
| **TOTAL** | $2,169.95 | 100.00% | $1,676.77 | 100.00% | 77.27% |
| Deobligations due to Expired FRNs | ($493.18) | | | | |
| **Net Commitments** | $1,676.77 | | | | |

**FUNDING YEAR 2002**

| | Net Commitments | | Net Authorized for Payment | | Auth/Com |
|---|---|---|---|---|---|
| | Millions of Dollars | % of Total Commitments | Millions of Dollars | % of Total Authorized for Payment | % of Committed Authorized for Payment |
| Telecommunications | $848.89 | 40.29% | $610.19 | 38.28% | 71.88% |
| Internet Access | $250.99 | 11.91% | $169.40 | 10.63% | 67.49% |
| Internal Connections | $1,007.24 | 47.80% | $814.61 | 51.10% | 80.87% |
| **TOTAL** | $2,107.12 | 100.00% | $1,594.20 | 100.00% | 75.66% |
| Deobligations due to Expired FRNs | ($512.92) | | | | |
| **Net Commitments** | $1,594.20 | | | | |

**FUNDING YEAR 2003**

| | Net Commitments | | Net Authorized for Payment | | Auth/Com |
|---|---|---|---|---|---|
| | Millions of Dollars | % of Total Commitments | Millions of Dollars | % of Total Authorized for Payment | % of Committed Authorized for Payment |
| Telecommunications | $898.73 | 35.68% | $657.50 | 33.94% | 73.16% |
| Internet Access | $271.87 | 10.79% | $203.32 | 10.49% | 74.79% |
| Internal Connections | $1,347.99 | 53.52% | $1,076.69 | 55.57% | 79.87% |
| **TOTAL** | $2,518.59 | 100.00% | $1,937.51 | 100.00% | 76.93% |
| Deobligations due to Expired FRNs | ($581.02) | | | | |
| **Net Commitments** | $1,937.57 | | | | |

**FUNDING YEAR 2004**

| | Net Commitments | | Net Authorized for Payment | | Auth/Com |
|---|---|---|---|---|---|
| | Millions of Dollars | % of Total Commitments | Millions of Dollars | % of Total Authorized for Payment | % of Committed Authorized for Payment |
| Telecommunications | $933.66 | 46.09% | $689.93 | 44.94% | 73.90% |
| Internet Access | $242.31 | 11.96% | $193.34 | 12.59% | 79.79% |
| | | | | | |
| Internal Connections | $849.98 | 41.95% | $651.97 | 42.47% | 76.70% |
| **TOTAL** | $2,025.95 | 100.00% | $1,535.24 | 100.00% | 75.78% |
| Deobligations due to Expired FRNs | ($490.46) | | | | |
| **Net Commitments** | $1,535.49 | | | | |

**FUNDING YEAR 2005**

| | Net Commitments | | Net Authorized for Payment | | Auth/Com |
|---|---|---|---|---|---|
| | Millions of Dollars | % of Total Commitments | Millions of Dollars | % of Total Authorized for Payment | % of Committed Authorized for Payment |
| Telecommunications | $983.87 | 49.00% | $778.02 | 47.92% | 79.08% |
| Internet Access | $259.37 | 12.92% | $214.35 | 13.20% | 82.64% |
| Internal Connections | $644.61 | 32.10% | $539.26 | 33.23% | 83.69% |
| Internal Connections-Maint | $120.02 | 5.98% | $91.66 | 5.65% | 76.37% |
| **TOTAL** | $2,007.87 | 100.00% | $1,623.29 | 100.00% | 80.86% |
| Deobligations due to Expired FRNs | ($384.50) | | | | |
| **Net Commitments** | $1,623.37 | | | | |

Funding commitments made to applicants during 3Q2021 are included in Appendix

SL01.

JA248

**FUNDING YEAR 2006**

| FUNDING YEAR 2006 | | | | | |
|---|---|---|---|---|---|
| | Net Commitments | | Net Authorized for Payment | | Auth/Com |
| | Millions of Dollars | % of Total Commitments | Millions of Dollars | % of Total Authorized for Payment | % of Committed Authorized for Payment |
| Telecommunications | $1,063.77 | 54.59% | $849.65 | 54.23% | 79.87% |
| Internet Access | $290.31 | 14.90% | $236.49 | 15.09% | 81.46% |
| Internal Connections | $475.89 | 24.42% | $394.60 | 25.19% | 82.92% |
| Internal Connections-Maint | $118.83 | 6.10% | $86.00 | 5.49% | 72.37% |
| **TOTAL** | $1,948.80 | 100.00% | $1,566.74 | 100.00% | 80.40% |
| Deobligations due to Expired FRNs | ($381.81) | | | | |
| **Net Commitments** | $1,566.99 | | | | |

**FUNDING YEAR 2007**

| FUNDING YEAR 2007 | | | | | |
|---|---|---|---|---|---|
| | Net Commitments | | Net Authorized for Payment | | Auth/Com |
| | Millions of Dollars | % of Total Commitments | Millions of Dollars | % of Total Authorized for Payment | % of Committed Authorized for Payment |
| Telecommunications | $1,163.90 | 49.39% | $947.37 | 48.51% | 81.40% |
| Internet Access | $310.51 | 13.18% | $258.89 | 13.26% | 83.38% |
| Internal Connections | $724.64 | 30.75% | $627.73 | 32.14% | 86.63% |
| Internal Connections-Maint | $157.47 | 6.68% | $118.96 | 6.09% | 75.57% |
| **TOTAL** | $2,356.52 | 100.00% | $1,952.95 | 100.00% | 82.88% |
| Deobligations due to Expired FRNs | ($403.57) | | | | |
| **Net Commitments** | $1,952.95 | | | | |

**FUNDING YEAR 2008**

| FUNDING YEAR 2008 | | | | | |
|---|---|---|---|---|---|
| | Net Commitments | | Net Authorized for Payment | | Auth/Com |
| | Millions of Dollars | % of Total Commitments | Millions of Dollars | % of Total Authorized for Payment | % of Committed Authorized for Payment |
| Telecommunications | $1,291.40 | 54.42% | $1,047.22 | 54.36% | 81.09% |
| Internet Access | $333.48 | 14.05% | $278.65 | 14.46% | 83.56% |
| Internal Connections | $623.21 | 26.26% | $508.17 | 26.38% | 81.54% |
| Internal Connections-Maint | $124.87 | 5.26% | $92.46 | 4.80% | 74.04% |
| **TOTAL** | $2,372.96 | 100.00% | $1,926.50 | 100.00% | 81.19% |
| Deobligations due to Expired FRNs | ($446.47) | | | | |
| **Net Commitments** | $1,926.49 | | | | |

**FUNDING YEAR 2009**

| FUNDING YEAR 2009 | | | | | |
|---|---|---|---|---|---|
| | Net Commitments | | Net Authorized for Payment | | Auth/Com |
| | Millions of Dollars | % of Total Commitments | Millions of Dollars | % of Total Authorized for Payment | % of Committed Authorized for Payment |
| Telecommunications | $1,353.49 | 48.22% | $1,111.21 | 47.63% | 82.10% |
| Internet Access | $350.22 | 12.48% | $292.66 | 12.54% | 83.56% |
| Internal Connections | $910.66 | 32.45% | $788.74 | 33.81% | 86.61% |
| Internal Connections-Maint | $192.36 | 6.85% | $140.36 | 6.02% | 72.97% |
| **TOTAL** | $2,806.73 | 100.00% | $2,332.97 | 100.00% | 83.12% |
| Deobligations due to Expired FRNs | ($473.50) | | | | |
| **Net Commitments** | $2,333.23 | | | | |

**FUNDING YEAR 2010**

| FUNDING YEAR 2010 | | | | | |
|---|---|---|---|---|---|
| | Net Commitments | | Net Authorized for Payment | | Auth/Com |
| | Millions of Dollars | % of Total Commitments | Millions of Dollars | % of Total Authorized for Payment | % of Committed Authorized for Payment |
| Telecommunications | $1,428.40 | 47.65% | $1,176.80 | 48.04% | 82.39% |
| Internet Access | $392.65 | 13.10% | $330.23 | 13.48% | 84.10% |
| Internal Connections | $973.91 | 32.49% | $795.38 | 32.44% | 81.60% |
| Internal Connections-Maint | $202.50 | 6.76% | $147.96 | 6.04% | 73.07% |
| **TOTAL** | $2,997.46 | 100.00% | $2,450.37 | 100.00% | 81.73% |
| Deobligations due to Expired FRNs | ($542.08) | | | | |
| **Net Commitments** | $2,455.38 | | | | |

Funding commitments made to applicants during 3Q2021 are included in Appendix SL02. Authorized funding by applicant during 3Q2021 and cumulative payments to service providers through 3Q2021 are listed in Appendices SL03 and SL04, respectively.

**FUNDING YEAR 2011**

| FUNDING YEAR 2011 | | | | | |
|---|---|---|---|---|---|
| | Net Commitments | | Net Authorized for Payment | | Auth/Com |
| | Millions of Dollars | % of Total Commitments | Millions of Dollars | % of Total Authorized for Payment | % of Committed Authorized for Payment |
| Telecommunications | $1,467.20 | 55.09% | $1,188.62 | 55.26% | 81.01% |
| Internet Access | $467.45 | 17.55% | $387.77 | 18.03% | 82.95% |
| Internal Connections | $602.82 | 22.63% | $498.42 | 23.17% | 82.68% |
| Internal Connections-Maint | $126.02 | 4.73% | $76.22 | 3.54% | 60.49% |
| **TOTAL** | $2,663.49 | 100.00% | $2,151.03 | 100.00% | 80.76% |
| Deobligations due to Expired FRNs | ($511.29) | | | | |
| **Net Commitments** | $2,152.20 | | | | |

**FUNDING YEAR 2012**

| | Net Commitments | | Net Authorized for Payment | | Auth/Com |
|---|---|---|---|---|---|
| | Millions of Dollars | % of Total Commitments | Millions of Dollars | % of Total Authorized for Payment | % of Committed Authorized for Payment |
| Telecommunications | $1,515.71 | 51.14% | $1,220.97 | 51.47% | 80.55% |
| Internet Access | $569.95 | 19.23% | $461.64 | 19.46% | 81.00% |
| Internal Connections | $746.14 | 25.17% | $610.51 | 25.73% | 81.79% |
| Internal Connections-Maint | $132.30 | 4.46% | $79.36 | 3.34% | 59.83% |
| **TOTAL** | $2,964.10 | 100.00% | $2,372.48 | 100.00% | 80.03% |
| Deobligations due to Expired FRNs | ($588.79) | | | | |
| **Net Commitments** | $2,375.31 | | | | |

Funding commitments made to applicants during 3Q2021 are included in Appendix SL05. Authorized funding by applicant during 3Q2021 and cumulative payments to service providers through 3Q2021 are listed in Appendices SL06 and SL07, respectively.

**FUNDING YEAR 2013**

| | Net Commitments | | Net Authorized for Payment | | Auth/Com |
|---|---|---|---|---|---|
| | Millions of Dollars | % of Total Commitments | Millions of Dollars | % of Total Authorized for Payment | % of Committed Authorized for Payment |
| Telecommunications | $1,563.58 | 71.08% | $1,239.97 | 70.73% | 79.30% |
| Internet Access | $636.22 | 28.92% | $513.06 | 29.27% | 80.65% |
| Internal Connections | $0.00 | 0.00% | $0.00 | 0.00% | 0.00% |
| Internal Connections-Maint | $0.00 | 0.00% | $0.00 | 0.00% | 0.00% |
| **TOTAL** | $2,199.80 | 100.00% | $1,753.03 | 100.00% | 79.69% |
| Deobligations due to Expired FRNs | ($446.68) | | | | |
| **Net Commitments** | $1,753.12 | | | | |

Authorized funding by applicant during 3Q2021 and cumulative payments to service providers through 3Q2021 are listed in Appendices SL08 and SL09, respectively.

**FUNDING YEAR 2014**

| | Net Commitments | | Net Authorized for Payment | | Auth/Com |
|---|---|---|---|---|---|
| | **Millions of Dollars** | **% of Total Commitments** | **Millions of Dollars** | **% of Total Authorized for Payment** | **% of Committed Authorized for Payment** |
| Telecommunications | $1,629.41 | 69.49% | $1,301.81 | 69.51% | 79.90% |
| Internet Access | $715.45 | 30.51% | $570.90 | 30.49% | 79.80% |
| Internal Connections | $0.00 | 0.00% | $0.00 | 0.00% | 0.00% |
| Internal Connections-Maint | $0.00 | 0.00% | $0.00 | 0.00% | 0.00% |
| **TOTAL** | $2,344.86 | 100.00% | $1,872.71 | 100.00% | 79.87% |
| Deobligations due to Expired FRNs | ($471.82) | | | | |
| **Net Commitments** | $1,873.04 | | | | |

Funding commitments made to applicants during 3Q2021 are included in Appendix SL10. Authorized funding by applicant during 3Q2021 and cumulative payments to service providers through 3Q2021 are listed in Appendices SL11 and SL12, respectively.

**FUNDING YEAR 2015**

| | Net Commitments | | Net Authorized for Payment | | Auth/Com |
|---|---|---|---|---|---|
| | **Millions of Dollars** | **% of Total Commitments** | **Millions of Dollars** | **% of Total Authorized for Payment** | **% of Committed Authorized for Payment** |
| Telecommunications | $812.78 | 25.30% | $701.64 | 25.14% | 86.34% |
| Internet Access | $719.80 | 22.40% | $604.35 | 21.65% | 83.96% |
| Internal Connections | $1,157.33 | 36.02% | $1,096.66 | 39.27% | 94.70% |
| Internal Connections-Maint | $22.70 | 0.71% | $17.29 | 0.62% | 76.29% |
| MIBS | $23.16 | 0.72% | $13.13 | 0.47% | 56.75% |

| | | | | | |
|---|---|---|---|---|---|
| Voice | $477.17 | 14.85% | $358.34 | 12.84% | 75.13% |
| **TOTAL** | $3,212.94 | 100.00% | $2,791.41 | 100.00% | 86.87% |
| Deobligations due to Expired FRNs | ($412.95) | | | | |
| **Net Commitments** | $2,799.99 | | | | |

Funding commitments made to applicants during 3Q2021 are included in Appendix SL13. Authorized funding by applicant during 3Q2021 and cumulative payments to service providers through 3Q2021 are listed in Appendices SL14 and SL15, respectively.

**FUNDING YEAR 2016**

| FUNDING YEAR 2016 | | | | | |
|---|---|---|---|---|---|
| | Net Commitments | | Net Authorized for Payment | | Auth/Com |
| | Millions of Dollars | % of Total Commitments | Millions of Dollars | % of Total Authorized for Payment | % of Committed Authorized for Payment |
| Telecommunications | $0.00 | 0.00% | $0.00 | 0.00% | 0.00% |
| Internet Access | $1,653.15 | 59.70% | $1,374.46 | 58.60% | 83.11% |
| Internal Connections | $795.35 | 28.72% | $730.03 | 31.06% | 91.56% |
| Internal Connections-Maint | $23.25 | 0.84% | $15.60 | 0.67% | 67.24% |
| MIBS | $23.17 | 0.84% | $20.52 | 0.88% | 88.61% |
| Voice | $274.38 | 9.91% | $206.06 | 8.79% | 75.13% |
| **TOTAL** | $2,769.30 | 100.00% | $2,346.67 | 100.00% | 84.66% |
| Deobligations due to Expired FRNs | ($412.01) | | | | |
| **Net Commitments** | $2,357.29 | | | | |

Funding commitments made to applicants during 3Q2021 are included in Appendix SL16. Authorized funding by applicant during 3Q2021 and cumulative payments to service providers through 3Q2021 are listed in Appendices SL17 and SL18, respectively.

**FUNDING YEAR 2017**

| FUNDING YEAR 2017 | | | | | |
|---|---|---|---|---|---|
| | Net Commitments | | Net Authorized for Payment | | Auth/Com |
| | Millions of Dollars | % of Total Commitments | Millions of Dollars | % of Total Authorized for Payment | % of Committed Authorized for Payment |
| Telecommunications | $0.00 | 0.00% | $0.00 | 0.00% | 0.00% |
| Internet Access | $1,651.46 | 69.75% | $1,392.90 | 70.16% | 84.21% |
| Internal Connections | $542.79 | 22.92% | $472.22 | 23.65% | 86.38% |
| Internal Connections-Maint | $22.74 | 0.96% | $10.89 | 0.55% | 47.70% |
| MIBS | $25.35 | 1.07% | $20.10 | 1.01% | 79.28% |
| Voice | $125.36 | 5.29% | $91.83 | 4.63% | 73.28% |
| **TOTAL** | $2,367.70 | 100.00% | $1,987.94 | 100.00% | 83.73% |
| Deobligations due to Expired FRNs | ($330.06) | | | | |
| **Net Commitments** | $2,037.64 | | | | |

Funding commitments made to applicants during 3Q2021 are included in Appendix SL19. Authorized funding by applicant during 3Q2021 and cumulative payments to service providers through 3Q2021 are listed in Appendices SL20 and SL21, respectively.

**FUNDING YEAR 2018**

| FUNDING YEAR 2018 | | | | | |
|---|---|---|---|---|---|
| | Net Commitments | | Net Authorized for Payment | | Auth/Com |
| | Millions of Dollars | % of Total Commitments | Millions of Dollars | % of Total Authorized for Payment | % of Committed Authorized for Payment |
| Telecommunications | $0.00 | 0.00% | $0.00 | 0.00% | 0.00% |
| Internet Access | $1,746.96 | 75.98% | $1,509.26 | 75.50% | 83.00% |
| Internal Connections | $487.18 | 21.19% | $432.14 | 22.12% | 87.19% |
| Internal Connections-Maint | $22.70 | 0.99% | $11.75 | 0.59% | 49.64% |
| MIBS | $20.20 | 0.88% | $18.86 | 0.98% | 93.36% |
| Voice | $22.32 | 0.97% | $15.67 | 0.82% | 70.23% |

| TOTAL | $2,299.36 | 100.00% | $1,987.68 | 100.00% | 83.53% |
|---|---|---|---|---|---|
| Deobligations due to Expired FRNs | ($251.74) | | | | |
| Net Commitments | $2,047.62 | | | | |

Funding commitments made to applicants during 3Q2021 are included in Appendix SL22. Authorized funding by applicant during 3Q2021 and cumulative payments to service providers through 3Q2021 are listed in Appendices SL23 and SL24, respectively.

**FUNDING YEAR 2019**

| FUNDING YEAR 2019 | | | | | |
|---|---|---|---|---|---|
| | Net Commitments | | Net Authorized for Payment | | Auth/Com |
| | Millions of Dollars | % of Total Commitments | Millions of Dollars | % of Total Authorized for Payment | % of Committed Authorized for Payment |
| Telecommunications | $0.00 | 0.00% | $0.00 | 0.00% | 0.00% |
| Internet Access | $1,582.69 | 66.91% | $1,272.50 | 67.56% | 75.79% |
| Internal Connections | $739.17 | 31.14% | $582.77 | 30.94% | 73.33% |
| Internal Connections-Maint | $25.22 | 1.07% | $8.91 | 0.48% | 28.63% |
| MIBS | $20.86 | 0.88% | $19.21 | 1.02% | 92.09% |
| Voice | $0.00 | 0.00% | $0.00 | 0.00% | 0.00% |
| TOTAL | $2,367.94 | 100.00% | $1,833.39 | 100.00% | 79.54% |
| Deobligations due to Expired FRNs | ($149.65) | | | | |
| Net Commitments | $2,218.29 | | | | |

Funding commitments made to applicants during 3Q2021 are included in Appendix SL25. Authorized funding by applicant during 3Q2021 and cumulative payments to service providers through 3Q2021 are listed in Appendices SL26 and SL27, respectively.

**FUNDING YEAR 2020**

| | | FUNDING YEAR 2020 | | | |
|---|---|---|---|---|---|
| | **Net Commitments** | | **Net Authorized for Payment** | | **Auth/Com** |
| | **Millions of Dollars** | **% of Total Commitments** | **Millions of Dollars** | **% of Total Authorized for Payment** | **% of Committed Authorized for Payment** |
| Telecommunications | $0.00 | 0.00% | $0.00 | 0.00% | 0.00% |
| Internet Access | $1,498.65 | 63.56% | $933.88 | 65.64% | 62.32% |
| Internal Connections | $805.66 | 34.17% | $464.23 | 32.63% | 57.62% |
| Internal Connections-Maint | $26.34 | 1.12% | $5.06 | 0.36% | 19.21% |
| MIBS | $27.33 | 1.16% | $19.57 | 1.38% | 71.68% |
| Voice | $0.00 | 0.00% | $0.00 | 0.00% | 0.00% |
| **TOTAL** | $2,357.98 | 100.00% | $1,422.74 | 100.00% | 60.34% |
| Deobligations due to Expired FRNs | $21.63 | | | | |
| **Net Commitments** | $2,379.61 | | | | |

Funding commitments made to applicants during 3Q2021 are included in Appendix SL28. Authorized funding by applicant during 3Q2021 and cumulative payments to service providers through 3Q2021 are listed in Appendices SL29 and SL30, respectively.

## FCC DECISIONS AND UNUSED FUNDS

In the *Schools and Libraries Third Report and Order*, the Commission amended its rules to allow unused funds from prior Funding Years to be carried forward on an annual basis in the second quarter of each calendar year for use in the next full Funding Year.[65] The Commission required USAC to file quarterly estimates of unused funds from prior Funding Years in submitting its projection of Schools and Libraries Support Mechanism demand for the upcoming quarter.

---

[65]  *Schools and Libraries Universal Service Support Mechanism,* CC Docket No. 02-6, *Third Report and Order and Second Further Notice of Proposed Rulemaking,* 18 FCC Rcd 26912, paras. 52-57 (2003) (*Schools and Libraries Third Report and Order*).

The following is a summary of estimated unused funds as of September 30, 2021 for each funding year, including adjustments made by the Commission and projections of unused funds as required by Commission rules.

*Funding Year 1998*

Funding Year 1998 began on July 1, 1998 and ended on June 30, 1999.  Balances as of September 30, 2021 are as follows:

| FY 1998 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $1,925.00 |
| Amount Authorized for Disbursement | ($1,398.97) |
| Administrative Expenses (21 months) | ($41.79) |
| Amount Carried Forward / Backward | ($7.08) |
| Amount Applied to Adjust 2000, 2001, and 2002 Collections | ($477.16) |
| Potential Additional Disbursements on Committed FRNs | $0.00 |
| Reserve for USAC Appeals | ($0.01) |
| Reserve for FCC Appeals | ($0.35) |
| **Estimated Remaining Balance** | **($0.36)** |

*Funding Year 1999*

Funding Year 1999 began on July 1, 1999 and ended on June 30, 2000.  Balances as of September 30, 2021 are as follows:

| FY 1999 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $2,250.00 |
| Amount Authorized for Disbursement | ($1,649.98) |
| Administrative Expenses | ($32.32) |
| Amount Applied to Adjust Third Quarter 2002 Collections | ($256.16) |
| Amount Applied to Adjust Fourth Quarter 2002 Collections | ($212.93) |
| Amount Carried Forward / Backward | ($94.60) |
| Amount Received from Rollover | $0.00 |
| Reserve for USAC Appeals | ($0.00) |
| Reserve for FCC Appeals | ($4.88) |
| **Estimated Remaining Balance** | **($0.87)** |

### Funding Year 2000

Funding Year 2000 began on July 1, 2000 and ended on June 30, 2001. Balances as of September 30, 2021 are as follows:

| FY 2000 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $2,250.00 |
| Amount Authorized for Disbursement | ($1,646.94) |
| Administrative Expenses | ($32.24) |
| Amount Applied to Adjust Fourth Quarter 2002 Collections | ($136.85) |
| Amount Applied to Adjust First Quarter 2003 Collections | ($246.18) |
| Amount Carried Forward / Backward | ($182.65) |
| Reserve for FCC Appeals | ($5.13) |
| **Estimated Remaining Balance** | **$0.01** |

### Funding Year 2001

Funding Year 2001 began on July 1, 2001 and ended on June 30, 2002. Balances as of September 30, 2021 are as follows:

| FY 2001 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $2,250.00 |
| Amount Authorized for Disbursement | ($1,676.77) |
| Administrative Expenses | ($30.56) |
| Amount Carried Forward / Backward | ($489.28) |
| Remaining Uncommitted Requests | ($20.33) |
| Reserve for USAC Appeals | ($11.25) |
| Reserve for FCC Appeals | ($24.30) |
| **Estimated Remaining Balance** | **($2.49)** |

### Funding Year 2002

Funding Year 2002 began on July 1, 2002 and ended on June 30, 2003. Balances as of September 30, 2021 are as follows:

| FY 2002 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $2,250.00 |
| Amount Authorized for Disbursement | ($1,594.20) |
| Administrative Expenses | ($38.53) |
| Amount Carried Forward / Backward | ($594.10) |
| Potential Additional Disbursements on Committed FRNs | $0.00 |
| Remaining Uncommitted Requests | ($0.93) |
| Reserve for USAC Appeals | ($0.00) |
| Reserve for FCC Appeals | ($22.43) |
| **Estimated Remaining Balance** | **($0.19)** |

## *Funding Year 2003*

Funding Year 2003 began on July 1, 2003 and ended on June 30, 2004. Balances as

of September 30, 2021 are as follows:

| FY 2003 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $2,250.00 |
| Amount Authorized for Disbursement | ($1,937.51) |
| Administrative Expenses | ($44.19) |
| Amount Carried Forward / Backward | ($640.82) |
| Amount Received from Rollover | $420.00 |
| Potential Additional Disbursements on Committed FRNs | ($0.06) |
| Remaining Uncommitted Requests | ($32.83) |
| Reserve for USAC Appeals | ($0.00) |
| Reserve for FCC Appeals | ($17.23) |
| **Estimated Remaining Balance** | **($2.64)** |

## *Funding Year 2004*

Funding Year 2004 began on July 1, 2004 and ended on June 30, 2005. Balances as

of September 30, 2021 are as follows:

| FY 2004 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $2,250.00 |
| Amount Authorized for Disbursement | ($1,535.24) |
| Administrative Expenses | ($55.75) |

| | |
|---|---|
| Amount Carried Forward / Backward | ($723.47) |
| Amount Received from Rollover | $150.00 |
| Amount Applied to Adjust Collections | ($550.00) |
| Adjustment for Reduction in Collections | $550.00 |
| Potential Additional Disbursements on Committed FRNs | ($0.25) |
| Reserve for USAC Appeals | ($0.00) |
| Reserve for FCC Appeals | ($85.29) |
| **Estimated Remaining Balance** | **$0.00** |

## *Funding Year 2005*

Funding Year 2005 began on July 1, 2005 and ended on June 30, 2006. Balances as

of September 30, 2021 are as follows:

| FY 2005 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $2,250.00 |
| Amount Authorized for Disbursement | ($1,623.29) |
| Administrative Expenses | ($64.99) |
| Amount Carried Forward / Backward | ($533.61) |
| Potential Additional Disbursements on Committed FRNs | ($0.08) |
| Remaining Uncommitted Requests | ($0.16) |
| Reserve for USAC Appeals | ($0.00) |
| Reserve for FCC Appeals | ($27.69) |
| **Estimated Remaining Balance** | **$0.18** |

## *Funding Year 2006*

Funding Year 2006 began on July 1, 2006 and ended on June 30, 2007. Balances as

of September 30, 2021 are as follows:

| FY 2006 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $2,250.00 |
| Amount Authorized for Disbursement | ($1,566.74) |
| Administrative Expenses | ($80.74) |
| Amount Carried Forward / Backward | ($584.65) |
| Potential Additional Disbursements on Committed FRNs | ($0.25) |
| Remaining Uncommitted Requests | ($0.00) |
| Reserve for USAC Appeals | ($0.38) |

| | |
|---|---|
| Reserve for FCC Appeals | ($16.21) |
| **Estimated Remaining Balance** | **$1.03** |

## *Funding Year 2007*

Funding Year 2007 began on July 1, 2007 and ended on June 30, 2008.  Balances as

of September 30, 2021 are as follows:

| FY 2007 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $2,250.00 |
| Amount Authorized for Disbursement | ($1,952.95) |
| Administrative Expenses | ($81.24) |
| Amount Carried Forward / Backward | ($850.23) |
| Amount Received from Rollover | $650.00 |
| Remaining Uncommitted Requests | ($0.94) |
| Reserve for USAC Appeals | ($0.06) |
| Reserve for FCC Appeals | ($14.55) |
| **Estimated Remaining Balance** | **$0.03** |

## *Funding Year 2008*

Funding Year 2008 began on July 1, 2008 and ended on June 30, 2009.  Balances as

of September 30, 2021 are as follows:

| FY 2008 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $2,250.00 |
| Amount Authorized for Disbursement | ($1,926.49) |
| Administrative Expenses | ($125.59) |
| Amount Carried Forward / Backward | ($778.39) |
| Amount Received from Rollover | $600.00 |
| Potential Additional Disbursements on Committed FRNs | ($0.00) |
| Remaining Uncommitted Requests | ($0.00) |
| Reserve for USAC Appeals | ($0.59) |
| Reserve for FCC Appeals | ($19.17) |
| **Estimated Remaining Balance** | **($0.23)** |

JA262

## Funding Year 2009

Funding Year 2009 began on July 1, 2009 and ended on June 30, 2010. Balances as of September 30, 2021 are as follows:

| FY 2009 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $2,250.00 |
| Amount Authorized for Disbursement | ($2,332.97) |
| Administrative Expenses | ($81.27) |
| Amount Carried Forward / Backward | ($726.67) |
| Amount Received from Rollover | $900.00 |
| Potential Additional Disbursements on Committed FRNs | ($0.26) |
| Reserved for Invoices Awaiting Approval Expired FRNs | ($0.00) |
| Remaining Uncommitted Requests | ($0.02) |
| Reserve for USAC Appeals | ($0.00) |
| Reserve for FCC Appeals | ($10.18) |
| **Estimated Remaining Balance** | **($1.37)** |

## Funding Year 2010

Funding Year 2010 began on July 1, 2010 and ended on June 30, 2011. Balances as of September 30, 2021 are as follows:

| FY 2010 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $2,270.25 |
| Amount Authorized for Disbursement | ($2,450.37) |
| Administrative Expenses | ($75.33) |
| Amount Carried Forward / Backward | ($740.73) |
| Amount Received from Rollover | $1,150.00 |
| Amount Applied to Adjust Collections FY2004 | ($140.00) |
| Potential Additional Disbursements on Committed FRNs | ($5.01) |
| Reserved for Invoices Awaiting Approval Expired FRNs | ($0.00) |
| Reserve for USAC Appeals | ($0.76) |
| Reserve for FCC Appeals | ($14.32) |
| **Estimated Remaining Balance** | **($6.27)** |

*Funding Year 2011*

Funding Year 2011 began on July 1, 2011 and ended on June 30, 2012. Balances as

of September 30, 2021 are as follows:

| FY 2011 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $2,290.68 |
| Amount Authorized for Disbursement | ($2,151.03) |
| Administrative Expenses | ($69.17) |
| Amount Carried Forward / Backward | ($649.83) |
| Amount Received from Rollover | $850.00 |
| Amount Applied to Adjust Collections FY2004 | ($250.00) |
| Potential Additional Disbursements on Committed FRNs | ($1.16) |
| Reserved for Invoices Awaiting Approval Expired FRNs | ($0.00) |
| Remaining Uncommitted Requests | ($0.00) |
| Reserve for USAC Appeals | ($0.36) |
| Reserve for FCC Appeals | ($13.59) |
| **Estimated Remaining Balance** | **$5.54** |

*Funding Year 2012*

Funding Year 2012 began on July 1, 2012 and ended on June 30, 2013. Balances as

of June30, 2021 are as follows:

| FY 2012 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $2,338.80 |
| Amount Authorized for Disbursement | ($2,372.48) |
| Administrative Expenses | ($67.31) |
| Amount Carried Forward / Backward | ($881.49) |
| Amount Received from Rollover | $1,050.00 |
| Amount Applied to Adjust Collections FY2004 | ($40.00) |
| Potential Additional Disbursements on Committed FRNs | ($2.83) |
| Reserved for Invoices Awaiting Approval Expired FRNs | ($1.08) |
| Remaining Uncommitted Requests | ($0.60) |
| Reserve for USAC Appeals | ($1.15) |
| Reserve for FCC Appeals | ($12.55) |
| **Estimated Remaining Balance** | **$9.31** |

*Funding Year 2013*

Funding Year 2013 began on July 1, 2013 and ended on June 30, 2014. Balances as

of September 30, 2021 are as follows:

| FY 2013 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $2,380.30 |
| Amount Authorized for Disbursement | ($1,753.03) |
| Administrative Expenses | ($62.90) |
| Amount Carried Forward / Backward | ($878.13) |
| Amount Received from Rollover | $450.00 |
| Amount Applied to Adjust Collections FY2004 | ($120.00) |
| Potential Additional Disbursements on Committed FRNs | ($0.09) |
| Reserved for Invoices Awaiting Approval Expired FRNs | ($0.24) |
| Remaining Uncommitted Requests | ($1.38) |
| Reserve for USAC Appeals | ($0.29) |
| Reserve for FCC Appeals | ($12.39) |
| **Estimated Remaining Balance** | **$1.85** |

*Funding Year 2014*

Funding Year 2014 began on July 1, 2014 and ended on June 30, 2015. Balances as

of September 30, 2021 are as follows:

| FY 2014 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $2,413.82 |
| Amount Authorized for Disbursement | ($1,872.71) |
| Administrative Expenses | ($74.94) |
| Amount Carried Forward / Backward | ($649.50) |
| Amount Received from Rollover | $200.00 |
| Potential Additional Disbursements on Committed FRNs | ($0.33) |
| Reserved for Invoices Awaiting Approval Expired FRNs | ($0.05) |
| Remaining Uncommitted Requests | ($0.48) |
| Reserve for USAC Appeals | ($6.04) |
| Reserve for FCC Appeals | ($14.18) |
| **Estimated Remaining Balance** | **($4.41)** |

*Funding Year 2015*

Funding Year 2015 began on July 1, 2015 and ended on June 30, 2016. Balances as of September 30, 2021 are as follows:

| FY 2015 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $2,250.00 |
| Amount Authorized for Disbursement | ($2,791.41) |
| Administrative Expenses | ($103.04) |
| Amount Carried Forward / Backward | ($915.51) |
| Amount Received from Rollover | $1,575.05 |
| Potential Additional Disbursements on Committed FRNs | ($8.58) |
| Reserved for Invoices Awaiting Approval Expired FRNs | ($0.52) |
| Remaining Uncommitted Requests | ($0.40) |
| Reserve for USAC Appeals | ($27.39) |
| Reserve for FCC Appeals | ($9.47) |
| **Estimated Remaining Balance** | **($31.27)** |

*Funding Year 2016*

Funding Year 2016 began on July 1, 2016 and ended on June 30, 2017. Balances as of September 30, 2021 are as follows:

| FY 2016 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $1,842.25 |
| Amount Authorized for Disbursement | ($2,346.67) |
| Administrative Expenses | ($120.35) |
| Amount Carried Forward / Backward | ($1,240.81) |
| Amount Received from Rollover | $1,900.00 |
| Potential Additional Disbursements on Committed FRNs | ($10.62) |
| Reserved for Invoices Awaiting Approval Expired FRNs | ($0.24) |
| Remaining Uncommitted Requests | ($0.06) |
| Reserve for USAC Appeals | ($2.18) |
| Reserve for FCC Appeals | ($22.75) |
| **Estimated Remaining Balance** | **($1.43)** |

*Funding Year 2017*

Funding Year 2017 began on July 1, 2017 and ended on June 30, 2018.  Balances as of September 30, 2021 are as follows:

| FY 2017 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $2,064.22 |
| Amount Authorized for Disbursement | ($1,987.94) |
| Administrative Expenses | ($110.67) |
| Amount Carried Forward / Backward | ($1,104.10) |
| Amount Received from Rollover | $1,200.24 |
| Potential Additional Disbursements on Committed FRNs | ($49.70) |
| Reserved for Invoices Awaiting Approval Expired FRNs | ($3.26) |
| Remaining Uncommitted Requests | ($0.40) |
| Reserve for USAC Appeals | ($5.28) |
| Reserve for FCC Appeals | ($11.97) |
| **Estimated Remaining Balance** | **($8.86)** |

*Funding Year 2018*

Funding Year 2018 began on July 1, 2018 and ended on June 30, 2019.  Balances as of September 30, 2021 are as follows:

| FY 2018 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $1,629.45 |
| Amount Authorized for Disbursement | ($1,987.70) |
| Administrative Expenses | ($97.28) |
| Amount Carried Forward / Backward | ($640.49) |
| Amount Received from Rollover | $1,200.00 |
| Potential Additional Disbursements on Committed FRNs | ($59.92) |
| Reserved for Invoices Awaiting Approval Expired FRNs | ($3.85) |
| Remaining Uncommitted Requests | ($1.21) |
| Reserve for USAC Appeals | ($8.42) |
| Reserve for FCC Appeals | ($27.85) |
| **Estimated Remaining Balance** | **$2.73** |

## *Funding Year 2019*

Funding Year 2019 began on July 1, 2019 and ended on June 30, 2020. Balances as of September 30, 2021 are as follows:

| FY 2019 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $1,699.18 |
| Amount Authorized for Disbursement | ($1,883.39) |
| Administrative Expenses | ($74.11) |
| Amount Carried Forward / Backward | ($241.15) |
| Amount Received from Rollover | $1,000.00 |
| Potential Additional Disbursements on Committed FRNs | ($334.90) |
| Reserved for Invoices Awaiting Approval Expired FRNs | ($6.34) |
| Remaining Uncommitted Requests | ($8.68) |
| Reserve for USAC Appeals | ($5.92) |
| Reserve for FCC Appeals | ($46.53) |
| **Estimated Remaining Balance** | **$98.16** |

## *Funding Year 2020*

Funding Year 2020 began on July 1, 2020 and ended on September 30, 2021. Balances as of September 30, 2021 are as follows:

| FY 2020 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $2,313.05 |
| Amount Authorized for Disbursement | ($1,422.76) |
| Administrative Expenses | ($75.08) |
| Amount Carried Forward / Backward | ($148.01) |
| Amount Received from Rollover | $500.00 |
| Potential Additional Disbursements on Committed FRNs | ($956.85) |
| Reserved for Invoices Awaiting Approval Expired FRNs | $0.00 |
| Remaining Uncommitted Requests | ($244.06) |
| Reserve for USAC Appeals | ($14.76) |
| Reserve for FCC Appeals | ($8.58) |
| **Estimated Remaining Balance** | **($57.05)** |

**SCHOOLS AND LIBRARIES SUPPORT MECHANISM SUMMARY**

On March 19, 2021, the FCC announced the funding cap for Funding Year 2021 of $4,276.83 million.[66] This reflects a 1.2 percent inflation-adjusted increase to the $4,226.12 million cap from Funding Year 2020.[67] The filing window for Funding Year 2021 closed on March 25, 2021. Based on applications received, USAC estimates demand for Funding Year 2021 will be $2,793.54 million (net of projected post window close adjustments).

In consultation with the FCC, USAC projects that a total of $500 million will be available to carry-forward to Funding Year 2021 from prior funding years as follows, 2000: $0.03 million; 2001: $27.52 million; 2004: $3.71 million; 2005: $5.12 million; 2006: $0.76 million; 2007: $0.41 million; 2008: $0.07 million; 2011: $3.10 million; 2013: $1.98 million; 2014: $2.84 million; 2016: $6.69 million; 2017: $31.43 million; 2018: $99.44 million; 2019: $168.89 million; and 2020: $148.01 million (net of funds carried back to funding years with a negative carry forward balance). Based on the estimated demand of $2,793.54 million, and funds carried forward of $500.00 million, the collections requirement for Funding Year 2021 is $573.39 million, which is one quarter of demand for Funding Year 2021.

The net fund requirement of $573.39 million is adjusted as follows: increased by the prior period adjustments of $45.58 million[68] and increased by $18.98 million for administrative expenses; resulting in a total projected 1Q2022 funding requirement for the Schools and Libraries Support Mechanism of $637.95 million.

---

[66] *See Wireline Competition Bureau Announces E-Rate and RHC Programs' Inflation-Based Caps for Funding Year 2021,* CC Docket No. 02-6, WC Docket No. 02-60, Public Notice, DA 21-332 (2021).

[67] *Id.*

[68] Prior period adjustments reconcile projections to actual results and include adjustments for billings, interest income, and bad debt.

## *AUTHORIZATION TO FILE WITH THE COMMISSION*

At their October 25, 2021 meeting, USAC's High Cost & Low Income, and Schools & Libraries Committees adopted resolutions authorizing USAC staff to file with the Commission the 1Q2022 projected support mechanism funding requirements described herein. On October 26, 2021, USAC's Rural Health Care Committee voted via email, authorizing USAC staff to file with the Commission the 1Q2022 projected support mechanism funding requirement. At their October 26, 2021 meeting, the USAC Board of Directors adopted a resolution authorizing the inclusion of the projected 1Q2022 administrative expenses in this report to the Commission.

Respectfully submitted,

UNIVERSAL SERVICE
ADMINISTRATIVE COMPANY

Michelle Garber, Vice President of Finance and
Chief Financial Officer

November 2, 2021

July 15, 2022

/s/ R. Trent McCotter
C. Boyden Gray
R. Trent McCotter
Jonathan Berry
Michael Buschbacher
Jared M. Kelson
BOYDEN GRAY & ASSOCIATES
801 17th Street NW, Suite 350
Washington, DC 20006
202-706-5488
*Counsel for Petitioners*

/s/ James M. Carr
P. Michele Ellison
Jacob M. Lewis
James M. Carr
Adam G. Crews
FEDERAL COMMUNICATIONS
COMMISSION
Washington, DC 20554
202-418-1740

/s/ Gerard J. Sinzdak
Brian M. Boynton
Sarah E. Harrington
Mark B. Stern
Gerard J. Sinzdak
UNITED STATES DEPARTMENT OF
JUSTICE
Washington, DC 20530
*Counsel for Respondents*

/s/ Stephanie Weiner
Stephanie Weiner
Jason Neal
HARRIS, WILTSHIRE & GRANNIS
LLP
1919 M Street NW, 8th Floor
Washington, DC 20036
202-730-1300
*Counsel for Intervenor Schools,
Health, & Libraries Broadband
Coalition*

/s/ Andrew Jay Schwartzman
Andrew Jay Schwartzman
1341 G Street NW, 5th Floor
Washington, DC 20005
202-241-2408
*Counsel for Intervenors Benton
Institute for Broadband &
Society, National Digital
Inclusion Alliance, and Center for
Media Justice d/b/a
MediaJustice*

/s/ Jennifer Tatel
Jennifer Tatel
Craig E. Gilmore
WILKINSON BARKER KNAUER, LLP
1800 M Street NW, Suite 800N
Washington, DC 20036
202-783-4141
*Counsel for Intervenors
USTelecom, NTCA, and CCA*

# <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 15, 2022, I electronically filed the foregoing document with the Clerk of this Court by using the CM/ECF system, which will serve all parties automatically.

Dated: July 15, 2022

<u>/s/ R. Trent McCotter</u>
R. Trent McCotter
Boyden Gray & Associates
801 17th St NW, #350
Washington, DC 20006
(202) 706-5488