No. 22-60008

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

**CONSUMERS' RESEARCH; CAUSE BASED COMMERCE, INCORPORATED; KERSTEN CONWAY; SUZANNE BETTAC; ROBERT KULL; KWANG JA KERBY; TOM KIRBY; JOSEPH BAYLY; JEREMY ROTH; DEANNA ROTH; LYNN GIBBS; PAUL GIBBS; RHONDA THOMAS,**

*Petitioners,*

v.

**FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES OF AMERICA,**

*Respondents.*

Petition for Review of an Order of the
Federal Communications Commission
Agency No. 96-45

**REPLY BRIEF FOR PETITIONERS**

C. Boyden Gray
R. Trent McCotter
  *Counsel of Record*
Jonathan Berry
Michael Buschbacher
Jared M. Kelson
BOYDEN GRAY & ASSOCIATES
801 17th Street NW, Suite 350
Washington, DC 20006
202-706-5488
mccotter@boydengrayassociates.com
*Counsel for Petitioners*

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

*Consumers' Research et al. v. Federal Communications Commission et al.*
No. 22-60008

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Local Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

*Petitioners*

1.    Consumers' Research. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

2.    Cause Based Commerce, Incorporated. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

3.    Kersten Conway

4.    Suzanne Bettac

5.    Robert Kull

6.    Kwang Ja Kirby

7.    Tom Kirby

i

8.   Joseph Bayly

9.   Jeremy Roth

10.   Deanna Roth

11.   Lynn Gibbs

12.   Paul Gibbs

13.   Rhonda Thomas

*Respondents*

14.   Federal Communications Commission

15.   United States of America

*Intervenors*

16.   Benton Institute for Broadband & Society

17.   National Digital Inclusion Alliance

18.   Center for Media Justice (d/b/a MediaJustice)

19.   Schools, Health & Libraries Broadband Coalition

20.   National Telecommunications Cooperative Association (d/b/a

NTCA – The Rural Broadband Association)

21.   Competitive Carriers Association

*Counsel*

22.     Boyden Gray & Associates PLLC: C. Boyden Gray, R. Trent McCotter, Jonathan Berry, Michael Buschbacher, and Jared M. Kelson are counsel for Petitioners.

23.     Federal Communications Commission: James M. Carr, Adam Crews, and Jacob M. Lewis are counsel for Respondent FCC.

24.     United States Department of Justice: Gerard J. Sinzdak is counsel for Respondent United States of America.

25.     Andrew Jay Schwartzman is counsel for Intervenors Benton Institute for Broadband & Society, National Digital Inclusion Alliance, and Center for Media Justice (d/b/a MediaJustice).

26.     Harris, Wiltshire & Grannis, LLP: Jason Neal and Stephanie Weiner are counsel for Intervenors Schools, Health & Libraries Broadband Coalition.

27.     Wilkinson, Barker & Knauer LLP: Jennifer Tatel and Craig Gilmore are counsel for USTelecom – The Broadband Association; National Telecommunications Cooperative Association (d/b/a NTCA – The Rural Broadband Association); and Competitive Carriers Association.

Dated: July 15, 2022                    /s/ R. Trent McCotter
                                        R. Trent McCotter
                                        *Counsel of Record for Petitioners*

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................ v

TABLE OF AUTHORITIES .................................................................. vi

INTRODUCTION AND SUMMARY .................................................... 1

ARGUMENT ........................................................................................ 6

I.     The Petition Was Timely Filed .................................................. 6

II.    The Universal Service Fund Is an Unconstitutional
       Delegation of Legislative Power ............................................... 16

       A.  Section 254 Violates the Original Understanding of
           Nondelegation ..................................................................... 16

       B.  Section 254 Violates the Intelligible-Principle Test ........... 18

           1.   What Qualifies As an "Intelligible Principle"
                Depends on Context ...................................................... 18

           2.   Section 254 Fails to Impose the Objective and
                Discrete Limitations Required in the Context of
                Revenue-Raising Statutes ............................................. 21

           3.   Section 254(b) Imposes No Meaningful Implied
                Limitations, Especially in Light of Congress's Dual-
                Layer Delegation to the FCC ....................................... 25

           4.   Section 254(c) Suffers from the Same Flaws As §
                254(b) ........................................................................... 31

           5.   The Government's Kitchen-Sink Approach Reveals
                the Lack of Meaningful Limitations on the FCC's
                Power ........................................................................... 34

III.   The Nondelegation Violations Here Are Particularly
       Egregious Because They Involve Congress's Exclusive
       Power to Levy Taxes .................................................................. 38

IV.    The FCC's Delegation to USAC Violates the Private
       Nondelegation Doctrine ............................................................ 42

CONCLUSION ...................................................................................... 48

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*A.L.A. Schechter Poultry Corp. v. United States,*
  295 U.S. 495 (1935) .................................................................. 27, 35

*Alenco Commc'ns, Inc. v. FCC*, 201 F.3d 608 (5th Cir. 2000) ... 22, 35, 36

*Am. Power & Light Co. v. SEC*, 329 U.S. 90 (1946) ......................... 4, 19

*Arbuckle Mountain Ranch of Tex., Inc. v. Chesapeake Energy
  Corp.*, 810 F.3d 335 (5th Cir. 2016) ..................................... 15

*Biden v. Texas*, __ S. Ct. __, 2022 WL 2347211 (June 30, 2022) ........... 12

*Columbia Broad. Sys. v. United States*, 316 U.S. 407 (1942) .......... 11, 14

*Dunn-McCampbell Royalty Int., Inc. v. Nat'l Park Serv.,*
  112 F.3d 1283 (5th Cir. 1997) ........................................... 8–9

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
  561 U.S. 477 (2010) ................................................... 14, 28

*Functional Music, Inc. v. FCC*, 274 F.2d 543 (D.C. Cir. 1958) ............... 8

*Glob. Van Lines, Inc. v. ICC*, 691 F.2d 773 (5th Cir. 1982) ................... 15

*Gundy v. United States*, 139 S. Ct. 2116 (2019) ............................. 16, 18

*In re Incomnet, Inc.*, 463 F.3d 1064 (9th Cir. 2006) ............................. 46

*Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022) ................................. 30–32

*J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394 (1928) ..... 17–18

*Lichter v. United States*, 334, U.S. 742 (1948) ...................................... 20

*Mistretta v. United States*, 488 U.S. 361(1989) ............................... 18, 20

*Nat'l Ass'n of Reversionary Prop. Owners v. Surface Transp. Bd.*,
  158 F.3d 135 (D.C. Cir. 1998) .......................................... 12

*National Broadcasting Co. v. United States*, 319 U.S. 190 (1943)......... 24

*NCTA v. United States*, 415 U.S. 336 (1974) ................. 17–18, 23, 39, 40

*Panama Refin. Co. v. Ryan*, 293 U.S. 388 (1935) ............... 20, 32, 35, 36

*PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*,
  139 S. Ct. 2051 (2019) ....................................................... 14

*Qwest Communications Int'l, Inc. v. FCC*,
  398 F.3d 1222 (10th Cir. 2005) ........................................ 28

*Qwest Corp. v. FCC*, 258 F.3d 1191 (10th Cir. 2001) ..................... 28–29

*Radio-Television New Directors Ass'n v. FCC*,
  229 F.3d 269 (D.C. Cir. 2000) .......................................... 15

*Rural Cellular Ass'n v. FCC*, 588 F.3d 1095 (D.C. Cir. 2009) .............. 22

*Rural Cellular Ass'n v. FCC*, 685 F.3d 1083 (D.C. Cir. 2012) .............. 41

*Skinner v. Mid-Am. Pipeline Co.*,
  490 U.S. 212 (1989) ........................................4, 18–25, 30–31, 38–40

*State v. Rettig*, 987 F.3d 518 (5th Cir. 2021) .................. 8–12, 43–44, 47

*Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381 (1940) ............. 47

*Tex. Off. of Pub. Util. Couns. v. FCC*,
  183 F.3d 393 (5th Cir. 1999) .......................................... 26, 41

*Tex. Off. of Pub. Util. Couns. v. FCC*,
  265 F.3d 313 (5th Cir. 2001) ............................................ 4, 16–17, 26

*Texas v. Biden*, 20 F.4th 928 (5th Cir. 2021) ......................................... 12

*Texas v. Rettig*, 993 F.3d 408 (5th Cir. 2021) ............................ 20, 43, 48

*Trafigura Trading LLC v. United States,*
   29 F.4th 286 (5th Cir. 2022) ...................................................... 39–40

*U.S. ex rel. Shupe v. Cisco Sys., Inc.*, 759 F.3d 379 (5th Cir. 2014) ....... 42

*United States v. Frame*, 885 F.2d 1119 (3d Cir. 1989) .................... 46–47

*Wayman v. Southard*, 23 U.S. 1, 43 (1825) ........................................... 17

*Weaver v. Fed. Motor Carrier Safety Admin.,*
   744 F.3d 142 (D.C. Cir. 2014) ........................................................... 11

*Whitman v. Am. Trucking Ass'ns,*
   531 U.S. 457 (2001) .....................................4, 18–19, 25–27, 34, 36, 44

## PUBLIC LAWS AND U.S. CODE

28 U.S.C. § 2112 ...................................................................................... 15

28 U.S.C. § 2344 ........................................................................................ 6

47 U.S.C. § 151 ......................................................................................... 39

47 U.S.C. § 153 ......................................................................................... 32

47 U.S.C. § 254 .............................................. 21–22, 26, 29, 32–34, 36–38

47 U.S.C. § 402 ......................................................................................... 12

## REGULATORY MATERIALS

47 C.F.R. § 54 .................................................................................... 10, 13

*In re Federal-State Joint Bd. on Universal Service*, 18 FCC Rcd.
   4818 (2003)........................................................................................ 45

*In re Universal Service Contribution Methodology*, 34 FCC Rcd.
   4143 (2019)........................................................................................ 45

Proposed Third Quarter 2022 Universal Service Contribution
    Factor, June 9, 2022,
    https://docs.fcc.gov/public/attachments/DA-22-623A1.pdf .................. 1

*Wireline Competition Bureau Provides Guidance to the Universal
    Service Administrative Company Regarding the High-Cost
    Universal Service Mechanism Budget*, 32 FCC Rcd. 9243 (2017)  .... 45

### MISCELLANEOUS

Barbara A. Cherry & Donald D. Nystrom, *Universal Service
    Contributions: An Unconstitutional Delegation of Taxing Power*,
    2000 L. Rev. Mich. St. U. Det. C.L. 107 (2000) ................................... 2

Philip Hamburger, *Is Administrative Law Unlawful?* (2014) .............. 17

Merriam-Webster Online Dictionary, https://www.merriam-
    webster.com/dictionary ............................................................ 21, 34

## INTRODUCTION AND SUMMARY

In their opening brief, Petitioners described the uniquely broad power that Congress delegated to the FCC to raise revenue from nearly every American for the Universal Service Fund and how the FCC had subsequently redelegated that power to USAC, a private company. Petitioners explained that Congress imposed no meaningful objective or implied limitations on how much money the FCC or USAC could raise, and Congress even gave the FCC the power to perpetually redefine what "universal service" means. The lack of objective guardrails has unsurprisingly resulted in skyrocketing quarterly tax rates for the Universal Service Fund, which now collects nearly 25 times the FCC's annual budget and just announced another near-record rate of 33% for the third quarter 2022. *Proposed Third Quarter 2022 Universal Service Contribution Factor*, June 9, 2022, https://docs.fcc.gov/public/attachments/DA-22-623A1.pdf.

As legal scholars have long noted, "[u]nlike the thousands of responsibilities carried out by governmental agencies on behalf of Congress, this delegation is unique because of the unfettered power given to the FCC in defining the scope of universal service, and because

Congress delegated the power to levy a tax to pay for the service with no limits, knowing that the end user, the American public, would ultimately be saddled with the burden." Barbara A. Cherry & Donald D. Nystrom, *Universal Service Contributions: An Unconstitutional Delegation of Taxing Power*, 2000 L. Rev. Mich. St. U. Det. C.L. 107, 110 (2000).

Petitioners demonstrated that this arrangement violates the original understanding of the nondelegation doctrine, *see* Pet.Br. 29–35, the modern intelligible-principle doctrine, *see id.* at 35–45, and the private nondelegation doctrine, *see id.* at 60–66. Accordingly, Petitioners asked the Court to vacate and set aside the FCC's approval of the *Proposed First Quarter 2022 Universal Service Contribution Factor*.

In response, the government[1] first argues that Petitioners' challenge is untimely even though they filed this case only nine days after the 2022 First Quarter rate was deemed approved. In the government's view, Petitioners are barred from challenging the constitutionality of that approval, even though Petitioners are required to pay money into the

---

[1] Unless otherwise noted, Petitioners refer to the FCC, the United States, and their supporting intervenors collectively as "the government." The brief of Intervenors Schools, Health & Libraries Broadband Coalition is cited as "SHLB.Br." The brief of Intervenors USTelecom, NTCA, and CCA is cited as "Suppliers.Br."

Universal Service Fund for the First Quarter 2022 solely because of that approval. The government's attempt to avoid judicial review of this agency action runs headlong into decades of this Court's precedents allowing a party affected by agency action to challenge the constitutionality of that action, even if it turns in part on agency regulations previously issued. *See* Part I, *infra*.

On the merits, the government barely responds to Petitioners' argument that 47 U.S.C. § 254—which established the Universal Service Fund and its funding mechanism—violates the original understanding of nondelegation, whereby Congress cannot pass significant policy choices to the executive branch, especially when the policy includes raising taxes. *See* Part II.A, *infra*.

Petitioners also demonstrated that § 254 violates the modern intelligible-principle test because § 254 includes a unique combination of authorities granted to an executive agency in the context of raising revenue, where precedents have involved at least some kind of objective limitation on how much money an agency can raise. There are no such limitations here. Congress defined "universal service" using a vague list of principles that this Court and even the FCC itself have labeled as

"aspirational," *Tex. Off. of Pub. Util. Couns. v. FCC* ("*TOPUC II*"), 265 F.3d 313, 321 (5th Cir. 2001), and the FCC can even add to those principles and redefine universal service whenever it wishes.

In response, the government claims these amorphous, precatory clauses provide a meaningful limitation on the FCC's power. But the skyrocketing rates charged by the FCC disprove any notion that the FCC is truly, meaningfully limited. And even if some clauses the government cites could seem to limit the FCC—which they do not—they still are trumped by the FCC's express power to change the already-vague definition of "universal service" through an open-ended amendment process. This unique dual-layer delegation, in the context of revenue-raising, proves there is no "clear[] delineat[ion]" of the "boundaries of th[e] delegated authority." *Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 219 (1989) (quoting *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946)). And it doesn't matter whether the FCC has actually used the full scope of its power, as "an agency's voluntary self-denial has no bearing upon" "[w]hether the statute delegates legislative power," *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 473 (2001); *see* Part II.B, *infra*.

Worse still, the FCC has also violated the private nondelegation doctrine by re-delegating operation of the Universal Service Fund to USAC. The government claims it closely monitors USAC's activity, which the government describes as "ministerial." But in the last 25 years, the government's best example of FCC oversight is when the FCC changed USAC's proposed taxing rate from .09044 to .091 because phone companies requested the change when their computers could not handle five decimal places. A more accurate description would be that the FCC provides ministerial support to USAC as it operates a nearly $10-billion-a-year program. *See* Part IV, *infra*.

Notably, the government never disputes that this scheme could be replicated across the entire federal government, with all money raised by agencies through amorphous grants of power to charge "fees" totaling billions (or trillions) of dollars annually. In fact, Congress could simply authorize the executive—in one sweeping bill or a series of program-specific bills—to assign and collect "equitable" and "nondiscriminatory" taxes sufficient to cover all federal needs, including discretionary spending. Appropriations would be unnecessary. The lack of political accountability would be a politician's dream, but a nightmare for the

separation of powers. The Court should make clear that Congress cannot delegate such power, let alone to a private entity. The Court should vacate and set aside the FCC's approval of the *Proposed First Quarter 2022 Universal Service Contribution Factor.*

## ARGUMENT

### I.    THE PETITION WAS TIMELY FILED.

The government first contends that Petitioners untimely filed their Petition for review, even though it was docketed just nine days after the *Proposed First Quarter 2022 Universal Service Contribution Factor* was "deemed approved" by the FCC. Gov.Br.24–27. Petitioners are legally required to pay money for the Universal Service Fund for First Quarter 2022 solely because of that approval, yet the government now insists that Petitioners cannot directly challenge the constitutionality of that approval. The government's argument rests on numerous errors and is foreclosed by decades of precedent.

The statutory timeline for seeking judicial review of FCC actions is 60 days. 28 U.S.C. § 2344; 47 U.S.C. § 402(a); *see* Gov.Br.24. The government agrees that the *Proposed First Quarter 2022 Universal Service Contribution Factor* was deemed approved on December 27, 2021.

6

Gov.Br.1. Petitioners accordingly had until February 25, 2022, to file their Petition. They did so on January 5, 2022, well before the deadline.

But the government argues that the 60-day window to challenge the approval of the *Proposed First Quarter 2022 Universal Service Contribution Factor* expired over ten, possibly twenty years *before* that approval. Gov.Br.25; SHLB.Br.26. To reach that illogical result, the government claims that Petitioners bring a "facial challenge" to the Universal Service Fund regulations issued in 1997 and 1998, and amended in 2011, which devise USAC's role and establish the revenue-raising mechanisms for the Universal Service Fund under the 1996 Telecommunications Act. Gov.Br.25.[2]

The government's timeliness argument is wrong because this Court has long held that "when an agency *applies* a rule, the limitations period

---

[2] The government does not appear to use "facial challenge" in the sense that any Court-ordered relief would extend beyond the named Petitioners. Gov.Br.25. If that distinction matters, the Court can extend relief only to Petitioners. That would also fully undermine the sky-is-falling claims made by the government. *See, e.g.*, Gov.Br.26; SHLB.Br.3, 26–39. Those claims are already unpersuasive because, as the congressional amicus brief demonstrates, Congress is keenly aware of this dispute and can facilitate universal service as necessary if this Court confirms the illegality of the current funding mechanism. *See* Cong.Br. In fact, that is Congress's responsibility in our constitutional scheme.

running from the rule's publication will not bar a claimant from challenging the agency's … authority." *Dunn-McCampbell Royalty Int., Inc. v. Nat'l Park Serv.*, 112 F.3d 1283, 1287 (5th Cir. 1997). In other words, "an agency's application of a rule to a party creates a new, [sixty-day] cause of action to challenge … *the agency's constitutional or statutory authority*." *Id.* (emphasis added).

Thus, even if recent agency action involves the application of long-extant regulations, a challenge to the agency's authority to act is timely. A "plaintiff may challenge a regulation after the limitations period has expired if the claim is that the agency exceeded its constitutional or statutory authority," *and* there is "some direct, final agency action involving the particular plaintiff within [60 days] of filing suit." *State v. Rettig*, 987 F.3d 518, 529 (5th Cir. 2021) (cleaned up); *see Dunn-McCampbell*, 112 F.3d at 1287.[3] "An agency's action is direct and final

---

[3] *Dunn-McCampbell* and *Rettig* involved the six-year limitations period under 28 U.S.C. § 2401 for an APA claim, but the same rule applies to the sixty-day period for challenges under the Hobbs Act. *See Texas v. United States*, 749 F.2d 1144, 1146 (5th Cir. 1985); *Functional Music, Inc. v. FCC*, 274 F.2d 543, 546 (D.C. Cir. 1958) ("[The Hobbs Act] does not foreclose subsequent examination of a rule where properly brought before this court for review of further Commission action applying it. For unlike ordinary adjudicatory orders, administrative rules and regulations are

*(footnote continued on next page)*

8

when two criteria are satisfied": (1) "the action must mark the consummation of the agency's decisionmaking process," and (2) "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Rettig*, 987 F.3d at 529 (cleaned up). Those "rights, obligations, or legal consequences must be new." *Id.*

Petitioners satisfy all these requirements. *First*, the government states that the approval of the *Proposed First Quarter 2022 Universal Service Contribution Factor* is a "straightforward application of [the 1997 and 1998] rules." Gov.Br.27. As noted above, the "application of a rule to a party creates a new, [sixty-day] cause of action to challenge [] the agency's constitutional or statutory authority." *Dunn-McCampbell*, 112 F.3d at 1287. Whether this case is framed as a challenge to an application of 47 U.S.C. § 254 or to its implementing regulations, Petitioners' claim is "that the agency exceeded its constitutional … authority" by exercising unconstitutionally delegated legislative power and by re-delegating that power to a private entity. *Rettig*, 987 F.3d at 529; Pet.Br.xiv.

---

capable of continuing application; limiting the right of review of the underlying rule would effectively deny many parties ultimately affected by a rule an opportunity to question its validity.").

*Second*, the government has not disputed that the approval of the *Proposed First Quarter 2022 Universal Service Contribution Factor* is "direct and final." *Rettig*, 987 F.3d at 529. No further steps are required to make that rate binding. *See* Gov.Br.19 (citing 47 C.F.R. § 54.709(a)(3)). Nor does the government dispute that "rights, obligations, or legal consequences" flow from the approval. *Rettig*, 987 F.3d at 529. Several billion dollars will be collected from consumers and carriers—including Petitioners—pursuant to that approval, and failure to pay the required amounts can lead to severe penalties. *See* 47 C.F.R. § 54.713.

*Third*, the approval of the *Proposed First Quarter 2022 Universal Service Contribution Factor* "involv[es] the particular [Petitioners]" in this case. *Rettig*, 987 F.3d at 529. For example, Petitioner Cause Based Commerce must pay money directly to the Universal Service Fund solely because of the approval of the *Proposed First Quarter 2022 Universal Service Contribution Factor*. *See* Ex. 2, ¶¶ 3–4. And other Petitioners pay line-items on their monthly bills for the same reason. *See* Exs.1, 3–7. Contrary to the government's implication, *see* Gov.Br.29, "the sort of 'application' that opens a rule to such a challenge is not limited to formal 'enforcement actions,'" *Weaver v. Fed. Motor Carrier Safety Admin.*, 744

F.3d 142, 145 (D.C. Cir. 2014). Rather, this requirement is satisfied so long as the new application merely "involv[es]" Petitioners, which it undoubtedly does. *Rettig*, 987 F.3d at 529; *see also Columbia Broad. Sys. v. United States*, 316 U.S. 407, 417 (1942) ("It is enough that failure to comply with [FCC action] penalizes licensees, and [anyone] with whom they contract. If an administrative order has that effect it is reviewable[.]").

*Fourth*, these obligations are "new." *Rettig*, 987 F.3d at 529. A new rate is determined every quarter and lasts only through the end of that specific quarter. There was no obligation for Petitioners to pay anything for the Universal Service Fund for the First Quarter 2022 *until and unless* the FCC approved the *Proposed First Quarter 2022 Universal Service Contribution Factor*. Moreover, the rate has increased dramatically over the last 25 years, demonstrating a "new" obligation to pay those increasing amounts. *See Rettig*, 987 F.3d at 530 (asking whether the agency action "mark[ed] a change to [Petitioners'] obligation" under a preexisting requirement).

Petitioners therefore satisfy all requirements to challenge the FCC's constitutional authority to approve and apply the *Proposed First Quarter 2022 Universal Service Contribution Factor*.[4]

Indeed, the government effectively admits as much. It concedes Petitioners' challenge would be proper if the FCC "issues an order requiring [Petitioner Caused Based Commerce] to comply." Gov.Br.29. But the approval of the *Proposed First Quarter 2022 Universal Service Contribution Factor* is just such an "order," *see* 47 U.S.C. § 402(a), because it imposes a requirement for Petitioner Cause Based Commerce to pay the new quarterly rate directly into the Universal Service Fund, *see* 47 C.F.R. § 54.713, and subjects other Petitioners to similar charges

---

[4] The government's reliance on the "reopening doctrine" from *Texas v. Biden*, 20 F.4th 928 (5th Cir. 2021), is misplaced for several reasons. Gov.Br.27. *First*, the Supreme Court recently reversed that decision and declined to rely on the reopening doctrine. *See Biden v. Texas*, __ S. Ct. __, 2022 WL 2347211 at *13 n.8 (June 30, 2022). *Second*, the government erroneously implies that satisfying the reopening doctrine is the only way to challenge an older regulation, ignoring the extensive precedent allowing parties to raise "claims that the agency exceeded its constitutional or statutory authority" in the new application of a prior rule. *Rettig*, 987 F.3d at 529. The government thus mistakenly conflates a challenge to an agency's discretionary "policy" choices, *Nat'l Ass'n of Reversionary Prop. Owners v. Surface Transp. Bd.*, 158 F.3d 135, 141 (D.C. Cir. 1998), with a challenge to the agency's constitutional and statutory power to act, which can be raised each time the agency exercises that power, *see Rettig*, 987 F.3d at 529.

through their carriers, *see id.* §§ 54.407(c), 54.712(a), and those obligations would not exist but-for the FCC's approval of the quarterly rate. So, even under the government's own test, Petitioners' challenge is proper.

The government's attempt to bar this challenge would yield absurd results. For example, the government claims Petitioners should have petitioned in 1997 or 1998, but Petitioner Cause Based Commerce did not even exist at that time, Ex. 2, ¶ 3, and Petitioner Jeremy Roth did not have a phone account until 2016 at the earliest, Ex. 7, ¶ 3.

It is no wonder that numerous Supreme Court Justices have criticized the government's argument elsewhere. Justices Kavanaugh, Thomas, Alito, and Gorsuch noted that "[i]t would be wholly impracticable … to expect and require every potentially affected party to bring pre-enforcement Hobbs Act challenges against every agency order that might possibly affect them in the future," especially because "the entities against whom an enforcement action is brought may not even have existed back when an agency order was issued." *PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, 139 S. Ct. 2051, 2061 (2019) (Kavanaugh, J., joined by Thomas, Alito, and Gorsuch, JJ., concurring in

the judgment). "Under the Government's position, … [t]he effect is to transform the regulation into the equivalent of a statute," "no matter how wrong the agency's interpretation might be." *Id.* at 2066. The Court should decline the government's request for judicial "abdication." *Id.*

The government does offer that Petitioner Cause Based Commerce could refuse to pay its mandatory contribution to USAC and then fight the subsequent punishment. Gov.Br.28–29; SHLB.Br. 24–25. But the Supreme Court "normally do[es] not require plaintiffs to bet the farm by taking the violative action before testing the validity of the law, and we do not consider this a meaningful avenue of relief." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 490–91 (2010) (cleaned up); *see also Columbia Broad. Sys.*, 316 U.S. at 417 (explaining that adverse FCC actions "are not any the less reviewable because their promulgation did not operate of their own force"). The government also claims Petitioners could have filed a petition for rulemaking, Gov.Br.28–29, but Petitioners need not raise their challenge via the government's preferred mechanism, and, in any event, the FCC has no statutory deadline to act on petitions for rulemaking, rendering it a largely pointless exercise for challenging the constitutionality of agency action, *see, e.g., Radio-*

*Television New Directors Ass'n v. FCC*, 229 F.3d 269, 270 (D.C. Cir. 2000) (noting a 20-year delay by the FCC on a petition to vacate rules burdening, if not outright violating, First Amendment rights).

*   *   *

The Petition was timely filed, and this Court has jurisdiction.[5]

## II. THE UNIVERSAL SERVICE FUND IS AN UNCONSTITUTIONAL DELEGATION OF LEGISLATIVE POWER.

### A. SECTION 254 VIOLATES THE ORIGINAL UNDERSTANDING OF NONDELEGATION.

In their opening brief, Petitioners demonstrated that the revenue-raising scheme for the Universal Service Fund violates the original understanding of nondelegation, which provides a straightforward

---

[5] No party disputes that all Petitioners have demonstrated standing and that venue is proper in this Court. Intervenor SHLB states—in passing in a footnote—that *certain* Petitioners supposedly "lack venue" in this Court. SHLB.Br.9 n.1. The argument is forfeited, *Arbuckle Mountain Ranch of Tex., Inc. v. Chesapeake Energy Corp.*, 810 F.3d 335, 339 n.4 (5th Cir. 2016), and is also incorrect because the proper presence of just one Petitioner is sufficient for this Court to entertain the entire challenge, *see Glob. Van Lines, Inc. v. ICC*, 691 F.2d 773, 774 n.1 (5th Cir. 1982) (under the Hobbs Act, "[b]ecause *one of* the petitioners is a corporation organized and existing under the laws of the state of Texas, venue is properly in this court" (emphasis added)). Indeed, the Hobbs Act expressly funnels all challenges from all interested parties—regardless of residence—into a single circuit court proceeding. *See* 28 U.S.C. § 2112(a)(3).

outcome here. Pet.Br.29–35. Congress is the entity that must "make[] the policy decisions when regulating private conduct," *Gundy v. United States*, 139 S. Ct. 2116, 2135–37 (2019) (Gorsuch, J., joined by Roberts, C.J., and Thomas, J., dissenting), and this Court has already recognized that § 254 "'delegate[d] difficult policy choices to the Commission's discretion,'" *TOPUC II*, 265 F.3d at 321.

It would also "frustrate 'the system of government ordained by the Constitution' if Congress could merely announce *vague aspirations* and then assign others the responsibility of adopting legislation to realize its goals," *Gundy*, 139 S. Ct. 2133 (Gorsuch, J., joined by Roberts, C.J. and Thomas, J., dissenting) (emphasis added), but, again, this Court has held that the principles in § 254(b) use only "*vague*, general language, rendering the section ambiguous" and imposing only "*aspirational*" limitations. *TOPUC II*, 265 F.3d at 321 (cleaned up; emphases added).

The unconstitutionality of § 254 is even more apparent when considering that it allows an agency to impose *taxes*. *See* Part III, *infra*. Tradition dating back to England holds that "taxes were legislative, and therefore under 'the original frame and constitution of the government,' they 'must be by an act made by the whole legislative authority." Philip

Hamburger, *Is Administrative Law Unlawful?* 63 (2014) (quoting *Brewster v. Kidgell* (K.B. 1698), Holt's Opinions, Add. Ms. 35979, fol. 109[v] - 110[r], British Library). Indeed, certain "important subjects … must be entirely regulated by the legislature itself," *Wayman v. Southard*, 23 U.S. 1, 43 (1825), and levying taxes undoubtedly qualifies, *see, e.g.*, *NCTA v. United States*, 415 U.S. 336, 340 (1974).

The government's response is unpersuasive. It claims § 254 is "very much like" the statute in *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394 (1928), which the government says would have passed muster under the traditional tests, Gov.Br.49 n.22. But the statute in *J.W. Hampton* set out an objective pricing formula for calculating customs duties, and the executive branch would merely conduct fact-finding to fill in missing pricing variables for specific products. 276 U.S. at 404–05; *see NCTA*, 415 U.S. at 342 (discussing *J.W. Hampton*). That sort of fact-finding is likely appropriate under the original understanding of nondelegation. *See Gundy*, 139 S. Ct. at 2139 (Gorsuch, J., joined by Roberts, C.J. and Thomas, J., dissenting). But § 254 is open-ended.

Under the original understanding of nondelegation, § 254's revenue-raising scheme is unconstitutional.

**B.** **SECTION 254 VIOLATES THE INTELLIGIBLE-PRINCIPLE TEST.**

Petitioners' opening brief demonstrated that the revenue-raising mechanism for the Universal Service Fund also violates the modern interpretation of the nondelegation doctrine, Pet.Br.35–45, whereby Congress still must "clearly delineate[]" the "boundaries of th[e] delegated authority." *Skinner*, 490 U.S. at 219. Congress failed to do so.

**1.** **What Qualifies As an "Intelligible Principle" Depends on Context.**

The Supreme Court has held that what suffices as an "intelligible principle" varies based on "'the extent and character'" of the power sought to be delegated, *Mistretta v. United States*, 488 U.S. 361, 372 (1989), and "the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred," *Whitman*, 531 U.S. at 475.

As Petitioners' opening brief explained, the power to directly raise revenue is, from a constitutional perspective, a uniquely important "power" to be "congressionally conferred" on an executive agency. *Id.*; *see* Pet.Br.36–41, 46–51. It is unsurprising, then, that the Supreme Court's intelligible-principle precedents focusing on revenue-raising statutes have involved more specificity than other contexts. Pet.Br.36–41; *see* Part II.B.1, *infra*.

18

For example, in *Skinner*, the Court expressly relied on the fact that the revenue statute (1) established a mathematical ceiling on how much money the agency could raise and (2) required the tax to be tied to objective measurements (e.g., volume-miles of oil transported). 490 U.S. at 215. By setting a maximum collectible amount, and further refining how the agency could collect that amount, Congress "clearly delineate[d]" the "boundaries of th[e] delegated authority." *Id.* at 219 (quoting *Am. Power & Light Co.*, 329 U.S. at 105). And *Skinner* tied the objective statutory limits to its intelligible-principle holding: "We have no doubt that these multiple restrictions Congress has placed on the Secretary's discretion to assess pipeline safety user fees satisfy the constitutional requirements of the nondelegation doctrine as we have previously articulated them." *Id.* at 220.

For evaluating Petitioners' challenge, the appropriate analogues are revenue-raising precedents like *Skinner*, not cases where the challenged statutory authority covered variegated matters largely incapable of precise definition. *See* Pet.Br.40–41.

Interpreting the Supreme Court's intelligible-principle precedents in this way is consistent with the directive in *Mistretta* that the standard

varies based on "'the extent and character'" of the power sought to be

delegated, 488 U.S. at 372, and would allow this Court both to follow

precedent and to interpret that precedent "in light of and in the direction

of the constitutional text and constitutional history," *Texas v. Rettig*, 993

F.3d 408, 418 (5th Cir. 2021) (Ho, J., joined by Jones, Smith, Elrod, and

Duncan, JJ., dissenting from denial of rehearing en banc). Both make

clear that delegations of the power to raise money—if allowable at all,

and regardless of whether they implicate the taxing power—require more

specificity, *see* Part I, *supra*; Part III, *infra*.[6]

---

[6] Intervenors USTelecom et al. argue that *Lichter v. United States*, 334, U.S. 742 (1948), which Petitioners cited as involving variegated matters requiring maximum flexibility, Pet.Br.38, actually involved taxation, Suppliers.Br.22. The Renegotiation Act at issue in *Lichter* was aimed at prohibiting excess profits during wartime to maximize resource production. 334 U.S. at 754–68. To the extent *Lichter* indirectly involved revenue-raising because the government could confiscate ill-gotten excess profits, wartime delegations typically "afford no adequate basis" for a nondelegation challenge because they usually involve "an authority which was cognate to the conduct by [the President] of the foreign relations of the government." *Panama Refin. Co. v. Ryan*, 293 U.S. 388, 422 (1935); *see* Pet.Br.37–38 n.11. Indeed, the Court in *Lichter* repeatedly compared the government's wartime ability to regulate business with conscripting soldiers and property. 334 U.S. at 755–56, 765–66.

**2. Section 254 Fails to Impose the Objective and Discrete Limitations Required in the Context of Revenue-Raising Statutes.**

The universal service statute sets no objective boundaries on the FCC's power to extract money from millions of Americans. There is no maximum amount that can be collected, no maximum taxing rate, and no formula with objective variables. Accordingly, it does not "clearly delineate[]" the boundaries of the FCC's delegated authority to raise money, and therefore fails to provide the requisite intelligible principle. *Skinner*, 490 U.S. at 219.

The closest to any objective limitation is the requirement that revenue-raising be "sufficient" to facilitate universal service, and "equitable and nondiscriminatory," 47 U.S.C. § 254(b)(4), (5), (d), (e), but those still do not impose anything like the concrete guardrails of *Skinner* or *J.W. Hampton*. If anything, the requirement that funding be "sufficient" imposes only a floor—not a ceiling—on the FCC's revenue-raising power. *See Sufficient*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/sufficient ("enough to meet the needs of a situation or a proposed end"). The D.C. Circuit has interpreted the term to justify charges that exceed any immediate needs.

*See Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1102 (D.C. Cir. 2009).[7] And "equitable and nondiscriminatory" might limit how charges can be distributed across the industry, but it does nothing to limit how much the FCC can demand in the first place.

These amorphous clauses are especially toothless after recognizing that the FCC may "ignore" a § 254(b) principle "[t]o satisfy a countervailing statutory principle." *Alenco Commc'ns, Inc. v. FCC*, 201 F.3d 608, 621 (5th Cir. 2000). So even if some limiting principle could be derived from a provision of § 254(b), the FCC remains free to disregard it in pursuit of another principle or even amend the universal service "principles" themselves, 47 U.S.C. § 254(b)(7).

The government responds that when raising revenue for the Universal Service Fund, broad phrases like "public interest" are "'as concrete as the complicated factors for judgment in such a field of

---

[7] The government says that "the FCC has sometimes imposed caps or restrictions on universal service funding" to avoid pricing some consumers out of the market, Gov.Br.37, but any such limitation is either self-imposed by the FCC or not truly binding because the statute remains precatory, 47 U.S.C. § 254(b)(1). And the FCC also has discretion to "ignore" a § 254(b) principle "[t]o satisfy a countervailing statutory principle," *Alenco Commc'ns, Inc. v. FCC*, 201 F.3d 608, 621 (5th Cir. 2000), or amend the universal service "principles," 47 U.S.C. § 254(b)(7).

delegated authority permit.'" Gov.Br.38 n.20. *Skinner* proved that wrong. The Supreme Court pointed to far more specific statutory limitations in the context of revenue-raising. *See* 490 U.S. at 220 (noting, for example, a mathematical cap). Moreover, *Skinner* stated that its approach was consistent with *NCTA*, where it had held that "public policy or interest served, and other pertinent facts" in the context of raising revenue would raise nondelegation concerns. 415 U.S. at 342–43; *see Skinner*, 490 U.S. at 223–24.

The government also suggests that universal service may be too novel and technical for congressional specificity. Gov.Br.38 n.20. But *Skinner* made clear that the Court must consider whether Congress "clearly delineate[d]" the "boundaries" of the *specific* "delegated authority" at issue in the lawsuit. 490 U.S. at 219. The delegated authority challenged here is specifically the FCC's power to *raise revenue* for universal service, and extracting money from Americans' pockets is hardly a novel scientific endeavor.

Congress could have provided an intelligible principle by, for example, stating that the Universal Service Fund could not raise more than a certain percentage of the FCC's annual budget (akin to *Skinner*),

or that the FCC could not raise more than $5 billion annually (which Congress could even peg to inflation rates that the executive must factually calculate), or that the FCC could tax 10% of carriers' interstate and international revenues, or that the amount raised should be equal to the difference between two fact-bound determinations (as in *J.W. Hampton*). These are all "clearly delineate[d]" limits on the revenue-raising power. *Skinner*, 490 U.S. at 219. Once there is a limit to how much money the FCC can raise, it could perhaps even use vague standards like "public interest" to guide the *disbursement* of money within that limit.[8] That kind of framework would likely comply with both the revenue-raising cases like *Skinner* and *J.W. Hampton*, and the variegated-matters cases like *National Broadcasting Co. v. United States*, 319 U.S. 190, 194 n.1, 216 (1943).

But the current framework tells the FCC to raise money for universal service, with no caps, no rates, and no clearly delineated boundaries—and therefore is unconstitutional.

---

[8] Again, Petitioners raise a nondelegation challenge only to how Universal Service Fund revenues are raised. Indeed, the government states that challenges to "spending decision[s]" are "irrelevant to this case." Gov.Br.60.

### 3. Section 254(b) Imposes No Meaningful Implied Limitations, Especially in Light of Congress's Dual-Layer Delegation to the FCC.

The lack of objective limitations on the FCC's revenue-raising power is amplified by the lack of meaningful *implied* limitations. Section 254(b) suffers from a rare combination of flaws rendering it uniquely incapable of clearly delineating the FCC's power to raise revenues for universal service.

*First*, although § 254(b) lists six universal service "principles" upon which FCC "shall" base policies, which ostensibly might cabin the FCC's power to raise money, those principles are not truly mandatory because they are couched as things the FCC "should" pursue, not "must." *See* Pet.Br.42. Because they are ultimately precatory, these statements cannot provide an intelligible principle under Supreme Court precedent, which states that "an agency's voluntary self-denial has no bearing upon" "[w]hether the statute delegates legislative power." *Whitman*, 531 U.S. at 473.

*Second*, even if they were mandatory, the principles in § 254(b) are so vague that they cannot "clearly delineate[]" limits on the FCC's revenue-raising power. *Skinner*, 490 U.S. at 219; Pet Br.42. The

government tries to portray Petitioners' description of § 254(b) as idiosyncratic, claiming these principles "are not simply 'aspirational,' as [P]etitioners would have it." Gov.Br.34. But the label of these principles as "aspirational" comes *from the FCC* and is taken verbatim from this Court's precedent: "[W]e have approved the FCC's interpretation of the statutory principles as aspirational only…. Indeed, the lofty and expansive language of § 254(b) hardly constitute[s] a series of specific statutory commands." *TOPUC II*, 265 F.3d at 321 (cleaned up). This Court has explicitly "avoided relying on the aspirational language in § 254(b) to bind the FCC to adopt certain cost methodologies for calculating universal service support." *Tex. Off. of Pub. Util. Couns. v. FCC* ("*TOPUC I*"), 183 F.3d 393, 421 (5th Cir. 1999).

The government also reiterates that the FCC "has adopted … measures to restrain the growth of the universal service program," Gov.Br.45; *id.* at 38, but that violates *Whitman*'s rule that an agency cannot defeat a nondelegation challenge by claiming the agency will restrain itself, *see* 531 U.S. at 473.

*Third*, the FCC can add *new* universal service "principles" as often as it wishes. Pet.Br.44–45; *see* 47 U.S.C. § 254(b)(7). This amounts to an

unusual multi-layered, "dual delegation" where Congress announces open-ended, precatory "principles" and then allows the agency to perpetually amend those principles using the agency's own open-ended amendment process. Pet.Br.45. The Supreme Court has expressly rejected the notion that a broad delegation can be saved on the premise that the executive agency will restrain itself from using the power granted by Congress. *See Whitman*, 531 U.S. at 473. The Court has also labeled as especially egregious those statutes that create multi-layered delegations by first granting a broad power to the executive and then allowing the executive itself to "add[] to … what is proposed, as 'in [the executive's] discretion' he thinks necessary 'to effectuate the policy' declared by the act." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 538–39 (1935).

The government responds that the FCC's second-layer authority to add new universal service principles must still be in the "public interest," which it claims derives meaning and limitation from the purposes of the larger statute. Gov.Br.37. That suffers from two errors. *First*, the government tellingly does not address the unusual multi-layered delegation issue itself. In other contexts, the Supreme Court has found

27

such multi-layered schemes to be unconstitutional even where one layer may have been allowed. *Cf. Free Enter. Fund*, 561 U.S. at 495 (holding that two levels of for-cause removal protections for an executive officer is unconstitutional, even though a single layer might not be, because "[t]he added layer … makes a difference"). *Second*, as explained above and in Petitioners' opening brief, *see* Part II.B.1, *supra*; Pet.Br.36–41, the "public interest" standard has satisfied the intelligible-principle test in variegated schemes like deciding emissions levels, but is inappropriate for revenue-raising statutes. Recourse to the broad "public-interest" standard in the context of a dual-layer revenue-raising delegation provides no more limitation than it would in the context of a single-layer revenue-raising delegation.

The government also overstates the significance of *Qwest Corp. v. FCC* ("*Qwest I*"), 258 F.3d 1191 (10th Cir. 2001), and *Qwest Communications Int'l, Inc. v. FCC* ("*Qwest II*"), 398 F.3d 1222 (10th Cir. 2005), as supposedly demonstrating limits on the FCC's authority, *see* Gov.Br.34–35, 38; Suppliers.Br.13. The Tenth Circuit was explicit that "each of the principles in § 254(b) internally is phrased in terms of 'should,'" which "indicates a recommended course of action, but does not

itself imply the obligation associated with 'shall.'" *Qwest I*, 258 F.3d at 1200. Therefore, "any particular principle can be trumped in the appropriate case." *Id*. As noted above, the illusory nature of any limitation becomes even more apparent when considering the FCC's ability to adopt new principles, 47 U.S.C. § 254(b)(7), which can then "trump" the others, *Qwest I*, 258 F.3d at 1200.

Finally, the government contends that, on rare occasion, courts have found certain FCC actions to have violated narrow and discrete parts of § 254(b), which is evidence the statutory scheme provides an intelligible principle. Gov.Br.39, 42–43; Suppliers.Br.30. The government's cited cases do not address nondelegation claims, however. And more importantly, the argument misunderstands the scope of the nondelegation inquiry. As the government candidly acknowledges elsewhere, the inquiry for nondelegation purposes includes whether there is a clear delineation of authority regarding "the size and scope of [the FCC's] universal service program and the amount of fees it collects to finance the program." Gov.Br.22. In other words, there must be clear direction and limitations for the program as a whole and its component parts. The mere existence of some limitation in some part of a statutory

regime does not validate the entire scheme. Were it otherwise, there could never be a nondelegation violation unless the statute gave literally endless power to an agency, without even subject-matter limitations.

An example is illustrative. Suppose Congress gave the FCC unbridled discretion to charge carriers for the Universal Service Fund but mandated that payment must be in Bitcoin. Agency action could easily exceed that one limitation, but the statutory regime as a whole would still fail to impose sufficient "clear[] delineat[ions]" of the revenue power writ-large. *Skinner*, 490 U.S. at 219.

This Court's precedent also proves the point. For example, in *Jarkesy v. SEC*, 34 F.4th 446, 459–63 (5th Cir. 2022), it did not matter for nondelegation purposes that the statute provided only two possible options for where the SEC could bring an enforcement action: either administratively or in federal court. Under the government's theory here—i.e., that a conceivable violation of a statute demonstrates an intelligible principle governing the whole—there was automatically an intelligible principle in *Jarkesy* because it would violate the statute for the SEC to bring an enforcement action in, say, state court. The SEC is also subject to countless provisions that govern other SEC functions. But

the mere possibility of exceeding the statute in some way was clearly insufficient to defeat a nondelegation challenge in that case. *Id.* at 461.

This Court should once again reject the government's blinkered view that a nondelegation violation exists only where Congress provided an agency with literally unlimited power.

### 4. Section 254(c) Suffers from the Same Flaws As § 254(b).

The government next cites § 254(c), which it claims indirectly limits revenue-raising discretion by laying out additional principles for spending universal service funds. Gov.Br.39. Again, as the government itself seems to acknowledge, implied limitations on *disbursements* are not particularly relevant to whether there is an intelligible principle for *raising* money. Gov.Br.60 (challenges to "spending decision[s]" are "irrelevant to this case"). Even setting that aside, § 254(c) suffers from many of the same flaws as § 254(b). *See* Part II.B.3, *supra*.

*First*, Congress failed to legislatively impose a clearly delineated objective boundary, *Skinner*, 490 U.S. at 219, declining to provide any type of fixed meaning for universal service and instead simply labeling it as an "evolving" standard. § 254(c)(1).

*Second*, many of the "principles" in § 254(c) are still exceedingly broad in application. The government argues, for example, that § 254(c) limits the FCC to raising revenue for "telecommunications services," Gov.Br.39; Suppliers.Br.16, but courts have repeatedly indicated that a broad subject-matter limitation is insufficient. For example, in *Panama Refining*, the Court invalidated the statute even though it ostensibly had numerous limitations, including its subject matter (petroleum products). 293 U.S. at 418. And in *Jarkesy*, the agency was limited to whether to initiate enforcement proceedings under certain securities laws in federal court or in administrative proceedings. 34 F.4th at 459–63. In neither case did the subject-matter limitation save the statute. "[T]elecommunications services"—which reach nearly every American— is an exceedingly broad category and thus similarly lacks meaningful limitation. 47 U.S.C. § 153(53).

*Third*, even if § 254(c)'s principles were more specific, they are not truly mandatory. The statute does not say, for example, that universal service *is* the level of service that has "been subscribed to by a substantial majority of residential customers." § 254(c)(1)(B). Rather, the FCC only must "consider" that factor when it decides how to redefine universal

service. § 254(c)(1). Given that § 254(c) could impose, at most, only an implied and indirect limitation on the FCC's revenue-raising power, the added agency discretion in evaluating § 254(c)'s principles cannot impose a meaningful limitation.

*Fourth*, the government's invocation of § 254(c)(3) is off-base because that provision says only that the FCC "may designate additional services." *See* Gov.Br.41–42. Allowing the FCC to *expand* services in no way creates a *limit* on the FCC's revenue-raising power.

*Fifth*, and most critically, even if these standards were more specific and binding, they are effectively overtaken by a catch-all at the end of the list saying the FCC can *redefine* universal service to be anything the FCC thinks is "consistent with the public interest, convenience, and necessity." § 254(c)(1)(D). This provides the agency with a trump card authorizing the very same kind of dual-layer, vague delegation deemed problematic elsewhere. *See* Part II.B.3, *supra*.

The government responds that the "statute does not permit the FCC to redefine universal service as often as it chooses." Gov.Br.41. But that contradicts both the statute itself, which allows the FCC to redefine the "evolving" meaning of universal service, § 254(c)(1), and also the

government's own brief, which claims the definition must keep up with the telecommunications market, which the government labels as "dynamic," Gov.Br.41, meaning "marked by usually continuous and productive activity or change," *Dynamic*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/dynamic. The government appears to argue that the FCC will not *actually* redefine universal service whenever it wants, but, again, an agency's self-imposed limitation is irrelevant for nondelegation purposes. *Whitman*, 531 U.S. at 473.

### 5. The Government's Kitchen-Sink Approach Reveals the Lack of Meaningful Limitations on the FCC's Power.

In addition to § 254(b) and (c), the government cites a bevy of other provisions that it claims provide the necessary limitations. Gov.Br.42–47. None suffices, as explained below, but it is worth noting that the government's kitchen-sink approach to finding an intelligible principle is reminiscent of the statutes in *Panama Refining* and *Schechter Poultry*.

As Congress listed more and more vague policies in the statutes at issue in those cases, the *easier* it became to demonstrate a nondelegation violation. For example, in *Schechter Poultry*, the statute authorized the

executive branch to impose codes of conduct that "impose no inequitable restrictions on admission," "are not designed to promote monopolies or to eliminate or oppress small enterprises," and "will tend" to "eliminate unfair competitive practices, to promote the fullest possible utilization of the present productive capacity of industries, to avoid undue restriction of production (except as may be temporarily required), to increase the consumption of industrial and agricultural products by increasing purchasing power, to reduce and relieve unemployment, to improve standards of labor, and otherwise to rehabilitate industry and to conserve natural resources." 295 U.S. at 522–23, 535; *see Panama Refining*, 293 U.S. at 417.

Like the lists in *Panama Refining* and *Schechter Poultry*, § 254 provides plenty of vague "policies," but it leaves the FCC largely "free to select as [it] chooses from the many and various objects generally described." *Panama Refining*, 293 U.S. at 431–32; *Alenco*, 201 F.3d at 621 (explaining the FCC may "ignore" a § 254(b) principle "[t]o satisfy a countervailing statutory principle"). And here, the FCC is even authorized by statute to redefine those principles as often as it wishes.

Contrary to the government's assertion, this only heightens the nondelegation problem.

Turning to the additional provisions cited by the government confirms they fail to impose clear delineations on the FCC's revenue-raising power.

***Section 254(a).*** The government notes that § 254(a) requires the FCC's implementing regulations to "include a definition of the services that are supported by Federal universal service support mechanisms." § 254(a); Gov.Br.39. The government seems to imply that this means the public will know in advance what scope of universal service the FCC has devised. But *Whitman* held that an agency-imposed limitation is no limitation at all for nondelegation purposes. 531 U.S. at 473.

***Section 254(d).*** The government notes that revenue-raising must be "sufficient," "equitable and nondiscriminatory," 47 U.S.C. § 254(d), but, as explained above, *see* Part II.B.2, *supra*, those do not impose objective and discrete guardrails. If anything, the requirement that funding be "sufficient" imposes a floor—but no ceiling—on the FCC's revenue-raising power. An additional flaw in the government's rationale becomes evident upon recognition that the FCC can simply redefine

"universal service" through an open-ended "public interest" standard. *See* Part II.B.4, *supra*. The requirement that funding be "sufficient" for universal service takes on new meaning when the FCC gets to decide what universal service means. And although the "nondiscriminatory" requirement perhaps imposes some flavor of limitation, it is insufficient to cabin the FCC's discretion in the context of the entire scheme—the FCC can charge as much or as little as it wants, so long as everyone pays.

***Sections 254(e) and (h).*** The government also points to § 254(e), which says funding recipients "should" receive funds "sufficient to achieve the purposes" of § 254—and the FCC can perpetually re-define those purposes—and to § 254(h), which imposes a few discrete formulas for specific discounts to be awarded to specific fund recipients. Gov.Br.45–47; Suppliers.Br.17. But as Petitioners noted above, they do not raise a nondelegation challenge to how the certain revenues are *disbursed*, but only to the mechanism for determining and raising those revenues, and neither § 254(e) nor § 254(h) imposes any limit on how much revenue the FCC raises. Indeed, the government later acknowledges that challenges to "spending decision[s]" are "irrelevant to this case." Gov.Br.60. If anything, § 254(h) assists Petitioners because it

shows—for only a sliver of the Universal Service Fund program—how Congress could easily provide objective and clear delineations, if it so chose.

### III. THE NONDELEGATION VIOLATIONS HERE ARE PARTICULARLY EGREGIOUS BECAUSE THEY INVOLVE CONGRESS'S EXCLUSIVE POWER TO LEVY TAXES.

Petitioners' opening brief demonstrated that Universal Service Fund charges are taxes, which makes Congress's delegation of such limitless power even worse. Pet.Br.51–59. Although Petitioners acknowledged that *Skinner* rejected "the application of a different and stricter nondelegation doctrine in cases where Congress delegates discretionary authority to the Executive under its taxing power," 490 U.S. at 213, Petitioners preserved the argument that the Supreme Court should narrow or overrule that decision*, see* Pet.Br.59.

In response, the government disputes that universal service charges are taxes. Gov.Br.50–51. The Supreme Court has indicated that a tax for constitutional purposes is a charge where "some of the administrative costs at issue inure[] to the benefit of the public." *Skinner*, 490 U.S. at 223; *see also Trafigura Trading LLC v. United States*, 29

F.4th 286, 294 (5th Cir. 2022).[9] The government cannot seriously dispute that at least "some"—indeed nearly all—of the universal service charges "inure[] to the benefit of the public." *Skinner*, 490 U.S. at 223. This is demonstrated by the huge sums of money involved, by the very name of the program ("Universal"), by its statutory goal of providing benefits "to all the people of the United States," 47 U.S.C. § 151, and even by the government's own brief, which is replete with references to the extensive public recipients of, and alleged public good provided by, the Universal Service Fund, *see, e.g.*, Gov.Br.2 (the Universal Service Fund "has benefited millions of Americans … throughout the nation"); *id.* at 19 (noting goal is "to give every American access to affordable telecommunications").

---

[9] To the extent Judge Ho's opinion in *Trafigura* is not binding, its discussion of taxes and fees is itself taken from independent and established precedent. *See Trafigura*, 29 F.4th at 291–94. Moreover, Judge Graves's dissent seems to agree with Judge Ho that the test for a fee is whether there is a "value-for-value" transaction, *see id.* at 298 n.8 (Graves, J., dissenting), and thus that point did command a majority.

Intervenors USTelecom et al. also argue that *Trafigura* was an Export Clause case, and thus should not control the definition of "tax" in other contexts. Suppliers.Br.35. But *NCTA*, 415 U.S. at 340–41, and *Skinner*, 490 U.S. at 224, articulated a comparable test and were not Export Clause cases.

The government claims the charges are "fees" and thus cannot be taxes. Gov.Br.50. But again the Supreme Court disagrees. It has defined a "fee" as a charge that is "incident to a voluntary act," meaning an agency can "exact" a charge in exchange for "bestow[ing] a benefit on the applicant, not shared by other members of society." *NCTA*, 415 U.S. at 340–41; *see also Skinner*, 490 U.S. at 224. *NCTA* actually limited the FCC's collection of certain filing "fees" to the "value to the recipient," because allowing the agency to offset its own costs or any other program expenditures would involve "costs inured to the benefit of the public" and implicate Congress's taxing power—and thus nondelegation. 415 U.S. at 342–44. In other words, to be a fee, the charge must represent "a 'value-for-value' transaction, in which a feepayer pays the fee to receive a service or benefit in return, and is thus better off as a result of the transaction." *Trafigura*, 29 F.4th at 294. But that does not describe the Universal Service Fund charges. Most contributors receive nothing in return—and certainly nothing "value-for-value," i.e., a proportional quid pro quo. Some, like Petitioner Cause Based Commerce, are actually injured as a result because those extra costs encourage customers to drop their

current telecommunication subscriptions. Pet.Br.57; Ford Report at 8, JA67.

The government agrees with Petitioners that this Court's passing footnote in *TOPUC I* about taxes and the Origination Clause "was dicta," Gov.Br.51 (citing *TOPUC I*, 183 F.3d at 427 n.52), and therefore is not binding. The government urges the Court to follow that dicta anyway, but the government does not dispute Petitioners' arguments for why *TOPUC I* is unpersuasive on this point. *See* Pet.Br.54–56 (noting that *TOPUC I* itself stated that (1) Taxing Clause and Origination Clause cases are subject to different analyses, and (2) a dramatic increase in universal service rates could become an "improperly delegated tax").

The government notes that the D.C. Circuit likewise stated that universal service charges are fees, not taxes, but that court simply cited *TOPUC I*'s unpersuasive dicta and also relied on supposed "network effects," *Rural Cellular Ass'n v. FCC*, 685 F.3d 1083, 1090–91 (D.C. Cir. 2012), which Petitioners' expert Dr. Ford soundly disproved at the agency stage in this case, *see* Ford Report at 6–7, JA65–66. The FCC has not disputed Dr. Ford's research or conclusions despite numerous opportunities to do so.

This Court should conclude that the Universal Service Fund charges are indeed taxes.

## IV. THE FCC'S DELEGATION TO USAC VIOLATES THE PRIVATE NONDELEGATION DOCTRINE.

Petitioners' opening brief also demonstrated that the FCC's delegation of power to USAC—"a private corporation owned by an industry trade group," *U.S. ex rel. Shupe v. Cisco Sys., Inc.*, 759 F.3d 379, 387 (5th Cir. 2014)—violates the private nondelegation doctrine, which provides an independent basis for ruling that the FCC's approval of *Proposed First Quarter 2022 Universal Service Contribution Factor* should be vacated and set aside, *see* Pet.Br.60–66.

In response, the government insists that "only the [FCC] has power to adopt a quarterly contribution factor," Gov.Br.54, and that USAC provides only "ministerial support" to the FCC, Gov.Br.53. A more accurate description would be that the FCC provides ministerial support to USAC. The FCC off-loaded to USAC the power to operate the Universal Service Fund, from deciding how much money to raise (which the FCC then ministerially calculates into a taxing rate), to creating a "deemed approved" mechanism (where the Commissioners only passively approve USAC's $10 billion in annual collections), to deciding where and

how to spend the money raised. And USAC's collections are nearly 25 times the FCC's annual budget—hardly a ministerial outsourcing.

The government next tries to analogize USAC's permanent and ubiquitous role in the Universal Service Fund program to the outsourcing this Court approved in *Rettig*, 987 F.3d 518, albeit over substantial dissent, *see Rettig*, 993 F.3d at 409 (Ho, J., joined by Jones, Smith, Elrod, and Duncan, JJ., dissenting from denial of rehearing en banc); Gov.Br.55. *Rettig* involved a requirement that certain "contracts be certified by a qualified actuary and that the [Actuarial Standards] Board's practice standards be followed." 987 F.3d at 531. The Court concluded it was reasonable to condition government approval on that "outside party's determination of some issue." *Id.* But for the First Quarter 2022 rate, USAC determined not just "some issue" but *every* issue, including how many billions of dollars to obtain from the general public. This is no mere requirement to get a private actuary to double-check your math.

More, the government does not satisfactorily explain what is the "reasonable connection between [USAC's] decision and the [FCC's] determination." *Id.* In particular, the FCC did not make its own separate "determination" at all when confronted with USAC's *Proposed First*

*Quarter 2022 Universal Service Contribution Factor*, but, even if the FCC did, letting a private entity conduct the entire program is still not a "reasonable" condition. *Id.*

The government next argues that there is no private nondelegation violation because the FCC "supervises" USAC. Gov.Br.56. In particular, the government claims it "'reviews and accepts' [USAC's] input" and "closely superintend[s]" USAC's work. Gov.Br.57–58 (cleaned up). Even assuming an agency's self-imposed restrictions could possibly save an otherwise improper private delegation, *but see* TechFreedom.Br.16–17; *Whitman*, 531 U.S. at 473, reality belies the government's portrayal of the FCC's role. It is unclear whether—let alone exactly *how*—the FCC "review[ed] and accept[ed]" USAC's work for the specific quarter being challenged in this lawsuit. No such evidence appears anywhere in the record. The FCC used the uniquely passive "deemed approved" process without the slightest hint of reviewing or analyzing USAC's figures. The FCC couldn't even be bothered to issue a separate approval document. This Court has held that the agency must "'independently perform[] its reviewing, analytical and judgmental functions,'" *Rettig*, 987 F.3d at 532,

but the FCC failed to do so for the *Proposed First Quarter 2022 Universal Service Contribution Factor*.

Nor has the FCC "closely superintend[ed]" USAC's work in the past. Some of the FCC's own supporting Intervenors candidly acknowledge that "[t]he FCC has never reversed USAC's projections of demand." Suppliers.Br.40. In its own brief, the FCC points to only three examples in the last 25 years—after the initial set-up in 1997 and 1998—where the FCC has allegedly superintended USAC. Gov.Br.59. One of those was a trivial change of the tax rate from .09044 to .091 because some carriers' computers could not handle five decimal places.[10] Another was undertaken by the Wireline Competition Bureau, with only passive acceptance by the FCC Commissioners.[11] And the third implemented a one-time *legislative* change.[12] Twenty-five years—and nearly a hundred quarterly ratemakings—and that is the sum total of the FCC's

---

[10] *In re Federal-State Joint Bd. on Universal Service*, 18 FCC Rcd. 4818, 4827 (2003).

[11] *Wireline Competition Bureau Provides Guidance to the Universal Service Administrative Company Regarding the High-Cost Universal Service Mechanism Budget*, 32 FCC Rcd. 9243, 9243–44 (2017).

[12] *In re Universal Service Contribution Methodology*, 34 FCC Rcd. 4143, 4144–45 (2019) (noting implementation in 2011).

"oversight" over the quarterly ratemaking process, during which time the rate has skyrocketed.

The government next tries to escape the Ninth Circuit's decision in *In re Incomnet, Inc.*, 463 F.3d 1064 (9th Cir. 2006), by insisting that case addressed only "a narrow bankruptcy law issue," Gov.Br.61; Suppliers.Br.41. But *Incomnet*'s value is its detailed description of USAC's incredible power, including that "USAC is not simply holding funds in the USF as the FCC's agent," 463 F.3d at 1074, that "USAC is charged with establishing a budget that meets the purpose of the statute, but neither the specific recipients nor the specific beneficiaries are named in that statute," *id.* at 1075, and that "USAC is a distinct legal entity that takes control over the funds, pools them together, and distributes them; *it is more than a mere conduit for contributions*," *id.* (emphasis added). Aside from the fact that USAC funds are now apparently held in the Treasury, *see* Gov.Br.62, it seems nothing has changed since *Incomnet* was issued.

The government claims this case is like *United States v. Frame*, 885 F.2d 1119 (3d Cir. 1989), where Congress authorized a private board to collect a $1 fee per head of cattle. Gov.Br.61. But the precise $1 rate was

mandated by statute, and the Secretary of Agriculture also exercised "pervasive surveillance" over the private board. *Frame*, 885 F.2d at 1129. That made *Frame* like *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381 (1940), where a government commission, "*not the [private] code authorities*, determine[d] the prices" to be charged, *id.* at 399 (emphasis added). Here, neither Congress nor the FCC set the quarterly contribution rate—USAC does that through its projected expenses, which the FCC ministerially converts into a quarterly rate, making it entirely unlike *Frame* and *Sunshine*. And as demonstrated above, the FCC does not exercise "pervasive surveillance" over USAC, which collects nearly $35 million *every single business day*, roughly equivalent to the amount collected *annually* under the scheme in *Frame*. *See* Gov.Br.61.

* * *

In the context of private nondelegation, governmental "'rubber stamping' is impermissible." *Rettig*, 987 F.3d at 532. But that is precisely what the FCC did here—and has done for decades.

One of the government's amici argues that this is just fine because international custom dictates that a "separate, independent (autonomous) entity" should collect and disburse universal service funds

because it supposedly improves "efficiency." Frieden.Br.23. But constitutional separation of powers is not designed to maximize "efficiency" and "autonom[y]." Quite the opposite. As the Framers recognized, "[b]icameralism and presentment make lawmaking difficult *by design*." *Rettig*, 993 F.3d at 409 (Ho, J., joined by Jones, Smith, Elrod, and Duncan, JJ., dissenting from denial of rehearing en banc) (cleaned up).

## <u>CONCLUSION</u>

This Court should vacate and set aside the *Proposed First Quarter 2022 Universal Service Contribution Factor* and its approval.

July 15, 2022                          Respectfully submitted,

<u>/s/ R. Trent McCotter</u>
C. Boyden Gray
R. Trent McCotter
  *Counsel of Record*
Jonathan Berry
Michael Buschbacher
Jared M. Kelson
BOYDEN GRAY & ASSOCIATES
801 17th Street NW, Suite 350
Washington, DC 20006
202-706-5488
mccotter@boydengrayassociates.com
*Counsel for Petitioners*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 15, 2022, I electronically filed the foregoing document with the Clerk of this Court by using the CM/ECF system, which will serve all parties automatically.

Dated: July 15, 2022

/s/ R. Trent McCotter
R. Trent McCotter
Boyden Gray & Associates
801 17th St NW, #350
Washington, DC 20006
(202) 706-5488

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Fifth Circuit Rule 32, Federal Rule of Appellate Procedure 32(a)(7)(B), and this Court's June 30 order authorizing Petitioners to file a brief not to exceed 9,500 words, because it contains 9,499 words, excluding the portions exempted by Rule 32(f). This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure Rule 32(a)(5)–(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook and 14-point font.

Dated: July 15, 2022

/s/ R. Trent McCotter
R. Trent McCotter
Boyden Gray & Associates
801 17th St NW, #350
Washington, DC 20006
(202) 706-5488