No. 22-60008

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

_____

CONSUMERS' RESEARCH; CAUSE BASED COMMERCE,
INCORPORATED; KERSTEN CONWAY; SUZANNE BETTAC; ROBERT
KULL; KWANG JA KERBY; TOM KIRBY; JOSEPH BAYLY; JEREMY
ROTH; DEANNA ROTH; LYNN GIBBS; PAUL GIBBS; RHONDA THOMAS,

*Petitioners*,

v.

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

*Respondents.*

_____

Petition for Review of an Order of the
Federal Communications Commission

_____

**JOINT BRIEF OF INTERVENORS SCHOOLS, HEALTH, & LIBRARIES
BROADBAND COALITION, BENTON INSTIUE FOR BROADBAND &
SOCIETY, NATIONAL DIGITAL INCLUSION ALLIANCE, AND
CENTER FOR MEDIA JUSTICE, DBA MEDIA JUSTICE
IN SUPPORT OF RESPONDENTS**

_____

Andrew Jay Schwartzman
1341 G Street, NW
5th Floor
Washington, DC 20005
(202) 241-2408
AndySchwartzman@gmail.com

*Counsel for Benton Institute for
Broadband & Society, National Digital
Inclusion Alliance, and Center for
Media Justice dba MediaJustice*

Stephanie Weiner
Jason Neal
HARRIS, WILTSHIRE & GRANNIS LLP
1919 M Street, NW, 8th Floor
Washington, D.C.  20036
(202) 730-1300
sweiner@hwglaw.com

*Counsel for Schools, Health, &
Libraries Broadband Coalition*

June 17, 2022

## CERTIFICATE OF INTERESTED PARTIES

### No. 22-60008, *Consumers' Research, et al. v. Federal Communications Commission and United States of America*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case.  These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

(1)  Petitioners are: Consumers' Research; Cause Based Commerce, Incorporated; Kersten Conway; Suzanne Bettac; Robert Kull; Kwang Ja Kerby; Tom Kirby; Joseph Bayly; Jeremy Roth; Deanna Roth; Lynn Gibbs; Paul Gibbs; and Rhonda Thomas.

(2)  Counsel for Petitioners are: C. Boyden Gray, R. Trent McCotter, Jonathan Berry, Michael Buschbacher, and Jared M. Kelson, of Boyden Gray & Associates.

(3)  The Federal Communications Commission is a federal agency, and the United States of America is a respondent by statute.

(4)  Counsel for the Federal Communications Commission are: P. Michele Ellison, Jacob Matthew Lewis, James Michael Carr, and Merrick Garland. Counsel for the United States of America are: Merrick Garland, Gerard J. Sinzdak, and P. Michele Ellison.

(5)  Intervenor Schools, Health & Libraries Broadband (SHLB) Coalition, supporting Respondents, is an incorporated 501(c)(3) public interest organization with over 300 members who share the goal of promoting open, affordable, high-quality broadband for anchor institutions and their communities.  Its members include representatives of health care providers and networks, schools, libraries, state broadband offices, private sector companies, state and national research and education networks, and consumer organizations.  A complete list is available at http://shlb.org/about/coalition-members.  Schools, Health & Libraries Broadband Coalition is a non-profit corporation that has no owners or subsidiaries; accordingly, it has no parent corporation and no publicly held corporation owns 10% or more of its stock.

(6)  Counsel for Intervenor Schools, Health & Libraries Broadband Coalition are Stephanie Weiner and Jason Neal of Harris, Wiltshire & Grannis LLP.

(7)  Benton Institute for Broadband & Society, the National Digital Inclusion Alliance, and the Center for Media Justice doing business as MediaJustice have intervened in this appeal in support of Respondents.  Counsel for those intervenors is Andrew Jay Schwartzman.

(8)  USTelecom – The Broadband Association, National Telecommunications Cooperative Association, dba NTCA – The Rural Broadband Association,

and Competitive Carriers Association have intervened in this appeal in support of Respondents.  Counsel for those intervenors are Jennifer Tatel and Craig Edward Gilmore of Wilkinson, Barker & Knauer LLP.

(9)  TechFreedom has filed an *amicus curiae* brief in this case in support of Petitioners.  Counsel for TechFreedom are Corbin K. Barthold, Berin Szóka, and James E. Dunstan.

(10)  Competitive Enterprise Institute, Free State Foundation, Christopher DeMuth, Harold Furchtgott-Roth, Michael S. Greve, and Randolph J. May have filed an *amicus curiae* brief in this case in support of Petitioners. Counsel for those *amici* are Jeffrey S. Beelaert, Michael Petrino, and Sam Kazman.

(11)  Pursuant to Fifth Circuit Rule 28.2.1, the following describes the "large group of persons or firms" that are "financially interested in the outcome" of this litigation: Petitioners challenge the Federal Communications Commission's approval of the *Proposed First Quarter 2022 Universal Service Contribution Factor*, Public Notice, DA 21-1550, CC Docket No. 96-45 (rel. Dec. 13, 2021).  Telecommunications companies obligated to pay a percentage of their interstate end-user revenues to the Universal Service Fund based on the Contribution Factor are financially interested in the outcome of this litigation.  The Universal Service Fund pays for four

programs: the "Lifeline/Link Up" program, the "High-Cost" program, the "Schools and Libraries" program, and the "Rural Health Care" program. *See*, *e.g.*, Federal Communications Commission, *Universal Service Support Mechanisms*, https://www.fcc.gov/consumers/guides/universal-service-support-mechanisms (last visited June 16, 2022).  Direct beneficiaries of those programs, providers of services covered by those programs, and many other participants in the overall telecommunications industry are financially interested or potentially interested in the outcome of this litigation.

Dated: June 17, 2022                              /s/ Stephanie Weiner

                                                  Stephanie Weiner
                                                  *Counsel of Record for Schools,*
                                                  *Health & Libraries Broadband*
                                                  *Coalition*

## STATEMENT REGARDING ORAL ARGUMENT

Intervenors Schools, Health & Libraries Broadband Coalition, Benton Institute for Broadband & Society, National Digital Inclusion Alliance, and Center for Media Justice dba MediaJustice adopt the statement regarding oral argument from Respondents' brief.

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT ...............................................v

INTRODUCTION ..................................................................................................1

JURISDICTIONAL STATEMENT ......................................................................4

STATEMENT OF ISSUES PRESENTED...............................................................4

STATEMENT OF THE CASE...............................................................................4

SUMMARY OF ARGUMENT ...............................................................................14

ARGUMENT ..........................................................................................................16

I.     PETITIONERS' CHALLENGE TO THE STRUCTURE OF THE
       UNIVERSAL SERVICE FUND IS BARRED BY THE HOBBS ACT. .....16

II.    PETITIONERS' LATE CHALLENGE TO THE UNIVERSAL SERVICE
       FUND WOULD DISRUPT THE ECONOMY AND DISCONNECT
       MILLIONS OF AMERICANS AND ANCHOR INSTITUTIONS. ............26

CONCLUSION .......................................................................................................39

# TABLE OF AUTHORITIES

## CASES

*Am. Stewards of Liberty v. Dep't of Interior*,
960 F.3d 223 (5th Cir. 2020) ...................................................21

*Columbia Broadcasting System v. United States*,
316 U.S. 407 (1942)...............................................................17

*Functional Music, Inc. v. FCC*,
274 F.2d 543 (D.C. Cir. 1958)............................................22, 23

*Geller v. FCC*,
610 F.2d 973 (D.C. Cir. 1979)............................................23, 24

*Halliburton, Inc. v. Administrative Review Bd.*,
771 F.3d 254 (5th Cir. 2014) ....................................................18

*In re FCC 11-161*,
753 F.3d 1015 (10th Cir. 2014) ................................................11

*Martin v. Halliburton*,
618 F.3d 476 (5th Cir. 2010) ....................................................18

*Qwest Corp. v. FCC*,
258 F.3d 1191 (10th Cir. 2001) ................................................10

*SCF Waxler Marine, L.L.C. v. ARIS T M/V*,
902 F.3d 461 (5th Cir. 2018) ....................................................18

*Telecommunications Research & Action Center v. FCC*,
750 F.2d 70 (D.C. Cir. 1984)....................................................25

*Texas Office of Public Utility Counsel v. FCC*,
183 F.3d 393 (5th Cir. 1999) ("*TOPUC I*")............................4, 6, 9

*Texas v. Biden*,
20 F.4th 928 (5th Cir. 2021) .........................................18, 20, 21

*Texas v. United States*,
730 F.2d 409 (5th Cir. 1984) ....................................................21

*Texas v. United States*,
749 F.2d 1144 (5th Cir. 1985) ......................................16, 21, 22

## STATUTES

28 U.S.C. § 2343 .......................................................................9

28 U.S.C. § 2344 ..................................................................1, 16

47 U.S.C. § 151 ....................................................................................................4

47 U.S.C. § 254 ....................................................................................................1

47 U.S.C. § 254(a)(2) ...........................................................................................5

47 U.S.C. § 254(b) ...............................................................................................5

47 U.S.C. § 254(b)(3) .....................................................................................6, 36

47 U.S.C. § 254(b)(5) ...........................................................................................6

47 U.S.C. § 254(b)(6) ...................................................................................27, 31

47 U.S.C. § 254(c) ................................................................................................8

47 U.S.C. § 254(c)(1) ...........................................................................................6

47 U.S.C. § 254(c)(3) .......................................................................................7, 8

47 U.S.C. § 254(d) .......................................................................................7, 8, 19

47 U.S.C. § 254(h) .....................................................................................8, 27, 31

47 U.S.C. § 254(h)(1)(A) ...............................................................................6, 31

47 U.S.C. § 254(h)(1)(B) ......................................................................6, 7, 8, 27

47 U.S.C. § 254(h)(7)(B) ....................................................................................31

47 U.S.C. § 254(i) ..............................................................................................34

47 U.S.C. § 254(j) ..............................................................................................34

47 U.S.C. § 402(a) .......................................................................................18, 23

47 U.S.C. § 402(b) ........................................................................................22-23

**REGULATIONS**

47 C.F.R. §§ 54.500-54.523 ...............................................................................29

47 C.F.R. § 54.503 ..............................................................................................29

47 C.F.R. § 54.505(a)-(b) ...................................................................................29

47 C.F.R. §§ 54.600-54.633 ...............................................................................32

47 C.F.R. § 54.620(b)-(c) ...................................................................................33

47 C.F.R. § 54.709(a) .........................................................................................19

47 C.F.R. § 54.709(a)(3) .....................................................................................17

# ADMINISTRATIVE MATERIALS

*Connect America Fund*,
  26 FCC Rcd. 17663 (2011).................................................................5

*Federal-State Joint Board on Universal Service*,
  12 FCC Rcd. 8776 (1997).........................................................7, 8, 17

*Federal-State Joint Board on Universal Service*,
  12 FCC Rcd. 18400 (1997).............................................................8

*Inquiry Concerning Deployment of Advanced Telecommunications
  Capability to All Americans in a Reasonable and Timely Fashion*,
  2020 Broadband Deployment Report,
  35 FCC Rcd. 8986, ¶ 52 (2020).....................................................28

Letter from AARP et al. to Chairman Ajit V. Pai, FCC, et al.,
  WC Docket No. 17-287 (filed May 23, 2018)..................................35

Letter from Gov. Michael J. Dunleavy, State of Alaska, to Marlene H.
  Dortch, Secretary, FCC,
  WC Docket No. 17-310 (filed Nov. 12, 2019) ................................33

Letter from Henry T. Kelly, Counsel, Cause Based Commerce, to
  Ms. Alexis Johns, FCC, WC Docket No. 06-224
  (filed Dec. 19, 2006) ...................................................................10

*Lifeline and Link Up Reform and Modernization*,
  31 FCC Rcd. 3962 (2016).............................................................34

Press Release, FCC, *FCC Announces $200 Million for New
  Broadband Deployments Through the Rural Digital Opportunity
  Fund as Agency Continues Program Oversight* (May 3, 2022).......37

*Promoting Telehealth in Rural America*,
  34 FCC Rcd. 7335 (2019).............................................................32

*Proposed Fourth Quarter 2021 Universal Service Contribution
  Factor*, Public Notice, DA 21-1134, CC Docket No. 96-45
  (rel. Sept. 10, 2021) ....................................................................11

*Report on the Future of the Universal Service Fund*, Notice of
  Inquiry, FCC 21-127, WC Docket No. 21-476 (rel. Dec. 15, 2021)......5, 26, 27

*Revision of Cable Television Rules Regarding Leapfrogging, Carriage
  of Local Independent Signals, and Non-Network Programming
  Exclusivity*, 62 F.C.C.2d 192 (1976).............................................24

*Rural Digital Opportunity Fund Phase I Auction (Auction 904)*, 35 FCC Rcd. 13,888 (2020)..................................................................37

Wireline Competition Bureau, FCC, *Report on the State of the Lifeline Marketplace*, WC Docket No. 20-437 (June 2021)....................................34-35

**OTHER AUTHORITIES**

Benjamin Herold, *The Slowest Internet in Mississippi: Rural Schools Still Struggle to Get Connected*, Education Week (Nov. 19, 2015), https://www.edweek.org/technology/the-slowest-internet-in-mississippi-rural-schools-still-struggle-to-get-connected/2015/11 .................28

Bill Callaghan *et al.*, *The Discount Internet Guidebook*, National Digital Inclusion Alliance and Public Knowledge (2018) ..............................13

Federal Communications Commission, *E-Rate – Schools and Libraries USF Program*, https://www.fcc.gov/general/e-rate-schools-libraries-usf-program..........................................................................28

Federal Communications Commission, *E-Rate: Universal Service Program for Schools and Libraries*, https://www.fcc.gov/consumers/guides/universal-service-program-schools-and-libraries-e-rate ..............................................................27

Georgia Dep't of Education, *E-Rate Program*, https://www.gadoe.org/Technology-Services/Infrastructure/Pages/erate.aspx ...........................................30

John B. Horrigan, *Reimagining Lifeline: Universal Service, Affordability, and Connectivity*, Benton Institute for Broadband & Society (Feb. 2022)...........................................................................13

Jordan Arnold, *Broadband Solutions for the Farm Office, Field, and Community*, Benton Institute for Broadband & Society (Sept. 2021)..................................................................................13

MAISA, *State Education Network (SEN)*, https://www.gomaisa.org/projects/state-education-network-sen/ ...................30

National Digital Inclusion Alliance, *Worst Connected Cities 2019*, https://www.digitalinclusion.org/worst-connected-cities-2019/ .....................13

The Quilt Circle, *Merit Network's commitment to schools stayed strong in 2021* (2022) ......................................................................30

Secretary of State, State of Ohio, Certificate of Sienna
Communications Group Incorporated,
https://bizimage.ohiosos.gov/api/image/pdf/5534_1037 .................................... 9

State Library of Louisiana, *E-Rate*, https://www.state.lib.la.us/public-
libraries/e-rate ................................................................................................. 30

TCEA, *Advocacy, E-rate Basics*, https://tcea.org/advocacy/e-rate/ ...................... 29

Texas State Library and Archives Commission, *Libraries Connecting
Texas*, https://www.tsl.texas.gov/broadband ............................................ 30-31

Tyler Cooper, *Report: Every ETC Registered with the FCC's Lifeline
Program*, BroadbandNow (Dec. 7, 2021) ........................................................ 34

Universal Service Administrative Company, *2021 Annual Report*,
https://www.usac.org/wp-content/uploads/about/documents/
annual-reports/2021/2021_USAC_Annual_Report.pdf ........... 28-29, 32, 35, 36

*Universal Service Support Mechanisms*,
https://www.fcc.gov/consumers/guides/universal-service-support-
mechanisms ................................................................................................ iii-iv

**INTRODUCTION**

Filed decades too late, this challenge to the constitutionality of the Universal

Service Fund ("USF" or "Fund") is untimely under the Hobbs Act, 28 U.S.C.

§ 2344.  The Federal Communications Commission ("FCC" or "Commission")

established the Fund and its contribution mechanism over 20 years ago in the first

Report and Order implementing Section 254 of the Communications Act, 47

U.S.C. § 254.  Because Petitioners challenge it now—decades after the Hobbs Act

deadline for seeking review—their Petition must be dismissed.

Petitioners purport to petition for review of new agency action, but this

"appeal" does not arise from a final Commission order of any kind, much less one

deciding some key structural aspect of the Universal Service Fund, or concluding a

Commission proceeding that sought comment on or otherwise reopened any of the

issues Petitioners raise.  Nor do Petitioners seek judicial review of a Commission

order against them for failure to pay into the Fund.  Instead, Petitioners "challenge"

a calculation set forth in a public notice, which simply carries out the decades-old

regulations by which the Commission calculates the amount all

telecommunications carriers must contribute to the Fund each quarter.

Petitioners cannot circumvent their timeliness problem through a

manufactured challenge to this ministerial public notice.  They do not disagree

with the Commission's universal service demand estimates or the methodology it

1

used in making the calculation.  Nor do they argue in their brief that the notice was arbitrary or capricious in some other way.  Rather, for several quarters in a row, they have filed the same lengthy comments reiterating that the Commission should set the contribution percentage at zero percent based on their constitutional arguments about the underlying program, and then filed multiple petitions for review in federal courts of appeals.  Plainly, therefore, Petitioners' claims do not arise from the public notice or its routine calculation.  Rather, Petitioners seek untimely review of the constitutionality of the entire Universal Service Fund— which the Commission established years ago when carrying out the congressional mandate to implement Section 254.

Although the Hobbs Act bars this petition, it does not deprive Petitioners of the opportunity to properly challenge the Fund's constitutionality and to seek relief, including judicial review.  There are multiple ways Petitioners could have legitimately raised their constitutional challenges to the Universal Service Fund for full Commission consideration, but they have thus far declined to employ them. Petitioners' chosen vehicle, which seeks judicial review of the decades-old Commission action implementing Section 254, must be dismissed as untimely.

Intervenors agree with the FCC and with Intervenors USTelecom, et al. that, even setting aside this fatal jurisdictional flaw, Petitioners' constitutional arguments lack merit.  But the belated posture of Petitioners' challenge also means

it comes after decades of reliance on universal service funding by millions of schools, libraries, rural health care providers, and rural and low-income consumers, as well as the communications companies that deliver services to them.  The Fund benefits not only universal service support recipients, but also all other communications subscribers who are able to connect with them as a result.  Among other things, countless family members can remain in contact with relatives whose connectivity depends on the existence of the Fund, businesses can communicate with their customers located in rural areas, and critical educational, health care, and civic organizations can efficiently reach the millions of individuals and institutions online today because of the Fund.

Had Petitioners properly pursued relief at the agency, the Commission would have been able to decide Petitioners' concerns in the first instance and to establish an orderly transition for any reforms it deemed necessary to address them. Instead, judicial review of Petitioners' improper challenge would threaten to inflict enormous disruption on the U.S. economy, upending the business and service plans of the many Universal Service Fund stakeholders.  Even more dire, if this Court were to nonetheless assert jurisdiction and grant Petitioners' untimely claims, it would abruptly cut off the internet connections of schools, libraries, health care providers, and rural and low-income consumers across the country at a time when internet access has never been more critical to participation in American life.  This

would, in turn, disrupt the orderly conduct of e-commerce, health care, and governmental services.

The Court should reject Petitioners' incorrect, untimely challenge.

## JURISDICTIONAL STATEMENT

Intervenors adopt the jurisdictional statement from Respondents' brief.

## STATEMENT OF ISSUES PRESENTED

Intervenors adopt the statement of issues from Respondents' brief.

## STATEMENT OF THE CASE

Universal service principles at the foundation of this case trace back at least as far as the original Communications Act of 1934, which created the Commission and tasked the new agency with regulating to "make available, so far as possible, to all the people of the United States … a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges." 47 U.S.C. § 151. "Armed with this statutory mandate, the FCC historically … focused on increasing the availability of reasonably priced, basic telephone service via the landline telecommunications network," through a "combination of implicit and explicit subsidies." *Texas Office of Public Utility Counsel v. FCC*, 183 F.3d 393, 406 (5th Cir. 1999) ("*TOPUC I*").

To fulfill the statutory goal of connecting business and families throughout the country to their relatives and customers located in rural, insular, and high-cost areas, the FCC imposed access charges on long-distance carriers (*i.e.*, AT&T for

much of the 20th century, followed by several geographically confined successors and new competitors after the company's breakup in 1984), paid to local exchange companies, *i.e.*, telephone companies.  To help low-income consumers afford service so that families and businesses could reach them and vice-versa, especially in the wake of AT&T's divestiture, the Commission created programs to defray certain costs that the Commission feared would cause a significant number of subscribers to cancel their service.  *See, e.g.*, *Report on the Future of the Universal Service Fund*, Notice of Inquiry, FCC 21-127, WC Docket No. 21-476, ¶ 33 (rel. Dec. 15, 2021).

In the Telecommunications Act of 1996, Congress "built upon" these longstanding universal service principles "by enacting section 254." *Connect America Fund*, 26 FCC Rcd. 17663, ¶ 61 (2011).  In Section 254, Congress required the FCC to hold a proceeding and adopt rules regarding the "services that are supported by Federal universal service support mechanisms," 47 U.S.C. § 254(a)(2), and it mandated that the Commission base its "policies for the preservation and advancement of universal service" on seven specific principles codified in the statute, *id.* § 254(b).

Recognizing the rapid development of technology, including wireless telephony and the internet, Congress further directed the Commission to establish the "evolving level of telecommunications services" that should be "supported by

Federal universal service support mechanisms," by "consider[ing] the extent to

which such telecommunications services— (A) are essential to education, public

health, or public safety; (B) have … been subscribed to by a substantial majority of

residential customers; (C) are being deployed in public telecommunications

networks by telecommunications carriers; and (D) are consistent with the public

interest, convenience, and necessity." *Id.* § 254(c)(1).  Congress also constrained

the FCC's discretion and guided the design of the Universal Service Fund

programs in many additional ways.  For example:

- In place of the previous "patchwork of explicit and implicit subsidies" for high-cost areas and low-income individuals, Congress required the FCC to adopt "'specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service.'" *TOPUC I*, 183 F.3d at 406 (quoting 47 U.S.C. § 254(b)(5)).

- Congress directed the FCC to ensure that "low-income consumers and those in rural, insular, and high cost areas" have access to "services … that are reasonably comparable to those services provided in urban areas … at rates that are reasonably comparable to rates charged for similar services in urban areas."  47 U.S.C. § 254(b)(3).

- Congress also created new requirements to promote universal service for health care providers in rural areas, *id.* § 254(h)(1)(A), with specific details for how that support mechanism should operate.  Congress required participating "telecommunications carrier[s]" to "provide telecommunications services which are necessary for the provision of health care services" to "any public or nonprofit health care provider" serving "persons who reside in rural areas," at "rates that are reasonably comparable to rates charged for similar services in urban areas" in the same state.  *Id.*

- Congress likewise created new requirements to promote universal service for schools and libraries, *id.* § 254(h)(1)(B), and again specified how the

Commission should organize the program.  Congress required participating "telecommunications carriers" to provide "services that are within the definition of universal service" to "elementary schools, secondary schools, and libraries for educational purposes at rates less than the amounts charged for similar services to other parties."  *Id.*; *see also id.* § 254(c)(3).

- To sustainably fund those universal service objectives, Congress expressly required "[e]very telecommunications carrier that provides interstate telecommunications services … [to] contribute, on an equitable and nondiscriminatory basis, to the specific, predictable, and sufficient mechanisms" that the FCC creates pursuant to the statute.  *See id.* § 254(d).  It also permitted the Commission to require any "other provider of interstate telecommunications" to contribute "if the public interest so requires."  *Id.*

The FCC responded to Congress's directions in May 1997, adopting a Report and Order that "put[] in place a universal service support system" commonly known as the Universal Service Fund, consistent with the "explicit statutory principles" in Section 254.  *Federal-State Joint Board on Universal Service*, 12 FCC Rcd. 8776, ¶ 2 (1997); *see also id.* ¶ 7 ("When it enacted section 254 of the Communications Act, Congress set forth the principles to guide universal service reform" and charged the Commission with "implement[ing] these principles").  Pursuant to Section 254, the Commission adopted four universal service programs, which continue in modernized forms to this day:

- To promote "universal service for high cost areas," the FCC put in motion the development of a "forward-looking universal service support mechanism based on forward-looking economic cost for non-rural carriers."  *Id.* ¶ 26.

7

- For "low-income consumers," the Commission expanded and modified its existing programs "so that they better comport with our universal service principles" and the requirement of the 1996 Act. *Id.* ¶ 27.

- For "schools and libraries," the Commission created a program to "provide schools and libraries with discounts" on telecommunications services based on "competitive bids" from service providers based on authority under Sections 254(c)(3) and 254(h)(1)(B). *Id.* ¶¶ 29-30.

- For rural health care providers, based on Congress's directions in "Sections 254(c) and 254(h)," the Commission required telecommunications carriers to "charge eligible rural health care providers a rate for supported service that is no higher than the highest tariffed or publicly available commercial rate for a similar service in a nearby city." *Id.* ¶ 35.

To fund these four programs, pursuant to "Section 254(d)," the Commission adopted rules to require "all carriers that provide interstate telecommunications services [to] contribute to the support mechanisms" and established a "contribution assessment methodology that is competitively neutral and easy to administer." *Id.* ¶¶ 39-40. Two months later, "[c]onsistent with [the] determinations" in the May 1997 order, the Commission set the total amount of required contributions as equal to the amount of funding, taken together, necessary to implement the four congressionally-directed universal service programs. *Federal-State Joint Board on Universal Service*, 12 FCC Rcd. 18400, ¶¶ 45-50 (1997).

Multiple parties timely filed petitions for review of the FCC's 1997 decision implementing Section 254. In particular, a long list of petitioners and intervenors challenged the FCC's "universal support system for high-cost areas … [o]n both

statutory and constitutional grounds," claimed it was "an encroachment on state

authority over intrastate telecommunications regulations," and "challenge[d] the

FCC's system for assessing contributions." *TOPUC I*, 183 F.3d at 408.  They also

challenged the FCC's "programs supporting schools, libraries, and health care

providers" as exceeding the FCC's "statutory authority" in several respects.  *Id.* at

408-09.  One petitioner attacked the "universal service contribution requirement as

an unconstitutional tax," including an "unconstitutional delegation of Congress's

exclusive taxing power under the Taxing Clause," as "a violation of equal

protection, and [as] an uncompensated taking."  *Id.* at 426.  Other parties

complained that the contribution assessment system was "unconstitutionally

vague."  *Id.* at 430.

Cause Based Commerce—the only petitioner in this case directly subject to

Section 254 and the FCC's universal service rules, *see* Pet. Br. 22-24, 27-28—was

incorporated in the state of Ohio on June 13, 1996, *see* Secretary of State, State of

Ohio, Certificate of Sienna Communications Group Incorporated,

https://bizimage.ohiosos.gov/api/image/pdf/5534_1037 (last visited June 16,

2022).[1]  And it appears to have been offering interstate telecommunications

---

[1]   Because Cause Based Commerce's principal office is in Ohio, in the Sixth
    Circuit, venue for its participation in this case is improper.  28 U.S.C. § 2343.
    Similarly, because Petitioners Joseph Bayly, Jeremy Roth, Deanna Roth, Lynn
    Gibbs, Paul Gibbs, and Rhonda Thomas do not claim to reside in the Fifth
    Circuit, they also lack venue to proceed in this Court.

services since at least 2006. *See* Letter from Henry T. Kelly, Counsel, Cause

Based Commerce, to Ms. Alexis Johns, FCC, WC Docket No. 06-224 (filed

Dec. 19, 2006). Petitioner Consumers' Research, also domiciled in Ohio,[2] was

likewise founded in 1929, well before the 1996 Act. Yet, neither Consumers'

Research nor Cause Based Commerce challenged the Commission's 1997 Order

establishing the Fund and its contribution mechanism.

   Since 1997, the Commission has continued to develop and modify the

universal service programs to achieve Congress's universal service objectives. In

response, interested parties have submitted comments, filed requests for

reconsideration, and raised arguments on numerous grounds against Commission

decisions. As the Commission adopted orders modernizing the programs in

accordance with Congress's universal service objectives, interested parties

brought timely challenges, including claims that the Commission's actions were

unconstitutional. *See, e.g.*, *Qwest Corp. v. FCC*, 258 F.3d 1191, 1196-98 (10th

Cir. 2001) (considering several challenges to the FCC's "Ninth Order" and

"Tenth Order" "reconsider[ing] and refin[ing]" particular aspects of the universal

service programs). Notably, when the Commission modernized universal service

to include broadband service in 2011, over 50 parties petitioned for review or

---

[2]   Like Cause Based Commerce, Consumers' Research has its principal office in
     the Sixth Circuit and lacks venue to participate in this proceeding.

intervened in the case, which included constitutional challenges to the

Commission's decisions.  *See In re FCC 11-161*, 753 F.3d 1015, 1089 (10th Cir.

2014).  In all these years, however, it appears that neither Cause Based

Commerce nor any other Petitioner in this case has ever commented on the

Commission's proposals for, sought reconsideration of, or participated in court

challenges to the FCC's universal service program.

Instead, in the fall of 2021, Petitioners raised a slew of constitutional and

other challenges—not in response to a substantive proposal regarding the

structure or legality of the Universal Service Fund or an order enforcing Cause

Based Commerce's obligation to pay universal service fees, but rather in response

to the ministerial public notice that (like dozens that the Commission had released

quarter after quarter for years) simply announced, pursuant to the long-established

FCC rule and procedure, the calculation of the contribution factor for the coming

quarter.  *See Proposed Fourth Quarter 2021 Universal Service Contribution*

*Factor*, Public Notice, DA 21-1134, CC Docket No. 96-45 (rel. Sept. 10, 2021).

When the Commission adopted the proposed contribution factor, some Petitioners

sued in the Sixth Circuit.  *See Consumers' Research et al. v. FCC*, No. 21-3886

(6th Cir. filed Sept. 30, 2021), *motion to hold case in abeyance pending*.  They

filed essentially the same comments again the following quarter in response to the

*Proposed First Quarter 2022 Universal Service Contribution Factor*, Public

Notice, DA 21-1550, CC Docket No. 96-45 (rel. Dec. 13, 2021) ("*First Quarter 2022 Contribution Public Notice*"), A100-104, and then brought this challenge. Petitioners have since filed yet another quarterly appeal in this circuit. *See infra* n.7.

Intervenors joined the case to support the many educational institutions, health care providers, and American consumers and businesses that—in the more than 20 years since the FCC established the Fund—have come to rely upon it for mission-critical broadband and other communications services. The Schools, Health & Libraries Broadband ("SHLB") Coalition is a public interest organization whose mission is to promote open, affordable, high-quality broadband for anchor institutions and their communities. SHLB and its members, who include many universal service recipients, support the E-Rate, Rural Health Care, and other universal service programs to ensure that community anchor institutions have access to broadband internet access—the essential 21st century tool they need to serve and benefit the public.

Benton Institute for Broadband & Society is a 41-year-old, private operating foundation that conducts research and engages in advocacy to bring open, affordable, high-performance broadband to all people in the United States to ensure a thriving democracy. To advance its mission, Benton seeks to assist

enrollment in USF-funded programs in many ways and conducts policy research

on USF-funded programs.[3]

National Digital Inclusion Alliance is a non-profit 501(c)(3) organization

supporting a community of digital inclusion practitioners and advocates who

engage in local and state-level efforts across the United States to promote equitable

internet access, adoption, and use for low- and moderate-income households and

communities, whether urban, rural, or Tribal.  In addition to participating in

proceedings at the Federal Communications Commission, National Digital

Inclusion Alliance provides educational resources to its affiliates and the public on

affordability and digital equity.[4]  Many of National Digital Inclusion Alliance's

---

[3]  Jordan Arnold, *Broadband Solutions for the Farm Office, Field, and Community*, Benton Institute for Broadband & Society (Sept. 2021), *available at* https://www.benton.org/sites/default/files/FutureAmericanFarming.pdf (detailed reporting regarding how broadband access affects the economy of rural America); John B. Horrigan, *Reimagining Lifeline: Universal Service, Affordability, and Connectivity*, Benton Institute for Broadband & Society (Feb. 2022), *available at* https://www.benton.org/sites/default/files/reimagininglifeline_final1_0.pdf (analysis based on a high-quality national poll of potential and actual Lifeline subscribers).

[4]  *See, e.g.*, Bill Callaghan *et al.*, *The Discount Internet Guidebook*, National Digital Inclusion Alliance and Public Knowledge (2018), *available at* https://discounts.digitalinclusion.org/pdfs/Discount%20Internet%20Guidebook%20v3.1.pdf (illustrating how private-sector initiatives and Universal Service Fund programs can expand access to areas that lack adequate connectivity); National Digital Inclusion Alliance, *Worst Connected Cities 2019*, https://www.digitalinclusion.org/worst-connected-cities-2019/ (last visited June 16, 2022).

625 affiliates, located in 46 states, directly support people and institutions who use Universal Service Fund programs that enable users to obtain more affordable access to communications services and technology, such as Lifeline, E-Rate, the High Cost Fund, and its successor program, the Rural Digital Opportunity Fund.

The Center for Media Justice dba MediaJustice is a non-profit, 501(c)(3) organization established in 2009. It is dedicated to democratizing the economy, government, and society through policies and practices that, among other things, ensure democratic media ownership, fundamental communication rights, and universal media and technology access at affordable prices. MediaJustice has a network of over 100 local, regional, or statewide affiliate social-justice organizations. MediaJustice and its affiliates directly support programs that enable users to obtain more affordable access to communications services and technology, including the Lifeline and E-Rate programs funded by the Universal Service Fund.

## SUMMARY OF ARGUMENT

**I.** This Court lacks jurisdiction over Petitioners' challenge to the Universal Service Fund because it is untimely under the Hobbs Act. Petitioners challenge the constitutionality of the Universal Service Fund and contribution mechanism, as adopted by the Commission in 1997 pursuant to Congress's direction in Section 254. Accordingly, their Petition is decades too late. Petitioners cannot solve this timeliness problem by purporting to challenge the ministerial quarterly public

notice carrying out the Commission's decades-old regulations. That notice in no way reopened decisions made years ago when the Commission implemented Section 254 and established the Fund. Although the Hobbs Act bars jurisdiction here, Petitioners are not foreclosed from seeking relief, including judicial review, through other means. Petitioners had—and still have—multiple ways in which they can properly challenge the Fund's constitutionality at the Commission and in court. But having failed to employ those options, Petitioners cannot use this jurisdictionally flawed petition to circumvent the Hobbs Act.

**II.** Demonstrating the critical importance of the Hobbs Act deadline, Petitioners' manufactured challenge would have dire and far-reaching consequences. During the twenty years that Petitioners declined to properly raise their concerns, millions of American schools, libraries, health care providers, companies, and rural and low-income consumers have come to depend on the Universal Service Fund for vital communications services. Had Petitioners properly pursued relief, the Commission would have had an opportunity to address their claims, with the benefit of comment from all stakeholders, and, if necessary, to establish an orderly transition for any reforms. And Petitioners would have had the opportunity to timely seek judicial review of the Commission's decisions. Instead, Petitioners' flawed approach risks abruptly terminating universal service support, which would upend the communications sector, throwing business plans

and services into chaos.  Beyond that, it threatens to abruptly disconnect students, teachers, library patrons, rural health care providers and their patients, and consumers in rural communities and low-income households—all of whom rely on the Fund for voice and internet services today.  This would, in turn, cause enormous disruption to the economy and impair the provision of critical educational and health care services across the country.

## ARGUMENT

## I.    PETITIONERS' CHALLENGE TO THE STRUCTURE OF THE UNIVERSAL SERVICE FUND IS BARRED BY THE HOBBS ACT.

Petitioners ask this Court to use this jurisdictionally defective vehicle to conclude that the "Universal Service Fund's mechanisms for raising revenue are unconstitutional," Pet. Br. 26, even though both the statutes and regulations that create and carry out those mechanisms have been in place for over two decades. Because Petitioners' challenge to the Universal Service Fund is untimely under the Hobbs Act, 28 U.S.C. § 2344, the Court should dismiss the petition.

The Hobbs Act provides that "[a]ny party aggrieved by [an agency's] final order may, within 60 days after its entry, file a petition to review the order in the court of appeals."  28 U.S.C. § 2344.  The Hobbs Act's timeliness requirement undisputedly applies here, *see* Pet. Br. xiv, and it is "jurisdictional and cannot be judicially altered or expanded."  *Texas v. United States*, 749 F.2d 1144, 1146 (5th Cir. 1985).  The FCC released its Report and Order "adopt[ing] rules that …

16

fulfill the universal service goals established by Congress" in the
Telecommunications Act of 1996 over 20 years ago. *See Federal-State Joint
Board on Universal Service*, 12 FCC Rcd. 8776, ¶ 3 (1997). The window for
challenging the Commission's decision creating the Universal Service Fund—or
for seeking review of any later Commission decision significantly modifying or
restructuring any of the Universal Service Fund mechanisms—has long closed.

Petitioners plainly seek to evade the Hobbs Act's jurisdictional limit. They
merely assert that their "Petition was timely filed … on January 5, 2022,"
Pet. Br. xiv—*i.e.*, fewer than 60 days after the First Quarter 2022 Contribution
Factor was deemed approved by the Commission through lack of action after the
release of the *First Quarter 2022 Contribution Public Notice, see* 47 C.F.R.
§ 54.709(a)(3). Petitioners do not explain, however, why the *First Quarter 2022
Contribution Public Notice*—a five-page document that does not discuss the
structure, legality, or underlying contribution mechanisms, A100-104—is a final
order in response to which they can belatedly challenge the entire Universal
Service Fund. They cite one judicial decision, *Columbia Broadcasting System v.
United States*, 316 U.S. 407, 416-20 (1942), in a "*see also*" citation with zero
explanation of the case's meaning or application to this case.[5] As the parties

---

[5]    In fact, *Columbia Broadcasting* is inapposite. The Court in that case held that
an FCC order promulgating regulations requiring the Commission to refuse to

seeking review, Petitioners "bear the burden of establishing [the Court's] appellate jurisdiction." *Martin v. Halliburton*, 618 F.3d 476, 481 (5th Cir. 2010). Petitioners have in no way met this burden. Indeed, Petitioners' unelaborated citation of *Columbia Broadcasting Systems* seems to demonstrate their awareness of this jurisdictional defect and their active choice not to engage with it.[6]

Petitioners cannot rely on the *First Quarter 2022 Contribution Public Notice* as the solution to their timeliness problem. "[T]he key step in the timeliness inquiry is to determine when the agency took its 'final action'" on the relevant issue. *Texas v. Biden*, 20 F.4th 928, 951 n.3 (5th Cir. 2021) (discussing, *inter alia*, the statute of limitations under the Hobbs Act). This Court's precedent does not permit Petitioners to treat the Commission's quarterly

---

grant a license to broadcasters engaging in particular contractual arrangements was reviewable under 47 U.S.C. § 402(a) even though the Commission had not yet instituted proceedings to enforce a penalty for non-compliance. Here, by contrast, Petitioners purport to challenge a ministerial public notice carrying out decades-old regulations.

[6] Under this Court's precedent, Petitioners' "argument in this regard is so terse, insubstantial, and lacking in citation to legal authority" that the Court should "find that the issue has been waived" or forfeited. *Halliburton, Inc. v. Administrative Review Bd.*, 771 F.3d 254, 267 n.11 (5th Cir. 2014). Petitioners' waiver or forfeiture on this issue applies notwithstanding its relationship to this Court's jurisdiction. *See, e.g.*, *SCF Waxler Marine, L.L.C. v. ARIS T M/V*, 902 F.3d 461, 464 (5th Cir. 2018) ("Although this court must satisfy itself of its own jurisdiction, … there is no need to explore jurisdictional bases the appellant does not address.") (internal quotation marks omitted).

contribution-factor calculations as a perpetual source of "final orders" through which to challenge the entire Universal Service Fund.[7]

Independent of any remotely recent Commission regulation or public notice, 47 U.S.C. § 254(d) requires "[e]very telecommunications carrier that provides interstate telecommunications services" to "contribute … to the specific, predictable, and sufficient mechanisms established by the Commission to preserve and advance universal service."  The Commission established those "mechanisms" in orders issued years ago, and even the rules governing how contribution amounts are calculated have long been established.  *See, e.g.*, 47 C.F.R. § 54.709(a).  The *First Quarter 2022 Contribution Public Notice*, like the public notices for previous quarters, simply "calculates the quarterly contribution factor based on the ratio of total projected quarterly costs of the universal service support mechanisms to contributors' total projected collected end-user interstate and international telecommunications revenues, net of projected contributions." *First Quarter 2022 Contribution Public Notice* at 1, A100.  It is not a final order as to the structure of the Universal Service Fund, the nature of the various

---

[7]  Petitioners have attempted to do just that, filing a second challenge in this Court in response to the FCC's public notice regarding the contribution factor for the second quarter of 2022.  *See Consumers' Research et al. v. FCC*, No. 22-60195 (5th Cir. filed Apr. 6, 2022), *stayed pending proceedings in Case No. 22-60008*. Both of the challenges in this Court followed a materially identical challenge in the Sixth Circuit.  *See Consumers' Research et al. v. FCC*, No. 21-3886 (6th Cir. filed Sept. 30, 2021), *motion to hold case in abeyance pending*.

Universal Service Fund programs, the group of entities from whom contributions are required, or even the existence of the contribution requirement for the First Quarter 2022.

This Court's precedent on the "reopening" doctrine confirms that Petitioners' challenge is untimely.  As this Court recently explained, the "D.C. Circuit developed the reopening doctrine as a way to pinpoint an agency's final action in cases where the agency has addressed the same issue multiple times." *Texas v. Biden*, 20 F.4th at 951.  Where the agency actually "reexamine[s] and reaffirm[s] its prior decision," the "reaffirmance, rather than the original decision, starts the limitation period." *Id.* (internal quotation marks omitted).  "But if the agency merely reaffirm[s] its decision without *really* opening the decision back up and reconsidering it, the agency's initial action is the only final agency action to review—so the limitation period runs from the first decision by the agency." *Id.*  Put differently, a "reopening has occurred *only* if the entire context demonstrates that the agency has undertaken a serious, substantive reconsideration of the existing rule." *Id.* at 952 (internal quotation marks omitted).

The *First Quarter 2022 Contribution Public Notice* did not "reconsider the existing rule" at all, let alone in any "serious, substantive" way.  None of the three factors this Court described regarding such an inquiry—whether the agency

20

invited comment on previously settled matters, the agency's response to comments filed by parties, and the entire context of the rulemaking, *see id.* at 952-53—is present here.  In short, nothing in the FCC's quarterly public notice announcing the *amount* of the Universal Service Fund contribution factor reopened the form or legality of the entire Universal Service Fund system so as to allow Petitioners to circumvent the Hobbs Act.

Nor does the quarterly public notice permit Petitioners to challenge the Commission's Universal Service Fund rules through their application "to a particular situation."  *Texas v. United States*, 749 F.2d at 1146.  The *First Quarter 2022 Contribution Public Notice* is not an order *applying* the Universal Service Fund rules to Petitioners within the meaning of cases like *Texas v. United States*. In that case, for example, the "contract rate rules" that a party challenged after the Hobbs Act limitation period had passed were applied in a ruling on a particular tariff submitted for approval.  *See Texas v. United States*, 730 F.2d 409, 411 (5th Cir. 1984); *see also, e.g.*, *Am. Stewards of Liberty v. Dep't of Interior*, 960 F.3d 223, 229 (5th Cir. 2020) ("An agency applies a regulation to a party when it, for example, issues an order requiring a plaintiff to comply with the regulation, imposes a fine or other sanction against the plaintiff for violating the regulation, or denies a plaintiff's petition to rescind the regulation.").  Here, by contrast, the *First Quarter 2022 Contribution Public Notice* simply announces the result of a

recurring determination, based on the rote application of a mathematical formula, of what the proposed contribution factor is for all parties to whom the contribution requirement applies. And it states that the Universal Service Administrative Company, the Commission's private contractor, "shall use" the proposed contribution factor "to calculate universal service contributions" for that quarter. *First Quarter 2022 Contribution Public Notice* at 4, A103. It does not decide whether contributions are required from any particular party, it does not apply the percentage to some, but not all, parties, it does not determine which of any carrier's revenues the percentage applies to, and it does not determine whether Petitioners or any particular entity have met their contribution obligations. In short, it certainly does not "apply" the entirety of the Universal Service Fund to Petitioners in a manner that permits their challenge.

The Court in *Texas v. United States* discussed D.C. Circuit precedent permitting "judicial review of the substantive statutory authority" for agency rules in certain situations even after the Hobbs Act limitation period has passed, as opposed to "the procedure by which" the rules "were adopted," 749 F.2d at 1146, but this case is unlike any of those cases. In *Functional Music, Inc. v. FCC*, 274 F.2d 543 (D.C. Cir. 1958), for example, the court held that it had jurisdiction to consider the legitimacy of previously adopted FCC rules because the petitioner challenged a later Commission order modifying its license under 47 U.S.C.

§ 402(b), and the court agreed that if the FCC's previous rules "were invalid," then the § 402(b) challenge to a later order was timely.  274 F.2d at 547-48.[8]  The "modification" order in *Functional Music*, however, was a Commission order refusing to reconsider the denial of a petition asking the Commission to "amend[] the rules to expunge altogether" the requirement that affected the challenger's broadcast license.  *Id.* at 545 & n.6; *see also id.* at 547 (the challenged order "affirm[ed]" an earlier substantive order).  Petitioners in this case do not challenge any license modification based on earlier rules, and they have not filed a petition seeking revision or reconsideration of Commission regulations, meaning they have not "properly brought" their arguments "before this court." *Id.* at 546.  As discussed below, the "continuing availability of review" of FCC "rules and regulations" in some other form, *id.* at 547, does not permit the untimely challenge Petitioners have brought here.

Similarly, in *Geller v. FCC*, 610 F.2d 973 (D.C. Cir. 1979), the D.C. Circuit permitted a "challenge to the continuing vitality of the [FCC's] public-interest justification" for rules adopted several years earlier because the petitioner had timely sought review of the FCC's "order refusing to reexamine

---

[8]    Notably, *Functional Music* was brought pursuant to Section 402(b) of the Communications Act which, unlike Section 402(a), is not governed by the Hobbs Act.  *See* 47 U.S.C. § 402(a) (requiring any challenge "except those appealable under subsection (b) of this section" to be brought "as provided by and in the manner prescribed in chapter 158 of title 28").

their continuing validity" in response to his petition for a rulemaking.  *Id.* at 977-

78.  After soliciting and receiving comments and replies from interested parties,

the Commission issued a five-page decision explaining in detail why it chose not

to modify the rules in question.  *Revision of Cable Television Rules Regarding*

*Leapfrogging, Carriage of Local Independent Signals, and Non-Network*

*Programming Exclusivity*, 62 F.C.C.2d 192 (1976).  By contrast here, the

quarterly public notice did not purport to "reexamine" the underlying rules.

Rather, it implemented without discussion the decisions made long ago by the

Commission about how to project Fund requirements and calculate the

contribution factor.  Allowing Petitioners to bring legal challenges to those

decades-old rules through each and every quarterly notice would eviscerate the

Hobbs Act deadline, preventing agency finality and perpetuating uncertainty for

all stakeholders.

Although the instant case must be dismissed as untimely, Petitioners had—

*and still have*—multiple avenues to properly have their concerns heard both at the

Commission and, as warranted, in court.  Petitioners could have filed a petition

for rulemaking asking the FCC to reexamine the rules and then timely challenged

any Commission decision declining to do so.  Petitioners could have filed a

petition for declaratory ruling raising their constitutional arguments and sought

timely judicial review of the Commission's ruling.  Petitioners—or at least Cause

Based Commerce, the one Petitioner directly subject to the contribution requirement—could have requested a waiver of Commission rules requiring payment and timely challenged any Commission action denying their waiver request. And, finally, Petitioners could have declined to pay their universal service contributions (or paid under protest), arguing that the application of the quarterly contribution factor to them was unconstitutional, and then timely appealed a Commission order requiring payment.

All of these alternatives remain open to the Petitioners. Any of them would give interested parties, such as Intervenors here, an opportunity to respond on the record before the Commission to the Petitioners' arguments. Any of them would lead to a final, reviewable order by the Commission setting forth the reasons for its decision based on a comprehensive administrative record. And any of them would permit Petitioners to raise timely legal challenges in accordance with the Hobbs Act.[9] Instead, Petitioners have impermissibly seized on a routine, ministerial decision regarding the amount of the Universal Service Fund

---

[9] Petitioners may argue that the Commission is not required to act on petitions for rulemaking, petitions for declaratory ruling, or waiver requests within any set timeframe. Here, of course, Petitioners had decades to pursue any of these alternative vehicles for relief and seek judicial recourse as needed. Their failure to do so does not permit them to circumvent the Hobbs Act. Moreover, in the unlikely event the FCC fails to act within a reasonable timeframe, Petitioners can seek judicial relief under the All Writs Act. *See, e.g.*, *Telecommunications Research & Action Center v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984) (describing relevant factors).

contribution factor to circumvent the Hobbs Act's jurisdictional limitation. The

Court should dismiss this challenge as barred.

## II. PETITIONERS' LATE CHALLENGE TO THE UNIVERSAL SERVICE FUND WOULD DISRUPT THE ECONOMY AND DISCONNECT MILLIONS OF AMERICANS AND ANCHOR INSTITUTIONS.

Petitioners' late challenge to the Universal Service Fund demonstrates

precisely the reason why the Hobbs Act bars parties from filing lawsuits decades

after final agency action. During the many years in which Petitioners declined to

properly pursue their claims, millions of schools, libraries, health care providers,

companies, and rural and low-income consumers have come to rely on the

universal service programs for internet access and other critical communications

services.

Had Petitioners pursued a procedurally appropriate vehicle at the agency, the

Commission could have considered alternative mechanisms for meeting

Congress's universal service objectives and, if persuaded by Petitioners'

arguments, established an orderly transition for the current universal service

programs.[10] By instead manufacturing this appeal in defiance of the Hobbs Act,

---

[10] Indeed, in late 2021, Congress and the Commission set in motion a proceeding to consider the future of the Universal Service Fund in light of recent Congressionally appropriated broadband investments. *See Report on the Future of the Universal Service Fund*, Notice of Inquiry, FCC 21-127, WC Docket No. 21-476 (rel. Dec. 15, 2021). The Commission specifically solicited—and

Petitioners ask the Court to pull the rug out from under stakeholders in each of the universal service programs without the normal process of agency consideration that typically precedes such important decisions. As a result, adjudication of this untimely petition risks massive disruption to the communications sector and threatens to abruptly cut off educational institutions, libraries, health care providers, businesses, and consumers who depend on universal service funding for vital communications services today. Businesses and other stakeholders relying on each of the FCC's four universal service programs would be severely harmed.

*E-Rate Program.* In Section 254(h), Congress provided specific direction to the Commission to establish a sustainable universal service program (commonly called "E-Rate") to ensure that schools and libraries have affordable access to advanced communications services. 47 U.S.C. § 254(h)(1)(B); *see also id.* § 254(b)(6). When the E-Rate program was established in 1996, "only 14 percent of the nation's K-12 classrooms" had even basic access to the Internet.[11] The lack of affordable high-quality broadband service at schools and libraries was most

---

received—comment on Petitioners' constitutional claims. *See id.* ¶¶ 22, 45 & n.124. The statutory deadline for the Commission's report to Congress is August 2022.

[11] Federal Communications Commission, *E-Rate: Universal Service Program for Schools and Libraries*, https://www.fcc.gov/consumers/guides/universal-service-program-schools-and-libraries-e-rate (last updated Sept. 15, 2021).

acute in rural areas, like Calhoun County, Mississippi, where schools were paying

"astronomical fees" for woefully slow internet speeds over copper lines.[12]

In 2014, the Commission modernized the E-Rate program to focus funding

on providing schools and libraries with affordable broadband connectivity and

internal Wi-Fi networks.  The Commission established an annual cap of $4.276

billion for the program, and E-Rate has achieved tremendous results while staying

well below that budget.[13]  With support from E-Rate and other programs, as of

2020, 99% of school districts obtained broadband service of at least 100 megabits

per second per 1,000 users, connecting over 46 million students.[14]  There is more

work to be done, however, as only 38% of school districts met the Commission's

long-term goal of 1 gigabit per second per 1,000 users.  In 2021 alone, "more than

98,000 schools, 15,000 school facilities, and 11,000 libraries" participated in the

E-Rate program, receiving discounts totaling approximately $2 billion.  Universal

Service Administrative Company, *2021 Annual Report*, at 10,

---

[12]  Benjamin Herold, *The Slowest Internet in Mississippi: Rural Schools Still Struggle to Get Connected*, Education Week (Nov. 19, 2015), https://www.edweek.org/technology/the-slowest-internet-in-mississippi-rural-schools-still-struggle-to-get-connected/2015/11.

[13]  Federal Communications Commission, *E-Rate – Schools and Libraries USF Program*, https://www.fcc.gov/general/e-rate-schools-libraries-usf-program (last updated June 5, 2022).

[14]  *Inquiry Concerning Deployment of Advanced Telecommunications Capability to All Americans in a Reasonable and Timely Fashion*, 2020 Broadband Deployment Report, 35 FCC Rcd. 8986, ¶ 52 (2020).

https://www.usac.org/wp-content/uploads/about/documents/annual-reports/2021/2021_USAC_Annual_Report.pdf ("USAC 2021 Annual Report").

Pursuant to long-standing FCC rules, schools and libraries have typically entered years-long contracts for eligible telecommunications and broadband internet service with providers. *See* 47 C.F.R. §§ 54.500-54.523. Participating schools and libraries regularly conduct competitive bidding processes to find providers for their desired services, *see id.* § 54.503, with universal service funding enabling discounts of generally 20-90% from the "pre-discount price." *Id.* § 54.505(a)-(b). The ultimate E-Rate beneficiaries are the millions of students, teachers, and library patrons across the country who depend on this universal service program for access to the advanced communications equipment and services necessary for modern education.

Petitioners' untimely challenge threatens to cut off educational connectivity for millions of students, teachers, and library users. Without the E-Rate program discounts, schools, and libraries across the country may no longer be able to afford the broadband connectivity they currently rely upon to provide essential educational services. Texas schools and libraries, for example, "have received $4.5 billion from the E-rate program" since 1998, and the "annual average Texas schools and libraries [have] received is $239,371,073." TCEA, *Advocacy, E-rate Basics*, https://tcea.org/advocacy/e-rate/ (last visited June 16, 2022); *see also, e.g.,*

29

Georgia Dep't of Education, *E-Rate Program*, https://www.gadoe.org/Technology-Services/Infrastructure/Pages/erate.aspx (last visited June 16, 2022) (since the "inception of E-rate," Georgia's Department of Education "has received over $500 million in E-rate funding"); State Library of Louisiana, *E-Rate*, https://www.state.lib.la.us/public-libraries/e-rate (last visited June 16, 2022) ("In FY 2020-21, Louisiana public libraries successfully applied for and received commitments of over $4 million in E-rate funding.").  In Michigan, E-Rate program funds have recently made it possible for SHLB member Merit Network to offer Michigan schools across the state superior speeds "for a mere $.50/mb," MAISA, *State Education Network (SEN)*, https://www.gomaisa.org/projects/state-education-network-sen/ (last visited June 16, 2022), as well as a fiber project in the Detroit Public Schools Community District providing "all 109 schools in the district" with "state-of-the-art broadband and creating opportunities for greater access, speed, and reliability."  The Quilt Circle, *Merit Network's commitment to schools stayed strong in 2021*, at 10 (2022), *available at* https://www.thequilt.net/wp-content/uploads/2022/04/TheQuiltCircle2022_FINAL_web-1.pdf.  Those projects would not be sustainable without E-Rate support.  At a minimum, without E-Rate, schools and libraries would face much higher fees for the critical internet access services and equipment that make those institutions community anchor points for accessing broadband.  *See, e.g.*, Texas State Library and Archives

Commission, *Libraries Connecting Texas*, https://www.tsl.texas.gov/broadband
(last visited June 16, 2022) (describing how "Public libraries are the only source of
public Internet access for approximately 60% of communities" as of 2018 and
encouraging Texas public libraries to participate in E-Rate).

In addition, companies that have invested in networks and facilities to serve
the schools and libraries that participate in the decades-old E-Rate program would
be left in unsustainable financial positions. Petitioners' challenge would throw
thousands of service contracts into disarray and undermine education opportunities
for millions of students, teachers, and community members that rely on broadband
in their schools and libraries.

*Rural Health Care Program.* In Section 254(h), Congress also expressly
provided universal service funding to support access for rural health care providers
(a congressionally defined term, *see* 47 U.SC. § 254(h)(7)(B)) to affordable
advanced communications services. *See id.* § 254(h)(1)(A); *see also id.*
§ 254(b)(6). The Rural Health Care program ensures that eligible rural health care
providers pay no more than their urban counterparts for telecommunications
services used for health care purposes and provides a 65% discount on the cost of
broadband and services and equipment used for health care purposes. The goal of
the program is to improve the quality of health care available to patients in rural
communities by ensuring eligible health care providers' access to affordable

telecommunications and broadband services.  As in E-Rate, health care providers participating in the program enter into contracts with telecommunications and broadband service providers after a competitive bidding process subject to Commission rules and oversight.  *See* 47 C.F.R. §§ 54.600-54.633.

Today, rural health care providers across the country rely on the Rural Health Care program for affordable access to the technology they need to treat their patients.  In 2021 alone, over 11,000 rural health care providers received funding commitments and program disbursements totaled $556 million for the year.  USAC 2021 Annual Report at 5, 8.

Many health care providers serving rural areas are able to afford modern telecommunications services and broadband internet service only because of the Rural Health Care program.  With this universal service support, providers are far more capable of offering telehealth services to reach patients who otherwise would have to travel long distances for medical treatment.  *See, e.g.*, *Promoting Telehealth in Rural America*, 34 FCC Rcd. 7335, ¶¶ 2, 5 (2019) (describing benefits of telehealth services for patients in rural areas across the country).  For example, as part of a New England regional consortium, Health Reach Community Centers relied on Rural Health Care program support to increase its bandwidth and expedite a telehealth rollout making virtual visits a possibility for the more than 25,000 patients in 87 rural Maine communities.  In North Carolina, Martin, Tyrell,

Washington District Health Department is relying on the Rural Health Care program's affordable connectivity to expand clinical services to three of the state's poorest rural counties.  Without access to that universal-service-funded network, the Department was stuck with expensive, unreliable broadband service that did not allow them to run their health records system and hold a Zoom meeting at the same time.  In particularly extreme environments, such as in many communities in Alaska, telehealth services made possible by the Rural Health Care program are often the only regularly available health care services.  *See, e.g.*, Letter from Gov. Michael J. Dunleavy, State of Alaska, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 17-310, at 2 (filed Nov. 12, 2019).

Petitioners' challenge would leave many health care providers that serve rural and remote communities unable to justify the cost of their connections, and it would throw contractual relationships between those health care facilities and their service providers into tumult.  *See, e.g.*, 47 C.F.R. § 54.620(b)-(c) (describing rules regarding long-term and multi-year contracts).  Worse yet, cutting off this universal service funding would impair the provision of rural health care across the country—depriving rural health care providers of affordable communications services and undermining their ability reach and treat patients in rural communities that lack easy access to medical care today.

*Lifeline Program.*  Since 1985, the Lifeline program has provided a discount on phone service for qualifying low-income consumers to ensure that all Americans have the opportunities and security that phone service brings, including being able to connect to jobs, family, and emergency services.  In 1996, Congress expressly codified the program, directing the Commission to preserve the preexisting Lifeline Assistance Program and to ensure that "universal service is available at rates that are just, reasonable, and affordable."  47 U.S.C. §§ 254(i), (j).  In 2016, the Commission adopted a comprehensive reform and modernization of the Lifeline program to ensure program integrity while including broadband as a supported service.  *See generally Lifeline and Link Up Reform and Modernization*, 31 FCC Rcd. 3962 (2016).  Today, the Lifeline program offers a monthly benefit of up to $9.25 towards phone or internet services for eligible households and up to $34.25 for eligible Tribal households.

As of June 2021, an estimated 6.9 million households rely on the Lifeline program for connectivity through more than 1100 qualified companies,[15] with most receiving broadband internet access as well as phone service.  *See, e.g.*, Wireline Competition Bureau, FCC, *Report on the State of the Lifeline Marketplace* at 6,

---

[15]  *See* Tyler Cooper, *Report: Every ETC Registered with the FCC's Lifeline Program*, BroadbandNow (Dec. 7, 2021), *available at* https://broadbandnow.com/report/report-every-etc-registered-with-the-fccs-lifeline-program/ (last visited on June 16, 2022).

WC Docket No. 20-437 (June 2021). Although the Lifeline program has steadily

decreased in size over the past three years—with disbursements dropping from

$981 million in 2019 to $723 million in 2021, *see* USAC 2021 Annual Report at

5—the program remains critical. This is particularly true for older Americans. As

AARP has explained to the Commission: "Lifeline helps older, low-income

Americans find and keep a job, get help in the case of an emergency, to access

news and information, and to keep in touch with families, educators and health

providers. According to one major provider, nearly a third of Lifeline customers

are over the age of 55, and 36 percent are disabled. Still another provider shared

that 47 percent of its Lifeline customers are over the age of 50." Letter from

AARP et al. to Chairman Ajit V. Pai, FCC, et al., WC Docket No. 17-287, at 1

(filed May 23, 2018).

Without Lifeline support, participating seniors and other low-income

households would struggle to afford the basic connectivity to the internet that—

particularly given the COVID-19 pandemic—has become necessary for full

participation in modern American life. If successful, Petitioners' untimely claims

would cut off millions of low-income Americans from the internet and phone

services that they rely on for access to emergency services, education, health care,

job opportunities, e-commerce, and civic engagement. As with other universal

service programs, companies that have entered into contracts with those

subscribers and built businesses around serving Lifeline participants would also face significant disruption.

*High-Cost Program.*  The Commission's high-cost program implements Section 254's direction to ensure that Americans in rural, insular, and high-cost areas have access to reasonably comparable communications services at "reasonably comparable … rates" to those in urban areas.  47 U.S.C. § 254(b)(3). Today, small and large communications companies rely on approximately $5 billion annually to provide essential voice and internet services to some of the hardest-to-reach, rural communities across the country.  USAC 2021 Annual Report at 5.  For example, Totelcom Communications, based in De Leon, Texas, was formed in 1895 to deliver telephone service in rural Texas.  Today, Totelcom and its affiliates offer voice, broadband, and other communications services to approximately 5,500 customers across 1,800 square miles of Texas and Oklahoma.  Universal service support through the High-Cost program has been and remains critical to the availability and affordability of services and sustainability of operations; in 2021, Totelcom received over $7.2 million in federal universal service support to connect these sparsely populated and deeply rural areas.  Were this support eliminated, the company would face the prospect of increasing rural customers' rates dramatically in Texas and Oklahoma to offset the

approximately $110 per customer per month received in support from the High-Cost program.

Most recently, as part of the high-cost program, the FCC established the Rural Digital Opportunity Fund and held an auction in late 2020 to identify support recipients that will deploy robust broadband networks to rural communities that have for too long gone without *any* broadband internet access. *See, e.g.*, *Rural Digital Opportunity Fund Phase I Auction (Auction 904)*, 35 FCC Rcd. 13,888 (2020). The Commission used a "reverse auction" procedure to choose winning bidders based on the companies' ability to deliver higher-quality services to as many unserved locations as possible, at the most efficient cost. The Commission has committed to provide winning bidders monthly subsidy payments over a term of ten years to build networks capable of providing high-quality voice and broadband service to every location in their award areas. As of May 3, 2022, the Commission has authorized a total of over $5 billion in universal service funds over 10 years to deploy high-quality broadband to 3 million currently unserved locations in 47 states and the Northern Mariana Islands. Press Release, FCC, *FCC Announces $200 Million for New Broadband Deployments Through the Rural Digital Opportunity Fund as Agency Continues Program Oversight* (May 3, 2022), https://docs.fcc.gov/public/attachments/DOC-382952A1.pdf.

Petitioners' challenge would abruptly eliminate the funding that thousands of small and large communications companies are relying on to provide reasonably comparable voice and broadband services to rural and high-cost consumers.  In addition, it would gut the Rural Digital Opportunity Fund, stranding the long-term planning and investments winning bidders have made for deployment over the next decade, thereby undercutting the program's objective of providing robust voice and broadband service in unserved areas across the country.

*    *    *

Petitioners assert that they "take no position on the wisdom of universal service," Pet. Br. 1, but their belated challenge to the Universal Service Fund, if successful, would abruptly dismantle it.  The result would be to cut off millions of consumers, schools, libraries, and health care providers—and to disrupt countless institutions and companies that have built the USF into their business plans.  By contrast, a properly brought challenge would allow Intervenors and other stakeholders to provide their views to the agency in the first instance.  It would permit the Commission (and potentially Congress) to address Petitioners' assertions and prevent the massively disruptive consequences of suddenly eliminating the current system without any transition plan or replacement.  And it would allow Petitioners to seek timely judicial review of the Commission's

decision. Finally, it would afford this Court the proper jurisdiction to review that decision.

Intervenors agree with the FCC and Intervenors USTelecom et al. that Petitioners' constitutional claims lack merit based on this Court's precedent. But the Court also should not ignore the immense, real-world consequences of Petitioners' untimely claims in considering the issues presented in this case.

## CONCLUSION

The Court should dismiss the petition for review.

Respectfully Submitted,

/s/ Andrew Jay Schwartzman

Andrew Jay Schwartzman
1341 G Street, NW
5th Floor
Washington, DC 20005
(202) 241-2408
AndySchwartzman@gmail.com

*Counsel for Benton Institute for Broadband & Society, National Digital Inclusion Alliance, and Center for Media Justice dba MediaJustice*

/s/ Stephanie Weiner

Stephanie Weiner
Jason Neal
HARRIS, WILTSHIRE & GRANNIS LLP
1919 M Street, NW, 8th Floor
Washington, D.C. 20036
(202) 730-1300
sweiner@hwglaw.com

*Counsel for Schools, Health, & Libraries Broadband Coalition*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 17th day of June, 2022, the foregoing document was filed via CM/ECF.  Service was accomplished on all parties or their counsel of record via CM/ECF.

/s/ Stephanie Weiner
Stephanie Weiner

# **CERTIFICATE OF COMPLIANCE**

I certify that the foregoing document complies with the requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared in 14-point Times New Roman font.

I further certify that the foregoing document complies with the requirements of Fifth Circuit Rule 32 and Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 8,748 words according to the word-count feature of Microsoft Word.

/s/ Stephanie Weiner
Stephanie Weiner