No. 22-60008

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

CONSUMERS' RESEARCH; CAUSE BASED COMMERCE,
INCORPORATED; KERSTEN CONWAY; SUZANNE BETTAC; ROBERT
KULL; KWANG JA KERBY; TOM KIRBY; JOSEPH BAYLY; JEREMY
ROTH; DEANNA ROTH; LYNN GIBBS; PAUL GIBBS; RHONDA THOMAS,

*Petitioners*,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES OF
AMERICA,

*Respondents*.

On Petition for Review of an Order of the
Federal Communications Commission

## JOINT BRIEF OF INTERVENORS USTELECOM, NTCA, AND CCA IN
SUPPORT OF RESPONDENTS

Jennifer Tatel
Craig E. Gilmore
Wilkinson Barker Knauer, LLP
1800 M Street NW, Suite 800N
Washington, DC 20036
(202) 783-4141
jtatel@wbklaw.com
cgilmore@wbklaw.com
*Counsel for USTelecom, NTCA, CCA*

June 17, 2022

## CERTIFICATE OF INTERESTED PERSONS

No. 22-60008

*Consumers' Research; Cause Based Commerce, Incorporated; Kersten Conway;*
*Suzanne Bettac; Robert Kull; Kwang Ja Kerby; Tom Kirby; Joseph Bayly;*
*Jeremy Roth; Deanna Roth; Lynn Gibbs; Paul Gibbs; Rhonda Thomas*
*v.*
*Federal Communications Commission;*
*United States of America*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Local Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

<u>Petitioners</u>

1.  Consumers' Research. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

2.  Cause Based Commerce, Incorporated. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

3.  Kersten Conway

4.  Suzanne Bettac

5.  Robert Kull

6.  Kwang Ja Kerby

7.  Tom Kirby

8.  Joseph Bayly

i

9.  Jeremy Roth

10.  Deanna Roth

11.  Lynn Gibbs

12.  Paul Gibbs

13.  Rhonda Thomas

Respondents

14.  Federal Communications Commission

15.  United States of America

Intervenors

16.  Benton Institute for Broadband & Society.  It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

17.  National Digital Inclusion Alliance.  It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

18.  Center for Media Justice (d/b/a MediaJustice).  It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

19.  Schools, Health & Libraries Broadband Coalition.  It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

20. USTelecom – The Broadband Association.  It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

21. National Telecommunications Cooperative Association d/b/a NTCA – The Rural Broadband Association.  It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

22. Competitive Carriers Association.  It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

<u>Counsel</u>

23. Boyden Gray & Associates PLLC: C. Boyden Gray, R. Trent McCotter, Jonathan Berry, Michael Buschbacher, and Jared M. Kelson are counsel for Petitioners.

24. Federal Communications Commission: Jacob M. Lewis, James M. Carr and Adam G. Crews are counsel for Respondent Federal Communications Commission.

25. United States Department of Justice: Gerard J. Sinzdak is counsel for Respondent United States of America.

26. Andrew Jay Schwartzman is counsel for Intervenors Benton Institute for Broadband & Society, National Digital Inclusion Alliance, and Center for Media Justice.

27. Harris, Wiltshire & Grannis, LLP: Stephanie Weiner and Jason Neal are counsel for Intervenors Schools, Health & Libraries Broadband Coalition.

28. Wilkinson Barker Knauer, LLP: Jennifer Tatel and Craig Gilmore are counsel for Intervenors USTelecom – The Broadband Association, National Telecommunications Cooperative Association d/b/a NTCA – The Rural Broadband Association, and Competitive Carriers Association.

*/s/ Jennifer Tatel*
Jennifer Tatel

## STATEMENT REGARDING ORAL ARGUMENT

Intervenors USTelecom – The Broadband Association, National Telecommunications Cooperative Association d/b/a NTCA – The Rural Broadband Association, and the Competitive Carriers Association request that this Court hear oral argument. The issues presented arise in the context of a complex statutory scheme, raise important constitutional issues, and have significant nationwide importance.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ......................................................... i

STATEMENT REGARDING ORAL ARGUMENT ................................................ v

TABLE OF AUTHORITIES ................................................................................. vii

JURISDICTIONAL STATEMENT ........................................................................ 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ............................ 1

STATEMENT OF THE CASE ................................................................................ 1

    A.   Intervenors' Interest in this Case ........................................................... 1

    B.   Background ............................................................................................. 2

SUMMARY OF ARGUMENT ............................................................................... 7

ARGUMENT .......................................................................................................... 8

I.      SECTION 254 IS NOT AN UNCONSTITUTIONAL DELEGATION. ....... 8

    A.   Section 254 Satisfies the Intelligible Principle Test. ............................ 9

    B.   The Court Should Reject Petitioners' False Distinctions Regarding
         Application of the Intelligible Principle Test. .................................... 20

    C.   Section 254's Delegation Must Be Analyzed Under Governing
         Precedent. ............................................................................................ 23

    D.   Section 254 Would Be Constitutional Even if the *Gundy* Dissent
         Provided the Controlling Standard. ..................................................... 26

II.    PETITIONERS' TAX CLAIMS ARE WRONG ON THE LAW AND
      IRRELEVANT UNDER BINDING PRECEDENT. ................................... 31

    A.   The Fifth Circuit and Other Courts Have Concluded that Universal
         Service Fees Are Not Taxes. ............................................................... 31

    B.   Petitioners' Fee-Versus-Tax Test Is Wrong ........................................ 33

    C.   Under *Skinner*, Whether a Payment Is a Tax or a Fee Is Irrelevant to
         the Nondelegation Analysis. ............................................................... 36

III.   USAC'S ROLE IS NARROWLY CONFINED AND PETITIONERS
      EXAGGERATE USAC'S AUTHORITY ................................................... 37

IV.   STRIKING DOWN SECTION 254 WOULD BE DISRUPTIVE AND
      UPSET INVESTMENT-BACKED RELIANCE INTERESTS. .................. 41

V.    CONCLUSION ............................................................................................. 44

# TABLE OF AUTHORITIES

## CASES

*A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935) ..................10

*ALA Commc'ns Corp. v. FCC*, 925 F.2d 487 (D.C. Cir. 1991)................................3

*Alenco Commc'ns, Inc. v. FCC*, 201 F.3d 608 (5th Cir. 2000) ...................14, 28, 29

*Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104 (1991) .........................17

*AT&T, Inc. v. FCC*, 886 F.3d 1236 (D.C. Cir. 2018) ....................................3, 19, 28

*Big Time Vapes, Inc. v. FDA*, 963 F.3d 436 (5th Cir. 2020) .................11, 12, 17, 23

*Blanca Tel. Co. v. FCC*, 991 F.3d 1097 (10th Cir. 2021)........................................17

*Cir. City Stores, Inc. v. Adams*, 532 U.S. 105 (2001)..............................................15

*Citizens' Util. Ratepayer Bd. v. State Corp. Comm'n*, 956 P.2d 685 (Kan. 1998) ..32

*Competitive Telecomms. Ass'n v. FCC*, 117 F.3d 1068 (8th Cir. 1997) .................18

*FPC v. Hope Nat. Gas Co.*, 320 U.S. 591 (1944)....................................................10

*Fund for Animals v. Kempthorne*, 538 F.3d 124 (2d Cir. 2008) .............................37

*Gen. Tel. Co. of the Southwest v. United States*, 449 F.2d 846 (5th Cir. 1971) .......19

*Gundy v. United States*, 139 S. Ct. 2116 (2019)...............................................passim

*Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421 (5th Cir. 2021) ...............................30

*In re Incomnet*, 463 F.3d 1064 (9th Cir. 2006)................................................40, 41

*J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394 (1928) .......................9, 21

*Jarkesy v. SEC*, No. 20-61007 (5th Cir. May 18, 2022)....................................11, 24

*Lichter v. United States*, 334 U.S. 742 (1948)........................................................22

*Mistretta v. United States*, 488 U.S. 361 (1989)...........................................8, 9, 10

*Morrow v. Meachum*, 917 F.3d 870 (5th Cir. 2019).........................................24, 37

*N.Y. Cent. Sec. Corp. v. United States*, 287 U.S. 12 (1932) ...................................10

*NAACP v. Fed. Power Comm'n*, 425 U.S. 662 (1976)............................................15

*Nat'l Broad. Co. v. United States*, 319 U.S. 190 (1943) ...............................9, 15, 22

*Nat'l Cable Television Ass'n v. United States*, 415 U.S. 336 (1974) ......................34

*Nat'l Fed. of Indep. Bus. v. OSHA*, 142 S. Ct. 661 (2022)......................................28

*Neinast v. Texas*, 217 F.3d 275 (5th Cir. 2000)......................................................33

*Panama Refin. Co. v. Ryan*, 293 U.S. 388 (1935) ....................................................10

*Payne v. Tennessee*, 501 U.S. 808 (1991) ...............................................................43

*Qwest Communs. Int'l, Inc. v. FCC*, 398 F.3d 1222 (10th Cir. 2005)...............13, 30

*Qwest Corp. v. FCC*, 258 F.3d 1191 (10th Cir. 2001) ........................................13, 30

*Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477 (1989).............23

*Rural Cellular Ass'n & Universal Serv. v. FCC*, 685 F.3d 1083 (D.C. Cir. 2012) .....
..................................................................................................................31, 34, 36

*Rural Cellular Ass'n v. FCC*, 588 F.3d 1095 (D.C. Cir. 2009) ...................15, 16, 28

*Rural Tel. Coal. v. FCC*, 838 F.2d 1307 (D.C. Cir. 1988) ...........................3, 18, 32

*Schumacher v. Johanns*, 722 N.W.2d 37, 50-51 (Neb. 2006) ..................................32

*Sierra Club v. Lynn*, 502 F.2d 43 (5th Cir. 1974)...............................................37, 40

*Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212 (1989) ........................20, 33, 34, 36

*Texas Ent. Ass'n v. Hegar,* 10 F.4th 495 (5th Cir. 2021)...........................................33

*Texas Off. of Pub. Util. Couns. v. FCC*, 183 F.3d 393 (5th Cir. 1999) .............passim

*Texas Off. of Pub. Util. Couns. v. FCC*, 265 F.3d 313 (5th Cir. 2001) ..........4, 13, 29

*Texas v. Rettig*, 987 F.3d 518 (5th Cir. 2021)............................................................39

*Texas v. Rettig*, 993 F.3d 408 (5th Cir. 2021)............................................................39

*Trafigura Trading LLC v. United States*, 29 F.4th 286 (5th Cir. 2022) .............33, 35

*U.S. Telecom Ass'n v. FCC*, 359 F.3d 554 (D.C. Cir. 2004)....................................37

*United States v. AT&T Co.*, 552 F. Supp. 131 (D.D.C. 1982)....................................3

*United States v. Jones*, 132 F.3d 232 (5th Cir. 1998)...............................................11

*United States v. Mecham*, 950 F.3d 257 (5th Cir. 2020) .....................................23, 37

*United States v. Mirza*, 454 F. App'x 249 (5th Cir. 2011) .......................................11

*United States v. United States Shoe Corp.*, 523 U.S. 360 (1998).......................33, 35

*United States v. Whaley*, 577 F.3d 254 (5th Cir. 2009).............................................11

*Voicestream GSM I Operating Co., LLC v. La. Pub. Serv. Comm'n*, 943 So. 2d 349
(La. 2006) .............................................................................................................33

*Vonage Holdings Corp. v. FCC*, 489 F.3d 1232 (D.C. Cir. 2007).........12, 19, 20, 28

*Vt. Pub. Serv. Bd. v. FCC*, 661 F.3d 54 (D.C. Cir. 2011).........................................6

*Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457 (2001)......................10, 17, 23

*Yakus v. United States*, 321 U.S. 414 (1944) ........................................26, 30

**STATUTES**

34 U.S.C. § 20913 ..............................................................................27

47 U.S.C. § 151 ...................................................................................2

47 U.S.C. § 153 .................................................................................16

47 U.S.C. § 214 .................................................................................17

47 U.S.C. § 254 ..........................................................................passim

47 U.S.C. § 405 .................................................................................25

**RULES AND REGULATIONS**

47 C.F.R. § 54.701 ...............................................................................5

47 C.F.R. § 54.702 .............................................................................39

47 C.F.R. § 54.709 ....................................................................5, 14, 38

47 C.F.R. § 54.725 ...............................................................................5

**ADMINISTRATIVE MATERIAL**

*Changes to the Bd. of Dirs. of the Nat'l Exch. Carrier Ass'n, Inc. and Fed.-State Bd. on Universal Serv.*, 12 FCC Rcd 18400 (1997) .................................4

*First Quarter 1998 Universal Service Contribution Factors Revised and Approved*, 12 FCC Rcd 21881 (CCB 1997) ..........................................................40

*Second Quarter 2003 Universal Service Contribution Factor*, 18 FCC Rcd 5097 (WCB 2003) ................................................................................40

**OTHER AUTHORITIES**

Ilan Wurman, Nondelegation at the Founding, 130 Yale L.J. 1490, 1555 (2021)...24

Julian Davis Mortenson & Nicholas Bagley, *Delegation at the Founding*, 121 Colum. L. Rev. 277 (2021).............................................................24

NTCA, NTCA Membership Broadband Survey (Dec. 2021) .................................42

## JURISDICTIONAL STATEMENT

USTelecom – The Broadband Association ("USTelecom"), National Telecommunications Cooperative Association d/b/a NTCA – The Rural Broadband Association ("NTCA"), and the Competitive Carriers Association ("CCA") (collectively, "Telecom Intervenors") adopt the jurisdictional statement made by Respondents the Federal Communications Commission ("FCC") and the United States of America.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

Telecom Intervenors adopt the statement of issues made by Respondents.

## STATEMENT OF THE CASE

### A.    Intervenors' Interest in this Case

USTelecom is a non-profit association representing service providers and suppliers for the telecom industry.  USTelecom members provide a full array of services, including broadband, voice, data, and video over wireline and wireless networks.   Its diverse member base ranges from large publicly traded communications corporations to small companies and cooperatives—providing advanced communications services to both urban and rural markets across the country.

NTCA is a general cooperative association whose membership is composed of nearly 850 independent, family-owned and community-based telecommunications companies providing voice and broadband services in rural

areas. NTCA's members build and deliver connectivity and operate essential services in rural and small-town communities across the United States. NTCA's members use universal service funds to serve customers who would otherwise go unserved or who would face the prospect of paying rates for services far in excess of those available in urban areas.

CCA is the nation's leading association for competitive wireless providers and stakeholders across the United States. CCA's membership includes nearly 100 competitive wireless providers ranging from small, rural carriers serving fewer than 5,000 customers to regional and national providers serving millions of customers. CCA also represents nearly 200 associate members, including vendors and suppliers that provide products and services throughout the mobile communications supply chain. CCA's members use universal service funds to serve customers who would otherwise go unserved.

### B.    Background

Congress established the FCC in part "to make available . . . to all the people of the United States . . . communication service with adequate facilities at reasonable charges." 47 U.S.C. § 151. Since its inception, the FCC has aimed to achieve that end.

Until the late 1990s, the FCC "achieved universal service by authorizing rates to monopoly providers sufficient to enable revenue from easy-to reach customers,

such as city dwellers, to implicitly subsidize service to those in areas that were hard to reach." *AT&T, Inc. v. FCC*, 886 F.3d 1236, 1242 (D.C. Cir. 2018) (citation omitted). However, with the breakup of AT&T in 1984, *see United States v. AT&T Co.*, 552 F. Supp. 131, 170 (D.D.C. 1982), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983), such implicit subsidies became harder to maintain. To begin to replace implicit subsidies, the FCC created the Universal Service Fund ("USF") to ensure universal service in high-cost areas. *See Rural Tel. Coal. v. FCC*, 838 F.2d 1307, 1311-12 (D.C. Cir. 1988). As the D.C. Circuit explained, the USF "was proposed in order to further the objective of making communication service available to all Americans at reasonable charges . . . ." *Id.* at 1315. The D.C. Circuit found that establishing the USF was within the FCC's authority because the USF's purpose was limited to "ensuring that 'telephone rates are within the means of the average subscriber.'" *Id*. (citation omitted). In addition to USF support for service to high-cost areas, the FCC also established the Link Up America and Lifeline programs to assist low-income households with telephone installation and service charges. *See ALA Commc'ns Corp. v. FCC*, 925 F.2d 487 (D.C. Cir. 1991) (unpublished).

Against this backdrop, and with increasing technological change in the industry, Congress enacted the Telecommunications Act of 1996 ("1996 Act"). "The 1996 Act made competition in the local basic service market one of its main

goals." *Texas Off. of Pub. Util. Couns. v. FCC*, 265 F.3d 313, 317 (5th Cir. 2001)

(*TOPUC II*).  While promoting competition, the 1996 Act also sought to "continu[e]

the provision of affordable universal service to all Americans."  *Id.* at 318.  Because

competition and implicit universal service subsidies operated in tension with each

other, Congress "required that the implicit subsidy system of rate manipulation be

replaced with explicit subsidies for universal service."  *Id.*

Congress did so through 47 U.S.C. § 254, which provided for the

"preservation and advancement of universal service," 47 U.S.C. § 254(b), and

directed the FCC to make support for universal service "explicit."  *Id.* § 254(e).

Congress mandated in Section 254(d) that every telecommunications carrier shall

contribute to mechanisms supporting universal service "on an equitable and

nondiscriminatory basis."  *Id.* § 254(d).  In addition to codifying the preservation

and advancement of existing universal service mechanisms, Congress also directed

the FCC to establish new mechanisms to support telecommunications service to rural

health care providers as well as to schools and libraries.  *See id.* § 254(h).

Pursuant to Section 254's directive, the FCC promulgated implementing

regulations to delineate in detail the mechanics of the universal service mechanisms

and contributions to fund them.  *See Changes to the Bd. of Dirs. of the Nat'l Exch.*

*Carrier Ass'n, Inc. and Fed.-State Bd. on Universal Serv.*, 12 FCC Rcd 18400,

18461 (1997).  The mechanisms supporting universal service are divided into four

4

programs to provide support for: (1) rural areas; (2) low-income customers; (3) schools and libraries; and (4) rural health care. As noted above, the FCC established support for rural areas and low-income consumers before the 1996 Act, and the 1996 Act established the programs for schools and libraries and rural health care.

Under its implementing regulations, the FCC established the Universal Service Administrative Corporation ("USAC") to administer universal service programs. *See* 47 C.F.R. §§ 54.701-725. As relevant here, the FCC provided that contributions to universal support "be based on contributors' projected collected end-user telecommunications revenues, and on a contribution factor determined quarterly by the Commission." *Id.* § 54.709(a). To assist with these calculations, the FCC charged USAC with submitting projections of demand for the universal service mechanisms and administrative expenses for the upcoming quarter. *See id.* § 54.709(a)(3). When USAC submits its quarterly projections, the FCC then issues a public notice announcing them and proposing a contribution factor based on those projections. If the FCC takes no further action within 14 days after release of the public notice, then the FCC's contribution factor is deemed approved. *See id.* However, the FCC "reserves the right to set projections of demand and administrative expenses at amounts that the Commission determines will serve the public interest." *Id.*

5

Once the FCC approves the contribution factor, USAC applies it to calculate each telecommunications carrier's quarterly USF assessment. *Id*. The USF program thus is "financed by fees charged to telephone companies and other providers of interstate telecommunications services." *Vt. Pub. Serv. Bd. v. FCC*, 661 F.3d 54, 57 (D.C. Cir. 2011) (citation omitted). Telecommunications providers "may pass these fees along to their customers, and almost always do." *Id*. This system of determining and collecting contributions has remained in place for a quarter century.

In accord with this regulatory regime, USAC submitted its projections of demand and administrative expenses for the First Quarter 2022 on November 2, 2021. *See Proposed First Quarter 2022 Universal Service Contribution Factor*, Public Notice, DA 21-1550, at 1 (rel. Dec. 13, 2021) ("Public Notice") (JA100). On December 13, 2021, the FCC's Office of Managing Director issued the Public Notice, which set forth the projections that USAC had estimated and the associated "quarterly contribution factor calculated by the [FCC]." *Id*. at 1-4 (JA100-103). The proposed contribution factor was deemed approved by the FCC on December 27, 2021, and Petitioners filed their Petition in this Court challenging that approval on January 5, 2022. Notably, Petitioners challenged neither USAC's estimated projections nor the FCC's calculation of the contribution factor based on those projections.

6

## SUMMARY OF ARGUMENT

Section 254's directive that the FCC preserve and advance universal service is constitutional. Under the Supreme Court's approach for reviewing nondelegation challenges, Section 254 falls well within constitutional bounds. Section 254 prescribes far more detailed directions than other statutes that have repeatedly been upheld by the Supreme Court over the past century. Even under a more searching standard—which could be adopted only by the Supreme Court—Section 254 still would pass constitutional muster. In addition, the contributions collected in furtherance of Section 254 are fees and not taxes. Even if they were taxes, however, the nondelegation analysis remains the same under Supreme Court authority.

Furthermore, USAC's role in administering universal service programs is constitutional because USAC plays only a ministerial role in helping to calculate the contribution factor and is expressly precluded from exercising decision-making authority. The only role USAC played in this case was the accounting exercise of projecting demand and administrative expenses for the First Quarter 2022. The FCC calculated the contribution factor based on those projections.

In an effort to overcome controlling authority contrary to their position, Petitioners exaggerate every aspect of this case. Petitioners overstate the stringency of the Supreme Court's "intelligible principle" test used to determine whether a statutory delegation is constitutional. Petitioners exaggerate the breadth of Section

7

254's delegation to the FCC.    And Petitioners exaggerate USAC's role in determining quarterly contribution factors.    This Court should reject Petitioners' arguments.

## ARGUMENT

## I.    SECTION 254 IS NOT AN UNCONSTITUTIONAL DELEGATION.

Section 254 complies with both the "modern intelligible-principle test" and, though foreclosed by binding precedent, Petitioners' claimed "original understanding of the nondelegation doctrine." *Cf.* Pet. Br. at 29.  In support of their arguments to the contrary, Petitioners overstate the breadth of Section 254 and ignore previous judicial constructions of Section 254 demonstrating the limits that cabin the FCC's discretion.  Under either test, Section 254's decades-old direction to the Commission to collect contributions from providers of telecommunications services for universal service passes constitutional muster.

Applying the intelligible principle test, the Supreme Court has repeatedly affirmed directives from Congress to administrative agencies that are brief and standard-based—it has not required directives that are lengthy or rule-like.  *See Mistretta v. United States*, 488 U.S. 361, 373 (1989) (collecting cases).  Moreover, Petitioners' claims that the intelligible principle test applies heightened scrutiny to "revenue-raising" statutes incorrectly attempts to limit cases' holdings to facts that

were not material to their outcome and ignores the reasoning in Supreme Court delegation cases.

Petitioners' claims about the original understanding of the nondelegation doctrine similarly are without merit. Those claims are contrary to this Court's and Supreme Court precedent. And even if this Court were to analyze Section 254 under such an approach, Section 254 complies with the factors set forth in Justice Gorsuch's dissent in *Gundy v. United States*, 139 S. Ct. 2116 (2019).

### A.    Section 254 Satisfies the Intelligible Principle Test.

Under the intelligible principle test, "a statutory delegation is constitutional as long as Congress 'lays down by legislative act an intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform.'" *Id.* at 2123 (plurality) (alterations omitted) (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)). Consistent with this test, the Supreme Court has affirmed broad congressional delegations to agencies, explaining that "Congress simply cannot do its job absent an ability to delegate power under broad general directives." *Mistretta*, 488 U.S. at 372 (citation omitted). For instance, the Supreme Court has upheld multiple delegations to agencies to take regulatory action in the "public interest." *See Nat'l Broad. Co. v. United States*, 319 U.S. 190, 225-26 (1943) (upholding delegation to FCC to regulate broadcast licensing in the "public interest"); *N.Y. Cent. Sec. Corp. v. United States*, 287 U.S.

9

12, 24-25 (1932) (upholding delegation to the Interstate Commerce Commission to approve railroad consolidations that are in the "public interest"); *see also Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 472 (2001) (citation omitted) (upholding delegation to the Environmental Protection Agency to regulate ambient air quality standards "which in the judgment of the Administrator . . . are requisite to protect the public health"); *FPC v. Hope Nat. Gas Co.*, 320 U.S. 591, 600-01 (1944) (upholding delegation to the Federal Power Commission to ensure "just and reasonable" rates).

Indeed, the Supreme Court has "almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law." *Mistretta*, 488 U.S. at 416 (Scalia, J., dissenting). The Supreme Court has struck down only two statutes for lacking an intelligible principle, and those two cases occurred more than eighty years ago. *See Panama Refin. Co. v. Ryan*, 293 U.S. 388, 433 (1935); *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 542 (1935). In both *Panama* and *Schechter*, the statutes "failed to articulate *any policy or standard* that would serve to confine the discretion of the authorities to whom Congress had delegated power." *Mistretta*, 488 U.S. at 373 n.7 (emphasis added). In turn, this Court has upheld statutes with

broad delegations where limited by an intelligible principle,[1] and found unconstitutional a statute only where Congress "offered *no guidance* whatsoever."[2]

A "nondelegation inquiry always begins (and often almost ends) with statutory interpretation." *Big Time Vapes, Inc.*, 963 F.3d at 443 (quoting *Gundy*, 139 S. Ct. at 2123 (plurality)). The text of Section 254 provides far more guidance than a "public interest," "just and reasonable," or other broad standard that has passed constitutional muster. First, Section 254(d) mandates that "[e]very telecommunications carrier that provides interstate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, to the specific, predictable, and sufficient mechanisms established by the Commission to preserve and advance universal service." 47 U.S.C. § 254(d). Thus, Congress answered the

---

[1] *See, e.g.*, *Big Time Vapes, Inc. v. FDA*, 963 F.3d 436, 439 (5th Cir. 2020) (affirming delegation to the Food and Drug Administration to regulate three listed tobacco products and also "*any other* tobacco products that the Secretary [of Health and Human Services] by regulation *deems* to be subject to" the relevant act (emphasis added)); *United States v. Mirza*, 454 F. App'x 249, 255-56 (5th Cir. 2011) (per curiam); *United States v. Whaley*, 577 F.3d 254, 263-64 (5th Cir. 2009) (upholding, against a nondelegation challenge, the Sex Offender Registration and Notification Act, the same statute upheld in *Gundy*); *United States v. Jones*, 132 F.3d 232, 239 (5th Cir. 1998).

[2] *Jarkesy v. SEC*, No. 20-61007, slip op. at 24 (5th Cir. May 18, 2022) (emphasis added). In *Jarkesy*, the panel majority held that Congress went too far when it granted the Securities and Exchange Commission ("SEC") "open-ended" authority to choose whether to bring an enforcement action within the agency (without a jury) or in court (with a jury), because Congress "said nothing at all indicating how the SEC should make that call in any given case." *Id*. at 24-25. As discussed below, Section 254's detailed guidance to the FCC presents no such concerns.

threshold question of who would be required to contribute. Although Section 254(d) permits the FCC to require contributions from "[a]ny other provider of interstate telecommunications . . . if the public interest so requires," this flexibility to adapt to technological and marketplace changes falls squarely within the authority permitted in *Big Time Vapes, Inc.*, 963 F.3d at 438 (finding no delegation issue in a statute permitting the Food and Drug Administration to regulate "any other tobacco products" deemed to be subject to the act). *See also Vonage Holdings Corp. v. FCC*, 489 F.3d 1232, 1239-41 (D.C. Cir. 2007) (analyzing statutory definitions and voice over Internet Protocol service to conclude that the FCC "has section 254(d) authority to require interconnected VoIP providers to make" contributions).

Further, Congress set forth explicit principles for the FCC to follow in implementing Section 254. These six universal service principles laid out in Section 254(b) include that "[q]uality services should be available at just, reasonable, and affordable rates," and that "[t]here should be specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service." 47 U.S.C. § 254(b).[3]

---

[3] Although Section 254(b) permits the creation of additional principles, such principles must be "necessary and appropriate for the protection of the public interest, convenience, and necessity and [be] consistent with this Act." 47 U.S.C. § 254(b)(7).

Petitioners nonetheless claim these fail to meaningfully limit FCC authority because they are no more than tautologies and "aspirational only." Pet. Br. at 41-42 (quoting *TOPUC II*, 265 F.3d at 321). However, Petitioners misapprehend the impact of *TOPUC II* in making this claim. *TOPUC II* was decided under the deferential *Chevron* standard that applies to agency interpretations of ambiguous statutes. *TOPUC II*, 265 F.3d at 321-22 ("Under this deferential review, we have approved the FCC's interpretation of the statutory principles as aspirational only" (citing *Texas Off. of Pub. Util. Couns. v. FCC*, 183 F.3d 393, 421 (5th Cir. 1999) (*TOPUC I*)). The *TOPUC II* court was analyzing just how tightly the Section 254 statutory principles constrain the FCC—not whether they constrain the FCC at all.

Underscoring that the FCC's discretion is limited by these principles, the Tenth Circuit has twice concluded that an FCC order did not properly interpret them. *See Qwest Corp. v. FCC*, 258 F.3d 1191, 1201, 1205 (10th Cir. 2001) (*Qwest I*) (concluding that the FCC had inadequately explained how its decision was related to the statutory requirements provided in Section 254); *Qwest Communs. Int'l, Inc. v. FCC*, 398 F.3d 1222, 1234 (10th Cir. 2005) (*Qwest II*) (concluding the FCC had erred in its constructions of "sufficient" and "reasonably comparable" by ignoring other universal service principles). Further demonstrating that Section 254 constrains the FCC, this Court has concluded that the principles in Section 254(b) may be overcome by other mandatory provisions in Section 254. *See TOPUC I*, 183

13

F.3d at 412 ("[T]he plain language of § 254(e) makes sufficiency of universal support a direct statutory command rather than a statement of one of several principles.").

Similarly, Petitioners' claim that the FCC is free to raise revenue with "no limit at all" is misplaced. Pet. Br. at 41. The FCC is not permitted to raise any amount of money, for any purpose, from anyone. Rather, the FCC first determines what constitutes universal service pursuant to Section 254(c). From there, the FCC determines "sufficient" mechanisms and support levels "to preserve and advance universal service." 47 U.S.C. § 254(b)(5), (d); *see also id.* § 254(e) (stating that universal support "should be explicit and sufficient to achieve the purposes of this section"). The level of support therefore is directed by what is sufficient to support universal service and by market demand. *See* 47 C.F.R. § 54.709(a)(3) (basing total contribution amount on projections of demand). This Court has noted that "excessive funding may itself violate the sufficiency requirements of the Act" if it undermines "universal service by causing rates unnecessarily to rise, thereby pricing consumers out of the market." *Alenco Commc'ns, Inc. v. FCC*, 201 F.3d 608, 620 (5th Cir. 2000). Similarly, the D.C. Circuit observed in *Rural Cellular Ass'n v. FCC* (*Rural Cellular I*) that "it is hard to imagine how the Commission could achieve the overall goal of § 254(b) . . . if the USF is 'sufficient' for purposes of § 254(b)(5), yet so large it actually makes telecommunications services less 'affordable,' in

contravention of § 254(b)(1)."    588 F.3d 1095, 1103 (D.C. Cir. 2009).    These

precedents demonstrate that Section 254 limits total contributions.[4]

Petitioners also claim that the FCC may define its own statutory mission under

Section 254(b)(7), Pet. Br. at 33-34, supposedly pulling the statute away from its

constitutional moorings, but this criticism again misses the mark.   Section 254(b)(7)

only permits the FCC to rely on other principles that are "necessary and appropriate

for the protection of the public interest, convenience, necessity and are consistent

with this Act" when developing the universal service program.   Even if this were the

sole guidepost, it would be permissible under the intelligible principle test.   *See Nat'l*

*Broad. Co.*, 319 U.S. at 225-26 (finding that FCC authority to regulate in the "public

interest" is permissible).   Moreover, Petitioners ignore the long-established *ejusdem*

*generis* canon that residual clauses are "controlled and defined by reference to the

enumerated categories . . . which are recited just before it."   *Cir. City Stores, Inc. v.*

*Adams*, 532 U.S. 105, 115 (2001); *see also NAACP v. Fed. Power Comm'n*, 425 U.S.

662, 669 (1976) (holding that use of "public interest" in a regulatory statute "is not

---

[4] Petitioners' arguments on the expanded budget of universal service are also misplaced.  *See* Pet. Br. at 33.  Expansion of budget has little probative value in assessing the scope of delegation.  Petitioners have failed to adjust for inflation, which dampens the real effects of market driven budget expansion.    More importantly, it is perfectly sensible that a regulatory program in its initial stages would start incrementally as an agency develops further expertise in the field.  Courts should not encourage agencies to start with maximalist programs in an effort to ward off nondelegation challenges in the future.

a broad license to promote the general public welfare" and instead "take[s] meaning from the purposes of the regulatory legislation"). Consistent with this limitation, the FCC has only infrequently developed additional universal service principles under Section 254(b)(7). For example, the FCC has adopted a seventh principle, that universal service mechanisms and rules neither unfairly advantage nor disadvantage one provider over another, *Rural Cellular I*, 588 F.3d at 1098, which is an outgrowth of the principle that contributions should be equitable and nondiscriminatory under Section 254(b)(4).

Petitioners further claim that the definition of "universal service" provides no limit on the FCC's discretion, Pet. Br. at 41, but then fail to analyze Section 254(c)'s guidance on the meaning of universal service. Section 254(c) limits the FCC to supporting "telecommunications services." 47 U.S.C. § 254(c); *id.* § 153(53). Section 254(c)(1) prescribes factors that the Commission "shall consider" in determining whether to support a service. Significantly, Section 254(c)(1) instructs the FCC to discern whether a telecommunications service is "essential" or has "been subscribed to by a substantial majority of residential customers." The former is a high bar, and the latter is an objective measure. Moreover, Section 254(c)(3)'s provision for designating additional services for support mechanisms for schools, libraries, and health care providers demonstrates Congress's intent that Section 254(c)(1) cannot be read so broadly as to include the services identified in Section

16

254(c)(3).  Section 254(c)(3) would be superfluous otherwise.  *See Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 112 (1991) (citation omitted) (stating that "we construe statutes, where possible, so as to avoid rendering superfluous any parts thereof").

Petitioners also ignore that Section 254(e) limits the recipients of universal service funds to "eligible telecommunications carrier[s]"[5] and that such funds may only be used for "the provision, maintenance, and upgrading of facilities and services for which such support is intended."  *See Blanca Tel. Co. v. FCC*, 991 F.3d 1097, 1105-06 (10th Cir. 2021) ("Congress did not intend for the USF to act as an unrestricted fund for eligible carriers to be distributed for any conceivable expense incurred while providing telecommunications services.").  Just as the Clean Air Act applies to a discrete set of pollutants, *Whitman*, 531 U.S. at 473, Section 254 only allows for funds for a discrete set of communications services.

Not only does Section 254's textual guidance clearly pass the delegation test, but Section 254's purpose and history further limit the FCC's discretion.  Courts employ additional tools of statutory interpretation in the intelligible principle analysis that extend beyond examining the text of the provision in question.  *Big Time Vapes, Inc.*, 963 F.3d at 443; *see also Gundy*, 139 S. Ct. at 2123 (plurality)

---

[5] An "eligible telecommunications carrier" is a telecommunications carrier that has been designated as eligible to receive universal service support by a state utility commission or, in some cases, by the FCC.  47 U.S.C. § 214(e).

(interpreting the "text . . . alongside its context, purpose, and history").  There is no dispute that Congress included Section 254 in the 1996 Act to preserve and advance universal service that had existed under the earlier non-competitive framework that allowed for implicit subsidies for high-cost service.  Pet. Br. at 7-10; *see also* 47 U.S.C. § 254(b) (providing for "preservation and advancement of universal service"); *Competitive Telecomms. Ass'n v. FCC*, 117 F.3d 1068, 1074 (8th Cir. 1997) (discussing transition from universal service using implicit support to explicit support under Section 254).  The pre-1996 Act USF program was not meant for "solving the problems of the poor" but was instead meant for "the more limited purpose of ensuring that 'telephone rates are within the means of the average subscriber.'"  *Rural Tel. Coal.*, 838 F.2d at 1315 (citation omitted).  Section 254 preserved aspects of the existing regime while requiring changes, such as the complete transition to explicit support.  By reflecting Congress's choices to retain or alter pre-1996 Act practices, Section 254 guides and constrains the FCC.

As an example of how Congress modified pre-1996 Act universal service, Section 254(h) established universal service support for rural healthcare and schools and libraries.  The statutory directives to the FCC in Section 254(h) are even more prescriptive than those in the rest of Section 254, which demonstrates two points.  First, Section 254(h) satisfies the intelligible principle test with respect to rural healthcare and school and library support even more easily than the remainder of

Section 254.   Second, the addition of subsection (h) indicates that Congress contemplated that existing universal service programs would guide and constrain the interpretation of the remainder of Section 254.   Indeed, nearly every federal appeals court decision analyzing Section 254 begins with an introductory section on this history of universal service.   *See, e.g.*, *TOPUC I*, 183 F.3d at 405-06; *AT&T Inc.*, 886 F.3d at 1241-42.

While the text, purpose, and history of Section 254 show that Congress established an intelligible principle that constrains the FCC's discretion, *Vonage* demonstrates Congress's wisdom in leaving some regulatory flexibility to the FCC to accommodate technological changes.   With this flexibility, the FCC can determine contribution levels and mechanisms that reflect market dynamics in the fast-changing technological area of telecommunications.[6]   In *Vonage*, the FCC was confronted with a new technology, voice over Internet Protocol services ("VoIP"), that was in its most nascent form when the 1996 Act was passed.   The FCC determined that such services should contribute to universal service as an "other provider of interstate telecommunications."   *Vonage*, 489 F.3d at 1238-41.   This determination required a technical analysis about the types of services that Vonage

---

[6] *See also Gen. Tel. Co. of the Southwest v. United States*, 449 F.2d 846, 853 (5th Cir. 1971) ("The Communications Act was designed to endow the Commission with sufficiently elastic powers such that it could readily accommodate dynamic new developments in the field of communications.").

provided and their similarities to those provided by telecommunications carriers. *See id.* at 1236. Notably, the FCC's calculation of contribution amounts from such providers was necessarily informed by technical aspects of the services provided. *See id.* at 1237 (noting that calculating contributions for wireless and VoIP providers is difficult because "customers may use their services from many locations and often have area codes that do not correspond to their true location").

### B. The Court Should Reject Petitioners' False Distinctions Regarding Application of the Intelligible Principle Test.

Petitioners attempt to evade relevant precedent by claiming to identify dividing lines establishing when courts should apply differential forms of the intelligible principle test, asserting that cases "involving revenue-raising statutes" are subject to a more stringent standard and those "regulat[ing] complex and variegated technical matters" are subject to a more relaxed standard. Pet. Br. at 36, 38. No such lines exist.

Petitioners wrongly overstate the stringency of the intelligible principle standard in the fee context. *Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212 (1989), offers an example of Petitioners' failed attempt to create a false distinction for statutes where agencies collect payments. *Skinner* upheld a statute directing the Secretary of Transportation to "establish a schedule of fees based on the usage, in reasonable relationship to volume-miles, miles, revenues, *or an appropriate combination thereof*." *Id.* at 214 (emphasis added). To be sure, the statute set a cap

on "the aggregate of fees received for any fiscal year." *Id.* at 215. But *Skinner* noted, "[i]n enacting [the statute], Congress delimited the scope of the Secretary's discretion with much greater specificity than in delegations that we have upheld in the past." *Id.* at 219 (collecting cases).[7] While Petitioners suggest that *Skinner* establishes a *de facto* standard that requires limitations such as a cap and specific metrics for setting fees, *Skinner* never said such statutory factors were necessary to pass muster as an intelligible principle.

Petitioners also claim that "objective limits" on the amount of revenue to be raised are required because *Hampton* reviewed a statute that they say provided that customs duties should be collected according to a "precise formula for objectively calculating such revenues." Pet. Br. at 36-37. But Petitioners overstate the precision of the statutory formula in *Hampton*. There, the relevant statute provided a list of considerations for the President to consider in ascertaining differences in production cost "in so far as he finds it practicable." *Hampton*, 276 U.S. at 401-02. Notably, the last of these considerations was "any other advantages or disadvantages in competition." *Id.* at 402. More fundamentally, *Hampton* explained that Congress cannot police every detail in a regulatory scheme. Rather, Congress may lay down

---

[7] The Court also concluded that "[e]ven if the user fees are a form of taxation . . . the delegation of discretionary authority under Congress' taxing power is subject to no constitutional scrutiny greater than that we have applied to other nondelegation challenges." 490 U.S. at 223. *See also infra* Section II.

the general approach for an agency to follow and the agency may implement the details. *Id.* at 407-11. This is consistent with the way in which Congress approached Section 254.

Petitioners cite *Lichter v. United States*, 334 U.S. 742, 785 (1948), for the proposition that regulation of complex technical matters is subject to more relaxed scrutiny. Pet. Br. at 38. But the statute in *Lichter* provided authority for "unilateral orders or payments into the Treasury of the United States of such portions of those profits as were determined by the administrative officials of that Government to be 'excessive profits.'" 334 U.S. at 765. Taxation of excess profits during wartime is not self-evidently more complex or technical than other regulatory matters, such as universal service. *Lichter* therefore blurs any purported distinction Petitioners formulate and undermines Petitioners' claims about the "proper analogues" for Section 254. Pet. Br. at 40. The same goes for Petitioners' reliance on *Nat. Broad. Co. v. United States*, where the Court specifically noted the subject matter was "both new and dynamic," 319 U.S. at 219, as were the telecommunications services to which the 1996 Act was responding. Additionally, Petitioners fail to explain why Section 254 itself does not fall into the "complex and variegated technical matters" that Petitioners claim receive more deference.

Finally, Petitioners note that "the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred."

22

Pet. Br. at 35–36 (quoting *Whitman*, 531 U.S. at 475). But this distinction is unavailing here. Petitioners do not acknowledge the breadth of the congressional delegation at issue in *Whitman*, which involved a "sweeping regulatory scheme[]" for "air standards that affect *the entire national economy*." 531 U.S. at 475 (emphasis added). Even in such a sweeping scheme, Justice Scalia explained that the congressional directive to set air quality standards requisite to protect the public health "fits comfortably within the scope of discretion permitted by our precedent." *Id.* at 476. In contrast, Section 254 is targeted at a single sector of the national economy.

### C.    Section 254's Delegation Must Be Analyzed Under Governing Precedent.

Petitioners urge this Court to analyze Section 254's delegation to the FCC under Petitioners' conception of the original understanding of the nondelegation doctrine, *see* Pet. Br. at 29, but such an approach is foreclosed by Supreme Court precedent and the precedent of this Court. *See Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) ("[T]he Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions."); *Big Time Vapes, Inc.*, 963 F.3d at 447 (continuing to evaluate statutes for an intelligible principle until directed otherwise by the Supreme Court); *United States v. Mecham*, 950 F.3d 257, 265 (5th Cir. 2020) (explaining that circuit courts should not "get ahead of the Supreme Court");

23

*Morrow v. Meachum*, 917 F.3d 870, 874 n.4 (5th Cir. 2019) ("We apply the Supreme Court's precedents faithfully."). As this Court recently recognized, "our role as an inferior court is to faithfully apply Supreme Court precedent, so we do not reach the proper historical scope of the non-delegation doctrine." *Jarkesy*, slip op. at 22 n.13.

Even if this Court were not bound by Supreme Court precedent, Petitioners offer a one-sided and selective reading of historical sources. *See* Pet. Br. at 31 (citing isolated statements of Montesquieu and Locke without providing any link to the Founders' intent). Recent academic research exhaustively reviewing legislation from before and after ratification of the Constitution undercuts Petitioners' isolated references. *See* Julian Davis Mortenson & Nicholas Bagley, *Delegation at the Founding*, 121 Colum. L. Rev. 277, 293, 332 (2021) (surveying historical evidence and finding that "contemporary political theory and practice before the Founding both confirm that broad delegations of all kinds of legislative authority were not only constitutionally tolerable, but commonplace" and that after the Founding "[r]egulatory delegations were limited only by the will and judgment of the legislature").[8]

---

[8] Professor Ilan Wurman responds to Mortenson and Bagley in *Nondelegation at the Founding*, but even under his analysis of Founding Era practice, Section 254 would likely pass muster because it "expressly authorize[s]" the FCC to act, the category of conduct is narrow, and the standards for the FCC's actions are "relatively precise in context." 130 Yale L.J. 1490, 1555 (2021).

Additionally, amici for Petitioners contend that Section 254 presents a "major question" that precludes an interpretation that the FCC has discretion to collect and spend funds for universal service.  Amicus Br. of Competitive Enterprise Inst. et al. at 25-27.  Neither Petitioners nor amici raised this argument below before the FCC, precluding its consideration here.  *See* 47 U.S.C. § 405(a) (a petition for reconsideration to the agency is a condition precedent to seeking judicial review concerning a question of law or fact on which the agency "has been afforded no opportunity to pass").  In any event, Congress has clearly authorized—in fact, required—the FCC to preserve and advance universal service by collecting contributions.  *See id.* § 254 (repeatedly directing that the FCC *shall* act to implement the statute to preserve and advance universal service through equitable and nondiscriminatory contributions).[9]  Thus, there is no ambiguity around the FCC's fundamental duty to collect contributions that could trigger application of the major questions doctrine.

---

[9] Because universal service programs are explicitly required by statute, Petitioners' political theory claims are unpersuasive.  *See* Pet. Br. at 6 (accusing Congress of shifting responsibility to a less accountable branch).  The FCC does not have discretion to end or fundamentally alter universal service; rather, that responsibility (and accountability) lies with Congress.

**D.    Section 254 Would Be Constitutional Even if the *Gundy* Dissent Provided the Controlling Standard.**

Not only does Section 254 easily pass muster under the long-established intelligible principle standard, but it would also be constitutional even if the *Gundy* dissent's factors were the controlling law.

The *Gundy* dissent was careful to state that although Congress must make the policy decisions, Congress still may direct agencies to "fill in even a large number of details" and to "find facts that trigger the generally applicable rule of conduct specified in a statute." *Gundy*, 139 S. Ct. at 2145 (Gorsuch, J., dissenting). Similarly, the *Gundy* dissent explained in evaluating cases from before the era of the intelligible principle: "Through all these cases, small or large, runs the theme that Congress must set forth standards 'sufficiently definite and precise to enable Congress, the courts, and the public to ascertain' whether Congress's guidance has been followed." *Id.* at 2136 (Gorsuch, J., dissenting) (quoting *Yakus v. United States*, 321 U.S. 414, 426 (1944)). Reflecting on past cases, Justice Gorsuch stated that the Supreme Court must ask "the right questions." *Id.* at 2141 (Gorsuch, J., dissenting). Those questions include: "Does the statute assign to the executive only the responsibility to make factual findings? Does it set forth the facts that the executive must consider and the criteria against which to measure them? And . . . did Congress, and not the Executive Branch, make the policy judgments?" *Id.* (Gorsuch, J., dissenting).

It is important to note how the *Gundy* dissent applied these considerations to the statute at issue in that case, which provides: "The Attorney General shall have the authority to specify the applicability of the requirements of this title to sex offenders convicted before the enactment of this Act." 34 U.S.C. § 20913(d). The *Gundy* dissent described that statute as "giving the nation's chief prosecutor the power to write a criminal code," giving "the discretion to apply or not apply any or all of [the act]'s requirements," and "allow[ing] the nation's chief law enforcement officer to write the criminal laws he is charged with enforcing." *Gundy*, 139 S. Ct. at 2144 (Gorsuch, J., dissenting). Importantly, Justice Gorsuch contrasted this approach with what Congress could have done for the law to be permissible in his view: it could have "required all pre-Act offenders to register, but then given the Attorney General the authority to make case-by-case exceptions," and it could have "set criteria to inform that determination." *Id.* at 2143 (Gorsuch, J., dissenting). Such a standard would still leave discretion to the executive, in just the same way that Section 254(d) does.[10]

Here, Congress has made "the policy decisions," and the FCC is filling in the details. *Id.* at 2136 (Gorsuch, J., dissenting). First, Section 254 has not given the

---

[10] The *Gundy* dissent found the statute's lack of limits on the executive especially troubling in the criminal law context, where liberty interests are at stake. *See Gundy*, 139 S. Ct. at 2144 (Gorsuch, J., dissenting). Of course, Section 254 is not a criminal statute.

FCC discretion, in the first instance, to determine whether there should be a universal service program or whether to require companies to contribute. Rather, Section 254(a) directs that the FCC "shall" implement a universal service program, and Section 254(d) requires that every telecommunications carrier that provides interstate telecommunications "shall" contribute.[11] Sections 254(b)(5), (d), and (e) direct the FCC to provide "sufficient" support, establishing outer bounds for universal service support. *See AT&T Inc.*, 886 F.3d at 1252 (stating that the sufficiency requirement "'seeks to strike an appropriate balance between the interests of' consumers and industry" (quoting *Rural Cellular I*, 588 F.3d at 1102)); *Alenco Commc'ns, Inc*, 201 F.3d at 620 (stating that the Communications Act "promises universal service" and that this "is a goal that requires sufficient funding of *customers*"). Thus, Congress "resolve[d the] important policy questions." *Nat'l Fed. of Indep. Bus. v. OSHA*, 142 S. Ct. 661, 669 (2022) (Gorsuch, J., concurring).

The statement in *TOPUC II* that Congress "delegate[d] difficult policy choices to the Commission's discretion" is not inconsistent with concluding that

---

[11] Although Section 254(d) goes on to permit the FCC to exempt a carrier or class of carriers, this is simply a conditional obligation subject to agency fact-finding. Similarly, Section 254(d)'s provision allowing for contribution from "[a]ny other provider of interstate telecommunications" likewise falls into the gap-filling category, where Congress has provided the policy, but agency gap-filling is required. *See Vonage*, 489 F.3d at 1236 (explaining that the FCC required providers of VoIP services that did not exist broadly in 1996 to make contributions and upholding that decision).

Section 254 conforms to the *Gundy* dissent standard.  265 F.3d at 322 (quoting *Alenco Commc'ns, Inc*, 201 F.3d at 615).  Read in context, *Alenco*'s and *TOPUC II*'s statements did not suggest that Congress delegated the *constitutionally* important policy choices.  Congress merely delegated the gap-filling policy choices—e.g., how to properly balance universal service principles while also moving to a competitive market structure in a rapidly evolving technological field.  Balancing between Section 254(b)'s principles while the industry undergoes a tectonic shift might present difficult choices, but such choices are not the threshold policy choices that *Gundy*'s dissent suggests cannot be left to the executive.

Next, Section 254(c)(1)'s delegation to the FCC to determine what constitutes universal service similarly represents an instance of agency fact-finding or gap-filling, where Congress has provided the FCC with the relevant factors to consider.  This is not a case where Congress has "found it expedient to hand off the job to the executive and direct there the blame for any later problems that might emerge." *Gundy*, 139 S. Ct. at 2143 (Gorsuch, J., dissenting).  Rather, Congress recognized that "the telecommunications market [would] undergo[] dramatic changes," *TOPUC II*, 265 F.3d at 322, and the definition of universal service would need to keep pace by allowing for an "evolving" standard subject to congressional prescriptions.  Section 254(c)'s universal service definition provides the factors the FCC *shall* consider in determining what constitutes universal service.  47 U.S.C. § 254(c).  In

this way, Section 254 "set[s] forth the facts that the executive must consider and the criteria against which to measure them," and thereby "set[s] forth standards 'sufficiently definite and precise to enable Congress, the courts, and the public to ascertain' whether Congress's guidance has been followed." *Gundy*, 139 S. Ct. at 2136, 2141 (Gorsuch, J., dissenting) (quoting *Yakus*, 321 U.S. at 426).  Indeed, the ability of courts to ascertain whether Congress's guidance has been followed has been borne out by federal court identification of limits on FCC action that may be taken pursuant to Section 254.  *See e.g.*, *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 436 (5th Cir. 2021) (noting that caselaw does not support the argument that the FCC "may deploy the universal-service mechanism to accomplish any non-prohibited purpose in the Act"); *TOPUC I*, 183 F.3d at 435 (reversing FCC decision after concluding that "[t]he agency has offered no reasonable explanation of how this outcome, which will require companies . . . to incur a loss to participate in interstate service, satisfies [Section 254(d)'s] 'equitable and nondiscriminatory' language"); *Qwest I*, 258 F.3d at 1201, 1205 (concluding that the FCC had inadequately explained how its decision was related to the statutory requirements provided in Section 254); *Qwest II*, 398 F.3d at 1234 (concluding that the FCC had erred in its constructions of "sufficient" and "reasonably comparable").

## II.    PETITIONERS' TAX CLAIMS ARE WRONG ON THE LAW AND IRRELEVANT UNDER BINDING PRECEDENT.

This Court and other federal and state courts around the country have already concluded that universal service contributions are not taxes.  These decisions are correct, and the Court should not heed Petitioners' effort to evade their conclusion by setting forth the wrong standard for determining whether a payment is a fee or a tax.  In any event, Petitioners' arguments urging heightened nondelegation scrutiny for taxes are irrelevant because the Supreme Court held in *Skinner* that the nondelegation analysis is the same regardless of whether a payment is a tax, fee, or anything else.

### A.    The Fifth Circuit and Other Courts Have Concluded that Universal Service Fees Are Not Taxes.

This Court has already concluded that universal service contributions are not taxes.  *See TOPUC I*, 183 F.3d at 427 n.52 ("[T]he universal service contribution qualifies as a fee because it is a payment in support of a service (managing and regulating the public telecommunications network) that confers special benefits on the payees.").  The D.C. Circuit similarly has concluded that universal service contributions are not taxes.  *See Rural Cellular Ass'n & Universal Serv. v. FCC*, 685 F.3d 1083, 1090-91 (D.C. Cir. 2012) (*Rural Cellular II*) (concluding that contributions are not taxes where "contributions to the temporary reserve support a

program to subsidize broadband Internet access from which those [contributing] carriers will particularly benefit").[12]

State courts also have concluded that contributions to analogous state universal service programs are not taxes under state law. In *Schumacher v. Johanns*, the Supreme Court of Nebraska held the state agency's contribution requirement was "not to generate revenue for governmental purposes, but, rather, to regulate the telecommunications industry through a rebalancing and restructuring of rates" and was therefore "not a tax." 722 N.W.2d 37, 50-51 (Neb. 2006). The Kansas Supreme Court reached that same conclusion regarding its universal service program. *Citizens' Util. Ratepayer Bd. v. State Corp. Comm'n*, 956 P.2d 685, 709-10 (Kan. 1998) (finding that universal service funds are not taxes because they are not meant to raise revenue and instead are part of a regulatory scheme to "manipulate the movement of the same money (extra access rate money) to the same parties (from companies purchasing access to the LECs) to be used for the same reasons (to build and maintain land lines)"). The Louisiana Supreme Court similarly concluded that state universal service fund contributions are fees and not taxes because they "are not intended to raise revenue" and instead "allocate the costs for the administration of a regulatory program." *Voicestream GSM I Operating Co., LLC v. La. Pub. Serv.*

---

[12] *See also Rural Tel. Coal.*, 838 F.2d at 1314 (citation omitted) (rejecting tax challenge to pre-1996 Act universal service approach because "a regulation is a tax only when its primary purpose judged in legal context is raising revenue").

*Comm'n*, 943 So. 2d 349, 359-62 (La. 2006). While these cases apply state law, they buttress federal court findings that charges to support universal service are regulatory in nature and not meant to raise general revenues, unlike a tax.

**B.    Petitioners' Fee-Versus-Tax Test Is Wrong.**

Petitioners argue that this Court should not follow *TOPUC I* because, in their view, it applied the incorrect test. Pet. Br. at 55. Petitioners claim that the tax question turns solely on whether "some of the payment inures to the benefit of the public." *Id.* at 56 (citing *Skinner*, 490 U.S. at 214; *United States v. United States Shoe Corp.*, 523 U.S. 360, 363 (1998); *Trafigura Trading LLC v. United States*, 29 F.4th 286 (5th Cir. 2022)).

Petitioners are wrong for several reasons. First, Petitioners ignore other factors that this Court has set forth for distinguishing taxes from fees. In *Texas Ent. Ass'n v. Hegar*, this Court noted that a fee "is imposed (1) by an agency, not the legislature; (2) upon those it regulates, not the community as a whole; and (3) for the purpose of defraying regulatory costs, not simply for general revenue-raising purposes." 10 F.4th 495, 505-06 (5th Cir. 2021) (quoting *Neinast v. Texas*, 217 F.3d 275, 278 (5th Cir. 2000)). Applying these standards, *Texas Ent. Ass'n* found the charge at issue to be a fee even though it was established by the legislature because it was focused on a narrow industry sector and because the funds raised were directed to a specific fund, "not general revenue." *Id.* at 506-07. The same is true of universal

service contributions, which are narrowly directed toward limited programs for telecommunications access for certain qualifying recipients and are not general revenue.[13]  Although the program might be directed toward "universal" service, the funds are not universally distributed.  Rather, as directed by Section 254(e), only eligible telecommunications carriers may receive such funds.

Next, Petitioners cite *Skinner* for the proposition that any time administrative costs inure to the benefit of the public, a payment constitutes a tax.  Pet. Br. at 55.  But *Skinner* held no such thing.  As discussed below, *Skinner* rejected distinguishing taxes and fees in the nondelegation context.  Having held that the tax-or-fee question was irrelevant, *Skinner* had no occasion to reach the question of what constitutes a fee versus a tax.  490 U.S. at 223 ("[W]e need not concern ourselves with the threshold question . . . whether the pipeline safety users 'fees' . . . are more properly thought of as a form of taxation).  In addition, *Skinner*'s reference to "some of the administrative costs at issue 'inur[ing] to the benefit of the public,'" *id.* (quoting *Nat'l Cable Television Ass'n v. United States*, 415 U.S. 336, 343 (1974) (*NCTA*)), was in reference to *NCTA* and another case where the Supreme Court applied the constitutional avoidance canon to interpret the underlying statute narrowly.  *See id.*

---

[13]  Moreover, contrary to the Dr. Ford Report relied on by Petitioners, for contributions to constitute fees not every contributor is required to receive a benefit exceeding its payments so long as benefits generally accrue to payors.  *See Rural Cellular II*, 685 F.3d at 1090-91 (examining the benefits to the group of contributors as a whole, rather than examining in detail benefits to each contributor).

at 223-24 (citing *NCTA*, 415 U.S. at 342). This is a far cry from holding the statute unconstitutional.

Petitioners' reliance on *United States Shoe Corp.* and *Trafigura* is also misplaced. In each case, the courts reviewed taxes under the Export Clause of the Constitution, which requires more "restrictive" review of purported fees than in other contexts, since the Export Clause categorically bars Congress from imposing any tax on exports. *United States Shoe Corp.*, 523 U.S. at 369; *see also Trafigura*, 29 F.4th at 289 ("The Supreme Court has repeatedly recognized the . . . breadth of the Export Clause."). *United States Shoe Corp.* distinguished other cases that found payments to be user fees because they "involved constitutional provisions other than the Export Clause." 523 U.S. at 368. And the Court's holding was expressly limited to the Export Clause. *See id.* at 369 ("The guiding precedent for determining what constitutes a bona fide user fee *in the Export Clause context* remains our time-tested decision in *Pace*. . . . *under the Export Clause*, the connection between a service the Government renders and the compensation it receives for that service must be closer than is present here.") (emphasis added). *Trafigura* in turn carefully analyzed and applied the Supreme Court's Export Clause-specific holdings in *United States Shoe Corp.* and *Pace v. Burgess*, 92 U.S. 372 (1876). *Trafigura*, 29 F.4th at 291-94.

Petitioners also argue that *TOPUC I*'s analysis is undermined by the growth of universal service in intervening years, Pet. Br. at 55-56, but Petitioners do not

35

support this claim with any caselaw.  A rule for distinguishing a fee from a tax based on the amount of money collected would invite unworkable line-drawing and undermine the finality of judicial decisions.

### C. Under *Skinner*, Whether a Payment Is a Tax or a Fee Is Irrelevant to the Nondelegation Analysis.

*TOPUC I* correctly concluded that universal service contributions are fees and not taxes.  But there is a more fundamental flaw in Petitioners' argument.  As Petitioners acknowledge in calling for the Supreme Court's *Skinner* decision to be overruled, *id.* at 59, the question of whether a payment is a fee or a tax is irrelevant to the nondelegation inquiry.  490 U.S. at 222-23 ("We find no support . . . for [the] contention that the text of the Constitution or the practices of Congress require the application of a different and stricter nondelegation doctrine in cases where Congress delegates discretionary authority to the Executive under its taxing power.").  Thus, "the delegation of discretionary authority under Congress' taxing power is subject to no constitutional scrutiny greater than that . . . applied to other nondelegation challenges." *Id.* at 223.  The D.C. Circuit has already reached this conclusion regarding Section 254: "Because section 254 of the Act clearly provides an intelligible principle to guide the Commission's efforts, viz., 'to preserve and advance universal service,' whether the assessment is deemed a tax is of no real moment." *Rural Cellular II*, 685 F.3d at 1091.

*Skinner* is well-founded.  Writing for a unanimous Court, Justice O'Connor analyzed the Constitution's text and concluded that nothing distinguished the taxing power from other enumerated powers in Article I.  *Skinner*, 490 U.S. at 221-22.  The opinion went on to explain that the First and Fifth Congresses after ratification of the Constitution enacted legislation granting significant authority to the secretary of the treasury regarding taxation, *id.* at 221, and that a contrary rule would call into question the Internal Revenue Service's authority to regulate under the tax code, *see id.* at 222.  This Court is bound by that precedent.  *Mecham*, 950 F.3d at 265; *Morrow*, 917 F.3d at 874 n.4.

## III.   USAC'S ROLE IS NARROWLY CONFINED AND PETITIONERS EXAGGERATE USAC'S AUTHORITY.

Petitioners contend that USAC's role in administering universal service programs "violates the private nondelegation doctrine, contrary to Article I of the U.S. Constitution."  Pet. Br. at 66.[14]  This Court should reject Petitioners' arguments, which are based on an exaggerated conception of USAC's role and discretion, as the relevant regulations and the Public Notice at issue make clear.

---

[14] Petitioners muddle their argument by repeatedly citing cases analyzing whether an agency is *statutorily* authorized to rely on a non-agency in administering a program.  *See* Pet. Br. at 63-65 (citing *Sierra Club v. Lynn*, 502 F.2d 43 (5th Cir. 1974); *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554 (D.C. Cir. 2004); *Fund for Animals v. Kempthorne*, 538 F.3d 124 (2d Cir. 2008)).

The FCC's regulations demonstrate that USAC exercises no lawmaking authority. The relevant regulations provide that "[c]ontributions to [universal service] mechanisms . . . shall be based on contributors' projected collected end-user telecommunications revenues, and on a contribution factor determined quarterly *by the Commission*." 47 C.F.R. § 54.709(a) (emphasis added). The FCC has determined through regulation that such contributions shall be "based on the ratio of total projected quarterly expenses of the universal service support mechanisms to the total projected collected end-user interstate and international telecommunications revenues, net of projected contributions." *Id.* § 54.709(a)(2). USAC's role is merely to gather data and make the quarterly projections from which the FCC performs the relevant calculation. *See id.* § 54.709(a)(2)-(3). The Public Notice that Petitioners challenge further bears this out. *See* Public Notice at 1, 4 (JA100, JA103) (stating that the quarterly contribution factor is "calculated by the Federal Communications Commission," which USAC "shall use" to then determine the amount of individual contributions). Petitioners therefore are wrong in claiming that "USAC decides how much money to raise each year in pursuit of 'universal service' and how to spend it." Pet. Br. at 60.

Not only is USAC's role in setting the contribution factor limited to a ministerial data gathering and projecting function, but the FCC's regulations expressly exclude USAC from policy-making functions and responsibilities. USAC

"may not make policy, interpret unclear provisions of the statute or rules, or interpret the intent of Congress," and "[w]here the Act or the Commission's rules are unclear, or do not address a particular situation, the Administrator shall seek guidance from the Commission."  47 C.F.R. § 54.702(c).  Accordingly, USAC acts in a ministerial capacity when gathering data and submitting projections of demand and expenses to the FCC so that the FCC can calculate the contribution factor, and USAC does not make any laws or exercise any unreviewable authority to raise money.  Telecom Intervenors routinely interact with USAC by reporting revenue, submitting contributions, and receiving support—and they interact with the FCC where policy and interpretive matters are at issue.

One of Petitioners' cited cases, *Texas v. Rettig*, shows the types of comparatively far-reaching third-party determinations that courts have viewed more skeptically (but nevertheless upheld).  The regulation at issue in *Rettig* required that the rates states paid to managed-care organizations must follow the practice standards established by the Actuarial Standards Board, a private entity.  987 F.3d 518, 524-25 (5th Cir. 2021).  As a result, the Actuarial Standards Board exercised "substantive *lawmaking power*, rather than some minor factual determination or *ministerial task*."  *Texas v. Rettig*, 993 F.3d 408, 410 (5th Cir. 2021) (Ho, J., dissenting from denial of rehearing en banc) (emphasis added).  USAC lacks any such unreviewable power with regard to the universal service contribution factor; it

simply compiles data and performs projections to provide the FCC with factual information the agency needs to determine the contribution factor.

The fact that the FCC has never reversed USAC's projections of demand is only a manifestation of the data-gathering and projecting role that USAC plays.[15] Matters of arithmetic are not subject to discretion. In this way, Petitioners' claim based on *Sierra Club v. Lynn* that the FCC only acts as a rubber stamp is inapt—that case involved the far more fact- and judgment-intensive development by third parties of an environmental statement under the National Environmental Policy Act. 502 F.2d at 59. Performance of a mechanical accounting task such as USAC's is fundamentally different.

Finding little support in the actual regulations that dictate USAC's functions and responsibilities with respect to the universal service contribution factor, Petitioners instead rely on *In re Incomnet*, a bankruptcy case where the court answered the narrow—and irrelevant—question of whether USAC was an "initial transferee" under the Bankruptcy Code. 463 F.3d 1064, 1069 (9th Cir. 2006). In answering that question, the court looked to the immediate control that USAC has

---

[15] As Respondents note, the FCC on occasion has revised USAC's calculations to account for changes in Commission policy. *See* Resp. Br. at 58 (*citing Revised Second Quarter 2003 Universal Service Contribution Factor*, 18 FCC Rcd 5097 (WCB 2003) (adjusting rate from 9.0044% to 9.1%); *First Quarter 1998 Universal Service Contribution Factors Revised and Approved*, 12 FCC Rcd 21881 (CCB 1997) (setting "the approved contribution factors")).

over universal service funds, but the court said nothing about USAC exercising lawmaking power. *Id.* at 1071-75. In fact, the court noted a litany of other ways in which the FCC controls USAC's actions. *Id.* at 1071-73. ("The FCC has responsibility for implementing and regulating the collection and distribution of the USF"; "The FCC must approve USAC's total projected expenses and budget on a quarterly basis"; "USAC is prohibited from mak[ing] policy, interpret[ing] unclear provisions of the statute or rules, or interpret[ing] the intent of Congress"; "The FCC retains the authority to overrule USAC's actions in administering the universal service support funds"; and "[T]hose who are aggrieved by USAC, its committees, or its Board may seek review from the FCC.") (internal quotations and citations omitted).

For all these reasons, this Court should reject Petitioners' hyperbolic claims about USAC's authority.

## IV.   STRIKING DOWN SECTION 254 WOULD BE DISRUPTIVE AND UPSET INVESTMENT-BACKED RELIANCE INTERESTS.

Petitioners claim they "take no position on the wisdom of universal service," Pet. Br. at 1, yet spend pages upon pages criticizing universal service. This one-sided story ignores the many benefits the USF provides and the disruption that would be caused by holding Section 254 unconstitutional in whole or part.

The universal service program includes the High-Cost Support Program, the Lifeline Program, the Schools and Libraries Program, and the Rural Healthcare

Program.   Through these programs, telecommunications providers across the country receive substantial funding to ensure connectivity for millions of Americans. Based on these support mechanisms, Telecom Intervenors' members have invested and will continue to invest in network infrastructure across the country.

Telecom Intervenors can confirm firsthand that universal service support helps to make the business case for deployment of networks and the delivery of services that satisfy the universal service principles articulated by Section 254.   For example, high-cost support pursuant to Section 254 enables companies to deploy high-speed broadband networks and provide service at affordable rates to especially high-cost rural areas in the country, where population densities tend to average roughly four serviceable locations per square mile.[16]   Lifeline support enables companies to add customers who could not otherwise afford service.   Network effects from additional users, which arise from all universal service programs, further benefit payors by enhancing the value of networks.   These benefits would be lost or significantly diminished if universal service support was cut off or curtailed, to the ultimate detriment of consumers who rely on network deployments, including in hard to serve areas.

---

[16] *See, e.g.*, NTCA, NTCA Membership Broadband Survey at 1 (Dec. 2021), https://www.ntca.org/sites/default/files/documents/2021-12/2021-broadband-survey-report-final-12-15-21.pdf (showing average serviceable area locations for respondents is 7,581, and average service area is 1,906 square miles).

Although Petitioners' policy claims are not relevant to the legality of Section 254, Telecom Intervenors' members' reliance interests are. To find Section 254 unconstitutional, the Supreme Court would have to overrule the cases employing the intelligible principle test. A significant factor in the *stare decisis* analysis is whether overturning existing precedent would upset reliance interests. *See Payne v. Tennessee*, 501 U.S. 808, 828 (1991) (citation omitted) ("Considerations in favor of *stare decisis* are at their acme in cases involving property and contract rights, where reliance interests are involved."). Here, many of Telecom Intervenors' members have invested in network infrastructure, made business plans, and offered service plans in reliance on future universal service payments. These investment-backed expectations should caution against overruling precedent to apply a new rule that would hold Section 254 unconstitutional.

## V.    CONCLUSION

For these reasons, in addition to those set forth in the Brief for Respondents, this Court should deny the Petition.

Respectfully submitted,

*/s/ Jennifer Tatel*
Jennifer Tatel
Craig E. Gilmore
Wilkinson Barker Knauer, LLP
1800 M Street NW, Suite 800N
Washington, DC 20036
(202) 783-4141
jtatel@wbklaw.com
cgilmore@wbklaw.com
*Counsel for USTelecom, NTCA, CCA*

June 17, 2022

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on June 17, 2022, I filed the foregoing Joint Brief of Intervenors USTelecom, NTCA, and CCA in Support of Respondents with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the electronic CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

*/s/ Jennifer Tatel*
Jennifer Tatel

## CERTIFICATE OF COMPLIANCE

1.   This brief complies with the type-volume limitations of Fed. R. App. P.
32(a)(7)(B) because this brief contains 10,130 words, excluding the parts of the brief
exempted by Fed. R. App. 32(f) and Circuit Rule 32.2.

2.   This brief complies with the typeface requirements of Fed. R. App. P.
32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this
brief has been prepared in a proportionally spaced typeface using Microsoft Word
using 14-point Times New Roman font.

*/s/ Jennifer Tatel*
Jennifer Tatel