# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 24, 2023

Lyle W. Cayce
Clerk

No. 22-60008

CONSUMERS' RESEARCH; CAUSE BASED COMMERCE,
INCORPORATED; KERSTEN CONWAY; SUZANNE BETTAC;
ROBERT KULL; KWANG JA KERBY; TOM KIRBY; JOSEPH BAYLY;
JEREMY ROTH; DEANNA ROTH; LYNN GIBBS; PAUL GIBBS;
RHONDA THOMAS,

*Petitioners*,

*versus*

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES OF
AMERICA,

*Respondents*.

On Petition for Review of an Order of the
Federal Communications Commission
Agency No. 96-45

Before RICHMAN, *Chief Judge*, and STEWART and HAYNES, *Circuit Judges*.

CARL E. STEWART, *Circuit Judge*:

Consumers' Research, along with other entities, (collectively "Petitioners") challenge: (1) the constitutionality of Congress's delegation of administration of the Universal Service Fund (the "USF") to the Federal Communications Commission (the "FCC"); and (2) the FCC's subsequent

No. 22-60008

reliance on a private entity for ministerial support. Because there are no nondelegation doctrine violations, we DENY their petition.

## I.   Background

Congress enacted § 254 of the Telecommunications Act of 1996, which established the USF and entrusted its administration to the FCC. Congress passed § 254 to ensure the facilitation of broad access to telecommunications services across the country. The USF accomplishes this goal by raising funds which are later distributed to people, entities, and projects to expand and advance telecommunications services in the nation. Funds are raised by periodic contributions to the USF from telecommunications carriers, who later pass those costs on to consumers via line-item charges in their monthly bills.

The FCC relies on a private entity, the Universal Service Administrative Company ("USAC"), to aid it in its administration of the USF. USAC is comprised of industry experts and the FCC tasks it with certain ministerial responsibilities, including: (1) collecting self-reported income information from telecommunications carriers; (2) compiling data to formulate the potential contribution rate for the USF; and (3) proposing a quarterly budget to the FCC for the USF's continued preservation. USAC proposals are approved by the FCC either expressly or after fourteen days of agency inaction.

USAC submitted its 2022 first quarter projections to the FCC on November 2, 2021. The FCC published these projections for notice-and-comment in accordance with the Administrative Procedure Act. On November 19, 2021, Petitioners submitted comments challenging the constitutionality of the USF and the FCC's reliance on USAC. The FCC weighed the comments and issued a *Public Notice of Proposed First Quarter 2022 Universal Service Contribution Factor* ("the Proposal"). Petitioners filed

another comment, invoking the same arguments as their November comment and seeking the discontinuance of the USF. The FCC, nonetheless, approved USAC's proposal on December 27, 2021. In response, Petitioners filed this petition on January 5, 2022.

On appeal, Petitioners assert that: (1) the Hobbs Act is not a jurisdictional bar to their constitutional claims; (2) Section 254 violates the nondelegation doctrine because Congress failed to supply the FCC with an intelligible principle; and (3) the FCC's relationship with USAC violates the private nondelegation doctrine because the FCC does not adequately subordinate USAC in its administration of the USF.

## II.  STANDARD OF REVIEW

This court reviews constitutional issues stemming from an agency's action de novo. *See Huwaei Tech USA, Inc. v. FCC*, 2 F.4th 421, 434 (5th Cir. 2021). We "hold unlawful and set aside" any agency action that is "contrary to constitutional right, power, privilege, or immunity." *Id.* (citing 5 U.S.C. § 706(2)(B)).

## III.  DISCUSSION

### A.  *Jurisdiction*

The Hobbs Act "provides that a party aggrieved by a rule, regulation, or final order . . . must file a petition for judicial review within sixty days." *State of Tex. v. United States*, 749 F.2d 1144, 1146 (5th Cir. 1985). This sixty-day period "is jurisdictional and cannot be judicially altered or expanded." *City of Arlington v. FCC*, 668 F.3d 229, 237 (5th Cir. 2012). However, plaintiffs may "challenge . . . a regulation after the limitations period has expired if the claim is that the agency has exceeded its constitutional authority or statutory authority." *State v. Rettig*, 987 F.3d 518, 529 (5th Cir. 2021). "To sustain such a challenge, the claimant must show some direct,

final agency action involving the particular plaintiff within [sixty days] of filing suit." *Id.* (quoting *Dunn-McCampbell Royalty Int., Inc. v. Nat'l Park Serv.*, 112 F.3d 1283, 1287 (5th Cir. 1997)). An agency's action is direct and final when two criteria are satisfied: First, the action must mark the "consummation of the agency's decisionmaking process . . . [and] second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Dunn-McCampbell*, 112 F.3d at 1287 (internal quotation and citation omitted).

The FCC contends that Petitioners' claims are time-barred by the Hobbs Act because: (1) any challenge to § 254 should have come when Congress originally enacted it and (2) the Proposal is not a direct and final agency action which creates legal consequences or new obligations for Petitioners. The FCC relies on *Dunn-McCampbell*, where we foreclosed a facial challenge to a National Park Service regulation because "the limitations period beg[an] to run when the agency publishe[d] the regulation in the Federal Register." *Id.* But we also carved out a limited exception in that case when we recognized that "an agency's application of a rule to a party creates a new . . . cause of action to the agency's constitutional or statutory authority." *Id.* Petitioners assert that they qualify for this exception. Whether they are correct depends on our determination that the Proposal: (1) constitutes application of a direct and final rule by the FCC; and (2) determines Petitioners' rights or has legal consequences for non-compliance. We hold in Petitioners' favor on both prongs.

Here, the Proposal qualifies for the *Dunn-McCampbell* exception because it (1) is a direct and final order which consummates the FCC's decisionmaking process; and (2) punishes telecommunications carriers for non-compliance. *See* 112 F.3d at 1287. Regarding prong one, the Proposal is distinguishable from the regulation in *Dunn-McCampbell*. In that case, we held that Dunn-McCampbell's facial challenge was time barred because the

"Park Service ha[d] not yet applied the regulations to the companies." *Id.* at 1288–89. So, any challenge he brought before the Park Service ever applied the regulation was necessarily a challenge to the regulation itself. The reverse is true in the instant case, where the FCC has applied and reapplied § 254's mandatory USF Contributions through its approval of the quarterly proposals. Each approval consummates the FCC's decisionmaking process for that quarter and, thus, allows for a constitutional challenge if that challenge is brought within the sixty-day time limit.

Prong two is also satisfied because the Proposal undoubtedly has legal consequences which flow to carriers that fail to meet their contribution obligations. *See* 47 C.F.R. § 54.713(b) (providing that "delinquent" USF contributors are subject to "interest at the rate equal to the U.S. prime rate . . . plus 3.5 percent, as well as administrative charges of collection and/or penalties and charges permitted by the applicable law"). Because Petitioners satisfy both *Dunn-McCampbell* prongs, the Hobbs Act does not bar their constitutional claims and we proceed to the merits of their nondelegation arguments. 112 F.3d at 1287; *Rettig*, 987 F.3d at 529.

### B.    *Nondelegation*

Article I of the United States Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." "Accompanying that assignment of power . . . is a bar on its further delegation." *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (internal quotations and citation omitted). However, the Constitution does not deny Congress the necessary "flexibility and practicality" to perform its functions. *Id.* The Supreme Court has, therefore, recognized that "Congress may obtain the assistance of its coordinate Branches . . . and in particular, may confer substantial discretion on executive agencies to implement and enforce the laws." *Id.* (quoting *Mistretta v. United States*, 488 U.S. 361, 372 (1989)).

To that end, the Constitution only requires Congress to provide an intelligible principle which adequately guides the Executive agency. *See id.* (holding "that a statutory delegation is constitutional as long as Congress lays down by legislative act an intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform") (internal quotations and citation omitted).

The intelligible principle standard is "not demanding." *Id.* at 2129. The Supreme Court has rarely "second-guess[ed] Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law." *Id.* Ultimately, "a nondelegation inquiry always begins (and often almost ends) with statutory interpretation. The constitutional question is whether Congress has supplied an intelligible principle to guide the delegee's use of discretion." *Id.* Put differently, we must construe § 254 to discern what tasks it delegates and what instructions Congress provided therein. "Only after [we have] determined [§ 254's] meaning can [we] decide whether the law sufficiently guides executive discretion to accord with Article I." *Id*

We recently grappled with the intelligible principle standard in *Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022).[1] In that case, we held that Congress failed to provide an intelligible principle when it gave "the SEC the ability to determine which subjects of its enforcement actions are entitled to Article III proceedings with a jury trial, and which are not." *Id.* at 461. We acknowledged that the Supreme Court "has not in the past several decades held that Congress failed to provide a requisite intelligible principle." *Id.* at

---

[1] We have since denied petition to rehear this case before the en banc court. *See Jarkesy v. SEC*, 51 F.4th 644. On March 8, 2023, the Government filed a petition for a writ of certiorari with the Supreme Court. Jarkesy's response to that petition is due April 10, 2023.

462. But we also noted that the Court had not been presented an instance where "Congress offered *no guidance* whatsoever" to an executive agency in that same span of time. *Id.* (emphasis in original). Accordingly, we reasoned that "[i]f the intelligible principle standard means anything, it must mean that a total absence of guidance is impermissible under the Constitution." *Id.*

In *Jarkesy*, we stated that the nondelegation doctrine applies where Congress has provided "*no guidance* whatsoever" to an agency, *Id.* at 462 (emphasis in original), citing to the most recent (though long ago) Supreme Court nondelegation violation decision. *See Panama Refining Co. v. Ryan*, 293 U.S. 388, 405 (1935) (holding that there was a nondelegation violation when Congress gave the President broad authority to prohibit the transportation of oil-related products in interstate commerce, but failed to provide any policy, establish any standard, or lay down any rules to direct the President's exercise of this authority).

Having fleshed out what the intelligible principle standard requires, we now examine Petitioners' assertions that § 254 violates the nondelegation doctrine because: (1) Congress failed to provide the FCC with an intelligible principle; and (2) to the extent Congress provided intelligible principles, they are merely aspirational and place no objective limits on the FCC in its administration of the USF.

1.    *Whether Congress Provided Intelligible Principles in § 254*

Petitioners argue that Congress has unconstitutionally delegated its authority to the FCC without providing an intelligible principle. For example, they point to the absence of a limit on how much the FCC can raise for the USF as evidence of a lack of proper guidance. With no objective ceiling on the amount that the FCC can raise each quarter, they contend that Congress's alleged intelligible principles fail to place necessary limits on the FCC's ability to assess fees from telecommunications carriers. Also,

Petitioners aver that § 254(b)(1)-(7) contains mere public policy statements which impose no meaningful limitations on or guidance to the FCC's revenue-raising obligation in its administration of the USF. In sum, Petitioners maintain that Congress has not articulated any guidance to the FCC in its administration of the USF—and that this failure violates the nondelegation doctrine. We disagree.

Congress passed § 254 for the express purpose of preserving and advancing universal telecommunications services.[2] *See* 47 U.S.C. § 254(b). To that end, § 254(b) provides that the FCC "shall base policies" on certain enumerated principles.[3] Petitioners maintain that these principles offer no guidance to the FCC as it attempts to realize § 254(b)'s purpose. Their position is untenable. Section 254 expressly requires the FCC to ensure that telecommunications services are: (1) of decent quality and reasonably priced; (2) equally available in rural and urban areas; (3) supported by state and federal mechanisms; (4) funded in an equitable and nondiscriminatory manner; (5) established in important public spaces (schools, healthcare providers, and libraries); and (6) available broadly across all regions in the nation. *See* § 254(b)(1)-(7). And should the FCC ever conclude that these principles were insufficient, the statute enables, and likely obligates, it to add principles "consistent with" § 254's overall purpose. *See* § 254(b)(7). Rather than leave the FCC with "*no guidance* whatsoever," Congress provided ample direction for the FCC in § 254. *Jarkesy*, 34 F.4th at 462.

---

[2] *See also* 47 U.S.C. § 151 (noting the FCC's original purpose of creating policies designed "to make available, so far as possible, to all the people of the United States . . . a rapid, efficient, Nation-wide . . . wire and radio communication service with adequate facilities at reasonable charges").

[3] *See* 47 U.S.C. § 254(b)(1)-(7) (providing a full list of principles).

No. 22-60008

Ultimately, in enacting § 254, Congress chose to "confer substantial discretion" over administration of the USF to the FCC. *Gundy*, 139 S. Ct. at 2139. Petitioners take issue with how the FCC uses this discretion—arguing that the FCC operates the USF with no guidance from Congress.[4] But if the FCC had a question about how to manage the USF, it need only look to § 254 to find an answer. Therefore, we conclude that Congress supplied the FCC with intelligible principles when it tasked the agency with overseeing the USF. Having established that § 254 contains intelligible principles, we next consider whether those principles adequately limit the FCC's revenue raising function.

2.    *Whether § 254 Properly Limits the FCC*

Petitioners contend that even if Congress provided the FCC with intelligible principles we should rule in their favor because those principles are nothing more than "vague aspirations" that fail to set objective limits on the FCC as they operate the USF. *Gundy*, 139 S. Ct. at 2133. They argue

---

[4] We note that much of Petitioners' nondelegation argument relies primarily on the dissents of the Supreme Court's holding in *Gundy* and this court's in *Rettig*, which, of course, are not binding on our court. *See, e.g.*, *Gundy*, 139 S. Ct. at 2133, 2134, 2135–37 (Gorsuch, J., joined by Roberts, C.J., and Thomas, J. dissenting); *see also Rettig*, 993 F.3d at 408, 409–10 (5th Cir. 2021) (Ho, J. joined by Jones, Smith, Elrod, and Duncan, JJ., dissenting from denial of rehearing en banc). That some Justices of the Supreme Court and some judges of this circuit have opined on whether Congress is permitted to delegate "difficult policy choices" is not determinative that Congress impermissibly did so here when it delegated administration of the USF to the FCC. Moreover, the mere fact that Petitioners dispute the policy choices that the FCC has made in overseeing the USF does not translate to a constitutional or statutory violation. *See Gundy*, 139 S. Ct. at 2139 ("Congress may confer substantial discretion on executive agencies to implement and enforce the laws."). At best, Petitioners argue for different policy choices. But they provide no binding law to support such a request.

that § 254 is no different than the statute in *Panama Refining*.[5] In that case, the Supreme Court took issue with 15 U.S.C. § 701's generally unhelpful guidance to the President as he tried to regulate the interstate hot oil industry. *See Panama Refining*, 293 U.S. at 419 (observing that § 701 failed to "limit[] or control[] the authority conferred" to the President). Petitioners argue that § 254 similarly fails to limit or control the FCC's ability to raise revenue for the USF. We disagree.

Here, § 254 provides limitations on the FCC's revenue-raising ability, whereas the statute in *Panama Refining* is markedly different. In *Panama Refining*, the Supreme Court observed that:

> The Congress left the matter to the President without standard or rule, *to be dealt with as he pleased*. The effort by ingenious and diligent construction to supply a criterion still permits such a breadth of authorized action as essentially to commit to the President the functions of a Legislature rather than those of an executive or administrative officer executing a declared legislative policy.

293 U.S. at 418–19 (emphasis added). Section 254 contains no such deficiencies, and certainly did not leave the matter to the FCC "without standard or rule, to be dealt with as [it] pleased." *Id.* Instead, § 254 requires that the FCC only raise enough revenue to satisfy its primary function. *See* § 254(b).

---

[5] *See* 293 U.S. at 417 (stating that the purpose of the challenges statute was "to eliminate unfair competitive practices, to promote the fullest possible utilization of the present productive capacity of industries, to avoid undue restriction of production (except as may be temporarily required), to increase the consumption of industrial and agricultural products by increasing purchasing power, to reduce and relieve unemployment, to improve standards of labor, and otherwise to rehabilitate industry and to conserve natural resources.") (internal quotations omitted).

No. 22-60008

For example, § 254(c)(1)(A)-(D) limits distribution of USF funds to telecommunications services that: (1) "are essential to education, public health, or public safety;" (2) "are being deployed in public telecommunications networks by telecommunications carriers;" and (3) "are consistent with the public interest, convenience, and necessity." Likewise, § 254(b)(5) requires that the FCC ensure there are "specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service." Furthermore, § 254(e) limits distribution of USF funds to eligible communication carriers under § 214(e)—and even those carriers may only receive support "sufficient to achieve the purposes of" § 254. Taken together, these provisions demonstrate that the FCC is not in the dark as to the amount of funding it should seek each quarter. Instead, § 254 sets out the FCC's obligations with respect to administration of the USF and the FCC, in turn, calculates what funds are necessary to satisfy its obligations.

Ultimately, § 254 reflects Congress's understanding that telecommunications services are constantly evolving.[6] That understanding also drove Congress to implement a unique revenue raising mechanism for the USF. That the mechanism is unique is not in itself a nondelegation violation—especially where Congress has placed identifiable limits on what USF distributions can fund. *See, e.g.*, § 254(b)-(e). Congress failed to place these limitations on the President in *Panama Refining*—and that led the Supreme Court to hold that a nondelegation violation occurred. But Congress did not make that same mistake with § 254, instead, ensuring that

---

[6] *See, e.g.*, § 254(c)(1) (providing that "[u]niversal service is an evolving level of telecommunications services that the Commission shall establish periodically under this section, taking into account advances in telecommunications and information technologies and services").

the statute is replete with intelligible principles to guide the FCC. Because Congress provided the FCC with numerous intelligible principles for its administration of the USF and those principles sufficiently limit the FCC's revenue-raising activity, we hold that § 254 does not violate the nondelegation doctrine.

### C.    *Private Nondelegation*

The private nondelegation doctrine prevents "governments from delegating too much power to private persons and entities." *Boerschig*, 872 F.3d at 707. "Although this so-called private nondelegation doctrine has been largely dormant" for nearly a century, "its continuing force is generally accepted." *Id.*; *see also Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 880–82 (5th Cir. 2022) (discussing the evolution of the private nondelegation doctrine). Functionally, the doctrine prevents agencies from giving private parties the "unrestrained ability to decide whether another citizen's property rights can be restricted" because "any resulting deprivation happens without 'process of law.'" *Boerschig*, 872 F.3d at 708.

To be clear, agencies "may subdelegate to private entities so long as the entities 'function subordinately to' the federal agency and the federal agency 'has authority and surveillance over [their] activities.'" *Rettig*, 987 F.3d at 532 (quoting *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940)). Ultimately, a statute does not violate the private nondelegation doctrine if it "'imposes a standard to guide' the private party and (2) provides 'review of that determination that prevents the [private party] from having the final say.'" *Id.* (alteration in original) (quoting *Carter v. Carter Coal Co.*, 298 U.S. 238, 310–311 (1936)).

Our decision in *National Horsemen* provides a timely comparator to the instant case. 53 F.4th 869 (5th Cir. 2022). There, multiple organizations

sued the Federal Trade Commission ("FTC"), alleging that the Horseracing Integrity and Safety Act's ("HISA") regulatory scheme violated the private nondelegation doctrine by giving government power to the Horseracing Integrity and Safety Authority (the "Authority") without adequate agency supervision. *Id.* On appeal, we held that the FTC's relationship with the Authority violated the private nondelegation doctrine.

We first noted that, under HISA, the Authority had "sweeping rulemaking power," with the ability to establish, enforce, and punish all entities involved in the horseracing industry. *Id.* at 882. We also observed that "HISA's generous grant of authority to the Authority to craft entire industry programs strongly suggests it is the Authority, not the FTC, that is in the saddle." *Id.* at 883 (internal quotations omitted). Finally, we highlighted that the FTC had no authority to conduct independent review of the Authority's policy choices and did not possess final say on what rules the Authority promulgated. *See id.* at 884. Instead, the FTC could only "recommend changes to the Authority's rules (and then, only to the extent that the rules are inconsistent with HISA)." *Id.* at 888. After considering the lack of oversight and control the FTC exercised over the Authority, we ruled against the FTC and held its redelegation of Congressional power unconstitutional.

In this case, Petitioners argue that the FCC violated the private nondelegation doctrine when it redelegated its authority over the USF to USAC, a private entity. They aver that the FCC does not oversee USAC in its performance of its duties. For example, they highlight that the FCC rarely exercises its power to alter USAC's proposed contribution factor under § 54.709(a)(3). They assert that one reason that the FCC does not exercise this authority is because the statute affords the agency just fourteen days to review and alter any USAC determinations before they become binding on the telecommunications carriers. To Petitioners, such a small window for

review renders the FCC's oversight over USAC meaningless. They suggest that the FCC is a rubber stamp for USAC's proposals and that USAC effectively administers the USF. We disagree.

Here, the FCC has not violated the private nondelegation doctrine because it wholly subordinates USAC. First, federal statutory law expressly subordinates USAC to the FCC. *See* 47 C.F.R. § 54.702(b) (providing that USAC "may not make policy, interpret unclear provisions of the statute or rules, or interpret the intent of Congress"). Second, unlike in *National Horsemen*, USAC does not enjoy the same type of sweeping rulemaking power—instead it makes a series of proposals to the FCC based off expert analysis, which are not binding on carriers until the FCC approves them. *See* 47 C.F.R. § 54.709(a). Third, the FCC permits telecommunications carriers to challenge USAC proposals directly to the agency and often grants relief to those challenges.[7] Fourth, the FCC dictates how USAC calculates the USF contribution factor and subsequently reviews the calculation method after USAC makes a proposal. *See* 47 C.F.R. §§ 54.709(a)(2)-(3); 54.711(a).

Ultimately, the FCC only uses USAC's proposals after independent consideration of the collected data and other relevant information. We have expressly upheld these types of arrangements. *See Rettig*, 987 F.3d at 531 (noting that agencies are permitted to "reasonably condition" their actions "on an outside party's determination of some issue"). Because the FCC properly subordinates USAC, it has not violated the private nondelegation doctrine.

---

[7] *See, e.g.*, *Streamlined Resol. of Requests Related to Actions by the Universal Serv. Admin. Co.*, DA 22-448, 2022 WL 1302467 (WCB rel. April 29, 2022); Alpaugh Unified Sch. Dist., 22 FCC Rcd. 6035 (2007)).

No. 22-60008

**IV.    CONCLUSION**

For the foregoing reasons we DENY the petition.