No. 22-60008

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

CONSUMERS' RESEARCH; CAUSE BASED COMMERCE,
INCORPORATED; KERSTEN CONWAY; SUZANNE BETTAC;
ROBERT KULL; KWANG JA KERBY; TOM KIRBY; JOSEPH
BAYLY; JEREMY ROTH; DEANNA ROTH; LYNN GIBBS; PAUL
GIBBS; RHONDA THOMAS,

*Petitioners*,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED
STATES OF AMERICA,

*Respondents.*

Petition for Review of an Order of the
Federal Communications Commission
Agency No. 96-45

PETITION FOR REHEARING EN BANC

C. Boyden Gray
R. Trent McCotter
  *Counsel of Record*
Jonathan Berry
Michael Buschbacher
Jared M. Kelson
BOYDEN GRAY & ASSOCIATES
801 17th Street NW., Suite 350
Washington, DC 20006
202-706-5488
mccotter@boydengrayassociates.com
*Counsel for Petitioners*

# CERTIFICATE OF INTERESTED PERSONS

*Consumers' Research et al. v. Federal Communications Commission et al.*
No. 22-60008

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Local Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

*Petitioners*

1.     Consumers' Research. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

2.     Cause Based Commerce, Incorporated. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

3.     Kersten Conway

4.     Suzanne Bettac

5.     Robert Kull

6.     Kwang Ja Kirby

7.     Tom Kirby

8.    Joseph Bayly

9.    Jeremy Roth

10.   Deanna Roth

11.   Lynn Gibbs

12.   Paul Gibbs

13.   Rhonda Thomas

*Respondents*

14.   Federal Communications Commission

15.   United States of America

*Intervenors*

16.   Benton Institute for Broadband & Society

17.   National Digital Inclusion Alliance

18.   Center for Media Justice (d/b/a MediaJustice)

19.   Schools, Health & Libraries Broadband Coalition

20.   National Telecommunications Cooperative Association (d/b/a

NTCA – The Rural Broadband Association)

21.   Competitive Carriers Association

*Counsel*

22.    Boyden Gray & Associates PLLC: C. Boyden Gray, R. Trent McCotter, Jonathan Berry, Michael Buschbacher, and Jared M. Kelson are counsel for Petitioners.

23.    Federal Communications Commission: James M. Carr, Adam Crews, and Jacob M. Lewis are counsel for Respondent FCC.

24.    United States Department of Justice: Gerard J. Sinzdak is counsel for Respondent United States of America.

25.    Andrew Jay Schwartzman is counsel for Intervenors Benton Institute for Broadband & Society, National Digital Inclusion Alliance, and Center for Media Justice (d/b/a MediaJustice).

26.    Harris, Wiltshire & Grannis, LLP: Jason Neal and Stephanie Weiner are counsel for Intervenors Schools, Health & Libraries Broadband Coalition.

27.    Wilkinson, Barker & Knauer LLP: Jennifer Tatel and Craig Gilmore are counsel for USTelecom – The Broadband Association; National Telecommunications Cooperative Association (d/b/a NTCA – The Rural Broadband Association); and Competitive Carriers Association.

Dated: April 20, 2023                    /s/ R. Trent McCotter
                                          R. Trent McCotter
                                          *Counsel of Record for Petitioners*

## <u>INTRODUCTION AND RULE 35(B)(1) STATEMENT</u>

The panel opinion acknowledged that the Federal Communications Commission's Universal Service Fund (USF)—which collects nearly *$10 billion* every year via a tax on consumers' monthly phone bills—is bankrolled by a historically "unique revenue raising mechanism" characterized by an "absence of a limit on how much the FCC can raise for the USF." Ex.A ("Opinion") at 7, 11. The FCC can thus self-raise billions of dollars in taxes from the general public, in perpetuity, without meaningful statutory limits. If replicated elsewhere, Congress would never have to appropriate funds or pass a budget again.

The novel delegation to an agency of a broad and perpetual taxing power should have raised alarm bells. After all, "[p]erhaps the most telling indication of a severe constitutional problem with an executive entity is a lack of historical precedent to support it." *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2201 (2020); *see CFPB v. All Am. Check Cashing, Inc.*, 33 F.4th 218, 223 (5th Cir. 2022) (Jones, J., joined by Elrod, Duncan, Englehardt, and Oldham, JJ., concurring).

But the Opinion not only rejected Petitioners' nondelegation challenges but further watered down the "intelligible principle standard"

by holding that it is violated *only* "where Congress has provided '*no guidance* whatsoever' to an agency." Op.7–8. While that's the incorrect standard for any nondelegation challenge, it's especially wrong for agency revenue-raising, where the Supreme Court has approved delegations only when there was an objective statutory limit on the executive's ability to self-fund, thereby rejecting the notion that agencies can extract money from the pockets of the public based only on generic statutory phrases like "in the public interest." *NCTA v. United States*, 415 U.S. 336, 341–42 (1974).

Moreover, the Opinion never addressed Petitioners' argument that the nondelegation violation here is worsened by its unique "dual-layer" status: Congress not only gave the FCC authority to raise money for "universal service," it also gave the FCC the power to *redefine* universal service and raise money for that expanded scope. That is "delegation running riot." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 553 (1935) (Cardozo, J., concurring). At one point, the Opinion even described an FCC *regulation* as "federal *statutory* law." Op.14 (emphasis added). Given its nearly unlimited power to raise money, one could be forgiven for believing the FCC can issue "statutes."

In the face of such broad delegated power, the Opinion claimed the FCC was limited by a list of statutory aphorisms labeled "universal service principles." 47 U.S.C. § 254(b). But this Court has repeatedly held those same principles are merely "aspirational," *Tex. Off. of Pub. Util. Couns. v. FCC* (*"TOPUC I"*), 183 F.3d 393, 421 (5th Cir. 1999), and an agency limited only by its own "aspirations" has no limit at all, *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 473 (2001). This case therefore directly tracks *Schechter Poultry* and *Panama Refining*, which likewise featured statutes with lengthy lists of vague policies but no directions on how to balance or limit them. Pet.Br.42–44. Under the Opinion, however, even those regimes would be upheld.

It gets worse. The FCC has delegated USF operations to a *private* corporation, the Universal Service Administrative Company (USAC), which is led by a group of self-described industry "interest groups." Each quarter, USAC proposes the new USF tax, which is automatically "deemed approved" if the FCC Commissioners do nothing during the "small window" for review. Op.13–14. Unsurprisingly, the FCC has never substantively changed USAC's proposals over the last 25 years.

The Opinion rejected Petitioners' private nondelegation challenge

to this scheme. But if a private company can perpetually collect billions of dollars in taxes pursuant to a statute with "no objective ceiling," Op.7, and without the FCC Commissioners lifting a finger, it is difficult to imagine what remains of the political accountability mandated by the nondelegation and private nondelegation doctrines.

The Opinion is thus worthy of *en banc* review not only because it conflicts with binding precedent but also because of the significance of the issues involved. As scholars have noted, "[u]nlike the thousands of responsibilities carried out by governmental agencies on behalf of Congress, this delegation is unique because of the unfettered power given to the FCC in defining the scope of universal service, and because Congress delegated the power to levy a tax to pay for the service with no limits, knowing that the end user, the American public, would ultimately be saddled with the burden." Barbara A. Cherry & Donald D. Nystrom, *Universal Service Contributions: An Unconstitutional Delegation of Taxing Power*, 2000 L. Rev. Mich. St. U. Det. C.L. 107, 110 (2000).

As expected given the lack of meaningful political checks, the USF taxing rate has skyrocketed from around 2% to over 30% and now collects approximately 25 times the FCC's *entire* annual budget. If duplicated

elsewhere, federal agencies could raise billions, even trillions, of dollars under the euphemistic label of "contributions." It would be a politician's dream: faux-balanced budgets, but the bureaucracy still flush with cash.

The USF thus presents a dramatic example of "Congress pass[ing] problems to the executive branch and then engag[ing] in finger-pointing for any problems that might result. The bureaucracy triumphs—while democracy suffers" to the tune of nearly $10 billion annually. *Texas v. Rettig*, 993 F.3d 408, 409 (5th Cir. 2021) (Ho, J., joined by Jones, Smith, Elrod, and Duncan, JJ., dissenting from denial of rehearing *en banc*) (cleaned up). Courts "ought not to shy away from [their] judicial duty to invalidate unconstitutional delegations; if [courts] are ever to reshoulder the burden of ensuring that Congress itself make the critical policy decisions, these are surely the cases in which to do it." *Big Time Vapes, Inc. v. FDA*, 963 F.3d 436, 443 (5th Cir. 2020) (cleaned up).

\* \* \*

This case thus raises two questions worthy of *en banc* review: (1) whether the nondelegation doctrine allows Congress to establish a "unique revenue raising mechanism" containing "no objective ceiling on the amount" that a federal agency can self-raise via a tax paid by millions

of consumers; and (2) whether the private nondelegation doctrine allows a federal agency to rubber stamp a private company's operation of a nearly-$10-billion-a-year welfare fund.

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS ...........................................i

TABLE OF CONTENTS ...........................................................xi

TABLE OF AUTHORITIES.......................................................xii

STATEMENT OF ISSUES MERITING REHEARING *EN BANC*..........1

STATEMENT OF THE COURSE OF PROCEEDINGS AND
DISPOSITION OF THE CASE......................................................1

    I.    Background on the USF.........................................................1

    II.   Increasing Rates and Widespread Fraud. .............................3

    III.  Prior Proceedings. ..............................................................4

STATEMENT OF FACTS NECESSARY TO THE ARGUMENT............5

ARGUMENT ...........................................................................6

    I.    The Court Should Review Whether the USF's "Unique"
and Objectively Limitless Revenue-Raising Mechanism
Violates the Nondelegation Doctrine....................................6

        A.    Uniqueness........................................................7

        B.    Absence of a Limit on Revenue-Raising. ......................8

        C.    Multi-Layer Delegation...............................................11

        D.    The USF Collects Taxes.............................................12

    II.   The Court Should Review the FCC's Delegation of USF
Authority to the Private Company USAC. ...........................14

CONCLUSION ........................................................................16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.L.A. Schechter Poultry Corp. v. United States*,
  295 U.S. 495 (1935) .................................................................. vi, vii, 11

*Am. Power & Light Co. v. SEC*,
  329 U.S. 90 (1946) ............................................................................. 8

*Big Time Vapes, Inc. v. FDA*,
  963 F.3d 436 (5th Cir. 2020) ............................................................. ix

*CFPB v. All Am. Check Cashing, Inc.*,
  33 F.4th 218 (5th Cir. 2022) ................................................. v, 12, 14

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*,
  51 F.4th 616 (5th Cir. 2022) ................................................ 7, 12, 14

*Dep't of Transp. v. Ass'n of Am. R.Rs.*,
  575 U.S. 43 (2015) ........................................................................... 16

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
  561 U.S. 477 (2010) ......................................................................... 12

*J.W. Hampton, Jr. & Co. v. United States*,
  276 U.S. 394 (1928) ........................................................................... 9

*NCTA v. United States*,
  415 U.S. 336 (1974) ..................................................................... vi, 9

*Seila Law LLC v. CFPB*,
  140 S. Ct. 2183 (2020) .................................................................. v, 7

*Sierra Club v. Lynn*,
  502 F.2d 43 (5th Cir. 1974) ............................................................. 16

*Skinner v. Mid-Am. Pipeline Co.*,
  490 U.S. 212 (1989) ............................................................. 9, 12, 13

*Tex. Off. of Pub. Util. Couns. v. FCC,*
   183 F.3d 393 (5th Cir. 1999)...............................................vii, 2, 10, 13

*Tex. Off. of Pub. Util. Couns. v. FCC,*
   265 F.3d 313 (5th Cir. 2001).........................................................6, 10

*Texas v. Rettig,*
   993 F.3d 408 (5th Cir. 2021).....................................................ix, 9, 15

*Trafigura Trading LLC v. United States,*
   29 F.4th 286 (5th Cir. 2022) .......................................................12, 13

*Whitman v. Am. Trucking Ass'ns,*
   531 U.S. 457 (2001).....................................................................vii, 10

## Constitutional and Statutory Provisions

U.S. Const. art. I............................................................................7

47 U.S.C. § 254 .................................................................vii, 1, 5, 6, 10

## Other Authorities

47 C.F.R. § 54.709 ..............................................................................2, 4

Barbara A. Cherry & Donald D. Nystrom, *Universal Service*
   *Contributions: An Unconstitutional Delegation of Taxing*
   *Power*, 2000 L. REV. MICH. ST. U. DET. C.L. 107 (2000) ....................viii

Philip Hamburger, IS ADMINISTRATIVE LAW UNLAWFUL?
   (2014)...............................................................................................12

John Harrison, *Executive Administration of the*
   *Government's Resources and the Delegation Problem*, in
   THE ADMINISTRATIVE STATE BEFORE THE SUPREME COURT
   (Peter J. Wallison & John Yoo eds. 2022) ...........................................11

Ronald J. Krotoszynski, Jr., *Reconsidering the Nondelegation*
   *Doctrine: Universal Service, the Power to Tax, and the*
   *Ratification Doctrine*, 80 IND. L.J. 239 (2005)......................................3

## STATEMENT OF ISSUES MERITING REHEARING *EN BANC*

(1) Whether the nondelegation doctrine allows Congress to establish a "unique revenue raising mechanism" containing "no objective ceiling on the amount" that a federal agency can self-raise via a tax paid by millions of consumers.

(2) Whether the private nondelegation doctrine allows a federal agency to rubber stamp a private company's operation of a nearly-$10-billion-a-year welfare fund.

## STATEMENT OF THE COURSE OF PROCEEDINGS AND DISPOSITION OF THE CASE

### I.    BACKGROUND ON THE USF.

The Telecommunications Act of 1996 established the USF and delegated its operation to the FCC. 47 U.S.C. § 254. As its name indicates, the USF is designed to facilitate broad access to telecommunications services, typically via subsidies.

Rather than pay for this general welfare program with an appropriation, Congress authorized the FCC to raise money for "universal service," with no statutory formula, ceiling, or other meaningful or objective restrictions. Although Congress provided a list of universal service "principles," § 254(b), they are so vague and nonbinding

that this Court has labeled them "aspirational only." *TOPUC I*, 183 F.3d at 421. The FCC is also authorized to add new "universal service principles" as often as it wishes. 47 U.S.C. § 254(b)(7).

To top it off, Congress vaguely defined "universal service" as "an evolving level of telecommunications services that the *[FCC] shall establish* periodically under this section, taking into account advances in telecommunications and information technologies and services." *Id.* § 254(c) (emphasis added).

The FCC has largely off-boarded this process to the private company USAC. Each quarter, USAC proposes how many billions of dollars it wants for "universal service," then the FCC ministerially calculates that figure into a tax rate based on expected interstate and international telephone revenues for the upcoming quarter, with the resulting tax rate euphemistically called a quarterly "Contribution Factor." *See* 47 C.F.R. § 54.709(a).

This rate is automatically "deemed approved" by the FCC unless the Commissioners act within 14 days of its publication. *Id.* § 54.709(a)(3). The charge generally appears on customers' phone bills as the "Universal Service Fund Fee." USAC collects the contributions and

2

then chooses how to disburse funds to subsidize the general welfare via subsidies to libraries, schools, rural areas, and "high-cost" areas.

## II.    INCREASING RATES AND WIDESPREAD FRAUD.

Without congressionally imposed limits, the figures have predictably skyrocketed. In the second quarter of 2000, the tax rate was 5.7%, but by 2021 that figure had jumped to the unprecedented level of 33.4%, with $2.5 billion collected in a single quarter. For first quarter 2022—at issue in this suit—the rate was 25.2%. The USF now collects roughly 25 times the FCC's annual budget.

Given its lack of accountability, the USF unsurprisingly has exhibited a history of extensive waste and abuse. *See* Pet.Br.17–20. And the USF levies a flat tax, meaning a "single, low-income mother, living in the Bronx, with a cell phone for personal safety, pays 10% or more of her monthly wireless telephone bill to support universal service for wealthy Montana residents living on ranchettes." Ronald J. Krotoszynski, Jr., *Reconsidering the Nondelegation Doctrine: Universal Service, the Power to Tax, and the Ratification Doctrine*, 80 IND. L.J. 239, 314 (2005).

## III.   PRIOR PROCEEDINGS.

Petitioners comprise several organizations and individuals, all of whom are adversely affected by USF charges. For example, Petitioner Kersten Conway is an art teacher who resides in League City, Texas. She has been a teacher for 35 years, has been divorced for almost 20 years, and is currently co-raising three young grandchildren. For her, every penny counts. She involuntarily pays into the USF every month via her phone bill.

In Fall 2021, Petitioners challenged the proposed First Quarter 2022 Contribution Factor of 25.2%, which was "deemed approved by the Commission" on December 27, 2021, even though the Commission itself had taken no action. *See* 47 C.F.R. § 54.709(a)(3). This occurred just days before the rate would take effect on January 1, 2022.

Petitioners timely sued in this Court, and the panel issued the Opinion on March 24, 2023. It correctly concluded the suit was timely, Op.3–5, but then upheld the USF's revenue-raising mechanism against Petitioners' nondelegation challenges.

The Opinion acknowledged the FCC possesses "a unique revenue raising mechanism," Op.11, with an "absence of a limit on how much the

FCC can raise for the USF," Op.7, but the opinion believed that "the intelligible principle standard" is violated *only* "where Congress has provided '*no guidance* whatsoever' to an agency." Op.7–8.

The Opinion interpreted § 254 as containing several meaningful restrictions on the FCC's ability to raise money. For example, the Opinion says § 254(b) imposes substantive "require[ments]" "to ensure that telecommunications services are: (1) of decent quality and reasonably priced; (2) equally available," etc., Op.8; that "§ 254 requires that the FCC only raise enough revenue to satisfy its primary function," Op.10; and that § 254(c) and (e) supposedly limit the subsequent "distribution of USF funds" that had already been collected, Op.11.

The Opinion found no private nondelegation violation, rejecting the view that the FCC is "rubber stamping" USAC's quarterly proposals. Op.13–14.

## **STATEMENT OF FACTS NECESSARY TO THE ARGUMENT**

No additional facts are necessary to the argument of the issues.

5

# ARGUMENT

## I. THE COURT SHOULD REVIEW WHETHER THE USF'S "UNIQUE" AND OBJECTIVELY LIMITLESS REVENUE-RAISING MECHANISM VIOLATES THE NONDELEGATION DOCTRINE.

The Court should review the constitutionality of the USF's "unique revenue raising mechanism," Op.11, which now generates 25 times the FCC's annual budget. Several aspects demonstrate why this scheme is so problematic:

- Rather than appropriate money, Congress allows the FCC to raise money directly, with the general public footing the bill, but with a conspicuous "absence of a limit on how much the FCC can raise for the USF." Op.7.

- The statutory "universal service principles"—which ostensibly might limit the FCC—are "aspirational only" and thus impose no substantive restriction. *Tex. Off. of Pub. Util. Couns. v. FCC* (*"TOPUC II"*), 265 F.3d 313, 321 (5th Cir. 2001).

- The FCC itself can add *new* "universal service principles" and *redefine* "universal service"—and then raise money to cover that expanded scope. 47 U.S.C. § 254(c)(1), (b)(7).

- The USF charges are not just any revenue but are "taxes" under relevant precedent, and taxation is a power belonging exclusively to Congress. *See* U.S. Const. art. I, § 8.

Each of these factors demonstrates why *en banc* review is warranted.

## A.    UNIQUENESS.

The Supreme Court has held that "[p]erhaps the most telling indication of a severe constitutional problem with an executive entity is a lack of historical precedent to support it." *Seila Law*, 140 S. Ct. at 2201 (cleaned up). And this Court has agreed specifically in the context of agency funding. *See, e.g., Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616, 624 (5th Cir. 2022).

Given its express recognition of the "unique" nature of the USF funding mechanism, the Opinion should have scrutinized this scheme even more stringently. Instead, it not only upheld the USF funding mechanism but, as explained next, also watered down the nondelegation test itself.

### B.    ABSENCE OF A LIMIT ON REVENUE-RAISING.

The Opinion's intelligible-principle analysis rested on three notable errors, each of which contradicts binding precedent.

*First*, the Opinion indicated that "the intelligible principle standard" is violated *only* "where Congress has provided '*no guidance* whatsoever' to an agency." Op.7–8. But providing truly unlimited power to an agency is not the only scenario that violates the nondelegation doctrine. Even in the context of technical and variegated matters that are difficult to define by statute, the Supreme Court has held that Congress still must "*clearly delineate[]*…the boundaries of th[e] delegated authority" to avoid a nondelegation violation. *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946) (emphasis added).

*Second*, the Supreme Court has imposed *heightened* scrutiny for statutes that delegate revenue-raising authority. It has held that giving an agency the power to raise money based only on vague statutory phrases like "'public policy or interest served, and other pertinent facts'" raises the specter of "forbidden delegation of legislative power" by "carr[ying] [the] agency far from its customary orbit and put[ting] it in

8

search of revenue in the manner of an Appropriations Committee of the House." *NCTA*, 415 U.S. at 341–42.

Accordingly, when it comes to revenue raising by agencies, the Court has approved of delegations only when there was some form of statutorily imposed objective limit on the executive's ability to self-fund. For example, in both *J.W. Hampton* and *Skinner*, the Court noted that the revenue statutes established mathematical ceilings on how much money the agency could raise. *See J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 401 (1928) (imposed duty could not vary more than 50% from the statutory figure); *Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 215 (1989) (agency could not raise more than 105% of the amount already appropriated by Congress). But the USF has nothing remotely like an objective limit, as the Opinion acknowledged. Op.7.

The original understanding of nondelegation would similarly bar this categorical off-boarding of Congress's policy decision of how much money to raise for a nationwide welfare program, again as the Opinion itself seems to acknowledge. Op.9.n.4 (noting Petitioners rely "primarily on the dissents" in *Gundy* and *Rettig* for this point).

9

*Third*, the Opinion claimed to identify sufficient limits in § 254 only by adopting interpretations of that statute that this Court and the FCC have rejected. For example, the Opinion says § 254(b) imposes substantive "require[ments]" "to ensure that telecommunications services are: (1) of decent quality and reasonably priced; (2) equally available," etc., Op.8, even though *the FCC itself* and this Court have stated those exact same § 254(b) principles are "aspirational only." *TOPUC II*, 265 F.3d at 321; *see TOPUC I*, 183 F.3d at 393. Because they are ultimately precatory, these supposed limitations turn only on the agency's own self-restraint in exercising them (or not). But "an agency's voluntary self-denial has no bearing upon" "[w]hether the statute delegates legislative power." *Whitman*, 531 U.S. at 473.

The Opinion also believed "§ 254 requires that the FCC only raise enough revenue to satisfy its primary function," Op.10, but this Court and the FCC have stated that "nothing in the statute" requires that "universal service support must equal the actual costs incurred," *TOPUC I*, 183 F.3d at 412, and this Court has further held that it cannot second-guess the FCC's ultimate policy decision about whether the tax is so high that it renders service unaffordable, *see TOPUC II*, 265 F.3d at 322.

10

The Opinion also cited § 254(c) and (e), which pertain to *spending* USF money, Op.11, but the FCC agreed that "spending decision[s]" are "irrelevant to this case," Gov.Br.60. The challenge here is to the FCC's ability to raise money from the general population in the first place, not the decision of where to *spend* money afterwards, *see* John Harrison, *Executive Administration of the Government's Resources and the Delegation Problem*, in THE ADMINISTRATIVE STATE BEFORE THE SUPREME COURT (Peter J. Wallison & John Yoo eds. 2022).

Congress, not the FCC, is the expert at making the policy judgment of how much money to raise for the USF. It was Congress's constitutional obligation to impose such a limit. It failed to do so.

## C.    MULTI-LAYER DELEGATION.

Petitioners argued that the FCC's additional statutory authority to *redefine* the already-vague definition of "universal service" and add *new* "universal service principles" makes this a rare "multi-layer" delegation that should be deemed unconstitutional on that basis alone. Pet.Reply.Br.25–29.

The Opinion never addressed this argument. But the Supreme Court has labeled such statutes as especially egregious. *See Schechter*

*Poultry*, 295 U.S. at 538–39. Both the Supreme Court and this Court have held in analogous contexts that "[t]he added layer … makes a difference" from a constitutional perspective, *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 495 (2010); *Cmty. Fin. Servs.*, 51 F.4th at 639; *All Am. Check*, 33 F.4th at 221 (Jones, J., joined by Elrod, Duncan, Englehardt, and Oldham, JJ., concurring).

### D.    THE USF COLLECTS TAXES.

Congress's off-boarding of its revenue-raising power is all the worse because it involves the raising of *taxes*. Pet.Br.45–59. Hard-fought tradition dating back to England established that "taxes were legislative, and therefore under 'the original frame and constitution of the government,' they 'must be by an act made by the whole legislative authority," not by the executive or an agency. Philip Hamburger, IS ADMINISTRATIVE LAW UNLAWFUL? 63 (2014).

A tax for constitutional purposes is typically a charge where "some of the administrative costs at issue inure[] to the benefit of the public." *Skinner*, 490 U.S. at 223; *see also Trafigura Trading LLC v. United States*, 29 F.4th 286, 294 (5th Cir. 2022) (opinion of Ho, J.). But *nearly all*

of the universal service charges "inure[] to the benefit of the public." *Skinner*, 490 U.S. at 223. They are therefore taxes.

These are not mere "fees," which represent "a 'value-for-value' transaction, in which a feepayer pays the fee to receive a service or benefit in return, and is thus better off as a result of the transaction." *Trafigura*, 29 F.4th at 294. For the USF, most contributors receive nothing in return—and certainly no proportional *quid pro quo*. Some, like Petitioner Cause Based Commerce, are actually injured because those extra costs encourage customers to drop their subscriptions. Pet.Br.61.[1]

\* \* \*

The Court should grant rehearing *en banc* to address this important nondelegation challenge and resolve the Opinion's conflicts with binding precedent.

---

[1] *Skinner* upheld a delegation of taxing power, but the statute in that case mathematically capped the agency's revenue-raising power, unlike the USF statute. Pet.Br.45–59. Moreover, the FCC agrees with Petitioners that this Court's passing footnote in *TOPUC I* about USF charges being fees "was dicta" and thus not binding. Gov.Br.51.

II.    **THE COURT SHOULD REVIEW THE FCC'S DELEGATION OF USF AUTHORITY TO THE PRIVATE COMPANY USAC.**

The Opinion's rejection of Petitioners' private nondelegation challenge is also worthy of *en banc* review. The Opinion concluded that the private company USAC is "wholly subordinate[d]" to the FCC. Op.14. That conclusion rested in part on the Opinion's erroneous conclusion that FCC *regulations* about USAC are "federal *statutory* law," *id.*, but of course only Congress can issue statutes.

The actual relationship between the FCC and USAC is best described as a federal agency providing administrative support to a private company, not the other way around. Each quarter, USAC decides how much money to raise, which the FCC then ministerially calculates into a taxing rate. Then that proposed taxing rate is automatically "deemed approved" by the FCC after 14 days, without the Commissioners lifting a finger, typically just days before the new quarter begins.

This Court has criticized such "perpetual self-funding scheme[s]." *Cmty. Fin. Servs.*, 51 F.4th at 641; *see All Am. Check*, 33 F.4th at 223 (Jones, J., joined by Elrod, Duncan, Englehardt, and Oldham, JJ., concurring). And, as noted above in Part I, this funding mechanism is open-ended and multi-layered even *before* it is off-loaded to USAC.

14

The Opinion claimed the FCC "only uses USAC's proposals after independent consideration of the collected data and other relevant information." Op.14. There is *no* evidence of this. In fact, the FCC has *never* substantively changed USAC's proposals despite the passage of over 100 quarters. The FCC cannot even be bothered to engage in the pretense of review—it never issues a separate approval document nor responds to comments filed by the public. And because this "approval" process plays out on the eve of each new quarter, the FCC would have no real choice but to accept whatever USAC proposes anyway.

The Opinion analogized this to the "arrangement[]" upheld by the panel in *Rettig*, Op.14, albeit over substantial dissent, *see Rettig*, 993 F.3d at 409 (Ho, J., joined by Jones, Smith, Elrod, and Duncan, JJ., dissenting from denial of rehearing *en banc*). But USAC's role here puts to shame the private delegation in *Rettig*. This is no "small part of the approval process," 987 F.3d at 533, but instead a private company determining the taxing rate that now yields 25 times the FCC's annual budget, with no evidence the FCC ever reviews the substance of that rate before it is imposed on millions of consumers.

15

This Court has held that an agency may not "reflexively rubber stamp[]" a private entity's proposal, and instead must "independently perform its reviewing, analytical and judgmental function." *Sierra Club v. Lynn*, 502 F.2d 43, 59 (5th Cir. 1974). If the FCC's hands-off approach to USAC's quarterly ratemaking isn't rubber stamping, then nothing is.

\* \* \*

If not stopped now, this sort of private delegation will be imitated. Agencies will hand over vast powers to private companies run by industry interest groups, who then decide how many billions of dollars in "contributions" they want to extract from the general public and redistribute to industry cronies. "[T]here is not even a fig leaf of constitutional justification" for such a scheme, yet the Opinion wholeheartedly endorsed it. *Dep't of Transp. v. Ass'n of Am. R.Rs.*, 575 U.S. 43, 62 (2015) (Alito, J., concurring). The Court should review this matter *en banc*.

## CONCLUSION

The Court should grant rehearing *en banc*.

April 20, 2023                    Respectfully submitted,

                                  /s/ R. Trent McCotter
                                  R. Trent McCotter
                                    *Counsel of Record*
                                  Jonathan Berry
                                  Michael Buschbacher
                                  Jared M. Kelson
                                  BOYDEN GRAY & ASSOCIATES
                                  801 17th Street NW, Suite 350
                                  Washington, DC 20006
                                  202-706-5488
                                  mccotter@boydengrayassociates.com

                                  *Counsel for Petitioners*

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record who have consented to electronic service are being served today with a copy of this document via the Court's CM/ECF. All parties in this case are represented by counsel consenting to electronic service.

/s/ R. Trent McCotter

R. Trent McCotter

## CERTIFICATE OF COMPLIANCE

I hereby certify that this petition complies with the type-volume limitations of Federal Rule of Appellate Procedure 35(b)(2)(A) because it contains 3897 words, excluding the parts of the petition exempted by Rule 32(f). This petition complies with the typeface and typestyle requirements of Rule 32(a)(5)–(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word.

/s/ R. Trent McCotter

R. Trent McCotter

# EX. A

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 24, 2023

Lyle W. Cayce
Clerk

No. 22-60008

———

Consumers' Research; Cause Based Commerce,
Incorporated; Kersten Conway; Suzanne Bettac;
Robert Kull; Kwang Ja Kerby; Tom Kirby; Joseph Bayly;
Jeremy Roth; Deanna Roth; Lynn Gibbs; Paul Gibbs;
Rhonda Thomas,

*Petitioners*,

*versus*

Federal Communications Commission; United States of
America,

*Respondents.*

———

On Petition for Review of an Order of the
Federal Communications Commission
Agency No. 96-45

———

Before Richman, *Chief Judge*, and Stewart and Haynes, *Circuit Judges*.

Carl E. Stewart, *Circuit Judge*:

Consumers' Research, along with other entities, (collectively "Petitioners") challenge: (1) the constitutionality of Congress's delegation of administration of the Universal Service Fund (the "USF") to the Federal Communications Commission (the "FCC"); and (2) the FCC's subsequent

reliance on a private entity for ministerial support. Because there are no nondelegation doctrine violations, we DENY their petition.

## I.  BACKGROUND

Congress enacted § 254 of the Telecommunications Act of 1996, which established the USF and entrusted its administration to the FCC. Congress passed § 254 to ensure the facilitation of broad access to telecommunications services across the country. The USF accomplishes this goal by raising funds which are later distributed to people, entities, and projects to expand and advance telecommunications services in the nation. Funds are raised by periodic contributions to the USF from telecommunications carriers, who later pass those costs on to consumers via line-item charges in their monthly bills.

The FCC relies on a private entity, the Universal Service Administrative Company ("USAC"), to aid it in its administration of the USF. USAC is comprised of industry experts and the FCC tasks it with certain ministerial responsibilities, including: (1) collecting self-reported income information from telecommunications carriers; (2) compiling data to formulate the potential contribution rate for the USF; and (3) proposing a quarterly budget to the FCC for the USF's continued preservation. USAC proposals are approved by the FCC either expressly or after fourteen days of agency inaction.

USAC submitted its 2022 first quarter projections to the FCC on November 2, 2021. The FCC published these projections for notice-and-comment in accordance with the Administrative Procedure Act. On November 19, 2021, Petitioners submitted comments challenging the constitutionality of the USF and the FCC's reliance on USAC. The FCC weighed the comments and issued a *Public Notice of Proposed First Quarter 2022 Universal Service Contribution Factor* ("the Proposal"). Petitioners filed

another comment, invoking the same arguments as their November comment and seeking the discontinuance of the USF. The FCC, nonetheless, approved USAC's proposal on December 27, 2021. In response, Petitioners filed this petition on January 5, 2022.

On appeal, Petitioners assert that: (1) the Hobbs Act is not a jurisdictional bar to their constitutional claims; (2) Section 254 violates the nondelegation doctrine because Congress failed to supply the FCC with an intelligible principle; and (3) the FCC's relationship with USAC violates the private nondelegation doctrine because the FCC does not adequately subordinate USAC in its administration of the USF.

## II.   Standard of Review

This court reviews constitutional issues stemming from an agency's action de novo. *See Huwaei Tech USA, Inc. v. FCC*, 2 F.4th 421, 434 (5th Cir. 2021). We "hold unlawful and set aside" any agency action that is "contrary to constitutional right, power, privilege, or immunity." *Id.* (citing 5 U.S.C. § 706(2)(B)).

## III.   Discussion

### A.   *Jurisdiction*

The Hobbs Act "provides that a party aggrieved by a rule, regulation, or final order . . . must file a petition for judicial review within sixty days." *State of Tex. v. United States*, 749 F.2d 1144, 1146 (5th Cir. 1985). This sixty-day period "is jurisdictional and cannot be judicially altered or expanded." *City of Arlington v. FCC*, 668 F.3d 229, 237 (5th Cir. 2012). However, plaintiffs may "challenge . . . a regulation after the limitations period has expired if the claim is that the agency has exceeded its constitutional authority or statutory authority." *State v. Rettig*, 987 F.3d 518, 529 (5th Cir. 2021). "To sustain such a challenge, the claimant must show some direct,

final agency action involving the particular plaintiff within [sixty days] of filing suit." *Id.* (quoting *Dunn-McCampbell Royalty Int., Inc. v. Nat'l Park Serv.*, 112 F.3d 1283, 1287 (5th Cir. 1997)). An agency's action is direct and final when two criteria are satisfied: First, the action must mark the "consummation of the agency's decisionmaking process . . . [and] second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Dunn-McCampbell*, 112 F.3d at 1287 (internal quotation and citation omitted).

The FCC contends that Petitioners' claims are time-barred by the Hobbs Act because: (1) any challenge to § 254 should have come when Congress originally enacted it and (2) the Proposal is not a direct and final agency action which creates legal consequences or new obligations for Petitioners. The FCC relies on *Dunn-McCampbell*, where we foreclosed a facial challenge to a National Park Service regulation because "the limitations period beg[an] to run when the agency publishe[d] the regulation in the Federal Register." *Id.* But we also carved out a limited exception in that case when we recognized that "an agency's application of a rule to a party creates a new . . . cause of action to the agency's constitutional or statutory authority." *Id.* Petitioners assert that they qualify for this exception. Whether they are correct depends on our determination that the Proposal: (1) constitutes application of a direct and final rule by the FCC; and (2) determines Petitioners' rights or has legal consequences for non-compliance. We hold in Petitioners' favor on both prongs.

Here, the Proposal qualifies for the *Dunn-McCampbell* exception because it (1) is a direct and final order which consummates the FCC's decisionmaking process; and (2) punishes telecommunications carriers for non-compliance. *See* 112 F.3d at 1287. Regarding prong one, the Proposal is distinguishable from the regulation in *Dunn-McCampbell*. In that case, we held that Dunn-McCampbell's facial challenge was time barred because the

"Park Service ha[d] not yet applied the regulations to the companies." *Id.* at 1288–89. So, any challenge he brought before the Park Service ever applied the regulation was necessarily a challenge to the regulation itself. The reverse is true in the instant case, where the FCC has applied and reapplied § 254's mandatory USF Contributions through its approval of the quarterly proposals. Each approval consummates the FCC's decisionmaking process for that quarter and, thus, allows for a constitutional challenge if that challenge is brought within the sixty-day time limit.

Prong two is also satisfied because the Proposal undoubtedly has legal consequences which flow to carriers that fail to meet their contribution obligations. *See* 47 C.F.R. § 54.713(b) (providing that "delinquent" USF contributors are subject to "interest at the rate equal to the U.S. prime rate . . . plus 3.5 percent, as well as administrative charges of collection and/or penalties and charges permitted by the applicable law"). Because Petitioners satisfy both *Dunn-McCampbell* prongs, the Hobbs Act does not bar their constitutional claims and we proceed to the merits of their nondelegation arguments. 112 F.3d at 1287; *Rettig*, 987 F.3d at 529.

## B.    *Nondelegation*

Article I of the United States Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." "Accompanying that assignment of power . . . is a bar on its further delegation." *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (internal quotations and citation omitted). However, the Constitution does not deny Congress the necessary "flexibility and practicality" to perform its functions. *Id.* The Supreme Court has, therefore, recognized that "Congress may obtain the assistance of its coordinate Branches . . . and in particular, may confer substantial discretion on executive agencies to implement and enforce the laws." *Id.* (quoting *Mistretta v. United States*, 488 U.S. 361, 372 (1989)).

To that end, the Constitution only requires Congress to provide an intelligible principle which adequately guides the Executive agency. *See id.* (holding "that a statutory delegation is constitutional as long as Congress lays down by legislative act an intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform") (internal quotations and citation omitted).

The intelligible principle standard is "not demanding." *Id.* at 2129. The Supreme Court has rarely "second-guess[ed] Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law." *Id.* Ultimately, "a nondelegation inquiry always begins (and often almost ends) with statutory interpretation. The constitutional question is whether Congress has supplied an intelligible principle to guide the delegee's use of discretion." *Id.* Put differently, we must construe § 254 to discern what tasks it delegates and what instructions Congress provided therein. "Only after [we have] determined [§ 254's] meaning can [we] decide whether the law sufficiently guides executive discretion to accord with Article I." *Id*

We recently grappled with the intelligible principle standard in *Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022).[1] In that case, we held that Congress failed to provide an intelligible principle when it gave "the SEC the ability to determine which subjects of its enforcement actions are entitled to Article III proceedings with a jury trial, and which are not." *Id.* at 461. We acknowledged that the Supreme Court "has not in the past several decades held that Congress failed to provide a requisite intelligible principle." *Id.* at

---

[1] We have since denied petition to rehear this case before the en banc court. *See Jarkesy v. SEC*, 51 F.4th 644. On March 8, 2023, the Government filed a petition for a writ of certiorari with the Supreme Court. Jarkesy's response to that petition is due April 10, 2023.

462. But we also noted that the Court had not been presented an instance where "Congress offered *no guidance* whatsoever" to an executive agency in that same span of time. *Id.* (emphasis in original). Accordingly, we reasoned that "[i]f the intelligible principle standard means anything, it must mean that a total absence of guidance is impermissible under the Constitution." *Id.*

In *Jarkesy*, we stated that the nondelegation doctrine applies where Congress has provided "*no guidance* whatsoever" to an agency, *Id.* at 462 (emphasis in original), citing to the most recent (though long ago) Supreme Court nondelegation violation decision. *See Panama Refining Co. v. Ryan*, 293 U.S. 388, 405 (1935) (holding that there was a nondelegation violation when Congress gave the President broad authority to prohibit the transportation of oil-related products in interstate commerce, but failed to provide any policy, establish any standard, or lay down any rules to direct the President's exercise of this authority).

Having fleshed out what the intelligible principle standard requires, we now examine Petitioners' assertions that § 254 violates the nondelegation doctrine because: (1) Congress failed to provide the FCC with an intelligible principle; and (2) to the extent Congress provided intelligible principles, they are merely aspirational and place no objective limits on the FCC in its administration of the USF.

1.    *Whether Congress Provided Intelligible Principles in § 254*

Petitioners argue that Congress has unconstitutionally delegated its authority to the FCC without providing an intelligible principle. For example, they point to the absence of a limit on how much the FCC can raise for the USF as evidence of a lack of proper guidance. With no objective ceiling on the amount that the FCC can raise each quarter, they contend that Congress's alleged intelligible principles fail to place necessary limits on the FCC's ability to assess fees from telecommunications carriers. Also,

No. 22-60008

Petitioners aver that § 254(b)(1)-(7) contains mere public policy statements which impose no meaningful limitations on or guidance to the FCC's revenue-raising obligation in its administration of the USF. In sum, Petitioners maintain that Congress has not articulated any guidance to the FCC in its administration of the USF—and that this failure violates the nondelegation doctrine. We disagree.

Congress passed § 254 for the express purpose of preserving and advancing universal telecommunications services.[2] *See* 47 U.S.C. § 254(b). To that end, § 254(b) provides that the FCC "shall base policies" on certain enumerated principles.[3] Petitioners maintain that these principles offer no guidance to the FCC as it attempts to realize § 254(b)'s purpose. Their position is untenable. Section 254 expressly requires the FCC to ensure that telecommunications services are: (1) of decent quality and reasonably priced; (2) equally available in rural and urban areas; (3) supported by state and federal mechanisms; (4) funded in an equitable and nondiscriminatory manner; (5) established in important public spaces (schools, healthcare providers, and libraries); and (6) available broadly across all regions in the nation. *See* § 254(b)(1)-(7). And should the FCC ever conclude that these principles were insufficient, the statute enables, and likely obligates, it to add principles "consistent with" § 254's overall purpose. *See* § 254(b)(7). Rather than leave the FCC with "*no guidance* whatsoever," Congress provided ample direction for the FCC in § 254. *Jarkesy*, 34 F.4th at 462.

---

[2] *See also* 47 U.S.C. § 151 (noting the FCC's original purpose of creating policies designed "to make available, so far as possible, to all the people of the United States . . . a rapid, efficient, Nation-wide . . . wire and radio communication service with adequate facilities at reasonable charges").

[3] *See* 47 U.S.C. § 254(b)(1)-(7) (providing a full list of principles).

No. 22-60008

Ultimately, in enacting § 254, Congress chose to "confer substantial discretion" over administration of the USF to the FCC. *Gundy*, 139 S. Ct. at 2139. Petitioners take issue with how the FCC uses this discretion—arguing that the FCC operates the USF with no guidance from Congress.[4] But if the FCC had a question about how to manage the USF, it need only look to § 254 to find an answer. Therefore, we conclude that Congress supplied the FCC with intelligible principles when it tasked the agency with overseeing the USF. Having established that § 254 contains intelligible principles, we next consider whether those principles adequately limit the FCC's revenue raising function.

2.    *Whether § 254 Properly Limits the FCC*

Petitioners contend that even if Congress provided the FCC with intelligible principles we should rule in their favor because those principles are nothing more than "vague aspirations" that fail to set objective limits on the FCC as they operate the USF. *Gundy*, 139 S. Ct. at 2133. They argue

---

[4] We note that much of Petitioners' nondelegation argument relies primarily on the dissents of the Supreme Court's holding in *Gundy* and this court's in *Rettig*, which, of course, are not binding on our court. *See, e.g.*, *Gundy*, 139 S. Ct. at 2133, 2134, 2135–37 (Gorsuch, J., joined by Roberts, C.J., and Thomas, J. dissenting); *see also Rettig*, 993 F.3d at 408, 409–10 (5th Cir. 2021) (Ho, J. joined by Jones, Smith, Elrod, and Duncan, JJ., dissenting from denial of rehearing en banc). That some Justices of the Supreme Court and some judges of this circuit have opined on whether Congress is permitted to delegate "difficult policy choices" is not determinative that Congress impermissibly did so here when it delegated administration of the USF to the FCC. Moreover, the mere fact that Petitioners dispute the policy choices that the FCC has made in overseeing the USF does not translate to a constitutional or statutory violation. *See Gundy*, 139 S. Ct. at 2139 ("Congress may confer substantial discretion on executive agencies to implement and enforce the laws."). At best, Petitioners argue for different policy choices. But they provide no binding law to support such a request.

that § 254 is no different than the statute in *Panama Refining*.[5] In that case, the Supreme Court took issue with 15 U.S.C. § 701's generally unhelpful guidance to the President as he tried to regulate the interstate hot oil industry. *See Panama Refining*, 293 U.S. at 419 (observing that § 701 failed to "limit[] or control[] the authority conferred" to the President). Petitioners argue that § 254 similarly fails to limit or control the FCC's ability to raise revenue for the USF. We disagree.

Here, § 254 provides limitations on the FCC's revenue-raising ability, whereas the statute in *Panama Refining* is markedly different. In *Panama Refining*, the Supreme Court observed that:

> The Congress left the matter to the President without standard or rule, *to be dealt with as he pleased*. The effort by ingenious and diligent construction to supply a criterion still permits such a breadth of authorized action as essentially to commit to the President the functions of a Legislature rather than those of an executive or administrative officer executing a declared legislative policy.

293 U.S. at 418–19 (emphasis added). Section 254 contains no such deficiencies, and certainly did not leave the matter to the FCC "without standard or rule, to be dealt with as [it] pleased." *Id.* Instead, § 254 requires that the FCC only raise enough revenue to satisfy its primary function. *See* § 254(b).

---

[5] *See* 293 U.S. at 417 (stating that the purpose of the challenges statute was "to eliminate unfair competitive practices, to promote the fullest possible utilization of the present productive capacity of industries, to avoid undue restriction of production (except as may be temporarily required), to increase the consumption of industrial and agricultural products by increasing purchasing power, to reduce and relieve unemployment, to improve standards of labor, and otherwise to rehabilitate industry and to conserve natural resources.") (internal quotations omitted).

For example, § 254(c)(1)(A)-(D) limits distribution of USF funds to telecommunications services that: (1) "are essential to education, public health, or public safety;" (2) "are being deployed in public telecommunications networks by telecommunications carriers;" and (3) "are consistent with the public interest, convenience, and necessity." Likewise, § 254(b)(5) requires that the FCC ensure there are "specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service." Furthermore, § 254(e) limits distribution of USF funds to eligible communication carriers under § 214(e)—and even those carriers may only receive support "sufficient to achieve the purposes of" § 254. Taken together, these provisions demonstrate that the FCC is not in the dark as to the amount of funding it should seek each quarter. Instead, § 254 sets out the FCC's obligations with respect to administration of the USF and the FCC, in turn, calculates what funds are necessary to satisfy its obligations.

Ultimately, § 254 reflects Congress's understanding that telecommunications services are constantly evolving.[6] That understanding also drove Congress to implement a unique revenue raising mechanism for the USF. That the mechanism is unique is not in itself a nondelegation violation—especially where Congress has placed identifiable limits on what USF distributions can fund. *See, e.g.*, § 254(b)-(e). Congress failed to place these limitations on the President in *Panama Refining*—and that led the Supreme Court to hold that a nondelegation violation occurred. But Congress did not make that same mistake with § 254, instead, ensuring that

---

[6] *See, e.g.*, § 254(c)(1) (providing that "[u]niversal service is an evolving level of telecommunications services that the Commission shall establish periodically under this section, taking into account advances in telecommunications and information technologies and services").

the statute is replete with intelligible principles to guide the FCC. Because Congress provided the FCC with numerous intelligible principles for its administration of the USF and those principles sufficiently limit the FCC's revenue-raising activity, we hold that § 254 does not violate the nondelegation doctrine.

## C. *Private Nondelegation*

The private nondelegation doctrine prevents "governments from delegating too much power to private persons and entities." *Boerschig*, 872 F.3d at 707. "Although this so-called private nondelegation doctrine has been largely dormant" for nearly a century, "its continuing force is generally accepted." *Id.*; *see also Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 880–82 (5th Cir. 2022) (discussing the evolution of the private nondelegation doctrine). Functionally, the doctrine prevents agencies from giving private parties the "unrestrained ability to decide whether another citizen's property rights can be restricted" because "any resulting deprivation happens without 'process of law.'" *Boerschig*, 872 F.3d at 708.

To be clear, agencies "may subdelegate to private entities so long as the entities 'function subordinately to' the federal agency and the federal agency 'has authority and surveillance over [their] activities.'" *Rettig*, 987 F.3d at 532 (quoting *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940)). Ultimately, a statute does not violate the private nondelegation doctrine if it "'imposes a standard to guide' the private party and (2) provides 'review of that determination that prevents the [private party] from having the final say.'" *Id.* (alteration in original) (quoting *Carter v. Carter Coal Co.*, 298 U.S. 238, 310–311 (1936)).

Our decision in *National Horsemen* provides a timely comparator to the instant case. 53 F.4th 869 (5th Cir. 2022). There, multiple organizations

sued the Federal Trade Commission ("FTC"), alleging that the Horseracing Integrity and Safety Act's ("HISA") regulatory scheme violated the private nondelegation doctrine by giving government power to the Horseracing Integrity and Safety Authority (the "Authority") without adequate agency supervision. *Id.* On appeal, we held that the FTC's relationship with the Authority violated the private nondelegation doctrine.

We first noted that, under HISA, the Authority had "sweeping rulemaking power," with the ability to establish, enforce, and punish all entities involved in the horseracing industry. *Id.* at 882. We also observed that "HISA's generous grant of authority to the Authority to craft entire industry programs strongly suggests it is the Authority, not the FTC, that is in the saddle." *Id.* at 883 (internal quotations omitted). Finally, we highlighted that the FTC had no authority to conduct independent review of the Authority's policy choices and did not possess final say on what rules the Authority promulgated. *See id.* at 884. Instead, the FTC could only "recommend changes to the Authority's rules (and then, only to the extent that the rules are inconsistent with HISA)." *Id.* at 888. After considering the lack of oversight and control the FTC exercised over the Authority, we ruled against the FTC and held its redelegation of Congressional power unconstitutional.

In this case, Petitioners argue that the FCC violated the private nondelegation doctrine when it redelegated its authority over the USF to USAC, a private entity. They aver that the FCC does not oversee USAC in its performance of its duties. For example, they highlight that the FCC rarely exercises its power to alter USAC's proposed contribution factor under § 54.709(a)(3). They assert that one reason that the FCC does not exercise this authority is because the statute affords the agency just fourteen days to review and alter any USAC determinations before they become binding on the telecommunications carriers. To Petitioners, such a small window for

review renders the FCC's oversight over USAC meaningless. They suggest that the FCC is a rubber stamp for USAC's proposals and that USAC effectively administers the USF. We disagree.

Here, the FCC has not violated the private nondelegation doctrine because it wholly subordinates USAC. First, federal statutory law expressly subordinates USAC to the FCC. *See* 47 C.F.R. § 54.702(b) (providing that USAC "may not make policy, interpret unclear provisions of the statute or rules, or interpret the intent of Congress"). Second, unlike in *National Horsemen*, USAC does not enjoy the same type of sweeping rulemaking power—instead it makes a series of proposals to the FCC based off expert analysis, which are not binding on carriers until the FCC approves them. *See* 47 C.F.R. § 54.709(a). Third, the FCC permits telecommunications carriers to challenge USAC proposals directly to the agency and often grants relief to those challenges.[7] Fourth, the FCC dictates how USAC calculates the USF contribution factor and subsequently reviews the calculation method after USAC makes a proposal. *See* 47 C.F.R. §§ 54.709(a)(2)-(3); 54.711(a).

Ultimately, the FCC only uses USAC's proposals after independent consideration of the collected data and other relevant information. We have expressly upheld these types of arrangements. *See Rettig*, 987 F.3d at 531 (noting that agencies are permitted to "reasonably condition" their actions "on an outside party's determination of some issue"). Because the FCC properly subordinates USAC, it has not violated the private nondelegation doctrine.

---

[7] *See, e.g.*, *Streamlined Resol. of Requests Related to Actions by the Universal Serv. Admin. Co.*, DA 22-448, 2022 WL 1302467 (WCB rel. April 29, 2022); Alpaugh Unified Sch. Dist., 22 FCC Rcd. 6035 (2007)).

No. 22-60008

## IV.  Conclusion

For the foregoing reasons we DENY the petition.