No. 22-60008

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

**CONSUMERS' RESEARCH; CAUSE BASED COMMERCE, INCORPORATED; KERSTEN CONWAY; SUZANNE BETTAC; ROBERT KULL; KWANG JA KERBY; TOM KIRBY; JOSEPH BAYLY; JEREMY ROTH; DEANNA ROTH; LYNN GIBBS; PAUL GIBBS; RHONDA THOMAS,**

*Petitioners,*

v.

**FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES OF AMERICA,**

*Respondents.*

Petition for Review of an Order of the
Federal Communications Commission
Agency No. 96-45

**EN BANC BRIEF FOR PETITIONERS**

R. Trent McCotter
  *Counsel of Record*
Jonathan Berry
Michael Buschbacher
Jared M. Kelson
BOYDEN GRAY PLLC
801 17th Street NW, Suite 350
Washington, DC 20006
202-706-5488
tmccotter@boydengray.com
*Counsel for Petitioners*

## CERTIFICATE OF INTERESTED PERSONS

*Consumers' Research et al. v. Federal Communications Commission et al.*
No. 22-60008

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Local Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

*Petitioners*

1.    Consumers' Research. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

2.    Cause Based Commerce, Incorporated. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

3.    Kersten Conway

4.    Suzanne Bettac

5.    Robert Kull

6.    Kwang Ja Kirby

7.    Tom Kirby

8.    Joseph Bayly

9.    Jeremy Roth

10.    Deanna Roth

11.    Lynn Gibbs

12.    Paul Gibbs

13.    Rhonda Thomas

*Respondents*

14.    Federal Communications Commission

15.    United States of America

*Intervenors*

16.    Benton Institute for Broadband & Society

17.    National Digital Inclusion Alliance

18.    Center for Media Justice (d/b/a MediaJustice)

19.    Schools, Health & Libraries Broadband Coalition

20.    National Telecommunications Cooperative Association (d/b/a

NTCA – The Rural Broadband Association)

21.    Competitive Carriers Association

*Counsel*

22.    Boyden Gray PLLC: C. Boyden Gray, R. Trent McCotter, Jonathan Berry, Michael Buschbacher, and Jared M. Kelson are counsel for Petitioners.

23.    Federal Communications Commission: James M. Carr, Adam Crews, and Jacob M. Lewis are counsel for Respondent FCC.

24.    United States Department of Justice: Gerard J. Sinzdak is counsel for Respondent United States of America.

25.    Andrew Jay Schwartzman is counsel for Intervenors Benton Institute for Broadband & Society, National Digital Inclusion Alliance, and Center for Media Justice (d/b/a MediaJustice).

26.    Harris, Wiltshire & Grannis, LLP: Jason Neal and Stephanie Weiner are counsel for Intervenors Schools, Health & Libraries Broadband Coalition.

27.    Wilkinson, Barker & Knauer LLP: Jennifer Tatel and Craig Gilmore are counsel for USTelecom – The Broadband Association; National Telecommunications Cooperative Association (d/b/a NTCA – The Rural Broadband Association); and Competitive Carriers Association.

<u>/s/ R. Trent McCotter</u>
R. Trent McCotter
*Counsel of Record for Petitioners*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................vii

JURISDICTIONAL STATEMENT .......................................................xiv

STATEMENT OF THE ISSUES............................................................xiv

INTRODUCTION .................................................................................. 1

STATEMENT OF THE CASE ............................................................... 8

    A.    Statutory and Regulatory Background................................. 8

    B.    Prior Proceedings. ............................................................. 15

SUMMARY OF THE ARGUMENT ...................................................... 17

ARGUMENT ....................................................................................... 17

    I.    The USF Funding Mechanism Is an Unconstitutional Delegation. ....................................................................... 17

        A.    Section 254 Violates the Original Understanding of Nondelegation. ......................................................... 19

        B.    Section 254 Violates the Intelligible-Principle Test.... 24

    II.    The Constitutional Violations Here Are Particularly Egregious Because They Involve Congress's Exclusive Power to Levy Taxes. .......................................................... 51

        A.    History of the Taxing Power. ....................................52

        B.    USF Charges Are Taxes................................................55

    III.    The USF Violates the Private Nondelegation Doctrine. ...... 60

    IV.    Scope of Relief. .................................................................. 66

CONCLUSION ................................................................................... 68

CERTIFICATE OF SERVICE.................................................................. 69

CERTIFICATE OF COMPLIANCE...................................................... 70

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A.L.A. Schechter Poultry Corp. v. United States,*
   295 U.S. 495 (1935)................ 1, 2, 4, 18, 25, 33, 37, 38, 39, 40, 48, 49

*Alenco Commc'ns, Inc. v. FCC,*
   201 F.3d 608 (5th Cir. 2000)................................................ 49

*American Power & Light Co. v. SEC,* 329 U.S. 90 (1946) ...................... 28

*Carter v. Carter Coal Co.,* 298 U.S. 238 (1936)....................................... 60

*CFPB v. All Am. Check Cashing, Inc.,*
   33 F.4th 218 (5th Cir. 2022) ........................................ 4, 19, 26, 40, 45

*Community Fin. Servs. Ass'n of Am. v. CFPB,*
   51 F.4th 616 (5th Cir. 2022) .................................. 3, 19, 22, 26, 40, 53

*Consumers' Rsch. v. FCC,*
   63 F.4th 441 (5th Cir. 2023) ..............................xiv, 1, 6, 16, 17, 18, 62

*Consumers' Rsch. v. FCC,* 67 F.4th 773 (6th Cir. 2023) ......................... 65

*Dep't of Transp. v. Ass'n of Am. R.Rs.,*
   575 U.S. 43 (2015)................................................................... 60

*Free Enter. Fund v. PCAOB,* 561 U.S. 477 (2010) .................................. 40

*Fund for Animals v. Kempthorne,*538 F.3d 124 (2d Cir. 2008) .............. 65

*Gundy v. United States,* 139 S. Ct. 2116 (2019) .......................... 4, 20, 23

*In re Incomnet, Inc.,* 463 F.3d 1064 (9th Cir. 2006)...................... 9, 10, 11

*INS v. Chadha,* 462 U.S. 919 (1983)........................................................54

*J.W. Hampton, Jr., & Co. v. United States,*
   276 U.S. 394 (1928)................................................ 24, 26, 27, 29, 31

*Jarkesy v. SEC,* 34 F.4th 446 (5th Cir. 2022) ............................. 43, 44, 47

*Lichter v. United States*, 334 U.S. 742 (1948) ......................................... 27

*M'Culloch v. Maryland*, 4 Wheat. 428 (1819) ........................................ 54

*Mistretta v. United States*,
    488 U.S. 361 (1989) ................................................................ 22, 25, 30

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012) ................................................................ 55

*National Horsemen's Benevolent & Protective Ass'n v. Black*,
    53 F.4th 869 (5th Cir. 2022) ................................................ 67

*NBC v. United States*, 319 U.S. 190 (1943). ........................................ 28

*NCTA v. United States*,
    415 U.S. 336 (1974) ................... 5, 22, 23, 26, 29, 40, 52, 55, 57, 58, 59

*Oklahoma v. United States*,
    62 F.4th 221 (6th Cir. 2023) ................................................ 67

*Panama Refining Co. v. Ryan*,
    293 U.S. 388 (1935) ...... 1, 2, 4, 18, 25, 28, 33, 36, 38, 43, 46, 47, 48, 49

*Paul v. United States*, 140 S. Ct. 342 (2019) ........................................ 20

*Pittston Co. v. United States*, 368 F.3d 385 (4th Cir. 2004) ................... 64

*Qwest Communications Int'l, Inc. v. FCC*,
    398 F.3d 1222 (10th Cir. 2005) ........................................... 41

*Qwest Corp. v. FCC*, 258 F.3d 1191 (10th Cir. 2001) ....................... 41, 42

*Rural Cellular Ass'n v. FCC*,
    588 F.3d 1095 (D.C. Cir. 2009) ........................................... 38

*Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020) ...................................... 4

*U.S. ex rel. Shupe v. Cisco Sys., Inc.*,
    759 F.3d 379 (5th Cir. 2014) ............................................... 61

*Sierra Club v. Lynn*, 502 F.2d 43 (5th Cir. 1974) .............................. 61, 65

*Skinner v. Mid-Am. Pipeline Co.*,
    490 U.S. 212 (1989) .... 25, 27, 29, 30, 31, 32, 33, 35, 44, 48, 51, 53, 55,
                                                                56, 57, 59

*Tex. Off. of Pub. Util. Couns. v. FCC*,
    183 F.3d 393 (5th Cir. 1999) ..............................2, 34, 35, 38, 42, 58, 59

*Tex. Off. of Pub. Util. Couns. v. FCC*,
    265 F.3d 313 (5th Cir. 2001) ...........................18, 23, 35, 38, 47, 51, 65

*Texas v. Rettig*, 993 F.3d 408 (5th Cir. 2021) .................. 7, 30, 62, 65, 66

*Tiger Lily, LLC v. U.S. Dep't of Hous. & Urb. Dev.*,
    5 F.4th 666 (6th Cir. 2021) ...................................................... 7, 17, 24

*Trafigura Trading LLC v. United States*,
    29 F.4th 286 (5th Cir. 2022) ................................................. 55, 56, 57

*United States v. Becton*, 632 F.2d 1294 (5th Cir. 1980).........................58

*United States v. Grimaud*, 220 U.S. 506 (1911) ....................................24

*United States v. U.S. Shoe Corp.*, 523 U.S. 360 (1998) ..........................57

*Wayman v. Southard*, 23 U.S. 1 (1825)...................................................21

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001).....................2, 8, 21, 25, 26, 29, 34, 40, 46, 50, 51

## Constitution and Statutes

U.S. Const. art. I, § 1............................................................................52

U.S. Const. art. I, § 7............................................................................53

U.S. Const. art. I, § 8............................................................................19

U.S. Const. art. I, § 9............................................................................53

26 U.S.C. § 3101 ...................................................................................32

47 U.S.C. § 151 .......................................................................................8

47 U.S.C. § 153 ........................................................................ 46

47 U.S.C. § 254(b) ..... 2, 9, 18, 33, 34, 35, 37, 39, 41, 42, 44, 45, 48, 51, 56

47 U.S.C. § 254(c) ........................................2, 9, 18, 39, 45, 46, 47, 48, 56

47 U.S.C. § 254(d) .................................................................... 3, 9

**Regulations and Other Agency Materials**

47 C.F.R. § 54.407 ...................................................................... 9

47 C.F.R. § 54.701 ...................................................................... 10

47 C.F.R. § 54.703 .................................................................. 10, 11

47 C.F.R. § 54.709 ....................................................... xiv, 11, 16

47 C.F.R. § 54.712 ...................................................................... 9

*2022 Budget Estimates to Congress*, FCC (May 2021),
    https://docs.fcc.gov/public/attachments/DOC-
    372853A1.pdf ................................................................... 12

*In re Federal-State Joint Bd. on Universal Service*,
    18 FCC Rcd. 4818 (2003) .............................................. 63

*In re Federal-State Joint Board on Universal Service*,
    12 FCC Rcd. 8776 (1997) ........................................... 3, 9

*In re Universal Service Contribution Methodology*,
    34 FCC Rcd. 4143 (2019) .............................................. 63

*Universal Service Contribution Factor*, DA 00-517 (Mar. 7,
    2000), https://docs.fcc.gov/public/attachments/DA-00-
    517A1.pdf ........................................................................ 12

*Universal Service Contribution Factor*, DA 23-507 (June 14,
    2023), https://docs.fcc.gov/public/attachments/DA-23-
    507A1.pdf ........................................................................ 64

*Wireline Competition Bureau Provides Guidance to the Universal Service Administrative Company Regarding the High-Cost Universal Service Mechanism Budget*, 32 FCC Rcd. 9243 (2017) .................................................. 63

## Other Sources

Mark Chenoweth & Richard Samp, *Reinvigorating Nondelegation with Core Legislative Power*, in THE ADMINISTRATIVE STATE BEFORE THE SUPREME COURT (Peter J. Wallison & John Yoo eds., 2022) ......................... 30

Barbara A. Cherry & Donald D. Nystrom, *Universal Service Contributions: An Unconstitutional Delegation of Taxing Power*, 2000 L. REV. MICH. ST. U. DET. C.L. 107 (2000) ...................... 5

Christopher C. DeMuth, Sr. & Michael S. Greve, *Agency Finance in the Age of Executive Government*, 24 GEO. MASON L. REV. 555 (2017)............................................................ 54, 57

Paul Einzig, THE CONTROL OF THE PURSE: PROGRESS AND DECLINE OF PARLIAMENT'S FINANCIAL CONTROL (1959) ...................... 22

Sam Dillon, *School Internet Program Lacks Oversight, Investigator Says*, N.Y. TIMES, June 18, 2004.................................... 14

Philip Hamburger, *Nondelegation Blues*, 91 GEO. WASH. L. REV. (forthcoming 2023), https://papers.ssrn.com/sol3/ papers.cfm?abstract_id=3990247 ........................................ 19

John Harrison, *Executive Administration of the Government's Resources and the Delegation Problem*, in THE ADMINISTRATIVE STATE BEFORE THE SUPREME COURT (Peter J. Wallison & John Yoo eds., 2022) ................................... 27, 45

Ronald J. Krotoszynski, Jr., *Reconsidering the Nondelegation Doctrine: Universal Service, the Power to Tax, and the Ratification Doctrine*, 80 IND. L.J. 239 (2005)..................................... 8

John Locke, TWO TREATISES OF GOVERNMENT (1690) ............................. 20

Michael W. McConnell, THE PRESIDENT WHO WOULD NOT BE
   KING (2020) ................................................................. 54

C.S. Lewis, POEMS (2017 ed.) .................................................. 35

Chad Squitieri, *Towards Nondelegation Doctrines*, 86 MO. L.
   REV. 1239 (2021) ......................................................... 25

Opening Statement of Chairman Greg Walden, *The Lifeline
   Fund: Money Well Spent?*: *Hearing Before the H.
   Subcomm. on Commc'n and Tech., H. Comm. on Energy
   and Comm.*, 113th Cong. 2 (2013),
   https://www.govinfo.gov/content/pkg/CHRG-
   113hhrg82189/pdf/CHRG-113hhrg82189.pdf .............................. 10, 13

An Act Declaring the Rights and Liberties of the Subject,
   and Settling the Succession of the Crown (Bill of Rights),
   1689, 1 W. & M., Sess. 2 .................................................. 52

*Benevolence*, ENCYCLOPEDIA BRITANNICA (11th ed. 1911),
   https://en.wikisource.org/wiki/Page%3AEB1911_-
   _Volume_03.djvu/748 ....................................................... 3

*Broadband Subsidies for Some, Broadband Taxes for
   Everyone,* TechFreedom (May 28, 2015),
   https://techfreedom.org/broadband-subsidies-for-some-
   broadband-taxes-for/ ...................................................... 14

Cong. Rsch. Srv., LSB10904, *Fifth Circuit Considers
   Constitutionality of the Universal Service Fund* (2023),
   https://crsreports.congress.gov/product/pdf/LSB/LSB10904 ............. 67

DEBATES AND PROCEEDINGS IN THE CONGRESS OF THE UNITED
   STATES (Joseph Gales ed., 1834) ........................................ 53

THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE
   ADOPTION OF THE FEDERAL CONSTITUTION (Jonathan Elliot
   ed., 2d ed. 1836) ........................................................ 21

*Dynamic*, MERRIAM-WEBSTER, https://www.merriam-
   webster.com/dictionary/dynamic ......................................... 46

*FCC Should Enhance Performance Goals and Measures for Its Program to Support Broadband Service in High-Cost Areas* (2020), https://www.gao.gov/assets/gao-21-24.pdf .................. 14

*FCC Should Evaluate the Efficiency and Effectiveness of the Lifeline Program* (2015), http://www.gao.gov/assets/670/669209.pdf ........................................................................... 15

*Sufficient*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/sufficient ....................................................... 38

## JURISDICTIONAL STATEMENT

The Federal Communications Commission issued the Proposed First Quarter 2022 Universal Service Contribution Factor on December 13, 2021. JA100. It was "deemed approved by the [FCC]" 14 days later on December 27, 2021. 47 C.F.R. § 54.709(a)(3). The Petition was timely filed with this Court on January 5, 2022. *See Consumers' Rsch. v. FCC*, 63 F.4th 441, 445–47 (5th Cir. 2023).

## STATEMENT OF THE ISSUES

(1)    Whether the nondelegation doctrine allows Congress to establish a "unique revenue raising mechanism" containing "no objective ceiling" or other meaningful limits on the amount that a federal agency can self-raise via a tax paid by millions of consumers; and

(2)    Whether the private nondelegation doctrine allows a federal agency to rubber stamp a private company's operation of a nearly-$10-billion-a-year welfare fund.

## **INTRODUCTION**

The panel opinion in this case acknowledged that the FCC's Universal Service Fund ("USF")—which collects nearly $10 billion every year via a tax on consumers' monthly phone bills—is bankrolled by a historically "unique revenue raising mechanism." *Consumers' Rsch.*, 63 F.4th at 450.

It is "unique" because it hands Congress's revenue-raising and taxing powers over to an unelected agency bureaucracy without clear and meaningful limitations. This delegation was accomplished through a combination of aspects that directly track the regimes in *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935), and *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935), which likewise featured statutes with lengthy lists of vague and competing policies but no directions on how to balance or limit them. If anything, the USF regime is even worse given the FCC's ability to redefine its own scope of power to raise money.

*First*, there is an "absence of a limit on how much the FCC can raise for the USF," 60 F.4th at 448, because the USF statute contains no objective limitations—no cap, rate, or formula—and any implied limitations in the definition of "universal service" are written in such

vague and broad language that this Court has labeled them merely "aspirational," *Tex. Off. of Pub. Util. Couns. v. FCC* ("*TOPUC I*"), 183 F.3d 393, 421 (5th Cir. 1999). An agency limited only by its own "aspirations" has no limit at all. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 473 (2001); Part I.B.3, *infra.* Or as *Panama Refining* and *Schechter Poultry* put it, a statute is invalid where the executive is "free to select as he chooses from the many and various objects generally described," 293 U.S. at 431–32, as he "roam[s] at will" "in that wide field of legislative possibilities," 295 U.S. at 538.

*Second*, the USF features a rare "dual-layer" delegation, where Congress not only allowed the FCC to raise money for "universal service," but also allowed the FCC to redefine universal service and add new universal service "principles" virtually at will. 47 U.S.C. § 254(c)(1), (b)(7); *see* Part I.B.3, *infra.* Again, this Court faced a similar regime in *Schechter Poultry*, where the President could "add[] to or tak[e] from what is proposed, as 'in his discretion' he thinks necessary 'to effectuate the policy' declared by the act." 295 U.S. at 538–39. Letting an agency daisy-chain its own scope of revenue-raising power is "delegation running riot." *Id.* at 553 (Cardozo, J., concurring).

*Third*, the USF charges are taxes that raise money for the benefit of the general public, as confirmed by the very name of the program: *Universal* Service Fund. *See* Part II, *infra*. The taxing power is the most jealously guarded legislative prerogative, borne out by centuries of legislatures fighting to check the executive via the power of the purse. Even the label of these forced payments as "contribution[s]" to the executive, 47 U.S.C. § 254(d), is reminiscent of the abusive history of English kings avoiding Parliament's purse strings by demanding payment from subjects under the euphemistic title of "loving contributions."[1]

*Fourth*, this revenue-raising power is perpetual, not a one-time or limited grant. *See Community Fin. Servs. Ass'n of Am. v. CFPB*, 51 F.4th 616, 638 (5th Cir. 2022) (labeling an agency's "self-actualizing, perpetual funding mechanism" as "[m]ost anomalous").

Taken together, this "unique" revenue scheme means the FCC can self-raise billions of dollars in taxes from the general public in perpetuity, with no meaningful statutory limits. A delegation of this type—unseen

---

[1] *See Benevolence*, 3 ENCYCLOPEDIA BRITANNICA 728 (11th ed. 1911), https://en.wikisource.org/wiki/Page%3AEB1911_-_Volume_03.djvu/748.

since the time of *Schechter Poultry* and *Panama Refining*—raises serious alarm bells for the separation of powers. After all, "[p]erhaps the most telling indication of a severe constitutional problem with an executive entity is a lack of historical precedent to support it." *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2201 (2020) (cleaned up); *see CFPB v. All Am. Check Cashing, Inc.*, 33 F.4th 218, 222–23 (5th Cir. 2022) (Jones, J., concurring).

This scheme violates the original understanding of nondelegation, which precluded Congress from "merely announc[ing] *vague aspirations* and then assign[ing] others the responsibility of adopting legislation to realize its goals." *Gundy v. United States*, 139 S. Ct. 2116, 2133 (2019) (Gorsuch, J., dissenting) (emphasis added). But that is precisely what Congress did here when it gave the FCC such grand power, limited only by "aspirational" statutory principles. *See* Part I.A, *infra*.

And we know from *Schechter Poultry* and *Panama Refining* that this sort of scheme also violates the intelligible-principle test, as noted above. Further buttressing this conclusion in this context is the fact that the Supreme Court has found an intelligible principle in delegations of *revenue-raising* powers only in cases where there was an objective

statutory limit—like a cap—on the executive's ability to self-fund. *See* Part I.B.1, *infra*. In fact, the Supreme Court has expressly warned—in a case involving the FCC, no less—that allowing an agency to raise money based only on vague statutory phrases like "'public policy or interest served, and other pertinent facts'" raises the specter of "'forbidden delegation of legislative power'" by "carr[ying] [the] agency far from its customary orbit and put[ting] it in search of revenue in the manner of an Appropriations Committee of the House." *NCTA v. United States*, 415 U.S. 336, 341–42 (1974).

Scholars have explained that "[u]nlike the thousands of responsibilities carried out by governmental agencies on behalf of Congress, this delegation is unique because of the unfettered power given to the FCC in defining the scope of universal service, and because Congress delegated the power to levy a tax to pay for the service with no limits, knowing that the end user, the American public, would ultimately be saddled with the burden." Barbara A. Cherry & Donald D. Nystrom, *Universal Service Contributions: An Unconstitutional Delegation of Taxing Power*, 2000 L. REV. MICH. ST. U. DET. C.L. 107, 110 (2000).

The USF also suffers from the tell-tale symptoms of improperly delegated power. Without meaningful political checks, the USF taxing rate has skyrocketed from around 2% to over 30% and now collects approximately 25 times the FCC's *entire* annual budget. The lack of accountability also means the USF is perpetually the subject of tremendous nonresponsiveness, waste, fraud, and abuse. And the USF tax is among the most regressive in the country.

If replicated, Congress would never have to impose taxes, appropriate funds, or pass a budget again. Congress could replace the Internal Revenue Code with a simple delegation to the IRS to collect mandatory "contributions" that are "sufficient and equitable" to fund the entire federal government. It would be a politician's dream: faux-low taxes, yet the bureaucracy still flush with cash.

But it gets worse. The FCC has subsequently delegated USF operations to a *private* corporation, the Universal Service Administrative Company ("USAC"), which is led by a group of self-described industry "interest groups." Each quarter, USAC proposes the new USF tax, which is *automatically* "deemed approved" if the FCC Commissioners do nothing during the "small window" for review. *Consumers' Rsch.*, 63

F.4th at 451. There is accordingly not even a pretense of review by the Commissioners themselves, and the process occurs so close to the start of a new quarter that the FCC has no choice but to accept USAC's figures. Unsurprisingly, the FCC has never substantively changed USAC's proposals over the last 25 years.

If a private company can perpetually collect billions of dollars in taxes pursuant to a statute with no objective ceiling, and without the FCC Commissioners lifting a finger, it is difficult to imagine what remains of the political accountability mandated by the nondelegation and private nondelegation doctrines.

If Congress believes USF is worth funding, it should endure the public scrutiny and beneficial debate of raising money for it. But "[b]y shifting responsibility to a less accountable branch, Congress protects itself from political censure—and deprives the people of the say the framers intended them to have." *Tiger Lily, LLC v. U.S. Dep't of Hous. & Urb. Dev.*, 5 F.4th 666, 674 (6th Cir. 2021) (Thapar, J., concurring). "The bureaucracy triumphs—while democracy suffers," to the tune of nearly $10 billion annually. *Texas v. Rettig*, 993 F.3d 408, 409 (5th Cir. 2021) (Ho, J., dissenting from denial of rehearing en banc).

"Whether the statute delegates legislative power is a question for the courts." *Whitman*, 531 U.S. at 473. The Court should find an improper delegation and grant the Petition.

## STATEMENT OF THE CASE

**A.    STATUTORY AND REGULATORY BACKGROUND.**

**1.    UNIVERSAL SERVICE BEFORE 1996.**

The government has long pursued the goal of expanding "telephone service to all residents and businesses in the United States." Ronald J. Krotoszynski, Jr., *Reconsidering the Nondelegation Doctrine: Universal Service, the Power to Tax, and the Ratification Doctrine*, 80 IND. L.J. 239, 279 (2005). Dating back to the 1930s, the historical version of universal service was modest in scope and focused only on certain telephone services. *See id.* at 279–81.

**2.    TELECOMMUNICATIONS ACT OF 1996.**

The Telecommunications Act of 1996, 47 U.S.C. § 151 *et seq.*, included 47 U.S.C. § 254, which expressly created a funding system to facilitate universal service. Congress mandated that "[e]very telecommunications carrier that provides interstate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, to

8

the specific, predictable, and sufficient mechanisms established by the [FCC] to preserve and advance universal service." *Id.* § 254(d).

Congress imposed no formula, rate, or cap on how much money the FCC could raise to support these mechanisms. And although the money must be spent on "universal service," that term was defined generically as "an evolving level of telecommunications services that the [FCC] shall establish periodically under this section, taking into account advances in telecommunications and information technologies and services." *Id.* § 254(c)(1). The FCC could even create new universal service "principles" based only on exceedingly broad and vague statutory statements. *Id.* § 254(b).

### 3. CARRIERS PASS SECTION 254 TAXES THROUGH TO CONSUMERS.

The USF charge is almost always "pass[ed] through to [the carriers'] subscribers," *In re Incomnet, Inc.*, 463 F.3d 1064, 1066 (9th Cir. 2006), which the FCC's regulations expressly permit, *see, e.g.*, 47 C.F.R. §§ 54.407(c), 54.712(a). The "charge generally appears on phone bills as the 'Universal Service Fund Fee.'" *Incomnet*, 463 F.3d at 1066. It was understood from the beginning that consumers would bear the costs of the USF through extra fees and increased telephone rates. *See In re*

*Federal-State Joint Board on Universal Service*, 12 FCC Rcd. 8776, 9199, ¶ 828 (1997); *id.* at 9211–12, ¶ 855; Report of Dr. Ford, JA62–63 n.7.

In the end, the USF is—and was designed to be—financed by "virtually every American's money" because "at the end of the day, it is still the same taxpaying people who bear the cost." Opening Statement of Chairman Greg Walden*, The Lifeline Fund: Money Well Spent?*: *Hearing Before the H. Subcomm. on Commc'n and Tech., H. Comm. on Energy and Comm.*, 113th Cong. 2 (2013), https://www.govinfo.gov/content/pkg/CHRG-113hhrg82189/pdf/CHRG-113hhrg82189.pdf.

### 4.    THE FCC RE-DELEGATES ITS POWERS TO A PRIVATE COMPANY.

The FCC subsequently re-delegated operation of the USF to USAC, a private company registered in Delaware. 47 C.F.R. § 54.701(a); *Incomnet*, 463 F.3d at 1067. USAC has a 19-member Board of Directors comprising individuals from various "interest groups affected by and interested in universal service programs" and who are nominated "by their respective interest groups." *Leadership*, USAC, https://www.usac.org/about/leadership/ (last accessed July 30, 2023); *see* 47 C.F.R. § 54.703(b).

10

USAC is charged with establishing the budget for the USF. *Id.* § 54.709(a). Each quarter, USAC announces a proposed contribution amount—essentially how much money USAC wants for "universal service" for the next quarter. The FCC's Office of Managing Director then ministerially calculates what percentage of all telecommunication carriers' expected interstate and international end-user revenues would be necessary to reach that target. *Id.*; *see also id.* § 54.706(a) (listing 19 types of taxed services). This number is published as the proposed quarterly Contribution Factor.

A quarterly Contribution Factor is then automatically "deemed approved" by the FCC and becomes binding unless the Commissioners act within 14 days of publication. *Id.* § 54.709(a)(3). The FCC has never meaningfully modified USAC's proposed budget—the entire process is automated, as the rate is deemed approved only a few days before the start of the next quarter when the rate takes effect.

USAC takes the contributions it receives from carriers and deposits them into the USF, then chooses how to disburse funds, with the purported goal of expanding telecommunications services for the masses. *Incomnet*, 463 F.3d at 1067, 1072.

5.    USAC Imposes Skyrocketing Rates, Raising Tens of
        Billions of Dollars.

The USF rate has skyrocketed since its inception. For example, in the second quarter of 2000, USAC's budget imposed a tax of 5.7% on all end-user interstate telecommunication revenues. *Proposed Second Quarter 2000 Universal Service Contribution Factor*, DA 00-517 (Mar. 7, 2000), https://docs.fcc.gov/public/attachments/DA-00-517A1.pdf. But by the early 2020s, the rate had reached unprecedented levels. For first quarter of 2022—at issue in this suit—USAC set the rate at 25.2%, representing a nearly 500% relative increase since 2000. *See* JA100.



And the scheme now yields nearly $10 billion annually, roughly 25 times the FCC's entire budget. *See 2022 Budget Estimates to Congress*,

FCC    (May    2021),    https://docs.fcc.gov/public/attachments/DOC-372853A1.pdf.



### 6.    RAMPANT ABUSE, FRAUD, AND WASTE IN THE USF.

Given its lack of accountability and limitations, and the fact that USAC is populated with self-described industry insiders, the USF has predictably demonstrated—in the words of then-Senator Claire McCaskill—a "history of extensive waste and abuse." *The Lifeline Fund: Money Well Spent?*, *supra*, at 2 (quoting Sen. McCaskill).

As further detailed at length in Petitioners' opening brief, *see* Pet.Br.17–20, the GAO and the FCC's internal watchdogs have issued a slew of reports on USF's waste and abuse over the past 15 years, cataloguing not just billions of dollars wasted but also a lack of responsiveness by the FCC and USAC to prior reports of waste and fraud. The FCC's Inspector General summed it up when he agreed that

"applicants view this program as a big candy jar, free money." Sam Dillon, *School Internet Program Lacks Oversight, Investigator Says*, N.Y. TIMES, June 18, 2004, at A22.

### 7.     THE USF IS A REGRESSIVE TAX.

Because the USF imposes a flat tax, customers pay the same rate regardless of their income or bill amount, making it among the "most regressive taxes in America." *Broadband Subsidies for Some, Broadband Taxes for Everyone,* TechFreedom (May 28, 2015), https://techfreedom.org/broadband-subsidies-for-some-broadband-taxes-for/. "A single, low-income mother, living in the Bronx, with a cell phone for personal safety, pays 10% or more of her monthly wireless telephone bill to support universal service for wealthy Montana residents living on ranchettes." Krotoszynski, Jr., *supra*, at 314 (cleaned up).

The GAO has reported that the USF is not even focused on providing the basic telephone services that low-income Americans actually use, but instead is expanding advanced telecommunications services for wealthier Americans. U.S. Gov't Accountability Off., GAO-21-24, *FCC Should Enhance Performance Goals and Measures for Its Program to Support Broadband Service in High-Cost Areas* 17 (2020),

https://www.gao.gov/assets/gao-21-24.pdf. And a separate GAO report found that the FCC had not even bothered to evaluate the USF's effectiveness. The low-income Lifeline Program, for example, may not have played *any* meaningful role in improving the "level of low-income households' subscribing to telephone service over the past 30 years," despite costing billions of dollars, footed by consumers. U.S. Gov't Accountability Off., GAO-15-335, *FCC Should Evaluate the Efficiency and Effectiveness of the Lifeline Program* (2015), http://www.gao.gov/assets/670/669209.pdf.

## B.    PRIOR PROCEEDINGS.

### 1.    PROCEEDINGS AT THE FCC.

Petitioners comprise several organizations and individuals, all of whom are adversely affected by USF charges. They range from consumer awareness groups like Consumers' Research (which pays a monthly USF charge), to resellers of telecommunications services like Cause Based Commerce (which pays directly into the USF), to individual customers whose tight budgets are stretched thinner from having to pay the USF charge each month. *See* Pet.Br.22–24.

On November 2, 2021, USAC proposed its first quarter 2022 USF budget, seeking approximately $1.8 billion in total collections over the upcoming quarter. JA211. On November 19, 2021, Petitioners filed a comment with the FCC challenging the legality of the USF. JA113.

On December 13, 2021, the FCC's Office of Managing Director issued the *Public Notice of Proposed First Quarter 2022 Universal Service Contribution Factor*, with a proposed 25.2% tax rate on all interstate and international telecommunications revenues to raise the $1.8 billion that USAC demanded. JA100. On December 21, 2021, Petitioners filed another comment, raising the same arguments as in their November comment. JA1.

On December 27, 2021, the 25.2% tax rate was "deemed approved by the Commission" pursuant to regulation. 47 C.F.R. § 54.709(a)(3).

### 2.    PROCEEDINGS AT THIS COURT.

Petitioners filed their Petition in this Court on January 5, 2022. The panel issued its decision on March 24, 2023, finding that the Petition was timely but rejecting Petitioners' nondelegation arguments. *Consumers' Rsch.*, 63 F.4th 441. Petitioners sought rehearing en banc, which was granted on June 29, 2023.

## SUMMARY OF THE ARGUMENT

This Court should grant the Petition and vacate the *Proposed First Quarter 2022 Universal Service Contribution Factor*. The USF's mechanisms for raising revenue are unconstitutional under the nondelegation and private nondelegation doctrines.[2]

## ARGUMENT

### I.    THE USF FUNDING MECHANISM IS AN UNCONSTITUTIONAL DELEGATION.

The Founders "separated powers within the Federal Government: The legislative power went to Congress; the executive to the president; and the judicial to the courts. That is the equilibrium the Constitution demands. And when one branch impermissibly delegates its powers to another, that balance is broken." *Tiger Lily*, 5 F.4th at 673 (Thapar, J., concurring).

The USF's "unique revenue raising mechanism," *Consumers' Rsch.*, 63 F.4th at 450, upsets that important balance by letting an executive agency generate tax revenue in perpetuity without meaningful statutory

---

[2] The panel opinion correctly held that the Petition was timely. *Consumers' Rsch.*, 63 F.4th at 446–47. The government's contrary arguments border on the absurd. *See* Pet.Reply.Br.6–15.

restraints. A combination of factors demonstrates why this scheme is so problematic:

- Rather than appropriate money, Congress allows the FCC to directly raise money, with the general public footing the bill, but with a conspicuous "absence of a limit on how much the FCC can raise for the USF," such as a cap or formula. *Consumers' Rsch.*, 63 F.4th at 448.

- The statutory "universal service principles" are "aspirational only." *Tex. Off. of Pub. Util. Couns. v. FCC* ("*TOPUC II*"), 265 F.3d 313, 321 (5th Cir. 2001). Accordingly, Congress imposed no "policy of limitation" on the FCC. *Panama Refining*, 293 U.S. at 418.

- The FCC itself can add *new* "universal service principles" and *redefine* "universal service"—and then raise money to cover that expanded scope, 47 U.S.C. § 254(c)(1), (b)(7), making it even worse than the limited dual-layer delegation in *Schechter Poultry*, 295 U.S. at 538–39.

- The USF charges are not just any revenue but are "taxes" under relevant precedent, and taxation is a power belonging exclusively to Congress. *See* U.S. CONST. art. I, § 8.

- This revenue-raising power is perpetual. *See Community Fin.*, 51 F.4th at 638 (labeling an agency's "self-actualizing, perpetual funding mechanism" as "[m]ost anomalous").

Congress's delegation to an executive agency of such indefinite revenue-raising power violates both the original understanding of the nondelegation doctrine and the intelligible-principle test.

### A.   SECTION 254 VIOLATES THE ORIGINAL UNDERSTANDING OF NONDELEGATION.

The original understanding of nondelegation prohibited any transfer of Congress's vested powers to another entity. *See* Philip Hamburger, *Nondelegation Blues*, 91 GEO. WASH. L. REV. (forthcoming 2023) (manuscript at 60–63, 87–93), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3990247 (analyzing original understanding of the Constitution and early federal practice). Article I of the Constitution begins: "*All* legislative Powers herein granted *shall* be vested in a Congress" (emphases added), and the Constitution vests legislative power nowhere else. This meant that Congress must "make[] the policy

decisions when regulating private conduct" and only can "authorize another branch to 'fill up the details'" or "make the application of that rule depend on executive fact-finding." *Gundy*, 139 S. Ct. at 2135–37 (Gorsuch, J., dissenting); *see also Paul v. United States*, 140 S. Ct. 342, 342 (2019) (Kavanaugh, J., statement respecting the denial of certiorari) ("[M]ajor national policy decisions must be made by Congress and the President in the legislative process, not delegated by Congress to the Executive Branch.").

The absolute bar on delegating this power was a fundamental principle underlying the separation of powers and on which the Constitution was premised. John Locke called the legislative power "a positive voluntary grant" by the people to the legislature, and that grant was "only to make laws, and not to make legislators," meaning a legislature "can have no power to transfer their authority of making laws, and place it in other hands."[3] The Founders also looked to Montesquieu, who warned that "[w]hen the legislative and executive powers are united in the same person, or in the same body of magistrates, there can be no

---

[3] John Locke, TWO TREATISES OF GOVERNMENT bk. II, ch. XI, § 141 (1690).

liberty," as those who "enact tyrannical laws" would "execute them in a tyrannical manner."[4]

Consistent with these views, James Madison explained during the ratification debates that "[i]f nothing more were required, in exercising a legislative trust, than a general conveyance of authority—without laying down any precise rules by which the authority conveyed should be carried into effect—it would follow that the whole power of legislation might be transferred by the legislature from itself, and proclamations might become substitutes for law." 4 THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION 560 (Jonathan Elliot ed., 2d ed. 1836).

Accordingly, under the Constitution, certain "important subjects … must be entirely regulated by the legislature itself." *Wayman v. Southard*, 23 U.S. 1, 43 (1825). "[T]here are cases in which … the significance of the delegated decision is simply too great for the decision to be called anything other than 'legislative.'" *Whitman*, 531 U.S. at 487 (Thomas, J., concurring).

---

[4] 1 THE COMPLETE WORKS OF M. DE MONTESQUIEU bk. 11, ch. VI, at 199 (T. Evans and W. Davis ed. 1777) (1748).

Chief among those important subjects is raising revenue. The "Framers carefully separated the purse from the sword by assigning to Congress and Congress alone the power of the purse." *Community Fin.*, 51 F.4th at 635 (cleaned up). This ensured Congress would serve "as an indispensable check on 'the overgrown prerogatives of the other branches of the government'" and was also the "best means of ensuring transparency and accountability to the people." *Id.* at 635–36.[5]

Deciding how much money to raise for an enormous welfare fund is therefore a quintessentially legislative choice that is "heavily laden (or ought to be) with value judgments and policy assessments" that only Congress can make. *Mistretta v. United States*, 488 U.S. 361, 414 (1989) (Scalia, J., dissenting). The Supreme Court held as much in *NCTA* when it warned that allowing agencies to raise funds via vague statutory grants of power raised the specter of "'forbidden delegation of legislative

---

[5] The Framers were also likely aware of—and sought to avoid—the "major loophole" then present in English law, which allowed executive departments to raise funds and set their own salaries, commissions, and expenses. Paul Einzig, THE CONTROL OF THE PURSE: PROGRESS AND DECLINE OF PARLIAMENT'S FINANCIAL CONTROL 188 (1959). The ability "to dispose of millions of pounds each year without obtaining Parliamentary grants and without even having to account to Parliament provided immense scope for misuse." *Id.* at 189.

power'" by "carr[ying] [the] agency far from its customary orbit and put[ting] it in search of revenue in the manner of an Appropriations Committee of the House." *NCTA*, 415 U.S. at 341–42.

This Court's precedents about the USF confirm that it violates this original understanding. *First*, Congress itself must "make[] the *policy decisions* when regulating private conduct," *Gundy*, 139 S. Ct. at 2135–37 (Gorsuch, J., dissenting) (emphasis added), but this Court has been clear that § 254 "'delegate[d] *difficult policy choices* to the Commission's discretion,'" including how much revenue to raise for universal service, *TOPUC II*, 265 F.3d at 321 (emphasis added).

*Second*, "it would frustrate 'the system of government ordained by the Constitution' if Congress could merely announce *vague aspirations* and then assign others the responsibility of adopting legislation to realize its goals." *Gundy*, 139 S. Ct. at 2133 (Gorsuch, J., dissenting) (emphasis added). This Court used the same language when it held that § 254 imposed merely "*aspirational*" limits on the FCC's revenue-raising powers. *TOPUC II*, 265 F.3d at 321 (emphasis added).

In short, the FCC does far more than "fill up the details." *Gundy*, 139 S. Ct. at 2135–37 (Gorsuch, J., dissenting).  The FCC creates the

scheme, defines and redefines the terms, raises as much money as it wants, and then spends it, based on nothing more than Congress's vague aspiration to provide telecommunication service broadly.

It is no answer that "modern society is too complex to be run by legislators—better to leave it to the agency bureaucrats," because the "original meaning, history, and structure of our Constitution" confirm that Congress itself is the expert when it comes to revenue-raising. *Tiger Lily,* 5 F.4th at 674 (Thapar, J., concurring).

For these reasons, under the original understanding of nondelegation, the USF's mechanisms for raising revenue are unconstitutional.[6]

### B.   SECTION 254 VIOLATES THE INTELLIGIBLE-PRINCIPLE TEST.

The FCC's unfettered power to raise revenue under § 254 also runs afoul of the intelligible-principle test. *See J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928). Under that test, Congress still

---

[6] The government has elsewhere invoked *United States v. Grimaud*, 220 U.S. 506 (1911), but the Court there addressed only whether Congress had given the Secretary the power to charge fees for grazing on federal land, not whether Congress imposed a limit on the *amount* of such fees. *Id.* at 522. In fact, Congress had established a $500 cap on any fine in *Grimaud. Id.* at 509. Any similar limit is absent from § 254.

must "clearly delineate[]" the "boundaries of th[e] delegated authority." *Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 219 (1989).

Section 254 violates this requirement because it fails to impose objective limits for revenue-raising. *See* Parts I.B.1–2, *infra*. Even more, the nondelegation violation closely tracks those held unconstitutional in *Schechter Poultry* and *Panama Refining*. *See* Parts I.B.3–5, *infra*.

1.  **WHAT QUALIFIES AS AN "INTELLIGIBLE PRINCIPLE" DEPENDS ON CONTEXT, AND REVENUE-RAISING STATUTES MUST CONTAIN AN OBJECTIVE LIMITATION.**

The Supreme Court has held that what suffices as an "intelligible principle" varies based on "'the extent and character'" of the power sought to be delegated, *Mistretta*, 488 U.S. at 372, and "the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred," *Whitman*, 531 U.S. at 475. In other words, there must be an intelligible principle, but what suffices will vary from context to context. *See, e.g.*, Chad Squitieri, *Towards Nondelegation Doctrines*, 86 Mo. L. Rev. 1239, 1295 (2021) (collecting examples of how "nondelegation principles are regularly applied differently to different powers" by courts).

The power to directly raise revenue is, from a constitutional perspective, a uniquely important "power" to be "congressionally conferred" on an executive agency, as explained above. *Whitman*, 531 U.S. at 475; *see* Part I.A, *supra*; *Community Fin.*, 51 F.4th at 636; *All Am. Check*, 33 F.4th at 229 (Jones, J., concurring).

Unsurprisingly then, the Supreme Court has taught that statutory phrases like "in the public interest," which might suffice for nondelegation purposes elsewhere, will not pass muster for revenue-raising statutes. *NCTA*, 415 U.S. at 341–42. In *NCTA*, the Court held that giving the FCC the power to raise money based only on vague phrases like "'public policy or interest served, and other pertinent facts'" is so broad that it raises the specter of "forbidden delegation of legislative power" by "carr[ying] [the] agency far from its customary orbit and put[ting] it in search of revenue in the manner of an Appropriations Committee of the House." *Id.*

In line with that view, the Supreme Court has upheld delegations of revenue-raising only when the statutes included an objective limit on the authority to generate funds. In *J.W. Hampton*, the Court upheld a statute authorizing the executive to calculate and collect customs duties

because Congress had laid out a precise formula for objectively calculating such revenues based on the difference in cost between foreign production and domestic production, and Congress barred the executive from varying the duty by more than 50% from the statutory figure. 276 U.S. at 401.

In *Skinner*, the Court similarly upheld the Secretary of Transportation's authority to impose charges on certain oil revenues, noting the statute contained a mathematical ceiling and objective variables. The "Secretary has no discretion whatsoever to expand the budget … because the ceiling on aggregate fees that may be collected in any fiscal year is set at 105 percent of the aggregate appropriations made by Congress for that fiscal year." 490 U.S. at 220. The very next sentence of the opinion tied the statute's objective considerations to the Court's conclusion that the statute "satisf[ied] the constitutional requirements of the nondelegation doctrine." *Id.*[7]

---

[7] The government has previously invoked *Lichter v. United States*, 334 U.S. 742 (1948), but that case is inapposite because it involved government spending (i.e., recoupment of funds expended via government contracting), not general revenue-raising. *See, e.g.*, John Harrison, *Executive Administration of the Government's Resources and the Delegation Problem*, in THE ADMINISTRATIVE STATE BEFORE THE

(*footnote continued on next page*)

By contrast, in cases where the statutory provision at issue regulated matters largely incapable of advance legislative definition, such as variegated technical matters, the Court has granted Congress far more leeway. For example, in *American Power & Light Co. v. SEC*, the Court approved of a statute authorizing the Securities and Exchange Commission to modify the structure of complex holding companies to ensure they are not "'unduly or unnecessarily complicate[d]'" and do not "'unfairly or inequitably distribute voting power among security holders,'" and the Court explained that "[n]ecessity" would prevent Congress from "apprais[ing] before-hand the myriad situations" in which these "complex" businesses could structure themselves. 329 U.S. 90, 104–05 (1946).

Similarly, in *NBC v. United States*, the Court approved statutes allowing the FCC to regulate "chain broadcasting" (i.e., where a program is simultaneously broadcast by multiple connected stations) in the "'public interest, convenience, or necessity.'" 319 U.S. 190, 194 n.1, 216 (1943). The Court held that this language "'is as concrete as the

SUPREME COURT 232 (Peter J. Wallison & John Yoo eds., 2022). It was also in a wartime posture, which the Supreme Court has held is a material distinction. *See Panama Refining*, 293 U.S. at 422.

complicated factors for judgment in such a field of delegated authority permit,'" especially given that radio technology was then "both new and dynamic." *Id.* at 216, 219.

And in *Whitman*, the Court upheld a statute that authorized the Environmental Protection Agency to set "ambient air quality standards the attainment and maintenance of which in the judgment of the Administrator, based on the criteria documents of § 108 [of the Clean Air Act] and allowing an adequate margin of safety, are requisite to protect the public health." 531 U.S. at 472 (cleaned up). The Court noted that discretion "inheres in" such a complicated scientific determination, such that Congress was not required to say "how much of a regulated harm is too much," especially after the Court interpreted the statutory phrase "adequate" to impose both a floor and a ceiling on the agency's discretion. *Id.* at 475 (cleaned up).

For evaluating Petitioners' challenge, the appropriate analogues are revenue-raising precedents like *J.W. Hampton*, *Skinner*, and *NCTA*, not the cases where the challenged statutory authority covered variegated matters largely incapable of precise legislative definition beforehand.

29

Requiring a statutorily imposed objective limit on revenue delegations would accord both with the directive in *Mistretta* that the intelligible-principle standard varies based on "'the extent and character'" of the power sought to be delegated, 488 U.S. at 372, and also with this Court's duty to "resolve questions about the scope of those [nondelegation] precedents in light of and in the direction of the constitutional text and constitutional history" explained above in Part I.A, *Rettig*, 993 F.3d at 418 (Ho, J., dissenting from denial of rehearing en banc) (cleaned up).

The Court should hold that it is no coincidence that every Supreme Court decision approving a revenue-raising delegation did so only when there was some form of statutorily imposed objective limit on the executive's ability to self-fund.[8]

---

[8] *Skinner*'s discussion of the standards for delegating the taxing power is not to the contrary. It held that the mathematical cap on agency revenue-raising was a key reason why the statute in that case survived any nondelegation test—and only then did the Court proceed to discuss the standards for delegating the taxing power in particular. *Skinner*, 490 U.S. at 220–23. That latter discussion is therefore "likely *dicta*." Mark Chenoweth & Richard Samp, *Reinvigorating Nondelegation with Core Legislative Power*, in THE ADMINISTRATIVE STATE, *supra*, at 99. Even if it weren't *dicta*, the Court rejected only the theories that the taxing power was not delegable at all or that it was subject to "*much stricter* guidelines

*(footnote continued on next page)*

As demonstrated next, the USF scheme has no such objective limitations and thus fails the intelligible-principle test.

### 2.    CONGRESS IMPOSED NO OBJECTIVE LIMITS ON THE FCC'S REVENUE-RAISING POWER.

Congress had numerous methods at its disposable to impose an objective limit on the USF. For example, it could have limited USF revenue-raising to a certain percentage of the FCC's annual budget or the amount Congress appropriated for a separate program (akin to *Skinner*), to an annual dollar amount (which Congress could perhaps peg to inflation rates the executive would factually calculate), to a certain tax percentage on carriers' interstate and international revenues, or even to the difference between two objective calculations with a cap on how large the difference could be (as in *J.W. Hampton*). Or Congress could have just appropriated a set amount of money in the first instance, as it does elsewhere.

---

than is required for other congressional delegations." 490 U.S. at 220 (emphasis added). *Skinner* certainly did not purport to overrule the cases holding that what suffices for an intelligible principle will vary from context to context, nor did it reject the modest notion that revenue-raising delegations require a *minimal objective limit* to pass constitutional muster.

Any of those would have provided the requisite "clear[] delineat[ion]" of the boundaries of the FCC's delegated authority to raise money. *Skinner*, 490 U.S. at 219. But Congress did none of the above.

The government has argued that the requirement for an objective limit on revenue-raising should not apply here because the "aspirational" terms in § 254 are "'as concrete as the complicated factors for judgment in such a field of delegated authority permit.'" Gov.Br.38 n.20.[9] This argument, presented only in a footnote in the government's prior briefing, is a red herring and wrong. The Court must determine whether Congress "clearly delineate[d]" the "boundaries" of the *specific* "delegated authority" at issue in the lawsuit, 490 U.S. at 219, and the delegated authority challenged here is the fundamental determination of how much money to extract from Americans' pockets for a nationwide welfare program. Even for complex programs like Social Security, that is hardly a novel scientific endeavor, *see* 26 U.S.C. § 3101(a) (setting exact tax rate for Social Security), and, as explained above in Parts I.A and I.B.1, it is Congress—not an executive agency—that is the expert in the field of revenue-raising for welfare programs.

---

[9] Cites to "Gov.Br." are to the FCC's panel-stage brief filed June 10, 2022.

In any event, the government is wrong that § 254's aspirational terms are as concrete as Congress could muster. As noted above, there are numerous simple ways Congress could have provided an objective limit. It had no trouble doing so in *Skinner*, which involved a statute about the technical matter of oil pipeline safety. *See* 490 U.S. at 220. Congress simply chose not to do so for USF.

### 3. SECTION 254(B) TRACKS THE STATUTES HELD UNCONSTITUTIONAL IN *SCHECHTER POULTRY* AND *PANAMA REFINING*.

Even setting aside the lack of objective limitations on the FCC's revenue-raising power, the statute is still unconstitutional because it so closely tracks (and if anything is worse than) the statutes in *Panama Refining* and *Schechter Poultry*.

The FCC claims to be "limited" to raising money based on a set of "universal service principles" provided in the statute, but those are often little more than tautologies that allow the FCC to "roam at will" "in that wide field of legislative possibilities." *Schechter Poultry*, 295 U.S. at 538. For example:

- "Quality service *should* be available at just, reasonable, and affordable rates";

- "Access to advanced telecommunications and information services *should* be provided in all regions of the Nation";

- "There *should* be specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service."

- "Such other principles as the Joint Board and the Commission determine are necessary and appropriate for the protection of the public interest, convenience, and necessity and are consistent with [the Act]."

47 U.S.C. § 254(b) (emphases added).

For several reasons, these principles do not meaningfully limit the FCC.

***Not Mandatory.*** The principles are not truly mandatory because they are couched as things the FCC only "should" pursue. *See TOPUC I*, 183 F.3d at 418 ("Generally speaking, courts have read 'shall' as a more direct statutory command than words such as 'should' or 'may.'"). That means these so-called limitations turn only on the agency's own self-restraint in interpreting or ignoring them. But the Supreme Court has held that "an agency's voluntary self-denial has no bearing upon" "[w]hether the statute delegates legislative power." *Whitman*, 531 U.S. at 473. In other words, the Court must assume the agency will exercise

34

the full and outer limit of its statutory power, but the non-binding principles here impose no limit in the first place.

***Vague and Indefinite.*** Even if they were mandatory, the principles in § 254(b) are still so vague and aspirational that they cannot "clearly delineate[]" limits on the FCC's revenue-raising power. *Skinner*, 490 U.S. at 219. The label of these principles as "aspirational" comes directly *from the FCC itself* and is taken verbatim from this Court's precedent: "[W]e have approved the FCC's interpretation of the statutory principles as aspirational only…. Indeed, the lofty and expansive language of § 254(b) hardly constitute[s] a series of specific statutory commands." *TOPUC II*, 265 F.3d at 321 (cleaned up).

Indeed, this Court has explicitly "avoided relying on the aspirational language in § 254(b) to bind the FCC to adopt certain cost methodologies for calculating universal service support." *TOPUC I*, 183 F.3d at 421. That is because it is next to impossible to say whether the FCC is being faithful to those principles. *Cf.* C.S. Lewis, "Evolutionary Hymn," in POEMS 86 (2017 ed.) ("Never knowing where we're going, / We can never go astray.").

Section 254(b)'s vague list is similar to the statute that *Panama Refining* invalidated as an unconstitutional delegation. 293 U.S. at 418. That statute—which elsewhere authorized the President to prohibit transportation of certain petroleum products—stated that the purpose of its regime was

> to eliminate unfair competitive practices, to promote the fullest possible utilization of the present productive capacity of industries, to avoid undue restriction of production (except as may be temporarily required), to increase the consumption of industrial and agricultural products by increasing purchasing power, to reduce and relieve unemployment, to improve standards of labor, and otherwise to rehabilitate industry and to conserve natural resources.

*Id.* at 417. The Court held that these statements provided no meaningful "policy *of limitation*" on the President's decision whether to outlaw transportation of certain oil, even though the language certainly announced "policies" in the general sense, and even though the President was limited to the specific subject matter of certain petroleum products. *Id.* at 418 (emphasis added). Within that realm, the President was still "free to select as he chooses from the many and various objects generally described." *Id.* at 431–32.

Accordingly, even when Congress imposes subject-matter and generic "policy" limitations, the statute is still invalid where the executive "may roam at will" "in that wide field of legislative possibilities." *Schechter Poultry*, 295 U.S. at 538. The FCC has that power—a "delegation running riot," *id.* at 553 (Cardozo, J., concurring)—when it comes to raising and spending revenues for universal service.

The government has previously pointed to language in § 254(b) that funding "should" be "equitable and nondiscriminatory," "sufficient," and "affordable"—and argued that this imposes meaningful limitations. 47 U.S.C. § 254(b)(1), (4), (5). Again, these are not mandatory, but in any event they still do not help the government.

*First*, "equitable and nondiscriminatory" closely tracks the statutory language found insufficient in *Schechter Poultry*, which constrained the executive to issue codes that "'impose no inequitable restrictions on admission'" and would not discriminate by "'promot[ing] monopolies or … eliminat[ing] or oppress[ing] small enterprises.'" 295 U.S. at 522–23. If aphorisms about equity and nondiscrimination couldn't save the statute in *Schechter Poultry*, they can't save § 254, either. And even if "equitable and nondiscriminatory" might limit how charges can

be distributed *across* the industry, those words do nothing to limit how much money the FCC can raise in the first place.

*Second*, the "sufficient" clause imposes only a floor—not a ceiling—on the FCC's revenue-raising power. *See Sufficient*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/sufficient ("enough to meet the needs of a situation or a proposed end"). This Court, the D.C. Circuit, and the *FCC itself* have agreed that "nothing in the statute" requires that "universal service support must equal the actual costs incurred." *TOPUC I*, 183 F.3d at 412; *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1102 (D.C. Cir. 2009). The FCC tries to have it both ways, arguing here that it can raise only just enough to cover universal service, but arguing elsewhere that it has a free hand to overcharge.

*Third*, the FCC has unreviewable discretion when it comes to deciding "affordab[ility]," ensuring this likewise remains a toothless statutory provision. Once the FCC chooses how to balance skyrocketing revenue-raising with affordability of service, this Court has held that it cannot second-guess that decision, precisely because it is a policy matter delegated by Congress to the FCC. *See TOPUC II*, 265 F.3d at 322. Again, as in *Schechter Poultry* and *Panama Refining*, a statute is invalid where

38

the executive is "free to select as he chooses from the many and various objects generally described," 293 U.S. at 431–32, as he "roam[s] at will" "in that wide field of legislative possibilities," 295 U.S. at 538.

***Multi-Layered Delegation.*** The FCC can add new "principles" of universal service as "necessary and appropriate for the protection of the public interest, convenience, and necessity and … consistent with [the Act]." 47 U.S.C. § 254(b)(7). This amounts to a unique multi-layered delegation where Congress announces open-ended, precatory "principles" and then allows the agency to perpetually amend and broaden them at will. And, as noted below, the FCC can also redefine "universal service" itself under § 254(c)(1)(D), making this multi-layered delegation even broader. *See* Part I.B.4, *infra.*

In *Schechter Poultry*, the Supreme Court labeled as especially egregious a statute that created a multi-layered delegation by first granting a broad power to the executive and then allowing the executive itself to "add[] to … what is proposed, as 'in [the executive's] discretion' he thinks necessary 'to effectuate the policy' declared by the act." 295 U.S. at 538–39. And the Supreme Court has further rejected the notion that a broad delegation can be saved on the premise that the executive agency

39

will restrain itself in using indefinite powers granted by Congress. *See Whitman*, 531 U.S. at 473. This multi-layer delegation alone warrants finding a nondelegation violation.

The government has suggested that the FCC's second-layer authority to add new universal service principles must still be in the "'public interest'" and "'consistent with'" the Communications Act writ-large. Gov.Br.34. That suffers from two errors. *First*, the government tellingly does not address the unusual multi-layered delegation issue itself. As noted, the Supreme Court has found such delegations to be especially pernicious, *see Schechter Poultry*, 295 U.S. at 538–39, and both the Supreme Court and this Court have found similar multi-layered schemes to be unconstitutional even where one layer may have been allowed, *see Free Enter. Fund v. PCAOB*, 561 U.S. 477, 495 (2010) ("The added layer … makes a difference."); *Community Fin.*, 51 F.4th at 639; *All Am. Check*, 33 F.4th at 221 (Jones, J., concurring).

*Second*, as explained above in Part I.B.1, the "public interest" standard may satisfy the intelligible-principle test in variegated or highly technical schemes like deciding emissions levels, but it is inappropriate for revenue-raising statutes, *NCTA*, 415 U.S. at 341–42.

Recourse to the broad "public-interest" standard in the context of a dual-layer revenue-raising delegation provides no more limitation than it would in the context of a single-layer revenue-raising delegation.

The FCC now asks this Court to countenance—but only in theory—restrictions that for decades it has claimed (and convinced this Court) were illusory. The Court should decline to participate in that charade.

\* \* \*

In response to these critical flaws in § 254(b), the government overstates the significance of cases like *Qwest Corp. v. FCC* ("*Qwest I*"), 258 F.3d 1191 (10th Cir. 2001), and *Qwest Communications Int'l, Inc. v. FCC* ("*Qwest II*"), 398 F.3d 1222 (10th Cir. 2005), as supposedly demonstrating that § 254(b) limits the FCC's revenue-raising authority, *see* Gov.Br.34–35, 38–39. Those cases did not address nondelegation challenges and involved the FCC's failure to comply with *procedural* requirements like explaining its conclusions. *See Qwest I*, 258 F.3d at 1201; *Qwest II*, 398 F.3d at 1234.

By contrast, on the supposed *substantive* limits on the FCC's power to raise money, the Tenth Circuit was clear that "each of the principles in § 254(b) internally is phrased in terms of 'should,'" which "indicates a

41

recommended course of action, but does not itself imply the obligation associated with 'shall.'" *Qwest I*, 258 F.3d at 1200. Therefore, "any particular principle can be trumped in the appropriate case." *Id*. As noted above, the illusory nature of any limitation becomes even more apparent when considering the FCC's ability to adopt new principles, 47 U.S.C. § 254(b)(7), which the Tenth Circuit agreed can then "trump" the others, *Qwest I*, 258 F.3d at 1200.

Noting that this Court once found an FCC action violated a narrow provision of § 254, the government has argued that if the statute can be violated, that is automatic proof it contains an intelligible principle. *See TOPUC I*, 183 F.3d at 433–35. But that case did not address nondelegation claims, and it is hardly a "meaningful limitation" that (as in that case) the FCC was barred from extracting more money than the company had earned altogether in interstate revenues.

More importantly, the government's argument misunderstands the scope of the nondelegation inquiry. The question is not whether the FCC can literally "raise any amount of money, for any purpose, from anyone." USTelecom Intervenor Br. 14 (June 17, 2022). An unlimited grant of power is not the only way to violate the nondelegation doctrine. Rather,

as the government candidly acknowledges elsewhere, the inquiry is whether there is a clear statutory delineation regarding "the size and scope of [the FCC's] universal service program and the amount of fees it collects to finance the program." Gov.Br.22.

The mere existence of some minor limitation in any part of a statutory regime does not validate the entire scheme. Were it otherwise, there could never be a nondelegation violation unless the statute gave literally endless power to an agency, without even subject-matter limitations. But we know from *Panama Refining* that cannot be right. There, the Court invalidated the statute even though it was limited to the narrow topic of "hot oil" transported in excess of state limits, and the Court even expressly noted the lack of ambiguity in that phrase. *See* 293 U.S. at 414 ("The subject to which this authority relates is defined.").

And in *Jarkesy v. SEC*, 34 F.4th 446, 459–63 (5th Cir. 2022), it did not matter that the statute provided only two possible options for where the SEC could bring an enforcement action: either administratively or in federal court. Under the government's theory here—i.e., that a conceivable violation of a statute demonstrates an intelligible principle governing the whole—there was automatically an intelligible principle in

*Jarkesy* because it would violate the statute for the SEC to bring an enforcement action in, say, state court. The mere possibility of exceeding the statute in some way was clearly insufficient to defeat a nondelegation challenge. *Id.* at 461.

Or suppose Congress gave the FCC unbridled discretion to raise money for the USF but mandated that payment must be in Bitcoin. Agency action could easily exceed that one minor limitation, but the statutory regime as a whole would surely still fail to impose sufficient "clear[] delineat[ions]" of the revenue power writ-large. *Skinner*, 490 U.S. at 219.

This Court should again reject the blinkered view that a nondelegation violation exists only where an agency has truly absolute power.

### 4. SECTION 254(C) SUFFERS FROM THE SAME FLAWS AS § 254(B).

The government has also cited § 254(c) as allegedly limiting revenue-raising discretion by laying out additional principles the FCC must "consider" when *spending* funds. Gov.Br.39–42. But the government has acknowledged that "spending decision[s]" are "irrelevant to this case." Gov.Br.60. That is because the question is whether

44

Congress provided meaningful limits on how much the FCC can raise, not on how it then spends the funds, and there is a difference because the executive historically had greater leeway when it comes to spending, subject to the important caveat that the money have been constitutionally acquired in the first place. *See* Harrison, *supra*; *All Am. Check*, 33 F.4th at 230 (Jones, J., concurring).

Even setting aside that distinction, § 254(c) suffers from many of the same flaws as § 254(b).

*First*, Congress provided what can only be described as a non-definition of "universal service," labeling it as an "evolving" standard the FCC itself gets to define, § 254(c)(1), just like the aspirational "principles" in § 254(b).

*Second*, the FCC can redefine universal service under § 254(c) to be anything the FCC thinks is "consistent with the public interest, convenience, and necessity." 47 U.S.C. § 254(c)(1)(D). This provides the agency with the same kind of trump card as in § 254(b), which allows the FCC to add new universal service "principles." *See* Part I.B.3, *supra*.

The government has claimed that the statute "does not permit the FCC to redefine universal service 'as often as it chooses.'" Gov.Br.41. But

45

that contradicts both the statute itself, which allows the FCC to redefine the "evolving" meaning of universal service, 47 U.S.C. § 254(c)(1), and also the government's own brief, which claims the definition must keep up with the "'dynamic'" telecommunications market, Gov.Br.41, meaning "marked by usually continuous and productive activity or change," *Dynamic*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/dynamic. The government appears to mean only that it will not *actually* redefine universal service whenever it wants, but, again, agency self-restraint is irrelevant for nondelegation purposes. *Whitman*, 531 U.S. at 473.

*Third*, even setting aside the FCC's power to redefine universal service at will, many of the "principles" in § 254(c) are still exceedingly broad in application. The government argues, for example, that § 254(c) limits the FCC to raising revenue for "telecommunications services." But that term is so broad that it reaches nearly every American. *See* 47 U.S.C. § 153(53). And as noted above in Part I.B.3, courts have long indicated that a subject-matter limitation is insufficient to defeat a nondelegation challenge. In *Panama Refining*, the statute was limited to the narrow and well-defined issue of "hot oil" transported in excess of state limits.

46

293 U.S. at 414. And in *Jarkesy*, the agency was limited to whether to initiate enforcement proceedings under certain securities laws in federal court or in administrative proceedings. 34 F.4th at 459–63. Those are both far narrower subject-matter scopes than "telecommunications services," but in neither case did it save the statute.

*Fourth*, even if § 254(c)'s principles were more specific, they are not mandatory or objective. The statute does not say, for example, that universal service *is* the level of service that has "been subscribed to by a substantial majority of residential customers." 47 U.S.C. § 254(c)(1)(B). Rather, the FCC only must "*consider*" that factor when it decides how to redefine universal service. *Id.* § 254(c)(1). That is not a substantive restriction on the FCC's power. And as noted above, once the FCC considers such issues, its resulting substantive decision balancing higher revenue-raising against higher USF fees is unreviewable. *See TOPUC II*, 265 F.3d at 322.

*Fifth*, the government's invocation of § 254(c)(3) is off base because that provision says only that the FCC "may designate additional services." *See* Gov.Br.41. Allowing the FCC to *expand* services in no way creates a *limit* on the FCC's revenue-raising power.

\* \* \*

As Judge Newsom recently stated regarding these same provisions, "When you read this statute it just feels like a lot of words … like a lot of soaring rhetoric." Oral Argument Recording at 15:40–15:52, *Consumers' Rsch. v. FCC*, No. 22-13315 (11th Cir. June 21, 2023). But soaring rhetoric cannot "clearly delineate[]" the "boundaries of th[e] delegated authority." *Skinner*, 490 U.S. at 219.

### 5. THE GOVERNMENT'S KITCHEN-SINK APPROACH FURTHER CONFIRMS THE SIMILARITY TO *SCHECHTER POULTRY* AND *PANAMA REFINING*.

In addition to § 254(b) and (c), the government has previously cited a bevy of other provisions that it claims provide the necessary limitations. Gov.Br.42–47. None suffices, as explained below. But it is worth noting that the government's kitchen-sink approach to finding an intelligible principle is reminiscent of the statutes in *Schechter Poultry* and *Panama Refining*.

As Congress lists more and more vague and competing policies in the statutes at issue in those cases, the *easier* it became to demonstrate a nondelegation violation. In *Schechter Poultry*, the statute authorized the executive to impose codes of conduct that "impose no inequitable

48

restrictions on admission," "are not designed to promote monopolies or to eliminate or oppress small enterprises," and "will tend" to "eliminate unfair competitive practices, to promote the fullest possible utilization of the present productive capacity of industries, to avoid undue restriction of production (except as may be temporarily required), to increase the consumption of industrial and agricultural products by increasing purchasing power, to reduce and relieve unemployment, to improve standards of labor, and otherwise to rehabilitate industry and to conserve natural resources." 295 U.S. at 522–23, 535; *see Panama Refining*, 293 U.S. at 417.

Like in *Panama Refining* and *Schechter Poultry*, § 254 provides a laundry list of vague and competing "policies," but it leaves the FCC largely "free to select as [it] chooses from the many and various objects generally described." *Panama Refining*, 293 U.S. at 431–32; *Alenco Commc'ns, Inc. v. FCC*, 201 F.3d 608, 621 (5th Cir. 2000) (explaining the FCC may "ignore" a § 254(b) principle "[t]o satisfy a countervailing statutory principle"). And here, the FCC is even authorized by statute to add to and redefine those principles and definitions as often as it wishes, further heightening the nondelegation problem.

49

Reviewing the additional provisions in § 254 only confirms they add nothing to the government's case.

**Section 254(a).** The government notes that § 254(a) requires the FCC's implementing regulations to "include a definition of the services that are supported by Federal universal service support mechanisms." § 254(a); Gov.Br.39. The government seems to imply that this means the public will know in advance what scope of universal service the FCC has devised via regulation. But *Whitman* held that agency regulations are irrelevant in deciding whether the underlying *statute* passes nondelegation muster. 531 U.S. at 473.

**Sections 254(e) and (h).** The government also points to § 254(e), which says funding recipients "should" *receive* funds "sufficient to achieve the purposes" of § 254—and the FCC can perpetually re-define those purposes—and to § 254(h), which imposes a few discrete formulas for discounts to be awarded to specific recipients of a small portion of the USF. Gov.Br.43–47. But as Petitioners have already noted, (1) the "sufficiency" text is not a meaningful limit, *see* Part I.B.3, *supra*; (2) they do not raise a nondelegation challenge to how the certain revenues are *disbursed*, but only to the mechanism for determining and raising those

revenues, *see id.*; and (3) § 254(h) addresses only a miniscule part of the USF and thus fails to impose a meaningful limit for the program writ-large, *see* Part I.B.3, *supra* (citing *Jarkesy* and the bitcoin example).

**Section 254(i).** Section 254(i) says the FCC "should" ensure that "universal service is available at rates that are just, reasonable, and affordable." Like the provisions above, the "should" makes this precatory, and therefore it cannot impose a meaningful limit under *Whitman*. And as noted above in Part I.B.3, the phrases in § 254(i), which are repeated in § 254(b), are too vague to impose clear limits because no Court can question the FCC's "policy-making function" of balancing affordability with costs, *TOPUC II*, 265 F.3d at 322.

## II. THE CONSTITUTIONAL VIOLATIONS HERE ARE PARTICULARLY EGREGIOUS BECAUSE THEY INVOLVE CONGRESS'S EXCLUSIVE POWER TO LEVY TAXES.

For the reasons above, the USF's mechanisms for raising revenues are unconstitutional regardless of whether they are considered taxes. But as demonstrated next, those charges are indeed taxes, which makes Congress's delegation of such power all the more egregious.[10]

---

[10] As noted above, *Skinner* is not to the contrary, as the statute there involved a precise mathematical cap that would likely pass muster under

*(footnote continued on next page)*

## A.    HISTORY OF THE TAXING POWER.

"Taxation is a legislative function, and Congress … is the sole organ for levying taxes." *NCTA*, 415 U.S. at 340. The power to tax was not always the province of legislative bodies. English kings often sought to avoid Parliament's claims on taxing authority by means of a "royal prerogative," and they typically referred to their collections not as taxes but as "loving contributions" and "benevolences." It took the English Civil War and the Glorious Revolution of 1688 to conclusively establish that the representative legislature *alone* had the authority to levy taxes on the people. *See* An Act Declaring the Rights and Liberties of the Subject, and Settling the Succession of the Crown (Bill of Rights), 1689, 1 W. & M., Sess. 2, c. 2, § 4.

Article I of the Constitution closely followed the English formula, providing that "[a]ll legislative Powers herein granted"—including the power "to lay and collect Taxes, Duties, Imposts, and Excises"—"shall be vested in a Congress of the United States." U.S. CONST. art. I, §§ 1, 8, cl. 1. Recognizing the need for controls on taxation, and for political

---

any nondelegation test, and its secondary discussion of the standards under which Congress could delegate the taxing power was likely *dicta*. *See* note 8, *supra*.

accountability regarding its use, the Constitution went even further with the Origination Clause, which requires that "[a]ll bills for raising Revenue shall originate in the House of Representatives," *id.* art. I, § 7, cl. 1, the body of government most responsive and accountable to the popular will of the people.

According to Madison, the "principal reason" for the Origination Clause was that House members are "chosen by the People," "best acquainted with their interests," and subject to "more frequent[]" elections. 1 DEBATES AND PROCEEDINGS IN THE CONGRESS OF THE UNITED STATES 361 (Joseph Gales ed., 1834); *see Skinner*, 490 U.S. at 214 ("[T]he Origination Clause … embod[ies] the Framers' concern that persons elected directly by the people have initial responsibility over taxation[.]").

The Constitution also limits the power to spend. Article I commands that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. CONST. art. I, § 9, cl. 7. This "does more than reinforce Congress's power over fiscal matters; it affirmatively obligates Congress to use that authority 'to maintain the boundaries between the branches and preserve individual liberty from the encroachments of executive power.'" *Community Fin.*, 51 F.4th at 637; *see*

Michael W. McConnell, THE PRESIDENT WHO WOULD NOT BE KING 103 (2020).

The benefits of this arrangement are significant. As Chief Justice Marshall observed, an "unlimited power to tax" is "a power to destroy." *M'Culloch v. Maryland*, 4 Wheat. 428, 432 (1819). The need for representative accountability is therefore at its highest when it comes to taxing and spending, which is why the framers ensured that "the legislative department alone has access to the pockets of the people." THE FEDERALIST NO. 48 (James Madison). And accessing the pockets of the people is hard by design. To legislate a tax, Congress must act through "Laws of the United States," in accordance with a "finely wrought" constitutional procedure. *INS v. Chadha*, 462 U.S. 919, 951 (1983).

In recent years, "the general assumption that Congress will jealously guard the powers of the purse as its ultimate means of checking and balancing the executive has become open to serious doubt." Christopher C. DeMuth, Sr. & Michael S. Greve, *Agency Finance in the Age of Executive Government*, 24 GEO. MASON L. REV. 555, 557 (2017). "Congress has increasingly empowered agencies to calculate and impose

outright taxes—charges unrelated to any service provided—and to exercise wide discretion in how the revenues are spent." *Id.* at 563.

The delegation at issue in this case is a stark example of this recent trend towards an unaccountable, tax-imposing bureaucracy.

## B.    USF Charges Are Taxes.

"Congress cannot change whether an exaction is a tax or a penalty for *constitutional* purposes simply by describing it as one or the other." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 544 (2012) (emphasis in original). Rather, the Court must consider the nature of the exaction.

Taxes "are commonplace measures designed to achieve important ends for society—ends that go well beyond merely defraying the costs of the government providing a particular service or benefit to members of the public." *Trafigura Trading LLC v. United States*, 29 F.4th 286, 293 (5th Cir. 2022) (opinion of Ho, J.).[11]

Despite euphemistically being labeled as "contributions" or "mechanisms" in § 254, the charges imposed for USF are widely

---

[11] The government has argued elsewhere that *Trafigura* is an Export Clause case and thus not controlling here, but it relied on a range of precedents defining a "tax," and, in any event, *NCTA* and *Skinner* both articulated a comparable test and were not Export Clause cases, *see* 415 U.S. at 340–41; 490 U.S. at 224.

recognized as taxes for constitutional purposes because "some of the administrative costs at issue 'inure[] to the benefit of the public.'" *Skinner*, 490 U.S. at 223. In fact, *practically all* of the universal service charges "'inure[] to the benefit of the public.'" *Id.* And "that's precisely what makes them a tax." *Trafigura*, 29 F.4th at 293–94.

The very title of the program—"Universal Service"—is textual proof that the funds are designed to benefit the public at large. The FCC's ability to define and implement "universal service" based on considerations of "public interest, convenience, and necessity," among other broad social goals, 47 U.S.C. § 254(b), (c), reaffirms that purpose. Indeed, the entire premise of the USF is to redistribute funds and benefits *away* from payors, whether viewed as consumers or telecommunication companies, and towards "a galaxy of policy concerns with no obvious connection to carrier liabilities." JA67–68.

Thus, the "contribution is a tax in all but name. It has no relation to any benefit conferred by the FCC; instead, it is based on the agency's

self-determined funding needs for its subsidy schemes." DeMuth, Sr. & Greve, 24 GEO. MASON L. REV. at 566.[12]

The government claims that USF charges are mere "fees." That is wrong. The Supreme Court defines a fee as a charge that is "incident to a voluntary act," meaning an agency can "exact" a charge in exchange for "bestow[ing] a benefit on the applicant, not shared by other members of society." *NCTA*, 415 U.S. at 340–41; *see also United States v. U.S. Shoe Corp.*, 523 U.S. 360, 363 (1998); *Skinner*, 490 U.S. at 224. Stated another way, a fee represents "a 'value-for-value' transaction, in which a feepayer pays the fee to receive a service or benefit in return, and is thus better off as a result of the transaction." *Trafigura*, 29 F.4th at 294.

To avoid serious nondelegation concerns, *NCTA* limited the FCC's collection of certain filing "fees" to the "'value to the recipient,'" because allowing the agency to offset other program expenditures would mean the "costs inured to the benefit of the public," which would implicate Congress's taxing power and thus nondelegation. 415 U.S. at 342–44.

---

[12] In fact, the USF charges are even more of a tax than Social Security taxes, which are framed as primarily benefitting the contributor himself (albeit later in life), rather than others.

But for the USF, most contributors receive nothing in return—and certainly no proportional *quid pro quo*. Those who "contribute large sums to the program receive few benefits" while those who "contribute little to the fund receive large benefits." JA65–67. Some, like Petitioner Cause Based Commerce, are actually injured because those extra costs encourage customers to drop their subscriptions. JA67.

Moreover, the sheer dollar values confirm these are no mere "incident[al]" fees like those the Supreme Court has authorized agencies to collect from applicants to recoup costs. *NCTA*, 415 U.S. at 340–41. The USF charges nearly $10 billion a year.

To be sure, in *TOPUC I*, this Court stated in the context of an Origination Clause challenge that the USF scheme imposes a "fee" rather than a "tax," 183 F.3d at 427 & n.52, but that is not binding here for several reasons. *First*, the Court expressly acknowledged that its cursory statement was dicta. *Id.*; Gov.Br.51 (agreeing it "was dicta"). This Court is "not bound by dicta," especially not by *self-acknowledged* dicta. *United States v. Becton*, 632 F.2d 1294, 1296 n.3 (5th Cir. 1980).

*Second*, *TOPUC I* held that a Taxing Clause challenge (as Petitioners bring here) would be subject to a "separate line[] of analysis"

compared to the Origination Clause challenge that *TOPUC I* rejected. 183 F.3d at 427 & n.51.

*Third*, *TOPUC I* seems to have identified the incorrect test for distinguishing a fee from a tax. The Court held that the USF charge "qualifies as a fee because it is a payment in support of a service (managing and regulating the public telecommunications network) that confers special benefits on the payees." *Id.* at 427 n.52. The inquiry is not whether the payor receives *any* particularized benefit, but rather whether the general public is the primary beneficiary. *See Skinner*, 490 U.S. at 223. Moreover, the supposed benefits were not even "special," which requires something "not shared by other members of society." *NCTA*, 415 U.S. at 340–41. Wherever the precise line may be, the USF crosses it because the benefits of USF charges inure almost exclusively to the general public.

*Fourth*, even if the charges could possibly be considered fees in 1999 when *TOPUC I* was decided, the rates and purposes of the charges have expanded so substantially that they no longer can be called anything but a tax today. *See TOPUC I*, 183 F.3d at 443 n.95 (noting that requiring

funding for a dramatically expanded interpretation of universal service "could constitute an improperly delegated tax"); *see* JA64.

* * *

For all these reasons, the USF statute transfers Congress's revenue-raising and taxing powers to the FCC, without meaningful limitations. It therefore violates the nondelegation doctrine, which is premised on the Constitution's structure, Article I's Vesting Clause, and (as relevant here) the Taxing and Appropriations Clauses.

## III.   THE USF VIOLATES THE PRIVATE NONDELEGATION DOCTRINE.

Delegation to "private persons" is "delegation in its most obnoxious form" because "it is not even delegation to an official or an official body, presumptively disinterested, but to private persons whose interests may be and often are adverse to the interests of others in the same business." *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936). In such cases, "there is not even a fig leaf of constitutional justification." *Dep't of Transp. v. Ass'n of Am. R.Rs.*, 575 U.S. 43, 62 (2015) (Alito, J., concurring). "Private entities are not vested with 'legislative Powers.' Nor are they vested with the 'executive Power,' which belongs to the President." *Id.* (citations omitted).

To ensure that government officials remain responsible for the obligations imposed by the government, this Court has long held that an agency may not "reflexively rubber stamp[]" a private entity's proposal, and instead must "independently perform its reviewing, analytical and judgmental functions." *Sierra Club v. Lynn*, 502 F.2d 43, 59 (5th Cir. 1974). Otherwise, it is the private party, not the government, that is in the driver's seat.

The FCC has violated these core principles by effectively delegating the USF revenue-raising scheme to USAC, "a private corporation owned by an industry trade group." *U.S. ex rel. Shupe v. Cisco Sys., Inc.*, 759 F.3d 379, 387 (5th Cir. 2014). The relationship between the FCC and USAC is best described as a federal agency providing administrative support to a private company, not the other way around. Each quarter, USAC decides how much money to raise, which the FCC then ministerially calculates into a taxing rate that is automatically "deemed approved" after 14 days, without the Commissioners lifting a finger or even issuing a separate document, typically just days before the new quarter begins.

The panel opinion in this case claimed the FCC "only uses USAC's proposals after independent consideration of the collected data and other relevant information." *Consumers' Rsch.*, 63 F.4th at 452. There is no evidence of this in the record, or anywhere. In fact, the FCC has never substantively changed USAC's proposals despite the passage of over 100 quarters. The FCC cannot even be bothered to engage in the pretense of review—it never issues a separate approval document nor responds to comments submitted by the public. And because this "approval" process plays out on the eve of each new quarter, the FCC has no real choice but to accept whatever USAC proposes anyway.

The panel opinion analogized this to the "arrangement[]" upheld by the panel in *Rettig*, *id.*, albeit over substantial dissent, *see Rettig*, 993 F.3d at 409 (Ho, J., dissenting from denial of rehearing en banc). But USAC's role here puts to shame the private delegation in *Rettig*. This is no "small part of the approval process," 987 F.3d at 533, but instead a private company determining the taxing rate that now yields 25 times the FCC's annual budget, with no evidence the FCC ever reviews the substance of that rate before it is imposed on millions of consumers.

Some of the FCC's supporting Intervenors candidly acknowledge that "the FCC has never reversed USAC's projections of demand." USTelecom Intervenor Br. 40 (June 17, 2022). In its own brief, the FCC points to only three examples in the last 25 years—after the initial set-up in 1997 and 1998—where the FCC has allegedly superintended USAC's quarterly taxing rate determination. Gov.Br.58–59. One of those was a ministerial change of the rate from .09044 to .091 because some carriers' computers could not handle five decimal places.[13] Another was undertaken by the Wireline Competition Bureau, with only passive acceptance by the FCC Commissioners.[14] And the third implemented a one-time *legislative* change.[15] Twenty-five years—and nearly a hundred quarterly ratemakings—and that is the sum total of the FCC's

---

[13] *In re Federal-State Joint Bd. on Universal Service*, 18 FCC Rcd. 4818, 4827 (2003).

[14] *Wireline Competition Bureau Provides Guidance to the Universal Service Administrative Company Regarding the High-Cost Universal Service Mechanism Budget*, 32 FCC Rcd. 9243, 9243–44 (2017).

[15] *In re Universal Service Contribution Methodology*, 34 FCC Rcd. 4143, 4144–45 (2019) (noting implementation in 2011).

"oversight" over the quarterly ratemaking process, during which time the rate has skyrocketed.[16]

This is a far cry from cases where courts have allowed agencies to "employ private entities for *ministerial* or *advisory* roles." *Pittston Co. v. United States*, 368 F.3d 385, 395 (4th Cir. 2004) (citing *United States v. Frame*, 885 F.2d 1119, 1129 (3d Cir. 1989)) (emphases in original). There is not some objectively provable or exact amount needed for "universal service" each quarter (especially because the term is so vague), and thus the determination of that figure inherently requires considerable policy and judgment calls—not ministerial calculations. And the FCC doesn't subsequently review those USAC calculations anyway.

To be sure, the FCC could revoke the power it has handed over to USAC, but "[i]f all it reserves for itself is 'the extreme remedy of totally terminating the [delegation agreement],' an agency abdicates its 'final

---

[16] The FCC may attempt to point to a recent revision as reflecting meaningful oversight. *See Proposed Third Quarter 2023 Universal Service Contribution Factor*, DA 23-507 (June 14, 2023), https://docs.fcc.gov/public/attachments/DA-23-507A1.pdf. But that was (1) a one-time ministerial adjustment to USAC's calculations to reflect a carryover of unspent funds, (2) not issued or directly approved by the Commissioners themselves, and (3) not from the quarterly contribution factor at issue in this case.

reviewing authority.'" *Fund for Animals v. Kempthorne*, 538 F.3d 124, 133 (2d Cir. 2008) (citation omitted). Stated another way, it is of course true that "any agency can always claw back its delegated power by issuing a new rule. But that would render the [private] nondelegation doctrine a dead letter" because an agency can always rescind the delegated power. *Rettig*, 993 F.3d at 416–17 (Ho, J., dissenting from denial of rehearing en banc). The point is that the agency has not actually done so.

Because the FCC "reflexively rubber stamp[s]" USAC's proposals and fails to "independently perform [the FCC's] reviewing, analytical and judgmental functions," the FCC has violated the private nondelegation doctrine. *Sierra Club*, 502 F.2d at 59. This would not even be the first time this court has reprimanded the FCC for giving "near-total deference" to private proposals in the context of the USF. *TOPUC II*, 265 F.3d at 328.[17]

\* \* \*

---

[17] The Sixth Circuit concluded that letting USAC act with impunity was a mere exercise of the FCC's "policymaking discretion … 'not to act.'" *Consumers' Rsch. v. FCC*, 67 F.4th 773, 796 (6th Cir. 2023). But letting private proposals automatically become binding under penalty of law is the very definition of a private nondelegation violation.

One of the government's amici argues that the FCC's hands-off approach is just fine because international custom dictates that a "separate, independent (autonomous) entity" should calculate and collect universal service funds because it supposedly improves "efficiency." Frieden Amicus Br. (June 17, 2022). But constitutional separation of powers is not designed to maximize "efficiency" and "autonom[y]." Quite the opposite. "Bicameralism and presentment make lawmaking difficult *by design*." *Rettig*, 993 F.3d at 409 (Ho, J., dissenting from denial of rehearing en banc) (cleaned up).

## IV. SCOPE OF RELIEF.

The government is also wrong that there will be any meaningful disruption from granting relief in this case. *First*, Petitioners have previously stated that the Court can limit relief to the named Petitioners, Pet.Reply.Br.7.n.2, and of course this case challenges only one particular quarter's taxing rate.

*Second*, as demonstrated by the congressional amicus brief filed in this case, there is bipartisan congressional interest in supporting USF, making it likely that Congress would resume its constitutional role to consider USF funding. *See* Congressional Amicus Br. (June 17, 2022).

In fact, Congress is already well aware of the constitutional flaws with the USF statute. The Congressional Research Service warned Congress in January 2023 that it should consider "limit[ing] the FCC's discretion over the program by placing a cap on the total revenue the FCC may collect from interstate carriers" or by "articulat[ing] a formula for how the contribution factor should be calculated." Cong. Rsch. Srv., LSB10904, *Fifth Circuit Considers Constitutionality of the Universal Service Fund* (2023), https://crsreports.congress.gov/product/pdf/LSB/LSB10904. Congress could also simply use the tried-and-true method of appropriating funds for the USF.

Congress's recent prompt statutory response to this Court's invalidation of another statute on nondelegation grounds provides strong reason to believe Congress would take similar action here. *See Oklahoma v. United States*, 62 F.4th 221, 225 (6th Cir. 2023) (recognizing Congress's statutory response to *National Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869 (5th Cir. 2022)). That would ensure that Congress remains accountable to the public for raising revenue for the USF, in accordance with the Constitution's separation of powers.

## **CONCLUSION**

The Court should grant the Petition.

July 31, 2023                    Respectfully submitted,

                                 /s/ R. Trent McCotter
                                 R. Trent McCotter
                                   *Counsel of Record*
                                 Jonathan Berry
                                 Michael Buschbacher
                                 Jared M. Kelson
                                 BOYDEN GRAY PLLC
                                 801 17th Street NW, Suite 350
                                 Washington, DC 20006
                                 202-706-5488
                                 tmccotter@boydengray.com
                                 *Counsel for Petitioners*

## CERTIFICATE OF SERVICE

I hereby certify that on July 31, 2023, I electronically filed the foregoing document with the Clerk of this Court by using the CM/ECF system, which will serve all parties automatically.

/s/ R. Trent McCotter
R. Trent McCotter
Boyden Gray PLLC
801 17th St NW, Suite 350
Washington, DC 20006
(202) 706-5488

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the type-volume limitations of Fifth Circuit Rule 32 and Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,939 words, excluding the portions exempted by Rule 32(f). This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure Rule 32(a)(5)–(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook and 14-point font.

Dated: July 31, 2023

/s/ R. Trent McCotter
R. Trent McCotter
Boyden Gray PLLC
801 17th St NW, Suite 350
Washington, DC 20006
(202) 706-5488