No. 22-60008

_____

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

CONSUMERS' RESEARCH; CAUSE BASED COMMERCE,
INCORPORATED; KERSTEN CONWAY; SUZANNE BETTAC;
ROBERT KULL; KWANG JA KERBY; TOM KIRBY; JOSEPH BAYLY;
JEREMY ROTH; DEANNA ROTH; LYNN GIBBS; PAUL GIBBS;
RHONDA THOMAS,
*Petitioners*,

v.

FEDERAL COMMUNICATIONS COMMISSION;
UNITED STATES OF AMERICA,
*Respondents*.

_____

On petition for review of an agency order

_____

**EN BANC BRIEF OF AMICI CURIAE COMPETITIVE
ENTERPRISE INSTITUTE, FREE STATE FOUNDATION,
CHRISTOPHER DEMUTH, HAROLD FURCHTGOTT-ROTH,
MICHAEL S. GREVE, AND RANDOLPH J. MAY IN SUPPORT
OF PETITIONERS**

_____

Jeffrey S. Beelaert
 *Counsel of Record*
STEIN MITCHELL BEATO & MISSNER LLP
2000 K Street NW, Suite 600
Washington, D.C. 20006
(202) 737-7777
jbeelaert@steinmitchell.com

_____

## CERTIFICATE OF INTERESTED PARTIES

(1)  *Consumers' Research v. FCC*, Fifth Circuit Case No. 22-60008

(2)  The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case.  These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

<u>Petitioners</u>

Consumers' Research

Caused Based Commerce

Kersten Conway

Suzanne Bettac

Robert Kull

Kwang Ja Kirby

Tom Kirby

Joseph Bayly

Jeremy Roth

Lynn Gibbs

Paul Gibbs

Rhonda Thomas

<u>Respondents</u>

Federal Communications Commission

United States of America

Intervenors

Benton Institute for Broadband & Society

National Digital Inclusion Alliance

Center for Media Justice (d/b/a MediaJustice)

Schools, Health & Libraries Broadband Coalition

National Telecommunications Cooperative Association (d/b/a NTCA – The Rural Broadband Association)

Competitive Carriers Association

Amici Curiae

Competitive Enterprise Institute

Free State Foundation

Christopher DeMuth

Harold Furchtgott-Roth

Michael S. Greve

Randolph J. May

Attorneys for Petitioners

C. Boyden Gray

R. Trent McCotter

Jonathan Berry

Michael Buschbacher

Jared M. Kelson

Boyden Gray & Associates PLLC

Attorneys for Respondents

James M. Carr

Jacob M. Lewis

Adam Crews

P. Michelle Ellison

Gerard J. Sinzdak

Merrick Garland

<u>Attorneys for Intervenors</u>

Andrew Jay Schwartzman

Michael D. Miller

Jason Neal

Stephanie Weiner

Harris, Wiltshire & Grannis, LLP

<u>Attorney for Amici Curiae</u>

Jeffrey S. Beelaert

Stein Mitchell Beato Missner LLP

*/s/ Jeffrey S. Beelaert*
Counsel of Record for Amici Curiae

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES ............................................ i

TABLE OF CONTENTS ....................................................................... iv

TABLE OF AUTHORITIES .................................................................. vi

INTEREST OF AMICI CURIAE .............................................................. 1

INTRODUCTION ................................................................................. 3

BACKGROUND .................................................................................... 4

    A.    History of regulation in the "public interest" ......................... 4

    B.    Universal service policy ......................................................... 6

    C.    Telecommunications Act of 1996 ............................................ 7

         1.    All interstate carriers must contribute to
             the statutory universal service program. ...................... 7

         2.    The FCC indirectly controls the universal
             service program. ............................................................. 9

SUMMARY OF ARGUMENT ................................................................. 12

ARGUMENT ....................................................................................... 13

I.   Congress impermissibly delegated legislative power to the
    FCC under 47 U.S.C. § 254. ........................................................... 13

    A.    Section 254 mandates a "contribution" that, as
           interpreted by the FCC, functions as a tax. ......................... 14

    B.    Section 254 provides the FCC no meaningful boundaries. ... 18

    C.    The economics of the universal service program
           confirm that the FCC operates within no meaningful
           boundaries. ............................................................................ 21

II.    The FCC cannot hand off regulatory power to the Universal
       Service Administrative Company...................................................25

CONCLUSION ...........................................................................................28

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*A.L.A. Schechter Poultry Corp. v. United States,*
    295 U.S. 495 (1935) ................................................................ 28

*Alabama Ass'n of Realtors v. Dep't of Health & Human Services,*
    141 S. Ct. 2485 (2021) ..................................................... 17, 18

*Alenco Commc'ns, Inc. v. FCC,*
    201 F.3d 608 (5th Cir. 2000) ............................................... 13

*American Power & Light Co. v. SEC,*
    329 U.S. 90 (1946) ................................................................ 19

*Blanca Tel. Co. v. FCC,*
    991 F.3d 1097 (10th Cir. 2021) ............................................. 9

*Bond v. United States,*
    564 U.S. 211 (2011) .............................................................. 25

*Carter v. Carter Coal Co.,*
    298 U.S. 238 (1936) .............................................................. 28

*Chastleton Corp. v. Sinclair,*
    264 U.S. 543 (1924) .............................................................. 24

*Dep't of Transp. v. Ass'n of Am. Railroads,*
    575 U.S. 43 (2015) .................................................... 20, 25, 28

*FCC v. Nat'l Citizens Comm. for Broadcasting,*
    436 U.S. 775 (1978) ................................................................ 4

*FCC v. Pottsville Broadcasting Co.,*
    309 U.S. 134 (1940) ................................................................ 5

*Fed. Radio Comm. v. Nelson Bros. Bond & Mortg. Co.,*
  289 U.S. 266 (1933) ................................................................. 5

*In re Incomnet, Inc.,*
  463 F.3d 1064 (9th Cir. 2006) .............................. 8, 10, 26, 27

*J.W. Hampton, Jr. & Co. v. United States,*
  276 U.S. 394 (1928) ............................................................... 18

*Marshall Field & Co. v. Clark,*
  143 U.S. 649 (1892) ............................................................... 13

*Mistretta v. United States,*
  488 U.S. 361 (1989) ............................................................... 18

*Nat'l Cable Television Ass'n, Inc. v. United States,*
  415 U.S. 336 (1974) ................................................... 14, 15, 16

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
  567 U.S. 519 (2012) ............................................................... 14

*NBC, Inc. v. United States,*
  319 U.S. 190 (1943) ................................................................. 5

*Reynolds v. United States,*
  565 U.S. 432 (2012) ............................................................... 14

*Rural Tel. Coalition v. FCC,*
  838 F.2d 1307 (D.C. Cir. 1988) .......................................... 6, 7

*Skinner v. Mid-America Pipeline Co.,*
  490 U.S. 212 (1989) ......................................................... 19, 27

*Texas Off. of Pub. Util. Counsel v. FCC,*
  265 F.3d 313 (5th Cir. 2001) ............................................... 13

*Texas v. Comm'r of Internal Revenue,*
  142 S. Ct. 1308 (Mar. 28, 2022) .......................................... 26

*Tiger Lily, LLC v. U.S. Dep't of Hous. & Urb. Dev.*,
  5 F.4th 666 (6th Cir. 2021) ..................................................... 21

*United States ex rel. Shupe v. Cisco Sys., Inc.*,
  759 F.3d 379 (5th Cir. 2014) ............................................... 9, 27

*United States v. Gundy*,
  139 S. Ct. 2116 (2019) .......................................................... 18

*United States v. Midwest Video Corp.*,
  406 U.S. 649 (1972) ................................................................ 5

*West Virginia v. EPA*,
  142 S. Ct. 2587 (2022) .......................................................... 18

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001) .............................................................. 14

**Constitution and statutes**

U.S. Const. art. I ...................................................................... 14

47 U.S.C. § 254 ................................................................ *passim*

47 U.S.C. § 303 ......................................................................... 4

Infrastructure Investment and Jobs Act
  Pub. L. No. 117-58 (Nov. 15, 2021) ...................................... 24

Radio Act of 1927
  Pub. L. No. 69-6321 (Feb. 23, 1927) ...................................... 4

**Rules and regulations**

47 C.F.R. § 54.5 ........................................................................ 9

47 C.F.R. § 54.701 ........................................................... 9, 12, 25

47 C.F.R. § 54.702 ......................................................................9

47 C.F.R. § 54.709 ...............................................9, 10, 15, 26

47 C.F.R. § 54.715 .....................................................................26

**Other Authorities**

Doug Abrahms, *Phone Rates Will Rise for Firms, Some Homes*, Wash. Times, Dec. 11, 1997 ................................................................15

Amy Coney Barrett, *Suspension and Delegation*, 99 Cornell L. Rev. 251 (2014) ...............................................18

Barbara A. Cherry & Donald D. Nystrom, *Universal Service Contributions: An Unconstitutional Delegation of Taxing Power*, 2000 L. Rev. Mich. St. U. Det. C.L. 107 ................................20

Robert W. Crandall, *Letting Go?  The Federal Communications Commission in the Era of Deregulation*, Review of Network Economics (Dec. 2008) ......................................................................23

Robert W. Crandall & Leonard Waverman, *Who Pays for Universal Service?  When Subsidies Become Transparent* (2000) ........................8

Christopher C. DeMuth & Michael S. Greve*, Agency Finance in the Age of Executive Government*, 24 Geo. Mason L. Rev. 555 (2017) ............15

The Federalist, No. 58 (James Madison).................................................13

Robert M. Frieden, *Universal Service:  When Technologies Converge and Regulatory Models Diverge*, 13 Harv. J.L. & Tech. 395 (2000)............6

A. Goolsbee & J. Guryan, *The Impact of Internet Subsidies in Public Schools* (2006).........................................................................23

GAO-20-27, *FCC Should Take Additional Action to Manage Fraud Risks in Its Program to Support Broadband Service in High-Cost Areas* (Oct. 2019) ........................................................................... 21, 22

Ronald J. Krotoszynski, Jr., *Reconsidering the Nondelegation Doctrine: Universal Service, the Power to Tax, and the Ratification Doctrine*, 80 Ind. L.J. 239 (2005) ................................. 5, 10

Randolph J. May, *The Public Interest Standard: Is It Too Indeterminate to Be Constitutional?,* 53 Fed. Comm. L.J. 427 (2000) ......................... 5

Randolph J. May, *The Nondelegation Doctrine is Alive and Well in the States*, The Reg. Rev. (Oct. 15, 2020) ................................................... 18

Eli M. Noam, *Will Universal Service and Common Carriage Survive the Telecommunications Act of 1996?*, 97 Colum. L. Rev. 955 (1997)......... 6

Martin H. Redish, *Pragmatic Formalism, Separation of Powers, and the Need to Revisit the Nondelegation Doctrine*, 51 Loy. U. Chi. L. J. 363 (2020) ............................................................. 6

Opening Statement of Hon. Greg Walden, *The Lifeline Fund: Money Well Spent?*, House Subcommittee on Communications and Technology, House Committee on Energy and Commerce, No. 113-36 (Apr. 25, 2013) ....................................................................................... 16

White House, Fact Sheet: The Bipartisan Infrastructure Deal (Nov. 6, 2021) ....................................................................................... 25

Pete Worden, *On Self-Licking Ice Cream Cones*, Workshop on Cool Stars, Stellar Systems, and the Sun (1992) ......................................... 21

## INTEREST OF AMICI CURIAE[1]

Amici include the following organizations and individuals:

The **Competitive Enterprise Institute** is a nonprofit organization headquartered in Washington, D.C., dedicated to promoting the principles of free markets and limited government. Since its founding in 1984, the institute has focused on raising public understanding of the problems of overregulation. It has done so through policy analysis, commentary, and litigation.

The **Free State Foundation** is a nonprofit, nonpartisan think tank. Its purpose is to promote, through research and educational activities, understanding of free markets, free speech, limited government, and rule of law principles at the federal level and in Maryland, and to advocate laws and policies true to these principles.

**Christopher C. DeMuth** is a distinguished fellow at the Hudson Institute, an organization dedicated to the nonpartisan analysis of economic, security, and political issues. Mr. DeMuth previously served as president of the American Enterprise Institute for Public Policy from 1986 to 2008. He frequently speaks and writes about government regulation, government policies, and legal controversies.

**Harold Furchtgott-Roth** is a senior fellow and director of the Center for the Economics of the Internet at Hudson Institute. He

---

[1] This brief was not authored in whole or in part by counsel for any of the parties; no party or party's counsel contributed money for the brief; and no one other than amici and their counsel have contributed to this brief.

frequently comments on issues related to the communications sector of the economy. From 1997 through 2001, Mr. Furchtgott-Roth served as a commissioner of the Federal Communications Commission.

Professor **Michael S. Greve** teaches administrative law at the Antonin Scalia Law School, George Mason University. Professor Greve also specializes in constitutional law, courts, and business regulation. A prolific writer, Professor Greve has authored nine books and a multitude of articles appearing in scholarly publications, as well as numerous editorials, short articles, and book reviews.

**Randolph J. May** is the Founder and President of The Free State Foundation. He is a past Chair of the American Bar Association's Section of Administrative Law and Regulatory Practice, a Fellow of the National Academy of Public Administration, and has served as a Public Member of the Administrative Conference of the United States, where he currently is a Senior Fellow. Mr. May has published more than two hundred articles and essays on communications, administrative, and constitutional law topics.

## INTRODUCTION

Americans love their phones. Today, there are more assigned phone numbers in the United States than there are residents. Americans own more than 300 million cell phones and have more than 100 million fixed telephone line subscriptions. Nearly everyone is familiar with a monthly phone bill, even if most people gloss over the nitty-gritty details.

Nowadays, most phone bills include a line item for the "Universal Service Fund Fee"—which is nothing more than an unconstitutional tax masquerading as a statutory "contribution" that the Federal Communications Commission quantifies each quarter and purportedly exacts from interstate service providers. As it turns out, however, service providers do not contribute much (if anything) because they pass along the costs of the universal service program to their customers as a "fee."

Only Congress has the power to lay and to collect taxes for the universal welfare of all Americans. Regardless of the public policy that it seeks to advance, Congress cannot delegate this power to the FCC or any other executive branch agency. Yet, under the Telecommunications Act of 1996, Congress purported to create a universal service program for the Commission to raise revenue however it sees fit "for the protection of the public interest" in seeking to provide greater access to telecommunications services. 47 U.S.C. § 254(b)(7). This delegation is unconstitutional.

3

The Constitution does not permit Congress to circumvent the legislative process by allowing an independent agency (guided by a private company owned by an industry trade group) to raise and to spend however much money it wants every quarter for "universal service" at the expense of every American who pays a monthly phone bill. Elected representatives of the people, not the Federal Communications Commission, must be responsible for making the difficult decisions to raise the revenue that funds this program.

## BACKGROUND

### A.     History of regulation in the "public interest"

In 1927, Congress created the Federal Radio Commission and authorized the agency to regulate broadcasting according to the "public interest." Radio Act of 1927, Pub. L. No. 69-632, § 11, 44 Stat. 1162, 1167. Years later, in 1934, Congress abolished the radio commission and transferred its jurisdiction to the newly created Federal Communications Commission. Congress similarly authorized the FCC to regulate communications "as public convenience, interest, or necessity requires." 47 U.S.C. § 303. But Congress never defined what it meant by public interest, nor provided any statutory guidance to the Commission.

The FCC has exercised its authority over the years according to its own "perception of the public interest" as the agency has pursued a wide range of policies and adopted a wide variety of regulations. *FCC v. Nat'l Citizens Comm. for Broadcasting*, 436 U.S. 775, 780 (1978). Going back

to the authority that Congress granted to the Federal Radio Commission, however, the Supreme Court has recognized that the public interest criterion was never meant "to be interpreted as setting up a standard so indefinite as to confer an unlimited power" upon federal regulators. *Fed. Radio Comm. v. Nelson Bros. Bond & Mortg. Co.*, 289 U.S. 266, 285 (1933). According to the Court, "context" limits the Commission's authority to act in the public interest. *Id.* So, for instance, the Court has concluded that the FCC may exercise its authority in the public interest as the agency weighs "complicated factors" related to the scope, character, and quality of broadcast services. *NBC, Inc. v. United States*, 319 U.S. 190, 216 (1943) (quoting *FCC v. Pottsville Broadcasting Co.*, 309 U.S. 134, 138 (1940)); *accord United States v. Midwest Video Corp.*, 406 U.S. 649, 668–73 (1972) (upholding a cablecasting rule).

But it is difficult to see in practice how the undefined notion of public interest has served as "a very instructive standard" that has limited the FCC's actions in any meaningful way. Ronald J. Krotoszynski, Jr., *Reconsidering the Nondelegation Doctrine: Universal Service, the Power to Tax, and the Ratification Doctrine*, 80 Ind. L.J. 239, 244 (2005). Analyzing the Commission's actions over the years, scholars have concluded that "the public interest standard is inconsistent with the separation of powers principles vindicated in our constitutional system through the nondelegation doctrine." Randolph J. May, *The Public Interest Standard: Is It Too Indeterminate to Be Constitutional?*, 53 Fed.

Comm. L.J. 427, 429 (2000); *accord* Martin H. Redish, *Pragmatic Formalism, Separation of Powers, and the Need to Revisit the Nondelegation Doctrine*, 51 Loy. U. Chi. L. J. 363, 378 (2020).

## B.   Universal service policy

Acting under its public interest delegation, the FCC historically adhered to a policy of "universal service" designed "to spread telecommunications to as many members of society as possible, and to make available, directly or indirectly, the funds necessary to support the policy." Eli M. Noam, *Will Universal Service and Common Carriage Survive the Telecommunications Act of 1996?*, 97 Colum. L. Rev. 955, 957 (1997). Before 1996, the Commission accomplished this policy goal by allowing a monopoly carrier to provide services across a wide range of customers "with the monopolist's profits used to support some of its endusers, especially residential and rural customers." *Id.*

Essentially, the FCC provided certain "carriers with valuable insulation from competition and reduced civil and criminal liability in exchange for governmental authority to regulate prices, revenues, and many other aspects of a carrier's corporate and operational behavior." Robert M. Frieden, *Universal Service:  When Technologies Converge and Regulatory Models Diverge*, 13 Harv. J.L. & Tech. 395, 401 (2000). Under this scheme, the FCC allowed monopolist carriers to charge some consumers above-market rates so that they would subsidize the higher costs of providing services to other consumers. *See Rural Tel. Coalition*

6

*v. FCC*, 838 F.2d 1307, 1312 (D.C. Cir. 1988) (discussing different rates).
That system ended in 1996.

### C.    Telecommunications Act of 1996

Congress overhauled regulation of the communications industry
when it enacted the Telecommunications Act of 1996, which allowed
competitors to enter local markets previously controlled by monopolist
carriers.  The Act also shifted the FCC away from implicit subsidies
collected from monopolist carriers, requiring the Commission instead to
rely on a new system of contributions from all providers of interstate
telecommunications services to fund "universal service" programs.  *See*
47 U.S.C. § 254.

### 1.    All interstate carriers must contribute to the statutory universal service program.

Congress required every "carrier that provides interstate
telecommunications services" to "contribute, on an equitable and
nondiscriminatory basis, to the specific, predictable, and sufficient
mechanisms established *by the Commission* to preserve and advance
universal service."  47 U.S.C. § 254(d) (emphasis added).  And Congress
required the FCC, in consultation with a federal-state board, to establish
various programs for the advancement of telecommunications services.
*See id.* § 254(a), (b).  All of these "support mechanisms," established by
the FCC, are then paid for by the interstate service providers on an
"equitable and non-discriminatory basis."  *Id.* § 254(d).  In practice,

however, service providers do not pay the contributions directly—they instead "pass this cost through to their subscribers." *In re Incomnet, Inc.*, 463 F.3d 1064, 1066 (9th Cir. 2006). The "charge generally appears on phone bills as the 'Universal Service Fund Fee.'" *Id.*

In the statute, Congress listed broad "principles" meant to guide the FCC as it sets "policies for the preservation and advancement of universal service." 47 U.S.C. § 254(b). These principles broadly include providing advanced telecommunications and information services "in all regions of the Nation," *id.* § 254(b)(2), especially "in rural, insular, and high cost areas," *id.* § 254(b)(3), and to schools, healthcare facilities, and libraries, *id.* § 254(b)(6). Yet the statutory list of principles is not exhaustive. The Commission and board may establish any other additional principles that they "determine are necessary and appropriate for the protection of the public interest, convenience, and necessity and are consistent with this chapter." *Id.* § 254(b)(7).

Of course, if Congress had desired "to vote for efficient, explicit subsidies for connecting high-cost residences, schools, libraries, or rural medical facilities, it could have funded such support from general revenues or from a relatively efficient tax." Robert W. Crandall & Leonard Waverman, *Who Pays for Universal Service? When Subsidies Become Transparent* 12 (2000). But that is not what Congress did. Congress instead left "the setting of the tax to federal regulators." *Id.*

### 2. The FCC indirectly controls the universal service program.

To fund the universal service program, the Commission sets what is referred to as the "universal service contribution factor" every quarter based on "projections of demand for the federal universal service support mechanisms" submitted by "the Administrator" of the program. 47 C.F.R. § 54.709(a)(3). The FCC has appointed the "Universal Service Administrative Company" as "the permanent Administrator" of the program. *Id.* § 54.701(a).

The Universal Service Administrative Company is "a private corporation owned by an industry trade group." *United States ex rel. Shupe v. Cisco Sys., Inc.*, 759 F.3d 379, 387 (5th Cir. 2014). Indeed, the Company is an "independent subsidiary of the National Exchange Carrier Association, Inc.," 47 C.F.R. § 54.5, which "is a membership organization of telecommunications carriers that collects and audits accounting reports from carriers," *Blanca Tel. Co. v. FCC*, 991 F.3d 1097, 1105 (10th Cir. 2021). The board governing the Company consists of members representing "various interest groups affected by and interested in universal service programs." USAC.org, *Leadership*.[2]

Under applicable FCC regulations, the Company administers "the financial transactions of the Universal Service Fund," 47 C.F.R. § 54.702(n), including the quarterly "contribution factor"—i.e.,

---

[2] https://www.usac.org/about/leadership/

"the percentage of end user revenue that will be contributed to the Universal Service Fund to support the universal service programs," USAC.org, *Contribution Factors*.[3]

The Universal Service Administrative Company submits budget data for specific program "support mechanisms" (i.e., "projected expenses" for "high-cost areas, low-income consumers, schools and libraries, and rural health care providers, respectively") to the Office of the Managing Director at the FCC at least 30 days before the start of each quarter. 47 C.F.R. § 54.709(a)(3). The FCC then posts the "projections of demand and administrative expenses and the contribution factor" on its website for a fourteen-day public comment period. *Id.* If the Commission takes *no action* within fourteen days that it releases the public notice, "the contribution factor shall be deemed approved by the Commission." *Id.* The FCC thus "indirectly" controls spending for universal service programs. *Incomnet*, 463 F.3d at 1074.

This regulatory scheme has unleashed a sharp increase in the overall size and scope of the universal service program since Congress enacted the Telecommunications Act of 1996. Over the years, the Universal Service Administrative Company consistently has required service providers to "contribute" more money, which really means that "they were forced to charge their customers more." Krotoszynski, 80 Ind.

---

[3] https://www.usac.org/service-providers/making-payments/contribution-factors/.

L. J. at 284. As contributions steadily have increased, distributions have too. The universal service program has issued several billion dollars in direct subsidies over the years, with the annual amount increasing from about $1.3 billion in 1996 to nearly $9 billion by 2019.

**Annual Universal Service Payments (Million $)**

| Year | High-Cost Support | Low Income Support | Rural Health Care | Schools and Libraries | Total |
|------|-----|-----|-----|-----|-----|
| 1996 | 1,188 | 166 | - | - | 1,354 |
| 1997 | 1,263 | 161 | - | - | 1,424 |
| 1998 | 1,690 | 464 | 3 | 1,399 | 3,556 |
| 1999 | 1,718 | 480 | 4 | 1,650 | 3,852 |
| 2000 | 2,235 | 519 | 10 | 1,647 | 4,411 |
| 2001 | 2,602 | 584 | 18 | 1,677 | 4,873 |
| 2002 | 2,978 | 673 | 21 | 1,594 | 5,266 |
| 2003 | 3,273 | 713 | 26 | 1,938 | 5,950 |
| 2004 | 3,488 | 759 | 31 | 1,535 | 5,813 |
| 2005 | 3,824 | 809 | 40 | 1,623 | 6,296 |
| 2006 | 4,096 | 820 | 45 | 1,567 | 6,528 |
| 2007 | 4,287 | 823 | 55 | 1,953 | 7,118 |
| 2008 | 4,478 | 819 | 67 | 1,926 | 7,290 |
| 2009 | 4,332 | 1,025 | 71 | 2,333 | 7,761 |
| 2010 | 4,278 | 1,315 | 87 | 2,450 | 8,130 |
| 2011 | 4,142 | 1,751 | 101 | 2,151 | 8,145 |
| 2012 | 4,130 | 2,189 | 117 | 2,372 | 8,808 |
| 2013 | 4,142 | 1,798 | 129 | 1,753 | 7,822 |
| 2014 | 3,769 | 1,660 | 135 | 1,873 | 7,437 |
| 2015 | 4,524 | 1,514 | 169 | 2,790 | 8,997 |
| 2016 | 4,593 | 1,537 | 184 | 2,347 | 8,661 |
| 2017 | 4,846 | 1,287 | 167 | 1,986 | 8,286 |
| 2018 | 4,800 | 1,162 | 135 | 1,972 | 8,069 |
| 2019 | 5,980 | 982 | 161 | 1,831 | 8,954 |
| 2020 | 5,049 | 854 | 32 | 1,065 | 7,000 |

Source – Federal-State Joint Board, Universal Service Monitoring Reports: 2005 (1996 to 2000 data); 2021 (2001 to 2020 data).[4]

## SUMMARY OF ARGUMENT

This Court should grant the petition for review and set aside the FCC's order approving the Proposed First Quarter 2022 Universal Service Contribution Factor for at least two reasons:

I.     Decisions regarding taxing and spending—especially picking winners and losers involving billions of dollars in government subsidies— are policy questions with vast economic and political significance.  Only elected members of Congress, representing the will of the people, may decide these questions.  The Commission's regulatory scheme under 47 U.S.C. § 254 for exacting revenue for government subsidies doled out by the Universal Service Administrative Company operates as an unconstitutional delegation of legislative authority.

II.    Even if this Court were to conclude that the FCC lawfully could raise taxes on its own, the FCC's appointment of the Universal Service Administrative Company as "the permanent Administrator" of the universal service program, 47 C.F.R. § 54.701(a), cannot stand.  Just as Congress cannot delegate legislative power to the FCC, the agency likewise cannot hand off regulatory power to a private entity controlled by interested parties.

---

[4] https://www.fcc.gov/general/federal-state-joint-board-monitoring-reports

# ARGUMENT

## I.    Congress impermissibly delegated legislative power to the FCC under 47 U.S.C. § 254.

In drafting and ratifying our Constitution, the people gave each branch of the federal government its own role with certain enumerated powers. That Congress cannot delegate its legislative power "is a principle universally recognized as vital to the integrity and maintenance of the system of government ordained by the Constitution." *Marshall Field & Co. v. Clark*, 143 U.S. 649, 692 (1892). To be sure, the power of the purse may be "the most complete and effectual weapon with which any constitution can arm the immediate representatives of the people." The Federalist, No. 58 (James Madison).

Even so, using "lofty and expansive language," Congress apparently intended "to delegate difficult policy choices to the Commission's discretion" when it enacted the scheme for the universal service program under 47 U.S.C. § 254. *Texas Off. of Pub. Util. Counsel v. FCC*, 265 F.3d 313, 321 (5th Cir. 2001) (quoting *Alenco Commc'ns, Inc. v. FCC*, 201 F.3d 608, 615 (5th Cir. 2000)). Those difficult policy choices include not only setting the amount of quarterly "contributions" that service providers (actually their customers) must pay the government, but also picking the specific recipients who ultimately receive a portion of the billions of dollars that get collected and distributed each year. The Constitution does not allow Congress to short-circuit the legislative process by

delegating such broad authority to the FCC to raise and to spend however much money it wants every quarter on universal service programs. Nor does the Constitution allow the FCC to hand off regulatory power to a private company controlled by parties affected by and interested in universal service programs.

"Taxation is a legislative function," and Congress "is the sole organ for levying taxes." *Nat'l Cable Television Ass'n, Inc. v. United States*, 415 U.S. 336, 340 (1974). Article I of the Constitution vests all legislative powers—including the power "to lay and collect Taxes, Duties, Imposes, and Excises"—"in a Congress of the United States" and nowhere else. U.S. Const. art. I, § 8, cl. 1. The text of Article I "permits no delegation of those powers." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001); *accord Reynolds v. United States*, 565 U.S. 432, 450 (2012) (Scalia, J., dissenting) ("[L]egislative powers are nondelegable.").

## A.   Section 254 mandates a "contribution" that, as interpreted by the FCC, functions as a tax.

Congress cannot change the nature of a tax "for *constitutional* purposes" simply by using an innocuous euphemism when describing the exaction in statutory text. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 544 (2012). So, although Congress may prefer to pass a statute that mandates "an equitable and nondiscriminatory *contribution*" as a means of supporting vaguely defined "universal service support mechanisms" under 47 U.S.C. § 254, that label is not dispositive. Simply put: "it's a

tax. It walks like a duck. It talks like a duck." Doug Abrahms, *Phone Rates Will Rise for Firms, Some Homes*, Wash. Times, Dec. 11, 1997 (quoting then-Senator John McCain).

In fact, the statutory contribution functions as a tax with "no relation to any benefit conferred by the FCC." Christopher C. DeMuth & Michael S. Greve, *Agency Finance in the Age of Executive Government*, 24 Geo. Mason L. Rev. 555, 566 (2017). The size of the quarterly contribution "is based on the agency's self-determined funding needs for its subsidy schemes." *Id.* And those funding needs in reality get defined by the Universal Service Administrative Company, *see* 47 C.F.R. § 54.709, which is actually run by "various interest groups affected by and interested in universal service programs.," USAC.org, *Leadership*.[5]

The collection of a contribution under Section 254 does not bestow any sort of direct "benefit" on interstate service providers—i.e., something traditionally understood as a permissible "fee" that the government may require industry to pay. *National Cable*, 415 U.S. at 340–41. Congress instead designed the contribution as a *universal* benefit "shared by other members of society"—i.e., something traditionally understood as a tax. *Id.* at 341. This Court therefore must consider whether Congress properly delegated its taxing power to the FCC. It did not.

---

[5] https://www.usac.org/about/leadership/

Congress cannot delegate to the Commission the power to levy taxes broadly designed to benefit consumers "in all regions of the Nation, including low-income consumers and those in rural, insular, and high cost areas;" "any public or nonprofit health care provider that serves persons who reside in rural areas;" and "elementary schools, secondary schools, and libraries for educational purposes." 47 U.S.C. §§ 254(b)(3), (h)(1). And Congress certainly cannot delegate to the Commission the power to establish *on its own* (working with the federal-state board) what amounts to "necessary and appropriate" spending policies "for the protection of the public interest, convenience, and necessity." *Id.* § 254(b)(7). "Taxation is a legislative function," and only Congress may levy taxes. *National Cable*, 415 U.S. at 340.

The Universal Service Fund is financed by "virtually every American's money," and, "at the end of the day, it is still the same taxpaying people who bear the cost, since 96 percent of the country has phone service and see a fee on their bill." Opening Statement of Hon. Greg Walden, *The Lifeline Fund: Money Well Spent?*, House Subcommittee on Communications and Technology, House Committee on Energy and Commerce, No. 113-36, at 1-2 (Apr. 25, 2013).[6] If this Court were to allow the FCC's scheme to stand, it will permit the Commission to do whatever it wants with taxes collected from nearly all Americans so

---

[6] https://www.govinfo.gov/content/pkg/CHRG-113hhrg82189/pdf/CHRG-113hhrg82189.pdf.

16

long as the FCC can claim to satisfy vague "principles" that the agency itself can redefine however it sees fit according to its own notions of "public interest, convenience, and necessity." 47 U.S.C. § 254(b)(7). That cannot be right.

This Court should reject the Commission's interpretation of Section 254 because it gives the agency "a breathtaking amount of authority." *Alabama Ass'n of Realtors v. Dep't of Health & Human Services*, 141 S. Ct. 2485, 2489 (2021) (per curiam). Under the FCC's interpretation, the agency essentially has a blank check for whatever "universal service" programs that it desires to fund under the expansive authority that the FCC claims to have under Section 254. Indeed, the Commission could make the tax exceptionally large one quarter and then infinitesimally small the very next quarter without any congressional approval and without any consideration of the benefit or harm that it inflicts on the service providers (i.e., American public) who pay the "contribution."

There is no limiting principle to the FCC's interpretation of the statute. Nor did Congress provide any meaningful limits. Under the Commission's current practice, the agency hypothetically could expand the service provider tax base to include providers of internet service or other technology companies to raise hundreds of billions of dollars if it wanted. Or, influenced by powerful special interests, the FCC potentially could move "into areas where state authority has traditionally

17

predominated." *West Virginia v. EPA*, 142 S. Ct. 2587, 2618 (2022) (Gorsuch, J., concurring). "That would be a particularly ironic outcome, given that so many States have robust nondelegation doctrines designed to ensure democratic accountability in their state lawmaking processes." *Id.* (citing Randolph J. May, *The Nondelegation Doctrine is Alive and Well in the States*, The Reg. Rev. (Oct. 15, 2020)).

This Court should reject the FCC's sweeping assertion of power because our system of government ordained by the Constitution does not allow an agency "to act unlawfully even in pursuit of desirable ends." *Alabama Ass'n of Realtors v. Dep't of Health & Human Services*, 141 S. Ct. 2485, 2490 (2021) (per curiam); *accord United States v. Gundy*, 139 S. Ct. 2116, 2133 (2019) (Gorsuch, J., dissenting).

## B.    Section 254 provides the FCC no meaningful boundaries.

There is no question that Congress may delegate some authority to the FCC by setting general standards meant to guide the agency's actions. In doing so, however, Congress must articulate "an intelligible principle" that clearly delineates the scope of agency's authority. *Mistretta v. United States*, 488 U.S. 361, 372 (1989); *see also J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 406 (1928). That test may seem "notoriously lax," Amy Coney Barrett, *Suspension and Delegation*, 99 Cornell L. Rev. 251, 318 (2014), but this case does not even involve an agency applying its expertise to fill in the technical details in

18

accord with an intelligible statutory principle that *clearly delineates the scope of agency's authority*. Section 254 leaves everything up to the Commission in executing the universal service program.

Even if this Court were to read Section 254 as articulating a "general policy" in favor of universal service, Congress provided no "boundaries" to the taxing power that it delegated to the FCC. *American Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946). Statutory boundaries are important because they respect the separation of powers.

For example, nearly forty years ago, Congress enacted a statute that directed the Secretary of Transportation to establish a schedule of annual fees for safety "based on the usage, in reasonable relationship to volume-miles, miles, revenues, or an appropriate combination thereof, of natural gas and hazardous liquid pipelines." *Skinner v. Mid-America Pipeline Co.*, 490 U.S. 212, 214 (1989) (quoting Section 7005(a)(1) of the Consolidated Omnibus Budget Reconciliation Act of 1985). Because Congress placed "multiple restrictions" on the Secretary's authority to impose those fees, the Supreme Court held that the statute satisfied the "requirements of the nondelegation doctrine." *Id.* at 220. Unlike the FCC in this case, the Secretary had "no discretion whatsoever to expand the budget" for administering the relevant safety program. *Id.*

Congress provided no such boundaries limiting the FCC's authority to impose taxes under Section 254. "Unlike the thousands of responsibilities carried out by governmental agencies on behalf of

Congress, this delegation is unique because of the unfettered power given to the Commission in defining the scope of universal service, and because Congress delegated the power to levy a tax to pay for the service with no limits, knowing that the end user, the American public, would ultimately be saddled with the burden."  Barbara A. Cherry & Donald D. Nystrom, *Universal Service Contribuions: An Unconstitutional Delegation of Taxing Power*, 2000 L. Rev. Mich. St. U. Det. C.L. 107, 110.  "This congressional obfuscation of the duty to lay taxes is an unconstitutional delegation."  *Id.*

The Court should reject Section 254's delegation of legislative authority because it upsets the balance of power that our Constitution demands.  Elected representatives of the people—not the FCC—must be responsible for making the difficult policy choices that impact on our entire nation, including the amount of the monthly telephone "fees" paid by nearly every American.  "Such assessments are in the nature of 'taxes' which under our constitutional regime are traditionally levied by Congress."  *Nat'l Cable*, 415. U.S. at 341.

By careful design, our Constitution "prescribes a process for making law, and within that process there are many accountability checkpoints." *Dep't of Transp. v. Ass'n of Am. Railroads*, 575 U.S. 43, 61 (2015) (Alito, J., concurring).  "It would dash the whole scheme if Congress could give its power away to an entity that is not constrained by those checkpoints." *Id.*  As a democratically accountable institution, Congress embodies the

will of the people. The statutory scheme for the universal service fund floats these principles. Shifting the responsibility to levy taxes to "a less accountable branch" may insulate Congress from political accountability, but that "deprives the people of the say the framers intended them to have." *Tiger Lily, LLC v. U.S. Dep't of Hous. & Urb. Dev.*, 5 F.4th 666, 673 (6th Cir. 2021) (Thapar, J., concurring). This Court therefore should reject any attempt at "outsourcing" taxation to administrative agencies. *Id.* at 675.

## C. The economics of the universal service program confirm that the FCC operates within no meaningful boundaries.

Congress encouraged the FCC to develop policies that increase the deployment and availability of advanced telecommunications and information services across the country. But there is no evidence that the FCC has implemented Section 254 in a manner that considers the effectiveness or the economic reasonableness of the universal service program. Even worse, parts of the program appear to have operated at times as a self-licking ice cream cone. *Cf.* S. Pete Worden, *On Self-Licking Ice Cream Cones*, Workshop on Cool Stars, Stellar Systems, and the Sun, 599, 600–01 (1992) (analyzing NASA's programs).[7] The Government Accountability Office has issued several reports documenting fraud, waste, and abuse in the program. *See, e.g.*, GAO-20-

---

[7] https://adsabs.harvard.edu/full/1992ASPC...26..599W

21

27, *FCC Should Take Additional Action to Manage Fraud Risks in Its Program to Support Broadband Service in High-Cost Areas* (Oct. 2019).[8]

As noted above, direct subsidies from the universal service program have ballooned over the last two decades from about $1.3 billion in 1996 to nearly $9 billion by 2019—nearly a seven-fold increase in spending that is ostensibly designed to advance telecommunications services in rural, low-income, and insular high-cost areas, as well as for schools, healthcare facilities, and libraries. Yet, during this same period, the interstate service *revenues* that fund these subsidies have been declining at an alarming rate as consumers shift to more sophisticated services that are not presently subject to the statutory "contributions." *See, e.g.*, T.J. York, *Experts Urge FCC Unilaterally Broaden Revenue Base of Universal Service Fund*, BroadbandBreakfast.com (Nov. 3, 2021).[9]

The contribution (read: tax) required to be paid by interstate service providers, which in practice gets passed on to consumers, has increased from 5.6% of interstate and international revenues at the end of 2000 to a whopping 29.1% of such revenues at the end of 2021.[10]  These two

---

[8] https://www.gao.gov/assets/gao-20-27.pdf

[9] https://broadbandbreakfast.com/2021/11/experts-urge-fcc-unilaterally-broaden-revenue-base-of-universal-service-fund/

[10] https://www.fcc.gov/document/usf-proposed-4th-quarter-contribution-factor-291-percent

opposing trends—ever-increasing subsidies doled out each year even with a declining revenue base from which to collect the tax—demonstrate the fiscal irrationality of the universal service program as the Commission continues to administer it unfettered by any meaningful statutory constraints.

Moreover, the FCC frequently seems oblivious to the real-world effects of the universal service program. For example, until about a decade ago, federal regulators distributed costly rural telephone subsidies with little examination as to whether those subsidies were needed for continuation of service, or whether they in fact contributed to lower rates for consumers or expanded rural subscriptions. Robert W. Crandall, *Letting Go? The Federal Communications Commission in the Era of Deregulation*, Review of Network Economics (Dec. 2008).[11] And, although the annual cost of the schools and libraries program has exceeded more than $2 billion, the Commission has demonstrated little interest in considering whether that spending results in any improvement in education outcomes. The only comprehensive study of this program "did not find significant effects . . . on student performance." A. Goolsbee & J. Guryan, *The Impact of Internet Subsidies in Public Schools* (2006).[12]

---

[11] https://www.degruyter.com/document/doi/10.2202/1446-9022.1159/html

[12] https://www.jstor.org/stable/40042999

That is not all.  In 2020, the FCC established the multi-billion-dollar Digital Rural Opportunity Fund purportedly to bring highspeed broadband services to rural America.  This program arguably was designed to advance the principle of increasing access in rural areas, 47 U.S.C. § 254(b)(3), but changed conditions affected "the constitutional applicability of the law," *Chastleton Corp. v. Sinclair*, 264 U.S. 543, 546 (1924).  Less than a year after it announced the rural opportunity fund, the Commission found that most households in rural areas already had access to highspeed broadband *before* the program even launched.  Indeed, as the FCC acknowledged, the rural-urban divide for highspeed broadband has been "rapidly closing" for years.  Report ¶ 2.[13]

On top of that, Congress recently enacted the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58 (Nov. 15, 2021).  According to the White House, the Act "will deliver $65 billion to help ensure that every American has access to reliable high-speed internet through a historic investment in broadband infrastructure deployment.  The legislation will also help lower prices for internet service and help close the digital divide, so that more Americans can afford internet access."

---

[13] https://www.fcc.gov/reports-research/reports/broadband-progress-reports/fourteenth-broadband-deployment-report

White House, Fact Sheet: The Bipartisan Infrastructure Deal (Nov. 6, 2021).[14]

Neither the FCC nor the Universal Service Administrative Company has suggested cutting back the budget of the universal service program despite this massive influx of spending from the Infrastructure Investment and Jobs Act. In its 2022 budget, the Commission announced that it expected to collect and eventually spend nearly $10 billion for universal service programs. FCC Budget 148 (Universal Service Fund Exhibit).[15]

## II. The FCC cannot hand off regulatory power to the Universal Service Administrative Company.

"The structural principles secured by the separation of powers" protect each branch of government from incursion by the others. *Bond v. United States*, 564 U.S. 211, 222 (2011). Just as Congress cannot delegate legislative power to an executive branch agency, the FCC likewise cannot hand off "regulatory power to a private entity." *Ass'n of Am. Railroads*, 575 U.S. at 62 (Alito, J., concurring).

The FCC's appointment of the Universal Service Administrative Company as "the permanent Administrator" of the universal service program, 47 C.F.R. § 54.701(a), raises a serious separation-of-powers

---

[14] https://www.whitehouse.gov/briefing-room/statements-releases/2021/11/06/fact-sheet-the-bipartisan-infrastructure-deal/

[15] https://docs.fcc.gov/public/attachments/DOC-372853A1.pdf

issue, *Texas v. Texas v. Comm'r of Internal Revenue*, 142 S. Ct. 1308 (Mar. 28, 2022) (statement of Alito, J., joined by Thomas and Gorsuch, JJ., respecting the denial of certiorari). "To ensure the Government remains accountable to the public, it cannot delegate regulatory authority to a private entity." *Id.* at 1309 (internal quotation marks omitted). Here, however, that is exactly what the FCC has done.

Each quarter, the Universal Service Administrative Company submits a budget to the FCC for the various programs described as "universal service support mechanisms." 47 C.F.R. § 54.709. "While the FCC has substantial authority to determine" the Company's budget and to approve its disbursements, the Ninth Circuit has concluded that Company does not simply administer the Universal Service Fund "as the FCC's agent." *Incomnet*, 463 F.3d at 1074. "The FCC only exercises power over the fund *indirectly*, essentially by overseeing USAC." *Id.* (citing 47 C.F.R. § 54.715(c)) (emphasis added).

The Commission posts the numbers on its website and then, *through agency inaction*, the budget—including the "contribution factor" (which really acts as a tax)—is "deemed approved by the Commission." 47 C.F.R. § 54.709(a)(3).

To be sure, the Universal Service Administrative Company must run the program according to the exceptionally broad principles articulated by Congress under 47 U.S.C. § 254, "but neither the specific recipients nor the specific beneficiaries are named in that statute."

*Incomnet*, 463 F.3d at 1075.  The Company "sets its own budget and, subject to FCC approval, it has *wide discretion*" to decide "if, when, and how it disburses funds."  *Id.* at 1076 (emphasis added).

This Court should not allow the FCC to hand off regulatory authority to "a private corporation" to administer this massive government-subsidy program, *Shupe*, 759 F.3d at 387, even if the Commission exercises indirect control.  The Company now rakes in nearly $10 billion each year in "contributions" (ultimately borne by consumers), which it then disburses to libraries, schools, rural areas, and carriers providing services in high-cost areas.  *Incomnet*, 463 F.3d at 1072.  Yet Congress provided no direction as to how either the FCC or the Universal Service Administrative Company should calculate rates for service providers.  And there is no statutory "ceiling" for the amount of fees that the Commission may collect or for the subsidies that it may distribute in any fiscal year.  *Skinner*, 490 U.S. at 220.

Nor is there any statutory guidance as to what qualifies as an "equitable and nondiscriminatory" contribution.   47 U.S.C. § 254(d).  Congress provided no statutory guidance as how either the FCC or the Universal Service Administrative Company should spend the contributions that they collect "to preserve and advance universal service" at libraries, schools, in rural areas, and in high-cost areas.  *Id.*  To the extent that Section 254 is read to permit the Commission to rely on a private company to administer the universal service program, that

"is delegation running riot." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 553 (1935) (Cardozo, J., concurring).

Delegation to a private entity "is not even delegation to an official or an official body, presumptively disinterested, but to private persons whose interests may be and often are adverse to the interests of others in the same business." *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936). In such cases, "there is not even a fig leaf of constitutional justification." *Ass'n of Am. Railroads*, 575 U.S. at 62 (Alito, J., concurring). "Private entities are not vested with 'legislative Powers.' Nor are they vested with the 'executive Power,' which belongs to the President." *Id.* (citations omitted).

Deciding how best to raise and to spend billions of dollars each year—including whether to connect telecommunications services to high-cost residences, schools, libraries, or rural medical facilities—encompasses precisely the hard choices that must be made by the elected representatives of the people, not a private company controlled by interested parties.

## CONCLUSION

This Court should grant the petition for review and set aside as unlawful the order of approval issued by the Federal Communication Commission authorizing the Proposed First Quarter 2022 Universal Service Contribution Factor.

Respectfully submitted,

*/s/ Jeffrey S. Beelaert*
Jeffrey S. Beelaert
 *Counsel of Record*
STEIN MITCHELL BEATO & MISSNER LLP
2000 K Street NW, Suite 600
Washington, D.C. 20006
(202) 661-0923
jbeelaert@steinmitchell.com

August 3, 2023

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of <u>Fed. R. App. P. 29(a)(5)</u> because it contains 6,049 words, excluding the parts of the brief exempted by <u>Fed. R. App. P. 32(f)</u>.

This brief also complies with the typeface requirements of <u>Fed. R. App. P. 32(a)(5)(A)</u> and the typestyle requirements of <u>Fed. R. App. P. 32(a)(6)</u> because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook, font size 14.

*/s/ Jeffrey S. Beelaert*
Jeffrey S. Beelaert
Counsel of Record for Amici Curiae

**CERTIFICATE OF SERVICE**

I certify that, on August 3, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. I further certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Jeffrey S. Beelaert*
Jeffrey S. Beelaert
Counsel of Record for Amici Curiae
