No. 22-60008

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

―――――――――――――――――――――――――――

CONSUMERS' RESEARCH; CAUSE BASED COMMERCE, INCORPORATED; KERSTEN CONWAY; SUZANNE BETTAC; ROBERT KULL; KWANG JA KERBY; TOM KIRBY; JOSEPH BAYLY; JEREMY ROTH; DEANNA ROTH; LYNN GIBBS; PAUL GIBBS; RHONDA THOMAS,

*Petitioners*,

v.

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

*Respondents*.

―――――――――――――――――――――――――――

Petition for Review of an Order of the
Federal Communications Commission

―――――――――――――――――――――――――――

## JOINT EN BANC BRIEF IN SUPPORT OF RESPONDENTS OF INTERVENORS SCHOOLS, HEALTH & LIBRARIES BROADBAND COALITION, BENTON INSTIUE FOR BROADBAND & SOCIETY, NATIONAL DIGITAL INCLUSION ALLIANCE, AND CENTER FOR MEDIA JUSTICE, DBA MEDIA JUSTICE

―――――――――――――――――――――――――――

Andrew Jay Schwartzman
1341 G Street, NW
5th Floor
Washington, DC 20005
(202) 241-2408
AndySchwartzman@gmail.com

*Counsel for Benton Institute for Broadband & Society, National Digital Inclusion Alliance, and Center for Media Justice dba MediaJustice*

Jason Neal
HWG LLP
1919 M Street, NW, 8th Floor
Washington, D.C.  20036
(202) 730-1300
jneal@hwglaw.com

*Counsel for Schools, Health & Libraries Broadband Coalition*

September 6, 2023

## CERTIFICATE OF INTERESTED PARTIES

**No. 22-60008,** *Consumers' Research, et al. v. Federal Communications Commission and United States of America*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

(1) Petitioners are: Consumers' Research; Cause Based Commerce, Incorporated; Kersten Conway; Suzanne Bettac; Robert Kull; Kwang Ja Kerby; Tom Kirby; Joseph Bayly; Jeremy Roth; Deanna Roth; Lynn Gibbs; Paul Gibbs; and Rhonda Thomas.

(2) Counsel for Petitioners are: R. Trent McCotter, Jonathan Berry, Michael Buschbacher, and Jared M. Kelson, of Boyden Gray & Associates.

(3) The Federal Communications Commission is a federal agency, and the United States of America is a respondent by statute.

(4) Counsel for the Federal Communications Commission are: P. Michele Ellison, Jacob Matthew Lewis, James Michael Carr, and Merrick Garland. Counsel for the United States of America are: Merrick Garland, Gerard J. Sinzdak, and P. Michele Ellison.

(5) Intervenor Schools, Health & Libraries Broadband (SHLB) Coalition, supporting Respondents, is an incorporated 501(c)(3) public interest

i

organization with over 300 members who share the goal of promoting open, affordable, high-quality broadband for anchor institutions and their communities.  Its members include representatives of health care providers and networks, schools, libraries, state broadband offices, private sector companies, state and national research and education networks, and consumer organizations.  A complete list is available at http://shlb.org/about/coalition-members.  Schools, Health & Libraries Broadband Coalition is a non-profit corporation that has no owners or subsidiaries; accordingly, it has no parent corporation and no publicly held corporation owns 10% or more of its stock.

(6) Counsel for Intervenor Schools, Health & Libraries Broadband Coalition is Jason Neal of HWG LLP.

(7) Benton Institute for Broadband & Society, the National Digital Inclusion Alliance, and the Center for Media Justice doing business as MediaJustice have intervened in this appeal in support of Respondents.  Counsel for those intervenors is Andrew Jay Schwartzman.

(8) USTelecom – The Broadband Association, National Telecommunications Cooperative Association, dba NTCA – The Rural Broadband Association, and Competitive Carriers Association have intervened in this appeal in

support of Respondents. Counsel for those intervenors are Jennifer Tatel and Craig Edward Gilmore of Wilkinson, Barker & Knauer LLP.

(9) TechFreedom has filed an *amicus curiae* brief in this case in support of Petitioners. Counsel for TechFreedom are Corbin K. Barthold, Berin Szóka, and James E. Dunstan.

(10) Competitive Enterprise Institute, Free State Foundation, Christopher DeMuth, Harold Furchtgott-Roth, Michael S. Greve, and Randolph J. May have filed an *amicus curiae* brief in this case in support of Petitioners. Counsel for those *amici* are Jeffrey S. Beelaert, Michael Petrino, and Sam Kazman.

(11) New Civil Liberties Alliance has filed an *amicus curiae* brief in this case in support of Petitioners. Counsel for New Civil Liberties Alliance are Kaitlyn D. Schiraldi and Zhonette M. Brown.

(12) Public Knowledge has filed an *amicus curiae* brief in this case in support of Respondents. Counsel for Public Knowledge is Gregory Guice.

(13) Emeritus Professor Robert Frieden has filed an *amicus curiae* brief in support of Respondents. Counsel for Professor Frieden are Eric P. Gotting and James Baller of Keller and Heckman LLP.

(14) Senators John Thune, Shelley Moore Capito, Deb Fischer, Amy Klobuchar, and Ben Ray Luján and Representatives James E. Clyburn, Mike

Doyle, Dusty Johnson, Tom O'Halleran, and Peter Welch, have filed an
*amicus curiae* brief in support of Respondents.  Counsel for those *amici* are
David M. Gossett, Thaila K. Sundaresan, and MaryAnn T. Almeida of Davis
Wright Tremaine LLP.

(15) Pursuant to Fifth Circuit Rule 28.2.1, the following describes the "large
group of persons or firms" that are "financially interested in the outcome" of
this litigation: Petitioners challenge the Federal Communications
Commission's approval of the *Proposed First Quarter 2022 Universal
Service Contribution Factor*, Public Notice, DA 21-1550, CC Docket
No. 96-45 (rel. Dec. 13, 2021).  Telecommunications companies obligated to
pay a percentage of their interstate end-user revenues to the Universal
Service Fund based on the Contribution Factor are financially interested in
the outcome of this litigation.  The Universal Service Fund pays for four
programs: the "Lifeline/Link Up" program, the "High-Cost" program, the
"Schools and Libraries" program, and the "Rural Health Care" program.
*See*, *e.g.*, Federal Communications Commission, *Universal Service Support
Mechanisms*, https://www.fcc.gov/consumers/guides/universal-service-
support-mechanisms (last visited Aug. 18, 2023).  Direct beneficiaries of
those programs, providers of services covered by those programs, and many

other participants in the overall telecommunications industry are financially

interested or potentially interested in the outcome of this litigation.

Dated: September 6, 2023                          /s/ Jason Neal

                                                 Jason Neal
                                                 *Counsel of Record for Schools,*
                                                 *Health & Libraries Broadband*
                                                 *Coalition*

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................1

JURISDICTIONAL STATEMENT ..............................................................4

STATEMENT OF ISSUES PRESENTED......................................................4

STATEMENT OF THE CASE......................................................................4

SUMMARY OF ARGUMENT ...................................................................14

ARGUMENT ............................................................................................16

I.    PETITIONERS' LATE CHALLENGE TO THE UNIVERSAL SERVICE
      FUND WOULD DISRUPT THE ECONOMY AND DISCONNECT
      MILLIONS OF AMERICANS AND ANCHOR INSTITUTIONS. ............16

II.   PETITIONERS' ARGUMENTS THAT THEIR REQUESTED RELIEF
      WOULD NOT CAUSE "ANY MEANINGFUL DISRUPTION" ARE
      WRONG. ..........................................................................................29

CONCLUSION .........................................................................................32

# TABLE OF AUTHORITIES

## CASES

*Consumers' Research v. FCC,*
    67 F.4th 773 (6th Cir. 2023) ............................................................11

*In re FCC 11-161,*
    753 F.3d 1015 (10th Cir. 2014) .........................................................10

*Texas Off. of Pub. Util. Couns. v. FCC,*
    183 F.3d 393 (5th Cir. 1999) ....................................................4, 6, 9

*Qwest Corp. v. FCC,*
    258 F.3d 1191 (10th Cir. 2001) .......................................................10

## STATUTES

47 U.S.C. § 151 ..................................................................................4

47 U.S.C. § 254 ..................................................................................1

47 U.S.C. § 254(a)(2) .....................................................................2, 5

47 U.S.C. § 254(b) .............................................................................5

47 U.S.C. § 254(b)(2) ........................................................................1

47 U.S.C. § 254(b)(3) ...............................................................1, 6, 26

47 U.S.C. § 254(b)(5) ........................................................................6

47 U.S.C. § 254(b)(6) .............................................................1, 17, 21

47 U.S.C. § 254(c)(1) .........................................................................6

47 U.S.C. § 254(c)(3) .........................................................................7

47 U.S.C. § 254(d) ..........................................................................2, 7

47 U.S.C. § 254(h)(1)(A) ..............................................................7, 21

47 U.S.C. § 254(h)(1)(B) ..............................................................7, 17

47 U.S.C. § 254(h)(7)(B) ................................................................21

47 U.S.C. § 254(i) ............................................................................24

47 U.S.C. § 254(j) ............................................................................24

Telecommunications Act of 1996,
    Pub. L. No. 104-104, 110 Stat. 56 ....................................................1

## REGULATIONS

47 C.F.R. §§ 54.500-54.523 ...................................................................18

47 C.F.R. § 54.503 .................................................................................18

47 C.F.R. § 54.505 .................................................................................19

47 C.F.R. §§ 54.600-54.633 ...................................................................21

47 C.F.R. § 54.620 .................................................................................23

47 C.F.R. § 54.712 ...................................................................................7

## ADMINISTRATIVE MATERIALS

*Connect America Fund*,
   26 FCC Rcd. 17663 (2011) .................................................................5

*Federal-State Joint Board on Universal Service*,
   12 FCC Rcd. 18400 (1997) .................................................................9

*Federal-State Joint Board on Universal Service*,
   12 FCC Rcd. 8776 (1997) ................................................................7, 8

*Inquiry Concerning Deployment of Advanced Telecommunications
   Capability to All Americans in a Reasonable and Timely Fashion*,
   2020 Broadband Deployment Report,
   35 FCC Rcd. 8986 (2020) .................................................................18

Letter from AARP et al. to Chairman Ajit V. Pai, FCC, et al.,
   WC Docket No. 17-287 (filed May 23, 2018) ..................................25

Letter from Gov. Michael J. Dunleavy, State of Alaska, to Marlene H.
   Dortch, Secretary, FCC, WC Docket No. 17-310
   (filed Nov. 12, 2019) ........................................................................23

*Lifeline and Link Up Reform and Modernization*,
   31 FCC Rcd. 3962 (2016) .................................................................24

Press Release, FCC, *FCC Announces Nearly $800 Million for
   Broadband Through the Rural Digital Opportunity Fund*
   (Aug. 31, 2022) .................................................................................27

*Promoting Telehealth in Rural America*,
   34 FCC Rcd. 7335 (2019) .................................................................22

*Report on the Future of the Universal Service Fund*, Notice of
   Inquiry, 36 FCC Rcd. 18006 (2021). ..................................................5

*Rural Digital Opportunity Fund Phase I Auction (Auction 904)*,
  35 FCC Rcd. 13,888 (2020) ........................................................... 27

Wireline Competition Bureau, FCC, *Report on the State of the Lifeline
  Marketplace*, WC Docket No. 20-437 (June 2021) ......................... 25

**OTHER AUTHORITIES**

Ann Treacy, *Report: Electric Coops in North East Mississippi Using
  RDOF Funds to Expand Broadband* (Dec. 12, 2022) ..................... 28

Benjamin Herold, *The Slowest Internet in Mississippi: Rural Schools
  Still Struggle to Get Connected*, Education Week (Nov. 19, 2015),
  https://www.edweek.org/technology/the-slowest-internet-in-
  mississippi-rural-schools-still-struggle-to-get-connected/2015/11 ................. 17

Bill Callaghan et al., *The Discount Internet Guidebook*, National
  Digital Inclusion Alliance and Public Knowledge (2018) .............. 13

Federal Communications Commission, *E-Rate – Schools and
  Libraries USF Program*, https://www.fcc.gov/general/e-rate-
  schools-libraries-usf-program ........................................................... 18

Federal Communications Commission, *E-Rate: Universal Service
  Program for Schools and Libraries*,
  https://www.fcc.gov/consumers/guides/universal-service-program-
  schools-and-libraries-e-rate ............................................................. 17

Federal Communications Commission, *Universal Service Support
  Mechanisms*, https://www.fcc.gov/consumers/guides/universal-
  service-support-mechanisms ............................................................. iv

Funds For Learning, 2021 E-Rate Trends Report,
  https://fundsforlearning.app.box.com/s/
  naiavth3yjfij2fbhkpg7n85h2h8sp3p ................................................. 19

John B. Horrigan, *Reimagining Lifeline: Universal Service,
  Affordability, and Connectivity*, Benton Institute for Broadband &
  Society (Feb. 2022) ........................................................................... 13

Jordan Arnold, *Broadband Solutions for the Farm Office, Field, and
  Community*, Benton Institute for Broadband & Society
  (Sept. 2021) ....................................................................................... 13

MAISA, *State Education Network (SEN)*,
  https://www.gomaisa.org/projects/state-education-network-sen/ ............. 20

National Digital Inclusion Alliance, *Worst Connected Cities 2019*,
https://www.digitalinclusion.org/worst-connected-cities-2019/ .......................13

Texas State Library and Archives Commission, *Libraries Connecting
Texas*, https://www.tsl.texas.gov/broadband ....................................................20

The Quilt Circle, *Merit Network's commitment to schools stayed
strong in 2021* (2022) .......................................................................................20

Tyler Cooper, *Report: Every ETC Registered with the FCC's Lifeline
Program*, BroadbandNow (Dec. 7, 2021) .........................................................25

Universal Service Administrative Company, *2022 Annual Report*,
https://www.usac.org/wp-content/uploads/about/documents/
annual-reports/2022/USAC_2022_Annual_Report.pdf ............... 18, 22, 24, 26

Universal Service Administrative Company, *E-Rate Search
Commitments Tool*, https://opendata.usac.org/stories/s/jj4v-cm5x ..................19

Universal Service Administrative Company, *RHC Commitments and
Disbursements Tool*, https://opendata.usac.org/Rural-Health-
Care/RHC- Commitments-and-Disbursements-Tool/sm8n-gg82 ....................22

**INTRODUCTION**

Almost three decades ago, Congress passed the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56, which overhauled telecommunications law and sought to usher in a new age of competition in the provision of telecommunications service to consumers.  Among other things, the 1996 Act amended the Communications Act of 1934 to add 47 U.S.C. § 254—a lengthy and detailed codification of the century-old concept of "universal service."  "Universal service," Congress explained, meant among other things that (1) "[a]ccess to advanced telecommunications and information services should be provided in all regions of the Nation," (2) "low-income consumers and those in rural, insular, and high cost areas should have access to telecommunications and information services … that are reasonably comparable" in kind and price to those available in urban areas, and (3) "[e]lementary and secondary schools and classrooms, health care providers, and libraries should have access to advanced telecommunications services."  *Id.* §§ 254(b)(2), (3), (6).

Congress also set out the respective roles of service providers and the Federal Communications Commission ("FCC" or "Commission") in "preserv[ing] and advanc[ing]" universal service.  With respect to service providers, Congress required that "[e]very telecommunications carrier that provides interstate telecommunications services shall contribute, on an equitable and

nondiscriminatory basis, to the specific, predictable, and sufficient mechanisms

created by the Commission to preserve and advance universal service." *Id.*

§ 254(d). And with respect to the FCC, Congress provided specific principles,

requirements, and guardrails to limit and guide the Commission in the creation and

maintenance of those "Federal universal service support mechanisms." *Id.*

§ 254(a)(2); *see, e.g.*, Resp. Supp. Br. 25-42 (describing those principles at length).

 In 1997, the Commission implemented Congress's directions and

established the Universal Service Fund ("USF" or "Fund"). In the ensuing

decades, the FCC has continually reviewed and modernized the USF in rulemaking

proceedings. And in those same years, an ecosystem of service providers, rural

healthcare facilities, schools, libraries, and millions upon millions of consumers

have all come to rely on the USF. Service providers have built networks in high-

cost areas because of USF support; rural healthcare facilities are able to offer

telemedicine and use modern technologies because of USF support; and schools

and libraries have entered into contracts for broadband internet service made

affordable because of USF support.

Petitioners ask the Court to pull the rug out from beneath all of this. They

have not participated in the numerous FCC proceedings over the years shaping the

programs to which they now object. Instead, beginning in September 2021,

attorneys for Petitioners began filing the same lengthy comments in response to

quarterly FCC public notices, repeatedly arguing that the "entire" Universal Service Fund is "illegal." A114, A168. As the Commission continued the business it has carried on for decades, Petitioners began filing petitions for review in this Circuit and others, asking courts to declare the Fund unlawful—not because of some recent change, but based on Congress's grant of authority to the FCC nearly three decades ago.

Intervenors agree with the FCC and with Intervenors USTelecom, et al. that Petitioners' constitutional arguments lack merit, and this brief will not repeat those arguments. Intervenors submit this brief to emphasize how Petitioners' challenge threatens to inflict enormous disruption on the U.S. economy, upending the business and service plans of the many Universal Service Fund stakeholders. A decision in favor of Petitioners would abruptly cut off the connections of schools, libraries, health care providers, and rural and low-income consumers across the country at a time when access these services to has never been more critical to participation in American life. The impact would be felt not only by direct recipients of USF support, but also all other communications subscribers who are able to connect with them as a result.

The Court should reject Petitioners' challenge.

## JURISDICTIONAL STATEMENT

Intervenors adopt the jurisdictional statement from Respondents' supplemental brief.  *See* Resp. Supp. Br. 1.  In addition, Intervenors note the jurisdictional issues raised in their merits brief at the panel stage based on the Hobbs Act.  *See* SHLB et al. Merits Br. 16-26.

## STATEMENT OF ISSUES PRESENTED

Intervenors adopt the statement of issues from Respondents' brief.  *See* Resp. Supp. Br. 2.

## STATEMENT OF THE CASE

***Universal Service, Section 254, and the FCC's Implementation of Congress's Directions.***  Universal service principles at the foundation of this case trace back at least as far as the original Communications Act of 1934, which created the Commission and tasked the new agency with regulating to "make available, so far as possible, to all the people of the United States … a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges." 47 U.S.C. § 151.  "Armed with this statutory mandate, the FCC historically … focused on increasing the availability of reasonably priced, basic telephone service via the landline telecommunications network," through a "combination of implicit and explicit subsidies." *Texas Office of Public Utility Counsel v. FCC*, 183 F.3d 393, 406 (5th Cir. 1999) *TOPUC I*").

To fulfill the statutory goal of connecting families and businesses throughout the country to their relatives and customers located in rural, insular, and high-cost areas, the FCC imposed access charges on long-distance carriers (*i.e.*, AT&T for much of the 20th century, followed by several geographically confined successors and new competitors after the company's breakup in 1984), paid to local exchange companies, *i.e.*, telephone companies. To help low-income consumers afford service so that families and businesses could reach them and vice-versa, especially in the wake of AT&T's divestiture, the Commission created programs to defray certain costs that the Commission feared would cause a significant number of subscribers to cancel their service. *See, e.g.*, *Report on the Future of the Universal Service Fund*, Notice of Inquiry, 36 FCC Rcd. 18006, ¶ 33 (2021).

In the Telecommunications Act of 1996, Congress "built upon" these longstanding universal service principles "by enacting section 254." *Connect America Fund*, 26 FCC Rcd. 17663, ¶ 61 (2011). In Section 254, Congress required the FCC to hold a proceeding and adopt rules regarding the "services that are supported by Federal universal service support mechanisms," 47 U.S.C. § 254(a)(2), and it mandated that the Commission base its "policies for the preservation and advancement of universal service" on seven specific principles codified in the statute, *id.* § 254(b). As described in the following paragraphs, Congress also established further guardrails to cabin the FCC's discretion,

including descriptions of specific programs and a statutory codification of the requirement that interstate telecommunications carriers contribute.

Recognizing the rapid development of technology, including wireless telephony and the internet, Congress directed the Commission to establish the "evolving level of telecommunications services" that should be "supported by Federal universal service support mechanisms," and limited its discretion by requiring it to "consider the extent to which such telecommunications services— (A) are essential to education, public health, or public safety; (B) have … been subscribed to by a substantial majority of residential customers; (C) are being deployed in public telecommunications networks by telecommunications carriers; and (D) are consistent with the public interest, convenience, and necessity." *Id.* § 254(c)(1). Congress also constrained the FCC's discretion and guided the design of the Universal Service Fund programs in many additional ways. For example:

- In place of the previous "patchwork of explicit and implicit subsidies" for high-cost areas and low-income individuals, Congress substituted concrete limits requiring the FCC to adopt "'specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service.'" *TOPUC I*, 183 F.3d at 406 (quoting 47 U.S.C. § 254(b)(5)).

- Congress directed the FCC to ensure that "low-income consumers and those in rural, insular, and high cost areas" have access to "services … that are reasonably comparable to those services provided in urban areas … at rates that are reasonably comparable to rates charged for similar services in urban areas." 47 U.S.C. § 254(b)(3).

6

- Congress also created new requirements to promote universal service for health care providers in rural areas, *id.* § 254(h)(1)(A), with specific details for how that support mechanism should operate. Congress required participating "telecommunications carrier[s]" to "provide telecommunications services which are necessary for the provision of health care services" to "any public or nonprofit health care provider" serving "persons who reside in rural areas," at "rates that are reasonably comparable to rates charged for similar services in urban areas" in the same state. *Id.*

- Congress likewise created new requirements to promote universal service for schools and libraries, *id.* § 254(h)(1)(B), and again specified how the Commission should organize the program. Congress required participating "telecommunications carriers" to provide "services that are within the definition of universal service" to "elementary schools, secondary schools, and libraries for educational purposes at rates less than the amounts charged for similar services to other parties." *Id.*; *see also id.* § 254(c)(3).

- To sustainably fund those universal service objectives, Congress expressly required "[e]very telecommunications carrier that provides interstate telecommunications services … [to] contribute, on an equitable and nondiscriminatory basis, to the specific, predictable, and sufficient mechanisms" that the FCC creates pursuant to the statute. *See id.* § 254(d). This scheme permitted, but did not mandate, the pass-through of these contributions to customers. *See* 47 C.F.R. § 54.712.

The FCC responded to Congress's directions in May 1997, adopting a Report and Order that "put[] in place a universal service support system" commonly known as the Universal Service Fund, consistent with the "explicit statutory principles" in Section 254. *Federal-State Joint Board on Universal Service*, 12 FCC Rcd. 8776, ¶ 2 (1997); *see also id.* ¶ 7 ("When it enacted section 254 of the Communications Act, Congress set forth the principles to guide universal service reform" and charged the Commission with "implement[ing] these

7

principles"). Pursuant to Section 254, the Commission adopted four universal

service programs, which continue in modernized forms to this day:

- To promote "universal service for high cost areas," the FCC put in motion the development of a "forward-looking universal service support mechanism based on forward-looking economic cost for non-rural carriers." *Id.* ¶ 26.

- For "low-income consumers," the Commission expanded and modified its existing programs "so that they better comport with our universal service principles" and the requirements of the 1996 Act. *Id.* ¶ 27.

- For "schools and libraries," the Commission created a program to "provide schools and libraries with discounts" on telecommunications services based on "competitive bids" from service providers based on authority under Sections 254(c)(3) and 254(h)(1)(B). *Id.* ¶¶ 29-30.

- For rural health care providers, based on Congress's directions in "Sections 254(c) and 254(h)," the Commission required telecommunications carriers to "charge eligible rural health care providers a rate for supported service that is no higher than the highest tariffed or publicly available commercial rate for a similar service in a nearby city." *Id.* ¶ 35.

To fund these four programs, pursuant to Section 254(d), the Commission adopted

rules to require "all carriers that provide interstate telecommunications services

[to] contribute to the support mechanisms" and established a "contribution

assessment methodology that is competitively neutral and easy to administer." *Id.*

¶¶ 39-40. Two months later, "[c]onsistent with [the] determinations" in the May

1997 order, the Commission set the total amount of required contributions as equal

to the amount of funding, taken together, necessary to implement the four

congressionally-directed universal service programs. *Federal-State Joint Board on Universal Service*, 12 FCC Rcd. 18400, ¶¶ 45-50 (1997).

Multiple parties timely filed petitions for review of the FCC's 1997 decision implementing Section 254. In particular, a long list of petitioners and intervenors appeared in this Court to challenge the FCC's "universal service support system for high-cost areas … [o]n both statutory and constitutional grounds," claiming that it was "an encroachment on state authority over intrastate telecommunications regulations," and "challeng[ing] the FCC's system for assessing contributions." *TOPUC I*, 183 F.3d at 408. They also challenged the FCC's "programs supporting schools, libraries, and health care providers" as exceeding the FCC's "statutory authority" in several respects. *Id.* at 408-09. One petitioner attacked the "universal service contribution requirement as an unconstitutional tax," including an "unconstitutional delegation of Congress's exclusive taxing power under the Taxing Clause," as "a violation of equal protection, and [as] an uncompensated taking." *Id.* at 426. Other parties complained that the contribution assessment system was "unconstitutionally vague." *Id.* at 430. This Court granted relief in part, holding that the Commission "exceeded its statutory authority" in particular respects not at issue here. *Id.* at 449 ("the agency exceeded its statutory authority in (1) prohibiting the states from imposing eligibility requirements and (2) requiring [incumbent local exchange carriers] to recover their contributions

from access charges" and lacked jurisdiction over "local service disconnections" and "universal service contributions based on intrastate revenues").

Since 1997, the Commission has continued to develop and modify the universal service programs to achieve Congress's universal service objectives, in keeping with Congress's statutory directives. In response, interested parties have submitted comments, filed requests for reconsideration, and raised arguments on numerous grounds in favor of or against Commission decisions. As the Commission adopted orders modernizing the programs in accordance with Congress's universal service objectives, interested parties brought timely challenges, including claims that the Commission's actions were unconstitutional. *See, e.g.*, *Qwest Corp. v. FCC*, 258 F.3d 1191, 1196-98 (10th Cir. 2001) (considering several challenges to the FCC's "Ninth Order" and "Tenth Order" "reconsider[ing] and refin[ing]" particular aspects of the universal service programs). Notably, when the Commission modernized universal service to include broadband service in 2011, over 50 parties petitioned for review or intervened in the case, which included constitutional challenges to the Commission's decisions. *See In re FCC 11-161*, 753 F.3d 1015, 1089 (10th Cir. 2014). In all these years, however, it appears that neither Cause Based Commerce nor any other Petitioner in this case has ever commented on the

Commission's proposals for, sought reconsideration of, or participated in court challenges to the FCC's universal service program.

*Petitioners' Repeated Challenges to the Legality of the USF.*  Instead, in the fall of 2021, Petitioners began submitting lengthy filings in response to each successive ministerial public notice issued by the Commission regarding its calculation of the contribution factor to support USF for the coming quarter. After their first Commission filing, Petitioners unsuccessfully challenged the relevant quarterly contribution factor in the Sixth Circuit.  *See Consumers' Research v. FCC*, 67 F.4th 773, 777-78 (6th Cir. 2023) (rejecting Petitioners' challenge), *reh'g en banc denied*, 2023 WL 3807406 (no noted dissents). Petitioners filed essentially the same comments the following quarter in response to the *Proposed First Quarter 2022 Universal Service Contribution Factor*, Public Notice, DA 21-1550, CC Docket No. 96-45 (rel. Dec. 13, 2021) ("*First Quarter 2022 Contribution Public Notice*"), A100-104, and then brought this challenge.  Petitioners have continued to challenge every quarterly contribution factor, occasionally adding new Petitioners and filing in new courts.  The current tally by Intervenors' count is four Fifth Circuit challenges, two Sixth Circuit challenges, one Eleventh Circuit challenge, and one D.C. Circuit challenge.[1]

---

[1]  *See Consumers' Research et al. v. FCC*, 6th Cir. No. 21-3886 (challenging Fourth Quarter 2021 Contribution Public Notice); *Consumers' Research et al.*

*Intervenors' Interests.* Intervenors joined this case and others to support the many educational institutions, health care providers, and American consumers and businesses that—in the more than 20 years since the FCC established the Fund—have come to rely upon it for mission-critical broadband and other communications services. The Schools, Health & Libraries Broadband ("SHLB") Coalition is a public interest organization whose mission is to promote open, affordable, high-quality broadband for anchor institutions and their communities. SHLB and its members, who include many universal service recipients, support the E-Rate, Rural Health Care, and other universal service programs to ensure that community anchor institutions have access to broadband internet access—the essential 21st century tool they need to serve and benefit the public.

Benton Institute for Broadband & Society is a 41-year-old, private operating foundation that conducts research and engages in advocacy to bring open, affordable, high-performance broadband to all people in the United States to

---

*v. FCC*, 5th Cir. No. 22-60008 (challenging First Quarter 2022 Contribution Public Notice); *Consumers' Research et al. v. FCC*, 5th Cir. No. 22-60195 (challenging Second Quarter 2022 Contribution Public Notice); *Consumers' Research et al. v. FCC*, 5th Cir. No. 22-60363 (challenging Third Quarter 2022 Contribution Public Notice); *Consumers' Research et al. v. FCC*, 11th Cir. No. 22-13315 (challenging Fourth Quarter 2022 Contribution Public Notice); *Consumers' Research et al. v. FCC*, 6th Cir. No. 22-4069 (challenging First Quarter 2023 Contribution Public Notice); *Consumers' Research et al. v. FCC*, D.C. Cir. No. 23-1091 (challenging Second Quarter 2023 Contribution Public Notice); *Consumers' Research et al. v. FCC*, 5th Cir. No. 23-60359 (challenging Third Quarter 2023 Contribution Public Notice).

ensure a thriving democracy.  To advance its mission, Benton seeks to assist

enrollment in USF-funded programs in many ways and conducts policy research

on USF-funded programs.[2]

National Digital Inclusion Alliance is a non-profit 501(c)(3) organization

supporting a community of digital inclusion practitioners and advocates who

engage in local and state-level efforts across the United States to promote equitable

internet access, adoption, and use for low- and moderate-income households and

communities, whether urban, rural, or Tribal.  In addition to participating in

proceedings at the Federal Communications Commission, National Digital

Inclusion Alliance provides educational resources to its affiliates and the public on

affordability and digital equity.[3]  Many of National Digital Inclusion Alliance's

---

[2]    Jordan Arnold, *Broadband Solutions for the Farm Office, Field, and Community*, Benton Institute for Broadband & Society (Sept. 2021), *available at* https://www.benton.org/sites/default/files/FutureAmericanFarming.pdf (detailed reporting regarding how broadband access affects the economy of rural America); John B. Horrigan, *Reimagining Lifeline: Universal Service, Affordability, and Connectivity*, Benton Institute for Broadband & Society (Feb. 2022), *available at* https://www.benton.org/sites/default/files/ reimagininglifeline_final1_0.pdf (analysis based on a high-quality national poll of potential and actual Lifeline subscribers).

[3]    *See, e.g.*, Bill Callaghan *et al.*, *The Discount Internet Guidebook*, National Digital Inclusion Alliance and Public Knowledge (2018), *available at* https://discounts.digitalinclusion.org/pdfs/Discount%20Internet%20Guidebook %20v3.1.pdf (illustrating how private-sector initiatives and Universal Service Fund programs can expand access to areas that lack adequate connectivity); National Digital Inclusion Alliance, *Worst Connected Cities 2019*,

625 affiliates, located in 46 states, directly support people and institutions who use Universal Service Fund programs that enable users to obtain more affordable access to communications services and technology, such as Lifeline, E-Rate, the High Cost Fund, and its successor program, the Rural Digital Opportunity Fund.

The Center for Media Justice dba MediaJustice is a non-profit, 501(c)(3) organization established in 2009. It is dedicated to democratizing the economy, government, and society through policies and practices that, among other things, ensure democratic media ownership, fundamental communication rights, and universal media and technology access at affordable prices. MediaJustice has a network of over 100 local, regional, or statewide affiliate social-justice organizations. MediaJustice and its affiliates directly support programs that enable users to obtain more affordable access to communications services and technology, including the Lifeline and E-Rate programs funded by the Universal Service Fund.

## SUMMARY OF ARGUMENT

Based on specific directions in Section 254, the Commission created four Universal Service Fund programs seeking to preserve and advance distinct aspects of universal service as described in the statute. During the over twenty years of the Universal Service Fund's existence, millions of American schools, libraries, health

---

https://www.digitalinclusion.org/worst-connected-cities-2019/ (last visited Aug. 15, 2023).

care providers, companies, and rural and low-income consumers have relied on the Fund for vital communications services.

Petitioners' campaign to eliminate the Universal Service Fund would upend the communications sector, throwing the business plans and service agreements of small companies and large carriers into chaos. Beyond that, it threatens to abruptly disconnect students, teachers, library patrons, rural health care providers and their patients, and consumers in rural communities and low-income households—all of whom rely on the Fund for voice and internet services today. This would, in turn, cause enormous disruption to the economy and impair the provision of critical educational and health care services across the country.

Petitioners briefly suggest that a declaration that this decades-old system is now illegal would not cause "any meaningful disruption." Pet. Supp. Br. 66. They are wrong. Neither reason they offer in support of this position withstands scrutiny. The consequences of declaring the entire Universal Service Fund to be unconstitutional would be chaotic and very disruptive.

## ARGUMENT

I.   **PETITIONERS' LATE CHALLENGE TO THE UNIVERSAL SERVICE FUND WOULD DISRUPT THE ECONOMY AND DISCONNECT MILLIONS OF AMERICANS AND ANCHOR INSTITUTIONS.**

In Section 254, Congress provided the Commission specific direction regarding each of the Universal Service Fund programs.  During the many years in which Petitioners declined to raise any constitutional objections to the USF program in the FCC's many proceedings,[4] millions of schools, libraries, health care providers, companies, and rural and low-income consumers have come to rely on the universal service programs for internet access and other critical communications services.  Petitioners' arguments risk massive disruption to the communications sector and threaten to jeopardize carriers' long-standing business plans, disrupting cash flow and interfering with capital investment plans.  They also threaten to abruptly cut off educational institutions, libraries, health care providers, businesses, and consumers who depend on universal service funding for vital communications services today.  Businesses and other stakeholders relying on each of the FCC's four universal service programs would be severely harmed.

---

[4]   Petitioner Consumers' Research, for example, was founded in 1929, and Petitioner Cause Based Commerce was incorporated in 1996 and appears to have been offering interstate telecommunications services since at least 2006. *See* SHLB et al. Merits Br. 9-10.

***E-Rate Program.***  In Section 254(h), Congress provided specific direction to the Commission to establish a sustainable universal service program (commonly called "E-Rate") to ensure that schools and libraries have affordable access to advanced communications services.  47 U.S.C. § 254(h)(1)(B); *see also id.* § 254(b)(6).

When the E-Rate program was established in 1996, "only 14 percent of the nation's K-12 classrooms" had even basic access to the internet.[5]  The lack of affordable high-quality broadband service at schools and libraries was most acute in rural areas, like Calhoun County, Mississippi, where schools were paying "astronomical fees" for woefully slow internet speeds over copper lines.[6]

In 2014, the Commission modernized the E-Rate program to focus funding on providing schools and libraries with affordable broadband connectivity and internal Wi-Fi networks.  The Commission established an annual cap for the program currently at $4.456 billion, and E-Rate has achieved tremendous results

---

[5]  Federal Communications Commission, *E-Rate: Universal Service Program for Schools and Libraries*, https://www.fcc.gov/consumers/guides/universal-service-program-schools-and-libraries-e-rate (last updated Sept. 15, 2021).

[6]  Benjamin Herold, *The Slowest Internet in Mississippi: Rural Schools Still Struggle to Get Connected*, Education Week (Nov. 19, 2015), https://www.edweek.org/technology/the-slowest-internet-in-mississippi-rural-schools-still-struggle-to-get-connected/2015/11.

while staying well below its budget.[7]  With support from E-Rate and other

programs, as of 2020, 99% of school districts obtained broadband service of at

least 100 megabits per second per 1,000 users, connecting over 46 million

students.[8]  There is more work to be done, however, as only 38% of school districts

met the Commission's long-term goal of 1 gigabit per second per 1,000 users.  In

2022 alone, over 128,500 schools, school facilities, and libraries participated in the

E-Rate program, receiving discounts totaling approximately $2 billion.  Universal

Service Administrative Company, *2022 Annual Report*, at 9,

https://www.usac.org/wp-content/uploads/about/documents/annual-reports/2022/

USAC_2022_Annual_Report.pdf ("USAC 2022 Annual Report").

 Pursuant to long-standing FCC rules, schools and libraries have typically

entered into years-long contracts for eligible telecommunications and broadband

internet service with providers.  *See* 47 C.F.R. §§ 54.500-54.523.  Participating

schools and libraries regularly conduct competitive bidding processes to find

providers for their desired services, *see id.* § 54.503, with universal service funding

enabling discounts of generally 20-90% from the "pre-discount price."  *Id.*

---

[7] Federal Communications Commission, *E-Rate – Schools and Libraries USF Program*, https://www.fcc.gov/general/e-rate-schools-libraries-usf-program (last updated Aug. 14, 2023).

[8] *Inquiry Concerning Deployment of Advanced Telecommunications Capability to All Americans in a Reasonable and Timely Fashion*, 2020 Broadband Deployment Report, 35 FCC Rcd. 8986, ¶ 52 (2020).

§ 54.505(a)-(b).  The ultimate E-Rate beneficiaries are the millions of students, teachers, and library patrons across the country who depend on this universal service program for access to the advanced communications equipment and services necessary for modern education.  The data confirm this: in one recent survey of 2,164 E-Rate applicants—one-tenth of the total E-Rate application base—over 94.5% of respondents agreed that "E-Rate funding is vital to [their] organization's Internet connectivity goals." Funds For Learning, 2021 E-Rate Trends Report, at 25, https://fundsforlearning.app.box.com/s/ naiavth3yjfij2fbhkpg7n85h2h8sp3p ("2021 E-Rate Trends Report").

Petitioners' untimely challenge threatens to cut off educational connectivity for millions of students, teachers, and library users.  Without the E-Rate program discounts, schools, and libraries across the country may no longer be able to afford the broadband connectivity they currently rely upon to provide essential educational services. *See id.* (96.7% of respondents agree that they "connect more students and/or library patrons to the Internet because of the E-Rate program"). For example, in Mississippi, Louisiana, and Texas alone, E-Rate has committed over $2.4 billion for schools and libraries since 2016.[9]  And this impact is

---

[9]    Universal Service Administrative Company, *E-Rate Search Commitments Tool*, https://opendata.usac.org/stories/s/jj4v-cm5x (last visited Aug. 8, 2023).  To use the tool, click the drop-down menu for "Billed Entity State" and select "LA," "MS," and "TX" for a breakdown of commitments and disbursements for each state.

replicated across the country.  In Michigan, E-Rate program funds have recently made it possible for SHLB member Merit Network to offer Michigan schools across the state superior speeds "for a mere $.50/mb," MAISA, *State Education Network (SEN)*, https://www.gomaisa.org/projects/state-education-network-sen/ (last visited Sept. 5, 2023), as well as a fiber project in the Detroit Public Schools Community District providing "all 109 schools in the district" with "state-of-the-art broadband and creating opportunities for greater access, speed, and reliability." The Quilt Circle, *Merit Network's commitment to schools stayed strong in 2021*, at 10 (2022), *available at* https://www.thequilt.net/wp-content/uploads/2022/04/ TheQuiltCircle2022_FINAL_web-1.pdf.  Those projects would not be sustainable without E-Rate support.  At a minimum, without E-Rate, schools and libraries would face much higher fees for the critical internet access services and equipment that make those institutions community anchor points for accessing broadband. *See, e.g.*, Texas State Library and Archives Commission, *Libraries Connecting Texas*, https://www.tsl.texas.gov/broadband (last visited Aug. 15, 2023) (describing how "Public libraries are the only source of public Internet access for approximately 60% of communities" as of 2018 and encouraging Texas public libraries to participate in E-Rate).

In addition, companies that have invested in networks and facilities to serve the schools and libraries that participate in the decades-old E-Rate program would

be left in unsustainable financial positions.  Petitioners' challenge would throw thousands of service contracts into disarray and undermine educational opportunities for millions of students, teachers, and community members that rely on broadband in their schools and libraries.

    ***Rural Health Care Program.***  In Section 254(h), Congress also expressly provided universal service funding to support access for rural health care providers (a congressionally defined term, *see* 47 U.SC. § 254(h)(7)(B)) to affordable advanced communications services.  *See id.* § 254(h)(1)(A); *see also id.* § 254(b)(6).

    The Rural Health Care program ensures that eligible rural health care providers pay no more than their urban counterparts for telecommunications services used for health care purposes and provides a 65% discount on the cost of broadband and services and equipment used for health care purposes.  The goal of the program is to improve the quality of health care available to patients in rural communities by ensuring eligible health care providers' access to affordable telecommunications and broadband services.  As in E-Rate, health care providers participating in the program enter into contracts with telecommunications and broadband service providers after a competitive bidding process subject to Commission rules and oversight.  *See* 47 C.F.R. §§ 54.600-54.633.

Today, rural health care providers across the country rely on the Rural Health Care program for affordable access to the technology they need to treat their patients.  In 2022, over 14,000 rural health care providers received funding commitments and program disbursements totaling $496 million.  USAC 2022 Annual Report at 2, 4.  Since 2012, the program has committed over $276 million to rural providers specifically in Louisiana, Mississippi, and Texas to help deliver life-saving care to underserved rural communities.[10]

Many health care providers serving rural areas are able to afford modern telecommunications services and broadband internet service only because of the Rural Health Care program.  With this universal service support, providers are far more capable of offering telehealth services to reach patients who otherwise would have to travel long distances for medical treatment.  *See, e.g.*, *Promoting Telehealth in Rural America*, 34 FCC Rcd. 7335, ¶¶ 2, 5 (2019) (describing benefits of telehealth services for patients in rural areas across the country).  For example, as part of a New England regional consortium, Health Reach Community Centers relied on Rural Health Care program support to increase its bandwidth and

---

[10]   Universal Service Administrative Company, *RHC Commitments and Disbursements Tool*, https://opendata.usac.org/Rural-Health-Care/RHC-Commitments-and-Disbursements-Tool/sm8n-gg82 (last visited Aug. 15, 2023).  To use the tool, click the drop-down menu for "Filing HCP State" and select "LA," "MS," and "TX" for the aggregate commitments and disbursements for the three states.  To see each state's individual allocation, only select that individual state in the drop-down menu.

expedite a telehealth rollout, making virtual visits a possibility for the more than

25,000 patients in 87 rural Maine communities.  In North Carolina, the Martin-

Tyrrell-Washington District Health Department is relying on the Rural Health Care

program's affordable connectivity to expand clinical services to three of the state's

poorest rural counties.  Without access to that universal-service-funded network,

the Department was forced to rely upon expensive, unreliable broadband service

that did not allow them to run their health records system and hold a Zoom meeting

at the same time.  In particularly extreme environments, such as in many

communities in Alaska, telehealth services made possible by the Rural Health Care

program are often the only regularly available health care services.  *See, e.g.*, Letter

from Gov. Michael J. Dunleavy, State of Alaska, to Marlene H. Dortch, Secretary,

FCC, WC Docket No. 17-310, at 2 (filed Nov. 12, 2019).

Petitioners' challenge would leave many health care providers that serve

rural and remote communities, such as those in the Gulf coast of Louisiana and

many other areas, unable to justify the cost of their connections, and it would

throw contractual relationships between those health care facilities and their

service providers into tumult.  *See, e.g.*, 47 C.F.R. § 54.620(b)-(c) (describing rules

regarding long-term and multi-year contracts).  Worse yet, cutting off this

universal service funding would impair the provision of rural health care across the

country—depriving rural health care providers of affordable communications

services and undermining their ability reach and treat patients in rural communities that lack ready access to medical care today.

*Lifeline Program.*  Since 1985, the Lifeline program has provided a discount on phone service for qualifying low-income consumers to ensure that all Americans have the opportunities and security that phone service brings, including being able to connect to jobs, family, and emergency services.  In 1996, Congress expressly codified the program, directing the Commission to preserve the preexisting Lifeline Assistance Program and to ensure that "universal service is available at rates that are just, reasonable, and affordable."  47 U.S.C. §§ 254(i), (j).

In 2016, the Commission adopted a comprehensive reform and modernization of the Lifeline program to ensure program integrity while including broadband as a supported service.  *See generally Lifeline and Link Up Reform and Modernization*, 31 FCC Rcd. 3962 (2016).  Today, the Lifeline program offers a monthly benefit of up to $9.25 towards phone or internet services for eligible households and up to $34.25 for eligible Tribal households.

As of 2022, nearly 7.5 million households participate in the Lifeline program.  USAC 2022 Annual Report at 2.  Further, more than 1,100 qualified

telecommunications providers work to help implement this program,[11] with most

subscribers receiving broadband internet access as well as phone service. *See, e.g.*,

Wireline Competition Bureau, FCC, *Report on the State of the Lifeline*

*Marketplace* at 6, WC Docket No. 20-437 (June 2021). The program is

particularly critical for older Americans who use Lifeline to stay connected to their

communities, health care, and livelihoods. As AARP has explained to the

Commission: "Lifeline helps older, low-income Americans find and keep a job, get

help in the case of an emergency, to access news and information, and to keep in

touch with families, educators and health providers. According to one major

provider, nearly a third of Lifeline customers are over the age of 55, and 36 percent

are disabled. Still another provider shared that 47 percent of its Lifeline customers

are over the age of 50." Letter from AARP et al. to Chairman Ajit V. Pai, FCC, et

al., WC Docket No. 17-287, at 1 (filed May 23, 2018).

Without Lifeline support, participating seniors and other low-income

households would struggle to afford the basic connectivity to the internet that—as

seen during the COVID-19 pandemic—has become necessary for full participation

in modern American life. If successful, Petitioners' untimely claims would cut off

---

[11] *See* Tyler Cooper, *Report: Every ETC Registered with the FCC's Lifeline Program*, BroadbandNow (Dec. 7, 2021), *available at* https://broadbandnow.com/report/report-every-etc-registered-with-the-fccs-lifeline-program/ (last visited Aug. 15, 2023).

millions of low-income Americans from the internet and phone services that they rely on for access to emergency services, education, health care, job opportunities, e-commerce, and civic engagement.  As with other universal service programs, companies that have entered into contracts with those subscribers and built businesses around serving Lifeline participants would also face significant disruption.

***High-Cost Program.***  The Commission's high-cost program implements Section 254's direction to ensure that Americans in rural, insular, and high-cost areas have access to reasonably comparable communications services at "reasonably comparable … rates" to those in urban areas.  47 U.S.C. § 254(b)(3).

Today, small and large communications companies rely on approximately $4.3 billion annually to provide essential voice and internet services to some of the hardest-to-reach, rural communities across the country.  USAC 2022 Annual Report at 4.  For example, Totelcom Communications, based in De Leon, Texas, was formed in 1895 to deliver telephone service in rural Texas.  Today, Totelcom and its affiliates offer voice, broadband, and other communications services to approximately 5,500 customers across 1,800 square miles of Texas and Oklahoma.  Universal service support through the High-Cost program has been and remains critical to the availability and affordability of services and sustainability of operations; in 2021, Totelcom received over $7.2 million in

federal universal service support to connect these sparsely populated and deeply rural areas. Were this support eliminated, the company would face the prospect of increasing rural customers' rates dramatically in Texas and Oklahoma to offset the approximately $110 per customer per month received in support from the High-Cost program.

Most recently, as part of the high-cost program, the FCC established the Rural Digital Opportunity Fund and held an auction in late 2020 to identify support recipients that will deploy robust broadband networks to rural communities that for too long have gone without *any* broadband internet access. *See, e.g.*, *Rural Digital Opportunity Fund Phase I Auction (Auction 904)*, 35 FCC Rcd. 13,888 (2020). The Commission used a "reverse auction" procedure to choose winning bidders based on the companies' ability to deliver higher-quality services to as many unserved locations as possible, at the most efficient cost. The Commission has committed to provide winning bidders monthly subsidy payments over a term of ten years to build networks capable of providing high-quality voice and broadband service to every location in their award areas. As of August 31, 2022, the Commission had authorized a total of over $6 billion in universal service funds over 10 years to deploy high-quality broadband to 3 million unserved locations in 47 states and the Northern Mariana Islands. Press Release, FCC, *FCC Announces*

*Nearly $800 Million for Broadband Through the Rural Digital Opportunity Fund*
(Aug. 31, 2022), https://docs.fcc.gov/public/attachments/DOC-386780A1.pdf.

Critically, these funds are already working to connect Americans across the
country, and winning bidders are making significant upfront capital investments to
build new broadband networks with the expectation that they will receive the
awards that they won.  For example, as of December 2022, six out of the nine
electric cooperatives that received Rural Digital Opportunity Fund support in
Mississippi have already completed their buildout to serve thousands of rural
Mississippians with high-speed internet access.[12]

Petitioners' challenge would abruptly eliminate the funding that thousands
of small and large communications companies are relying on to provide reasonably
comparable voice and broadband services to rural and high-cost consumers.  In
addition, it would gut the Rural Digital Opportunity Fund, stranding the long-term
planning and investments winning bidders have made for deployment over the next
decade, thereby undercutting the program's objective of providing robust voice and
broadband service in unserved areas across the country.

---

[12] *See* Ann Treacy, *Report: Electric Coops in North East Mississippi Using RDOF
Funds to Expand Broadband* (Dec. 12, 2022), *available at*
https://communitynets.org/content/electric-coops-north-east-mississippi-using-
rdof-funds-expand-broadband.

## II.    PETITIONERS' ARGUMENTS THAT THEIR REQUESTED RELIEF WOULD NOT CAUSE "ANY MEANINGFUL DISRUPTION" ARE WRONG.

In their opening brief, Petitioners asked this Court to "vacate" the FCC's approval of the contribution factor for the first quarter of 2022 on the ground that the Universal Service Fund is unconstitutional.  Pet. Merits Br. 67; *see also* Pet. Reply Br. 48 ("[t]his Court should vacate and set aside" the approval of the contribution factor).  If Petitioners were to receive that relief in this case and the follow-on cases pending in this Circuit and others, the result would be to cut off connectivity for millions of consumers, schools, libraries, and health care providers—and to disrupt countless institutions and companies that have built the USF into their business plans.

Petitioners have not discussed how they believe the FCC would be required to respond in the aftermath of vacatur of one quarter's contribution requirement (let alone multiple quarters' requirements).  But that issue is extremely important for the many stakeholders that participate in and rely on the USF system in the ways described above.  Would Petitioners expect the Commission to pay back the contributions from the quarter at issue, for example, or credit existing contributions against any future contribution requirement?  Would service providers that received funding from the High-Cost Program be required to return those funds, even if they are already contractually committed or spent?  Would schools,

libraries, and rural healthcare providers whose contracts with their service

providers are based on the existence of the USF lose service, or would service

providers be required to continue serving customers even without the USF funding

that makes that service economically sustainable?

Rather than confronting the potential consequences that could follow from

their request for vacatur, Petitioners offer perfunctory, false assurances.

First, they argue, "the Court can limit relief to the named Petitioners." Pet.

Supp. Br. 66. Yet, Petitioners have never explained how the quarterly contribution

factor can be vacated as to them alone. Nor have they explained how the

Commission would separate the specific contributions attributable to them from

the contributions made by others, for purposes of awarding any kind of relief. USF

contributions are inherently connected to distributions made to other parties

receiving USF support.

Second, Petitioners assert that "of course *this case* challenges only one

particular quarter's" contribution factor. *Id.* (emphasis added). That assertion may

be literally true so far as it goes, but it lacks any credibility as an assertion that the

relief Petitioners seek would not cause disruption. As discussed above, Petitioners

have filed materially identical challenges every single quarter, beginning in fall

2021, leading to seven other cases in the federal courts of appeals. Three of those

challenges are pending in this Court and presumably would be controlled by the

30

outcome of this case. Petitioners' legal strategy plainly is not so modest as their brief suggests.

Third, Petitioners point to a brief by a bipartisan group of ten members of Congress filed at the panel stage and argue that it establishes "bipartisan congressional interest in supporting USF." *Id.* That amicus brief in fact demonstrates bipartisan rejection of Petitioners' constitutional arguments: "Whatever one thinks about the nondelegation doctrine generally—and signatories to this brief have diverse views on the subject—this is *not even a close case* given Congress's instructions and oversight." Merits Amicus Br. of Members of Congress 24 (emphasis added). The members of Congress also directly contradict Petitioners' arguments regarding the likelihood of disruption, explaining that their constituents would suffer a "devastating" loss of "essential services on which they rely" if Petitioners receive the relief they seek. *Id.* In any event, an amicus brief from ten members of Congress does not establish any "strong reason to believe" (Pet. Supp. Br. 67) the current Congress or a future one would take any particular action in response to these cases, especially on a timeline that would prevent the disruptive consequences of Petitioners' request for vacatur.

As noted above, Intervenors agree with the FCC and Intervenors USTelecom et al. that Petitioners' constitutional claims lack merit based on this Court's

precedent. But the Court also should not ignore the immense, real-world

consequences of Petitioners' claims in considering the issues presented in this case.

## CONCLUSION

The Court should deny the petition for review.

Respectfully submitted,

/s/ Andrew Jay Schwartzman

Andrew Jay Schwartzman
1341 G Street, NW
5th Floor
Washington, DC 20005
(202) 241-2408
AndySchwartzman@gmail.com

/s/ Jason Neal

Jason Neal
HWG LLP
1919 M Street, NW, 8th Floor
Washington, D.C.  20036
(202) 730-1300
jneal@hwglaw.com

*Counsel for Benton Institute for Broadband & Society, National Digital Inclusion Alliance, and Center for Media Justice dba MediaJustice*

*Counsel for Schools, Health & Libraries Broadband Coalition*

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of September, 2023, the foregoing document was filed via CM/ECF.  Service was accomplished on all parties or their counsel of record via CM/ECF.

/s/ Jason Neal
Jason Neal

**CERTIFICATE OF COMPLIANCE**

I certify that the foregoing document complies with the requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared in 14-point Times New Roman font.

I further certify that the foregoing document complies with the requirements of Fifth Circuit Rule 32 and Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,779 words according to the word-count feature of Microsoft Word.

/s/ Jason Neal
Jason Neal