# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 24, 2024

Lyle W. Cayce
Clerk

---

No. 22-60008

---

Consumers' Research; Cause Based Commerce, Incorporated; Kersten Conway; Suzanne Bettac; Robert Kull; Kwang Ja Kerby; Tom Kirby; Joseph Bayly; Jeremy Roth; Deanna Roth; Lynn Gibbs; Paul Gibbs; Rhonda Thomas,

*Petitioners*,

*versus*

Federal Communications Commission; United States of America,

*Respondents*.

---

Petition for Review from the
Federal Communications Commission
Agency No. 96-45

---

ON PETITION FOR REHEARING EN BANC

No. 22-60008

Before Richman, *Chief Judge*, and Jones, Smith, Stewart, Elrod, Southwick, Haynes, Graves, Higginson, Willett, Ho, Duncan, Engelhardt, Oldham, Wilson, and Douglas, *Circuit Judges*.[*]

Andrew S. Oldham, *Circuit Judge*, joined by Jones, Smith, Elrod, Willett, Ho, Duncan, Engelhardt, and Wilson, *Circuit Judges*:

In the Telecommunications Act of 1996, Congress delegated its taxing power to the Federal Communications Commission. FCC then subdelegated the taxing power to a private corporation. That private corporation, in turn, relied on for-profit telecommunications companies to determine how much American citizens would be forced to pay for the "universal service" tax that appears on cell phone bills across the Nation. We hold this misbegotten tax violates Article I, § 1 of the Constitution.

I.

A.

Congress has long "pursued a policy of providing 'universal' [telecommunications] service to all residents and businesses in the United States." Ronald J. Krotoszynski, Jr., *Reconsidering the Nondelegation Doctrine: Universal Service, the Power to Tax, and the Ratification Doctrine*, 80 Ind. L.J. 239, 279 (2005). For half a century Congress pursued this policy through a complicated cross-subsidy regime. Back when the old AT&T was a regulated monopoly, Congress allowed it to charge supra-competitive rates to urban customers in exchange for requiring it to provide services it might not otherwise provide to high-cost rural customers. But "[f]or obvious reasons, this system of implicit subsidies can work well only under regulated

---

[*] Judge Ramirez joined the court after this case was submitted and did not participate in the decision.

conditions. In a competitive environment, a carrier that tries to subsidize below-cost rates to rural customers with above-cost rates to urban customers is vulnerable to a competitor that offers at-cost rates to urban customers." *Tex. Off. of Pub. Util. Couns. v. FCC* ("*TOPUC I*"), 183 F.3d 393, 406 (5th Cir. 1999). So when Congress deregulated AT&T and other telecommunications companies, it had to abandon the old way of pursuing universal service.

Congress's new way is 47 U.S.C. § 254. Section 254 authorizes FCC to establish "specific, predictable, and sufficient . . . mechanisms to preserve and advance universal service." *Id.* § 254(b)(5). Pursuant to this grant of authority, FCC levies "contributions" to a Universal Service Fund ("USF") from telecommunications carriers, *id.* § 254(b)(4), and it distributes the monies raised to people, entities, and projects to expand and advance telecommunications services. FCC regulations expressly permit carriers to pass these "contributions" through to their customers, *see* 47 C.F.R. § 54.712(a), and the overwhelming majority of carriers do so, *see* FCC, FCC 22-67, Report on the Future of the Universal Service Fund 10084–85 , (Aug. 15, 2022) ("Report to Congress").

Notably, Congress declined to define "universal service" itself. Instead, it delegated to FCC the responsibility to periodically "establish" the concept of "universal service" by "taking into account advances in telecommunications and information technologies and services." 47 U.S.C. § 254(c)(1). In making this determination, Congress directed FCC to:

> consider the extent to which such telecommunications services—
> > (A) are essential to education, public health, or public safety;

(B) have, through the operation of market choices by customers, been subscribed to by a substantial majority of residential customers;
(C) are being deployed in public telecommunications networks by telecommunications carriers; and
(D) are consistent with the public interest, convenience, and necessity.

*Id.* § 254(c)(1).

Section 254(b) also suggests principles for FCC to "base policies for the preservation and advancement of universal service." Telecommunications services "should" be "available at just, reasonable, and affordable rates"; accessible "in all regions of the Nation"; and available to "low-income consumers and those in rural, insular, and high cost areas" at rates "reasonably comparable to rates charged for similar services in urban areas." *Id.* § 254(b)(1)–(3). FCC also may develop "such other [universal service principles it] determine[s] are necessary and appropriate for the protection of the public interest, convenience, and necessity and are consistent with this chapter." *Id.* § 254(b)(7).

Section 254 further provides that "[e]lementary and secondary schools and classrooms, health care providers, and libraries should have access to advanced telecommunications services." *Id.* § 254(b)(6). Accordingly, "telecommunications carrier[s] shall, upon receiving a bona fide request, provide telecommunications services which are necessary for the provision of health care services in a State . . . to any public or nonprofit health care provider that serves persons who reside in rural areas in that State at rates that are reasonably comparable to rates charged for similar services in urban areas in that State." *Id.* § 254(h)(1)(A). And "telecommunications carriers . . . shall, upon a bona fide request for any of its services that are within the [FCC's] definition of universal service . . . , provide such services to elementary schools, secondary schools, and libraries for educational

purposes at rates less than the amounts charged for similar services to other parties.ʺ *Id.* § 254(h)(1)(B). FCC then reimburses telecommunications providers for the costs of providing this subsidized service. *Id.* § 254(h)(1)(A), (B)(i)–(ii).

## B.

Presently, USF supports telecommunications projects through four major programs: the High-Cost Program (*see* 47 C.F.R. §§ 54.302–54.322), the Lifeline Program (*see id.* §§ 54.400–54.423), the E-rate Program (*see id.* §§ 54.500–54.523), and the Rural Health Care Program (*see id.* §§ 54.600–54.633).

Each program has a laudable objective. The High-Cost Program subsidizes the provision of voice and internet services in rural communities. The Lifeline Program subsidizes the provision of phone service to low-income consumers. The E-Rate Program subsidizes the provision of broadband connectivity and Wi-Fi to schools and libraries. And the Rural Health Care Program subsidizes the provision of telecommunications services to rural healthcare providers.

FCC regulations establish the services supported by each of these programs and the eligibility criteria applicants must satisfy to obtain assistance. But FCC does not administer all these universal service programs itself. Instead, it relies on a private company called the Universal Service Administrative Company (ʺUSACʺ). USAC is managed by representatives from ʺinterest groups affected by and interested in universal service programsʺ who are ʺnominated by their respective interest groups.ʺ *See Leadership*, UNIVERSAL SERV. ADMIN. CO., https://perma.cc/9W92G4Z9 (last accessed Sept. 11, 2023); *see also* 47 C.F.R. § 54.703(b) (providing for the composition of USAC's board of directors). FCC has charged USAC with myriad tasks: ʺbilling contributors,

No. 22-60008

collecting contributions to the universal service support mechanisms, and disbursing universal service support funds." 47 C.F.R. § 54.702(b).

Most prominently, though, USAC is responsible for deciding the quarterly USF contribution amount—a projection of the dollar value of demand for universal support programs and the costs of administering them. *See id.* § 54.709(a)(3). The contribution amount dictates the size of the universal service contributions levied on telecommunications carriers and, in turn, American telecommunications consumers. To set the contribution amount, USAC relies on "information from universal service program participants" to "estimate[] how much money will be needed each quarter to provide universal service support." *See Universal Service*, Universal Serv. Admin. Co., https://perma.cc/B5NN-AVF8 (last accessed Oct. 10, 2023). In other words, the contribution amount ultimately derives from the universal service demand projections of private, for-profit telecommunications carriers, all of whom have "have financial incentives" to increase the size of universal service programs. U.S. Gov't Accountability Off., GAO-17-538, Additional Action Needed to Address Significant Risks in FCC's Lifeline Program 1 (2017), https://perma.cc/K5J9-L89K ("FCC's Lifeline Program").

FCC then uses USAC's contribution amount to impose a tax on America's telecommunications carriers. (FCC calls this tax the USF "contribution factor"; but we call it what it is—the "USF Tax.") The USF Tax is the percentage of end-user telecommunications revenues each carrier must contribute to USF in a particular quarter. As a practical matter, USAC sets the USF Tax—subject only to FCC's rubber stamp. True, FCC "reserves the right to set projections of demand and administrative expenses at amounts that [it] determines will serve the public interest." *See* 47 C.F.R. § 54.709(a)(3). But FCC never made a substantive revision to USAC's

proposed contribution amount prior to this litigation,[1] and it does not even have a documented process for checking USAC's work. Instead, FCC has provided that if it "take[s] no action within fourteen (14) days of the date of release of the public notice announcing [USAC's] projections of demand and administrative expenses, the projections of demand and administrative expenses . . . shall be *deemed approved* by the Commission." *See ibid.* (emphasis added). So FCC has delegated to USAC responsibility—*de facto* if not *de jure*—for imposing the USF Tax.

## C.

In 1995, the USF Tax was $1.37 billion. JA62. But by the end of 2021, USAC ballooned the USF to over $9 billion. *See* Universal Serv. Admin. Co., 2021 Annual Report 20 (2023) https://perma.cc/9CPT-H5LM. The proposed USF Tax at issue in this case is 25.2%, up from just over 5% in 2000. *See* FCC, DA 00-517, Proposed Second Quarter 2000 Universal Service Contribution Factor (Mar. 7, 2000), https://perma.cc/4BSK-6QZR. Recent USF Taxes have been set as high as 34.5%. *See* FCC, DA 23-843, Proposed Fourth Quarter 2023 Universal Service Contribution Factor (Sep. 13, 2023), https://perma.cc/Y2QW-6HBD.

Many of the billions injected into the USF have undoubtedly been deployed to support the important goal of universal service. But waste and fraud have also contributed to the USF's astronomical growth. For example, in 2004, FCC's Inspector General affirmed that schools view the E-Rate Program as "a big candy jar" of "free money." Sam Dillon, *School Internet*

---

[1] FCC claims it has made three alterations to USF projections. But one of those was a ministerial change of the rate from .09044 to .091 because some carriers' computers could not handle five decimal places. And the other two were not even initiated by FCC. *See* Petrs' EB Br. 63.

*Program Lacks Oversight, Investigator Says*, N.Y. Times (June 18, 2004), https://perma.cc/9PZY-ED3K. The Inspector General's primary concern was FCC's heavy and longstanding reliance on self-certified eligibility determinations in the E-rate Program. *See* U.S. Gov't Accountability Off., GAO-20-606, FCC Should Take Action to Better Manage Persistent Fraud Risks in the Schools and Libraries Program18 (Sep. 2020), https://perma.cc/5EK4-Q8V8 ("FCC's E-rate Program"). A 2008 GAO report demonstrated that, in a single year, USAC made almost a billion dollars of High-Cost Program payments that "should not have been made, or were not made, in the correct amount, when viewed from the perspective of applicable Federal Communications Commission rules, orders and interpretative opinions." Off. of the Inspector Gen., FCC, The High Cost Program 2 (Nov. 26, 2008), https://perma.cc/WJG3-6PJ6 ("The High-Cost Program"). In 2013, one Congressman noted:

> The [Lifeline] fund [] increased 266 percent [between 2008 and 2013], . . . all while the cost of phone service [went] down. Despite the limit of one subsidized subscriber per household, published reports suggest some subscribers have eight or more phones with subsidized service, with one woman saying that to get one "she just goes across the street and gets it." One man has claimed to have a bag full of 20 phones on the program that he sells "for about 10, 15, 20 bucks" each.

*The Lifeline Fund: Money Well Spent?: Hearing Before the H. Subcomm. on Commc'n & Tech., H. Comm. On Energy & Comm.*, 113th Cong. 2 (2013) (opening statement of Chairman Greg Walden), https://perma.cc/4DAWUERW. And in 2018, FCC's managing director reported a GAO audit that uncovered gross improper payments of $336.39 million in the Lifeline Program alone. *See* Letter from Mark Stephens, Managing Director, FCC, to Ron Johnson, Chairman, S. Comm. On

Homeland Sec. & Gov't Affs. (Aug. 27, 2019), https://perma.cc/VNQ6-N3WB. While earth's only two certainties are death and taxes, the USF Tax manages to cheat the grave: It is well-documented that FCC disburses USF money to dead people. *See* FCC's Lifeline Program, *supra*, at 43.

USAC's role in perpetuating USF waste is equally well known. In 2010, GAO concluded that USAC "lacks key features of effective internal controls." U.S. Gov't Accountability Off., GAO-11-11, Improved Management Can Enhance FCC Decision Making for the Universal Service Fund Low-Income Program i (Oct. 2010), https://perma.cc/9YHE-8YE9 ("FCC's Low-Income Program"); *see also* FCC's E-rate Program, *supra*, at 20–21. The Low-Income Program report noted that while USAC primarily uses audit findings to monitor compliance with USF rules, "the number and scope of USAC's audits have been limited and there is no systematic process in place to review the findings of those audits that are conducted." FCC's Low-Income Program, *supra*, at cover page. Moreover, the GAO noted USAC had not even considered "the possibility that multiple carriers may claim support for the same telephone line and that households may receive more than one discount, contrary to program rules." *Ibid.* In 2017, GAO explained that USAC "relies on over 2,000 Eligible Telecommunication Carriers that are Lifeline providers to implement key program functions, such as verifying subscriber eligibility," which is problematic because "companies may have financial incentives to enroll as many customers as possible." FCC's Lifeline Program*, supra*, at cover page. And in 2019, FCC acknowledged that USAC was out of compliance with improper payment reporting requirements. *See* Letter from Mark Stephens, *supra*, at 1.

\*    \*    \*

No. 22-60008

Section 254 reflects a policy goal of making telecommunications services available to all Americans. It is emphatically the province of Congress to make such policy choices. But it is our judicial duty to ensure that Congress pursued its goal through lawful means. And in that regard, our brief survey of the USF's history makes three things clear. First, Congress's instructions are so ambiguous that it is unclear whether Americans should contribute $1.37 billion, $9 billion, or any other sum to pay for universal service. Second, private entities bear important responsibility for universal service policy choices. And third, it is impossible for an aggrieved citizen to know who bears responsibility for the USF's serious waste and fraud problems. All three of those things implicate bedrock constitutional principles.

## II.

## A.

On November 2, 2021, USAC proposed its Q1 2022 USF contribution amount. A subset of the Petitioners in this action filed a comment with FCC challenging the constitutionality of the universal service contribution mechanism on November 19. On December 13, 2021, FCC issued a public notice of its Proposed Q1 2022 USF Tax, which was derived directly from USAC's proposed contribution amount. Petitioners re-filed their comment on December 22. FCC took no action with respect to USAC's proposed contribution amount, so on December 27 the contribution factor was deemed approved. *See* 47 C.F.R. § 54.709(a)(3). Petitioners then filed a timely petition for review in our court.

No. 22-60008

## B.

We have statutory jurisdiction under 47 U.S.C. § 402 and 28 U.S.C. § 2342.[2] FCC does not contest our constitutional jurisdiction, but we have an obligation to consider jurisdictional questions *sua sponte* even when they are not raised by the parties. *See E.T. v. Paxton*, 41 F.4th 709, 718 n.2 (5th Cir. 2022).

Consistent with that obligation, we note that at least one petitioner—Cause Based Commerce—had Article III standing when the petition was filed. *See Biden v. Nebraska*, 143 S. Ct. 2355, 2365 (2023) ("If at least one plaintiff has standing, the suit may proceed."); *Advanced Mgmt. Tech., Inc. v. FAA*, 211 F.3d 633, 636 (D.C. Cir. 2000) ("Standing is assessed at the time the action commences." (citation and quotation omitted)). Cause Based Commerce incurred a classic pocketbook injury as a result of its legal obligation to pay the USF Tax. Its injury is fairly traceable to the challenged conduct because the size of its Q1 2022 USF liability was controlled by the contribution factor set by USAC. And, at the time the petition was filed, its injury could have been redressed by a favorable judicial decision because vacatur of FCC's approval of the proposed contribution factor would have prevented collection of the USF Tax. *See* 47 C.F.R. § 54.709(a)(3) ("[T]he Administrator shall apply the quarterly contribution factor, *once approved by the Commission*, to contributor's interstate and international end-user telecommunications revenues to calculate the amount of individual contributions." (emphasis added)).

---

[2] Before the panel, FCC argued that we lack statutory jurisdiction because the petition was not timely filed. The panel rejected that argument, *see Consumers' Rsch. v. FCC*, 63 F.4th 441, 446 (5th Cir. 2023), *reh'g en banc granted, opinion vacated*, 72 F.4th 107 (5th Cir. 2023), and FCC has abandoned it.

No. 22-60008

It is not clear that Cause Based Commerce's pocketbook injury is still redressable because sovereign immunity may bar recovery of the monies it paid into USF pursuant to the Q1 2022 USF Tax. *See* 5 U.S.C. § 702 (waiving sovereign immunity for actions against agencies seeking relief "other than money damages"). If that is right, Cause Based Commerce's challenge might be moot because no court-ordered relief could redress the injuries it incurred as a result of the Q1 2022 USF Tax. *See Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) ("A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." (quotation and citation omitted)).

We need not reach that question, however, because even assuming Cause Based Commerce's injury is no longer redressable, it is nonetheless justiciable because it is capable of repetition yet evading review. *See, e.g.*, *S. Pac. Terminal Co. v. Interstate Com. Comm'n*, 219 U.S. 498, 515 (1911) (establishing the exception and noting that jurisdiction "ought not to be . . . defeated, by short term orders, capable of repetition, yet evading review" because otherwise the government and regulated parties would "have their rights determined by the Commission without a chance of [judicial] redress"). The Q1 2022 USF Tax evades review because it was in force for just one quarter—"too short [a] duration to be fully litigated in the United States Supreme Court before it expire[d]." *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 321 (D.C. Cir. 2014); *see ibid.* ("As a rule of thumb, agency actions of less than two years' duration cannot be fully litigated prior to cessation or expiration, so long as the short duration is typical of the challenged action." (quotation and citation omitted)). And it is capable of repetition because there is "a reasonable expectation"—indeed, a near certainty—"that [Cause Based Commerce] will be subjected to the same action again." *Id.* at 323; *see id.* at 324 ("The same action generally refers to

No. 22-60008

. . . recurrent identical agency actions." (quotation and citations omitted)); *see also* 47 C.F.R. § 54.709(a)(3) (providing that a new contribution factor is calculated each quarter).

Accordingly, we have jurisdiction to decide the merits of petitioners' constitutional claims.

## C.

We must decide one more threshold issue. On June 17, 2024, FCC filed a motion to dismiss on the that ground issue preclusion bars the petition for review. In FCC's view, that is because petitioners raised identical challenges to different USF quarterly contribution factors in the Sixth and Eleventh Circuits, and those courts rejected petitioners' arguments. But even if there were something to FCC's issue preclusion argument, it fails because FCC forfeited it.

"[I]ssue preclusion[] is an affirmative defense." *Taylor v. Sturgell*, 553 U.S. 880, 907 (2008). That means the party asserting preclusion ordinarily must timely raise it. *Ibid.*; *see* 18A Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice & Procedure § 4405 (3d ed. 2017). Where, as here, an allegedly preclusive judgment is rendered after suit is filed, the party "wishing to raise [preclusion] is obliged to assert it at the earliest moment practicable." *Home Depot, Inc. v. Guste*, 773 F.2d 616, 620 n. 4 (5th Cir. 1985); *see Evans v. Syracuse City Sch. Dist.*, 704 F.2d 44, 47 (2d Cir. 1983) ("[T]he party wishing to raise [preclusion as a] defense is obliged to plead it at the earliest possible moment." (quotation omitted)); *Aetna Cas. & Sur. Co. v. Gen. Dynamics Corp.*, 968 F.2d 707, 711 (8th Cir. 1992) (issue preclusion must be raised "at the first reasonable opportunity after the rendering of the decision having the preclusive effect"); *Davignon v. Clemmey*, 322 F.3d 1, 15 (1st Cir. 2003) (holding that district court abused its discretion by allowing defendant to

No. 22-60008

assert preclusion defense "at the eleventh hour"); *Georgia Pac. Consumer Prod., LP v. Von Drehle Corp.*, 710 F.3d 527, 533 (4th Cir. 2013) ("Even when a preclusion defense is not available at the outset of a case, a party may waive such a defense arising during the course of litigation by waiting too long to assert the defense after it becomes available."); *Arizona v. California*, 530 U.S. 392, 413 (2000) (holding that party could not raise preclusion as a defense when party could have raised the defense earlier in the proceedings but did not, "despite ample opportunity and cause to do so").

That makes sense. The policy underlying issue preclusion is based primarily on a "defendant's interest in avoiding the burdens of twice defending a suit" and "the avoidance of unnecessary judicial waste." *Arizona*, 530 U.S. at 412 (quoting *United States v. Sioux Nation*, 448 U.S. 371, 432 (1980) (Rehnquist, J., dissenting)). Issue preclusion cannot serve either of those purposes if it is raised in the eleventh hour of proceedings, after the defendant and the court have already carried all the burdens necessary to decide the case. So even assuming FCC could defeat petitioners' claims on the ground the Sixth and the Eleventh Circuits have rendered preclusive judgments, FCC was obliged to raise that issue "at the earliest moment practicable." *Guste*, 773 F.2d at 620 n.4.

It did not. The first allegedly preclusive judgment FCC cites is the Sixth Circuit's judgment in *Consumers' Research v. FCC*. *See* 67 F.4th 773 (6th Cir. 2023), *cert. denied Consumers' Rsch. v. FCC*, No. 23-456, 2024 WL 2883753 (U.S. June 10, 2024). That judgment bound six of the named petitioners in this case.[3] And it was final on June 7, 2023. *See* Mandate Issued, *Consumers' Rsch.*, 67 F.4th 773 (No. 21-3886) (Jun. 7, 2023). True, the

---

[3] Consumers' Research, Cause Based Commerce, Deanna Roth, Jeremy Roth, Joseph Bayly, Lynn Gibbs, and Paul Gibbs.

petitioners sought certiorari in that case. But "the general rule in American jurisprudence [is] that a final judgment of a court . . . can be given [preclusive] effect even while an appeal is pending." *Prymer v. Ogden*, 29 F.3d 1208, 1213 n.2 (7th Cir. 1994); *see* Wright & Miller, *supra*, § 4433 ("[I]t is . . . held in federal courts that the preclusive effects of a lower court judgment cannot be suspended simply by taking an appeal that remains undecided."); Restatement (Second) of Judgments § 13, cmt. f (explaining a "judgment otherwise final" for purposes of the law of res judicata should "remain[] so despite the taking of an appeal").

That means FCC could have asserted preclusion against six petitioners on June 7, 2023. At the very least, FCC could have raised preclusion in its supplemental brief, which it filed on August 30, 2023. But FCC did not do so. Instead, it waited more than a year and then filed a tardy motion to dismiss at the eleventh hour. FCC therefore forfeited its preclusion defense with respect to at least six petitioners.[4] So there is no doubt we may proceed to the merits of those petitioners' claims.

FCC also cites the Eleventh Circuit's judgment in *Consumers' Rsch. v. FCC*, 88 F.4th 917, 923 (11th Cir. 2023), *cert. denied Consumers' Rsch. v. FCC*, No. 23-743, 2024 WL 2883755 (U.S. June 10, 2024). That judgment bound all the petitioners in this case, including the six who were parties to the Sixth Circuit proceeding. But that another allegedly preclusive judgment was rendered during the course of this proceeding does not change the fact that FCC had a purported preclusion defense against six petitioners as of June 7, 2023. And even if the Eleventh Circuit's judgment somehow gave FCC a new window to raise a preclusion defense against those petitioners, the window closed before FCC raised it. The Eleventh Circuit's judgment was final (and

---

[4] Including Cause Based Commerce, who certainly has standing. *See supra*, at 11.

No. 22-60008

therefore had preclusive effect) on February 5, 2024. *See* Mandate Issued, *Consumers' Research v. FCC*, 88 F.4th 917 (No. 22-13315) (Feb. 5, 2024). FCC nonetheless waited to file a motion to dismiss on the basis of that judgment until June 17, 2024—more than four months later.

There may sometimes be ambiguity about whether a defendant carried its obligation to raise a preclusion defense "at the earliest moment practicable." *Guste*, 773 F.2d at 620 n.4. But this is not a close case. Litigants ordinarily have 21 days to plead an affirmative defense. *See* Fed. R. Civ. P. 12(a)(1)(A)(ii); *see also* Wright & Miller, *supra*, § 1394 (noting affirmative defenses are forfeited if they are not raised in responsive pleadings). There is no reason a party should have six times that many days to raise an affirmative defense to a petition for review. So even if we thought FCC could have asserted preclusion against all the petitioners within a reasonable time after the Eleventh Circuit rendered judgment, we would hold FCC failed to do so.

In sum, FCC forfeited any preclusion defense. True, we have discretion to forgive a forfeiture in "extraordinary circumstances"—as where "a miscarriage of justice would result from our failure to consider" the forfeited argument. *See, e.g.*, *AG Acceptance Corp. v. Veigel*, 564 F.3d 695, 700 (5th Cir. 2009). But FCC does not supply any reason to think a miscarriage of justice would result from our reaching the merits of petitioners' claims. *See ibid.* (explaining the burden of establishing extraordinary circumstances is on the party seeking review). And we cannot think of one. In fact, if we do not decide the constitutional questions presented in this case, we will have to decide them in a pending challenge that includes petitioners who were not parties to the Sixth or Eleventh Circuit proceedings. *See* Petition for Review,

No. 22-60008

*Consumers' Research v. FCC*, No. 24-60330 (5th Cir. Jun. 27, 2024). It effects no injustice to hold FCC to its forfeiture.[5]

\*     \*     \*

We therefore proceed to the merits. Our review is de novo. *See Huwaei Tech. USA, Inc. v. FCC*, 2 F.4th 421, 434 (5th Cir. 2021).

III.

Petitioners contend the universal service contribution mechanism violates the Legislative Vesting Clause. *See* U.S. Const. art. I, § 1 ("All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."). We agree. We (A) explain that the power to levy USF "contributions" is the power to tax—a quintessentially legislative power. Then we (B) explain that Congress through 47 U.S.C. § 254 may have delegated legislative power to FCC because it purported to confer upon FCC the power to tax without supplying an intelligible principle to guide FCC's discretion. Next, we (C) explain that FCC may have impermissibly delegated the taxing power to private entities. Finally, we (D) explain that we need not definitively answer either delegation question because even if § 254 contains an intelligible principle, and even if FCC was permitted to enlist private entities to

---

[5] FCC convinced the Supreme Court to deny certiorari in the Sixth and Eleventh Circuit cases in part by explaining the Court would have another chance to consider the constitutionality of the USF after this court's en banc ruling. *See* Br. in Opp'n 17–18, *Consumers' Rsch. v. FCC*, Nos. 23-456, 23-743 (U.S. May 3, 2024) ("[T]he en banc Fifth Circuit has not yet issued its decision in that case. Once it does so, the parties can determine whether to seek, and this Court can determine whether to grant, certiorari to review that decision."). Had FCC told the Supreme Court it thought petitioners' claims in this court were issue precluded, the Court might have granted certiorari in those other cases. It would be unjust to allow FCC to raise an issue to evade en banc review so soon after it hid that issue to evade Supreme Court review.

determine how much universal service tax revenue it should raise, the combination of Congress's broad delegation to FCC and FCC's subdelegation to private entities certainly amounts to a constitutional violation.

## A.

Section 254(d) provides that "[e]very telecommunications carrier that provides interstate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, to the specific, predictable, and sufficient mechanisms established by the Commission to preserve and advance universal service." 47 U.S.C. § 254(d). Pursuant to this authority, FCC mandates that "telecommunications carriers . . . must contribute to the universal service support mechanisms." 47 C.F.R. § 54.706(a). USAC determines carriers' USF contribution obligations on a quarterly basis by "apply[ing] the quarterly contribution factor . . . to [each carriers'] interstate and international end-user telecommunications revenues." *Id.* § 54.709(a)(3). The result is a USAC-fashioned USF Tax.

FCC's principal defense of the USF scheme is that the USF Tax is not really a *tax* at all. Rather, FCC contends, it is a *fee*. That is because, FCC reasons, a fee is a charge that "bestows a benefit on the [payor], not shared by other members of society." *Nat'l Cable Television Ass'n v. United States*, 415 U.S. 336, 341 (1974). And FCC thinks universal service contributions comport with that definition because telecommunications carriers pay them, and because they are used to fund the universal service program, which "confers special benefits on contributing carriers by (among other things) expanding the network such carriers can serve." FCC EB Br. 51.

But FCC misunderstands the nature of the inquiry. A fee has three characteristics: First, fees are incurred "incident to a voluntary act." *Nat'l Cable*, 415 U.S. at 341; *see also* Krotoszynski, Jr., *Reconsidering the*

No. 22-60008

*Nondelegation Doctrine*, *supra*, at 270 ("A 'fee' constitutes a charge that an agency exacts in return for a benefit voluntarily sought by the payer."). For example, "[a] public agency might charge a user fee to visit a public park, tour a museum, or enter a toll road." *Trafigura Trading LLC v. United States*, 29 F.4th 286, 293 (5th Cir. 2022) (Opinion of Ho, J.); *see also ibid.* (noting that fees "arise in the context of value-for-value transactions" between individuals and government). The government may also charge fees designed to defray the cost of providing benefits to a regulated party, but only if the fees charged represent a "fair approximation of services, facilities, or benefits furnished." *United States v. U.S. Shoe Corp.*, 523 U.S. 360, 363 (1998). Second, a fee generally is "imposed by an administrative agency upon only those persons, or entities, subject to its regulation for regulatory purposes." *Valero Terrestrial Corp. v. Caffrey*, 205 F.3d 130, 134 (4th Cir. 2000). And third, the revenue the government raises through its collection of fees is used to supply benefits inuring to the persons or entities paying them rather than to the public generally. *See Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 223 (1989) (quoting *Nat'l Cable*, 415 U.S. at 343).

Universal service contributions do not have any of these characteristics. First, they are not incident to a voluntary act but rather are a condition of doing business in the telecommunications industry. *See* 47 U.S.C. § 254(d). Nor do they represent a fair approximation of the benefits conferred by government regulation on telecommunications carriers. In fact, they are not related to regulatory costs at all. They are designed to fund telecommunications subsidies to schools, libraries, healthcare facilities, and low-income individuals. Second, the cost of universal service contributions is not borne by parties FCC regulates. While FCC formally imposes the charges on telecommunications carriers, carriers overwhelmingly pass the cost of contributions on to consumers, as is expressly permitted by FCC regulation. *See* FCC, REPORT TO CONGRESS, *supra*, at 45–46; 47 C.F.R.

No. 22-60008

§ 54.712(a). So the cost of universal service contributions is widely shared by the population in a manner reminiscent of a "classic tax." *See Valero*, 205 F.3d at 134 ("The 'classic tax' is imposed by the legislature upon a large segment of society."). And third, the benefits associated with universal service contributions "inure to the benefit of the public"—or more accurately to the benefit of those fortunate enough to receive subsidies from USAC—rather than to the benefit of the persons who pay them. *Skinner*, 490 U.S. at 223 (quoting *Nat'l Cable*, 415 U.S. at 343). There is no overlap at all between the class of USF beneficiaries (recipients of subsidized telecommunications services) and the class of USF contributors (American telecommunications consumers who see USF charges on their phone bills each month).

Think about the consequences of FCC's position:

- Congress could fund Medicare and Medicaid without "taxing" anyone. It could simply allow hospital executives to set the Medicare-Medicaid budget, then have HHS rubber-stamp the hospitals' healthcare taxes, which could then be passed through to consumers' hospital bills.

- Congress could fund the Supplemental Nutrition Assistance Program ("SNAP") without "taxing" anyone. It could simply allow grocery store executives to set the SNAP budget, then have USDA rubber-stamp the grocers' SNAP taxes, which could then be passed through to consumers at the checkout register.

- Congress could fund affordable housing without "taxing" anyone. It could simply allow real estate companies to set the affordable housing budget, then have HUD rubber-stamp the companies affordable-housing taxes, which could then be passed through to consumers as new line items at closing or in monthly surcharges for rent.

We could go on. But you get the point: All of these are obviously taxes. So while "[d]istinguishing a tax from a fee often is a difficult task," *Tex. Ent.*

No. 22-60008

*Ass'n, Inc. v. Hegar*, 10 F.4th 495, 505 (5th Cir. 2021) (citation omitted), the analysis here is straightforward. Congress has bestowed upon FCC the power to levy taxes, and we accordingly conclude that it has delegated its taxing power.[6]

## B.

In § 254 of the Telecommunications Act, Congress delegated its taxing power to FCC. The power to tax is a quintessentially legislative one. *See* U.S. Const. art. 1, § 8, cl. 1; *see also Nat'l Cable*, 415 U.S. at 340 ("Taxation is a legislative function, and Congress . . . is the sole organ for levying taxes."); Michael W. McConnell, The President Who Would Not Be King 334 (2020) (noting that domestic taxation is "especially central to the legislative branch"). So § 254 is constitutional only if it passes nondelegation muster. We (1) explain the nondelegation doctrine as articulated by the Supreme Court. Then we (2) explain the breadth of Congress's delegation to FCC. Lastly, we (3) explain that the Supreme Court has never upheld a delegation of core legislative power as sweeping as the one contained in § 254.

## 1.

The Constitution vests "[a]ll legislative Powers herein granted" " in a Congress of the United States." U.S. Const. art. I, § 1. "Accompanying that assignment of power to Congress is a bar on its further delegation." *Gundy v. United States*, 588 U.S. 128, 135 (2019) (plurality op.). Moreover, "the principle of separation of powers that underlies our tripartite system of

---

[6] The fact that Congress euphemistically labeled these universal service charges "contribution[s]," 47 U.S.C. § 254(d), is irrelevant. "Congress cannot change whether an exaction is a tax . . . *for constitutional purposes* simply by" relabeling it. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 544 (2012) (emphasis in original).

Government" independently compels the conclusion that Congress, not agencies, must make legislative decisions. *Mistretta v. United States*, 488 U.S. 361, 371 (1989); *see Gundy*, 588 U.S. at 153 (Gorsuch, J., dissenting) ("[I]t would frustrate the system of government ordained by the Constitution if Congress could merely announce vague aspirations and then assign others the responsibility of adopting legislation to realize its goals." (quotation omitted)). So there is no doubt that "the lawmaking function belongs to Congress," *Loving v. United States*, 517 U.S. 748, 758 (1996), and that Congress "may not constitutionally delegate that power to another" constitutional actor, *Touby v. United States*, 500 U.S. 160, 165 (1991).

But "[t]he Constitution has never been regarded as denying to the Congress the necessary resources of flexibility and practicality, which will enable it to perform its function." *Panama Refin. Co. v. Ryan*, 293 U.S. 388, 421 (1935). So the Supreme Court has held that delegations are constitutional so long as Congress "lay[s] down by legislative act an intelligible principle to which the person or body authorized [to exercise the delegated authority] is directed to conform." *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928).

Still, "there are limits of delegation which there is no constitutional authority to transcend." *Panama Refin.*, 293 U.S. at 430. And for good reason. Vague congressional delegations undermine representative government because they give unelected bureaucrats—rather than elected representatives—the final say over matters that affect the lives, liberty, and property of Americans. *See Tiger Lily, LLC v. U.S. Dep't of Hous. & Urb. Dev.*, 5 F.4th 666, 674 (6th Cir. 2021) (Thapar, J., concurring) ("By shifting responsibility to a less accountable branch, Congress . . . deprives the people of the say the framers intended them to have."). Overly broad delegations also obscure accountability: When elected representatives shirk hard choices, constituents do not know whom to hold accountable for government action.

*See Gundy*, 588 U.S. at 156 (Gorsuch, J., dissenting). And they offend the deliberation-forcing features of the constitutionally prescribed legislative process. *See* U.S. Const. art. I, § 7; John Manning, *Lawmaking Made Easy*, 10 Green Bag 2d 191, 202 (2007) ("[B]icameralism and presentment make lawmaking difficult *by design*." (emphasis in original)); *see also* The Federalist No. 73 (A. Hamilton) (noting that the Constitution prescribed elaborate procedures for lawmaking because "[t]he oftener the measure is brought under examination, the greater the diversity in the situations of those who are to examine it, the less must be the danger of those errors which flow from want of due deliberation, or of those missteps which proceed from the contagion of some common passion or interest.").

So while "the Supreme Court has not in the past several decades held that Congress failed to provide a requisite intelligible principle," *Jarkesy v. SEC*, 34 F.4th 446, 462 (5th Cir. 2022), *aff'd on other grounds*, 144 S. Ct. 2117 (2024), "[t]hat does not mean . . . we must rubber-stamp all delegations of legislative power," *Big Time Vapes, Inc. v. FDA.*, 963 F.3d 436, 443 (5th Cir. 2020). Rather, "[w]e ought not to shy away from our judicial duty to invalidate unconstitutional delegations." *Ibid.* (quotation omitted).

## 2.

Nondelegation inquiries "always begin[] . . . with statutory interpretation" because the constitutional question is whether Congress has supplied a sufficiently intelligible principle to guide an agency's discretion. *Gundy*, 588 U.S. at 135 (plurality op.). So we must construe "the challenged statute to figure out what task it delegates and what instructions it provides." *Id.* at 136. Petitioners challenge the USF's funding mechanism, so we must consider whether 47 U.S.C. § 254 sufficiently instructs FCC regarding how much it should tax Americans to pay for the universal service program.

No. 22-60008

Two of § 254's subsections are relevant: § 254(d) provides that USF funding should be "sufficient . . . to preserve and advance universal service," and § 254(b)(1) suggests that telecommunications services "should be available at . . . affordable rates."

These statutory phrases supply no principle at all. Start with sufficiency. That funding should be "sufficient . . . to preserve and advance universal service" is meaningful only if the concept of universal service is sufficiently intelligible. It is not. Rather, universal service is "an evolving level of telecommunications services that the Commission shall establish periodically" by determining what telecommunications services are "essential to education, public health, or public safety"; are "subscribed to by a substantial majority of residential customers"; are "deployed . . . by telecommunications carriers"; or are otherwise "consistent with the public interest, convenience, and necessity." 47 U.S.C. § 254(c). That is a lot of words, but they amount to a concept of universal service so amorphous that Congress's instruction to raise "sufficient" funds amounts to a suggestion that FCC exact as much tax revenue for universal service projects as FCC thinks is good. *Cf.* Gary Lawson, *Delegation and Original Meaning*, 88 Va. L. Rev. 327, 339–40 (2002) (describing consequences of congressional enactment that requires "'goodness and niceness'").

That § 254(b) supplies minimal guidance on the contours of Congress's idea of an ideal universal service policy is no answer. That is for three reasons. First, we have previously accepted FCC's contention that "nothing in [§ 254] defines 'sufficient' to mean that universal service support must equal the actual costs incurred by" telecommunications carriers contributing to the USF. *TOPUC I*, 183 F.3d at 412. So FCC's universal service taxation is not formally limited by the amount it disburses on universal service projects. Nothing in the statute precludes FCC from, for example, imposing the USF Tax to create an endowment that it could use to

fund whatever projects it might like. FCC has never done so, but the fact "that the recipients of illicitly delegated authority opted not to make use of it is no antidote. It is *Congress's* decision to delegate that is unconstitutional." *Dep't of Transp. v. Ass'n of Am. Railroads* ("*Amtrak II*"), 575 U.S. 43, 62 (2015) (Alito, J., concurring) (emphasis in original) (quotation omitted) (quoting *Ass'n of Am. Railroads v. U.S. Dep't of Transp.* ("*Amtrak* I"), 721 F.3d 666, 674 (D.C. Cir. 2013), *vacated and remanded sub nom. Amtrak II*, 575 U.S. 43); *see Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 472 (2001) ("We have never suggested that an agency can cure an unlawful delegation of legislative power by adopting in its discretion a limiting construction of the statute.").

Second, even if FCC's power to levy taxes were limited by the amount it disburses on universal service projects, subsection (b) still would not curb FCC's discretion because we have explained it sets out "aspirational" principles rather than "inexorable statutory command[s]." *TOPUC I*, 183 F.3d at 421; *see also Tex. Off. of Pub. Util. Couns. v. FCC*, 265 F.3d 313, 321 (5th Cir. 2001). And even if the principles in subsection (b) were more than aspirational, they still would not meaningfully limit FCC because § 254(b)(7) vests FCC with discretion to formulate "other principles" so long as it considers the additional principles to be "necessary and appropriate for the protection of the public interest, convenience, and necessity and . . . consistent with" the rest of Chapter 5 of Title 47 of the United States Code. In other words, FCC "may roam at will," *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 538 (1935), disregarding § 254(b)'s enumerated principles altogether when it thinks the "public interest" warrants the journey. 47 U.S.C. § 254(c)(1)(D); *id.* § 254(b)(7).

Third, even if the principles in § 254(b) in some way bind FCC, they are contentless in important respects. For example, § 254(b)(6) suggests that "[e]lementary and secondary schools and classrooms . . . and libraries should

have access to advanced telecommunications services as described in subsection (h)." But subsection (h) says only that "elementary schools, secondary schools, and libraries" should have access to telecommunications services "for educational purposes at rates less than the amounts charged for similar services to other parties." *Id.* § 254(h)(1)(B). Which services? Presumably those FCC thinks are "essential to education" or otherwise within the ambit of its self-defined universal service utopia. *Id.* § 254(c). But how is FCC to make that determination? And which schools and libraries should receive subsidized services? And how much less should they pay?

Congress never said. FCC has answered some of these questions, *see* 47 C.F.R. §§ 54.501, .502, .505, but it remains a mystery how we are supposed to "ascertain whether the will of Congress has been obeyed." *Mistretta*, 488 U.S. at 379 (citation omitted). Each of the "aspirational" universal service principles in § 254(b) & (c) is inapposite.[7] So apparently your guess is as good as ours is as good as FCC's is as good as any random American taxpayer's. And funding for schools and libraries is not merely an

---

[7] Section 254(c)(1)(B) suggests low-income consumers should have access to telecommunications services comparable to those subscribed to by unsubsidized residential customers. And § 254(b)(3) tells FCC to make telecommunications services available in rural areas at rates comparable to those charged in urban areas. Those provisions may supply sufficient guidance for FCC to execute certain aspects of the universal service program. But nothing in the statute remotely suggests FCC should provide universal service funding only to low-income or rural schools. So §§ (b)(3) and (c)(1)(B) cannot supply the limiting principle that § (h)(1)(B) lacks. And the fact that FCC has limited universal service funding to low-income schools is, once again, irrelevant. *See Am. Trucking*, 531 U.S. at 472. The question is whether the statute itself in any way limits FCC's discretion to supply universal service funding for educational programs, and it plainly does not.

No. 22-60008

interstitial gap in the statutory scheme. It constituted more than a third of the contribution amount that gave rise to these proceedings. *See* JA.101.[8]

So if § 254(b) binds at all, it is apparent that the only real constraint on FCC's discretion to levy excise taxes on telecommunications carriers (and American consumers in turn) is that rates "should" remain "affordable." 47 U.S.C. § 254(b)(1); *see Consumers' Rsch.*, 67 F.4th at 794 ("[E]xcess subsidization in some cases may detract from universal service by causing rates unnecessarily to rise, thereby pricing some consumers out of the market." (citation omitted)). But saying telecommunications services "should" remain "affordable" amounts to "*no guidance* whatsoever." *Jarkesy*, 34 F.4th at 462 (emphasis in original). How is FCC to determine whether the USF Tax it mandates has made telecommunications services unaffordable? The demand for cell phones is uncommonly inelastic because cell phones are essential to participation in the modern world. *See Carpenter v. United States*, 138 S. Ct. 2206, 2220 (2018) ("[C]ell phones and the services they provide are such a pervasive and insistent part of daily life that carrying one is indispensable to participation in modern society." (citation and quotation omitted)). That means the FCC could impose eye-watering USF Taxes while also arguing with a straight face that cell phones remain "affordable" in the sense that most Americans would choose to keep using them. And that means § 254 leaves FCC—and as importantly reviewing courts[9]—utterly at sea. Is a 25% excise tax excessively burdensome under §

---

[8] Both dissenting opinions contend 47 U.S.C. § 254 is loaded with intelligible principles. *See post*, at 77–82 (Stewart, J., dissenting); *id.* at 101–02 (Higginson, J., dissenting). But neither identifies any principle that might guide FCC in determining how much less schools and libraries should pay for telecommunications services.

[9] *See Mistretta*, 488 U.S. at 379 (noting courts are "justified" in invalidating delegations where it would be "impossible in a proper proceeding to ascertain whether the

254(b)(1)? 250%? 2500%? There are no answers because Congress never gave them.

Finally, the breadth of § 254's delegation is especially troubling because the statute insulates FCC from the principal tool Congress has to control FCC's universal service decisions—the appropriations power. *See* U.S. Const. art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."). Ordinarily, when Congress delegates broadly, it retains a residuum of control over agency action because the agency is powerless to act without a congressional appropriation of funds. *See CFPB v. All Am. Check Cashing, Inc.*, 33 F.4th 218, 232 (5th Cir. 2022) (Jones, J., concurring) ("Congress's supremacy in fiscal matters makes the executive branch dependent on the legislative branch for subsistence, thereby forging a vital line of accountability between the executive branch and the legislative branch and, therefore, the people. Recent history confirms that Congress's appropriations powers have proven a forcible lever of accountability: Congress has tightened the purse strings to express displeasure with an agency's nefarious activities and even to end armed combat."). So even when statutes vest agencies with significant discretion, the appropriations process generally ensures agencies remain subservient to the will of the people as expressed through their elected representatives. *See* Jonathan H. Adler & Christopher J. Walker, *Delegation and Time*, 105 Iowa L. Rev. 1931, 1957 (2020) (cataloguing examples and noting that "[l]imiting appropriations is an effective way to limit an agency's exercise of delegated power").

---

will of Congress has been obeyed") (quoting *Yakus v. United States*, 321 U.S. 414, 425–26 (1944)).

No. 22-60008

Here, though, Congress cannot exercise control by limiting appropriations because the whole point of USF is to fund universal service *outside* the regular appropriations process.[10] And since FCC commissioners are removable by the President only for-cause, *see* 47 U.S.C. § 154(c)(1)(A), the connection between FCC policy decisions made pursuant to § 254 and *any* democratically accountable federal official is extremely attenuated.

3.

The Supreme Court has "over and over upheld even very broad delegations." *Gundy*, 588 U.S. at 146 (plurality op.). But it has also suggested the scope of permissible delegation varies with context. *See Am. Trucking*, 531 U.S. at 475 ("[T]he degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred."); *J.W. Hampton*, 276 U.S. at 406 ("In determining what [Congress] may do in seeking assistance from another branch, the extent and character of that assistence [*sic*] must be fixed according to common sense and the inherent necessities of the governmental co-ordination."); *Loving*, 517 U.S. at 768 (noting the general rule that "*a constitutional power* implies a power of

---

[10] FCC has concluded that 47 U.S.C. § 254 constitutes "a permanent indefinite appropriation." GAO-05-151, Greater Involvement Needed by FCC in the Management and Oversight of the E-Rate Program 11 (2005), https://perma.cc/QNU6-YEFS. If we had to decide whether § 254 comports with the Appropriations Clause, U.S. Const. art. I, § 1, cl. 9, we would apply the Supreme Court's decision in *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416 (2024). But we need not decide that question because Petitioners did not formally raise an Appropriations Clause challenge. Our point is only that, to the extent Congress's ability to control agencies through regular appropriations supplies some justification for broad delegations, *see, e.g.*, Christopher J. Walker, *Restoring Congress's Role in the Modern Administrative State*, 116 Mich. L. Rev. 1101, 1116 (2018) (explaining the tools Congress has, including the appropriations power, "to rein in the administrative state and prevent federal agencies from abusing their consolidated lawmaking and law-execution powers"), that justification is absent here.

delegation of authority under *it* sufficient to effect *its* purposes" (emphasis added)) (quoting *Lichter v. United States*, 334 U.S. 742, 778 (1948)); *Lichter*, 334 U.S. at 778–79 (suggesting Congress may delegate its war powers more broadly); *Panama Refin.*, 293 U.S. at 422 (same). So the fact that the Court has upheld certain broad delegations does not necessarily dictate that we uphold § 254's delegation of power to FCC to levy taxes on American consumers. And § 254 appears unlike any delegation the Court has ever blessed.

For starters, the Supreme Court's nondelegation "jurisprudence has been driven by a practical understanding that in our increasingly complex society, replete with ever changing and more *technical* problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives." *Mistretta*, 488 U.S. at 372 (emphasis added). So the Court has deemed it constitutionally sufficient for Congress to make a policy judgment and then direct an agency to give that judgment effect through the application of technical knowledge.

For example, in *American Trucking*, 531 U.S. 457, the Court considered a congressional directive to EPA to set ambient air quality standards for certain pollutants. *Id.* at 472. It held that the statute supplied an intelligible principle because it required EPA to set air quality standards "requisite to protect the public health" "for a discrete set of pollutants" based on "the latest scientific knowledge." *Id.* at 472–73. In other words, the statute was constitutional because Congress made the crucial policy judgment—that the public should be protected from harmful pollutants— and then relied on EPA to give effect to that judgment through the

No. 22-60008

application of its scientific expertise.[11] *See Gundy*, 588 U.S. at 166 (Gorsuch, J., dissenting) (explaining that the "most important[]" question in the intelligible principle inquiry is whether "Congress, and not the Executive Branch, ma[d]e the policy judgments").

Here, in contrast, Congress did not delegate because FCC has some superior technical knowledge about the optimal amount of universal service funding. No such knowledge exists because determining the ideal size of a welfare program involves policy judgments, not technical ones. And under our Constitution, those judgments usually are Congress's to make.

In fact, in every case where the Court has upheld a congressional delegation of its prerogative to make significant policy judgments, there has been some special justification. In *Mistretta*, for example, the Court considered a congressional delegation of authority to Article III judges to promulgate sentencing guidelines. Few things are more policy-laden than criminal sentencing decisions, but the Court found the delegation permissible because "the Judiciary always has played, and continues to play, [a role] in sentencing." *Mistretta*, 488 U.S. at 391; *see also ibid.* ("Just as the rules of procedure bind judges and courts in the proper management of the cases before them, so the Guidelines bind judges and courts in the exercise of their uncontested responsibility to pass sentence in criminal cases. In other words, the Commission's functions, like this Court's function in promulgating procedural rules, are clearly attendant to a central element of the historically acknowledged mission of the Judicial Branch.").

---

[11] The Court upheld the delegation only after deciding that the statute in question "unambiguously bar[red] cost considerations from the NAAQS-setting process." *Id.* at 471; *see also id.* at 473–74 (noting the statute "did not permit economic costs to be considered").

No. 22-60008

Similarly, in *National Broadcasting Co. v. United States*, 319 U.S. 190 (1943), the Court upheld a delegation to FCC to regulate broadcasting "as public convenience, interest, or necessity requires . . . ." *Id.* at 214. But licensing of broadcasting rests on the principle "that the public . . . own[s] the airwaves," and that private people may use that resource only on terms the government sets. John Harrison, *Executive Administration of the Government's Resources and the Delegation Problem*, *in* The Administrative State Before the Supreme Court 232, 250 (Peter J. Wallison & John Yoo eds., 2022); *see also* McConnell, The President Who Would Not Be King, *supra*, at 334 (noting that the Communications Act of 1934 "can be seen as merely a transfer back to the executive branch of a power to manage public property"). "[S]ecur[ing] the maximum benefits of" a public resource "to all the people of the United States," *Nat'l Broad. Co.*, 319 U.S. at 217, is "within the core of the executive power," Harrison, *Executive Administration*, *in* The Administrative State Before the Supreme Court, *supra*, at 238. And "when a congressional statute confers wide discretion to the executive, no separation-of-powers problem may arise if the discretion is to be exercised over matters already within the scope of executive power." *Gundy*, 588 U.S. at 159 (Gorsuch, J., dissenting) (citation and quotation omitted); *see Wayman v. Southard*, 23 U.S. 1, 42–43 (1825) ("It will not be contended that Congress can delegate . . . powers which are strictly and exclusively legislative. But Congress may certainly delegate to others, powers which the legislature may rightfully exercise itself."); *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319–20 (1936) (explaining that Congress may delegate more broadly in the foreign affairs context because "the President [is] the sole organ of the federal government in the field of international relations."); *see also* McConnell, The President Who Would Not Be King, *supra*, at 334 ("[S]ome of Congress's enumerated powers are strictly and

exclusively legislative but some are not, and Congress may either exercise the latter powers itself or delegate them."); Phillip Hamburger, *Nondelegation Blues*, 91 Geo. Wash. L. Rev. 1083, 1148 (2023) (noting that "the shared reach of the" legislative, executive, and judicial "powers occasionally allows different branches to do the same thing even under their different and separated powers.").

Section 254, in contrast, did not delegate to the executive any power even remotely executive in character. It delegated the power to tax, which "is a legislative function." *Nat'l Cable*, 415 U.S. at 340.

True, the Supreme Court has upheld seemingly broad congressional delegations of core legislative functions. *See, e.g.*, *Yakus*, 321 U.S. at 420 (upholding a delegation to the agency to fix the prices of commodities at a level that "will be generally fair and equitable and will effectuate the purposes of the Act." (citation omitted)); *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 97 (1946) (upholding a delegation to SEC to modify the structure of holding company systems so as to ensure that they are not "unduly or unnecessarily complicated" and do not "unfairly or inequitably distribute voting power among security holders." (citation omitted)). But careful consideration reveals that the statutes considered in all these cases limited agency discretion enough that, at the very least, reviewing courts could "ascertain whether the will of Congress ha[d] been obeyed." *Mistretta*, 488 U.S. at 379 (quoting *Yakus*, 321 U.S. at 425–26).

In *Yakus*, for example, Congress directed the administrator responsible for ensuring "fair and equitable" prices to "ascertain and give due consideration to the prices prevailing" in a particular two-week period, and to make adjustments for relevant factors including "[s]peculative fluctuations, general increases or decreases in costs of production, distribution, and transportation, and general increases or decreases in profits

earned by sellers of the commodity or commodities, during and subsequent to the year ended October 1, 1941." 321 U.S. at 421 (citation omitted). It can hardly be contended that the executive wanted for legislative direction under this statute, or that reviewing courts lacked workable standards. *See id.* at 426 (noting that "the standards prescribed by the . . . Act" were "sufficiently definite and precise to enable Congress, the courts and the public to ascertain whether the Administrator, in fixing the designated prices, has conformed to those standards"). Similarly in *American Power & Light Co.*, the Court found that "a veritable code of rules" set out in other sections of the statute clarified the ambiguities inherent in the phrases "unduly or unnecessarily complicate[d]" and "unfairly or inequitably distribute[d]" such that courts would have no trouble testing SEC's policies against the law. 329 U.S. at 104–05.

The Court's other nondelegation precedents are in accord. The statute considered in *J.W. Hampton*, 276 U.S. 394, simply directed the President to impose tariffs that would "equalize" the relative costs of production for American companies and their foreign counterparts—a fact-finding role. *Id.* at 401; *see also Gundy*, 588 U.S. at 163 (Gorsuch, J., dissenting) (noting that the statute may have required the President to make "intricate calculations, but it could be argued that Congress had made all the relevant policy decisions, and the Court's reference to an 'intelligible principle' was just another way to describe the traditional rule that Congress may leave the executive the responsibility to find facts and fill up details."). And the term "public interest" in § 407 of the Transportation Act of 1920 was shorthand for a congressional instruction to the Interstate Commerce Commission to ensure that proposed railroad consolidation would not result in deteriorating service quality or unreasonable or discriminatory rates—an instruction with discernible content in light of the common law of common carriers. *See N.Y. Cent. Sec. Corp. v. U.S.*, 287 U.S. 12, 25 (1932); *see also id.*

at 24 ("It is a mistaken assumption that [the term 'public interest'] is a mere general reference to public welfare without any standard to guide determinations. The purpose of the Act, the requirements it imposes, and the context of the provision in question show the contrary."); Herbert Hovenkamp, *Regulatory Conflict in the Gilded Age: Federalism and the Railroad Problem*, 97 YALE L.J. 1017, 1045 (1988) ("As early as the 17th century, the common law had derived the duty to charge reasonable rates from the common carrier's obligation to serve everyone . . . ."). And the statute considered in *Touby* "meaningfully constrain[ed] the Attorney General's discretion" because it directed the Attorney General to ban drugs only after making a factual determination that there was a history of significant abuse that threatened the public health. *See* 500 U.S. at 166; *see also Gundy*, 588 U.S. at 166 (Gorsuch, J., dissenting) (noting that in *Touby* the Court "stressed all [the statutory] constraints on the Attorney General's discretion . . . to indicate that the statute supplied an 'intelligible principle' *because* it assigned an essentially fact-finding responsibility to the executive." (emphasis in original)). And the statute considered in *Lichter*, 334 U.S. 742—which authorized the executive to recoup "excessive profits" on wartime government contracts—was likewise judicially workable. As the Court noted, 'excessive' simply means "[g]reater than the usual amount or degree." *Id.* at 785 n.37 (quoting WEBSTER'S NEW INTERNATIONAL DICTIONARY (2d ed. 1938)). A reviewing court would thus have no trouble discerning whether a contractor reaped in excess because it could easily compare his profits to those of his peers.[12] And so on and so forth.

---

[12] Moreover, as we have noted, context matters to the intelligible-principle inquiry. So assuming *arguendo Lichter* blessed a delegation more sweeping than any other (we think it did not), it is surely relevant that the Court emphasized that the statute in question came about because of the necessities of war, "sprang from [Congress's] war powers," and

No. 22-60008

\*     \*     \*

So amidst all the statutes that have survived nondelegation challenges, § 254 stands alone. Unlike delegations implicating special agency expertise, § 254 delegates to FCC the power to make important policy judgments, and to make them while wholly immunized from the oversight Congress exercises through the regular appropriations process. Unlike delegations implicating the power to impose criminal sentences, taxation has always been an exclusively legislative function. Unlike the power to impose conditions on the use of public property, taxation involves the conversion of private property. And unlike other congressional delegations implicating core legislative functions, § 254 is a hollow shell that Congress created for FCC to fill—so amorphous that no reviewing court could ever possibly invalidate any FCC action taken in its name.[13]

---

operated only for "the duration of the war or . . . a short time thereafter." *Id.* at 755; 787. As the Court explained, because "[t]he power to wage war is the power to wage war successfully," "[r]easonable regulations to safeguard the resources upon which we depend for military success must be regarded as being within the powers confided to Congress to enable it to prosecute a successful war." *Id.* at 780–81. The *Panama Refining* Court similarly deemed the wartime posture of certain broad delegations meaningful to the delegation inquiry because the President himself has war powers "cognate to the conduct by him of the foreign relations of the government." 293 U.S. at 422.

[13] Section 254 also implicates the taxing power, which makes the nondelegation concerns it raises especially salient. *See Nat'l Cable*, 415 U.S. at 341 ("It would be such a sharp break with our traditions to conclude that Congress had bestowed on a federal agency the taxing power that we read [the relevant statute] narrowly as authorizing not a 'tax' but a 'fee.'"). That is because limitations on the taxing power have long been the mechanism through which the people curb the excesses of unelected power. *See* THE FEDERALIST No. 58 (J. Madison) ("[The House], in a word, hold[s] the purse that powerful instrument by which we behold, in the history of the British Constitution, an infant and humble representation of the people gradually enlarging the sphere of its activity and importance, and finally reducing, as far as it seems to have wished, all the overgrown prerogatives of the other branches of the government.").

No. 22-60008

We therefore have grave concerns about § 254's constitutionality under the Supreme Court's nondelegation precedents. *See Gundy*, 588 U.S. at 136 (plurality op.) (noting that the Court "*would* face a nondelegation question" if the statutory provision at issue had "grant[ed] the Attorney General plenary power to determine [the statute's] applicability to pre-Act offenders—to require them to register, or not, as she sees fit, and to change her policy for any reason and at any time" (emphasis added) (citation omitted)). Nevertheless, we need not hold the agency action before us unconstitutional on that ground alone because the unprecedented nature of the delegation combined with other factors is enough to hold it unlawful. *See infra*, Part III.D.

---

For that reason, the framers through the Origination Clause took special care to ensure that the taxing power remained intimately connected with the people. *See* U.S. CONST. art. I, § 7, cl.1 ("All Bills for raising Revenue shall originate in the House of Representatives; but the Senate may propose or concur with Amendments as on other Bills."); 1 THE RECORDS OF THE FEDERAL CONVENTION OF 1787 544 (Max Farrand ed., 2d ed. 1937) (George Mason) ("[T]he consideration which weighed with the Committee [when drafting the Origination Clause] was that the [House] would be the immediate representatives of the people, the [Senate] would not."). In fact, "vesting the origination power with the House was an integral part of the deal that resolved the conflict over congressional apportionment: seats in the Senate would not be apportioned based on population, but only the House of Representatives would have the power to initiate legislation that raises or spends money." Krotoszynksi, Jr., *Reconsidering the Nondelegation Doctrine, supra*, at 252. Benjamin Franklin, among others, noted that "the two clauses, the originating of money bills, and the equality of votes in the Senate, [are] essentially connected by the compromise which had been agreed to." 2 THE RECORDS OF THE FEDERAL CONVENTION, *supra*, at 233.

So the Constitution's original meaning would seem to compel a more restrictive test for delegations of the taxing power. Nevertheless, the Supreme Court has declined to apply heightened scrutiny to tax-related delegations, *see Skinner*, 490 U.S. at 223, and we are not authorized to depart from that holding.

No. 22-60008

## C.

The Q1 2022 USF Tax is not only difficult to square with the Supreme Court's public nondelegation precedents. It was also formulated by private entities. That raises independent but equally serious questions about its compatibility with Article I, § 1, which requires "[a]ll legislative Powers herein granted shall be vested in a Congress." We (1) explain that the scope of FCC's delegation to private entities may violate the Legislative Vesting Clause by allowing private entities to exercise government power. Then we (2) explain that even if FCC's delegation could be constitutionally justified, FCC may have violated the Legislative Vesting Clause by delegating government power to private entities without express congressional authorization.

### 1.

#### a.

The Supreme Court has held Congress has broad discretion to empower executive agencies to "execute" the law. *See City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013). "When it comes to private entities, however, there is not even a fig leaf of constitutional justification. Private entities are not vested with legislative Powers. Nor are they vested with the executive Power, which belongs to the President." *Amtrak II*, 575 U.S. at 62 (Alito, J., concurring) (quotation and citations omitted). So it is clear that delegations to private entities raise constitutional concerns entirely distinct from delegations to the executive.

No. 22-60008

Only four times has the Supreme Court considered whether a delegation to private entities violates Article I's Vesting Clause.[14]

First, in *Schechter Poultry*, the Court considered a constitutional challenge to the National Industrial Recovery Act ("NIRA") of 1933, 48 Stat. 195. *See* 295 U.S. at 519–21. That statute delegated to trade or industrial groups the authority to develop codes defining "unfair method[s] of competition." *Id.* at 521 n.4 (quotation omitted). If the codes were approved by the President, they were to become law under "such exceptions to and exemptions from the provisions of such code, as the President in his discretion deem[ed] necessary to effectuate the policy" of the NIRA. *Ibid.* The Court held that the statute was unconstitutional. In part, it reasoned the idea that "Congress could delegate its legislative authority to trade or industrial associations or groups so as to empower them to enact the laws they deem to be wise and beneficent for the rehabilitation and expansion of their trade or industries," or that "trade or industrial associations or groups be constituted legislative bodies for that purpose because such associations or groups are familiar with the problems of their enterprises" was "utterly inconsistent with the constitutional prerogatives and duties of Congress." *Id.* at 537.

The next year, in *Carter v. Carter Coal Company*, 298 U.S. 238, 278 (1936), the Court considered a delegation challenge to the Bituminous Coal Conservation Act of 1935, 49 Stat. 991 (repealed 1937). That statute authorized the district board in local coal districts (the "code authority") to

---

[14] The parties in *Amtrak II* raised a private delegation challenge, but the Court did not reach it because it determined that, for relevant purposes, Amtrak was a governmental entity. *See* 575 U.S. at 55. The Court has also several times considered whether state delegations of legislative power to private entities violated due process, *see* Paul J. Larkin, *The Private Delegation Doctrine*, 73 Fla. L. Rev. 31, 45–47 (2021), but those cases present a question different from the one before us.

adopt a code that included agreed-upon minimum prices for coal. *Carter Coal*, 298 U.S. at 282–83. It also allowed an agreement between producers of more than two-thirds of the annual tonnage of coal and a majority of mine workers to set industry-wide minimum wage and maximum working-hour agreements. *Id.* at 283–84. Both the minimum price codes and the labor codes bound producers—*i.e.*, obtained legal force—without approval by any federal official. *Id.* at 282, 284. The Court explained the statute amounted to "delegation in its most obnoxious form" because it purported to delegate regulatory power not "to an official or an official body, presumptively disinterested," but rather "to private persons whose interests . . . often are adverse" to those whom the statute authorized them to regulate. *Id.* at 311. That, the Court held, was "an intolerable and unconstitutional interference with personal liberty and private property." *Ibid.*[15]

In *Currin v. Wallace*, 306 U.S. 1, 5–6 (1939), the Court considered a delegation challenge to the Tobacco Inspection Act of 1935, 49 Stat. 731 which authorized the Secretary of Agriculture to designate markets in which no tobacco could be sold unless it had "been inspected and certified by an authorized representative of the Secretary according to the established standards." One of the bases for the challenge was that the Secretary could not designate a market unless two-thirds of the growers voting at a prescribed referendum favored the designation. *See Currin*, 306 U.S. at 6, 15. But the producers had no power to designate the markets in which classification would be required; only the Secretary could do that. Nor did the statute even

---

[15] The Court did not clearly specify which constitutional provision—the Legislative Vesting Clause or the Fifth Amendment Due Process Clause—the statute offended. *See id.* at 310–12; *see also Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 881 n.23 (5th Cir. 2022). But because the relevant portion of the *Carter Coal* cited *Schechter Poultry*, a Vesting Clause case, alongside Due Process cases, the Court presumably held the delegation was unlawful on both grounds.

provide that the producers would help craft regulations. So unlike the private bodies in *Carter Coal*, the tobacco producers had no power to "make the law and force it upon a minority." *Id.* at 15–16 (citation omitted). Congress merely gave them the ability to prevent certain regulations from taking effect. *See ibid.* The Court accordingly rejected the challenge on the ground that the statute did not delegate *any* legislative power to private entities. *Ibid.*

Finally, in *Sunshine Anthracite Coal Company v. Adkins*, 310 U.S. 381, 387 (1940), the Court considered a private delegation challenge to The Bituminous Coal Act of 1937, 50 Stat. 72 (repealed 1966), a revised version of the statute the Court held unlawful in *Carter Coal*. Congress's most important revision was to relegate the code authorities from lawmakers to "aid[s]" subject to the "pervasive surveillance and authority" of the National Bituminous Coal Commission. *Sunshine Anthracite*, 310 U.S. at 388. Under the revised statute, code authorities could "propose" minimum prices, but their proposals were legal nullities until they were expressly "approved, disapproved, or modified" by the Coal Commission. *Ibid.* Thus, the Court concluded that the Commission, "not the code authorities, determine[d] [coal] prices," *id.* at 399, and it therefore held that the statute did not unconstitutionally delegate government power to private entities.

Lower courts have discerned from these cases the "cardinal constitutional principle [] that federal power can be wielded only by the federal government." *Black*, 53 F.4th at 872. Private delegations are thus constitutional only on three conditions. First, government officials must have final decision-making authority. *See* Larkin, *The Private Delegation Doctrine*, *supra*, at 50–51 (noting that in every case in which the Supreme Court has upheld a private delegation, "the law[] at issue . . . left final decision-making authority in the hands of a government official"). Second, agencies must *actually exercise* their authority rather than "reflexively rubber stamp [work product] prepared by others." *Sierra Club v. Lynn*, 502 F.2d 43, 59 (5th Cir.

No. 22-60008

1974); *see State v. Rettig*, 987 F.3d 518, 531 (5th Cir. 2021), *cert. denied, Tex. v. Comm'r of Internal Revenue*, 142 S. Ct. 1308 (2022) ("A federal agency may not abdicate its statutory duties by delegating them to a private entity." (quotation and citation omitted)).[16] And third, the private actors must always remain subject to the "pervasive surveillance and authority" of some person or entity lawfully vested with government power. *Sunshine Anthracite*, 310 U.S. at 388.

In light of these strictures on private delegations, we held unconstitutional a statute that vested a private entity with the power to make rules regulating an industry where those rules were subject only to limited agency review. *See Black*, 53 F.4th at 884–89. And the D.C. Circuit similarly held unconstitutional a statute that empowered Amtrak to work jointly with the Federal Railroad Administration to develop binding railroad performance standards because the statute did not vest FRA with complete regulatory control. *See Amtrak I*, 721 F.3d at 670–74, *vacated and remanded sub nom. Amtrak II*, 575 U.S. 43; *see also Black*, 53 F.4th at 889–90 (relying on *Amtrak I*).

In contrast, where courts have deemed delegations to private entities constitutional, they have uniformly emphasized the agency's actual decision-making authority and control. For example, when the Third Circuit approved the National Association of Securities Dealers' role in securities regulation, it explained industry self-regulation raises "serious constitutional

---

[16] *Lynn* arose under the National Environmental Policy Act ("NEPA"), not the Constitution. But *Rettig* repeatedly cited *Lynn* to expound the level of control agencies must retain over private actors wielding governmental power for constitutional purposes. *Rettig*, 987 F.3d at 532. The central question in *Lynn* was whether an agency bore ultimate responsibility for work product prepared by a private entity, *see* 502 F.2d at 59, which is required not only by NEPA but also by the Legislative Vesting Clause, *see, e.g.*, *Black*, 53 F.4th at 881.

challenges." *Todd & Co. v. SEC*, 557 F.2d 1008, 1014 (3d Cir. 1977). Accordingly, the Court held securities self-regulation was constitutional only after emphasizing that SEC was obliged to "insure fair treatment of those disciplined by" NASD. *Ibid.* It also stressed that SEC was statutorily required to review NASD orders, make de novo findings, and come to an "independent decision on" securities' violations and penalties. *See id.* at 1012; *see also id.* at 1012–13 ("[NASD's] rules and its disciplinary actions were subject to full review by the S.E.C., a wholly public body, which *must* base its decision on its own findings." (emphasis added)). Similarly, when we approved a private entity's role in drafting an environmental impact statement, we emphasized that "the applicable federal agency [bore] the responsibility for the ultimate work product" and "independently perform[ed] its reviewing, analytical and judgmental functions." *Lynn*, 502 F.2d at 59 (quotation and citation omitted); *see also Rettig*, 987 F.3d at 531–32 (citing *Lynn* in an Art. I, § 1 challenge).

b.

FCC has delegated government power—the power to dictate the size of the universal service contribution amount, which controls the size of a tax levied on American consumers—to USAC and private telecommunications carriers. That delegation is lawful only if FCC (1) has final decision-making authority, (2) actually exercises that authority, and (3) exercises "pervasive surveillance and authority" over the private entities exercising power in its name. *Black*, 53 F.4th at 884 (quoting *Sunshine Anthracite*, 310 U.S. at 388).

FCC's subdelegation of its taxing power violates this test in two ways. The first problem is that FCC regulations provide that USAC's projections take legal effect without formal FCC approval. *See* 47 C.F.R. § 54.709(a)(3). FCC has, in effect, given private entities the final say with respect to the size of the USF Tax. That FCC retains discretion to revise the proposed

No. 22-60008

contribution amount, *see ibid.*, is insufficient. Congress could not say: "The defense budget is whatever Lockheed Martin wants it to be, unless Congress intervenes to revise it." To make law, Congress must affirmatively adopt the statutory text, pass it bicamerally, and present it to the President for signature. *INS v. Chadha*, 462 U.S. 919, 959 (1983). Legislation requires action not acquiescence. Similarly, while FCC may solicit advice from USAC and private carriers, it must affirmatively act to give legal effect to that advice because it alone has constitutional authority to execute 47 U.S.C. § 254.

The second problem is that FCC does not appear to "independently perform[] its reviewing, analytical and judgmental functions" with respect to the privately supplied universal service contribution amount. *Rettig*, 987 F.3d at 532 (quoting *Lynn*, 502 F.2d at 59). FCC has not pointed us to anything that suggests it *even checks* USAC's work. Instead, it appears to "reflexive[ly] rubber stamp" whatever contribution amount USAC proposes. *Lynn*, 502 F.2d at 59. The record before us shows that, before this litigation started, FCC *never made a single substantive change* to the contribution amounts proposed by USAC. *See supra*, at 6 & n.1.[17]

That is a *de facto* abdication. And when an agency *de facto* abdicates to a private entity its responsibility to make governmental decisions, that entity becomes more than a mere "aid" to the agency. *See Black*, 53 F.4th at 881 (quoting *Sunshine Anthracite*, 310 U.S. at 388). The private company becomes a lawmaker in its own right. So *de jure* approval alone is not enough. If FCC is going to rely on a non-governmental actor to supply a revenue requirement that dictates the size of a tax levied on American consumers, it

---

[17] Even if FCC wanted to change USAC's proposals, it is not at all clear it could. Petitioners contend, and FCC does not dispute, that the "approval" process for USAC's proposals plays out just days before the new quarter begins. With such a short time window, it appears FCC has no real choice but to accept USAC's proposed figures.

must at the very least do something to demonstrate that it applied its independent judgment.

c.

The Government's principal counterargument is that FCC—not USAC—is exercising governmental power. Its argument goes like this: FCC sets out detailed regulations specifying who is eligible for what kinds of universal service subsidies. Private companies merely project the costs they will incur supplying the FCC-specified subsidized services and report that information to USAC. And then USAC merely aggregates that information into a contribution amount, which FCC turns into the contribution factor that is levied on telecommunications revenues as a USF Tax. FCC regulations even preclude USAC from making policy. So in determining the contribution amount, which directly controls the size of the tax levied on American telecommunications consumers, USAC and private carriers perform a simple, ministerial task—a mere "fact gathering function for the FCC." FCC EB Br. 56 (quotation omitted).

But FCC obfuscates how the universal service sausage is really made. FCC would have us believe its universal service policy necessarily dictates the size of the contribution amount, and so FCC really controls the size of the USF Tax. But that cannot be right because USF disbursements often do not comply with FCC policy. *See supra*, Part I.C. Instead, large swaths of USF funds—perhaps at one point close to one-quarter—are disbursed to ineligible recipients. *See, e.g.*, The High-Cost Program, *supra*, at 2. That FCC sets universal service policy obviously does nothing to limit the revenue FCC allows private entities to exact from consumers to fund payments made *in violation of* FCC's universal service policy.

Put differently, FCC policy would dictate the contribution amount only if it in fact dictated how private companies raised and spent USF

monies. The problem is that FCC has abdicated responsibility for ensuring compliance to the very entities whose universal service demand projections dictate the size of the contribution amount. *See, e.g.*, FCC's Lifeline Program, *supra*, at executive summary page (noting that FCC "relies on over 2,000 Eligible Telecommunication Carriers that are Lifeline providers to implement key program functions, such as verifying subscriber eligibility," which is problematic because "companies may have financial incentives to enroll as many customers as possible"); FCC's E-rate Program, *supra*, at 21–22 (noting that telecommunications service providers have opportunities to "make misrepresentations . . . during the funding phase" that "may not be discovered due to the self-certifying nature of the program").

Moreover, the entity most responsible for snuffing out wasteful or fraudulent disbursements—USAC—is run almost entirely by stakeholders who stand to benefit financially when universal service subsidies grow. *See Leadership*, Universal Serv. Admin. Co., *supra*; *see also* FCC's E-rate Program, *supra*, at 15 (noting that FCC relies on USAC to ensure compliance carrier compliance with FCC rules). And that is no accident. USAC is run by self-interested stakeholders because FCC regulations *require* it. *See* 47 C.F.R. § 54.703(b). FCC mandates that nine of USAC's nineteen directors represent companies in the telecommunications industry who are compensated by the very same USF funds they raise. *See id.* § 54.703(b)(1)– (6). It mandates that another seven represent the schools, libraries, health care providers, and low-income consumers who are direct recipients of USF funds. *See id.* § 54.703(b)(7)–(10).

Because the telecommunications industry polices its own compliance with FCC universal service policy, and responsibility for monitoring the industry falls most heavily on a board composed of industry representatives and consumer groups with a direct financial interest in the size of USF taxes,

private entities have a far more important and discretionary role in determining the size of the contribution amount (which controls the level of universal service taxation) than FCC would have you believe. For example, a carrier could (intentionally or unintentionally) project and then supply USF-subsidized service costing twenty-five percent more than its USF-subsidized service would cost if it strictly complied with FCC rules. And FCC offers us *zero* reason to think it would even discover the discrepancy—let alone that FCC would do *anything* about it. FCC has in effect said to carriers: "Here is our universal service policy and a blank check. We're not going to pay any attention to what you put in the dollar box. We know you have financial incentives to juice the number, but we trust you'll follow our policy to the letter anyways. Just fill it out however you see fit, take it to the bank, and the money will be drawn from the accounts of American telecommunications consumers." We do not doubt that most of the industry is staffed by individuals of the utmost integrity, but we cannot agree that private entities are no more than ministerial bean counters when it comes to setting the USF Tax.

Moreover, even if we put the compliance issue to one side, we would still disagree that private companies have merely "ministerial" control over the contribution amount. As we have noted, FCC's counterargument turns on the Commission's nominal control over universal service policy. But setting a policy is not the same as allocating funds to execute that policy. That much is evident from the constitutional requirement that Congress appropriate money to execute the government programs it establishes. *See* U.S. Const. art. I, § 9, cl. 7. Thus, FCC's argument fails because it impermissibly collapses universal service funding decisions into universal service policy decisions. The decision of how much money should be set aside to execute FCC's universal service policies—the very decision FCC has delegated to USAC and private carriers—is an independent decision that

No. 22-60008

requires independent judgment. And surely discretion inheres in decisions about how much money to allocate to a massive federal welfare program. *See Gaines v. Thompson*, 74 U.S. (7 Wall.) 347, 353 (1868) ("A ministerial duty . . . is one in respect to which nothing is left to discretion." (quotation omitted)). So even if we thought FCC correctly described the role of private entities, we would still conclude that dictating the contribution amount is an exercise of government power.

\*    \*    \*

FCC has not delegated to private entities a trivial, fact-gathering role. It has delegated the power to dictate the amount of money that will be exacted from telecommunications carriers (and American consumers in turn) to promote "universal service." In other words, it has delegated the taxing power. And the delegation is not even "to an official or an official body, presumptively disinterested," but rather to private persons vested with no government power and with interests that "often are adverse" to those whom they are taxing. *Carter Coal*, 298 U.S. at 311; *see also Ass'n of Am. Railroads v. U.S. Dep't of Transp.* ("*Amtrak III*"), 821 F.3d 19, 29 (D.C. Cir. 2016) ("Delegating legislative authority to official bodies is inoffensive because we presume those bodies are disinterested, that their loyalties lie with the public good, not their private gain. But here, the majority producers may be and often are adverse to the interests of others in the same business." (citation and quotation omitted)). We accordingly have serious trouble squaring FCC's subdelegation with Article I, § 1 of the Constitution.[18]

---

[18] JUDGE NEWSOM recently expressed skepticism that the private entities involved in USF may constitutionally exercise the power FCC delegated to them. *See Consumers' Rsch.*, 88 F.4th at 932 (Newsom, J., concurring). But JUDGE NEWSOM voted to deny a petition for review that is almost identical to the one before us because in his view, these private entities exercise executive rather than legislative power, and petitioners did

No. 22-60008

2.

Even if the Constitution does not categorically forbid FCC's delegation to USAC and private telecommunications carriers, 47 U.S.C. § 254 does not authorize it. And there is no precedent establishing that federal agencies may subdelegate powers in the absence of statutory authorization. To the contrary, the *only* Supreme Court cases blessing private delegations involved explicit statutory authorizations.

a.

At the Founding, the maxim that *delegata potestas non potest delegari*—no delegated powers can be further delegated—was widely accepted. The maxim has its roots in the civil law. *See* Patrick W. Duff & Horace E. Whiteside, Delegata Potestas Non Potest Delegari: *A Maxim of American Constitutional Law*, 14 Cornell L.Q. 168, 171 (1929). Lord Coke enshrined the maxim as a common law doctrine. *See id.* at 170–71 (citations omitted). And the doctrine endured through the founding generation, as evidenced by treatises of the great 19th-century scholars. Samuel Livermore, for example, noted that "[a]n authority given to one person cannot in general be delegated by him to another; for being a personal trust and confidence it is not in its nature transmissible, and if there be such a power to one person, to exercise his judgment and discretion, he cannot say, that the trust and confidence reposed in him shall be exercised at the discretion of another person." A Treatise on the Law of Principal and Agent and of Sales by Auction 54 (1818). Likewise, James Kent wrote that "[a]n agent, ordinarily and without express authority, has not power to employ a

---

not raise an Article II challenge. *Ibid.* With utmost respect to our distinguished colleague, private entities do play a legislative role in the USF because their projections directly control the size of USF tax rates, and setting tax rates is unquestionably a legislative function. *See supra*, Part III.B.

sub-agent to do the business, without the knowledge or consent of his principle. The maxim is, that *delegatus non potest delegare*, and the agency is generally a personal trust and confidence which cannot be delegated." 2 Commentaries on American Law 496 (1827). And Joseph Story agreed, explaining that "[o]ne, who has a bare power or authority from another to do an act, must execute it himself, and cannot delegate his authority to another; for this being a trust or confidence reposed in him personally, it cannot be assigned to a stranger, whose ability and integrity might not be known to the principal or who, if known, might not be selected by him for such a purpose." Commentaries on the Law of Agency, as a Branch of Commercial and Maritime Jurisprudence 66–67 (1844).

As with most rules, this one had exceptions. Common lawyers assumed that ministerial tasks could be subdelegated. *See* Gary Lawson & Guy Seidman, "A Great Power of Attorney": Understanding the Fiduciary Constitution 115 (2017). And a fiduciary document could specifically authorize subdelegations of delegated authority. *Ibid.*

But as a general matter, "[t]he founding-era rule against subdelegation of delegated agency authority is as clearly established as any proposition of law can be established." *Id.* at 114. And it was not merely a proposition of agency law. In fact, the Supreme Court once noted that the maxim "has had wider application in the construction of our federal and state Constitutions than it has in private law." *J.W. Hampton*, 276 U.S. at 405–06; *see also* Duff & Whiteside, Delegata Potestas Non Potest Delegari, *supra*, at 175 ("[I]n cases which involve a supposed delegation to an independent board or commission, as well as those where the delegation is to the executive or judiciary, the maxim *delegata potestas non potest delegari*, or its English

equivalent, has been the chief reliance of the courts, and has attained in their eyes the dignity of a principle of constitutional law.").

So the Founders' law prohibited unauthorized subdelegations of non-ministerial delegated authority, and the Supreme Court has recognized that as a constitutional principle. *See J.W. Hampton*, 276 U.S. at 405–06; *cf. Gundy*, 588 U.S. at 135 (plurality op.) ("Article I of the Constitution provides that '[a]ll legislative Powers herein granted shall be vested in a Congress of the United States.' § 1. Accompanying that assignment of power to Congress is a bar on its further delegation."). We think the clear implication is that the Constitution imposes upon federal agencies—acting as agents of the people's representatives in Congress—a duty to wield delegated power unless Congress authorizes subdelegation or the subdelegation involves no more than ministerial tasks. In other words, "*Congress* may formalize [a limited] role [for] private parties" in executing its laws, *Amtrak I*, 721 F.3d at 671 (emphasis added) (citing *Sunshine Anthracite*, 310 U.S. at 388), but agencies may not.

b.

This rule does not just accord with law at the Founding; it also accords with Supreme Court precedent.

The Court has emphasized the "vital constitutional principle" that "[l]iberty requires accountability." *Amtrak II*, 575 U.S. at 57 (Alito, J., concurring). Every executive branch official is in some way accountable to the people because every executive branch official may be removed—for good cause at least—by the President, who is himself "the most democratic and politically accountable official in Government." *Seila L. LLC v. CFPB*, 591 U.S. 197, 224 (2020). Private persons, in contrast, may not be removed by the President because private persons do not wield any portion of "the executive Power" our Constitution vests "in a President of the United States

No. 22-60008

of America." U.S. CONST. art. II, § 1, cl. 1. There is no reason to lightly infer that Congress intends to insulate law execution from democratic accountability in this way.[19]

In accordance with these principles, both Supreme Court cases authorizing private entities to wield anything like government power involved express authorizations from Congress. The Tobacco Inspection Act considered in *Currin* expressly provided that regulations would take effect only with the support of two-thirds of the tobacco growers in the relevant market. *See* 306 U.S. at 6, 15. And the Bituminous Coal Act considered in *Sunshine Anthracite* created the very private boards that proposed minimum prices and labor codes to the Coal Commission. *See* 310 U.S. at 387–88 (noting that the statute provided for "[s]ome twenty district boards of code members . . . which are to operate as an aid to the Commission" and "specifie[d] in detail the methods of their organization and operation, the scope of their functions, and the jurisdiction of the Commission over them.").[20]

c.

Section 254, by contrast, makes no mention of the fact that private entities might be responsible for determining the size of the tax FCC levies

---

[19] Deciding who should exercise governmental power can be as important as deciding whether governmental power should be delegated in the first place. If it were not, we would not care so deeply about Presidential elections. So democratic accountability is frustrated when decisions about who should exercise governmental power are made by bureaucrats—whose connection to the people is real but highly attenuated—rather than Congress, whose members are directly "accountable to [their] constituents through regular popular elections." *Jarkesy*, 34 F.4th at 459 (citation omitted).

[20] Likewise the Maloney Act, which the Third Circuit considered in *Todd & Co.*, specifically authorized registered organizations to self-regulate over-the-counter securities markets. *See* 557 F.2d at 1012.

on American consumers. It does not *even mention* USAC, a Delaware corporation FCC established without congressional authorization.

When asked at oral argument to identify the portion of § 254 that authorizes FCC to subdelegate administration of the universal service contribution mechanism to private entities, the Government's counsel could point only to subsection § 254(b)(5). *See* Oral Arg. at 46:40–48:55. That subsection directs FCC to establish "mechanisms to preserve and advance universal service." § 254(b)(5). But a directive to establish "mechanisms" plainly does not imply that those "mechanisms" may be controlled by a private, non-governmental entity incorporated by FCC without any involvement from Congress.

In fact, § 254(b)(5) seems to suggest precisely the opposite. Rather than directing FCC to establish private mechanisms, it specifically instructs FCC to establish "Federal and State mechanisms," *ibid.*, which indicates Congress intended to make government entities responsible for administering universal service programs. So subsection (b)(5) is unavailing.

The closest § 254 comes to contemplating that a non-governmental entity might play any role in executing the statute is to incorporate by reference some of the preexisting regulations governing the Lifeline Program. *See* § 254(j) ("Nothing in this section shall affect the collection, distribution, or administration of the Lifeline Assistance Program provided for by the Commission under regulations set forth in section 69.117 of title 47, Code of Federal Regulations, and other related sections of such title."). Those regulations made the National Exchange Carrier Association ("NECA") responsible for calculating the Lifeline Assistance charges levied on local exchange carriers. *See* 47 C.F.R. § 69.117 (10-1-95 ed.). And they gave local exchange carriers a small role in determining the size of Lifeline Assistance charges because carriers could obtain subsidies for their self-reported costs

incurred in waiving one kind of regulatory fee. *See id.* § 69.104(j) (10-1-95 ed.).

But the fact that § 254 incorporated certain pre-1996 Lifeline Assistance program regulations does not suggest Congress authorized FCC's abdication of responsibility for the USF Tax to private entities. That is for three reasons.

First, NECA's role under 47 C.F.R. § 69.117 in 1995 was not remotely analogous to USAC's current role of administering the entire USF. Section 69.117 charged NECA only with two simple, ministerial tasks: (1) Calculating Lifeline Assistance charges by "dividing the sum of one-twelfth of the projected annual Lifeline Assistance revenue requirement and one-twelfth of the projected annual revenue requirement calculated by all telephone companies pursuant to § 69.104(l) by the number of common lines presubscribed to interexchange carriers . . . ." *Id.* § 69.117(b) (10-1-95 ed.). And (2) "bill[ing] and collect[ing] the charge, and disburs[ing] associated revenue." *Ibid.* USAC's role as USF administrator, by contrast, involves far more than ministerial tasks. *See supra*, Part III.C.1.c.

Second, the carriers' role under 47 C.F.R. § 69.117 (and associated regulations) in 1995 was not analogous to their role in 2023. Before the 1996 Act, FCC regulations authorized certain carriers to bill the Lifeline Program for costs associated with waiving certain minor, regulatorily imposed end user common line charges for certain means-tested subscribers pursuant to a carrier-developed plan certified by FCC. *Id.* § 69.104(j) (10-1-95 ed.). But carriers could waive end user charges only if they reduced their own service rate charges by an equivalent amount. *Ibid.* That is nothing like the modern universal service regime, which allows a greatly expanded class of carriers to bill USF for a broad range of subsidized services provided at no cost to themselves.

No. 22-60008

Third, even if the role NECA and telecommunications carriers played in administering Lifeline Assistance charges before § 254 was analogous to the role they play in administering the modern Lifeline Program, there is no evidence Congress contemplated private entities would play the same role in administering the three other major universal service programs FCC has established pursuant to its § 254 authority. That Congress provided a narrow role for certain private entities in administering a small government program subsidizing one kind of telecommunications service says nothing about whether Congress authorized a broadly expanded class of private entities to play a central role in administering a nine-billion-dollar welfare fund offering subsidies for technologies no one could have imagined when § 254 was enacted. If anything, the text of § 254 suggests Congress actually meant to *preclude* private entities from administering USF programs other than Lifeline. That is because NECA did administer the pre-1996 USF. *See* 47 C.F.R. § 69.116 (10-1-95 ed.). But NECA's USF responsibilities were distinct from its Lifeline Assistance responsibilities; the former were spelled out in § 69.116, and the latter in § 69.117. Congress referenced § 69.117 in § 254, but it conspicuously did not reference § 69.116. Congress's explicit recognition of one relatively minor aspect of private companies' participation in the pre-1996 Lifeline Assistance regime thus evinces that Congress knew how to empower private companies and chose not to empower them to administer other aspects of the USF.

So if Congress authorized FCC to delegate sweeping universal service responsibilities to private entities, it did not say so very clearly. Indeed, it speaks volumes that the only plausible statutory justification for FCC's subdelegation—§ 254(j)—is so ambiguous that FCC, which should be more familiar with § 254 than anyone, did not even think to point to it as justification for its reliance on private companies to set the USF Tax.

No. 22-60008

\*    \*    \*

FCC subdelegated the power to determine the universal service contribution amount to USAC, who further subdelegated it to private, for-profit telecommunications carriers. That subdelegation was not authorized. *See supra*, Part III.C.2.c. And the tasks FCC subdelegated are not ministerial. *See supra*, Part III.C.1.b–c. So even if Article I, § 1 does not categorically forbid USAC and private telecommunications carriers from exercising the kind of power FCC has vested in them, it may forbid them from doing so absent express congressional authorization.[21]

### D.

We are highly skeptical that the contribution factor before us comports with the bar on congressional delegations of legislative power. And we are similarly skeptical that it comports with the general rule that private entities may not wield governmental power, especially not without express and unambiguous congressional authorization. But we need not resolve either question in this case. That is because *the combination* of Congress's sweeping delegation to FCC and FCC's unauthorized subdelegation to USAC violates the Legislative Vesting Clause in Article I, § 1.

---

[21] Petitioners certainly could have framed their private nondelegation challenge in statutory terms. *See Consumers' Rsch*, 88 F.4th at 933 (Newsom, J., concurring) ("[I]t may be that USAC is operating in contravention of the governing statute, 47 U.S.C. § 254, which conspicuously never even *mentions* USAC, let alone authorizes its involvement in the universal-service program." (emphasis in original)). But assuming private entities are permitted to exercise government power at all, the decision to delegate government power to a private entity is itself a legislative one. And since agencies may not wield legislative power, we are persuaded FCC's unauthorized decision to delegate government power to a private actor likely violates not only § 254 but also Article I, § 1 of the Constitution. *But see id.* at 933 n.5 (Newsom, J., concurring) (expressing skepticism that the lack of statutory authorization for a delegation to a private entity "has any real bearing on the *constitutional* [private nondelegation] question" (emphasis in original)).

No. 22-60008

We (1) explain the Supreme Court's cases instructing that separation-of-powers jurisprudence is done holistically, with an eye to constitutional history and structure, not by dissecting government programs into their component parts. Then we (2) explain why an agency action involving a broad congressional delegation *and* an unauthorized agency subdelegation to private entities violates the Constitution even if neither of those features does so independently.

1.

The Supreme Court has instructed us to review separation-of-powers challenges holistically. And it has held that two or more things that are not independently unconstitutional *can combine* to violate the Constitution's separation of powers.

Take for example *Seila Law*, 591 U.S. 197. The question presented in that case was whether a for-cause removal restriction unconstitutionally infringed the President's power to remove the Director of the Consumer Financial Protection Bureau. *See id.* at 204. Two lines of precedent seemed to converge to suggest the removal restriction at issue posed no constitutional problem. First, *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), established that Congress may constitutionally grant for-cause removal protections to a group of agency directors that wield executive power. *See also Seila L.*, 591 U.S. at 216 n.2 (noting that FTC has always exercised executive power). Second, *Morrison v. Olson*, 487 U.S. 654 (1988), established that Congress may constitutionally give for-cause removal protection to a single official vested with executive authority. *See also Seila L.*, 591 U.S. at 217 (noting that the independent counsel wielded executive power). The Court of Appeals accordingly reasoned that *Humphrey's Executor* and *Morrison* controlled and that the statutory provision limiting the President's power to

remove the CFPB director was constitutional. *CFPB v. Seila L. LLC*, 923 F.3d 680, 684 (9th Cir. 2019).

The Supreme Court reversed. It granted that some for-cause removal restrictions are not problematic. *See Seila L.*, 591 U.S. at 215. And it granted that for-cause removal restrictions applied to single-member directorships are sometimes constitutionally permissible. *See id.* at 217. But it held the combination of (1) for-cause removal, (2) a one-member CFPB Director, and (3) the capacious powers of the CFPB created a constitutional problem. *Id.* at 224–25; *see also id.* at 258 (Thomas, J., concurring in part) ("The constitutional violation results from, at a minimum, the *combination* of the removal provision and the provision allowing the CFPB to seek enforcement of a civil investigative demand." (emphasis added) (citations omitted)). In other words, three features of the CFPB—each independently constitutional—combined to create a "new situation" that could not be decided by reference to precedents that concerned only one aspect of the problem. *Id.* at 220 (citation omitted).

The same kind of reasoning guided the Court in *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477 (2010). In that case, the question presented was whether "the President [may be] restricted in his ability to remove a principal officer, who is in turn restricted in his ability to remove an inferior officer, even though that inferior officer determines the policy and enforces the laws of the United States[.]" *Id.* at 483–84. The Court noted its previous holding that Congress may provide for restrictions on the President's ability to remove the directors of independent agencies like SEC. *See id.* at 483; *see also Humphrey's Executor*, 295 U.S. 602. It also noted its previous holding that Congress may provide for restrictions on the power of principal executive officers to remove their own inferiors. *See ibid.*; *see also United States v. Perkins*, 116 U.S. 483 (1886). But the Court held that the *combination* of two separate layers of removal protections created "a

No. 22-60008

new situation not yet encountered by the Court." *Free Enter. Fund*, 561 U.S. at 483. And that combination, the Court held, violated the Constitution. *Id.* at 484.

*Seila Law* and *Free Enterprise Fund* thus evince a general principle that, with respect to the separation of powers at least, two constitutional parts do not necessarily add up to a constitutional whole. *Cf.* Aristotle, *Metaphysics*, *in* 1 Works of Aristotle 569 (Mortimer J. Adler ed., W. D. Ross trans., 1990) (observing "the whole is" often "something besides the parts"). Rather, reviewing courts must consider a government program holistically, with an eye toward its compatibility with our constitutional history and structure. *See Seila L.*, 591 U.S. at 222.

2.

Here, history and structure both point in the same direction: the universal service contribution mechanism is unconstitutional.

a.

"Perhaps the most telling indication of a severe constitutional problem" with the structure of a government program "is a lack of historical precedent to support it." *Id.* at 220 (quotation omitted) (quoting *Free Enter. Fund*, 561 U.S. at 505). And USF's double-layered delegation is unprecedented.

First, there is no record of any government program like USF in all the U.S. Reports. The only case that even remotely resembles USF's combination of a broad congressional delegation with significant industry involvement is *Sunshine Anthracite*, 310 U.S. 381. *See supra*, Part III.C.1.a.

While *Sunshine Anthracite* is the closest analogue, it is not really that close. Unlike USAC and private telecommunications carriers, which *de facto* decide the USF contribution amount, the code authorities under the

Bituminous Coal Act of 1937 only had the power to *recommend* minimum coal prices. *See* 310 U.S. at 399 ("[The Coal Commission], not the code authorities, determines the prices."). And the only recommendations the code authorities could make were cabined by a clear rule: Congress provided that minimum coal prices were to be fixed at a level which "reflect[ed] as nearly as possible the relative market values at points of delivery taking into account specifically enumerated factors," *id.* at 397—namely labor, supplies, power, taxes, insurance, workmen's compensation, royalties, depreciation and depletion and all other direct expenses of production, coal operators' association dues, district board assessments for Board operating expenses only levied under the code, and reasonable costs of selling and the cost of administration. *See* The Bituminous Coal Act of 1937, 50 Stat. at 78. Those enumerated factors, "consistently with the process of coordination, yield a return to each area approximating its weighted average cost per ton." *Sunshine Anthracite*, 310 U.S. at 397.[22]

That case is nothing like ours. To make *Sunshine Anthracite* apposite, the Coal Commission's discretion to set minimum prices would have had to have been unfettered (it was not); the Coal Commission's passive acquiescence would have had to make the code authorities' price recommendations legally binding (it did not); and there would have to have been evidence that the Coal Commission *always* agreed with the code authorities' price recommendations (there was not).

Second, FCC has not pointed to any historical analogue outside the U.S. Reports. That is hardly surprising. USF combines a sweeping delegation of the taxing power, *see supra*, Part III.B, with a subdelegation of that power

---

[22] The statute also authorized the Commission to fix maximum coal prices under certain circumstances, but the code authorities had no role in formulating those maximums. *See ibid.*

to private entities with a personal financial interest in the size of the tax, *see supra*, Part III.C. It is difficult to imagine early Congresses would have authorized a similarly dual-layered delegation of the taxing power.

True, Congress has always relied on the executive to execute tax laws. For example, in 1798 Congress vested tax assessors with authority to value real estate for the purpose of administering a nationwide direct tax. *See* Act of July 14, 1798, ch. 75, 1 Stat. 597 (1798); *see also* Nicholas R. Parrillo, *A Critical Assessment of the Originalist Case Against Administrative Regulatory Power: New Evidence from the Federal Tax on Private Real Estate in the 1790s*, 130 Yale L.J. 1288 (2021). But the 1798 direct tax is no precedent for the USF Tax because the 1798 direct tax is nothing like the USF Tax. That is for three reasons.

First, the 1798 Congress itself decided the amount of revenue the Government would levy from American citizens. *See* Parrillo, *New Evidence*, *supra*, at 1303 ("Congress decided to raise $2 million nationwide and, per the Constitution's requirement for direct taxes, apportioned that sum among the states according to each state's free population plus three-fifths of its slave population."). In contrast, Congress through § 254 delegated to FCC the power to decide how much revenue the Government will raise via USF taxes. And FCC's revenue-raising discretion is limited only by the most amorphous of standards. *See supra*, Part III.B.2. So while the 1798 Executive Branch only had authority to raise $2 million, the present-day FCC can levy taxes practically *ad infinitum* based on little more than its own conception of the public interest. *See ibid.* It thus strains credulity to analogize the 1798 direct tax to the USF Tax.

Second (and relatedly), unlike the Congress that enacted § 254, the 1798 Congress made all the relevant tax policy decisions. It decided to raise $2 million, it decided to levy the $2 million through direct taxes on property

(mostly real estate), and it decided how the tax burden would be allocated: mainly in proportion to the value of citizens' property in money. Parrillo, *New Evidence*, *supra*, at 1303; *see supra*, Part III.B.2 (explaining the policy decisions § 254 leaves for FCC). That makes sense because tax decisions—including decisions about rates—traditionally implicated the legislative power and so could not be made by officials in the executive branch. *See* Phillip Hamburger, Is Administrative Law Unlawful 57–64 (2014).

Obviously a direct tax on land could not be administered without a fair accounting of the value of citizens' property, so Congress provided for assessors and gave them authority to assess the value of citizens' property. Congress did not provide detailed instructions about how assessors were to go about their business, but that is of no significance. At common law, "[d]eterminations of facts, *including assessments*, were understood . . . to be judicial in nature, not legislative. Although not actually exercises of judicial power, they were expected to mimic judicial decisions at least in being exercises of judgment" as opposed to legislative will. Hamburger, *Nondelegation Blues*, *supra*, at 1211 (emphasis added). In other words, the making of assessments has never involved legislative power because it has always been assumed that assessors must accurately characterize the facts on the ground and fairly apply the law to the facts.

For example, in 1598 the English Court of Common Pleas heard a case concerning the power of the sewers commissioners, who were tasked with repairing riverbanks and assessing the costs to nearby landowners. *See Rooke's Case*, 77 Eng. Rep. 209 (C.P. 1598) (Coke, J.). The commissioners repaired a riverbank and then assessed the entire cost to one nearby landowner. The landowner sued, and Lord Coke held the commissioners acted unlawfully because they were supposed to assess repair costs to "all who had land in danger." *Id.* at 210. Coke explained that while "[t]he words

of the commission [gave] authority to the commissioners to do according to their discretions," the commissioners could "not [act] according to their wills and private affections" but rather were "limited and bound with the rule of reason and law." *Id.* at 210. Thus, the discretion possessed by the commissioners was merely the discretion "to discern between falsity and truth." *Ibid.* In other words, the commissioners had the power to determine whose land was truly endangered by damaged riverbanks, but they could not use that discretion to make policy judgments about which landowners should bear the cost of repairing those banks. *See* Hamburger, Is Administrative Law Unlawful, *supra*, at 97–100 (describing the nature of assessments at common law).

Like the common law assessors, the tax assessors at the founding had discretion merely "to discern between falsity and truth" in property values. *Rooke's Case*, 77 Eng. Rep. at 210. Federal officials assumed all property had a "correct valuation." Parrillo, *New Evidence*, *supra*, at 1366 (quoting Oliver Wolcott, Jr., Direct Taxes 441 (1796)). The task of officials executing the direct tax was merely to make the factual determinations necessary to unearth that correct valuation. Congress told the assessors to do this "just[ly] and equitab[ly]"—"a familiar measure of the conduct of government officials making judicial or judicial-like determinations, including assessments." Hamburger, *Nondelegation Blues*, *supra*, at 1212. The assessors accordingly had no power to make tax policy, at least not legitimately. And the kinds of factual findings Congress charged the assessors with making have never been thought to involve legislative power. *See, e.g.*, *Panama Refin.*, 293 U.S. at 426 ("[A]uthorizations given by Congress to selected instrumentalities for the purpose of ascertaining the existence of facts to which legislation is directed have constantly been sustained.").

No. 22-60008

It is possible that assessors sometimes mischaracterized the value of property so as to shift the tax burden from one group of citizens to another. *See* Hamburger, *Nondelegation Blues*, *supra*, at 1212 (noting "assessments and other determinations of fact have often been misused to exercise a disguised legislative power"). If that is right, some assessors may have exercised will rather than judgment and so acted in a legislative rather than an executive capacity. But in doing so, the assessors abused the power the 1798 Congress gave them, and abuses of a power do not change the nature of the power itself. For example, it is commonly said that the Supreme Court in *Lochner* abused the judicial power. *See, e.g.*, Kermit Roosevelt III, *What if* Slaughter-House *had been Decided Differently?*, 45 Ind. L. Rev. 61, 84 (2011) (noting in *Lochner* the court committed "the sin . . . of substituting judicial for legislative policymaking"). But no one contends that in light of *Lochner's* abuses the Court in fact exercises legislative power when it rules in constitutional cases. So too with the assessors.

Thus, we can find no historical precedent for broad delegations of Congress's power to tax. But even if there were—even if the 1798 direct tax suggests Congress may delegate the Taxing Power to the Executive Branch—there is still no historical precedent for the USF Tax. That is because it is utterly inconceivable that the first Treasury, upon receiving from Congress broad powers to levy taxes on American citizens, would have abdicated responsibility for determining tax rates to privately employed bounty hunters who had a personal financial interest in the amount of tax revenue collected. And that is exactly what FCC has done here. *See supra*, Part III.C.

Accordingly, USF's double-layered delegation "is an innovation with no foothold in history or tradition." *Seila L.*, 591 U.S. at 222.

No. 22-60008

b.

In addition to being a historical anomaly, USF's double-layered delegation "is incompatible with our constitutional structure." *Ibid.*

Both the public and the private nondelegation doctrines exist to ensure that Congress exercises its legislative powers—the greatest of the powers vested by the Constitution in the federal government—"in a way that comports with the People's will."[23] *Jarkesy*, 34 F.4th at 459; *see* THE FEDERALIST NO. 51 (J. Madison) ("A dependence on the people is, no doubt, the primary control on the government[.]"). As we previously noted:

> Every member of Congress is accountable to his or her constituents through regular popular elections. And a duly elected Congress may exercise the legislative power only through the assent of two separately constituted chambers (bicameralism) and the approval of the President (presentment). This process, cumbersome though it may often seem to eager onlookers, ensures that the People can be heard and that their representatives have deliberated before the strong hand of the federal government raises to change the rights and responsibilities attendant to our public life.

---

[23] The private nondelegation doctrine also likely applies to delegations of the executive power to private entities, *see Amtrak II*, 575 U.S. at 62 (Alito, J., concurring) ("[I]t raises 'difficult and fundamental questions' about the 'delegation of Executive power' when Congress authorizes citizen suits.") (quoting *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 197 (2000) (Kennedy, J., concurring), but petitioners did not raise an Article II challenge. If they had, we might also conclude that FCC has unconstitutionally delegated the executive power to private entities. *See Consumers' Rsch*, 88 F.4th at 934 (Newsom, J., concurring) ("[I]t seems obvious to me that in collecting de facto taxes and distributing benefits USAC is exercising 'executive' power.").

No. 22-60008

*Jarkesy*, 34 F.4th at 459–60 (citations and footnote omitted). "But that accountability evaporates if a person or entity other than Congress," whether public or private, "exercises legislative power." *Id.* at 460 (citation omitted).

Broad congressional delegations to the executive undermine democratic accountability for at least three reasons. First, they allow Congress to circumvent the "many accountability checkpoints" inherent in the Constitutional lawmaking process. *Amtrak II*, 575 U.S. at 61 (Alito, J., concurring). Second, they obscure lines of accountability the Framers intended to be clear. *See Gundy*, 588 U.S. at 155 (Gorsuch, J., dissenting) ("[B]y directing that legislating be done only by elected representatives in a public process, the Constitution sought to ensure that the lines of accountability would be clear: The sovereign people would know, without ambiguity, whom to hold accountable for the laws they would have to follow."); *id.* at 156 (Gorsuch, J., dissenting) ("Legislators might seek to take credit for addressing a pressing social problem by sending it to the executive for resolution, while at the same time blaming the executive for the problems that attend whatever measures he chooses to pursue. In turn, the executive might point to Congress as the source of the problem. These opportunities for finger-pointing might prove temptingly advantageous for the politicians involved, but they would also threaten to disguise responsibility for the decisions." (citations and quotation omitted)). And third, they render the promise of recourse to the judiciary illusory because they give reviewing courts no standard against which to measure the compatibility of executive action with the prescriptions of the people's elected representatives. *See id.* at 167–68 (Gorsuch, J., dissenting) (noting the similarity of the questions raised in vagueness challenges and delegation challenges).

Delegations to private entities undermine accountability for different reasons. Most obviously, private entities are "neither legally nor politically accountable to . . . government officials or to the electorate." Larkin, *The*

No. 22-60008

*Private Delegation Doctrine*, *supra*, at 20; *see Black*, 53 F.4th at 880 ("[I]f people outside government could wield the government's power[ ]then the government's promised accountability to the people would be an illusion."). Unlike officers of the United States, who "must take an oath or affirmation to support the Constitution," *Amtrak II*, 575 U.S. at 57 (Alito, J., concurring) (citing U.S. Const. art. VI, cl. 3), directors of private entities owe no fealty to the Constitution and instead owe legal obligations to their shareholders. *See* 2 Bus. & Com. Litig. Fed. Cts. § 13:77 (5th ed.) ("Under Delaware law, directors, officers, and controlling shareholders owe a duty of loyalty to the company and to its shareholders or owners."). Moreover, "passing off a Government operation as an independent private concern" allows "Government officials [to] wield power without owning up to the consequences" because the people might not associate bad results with the Government at all. *Amtrak II*, 575 U.S. at 57 (Alito, J., concurring).

USF combines these features, meaning accountability is undermined twice over. First, the public cannot tell whether it is being taxed by the FCC or USAC. *See Universal Service*, Universal Serv. Admin. Co., *supra* ("Using information from universal service program participants, *USAC* estimates how much money will be needed each quarter to provide universal service support." (emphasis added)). And if some sleuthing member of the public suspected the federal government was behind the mysterious USF charge on his phone bill, how could he determine which governmental official to blame? Not only could Congress and FCC point fingers at each other, *see Gundy*, 588 U.S. at 156 (Gorsuch, J., dissenting), but both could offload responsibility onto the private entities (USAC and its private, for-profit, constituents) to which FCC delegated the USF Tax without congressional authorization. *See Free Enter. Fund*, 561 U.S. at 497–98 ("The diffusion of power carries with it a diffusion of accountability . . . Without a clear and effective chain of command, the public cannot determine on whom the blame

or the punishment of a pernicious measure, or series of pernicious measures ought really to fall." (citation omitted)). And even as government officials are immunized from public oversight by this "Matryoshka doll" of delegations and subdelegations, *id.* at 497, important governmental responsibilities are carried out by private entities with a legal obligation not to serve the public but rather to reap profits from it. And last but not least, reviewing courts are handicapped from redressing the injuries of aggrieved citizens by the complete absence of a judicially workable standard in 47 U.S.C. § 254.

Thus, just as the added layer of tenure protection at issue in *Free Enterprise Fund* "ma[de] a difference" to the President's ability control the executive branch, *id.* at 495, so too do the myriad obfuscations of the USF Tax make a difference to the Legislative Vesting Clause. Accordingly, we hold that the universal service contribution mechanism's double-layered delegation "is incompatible with our constitutional structure." *Seila L.*, 591 U.S. at 222.

## IV.

Finally, a brief word about the dissenting opinions. The principal dissent spills much ink on the distinction between fees and taxes only to conclude the distinction does not matter because all "revenue-raising delegation[s]" are the same. *Post*, at 96 (Stewart, J., dissenting). And how does the Constitution permit *double* insulation of a revenue-raising delegation like the USF? The principal dissent does not say.

The second dissenting opinion calls the majority opinion an "unannounced" and "unprecedented" "sleight of hand." *Post*, at 98, 105 (Higginson, J., dissenting). Worse, it is a usurpation that leaves "the political branches powerless to govern." *Post*, at 101, 105. With deepest respect for

our esteemed colleagues who see this case differently, the dissenting opinion's legal authorities do not support its conclusions.

For example, it repeatedly accuses us of contravening Supreme Court precedent. *Post*, at 98, 99, 100, 101, 103, 105 (Higginson, J., dissenting). But which precedent, precisely, are we flouting? The dissenting opinion does not say. The closest it comes is to contend that the Supreme Court has considered cases involving both a "delegation of legislative power and a[ ] delegation of government power to a private entity, yet the Court has never instructed . . . that a different standard applies." *Id.* at 98–99 (Higginson, J., dissenting). But in which case did the Supreme Court consider a double delegation problem like the one presented here? The statutory provision at issue in *Carter Coal* did not feature a combined public/private delegation; it delegated power directly to private enterprise. *See* 298 U.S. at 283–84. And the Court found that violated the Constitution. *Id.* at 311. Having found that statute unconstitutional, it would have been quite peculiar for the Court to proceed to render an advisory opinion on whether a nonexistent double delegation would also violate the Constitution.

Meanwhile, in *Currin* and *Sunshine Anthracite*, the Court found the Government had not delegated any legislative power to any private entity. *See Currin*, 306 U.S. at 15 ("So far as growers of tobacco are concerned, the required referendum does not involve any delegation of legislative authority."); *Sunshine Anthracite*, 310 U.S. at 399 ("Since law-making is not entrusted to the industry, this statutory scheme is unquestionably valid."). There cannot be a combined public/private delegation without a private delegation. We obviously agree with our esteemed colleagues in dissent that Supreme Court precedent binds us and binds us absolutely. But we do not understand how the dissenting opinions can say this case is controlled by Supreme Court precedent without disputing that the double delegation at issue here is unprecedented.

No. 22-60008

The second dissenting opinion also contends we have mischaracterized the Supreme Court's separation-of-powers precedents. On its telling, *Seila Law* does not evince a general principle that two constitutional parts can converge to create an unconstitutional whole. Rather, it says the *Seila Law* Court simply declined to recognize an exception to the President's removal power for single principal officers who wield significant executive authority. *Post*, at 100 (Higginson, J., dissenting). Even if that were right, it would not explain *Free Enterprise Fund*. In that case the Court unquestionably held that two independently constitutional removal restrictions—one that fit squarely within the *Humphrey's Executor* exception, and one that fit squarely within the *Morrison* exception—combined to create a constitutional violation. The dissenting opinion offers no explanation for that holding.

Finally, the second dissenting opinion contends our decision leaves the political branches "powerless to govern." *Post*, at 105 (Higginson, J., dissenting). That is quite an assertion, but with greatest respect, it is untrue. Today's decision applies to a narrow question, implicating just one federal program that is doubly insulated from political accountability. The parties before us have not pointed to other federal programs that have the same or similar constitutional defects. And as to the USF particularly, Congress could obviate the constitutional problem by simply ratifying USAC's decisions about how much American citizens should contribute to the goal of universal service. *Cf.* Saikrishna Bangalore Prakash, *The Sky Will Not Fall: Managing the Transition to a Revitalized Nondelegation Doctrine*, *in* The Administrative State Before the Supreme Court, *supra*, at 290 ("Legislative ratification of agency law would wholly preclude a nondelegation challenge[.]").

The second dissenting opinion contends otherwise because, in its view, the Federal Government will grind to a halt if Congress, or even FCC,

were required to do more than wield a Russian veto over the USF tax. As evidence, it points to private contractors who perform ministerial functions on behalf of the Centers for Medicare and Medicaid Services. *Post*, at 103 (Higginson, J., dissenting). But if anything, Medicare and Medicaid prove the opposite. *Congress*—not a federal agency, and certainly not executives of private companies—decides how much Americans should be taxed to fund federal healthcare programs. *See, e.g.*, Louise Sheiner, Lorae Stojanovic, & David Wessel, *How does Medicare work? And how is it financed?*, Brookings (Mar. 20, 2024), https://perma.cc/D7LN-DHYW (explaining the Government's contributions to Medicare come from a combination of general revenues and payroll taxes); 26 U.S.C. § 3101 (setting the Medicare payroll tax rate). The unconstitutionality of the USF says nothing about other tax programs, like Medicare and Medicaid, that Congress administers.

\*    \*    \*

American telecommunications consumers are subject to a multi-billion-dollar tax nobody voted for. The size of that tax is *de facto* determined by a trade group staffed by industry insiders with no semblance of accountability to the public. And the trade group in turn relies on projections made by its private, for-profit constituent companies, all of which stand to profit from every single tax increase. This combination of delegations, subdelegations, and obfuscations of the USF Tax mechanism offends Article I, § 1 of the Constitution.

For the foregoing reasons, we hold unconstitutional the Q1 2022 USF Tax. Accordingly, we GRANT the petition and REMAND to FCC for further proceedings.

No. 22-60008

Jennifer Walker Elrod, *Circuit Judge*, joined by Ho and Engelhardt, *Circuit Judges*, concurring:

I concur in the majority opinion in full. The majority correctly and thoroughly identifies the concerns that make this double delegation unconstitutional. I write separately to say that I would go one step further and address the lawfulness of each individual delegation. For the reasons explained in the majority's thorough opinion, Congress's delegation of legislative power to the FCC and the FCC's delegation of the taxing power to a private entity each individually contravene the separation of powers principle that undergirds our Constitutional Republic.

As James Madison put it, "[t]he accumulation of all powers legislative, executive, and judiciary in the same hands, . . . may justly be pronounced the very definition of tyranny." *Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43, 74 (2015) (Thomas, J., concurring) (quoting The Federalist No. 47, p. 301 (C. Rossiter ed. 1961)); *see also* Baron de Montesquieu, *The Spirit of the Laws*, bk. XI, ch. VI (1748) ("When the legislative and executive powers are united in the same person, or in the same body of magistrates, there can be no liberty; . . . .").

To ensure that the legislative power remains separate from the executive power, the Constitution "provides strict rules to ensure that Congress exercises the legislative power in a way that comports with the People's will." *Jarkesy v. Sec. and Exch. Comm'n*, 34 F.4th 446, 459 (5th Cir. 2022) *aff'd*, No. 22-859, 2024 WL 3187811 (U.S. June 27, 2024). Each member of Congress is accountable to his or her constituents through regular popular elections. U.S. Const. art I, §§ 2, 3; *id.* amend. XVII, cl. 1. And Congress may exercise legislative power (including the power to tax) only by going through the arduous process of bicameralism and presentment. U.S. Const. art. I, § 7. This "ensures that the People can be heard and that their

No. 22-60008

representatives have deliberated before the strong hand of the federal government raises to change the rights and responsibilities attendant to our public life." *Jarkesy*, 34 F.4th at 459–60. Each of the delegations here, viewed independently, violates this principle.

Justifying the Congressional delegation on the grounds that Congress has enlisted the "expertise" of the FCC in the undefined area of Universal Service rings hollow given that the FCC relies on the determinations of private industry leaders to determine the USF tax.

The second dissent states that the federal government is rendered "powerless to govern" by the majority's holding. *Post*, at 101 (Higginson, J., dissenting). That is a *non sequitur*. Congress can always act by passing duly enacted legislation through bicameralism and presentment. The assertion that delegations of legislative power are necessary for effective and efficient governance in the modern world does not authorize Congress to violate Article I, Section I's vesting clause. Congress's inability to implement and oversee the program itself might even suggest that the program should not exist. Regardless, Congress must implement, or at least approve, the USF tax. That way, the power of the people to oversee those they have chosen to govern is rightfully restored.[1]

With this in mind, I join the thorough and well-reasoned opinion of the court in full.

---

[1] They are, after all, the ones ultimately footing the bill for Universal Service.

No. 22-60008

James C. Ho, *Circuit Judge*, concurring:

Our court today holds that the delegation of Congress's taxing power, first to a federal agency, and then to a private entity, violates the Vesting Clause of Article I of the Constitution. I agree and accordingly concur.

In reaching this decision, the court distinguishes *Texas v. Rettig*, 987 F.3d 518 (5th Cir. 2021). I would also disavow *Rettig* altogether, for the reasons noted in *Texas v. Rettig*, 993 F.3d 408, 408 (5th Cir. 2021) (Ho, J., dissenting from denial of rehearing en banc).

The delegations of taxing authority at issue in *Rettig* present the same challenges to our constitutional democracy—and to the founding principle of taxation without representation—that are presented here. It's just as true in *Rettig* as here that "[t]he right to vote means nothing if we abandon our constitutional commitments and allow the real work of lawmaking to be exercised by private interests colluding with agency bureaucrats, rather than by elected officials accountable to the American voter." *Id*. at 410-11.

And both in *Rettig* and here, the threats to democracy presented by the administrative state are not inadvertent, but intentional—a deliberate design to turn consent of the governed into an illusion. "[T]he expansion of the electorate has been accompanied by the growth of administrative law. . . . [W]hether in 1870, 1920, or 1965 . . . each time, after representative government became more open to the people, legislative power increasingly has been sequestered to a part of government that is largely closed to them." Philip Hamburger, Is Administrative Law Unlawful? 369 (2014). "[A]lthough [members of the knowledge class] mostly supported expanded suffrage, they also supported the removal of legislative power to administrative agencies staffed by persons who shared their outlook." *Id*. at 374. "The development of administrative power thus . . . must be recognized as . . . a profoundly disturbing shift of power. As soon as the people secured

No. 22-60008

the power to vote, a new class cordoned off for themselves a sort of legislative power that they could exercise without representation." *Id.* Another scholar recently put it this way: "However much [administrative] agencies may emphasize their formal openness, in practice well-organized, directly interested parties dominate comment processes. Normal people do not perceive these proceedings as 'democratic.'" PHILIP A. WALLACH, WHY CONGRESS? 231 (2023). With Congress, by contrast, at least "the electorate still has the chance, crude as it may be, to pass judgment on the elected official and convince other members of their community of the importance of doing so. Against . . . the bureaucracy, citizens have no such recourse." *Id.*

We devote significant energy and resources to securing the right to vote for every citizen. But our right to vote only matters if our elected officials matter. There's no point in voting if the *real* power rests in the hands of unelected bureaucrats—or their private delegates. If you believe in democracy, then you should oppose an administrative state that shields government action from accountability to the people. I concur.

No. 22-60008

Carl E. Stewart, *Circuit Judge*, joined by Richman, *Chief Judge*, and Southwick, Haynes, Graves, Higginson, and Douglas, *Circuit Judges*, dissenting:

I dissent because the Universal Service Fund ("USF") is not unconstitutional. Section 254 of the Telecommunications Act of 1996 provides an intelligible principle and the Federal Communications Commission ("FCC") maintains control over the Universal Service Administrative Company ("USAC"), the private entity entrusted to aid its administration of the USF. The majority's exhaustive exegesis about policy, history, and assorted doctrines does not eclipse the consistent holding of three sister circuits that have addressed constitutional challenges to Section 254. All have held it constitutional under the intelligible principle test. The majority has created a split in a sweeping opinion that (1) crafts an amorphous new standard to analyze delegations, (2) overturns—without much fanfare—circuit precedent holding that this program collects administrative fees and not taxes, (3) blurs the distinction between taxes and fees, and (4) rejects established administrative law principles and all evidence to the contrary to create a private nondelegation doctrine violation.

## I. The Nondelegation Doctrine

Petitioners and the majority contend that § 254 violates the nondelegation doctrine. Notably, the Supreme Court has denied petitions for review of the Sixth Circuit's and the Eleventh Circuit's decisions rejecting these contentions. *Consumers' Rsch. v. FCC*, No. 23-456, 2024 WL 2883753 (U.S. June 10, 2024) (Mem.); *Consumers' Rsch. v. FCC*, No. 23-743, 2024 WL 2883755 (U.S. June 10, 2024) (Mem.). In line with our colleagues in the Sixth, Eleventh, and D.C. Circuits, I would reject this challenge and hold that § 254 satisfies the intelligible principle test as articulated by the Supreme Court.

No. 22-60008

### a. Section 254 Sufficiently Delimits the FCC's Discretion

The nondelegation doctrine is based on the central principle that the separation of powers underlies our system of Government. *See Mistretta v. United States*, 488 U.S. 361, 371 (1989). Article I, Section 1 of the U.S. Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const., art. I, § 1. The Court has long acknowledged that Congress "may confer *substantial discretion* on executive agencies to implement and enforce the laws" where it "has supplied an intelligible principle to guide the delegee's use of discretion." *Gundy v. United States*, 588 U.S. 128, 135 (2019) (plurality opinion) (emphasis added). It has consistently held that a delegation is constitutional if "Congress has supplied an intelligible principle to guide the delegee's use of discretion." *Id.* at 2123. Under this framework, the Court has approved narrow and broad delegations, acknowledging that "in our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives." *Mistretta*, 488 U.S. at 372; *see Am. Power Light & Co. v. SEC*, 329 U.S. 90, 105 (1946) ("The judicial approval accorded [to] these 'broad' standards for administrative action is a reflection of the necessities of modern legislation dealing with complex economic and social problems."); *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 398 (1940). It has further explained that the nondelegation inquiry "always begins (and often almost ends) with statutory interpretation." *Gundy*, 588 U.S. at 135.

As such, we begin our nondelegation inquiry not with a long discourse about the history of the USF's shortcomings, but with statutory interpretation. *See id.* In 47 U.S.C. § 254, Congress clearly set out both the general policy—ensuring "[a]ccess to advanced telecommunications and information services [are] provided in all regions of the Nation," *id.* at

No. 22-60008

§ 254(b)(2)—and the agency entrusted to execute that policy, the FCC, *see Am. Power*, 329 U.S. at 105. All that leaves is the question of whether Congress delineated "the boundaries of this delegated authority." *Id.* Petitioners argue that because § 254 sets no definite limits on how much the FCC can raise for the USF that it lacks any concrete, objective guidance limiting this authority. The Court has rejected this argument in several formulations in challenges to delegations implicating the authority to raise revenue. *See, e.g., Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 222–23 (1989); *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928). For similar reasons, Petitioners' argument should fail here. Examining the plain language of § 254, it becomes clear that Congress has sufficiently limited the FCC's ability to raise revenue in a way other than imposing a statutory cap on how much can be raised.

Section 254(b) lays out the principles that the FCC *must* adhere to. It sets out the specific directive that the FCC "*shall* [create] policies for the preservation and advancement of universal service." 47 U.S.C. § 254(b) (emphasis added). It further establishes that the FCC is required to do so pursuant to certain enumerated principles that: "quality services should be made available at just and reasonable rates; advanced services should be provided to the entire United States; and 'low-income consumers and those in rural, insular, and high cost areas' should have access to advanced services at reasonably comparable rates to those in urban areas." 47 U.S.C. § 254(b)(1)–(3). Section 254(b)(5) limits the FCC to only enact universal service policies that are "specific, predictable and sufficient" to "preserve and advance universal service." *Id.* 254(b)(5). The statute further charges telecommunications carriers with the duty to provide access that meets minimum standards of universal service to "[e]lementary and secondary schools and classrooms, healthcare providers, and libraries." *Id.* 254(b)(6).

No. 22-60008

As the panel noted, § 254(b)(7) "enables, and likely *obligates*, [the FCC] to add principles 'consistent with' § 254's overall purpose." *Consumers' Rsch. v. FCC*, 63 F.4th 441, 448 (5th Cir. 2023) (quoting 47 U.S.C. § 254(b)(7)), *reh'g en banc granted, opinion vacated*, 72 F.4th 107 (5th Cir.). In line with our colleagues at the Sixth Circuit, I view § 254(b) as Congress laying out "a high-level goal for universal service" and then going further to "enumerate[] specific principles of universal service." *Consumers' Rsch. v. FCC*, 67 F.4th 773, 790–91 (6th Cir. 2023), *cert. denied*, 2024 WL 2883753 (June 10, 2024) (Mem.). Section 254(b) contains limiting principles that impose "a mandatory duty on the FCC" to consider the listed universal service principles when it updates its universal service policies. *Qwest Corp. v. FCC*, 258 F.3d 1191, 1200 (10th Cir. 2001); *see, e.g.*, *Consumers' Rsch.*, 67 F.4th at 791; *Consumers' Rsch.*, 88 F.4th 917, 924 (11th Cir. 2023), *cert. denied*, 2024 WL 2883755 (June 10, 2024) (Mem.). By its plain language, Congress ordered in § 254 that the FCC "*shall* base policies for the preservation and advancement of universal service on the principles" enumerated in § 254(b). 47 U.S.C. § 254(b). This imposition of a duty to weigh the enumerated universal service principles is reminiscent of constitutional statutory delegations that provided an intelligible principle in the form of "guidance that the [agency] cannot disregard." *Allstates Refractory Contractors, LLC v. Su*, 79 F.4th 755, 775 (6th Cir. 2023) (Nalbandian, J., dissenting) (citing *Mistretta*, 488 U.S. at 375–76).

Reading § 254(b)'s provisions together, as our sister circuits have, "indicates that Congress *required* that the FCC base its efforts to preserve and advance universal service on the enumerated principles while allowing the FCC to then '*balance* [each] principle[] against one another when they conflict.'" *Consumers' Rsch.*, 67 F.4th at 791 (quoting *Qwest Corp.*, 258 F.3d at 1200); *see also Tex. Off. of Pub. Util. Couns. v. FCC* ("*TOPUC I*"), 183 F.3d 393, 412 (5th Cir. 1999) ("[W]e agree that the use of the word 'shall'

indicates a congressional command . . . ."). Thus, contrary to Petitioners' and the majority's contentions, § 254(b)(7)'s grant of authority to the FCC to devise new universal service policies based on principles that it "determine[s] are necessary and appropriate for the protection of the public interest, convenience, and necessity" *does not* render the other principles meaningless. Nor does it "strip away the intelligible principle and the limits on the FCC's discretion that Congress imposed in the first six principles and throughout" the remainder of § 254's other provisions. *See Consumers' Rsch. v. FCC*, 67 F.4th at 792. Rather, § 254(b)(7) allows the FCC to comply with [Congress's] mandate to account for the advances to the world of 'evolving' telecommunications," as stated in § 254(c)(1). *See id.* (quoting 47 U.S.C. § 254(c)(1)).[1]

The majority's holding to the contrary here contravenes the rationale that "underpins the nondelegation doctrine." *Id.* at 793 (citing *Gundy*, 588 U.S. at 135–36). Section 254's strictures set out from whom funds are exacted, 47 U.S.C. § 254(d), who receives the benefit of the funds, 47 U.S.C. § 254(e), and what minimum standards of service must be provided in order to satisfy the longstanding goal of providing universal service. *Alenco Commc'ns, Inc. v. FCC*, 201 F.3d 608, 614 (5th Cir. 2000) ("Universal service has been a fundamental goal of federal telecommunications regulation since the passage of the Communications Act of 1934."). With this context, it becomes clear that this is not a situation in which Congress has "left the matter to the [FCC] without standard or rule, to be dealt with as [it] please[s]." *Panama Refining Co. v. Ryan*, 293 U.S. 388, 418 (1935).

---

[1] This intent is consistent with Congress's longstanding aim to ensure reliable and affordable universal service for all and is clearly discernible from "the context, purpose, and history" of the Communications Act of 1934 and the Telecommunications Act of 1996. *See Gundy*, 588 U.S. at 136.

No. 22-60008

Petitioners' and the majority's assertions that § 254(b) and its limits are insufficient or vague place far too much weight on prior litigating positions in the context of *Chevron* doctrine questions arising out of different actions taken by the FCC. Thus, any assertion that the USF's goals are "aspirational" has no bearing on its constitutionality. Maj. Op. at 20–21. Thus, any reference to this dicta from *Texas Office of Public Utility Counsel v. FCC* ("*TOPUC II*"), 265 F.3d 313 (5th Cir. 2001) is misplaced. A closer look at *TOPUC II* reveals how a strained interpretation of our prior utterances does not support a determination that § 254 contains "no guidance whatsoever." *Jarkesy v. SEC*, 34 F.4th 446, 462 (5th Cir. 2022), *cert. granted*, 143 S. Ct. 2688 (2023).

In *TOPUC II*, we examined whether the FCC's CALLS Order, which raised a price cap on the amount that "end-users of basic local service," 265 F.3d at 318, paid on their telephone bills, violated § 254's "requirement of affordable universal access." *Id.* at 320. Undertaking a *Chevron* analysis, we asked "whether Congress has spoken directly on the precise question at issue," and then turned to whether the FCC's interpretation of § 254 was based upon a permissible construction. *Id.* at 320–21. Notably, we did *not* evaluate the constitutionality of Congress's delegation there, but considered whether the Order's price cap violated the Act's principles of ensuring "just, reasonable, and affordable rates" of universal service. *Id.* at 321 (quoting 47 U.S.C. § 254(b)(1), (i)). Given the full scope of our prior interpretation of § 254(b), Petitioners' overreliance on these unrelated considerations to carry the day in a nondelegation doctrine inquiry is unfounded.

Section 254's other provisions provide further checks on the FCC's discretion. Section 254(c) limits the FCC in determining which telecommunications services will receive support from the USF. In § 254(c)(1), Congress specifically ordered the FCC to revise its definition of supported services only to account for "advances in telecommunications and

No. 22-60008

information technologies and services." Some have said that § 254(c) does not limit the FCC's discretion to raise revenue because it only addresses the spending of USF money. However, that contention neglects the direct link between the collection of universal service contributions and the disbursement of USF money. Section 254(d) requires "telecommunications carrier[s] that provide[] interstate telecommunications services" to "contribute, on an equitable and nondiscriminatory basis" to the "mechanisms established by the [FCC] to preserve and advance universal service." *Id.* § 254(d).[2] As the FCC points out, the less money the telecommunications carriers require to effectively provide universal service results in "less revenue the FCC must raise to finance those mechanisms."

With respect to dispersing any money from the USF, the FCC is restricted to dispersing credits to statutorily designated eligible telecommunications carriers that provide support for universal services. *Id.* § 254(e); *see TOPUC I*, 183 F.3d at 412 ("The term 'sufficient' appears in § 254(e), and the plain language of § 254(e) makes sufficiency of universal service support *a direct statutory command* rather than a statement of one of several principles." (emphasis added)). On more than one occasion, we have held that § 254(e) "*requires* that universal service support be 'explicit and sufficient.'" *Alenco*, 201 F.3d at 614 (emphasis added). As a practical matter, it is worth noting that USF program disbursements have "remained relatively stable over the past decade" and even decreased from 2012 to 2020. FCC, FCC 22-67, Report on the Future of the

---

[2] As I explain in Part III, *infra*, that telecommunications carriers typically pass through the cost of their quarterly contributions in the form of line-item charges on consumers' bills on their own volition is irrelevant to our constitutional analysis. *Cf. J.W. Hampton*, 276 U.S. at 406 (describing that Congress's delegations must be analyzed for the specificity and extent of vestment of discretion yielded to the appropriate co-ordinate branch of government).

No. 22-60008

Universal Service Fund 10084–85, ¶ 92 (Aug. 15, 2022) ("Report to Congress"). This fact flatly contradicts Petitioners' assertions that the FCC has acted from a position "that it has a free hand to overcharge" for universal service. Thus, I would deny the petition for review because § 254 satisfies the intelligible principle test as articulated by the Supreme Court.

### b. Section 254's Context, Purpose, and History

In *Gundy*, the Court stated that the intelligible principle analysis requires examination of "[t]he [statute's] text, considered alongside its context, purpose, and history." 588 U.S. at 136. Congress's consistent intention to preserve and advance universal service for nearly a century,[3] combined with § 254's articulated purpose provide further evidence of the existence of an intelligible principle. *Consumers' Rsch.*, 67 F.4th at 790–95; *see Am. Power*, 329 U.S. at 104; *TOPUC I*, 183 F.3d at 405–06. The majority's disagreement with Congress's policy choices, Maj. Op. at 26, does not transform the USF into a constitutional or statutory violation. *See Consumers' Rsch.*, 63 F.4th at 449 n.4. As the panel held, § 254 does not leave the FCC with "no guidance whatsoever," *id.* at 448–49, and more befittingly, it accords with the statute's purpose, and "Congress's history of pursuing universal service" to clearly enunciate an intelligible principle that sufficiently cabins the FCC's discretion. *See Consumers' Rsch.*, 67 F.4th at 795; *Gundy,* 588 U.S. at 135–36. In sum, I would hold that the context,

---

[3] Congress passed the FCC's organic statute in 1934 and modernized the agency's regulatory role in passing the Telecommunications Act of 1994 "to make available, so far as possible, to all the people of the United States, without discrimination on the basis of race, color, religion, national origin, or sex, a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges." 47 U.S.C. § 151.

No. 22-60008

purpose, and history surrounding § 254 evinces a clear intelligible principle delimiting agency discretion.

## II. The Private Nondelegation Doctrine

An agency may obtain the assistance of private parties in implementing its mandate under federal law so long as those private parties are subordinate to the agency and subject to the agency's "surveillance" and guidance. *Adkins*, 310 U.S. at 388, 399; *see also Boerschig v. Trans-Pecos Pipeline, LLC*, 872 F.3d 701, 708 (5th Cir. 2017) (noting same). Petitioners and the majority assert however, that the FCC "reflexively rubberstamps" USAC's proposals to determine the contribution rates charged to telecommunications carriers. They further posit that USAC maintains final decision-making power because "the FCC has never reversed USAC's projections of demand." Neither of these arguments is supported by the statute or applicable regulations nor do they consider well-established principles of administrative law. As described below, these arguments follow from misstatements of record facts.

The FCC determines a quarterly contribution factor "based on the ratio of total projected quarterly expenses of the universal service support mechanisms to the total end-user interstate and international telecommunications revenues." 47 C.F.R. § 54.709(a)(2). Sixty days in advance of this determination, USAC submits its "projections of demand"—the projected expenses to ensure the operation of the USF programs—to the FCC. *Id.* § 54.709(a)(3). These projections of demand for USF support are subject to the FCC's imposed caps. *See, e.g.*, *Interim Cap Order*, 23 FCC Rcd. 8834 (2008) (adopting caps on disbursements of USF contributions that eligible telecommunications carriers may receive to "rein in the explosive growth in high-cost universal service support disbursements"). Considering the FCC's limitations on USAC's proposed

"projections of demand," USAC compiles the total revenues and expenses of the contributing carriers based on their Reporting Worksheets. 47 C.F.R. § 54.709(a)(2). These worksheets, created by the FCC, *id.* § 54.711, must be submitted for review at least thirty days before the start of the quarter. *Id.* § 54.709(a)(2). USAC then calculates the contribution factor from the Reporting Worksheets and then the ratio is publicly noticed and made available on the FCC's website. *See id.* § 54.709(a)(3). The FCC then may approve the projections or administrative expense estimates or exercise its "right to set projections of demand and administrative expenses." *Id.* Where the FCC does not act within fourteen days of the release of the projections of demand, then the projections and contributions are deemed approved by the FCC. *Id.*

The USF and its programs receive funding only after the execution of a detailed, multistep process devised by the FCC. Petitioners and the majority assert that this framework is evidence that the FCC merely sits on its hands while USAC drives the boat in determining how much is raised. This ignores the established principle that "an agency exercises its policymaking discretion with equal force when it makes policy by either 'decid[ing] to act' or 'decid[ing] *not* to act.'" *Consumers' Rsch.*, 67 F.4th at 796 (quoting *Oklahoma v. United States*, 62 F.4th 221, 230 (6th Cir. 2023)). Significantly, the structural relationship between the agency and the private party is the focus of the private nondelegation doctrine inquiry. *See Texas v. Rettig*, 987 F.3d 518, 531 (5th Cir. 2021). A closer look at the relationship here leads to the conclusion that the FCC has not ceded control of the USF to USAC.

USAC is fully subordinate to the FCC as its functions are strictly ministerial. *See Consumers' Rsch.*, 63 F.4th at 451–52. Here is a short list of what USAC *can* do. USAC is tasked with "billing contributors, collecting contributions to the universal service support mechanisms, and disbursing

universal service support funds." 47 C.F.R. § 54.702(b). It collects information and facts from the contributing telecommunications companies and tabulates the companies' contribution factors based on that information and the formulas that the FCC furnishes for USAC to apply. *See, e.g.*, 47 C.F.R. §§ 54.1304(b) (establishing formula to calculate safety net additive support), 54.901(a) (explaining Connect America Fund Broadband Loop Support), 54.303(a)(1) (setting formula to determine total eligible operating expenses), 54.702(n). USAC contribution determinations are mere *proposals* subject to government approval. *See Consumers' Rsch.*, 88 F.4th at 927. As the Court held in *Adkins*, a private entity's participation in ministerial functions under the agency "pervasive surveillance and authority" does not violate the Constitution. 310 U.S. at 388. Here, all of this is done under the FCC's watch *and* is conducted only with the FCC's approval. *See Universal Service Contribution Methodology*, 34 FCC Rcd. 4143, 4144–45 (2019) (citing *Connect America Fund*, 26 FCC Rcd. 17663, 17847 (2011)) (directing USAC to make specific contribution collections "regardless of the projected quarterly demand" calculated from the FCC-supplied formulas).

   With respect to the FCC's control over USAC, the list of what USAC *cannot* do is instructive. USAC cannot make policy. 47 C.F.R § 54.702(c). It cannot interpret unclear provisions or rules. *Id.* It cannot unilaterally give its proposals the force of law. 47 C.F.R. § 54.709(a)(2). The very agency action addressed in the instant petition for review is the FCC's "*Proposed* First Quarter 2022 Universal Service Contribution Factor." Consequently, it is inaccurate to state that USAC definitively determines how much money the USF will collect each quarter. *See* 47 C.F.R. § 54.709(a)(3). The FCC is not bound by USAC's projections. *Id.* USAC acts no differently than an advisor or policy aide that proposes regulations subject to government approval. *See Adkins*, 310 U.S. at 388. Upon receiving USAC's proposals, the FCC issues

No. 22-60008

a Public Notice, publishing the proposed contribution factor and soliciting public comment. 47 C.F.R. § 54.709(a)(3).

What occurs after the FCC approves the quarterly contribution factor further supports the notion that USAC is fully subservient to the FCC. The FCC maintains supervision and review over USAC proposals well after it issues the approved quarterly contribution factor.[4] Any party that is aggrieved by a ministerial act of USAC—typically the issuance of an invoice to collect contributions—may seek review from the FCC. 47 C.F.R. § 54.719(b); *Universal Serv. Contribution Methodology*, 31 FCC Rcd. 13220 (2016) (holding that USAC overcharged Cisco WebEx through an improper revenue calculation). The FCC quite routinely adjusts USAC proposals that deny discount rate status to public libraries and schools. *See, e.g.*, *Streamlined Resol. of Requests Related to Actions by the Universal Serv. Admin. Co.,* 37 FCC Rcd. 5442 (2022); *Alpaugh Unified Sch. Dist.,* 22 FCC Rcd. 6035, 6036–37 (2007) (remanding USAC proposals that reduced or denied discounted rates to public libraries and schools for further fact finding). USAC is not charged with reviewing applications to receive subsidized universal service from qualified hospitals, libraries, low-income consumers, rural consumers, and

---

[4] Hospitals in rural areas and libraries and schools can apply for discounted telecommunications services under the E-Rate program. 47 U.S.C. § 254(h)(1)(A)–(B). The hospitals, schools, and libraries must post their applications on USAC's website, undergo a technology assessment, and comply with strenuous bidding requirements as outlined by the FCC. *See Bishop Perry Middle Sch. New Orleans*, 21 FCC Rcd. 5316, 5317–18 (2006) (listing the requirements for the E-Rate program as set out by Congress in § 254(h) and the FCC in 47 C.F.R. §§ 54.504, 54.511(a)). Where a party fails to comply with the statutory and regulatory requirements necessary to obtain the discount, it may seek review with the FCC. *See generally id.* Notably, the FCC issues the final orders that analyze the requests and either grants them outright, remands them to USAC for further fact-finding, or denies them. *See id.* at 5327–28 (ordering clauses).

schools. The FCC fulfills that role. *See* 47 U.S.C. § 254(h)(1)(A)–(B). We could continue to illustrate the other places in § 254 and the Code of Federal Regulations that demonstrate that the FCC is in the driver's seat. But, all of this shows that the FCC maintains complete control over USAC and holds final decision-making authority regarding the USF and its programs.

A comparison to a recent case where we held that a violation of the private nondelegation doctrine occurred further underscores this point. Take our recent decision in *National Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869 (5th Cir. 2022). There, this court was confronted with Congress's delegation of rulemaking authority to a private entity, the Horseracing Integrity and Safety Authority (the "Authority"). *Id.* at 872. The statute at issue "nationalize[d] the governance of the thoroughbred horseracing industry," placing substantial unchecked rulemaking power in the Authority's hands. *Id.* at 872. The statute ordered the Authority—and not the Federal Trade Commission ("FTC")—to establish anti-doping, medication, and racetrack safety programs and a scheme of sanctions, among many other rules carrying the force of law. *Id.* at 882–83. The FTC was then *required by statute* to affirm the Authority's proposed regulations if deemed consistent with the statute. *Id.* at 884–85. This essentially placed the FTC and the Authority on the same ground with respect to enacting rules regulating the horseracing industry that carried the force of law. *See id.* at 883. Specifically, we stated that "[a]n agency does not have meaningful oversight if it does not write the rules, cannot change them, and cannot second-guess their substance." *Id.* at 872.

That is not the case here. Unlike the FTC in *National Horsemen's*, the FCC sets the rules and policy determinations under which USAC operates and retains final approval and review of USAC's proposals. *See Consumers' Rsch.*, 63 F.4th at 451; *Consumers' Rsch.*, 67 F.4th at 796–97; *Consumers' Rsch.*, 88 F.4th at 927–28. "Contributions to [universal service] mechanisms

. . . *shall* be based on contributors' projected collected end-user telecommunications revenues, and on a contribution factor determined quarterly *by the* [*FCC*]." 47 C.F.R. § 54.709(a) (emphasis added). This case differs from instances where courts have analyzed whether an agency was statutorily authorized to rely on a private entity for matters that exceeded ministerial tasks. *See Sierra Club v. Lynn*, 502 F.2d 43 (5th Cir. 1974). As an initial matter, those cases are inapt comparisons because USAC serves solely ministerial functions. And the majority can point to no binding jurisprudence requiring Congress to specifically designate a private entity to aid an agency to avoid a constitutional violation.

Put another way, this court is confronted with a classic case where an agency enlists a private entity to assist with ministerial support in the form of fee calculation and collection. *See, e.g.*, *Adkins*, 310 U.S. at 399 (holding a private subdelegation of ministerial or fact collecting functions is valid); *Oklahoma*, 62 F.4th at 229 ("Private entities may serve as advisors that propose regulations. And they may undertake ministerial functions, such as fee collection." (internal citations omitted)). Furthermore, the private entity holds not even a modicum of final decision-making power. Regrettably, the majority has adopted Petitioners' exaggerated conception of USAC's role and discretion to create a private nondelegation doctrine violation where none exists. To the contrary, I would hold, as the panel did, that there is no private-nondelegation doctrine violation.

## III. Examining Revenue-Raising Delegations

I conclude with a point of clarification regarding USF contributions in the instant regulatory scheme. Section 254 establishes a system of fees, not taxes. It refers to these sums as contributions—a fee for telecommunications providers to pay as a cost of doing business. However, whether the contributions are a fee has no bearing on the nondelegation doctrine analysis

because delegations of the taxing power are not subject to stricter scrutiny. *See Skinner*, 490 U.S. at 222. The majority's holding presents an unnecessary narrowing—or perhaps even elimination—of the distinction of pass-through fees and taxes and drastically breaks with our prior precedent to proclaim that the instant case involves a delegation of the power to tax.

### a. The Difference Between Pass-Through Fees and Taxes

The Supreme Court has long differentiated taxes from fees or other efforts to generate revenue. *See, e.g.*, *Twin City Nat'l Bank of New Brighton v. Nebecker*, 167 U.S. 196, 202 (1897); *United States v. Munoz-Flores*, 495 U.S. 385, 398 (1990). In *National Cable Television Ass'n v. United States*, 415 U.S. 336, 340–41 (1974), the Court distinguished fees as costs incurred "incident to a voluntary act," that "bestow[] a benefit on the applicant, not shared by other members of society." *Id.* Even in cases requiring "heightened scrutiny," we have similarly analyzed costs assessed to entities engaged in the course of business by legislative bodies and divined our own analysis for whether costs are fees or taxes. *See Neinast v. Texas*, 217 F.3d 275, 278 (5th Cir. 2000). An examination of both the law of this circuit and the Court's cases addressing this important distinction reveals that the majority's analysis distinguishing taxes and fees invites future line-drawing that will prove to be unworkable.

### i. Analyzing this Distinction under Circuit Precedent

The majority errs by misapplying its standard to determine what constitutes a tax to the USF contributions at issue. The majority erases the established distinctions between fees, which do not implicate the Taxing Clause, and taxes. *See Nat'l Cable*, 415 U.S. at 340–41. I cannot condone the patent overriding of established precedent from this court and our sister circuits that have long held that USF contributions are fees without substantial consideration of those determinations.

No. 22-60008

In *TOPUC I*, we considered a constitutional challenge from several wireless telecommunications companies asserting that the USF contribution scheme violated the Origination Clause. 183 F.3d at 426. There, the petitioning companies specifically argued that the constitutional violation flowed from the FCC's requirement that paging carriers make contributions to the USF. *Id.* at 426–27. The panel rejected this challenge, noting that the Court has made clear that "a statute [] creat[ing] a particular governmental program and [] rais[ing] revenue to support that program . . . is not a 'Bil[l] for raising Revenue' within the meaning of the Origination Clause." 183 F.3d at 426–27 (quoting *Munoz-Flores*, 495 U.S. at 398). As to the waived Tax Clause argument, the panel explained in dicta that "[e]ven if [the petitioner]'s Taxing Clause argument were properly before us, we find no basis for reversal" because "the universal service contribution qualifies as a fee because it is a payment in support of a service (managing and regulating the public telecommunications network) that confers special benefits on the [telecommunications carrier] payees." *TOPUC I*, 183 F.3d at 427 n.52 (first citing *Nat'l Cable*, 415 U.S. at 340; and then citing *Rural Tele. Coalition v. FCC*, 838 F.2d 1307, 1314 (D.C. Cir. 1988) (holding universal service contributions as a fee supporting allocations between interstate and intrastate jurisdictions)).

Even though the Taxing Clause and Origination Clause analyses differ, they require consideration of essentially the same factors—namely, "whether the revenues are used to primarily defray the expenses of regulating the act" or whether "the revenues generated from the assessment are for general revenues or for a particular program." *Id.* at 427 n.51. Nearly fifteen years after *TOPUC I*, the D.C. Circuit rejected the same arguments presented under the Tax Clause in *Rural Cellular Ass'n v. FCC*, 685 F.3d 1083, 1089–90 (D.C. Cir. 2012). It held that § 254 could not reasonably be "interpreted" as "an unconstitutional delegation of Congress's authority

under the Taxing Clause . . . because the assessment of contributions from carriers is not a tax." 685 F.3d at 1091. The en banc court should have reached this same determination here, as this dicta from *TOPUC I* applies in equal force.

The conclusion that USF contributions are valid fees and not impermissible taxes follows even under heightened scrutiny borrowed from different constitutional and statutory frameworks. *See* discussion *infra* Part II.a–b, pp. 20–23. For instance, in *Texas Entertainment Ass'n, Inc. v. Hegar*, 10 F.4th 495 (5th Cir. 2021), we set out the governing factors to determine whether an assessed contribution is a fee or a tax for the purposes of the Tax Injunction Act ("TJA"). Under the TJA, we have favored a "broad construction of 'tax'" out of respect of preventing delays in reviewing challenges to revenue raising efforts of state and local governments. *See Home Builders Ass'n of Miss. v. City of Madison*, 143 F.3d 1006, 1011 (5th Cir. 1998). Despite the differences in the analysis presented in the TJA and taxing power inquiries, any distinction does not impact the fact that USF contributions are not taxes under either test.

The *Hegar* panel stated that a fee: "is imposed (1) by an agency, not the legislature; (2) upon those it regulates, not the community as a whole; and (3) for the purposes of defraying regulatory costs, not simply for general revenue-raising purposes." *Id.* at 505–06 (quoting *Neinast*, 217 F.3d at 278). We considered whether the Texas legislature's enactment of a "sexually oriented business" fee was a fee or a tax. *Id.* at 502, 505–06. We noted that while the cost assessed to each "sexually oriented business" was imposed by the legislature, the text made clear that the cost was imposed only on "sexually oriented businesses" to finance a program for the prevention of sexual assault in that industry. *Id.* at 506. Ultimately, we concluded that a charge by a legislative body is a fee, and not a tax, where the charge is levied

No. 22-60008

against a specific industry sector, serves a regulatory purpose, and raises funds for a specific regulatory program. *Id.* at 506–07.

All of the same factors are present here. In § 254, Congress set out that a charge must be collected from "[e]very *telecommunications carrier* that provides interstate telecommunications services." 47 U.S.C. § 254(d) (emphasis added). The contributions collected from telecommunications carriers are directed to a specific fund and "not general revenue." *See Hegar*, 10 F.4th at 506–07. In fact, § 254(e) provides that these funds are not universally distributed but paid only to eligible telecommunications carriers that provide universal service. USF contributions are imposed upon a specific industry—telecommunications carriers—and not the general public. *See id.*; *see also TOPUC I*, 183 F.3d at 427–28 (holding that all telecommunications carriers—including those that are exempt from contributing—are the beneficiaries of the program receiving the primary benefit in the form of the expansion of universal service). The best support for this lies in the plain language of § 254(b)(4), (d).

But one need not rely solely on Congress's word as expressed in § 254. A look at the USF contribution system in practice confirms who the true payors are. The class of entities that Congress orders to contribute—those that are compelled by congressional act to actually pay this fee—are the telecommunications providers themselves. A close review of the list of entities that must contribute, reproduced on USAC's website, includes landline providers, prepaid calling card providers, coaxial cable providers, telex companies, and other types of telecommunications service providers.[5] Conspicuously absent from § 254, this list, or from any material or orders of

---

[5] *See* 47 U.S.C. § 254(d); Univ. Serv. Admin. Co., *Who Must Contribute*, https://www.usac.org/service-providers/contributing-to-the-usf/who-must-contribute/ (last visited May 24, 2024).

No. 22-60008

Congress or the FCC is any listing of the American populace as contributors. Thus, the majority errs in categorizing the class of contributors as "American telecommunications consumers who see USF charges on their phone bills each month." Maj. Op. at 15. Whether or not the telecommunications carriers pass through that cost to consumers in the form of a line-item on their bills is irrelevant to our analysis because we are concerned with the constitutionality of Congress's action, not the action of independent third parties that choose to pass costs along to their customers. This degree of separation between the governmental act and the consumers' payments should end the inquiry.

But if we continue, it becomes even clearer that there *is* complete overlap between the class of USF contributors are the payors and the beneficiaries. The general public then receives an ancillary benefit in the form of more affordable, standardized service. However, the telecommunications carriers receive the primary benefit in the forms of both direct dispersals of USF money and positive network economic effects that result from the proliferation of universal service. *See* 47 U.S.C. § 254(e); *TOPUC I*, 183 F.3d at 427–28 & n.52; *Rural Cellular Ass'n*, 685 F.3d at 1091–92; *see also* Mark A. Lemley & David McGowan, *Legal Implications of Network Economic Effects*, 86 Calif. L. Rev. 479, 551 (1998). As we said in *TOPUC I*, "universal service contributions are part of a particular program supporting the expansion of, and increased access to, the public institutional telecommunications network. . . . Each [] carrier *directly benefits* from a *larger and larger network* and, with that in mind, Congress designed the universal service scheme to exact payments from those companies benefiting from the provision of universal service." 183 F.3d at 427–28 (emphasis added).

In *Rural Cellular*, the D.C. Circuit reached the exact same conclusion regarding enhanced access to broadband services. 685 F.3d at 1091–92. It held that as telecommunications providers advance universal service "they

No. 22-60008

will benefit from the increased utility of the [basic] Internet [and cell services] that come[] with a greater number of users having enhanced access to" those services. *Id.* at 1090–91. It concluded that the FCC "collected these [universal service] contributions to support the expansion of universal service and no other use was ever contemplated." *Id.* at 1091.

The majority makes much ado of the benefit that the general public and the rural area consumers, schools, hospitals, and public libraries receive from USF programs. Maj. Op. at 15 ("There is no overlap at all between the class of USF beneficiaries (recipients of subsidized telecommunications services) and the class of USF contributors."). But, the majority mistakes the recipients of an ancillary benefit derived from the exaction of a fee with the payor that primarily benefits from the fees exacted for the purposes of funding regulatory efforts. Curiously, the majority cites *Trafigura Trading LLC v. United States*, for the proposition that a common fee arises "in the context of 'value-for-value transaction[s].'" 29 F.4th 286, 289 (5th Cir. 2022) (quoting Erik M. Jensen, *The Export Clause*, 6 Fla. Tax Rev. 1, 8 (2003)).

Its reliance on *Trafigura* is misplaced. The majority omits that we reviewed that case under the Export Clause of the Constitution, which requires "apply[ing] 'heightened scrutiny' . . . [to] strictly enforce the Export's Clause ban on taxes by 'guard[ing] against . . . the imposition of a [tax] under the pretext of fixing a fee.'" *Id.* at 282 (citation omitted). Looking at the precedent set forth by this court and our sister circuits, it should be apparent that USF contributions are fees. *TOPUC I*, 183 F.3d at 427–28 & n.52; *Rural Cellular*, 685 F.3d at 1091–92. Nonetheless, some remain unmoved to apply our established precedent and venture into crafting new formulations to analyze whether a certain charge is a fee or not. Once again, noting our role not to directly contravene Supreme Court jurisprudence, I would hold that § 254 does not implicate the taxing power.

No. 22-60008

*b. At Every Level of Scrutiny, USF Contributions are Fees*

The majority's framing of the fee inquiry misconstrues language from the Court's decision in *National Cable* and numerous persuasive authorities to reach its result. It describes fees as costs: (1) "incurred 'incident to a voluntary act'"; (2) "imposed by an administrative agency upon only those persons, or entities, subject to its regulation for regulatory purposes"; and (3) revenues the government raises to supply a benefit that inures to the persons or entities paying them rather than to the public generally. *See* Maj. Op. at 14.

USF contributions have nearly all of these characteristics. First, they are incurred by telecommunications carriers incident to the voluntary act of doing business. In *National Cable*, the Court categorized charges incurred as a result of a request to obtain a state license to practice law or medicine, or to run a broadcast station, as fees because they were incident to "a voluntary act." *See* 415 U.S. at 340–41. Thus, telecommunications providers' willing choice to engage in the industry, like the cost paid for professional licensure, fits within the Court's formulation of costs incurred incident to a voluntary act. Second, USF contributions are imposed by the legislature on telecommunications providers, and not society at large for the purposes of maintaining a system of universal service that they benefit from. *See* 47 U.S.C. § 254(d), (e) (imposing the contribution on telecommunications carriers for the benefit of qualified telecommunications carriers). In this case, the majority can point to nowhere in § 254 or the Code of Federal Regulations where Congress, the FCC, or even USAC order or direct telecommunications providers to pass along the cost to their customers. At most, the majority points to a regulation enacted by the FCC that merely notes that is not unlawful for carriers to pass on the costs to consumers. Maj. Op. at 15 (citing 47 C.F.R. § 54.712(a)). That simply is not sufficient for our constitutional analysis that examines Congress's action and scrutinizes what

No. 22-60008

it has set out in delegating authority. *Cf. J.W. Hampton*, 276 U.S. at 406 (analyzing what *Congress* "may do in seeking assistance from another branch" through the delegation of authority).

The majority cites *Valero Terrestrial Corp. v. Caffrey*, 205 F.3d 130, 134 (4th Cir. 2000), for the proposition that the fact that carriers pass along the cost of contributions to consumers makes it "reminiscent of a 'classic tax'" with obligations shared by the population at large. Maj. Op. at 15. As mentioned above, this determination relies on the baked-in assumption that Congress or the FCC has imposed the cost on consumers. Again, this simply is not supported by the plain language of the statute. Section 254(d) specifically provides that "[e]very *telecommunications carrier* that provides interstate telecommunications services" must make contributions. 47 U.S.C. § 254(d). Costs incurred by entities and passed down to consumers through the entities' independent business judgment are not taxes.[6]

In my view, a strained interpretation of our applicable law and liberties taken to broadly expand the definition of a tax using distinguishable authorities should not stand. But regardless of the outcome of this analysis, the Court has made clear that whether a revenue-raising delegation implicates the taxing power is irrelevant to a nondelegation doctrine challenge. *See Skinner*, 490 U.S. at 223. I remain unpersuaded that we should create a sharp split with our precedent concluding that USF contributions are fees, along with our sisters circuits' same conclusions. Nor do I support our departure from the sound reasoning of the Court that any distinction of a

---

[6] *See, e.g.*, *Edye v. Robertson*, 112 U.S. 580, 595 (1884) (holding that a per-head charge imposed on ship owners that brought immigrants to American was a processing fee or mitigation charge, and not a tax); Hugh D. Spitzer, *Taxes vs. Fees: A Curious Confusion*, 38 Gonz. L. Rev. 335, 337–50, 364–65 (2002) (detailing differences between taxes and different types of user charges, commodities charges, and the like).

No. 22-60008

charge as a fee or tax is of little relevance as it pertains to the nondelegation doctrine analysis.

## IV. Conclusion

In sum, § 254 represents Congress's effort to "obtain[] the assistance of its coordinate Branches"[7] in an extensive and vastly changing subject matter area. In so doing, Congress has provided the FCC with an intelligible principle that sufficiently delimits the FCC's discretion based on the established universal service principles. Petitioners' argument that this revenue-raising delegation is subject to a higher standard of scrutiny has been consistently rejected by the Supreme Court. Because I am not persuaded that we should deviate from Supreme Court precedent, deviate from our precedent, and create a split with the Sixth, Eleventh, and D.C. Circuits by departing from the solid reasoning offered in their denials of those nondelegation doctrine challenges, I would affirm our original holding that § 254 satisfies the intelligible principle test and that no constitutional violation arises from the FCC's subdelegation of ministerial tasks to USAC.

---

[7] *Mistretta*, 488 U.S. at 372.

No. 22-60008

Stephen A. Higginson, *Circuit Judge*, joined by Stewart, Southwick, Graves, and Douglas, *Circuit Judges*, dissenting:

The majority finds neither an unconstitutional delegation of legislative power nor an unconstitutional exercise of government power by a private entity. Supreme Court precedent dictates these answers, which is why every other circuit to consider these questions stopped there and the Supreme Court denied petitions for review of those decisions. *Consumers' Rsch. v. FCC*, No. 23-456, 2024 WL 2883753 (U.S. June 10, 2024) (Mem.); *Consumers' Rsch. v. FCC*, No. 23-743, 2024 WL 2883755 (U.S. June 10, 2024) (Mem.).

But our court does not stop there, going beyond even petitioners' arguments to adopt a novel theory that it is "the combination" of these two *non*-violations that "violates the Legislative Vesting Clause in Article I, § 1." Maj. Op. at 55. That is, according to the majority, when Congress provides an intelligible principle to channel agency discretion (constitutional) and a private entity performs calculations under the agency's supervision (also constitutional), it becomes—pursuant to an undefined, unannounced, and unprecedented test—unconstitutional. Make no mistake, there is nothing narrow about this ruling. This decision invites lower courts to leapfrog the Supreme Court; creates a split with all other circuits to have considered the issue; ignores statutory criteria and regulations; and upends the political branches' decades-long engagement with each other, industry, and consumers to address the technology divide.

## I.

The majority argues that the "combination" theory on which its holding rests is nothing new. But the Supreme Court has considered cases that, like this one, involved challenges on the grounds that there was both an unconstitutional delegation of legislative power and an unconstitutional

No. 22-60008

delegation of government power to a private entity, yet the Court never instructed, as the majority does now, that a different standard applies. *See, e.g.*, *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936); *Currin v. Wallace*, 306 U.S. 1, 15-16 (1939); *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940).

In *Sunshine Anthracite*, for example, challengers argued that there was both an impermissible delegation of legislative power to an executive commission and an impermissible delegation of government power to a private entity because that commission relied on private actors. 310 U.S. at 397-99. The Supreme Court rejected the legislative delegation challenge after concluding that "in the hands of experts the criteria which Congress ha[d] supplied [we]re wholly adequate for carrying out the general policy and purpose of the Act." *Id.* at 398. It then rejected the private delegation challenge after concluding that the private actors "function subordinately to the Commission," which had "authority and surveillance" over them. *Id.* at 399. It ended its analysis of both delegation challenges there. If the majority were correct that a different standard applies, the Supreme Court would have instead asked whether, despite constituting neither a delegation of legislative power nor a delegation of government power to a private entity, there was still a constitutional problem. It did not. The majority attempts to distinguish on the ground that the Supreme Court "found the Government had not delegated any legislative power to any private entity" and "[t]here cannot be a combined public/private delegation without a private delegation." Maj. Op. at 68. But that is no answer. Indeed, it directly undermines the majority's conclusion because the majority *also* does not find a private delegation. *Id.* at 17 (explaining the court "need not definitively answer either delegation question").

The majority points to presidential removal authority precedent but ignores how the Supreme Court itself has characterized that precedent. In

No. 22-60008

*Seila Law LLC v. CFPB*, a decade after *Free Enterprise Fund*, it explained that there were only two exceptions to the president's otherwise "unrestricted removal power." 591 U.S. 197, 204 (2020). The CFPB's structure fit into neither exception. *Id.* The Court declined to create a new one and, unlike the majority here, applied precedent. *Id.* It was not, as the majority recasts it, a situation in which "[t]wo lines of precedent seemed to converge to suggest the removal restriction at issue posed no constitutional problem" but "the combination" of features was unconstitutional. Maj. Op. at 56.[1] And, as discussed above, the Supreme Court has considered this combination of features and, applying the legislative delegation and private delegation tests the majority disregards, has found no constitutional defect.

Even if the majority were correct that the presidential removal authority cases now suggest that a different standard could apply in this case, the Supreme Court has been clear that, where its precedent "has direct application in a case," "the Court of Appeals should follow the case which directly controls, leaving to [it] the prerogative of overruling its own decisions." *Agostini v. Felton*, 521 U.S. 203, 237 (1997) (quoting *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989)); *see also Consumers' Rsch. v. Consumer Prod. Safety Comm'n*, 91 F.4th 342, 352 (5th Cir. 2024) ("[O]ur role in the judicial architecture requires us only to map—not adjust—the borders" of Supreme Court precedent). The majority ignores this repeated instruction.

II.

---

[1] In doing so, the majority quotes Justice Thomas's separate writing in which he disagreed with seven Justices that severing the removal provision cured the CFPB's constitutional defect. But that analysis, joined by only one other Justice, about when severance is a proper remedy has little purchase here in determining whether there has been a constitutional violation in the first place.

No. 22-60008

The majority cannot prevail under legislative delegation or private delegation precedent, and so it concocts a theory to rewrite both. In doing so, it offers no test for determining when something that is neither an unconstitutional delegation of legislative power from Congress to an agency nor an unconstitutional delegation of government power to a private entity becomes unconstitutional, leaving the political branches powerless to govern.

On the issue of legislative delegation, the majority acknowledges that "the Supreme Court's nondelegation 'jurisprudence has been driven by a practical understanding that in our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives.'" Maj. Op. at 29 (quoting *Mistretta v. United States*, 488 U.S. 361, 372 (1989) (added emphasis omitted)). It then asserts, without explanation, that "Congress did not delegate because FCC has some superior technical knowledge about the optimal amount of universal service funding" as "[n]o such knowledge exists because determining the ideal size of a welfare program involves policy judgments, not technical ones." *Id.* at 30.

But Congress designed a vital, nationwide program in an area—telecommunications—where the only constant has been rapid change in both technology and markets. This is exactly the type of "ever changing" and "technical problem[]" that the Supreme Court has held Congress can address with "broad general directives" to expert agencies. *Mistretta*, 488 U.S. at 372. Congress chose not to freeze in place precise rates for different types of customers in different regions nor to impose service technology standards that would almost immediately become obsolete. Instead, Congress made policy decisions about how those precise answers should be reached, and regularly revisited, by the expert agency it had created. To determine which services to fund, FCC is required to account for which services "are essential to education, public health, or public safety";

No. 22-60008

"subscribed to by a substantial majority of residential customers"; "being deployed in public telecommunications networks by telecommunications carriers"; and "consistent with the public interest, convenience, and necessity." 47 U.S.C. § 254(c)(1). Congress provided additional principles to guide FCC. For example, Congress made the policy decision that rural Americans should not be abandoned on the wrong side of the technology divide. Without the ability to predict what types of services urban Americans would have access to and what rates they would pay, Congress decided to require FCC to ensure that rural Americans have "access to telecommunications and information services" "reasonably comparable to those services provided in urban areas and that are available at rates that are reasonably comparable to rates charged for similar services in urban areas." *Id.* § 254(b)(3). The majority offers Congress no guidance on how it should address this rapidly evolving area, or any number of others, differently.

The majority is mistaken to suggest that these are issues that have been withdrawn from congressional scrutiny—and attendant public debate—because Congress has enlisted FCC's expertise to address them. There have been congressional hearings, reports, proposed bills, and engagement with FCC over every aspect of the Universal Service Fund (USF), ranging from revising the High Cost Program's performance goals to expanding the list of eligible entities for the Rural Health Care Program to broadening the contribution base for the USF. Patricia Figliola, Cong. Rsch. Serv., R47621, The Future of the Universal Service Fund and Related Broadband Programs 12-16 (2024) ("Future of the Universal Service Fund"). The USF remains subject to extensive congressional efforts to weigh competing policy priorities and interests, balancing concerns of different consumers and industries.

No. 22-60008

On private delegation, too, the majority ignores both precedent and facts. The Universal Service Administrative Company (USAC), constrained by comprehensive regulations, "bill[s] contributors, collect[s] contributions to the universal service support mechanisms, and disburs[es] universal service support funds." 47 C.F.R. § 54.702(b). In performing these administrative functions, USAC "may not make policy, interpret unclear provisions of the statute or rules, or interpret the intent of Congress." *Id.* § 54.702(c).

Yet, the majority asserts that FCC has "*de facto* if not *de jure*" abdicated government power to USAC because FCC has rarely rejected the contribution factor that USAC calculates based on collected inputs. Maj. Op. at 7. But the relevant question is what the majority discounts as only the "*de jure*" one: Whether FCC has the "authority" to do so. *Sunshine Anthracite*, 310 U.S. at 399. And even the majority acknowledges that FCC does have that authority. *See* Maj. Op. at 6 ("True, FCC 'reserves the right to set projections of demand and administrative expenses at amounts that [it] determines will serve the public interest.' *See* 47 C.F.R. § 54.709(a)(3)."). Certainly, any number of private entities that perform administrative roles at government direction and under government control would fail this rewritten test. *See, e.g.*, *What's a MAC*, Ctr. for Medicare & Medicaid Servs., https://www.cms.gov/medicare/coding-billing/medicare-administrative-contractors-macs/whats-mac (last modified Mar. 13, 2024) (describing how Medicare Administrative Contractors—private insurers—process claims, make and account for Medicare payouts, and establish local coverage determinations).

Furthermore, as Judge Stewart explains, it is hardly surprising that FCC should approve USAC's calculation of the contribution factor when it is entirely the product of inputs that FCC regulates at every turn, from the detailed worksheets that FCC requires telecommunications companies

No. 22-60008

submit to calculate projected revenue to the caps that FCC imposes on projected expenses. If anything, it is evidence of the efficacy of FCC's "pervasive surveillance and authority" exercised over USAC. *Sunshine Anthracite*, 310 U.S. at 388. That authority is maintained through processes that allow parties disagreeing with USAC's math to seek further FCC review, 47 C.F.R. § 54.719(b), and audits to ensure "proper[] administrat[ion] [of] the universal service support mechanisms to prevent fraud, waste, and abuse," *id.* § 54.717. That those audits reveal errors and waste is concerning but this has never been enough to declare a coequal political branch's act unconstitutional. Nor does it convert USAC's accounting role into a constitutional violation.[2]

Additionally, the majority overlooks the fact that the increasing contribution factor is not caused by the scope of USAC's authority but is instead driven "in large part [by] a decline in the contributions revenue base, i.e., providers are reporting a declining share of telecommunications revenues and an increasing share of non-telecommunications revenues." Future of the Universal Service Fund at 9. Crucially, Congress has responded with a number of legislative proposals, from members of both parties, to potentially expand the revenue base by including broadband providers and online content and services providers. *Id.* at 9-10 (citing Senator Markwayne Mullin's Lowering Broadband Costs for Consumers Act, Senator Roger Wicker's FAIR Contributions Act, and the Reforming

---

[2] The majority separately argues that Congress was required to expressly authorize USAC's role under founding-era agency law principles. But, even granting that this were historically accurate and the relevant question, the majority acknowledges that there was an "assum[ption] that ministerial tasks could be subdelegated," and so this argument fails because, as discussed above, USAC performs only ministerial tasks. Maj. Op. at 49 (citing Gary Lawson & Guy Seidman, "A Great Power of Attorney": Understanding the Fiduciary Constitution 115 (2017)).

No. 22-60008

Broadband Connectivity Act proposed by Senator Amy Klobuchar and Representative Joe Neguse). Put differently, the body constitutionally tasked with addressing the policy problem the majority identifies is doing just that.

As our unanimous panel and every other court to have considered these issues held, each challenge fails under binding Supreme Court legislative delegation and private delegation precedent. Yet the majority, in undermining both lines of precedent, offers no test for determining at what point something that is neither an unconstitutional delegation of legislative power nor an unconstitutional delegation of government power to a private entity still becomes, convergingly, unconstitutional. Congress, the Executive, and courts in our circuit are left only with the implication that the bar for what is an intelligible principle is raised—by how much is unclear—when an agency enlists a private entity to perform accounting tasks. Conversely, tasks performed by private entities that have long been considered ministerial will be elevated—at what point, again, is unclear—to exercises of government power when Congress legislates with otherwise permissibly intelligible principles that limit agency discretion.

This convergence sleight of hand not only undoes Supreme Court precedent but also leaves the political branches powerless to address this perceived constitutional deficiency, ignorant as to how to legislate and regulate in ways that will survive judicial review. Here, Article III nullifies a program that has served millions of Americans for over a quarter of a century, which Congress, FCC experts, industry, and consumers revisit yearly in the face of changing technology and markets. Our court should not constitutionalize policy disagreements nor, worse still, do so with an amorphous standard, not urged by petitioners and contrary to precedent, that leaves the coequal, political branches without stability or clarity. In announcing its new constitutional theory, our court creates a greater threat to the separation of powers than the one it purports to address.

No. 22-60008

\*       \*       \*

For these reasons, and those stated by Judge Stewart, I respectfully
dissent.