IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

| | |
|---|---|
| Consumers' Research, et al., )<br>      Petitioners, )<br>)<br>v. )<br>)<br>Federal Communications Commission )<br> and United States of America, )<br>      Respondents. ) | No. 22-60008 |

**UNOPPOSED MOTION TO STAY MANDATE PENDING
PETITION FOR WRIT OF CERTIORARI**

The Solicitor General recently authorized the filing of a petition for certiorari by the government in this case.  Pursuant to Federal Rule of Appellate Procedure 41(d)(1), respondents respectfully request that this Court stay the issuance of its mandate, currently set to issue on September 16, 2024, pending the filing of that forthcoming petition.  Respondents further request that the Court rule on this motion by September 9, 2024, to afford the Solicitor General sufficient time to determine whether to seek a stay from the Supreme Court in the event this motion is denied.  Respondents have discussed this motion with counsel for all parties.  Intervenors supporting respondents consent to the motion.  Counsel for petitioners has authorized us to state that petitioners do not oppose the motion on the condition (to which respondents have agreed) that the government file its petition for certiorari by September 30, 2024.

In this case, a narrow majority of the en banc Court ruled that the funding mechanism for the universal service program established by section 254 of the Communications Act, 47 U.S.C. § 254, and implemented by the Federal Communications Commission, violates Article I, section 1 of the Constitution. This decision conflicts with recent decisions of two other courts of appeals rejecting identical constitutional challenges to the same program. As important, the decision threatens to disrupt the operation of a multibillion-dollar subsidy program, in existence for nearly thirty years, on which millions of Americans—including schoolchildren, library patrons, and users of rural health care services, as well as those with low incomes and living in costly-to-serve rural areas—rely to obtain modern telecommunications services connecting them to the rest of the world. Simply put, the Universal Service Fund extends a literal Lifeline to many Americans. Therefore, this decision, if implemented, could have catastrophic consequences for the most vulnerable among us, severing vital communications connections to education, medical and emergency services, and civic life—ultimately isolating citizens in rural and remote communities across the nation.

The Court's decision raises "a substantial question" warranting Supreme Court review, and there is "good cause" for a stay of the mandate. Fed. R. App. P. 41(d)(1). Accordingly, the Court should grant the motion.

## BACKGROUND

1. "Universal service"—the availability of affordable, reliable telecommunications service nationwide—"has been a fundamental goal of federal telecommunications regulation since the passage of the Communications Act of 1934." *Alenco Commc'ns, Inc. v. FCC*, 201 F.3d 608, 614 (5th Cir. 2000). Section 254 of the Act defines "universal service" as "an evolving level of telecommunications services that the [Federal Communications] Commission shall establish periodically," "taking into account advances in telecommunications and information services and technologies." 47 U.S.C. § 254(c)(1). The statute also directs the FCC to promote universal service through subsidy programs known as "universal service support mechanisms." *Ibid*. Section 254(d) requires "[e]very telecommunications carrier that provides interstate telecommunications services" to "contribute, on an equitable and nondiscriminatory basis, to the … mechanisms established by the Commission to preserve and advance universal service." *Id.* § 254(d).

Pursuant to section 254(b), the Commission must "base policies for the preservation and advancement of universal service" on a series of specific "principles." 47 U.S.C. § 254(b)(1)-(7). And section 254(c)(1) directs the Commission, when deciding whether to support a service through "universal service support mechanisms," to consider whether the service meets certain

criteria, *id.* § 254(c)(1)(A)-(D)—*e.g.*, whether "a substantial majority of residential customers" subscribe to the service. *See id*. § 254(c)(1)(B).

2. In accordance with the Act, the FCC established four universal service support mechanisms to subsidize service to remote high-cost areas, low-income consumers, schools and libraries, and rural health care providers. In 1999, the agency appointed the Universal Service Administrative Company (USAC), a private corporation with FCC oversight, as the Administrator of these four mechanisms. 47 C.F.R. § 54.701(a). In 2023, the four universal service programs disbursed a total of $8.1 billion. *See* Universal Service Administrative Company, 2023 Annual Report at 3 (available at https://www.usac.org/wp-content/uploads/about/documents/annual-reports/2023/2023_USAC_Annual_Report.pdf).

USAC is "responsible for billing contributors, collecting contributions to the universal service support mechanisms, and disbursing universal service support funds." 47 C.F.R. § 54.702(b). USAC "may not make policy, interpret unclear provisions of the statute or rules, or interpret the intent of Congress." *Id*. § 54.702(c). "Where the Act or the Commission's rules are unclear, or do not address a particular situation," USAC must "seek guidance from the Commission." *Ibid*. USAC must comply with detailed regulations issued by the FCC, *see id.*

§ 54.701-54.717, and any party that is aggrieved by USAC's decisions may request de novo review by the Commission, *see id*. §54.719-54.725.

USAC helps the FCC compute the amount of each quarterly payment that telecommunications carriers must contribute toward universal service. *See* 47 C.F.R. § 54.709. Before each quarter, USAC submits to the Commission its projections of the expenses that the four universal service mechanisms will incur and the revenues that telecommunications carriers will earn through interstate and international telecommunications services. *See id*. § 54.709(a)(3). The Commission uses those projections to compute a "contribution factor"—a number that is based on the ratio of the projected expenses to the projected revenues. *Id*. § 54.709(a)(2). The FCC then announces to the public the projections and the proposed contribution factor. *See id*. § 54.709(a)(3).

The FCC may revise USAC's projections (and thus the contribution factor) by setting them "at amounts that the Commission determines will serve the public interest." 47 C.F.R. § 54.709(a)(3). If the FCC takes no action within 14 days after the announcement of the proposed contribution factor, however, the factor is "deemed approved." *Ibid*. Once the contribution factor is approved, USAC calculates each carrier's contribution by applying the factor to that carrier's "contribution base" (generally, the carrier's projected interstate and international

5

telecommunications revenues). *Ibid*. Carriers may—but are not required to—pass on to customers the cost of their contributions. *See id*. § 54.712(a).

3. Based on USAC's projections, the Commission on December 13, 2021 proposed a contribution factor of 25.2 percent for the first quarter of 2022. The FCC decided to take no further action within 14 days after publishing the proposed contribution factor. As a result, the factor was deemed approved.

Petitioners filed a petition for review of the first quarter 2022 contribution factor in this Court. They argued that the contribution factor was unlawful for two reasons: (1) section 254 delegates legislative power to the FCC, in violation of Article I, section 1 of the Constitution; and (2) the Commission unlawfully delegated governmental power to USAC, a private entity.

A panel of this Court rejected petitioners' claims and denied the petition for review in March 2023. 63 F.4th 441 (5th Cir. 2023). In June 2023, the Court granted rehearing en banc and vacated the panel decision. 72 F.4th 107 (5th Cir. 2023).

4. On July 24, 2024, the en banc Court—by a vote of 9 to 7—granted the petition for review, holding that "*the combination* of Congress's sweeping delegation" to the FCC and the Commission's "unauthorized subdelegation to USAC violates the Legislative Vesting Clause in Article I, § 1" of the Constitution. Slip op. at 56.

First, the Court found that Congress "delegated its taxing power" to the FCC in section 254 of the Communications Act. Slip op. at 21. The Court recognized that under binding Supreme Court precedent, such a delegation is constitutional if Congress provides an "intelligible principle" to which the agency exercising the delegated authority "is directed to conform." *Id*. at 22 (quoting *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 372, 409 (1928)). But after reviewing the provisions of section 254, the Court said that it had "grave concerns" about the statute's constitutionality. *Id*. at 37. The Court also stated that it had "serious trouble squaring" the FCC's "subdelegation" to USAC "with Article I, § 1 of the Constitution." *Id*. at 48. Among other things, it noted that section 254 does not expressly authorize this subdelegation. *Id*. at 52-55. In addition, the Court found that the FCC effectively abdicated to USAC "its responsibility to make governmental decisions" regarding the appropriate level of funding for universal service. *Id*. at 44.

However, the Court concluded that it "need not resolve" whether the congressional delegation in section 254 is constitutional under Supreme Court precedent, or whether the FCC's subdelegation to USAC "comports with the general rule that private entities may not wield governmental power." Slip op. at 56. Instead, the Court found that "even if § 254 contains an intelligible principle, and even if [the] FCC was permitted to enlist private entities to determine how

7

much universal service tax revenue it should raise, the combination of Congress's broad delegation" to the FCC and the Commission's "subdelegation to private entities certainly amounts to a constitutional violation." *Id*. at 17-18. Accordingly, the Court granted the petition for review, held that the first quarter 2022 universal service contribution factor was unconstitutional, and remanded to the FCC for further proceedings. *Id*. at 71.

Seven judges dissented. Like the panel in this case, and like the Sixth and Eleventh Circuits, the dissenting judges would have rejected petitioners' nondelegation claims. They would have ruled that the challenged congressional delegation is constitutional because section 254 contains an intelligible principle to guide the FCC's discretion. They also would have held that the FCC's subdelegation of ministerial tasks to USAC is lawful because the Commission retains final decisionmaking authority over the universal service program. *See* slip op. at 76-98 (Stewart, J., dissenting); *id*. at 99-107 (Higginson, J., dissenting).

## ARGUMENT

To obtain a stay of the mandate "pending the filing of a petition for a writ of certiorari in the Supreme Court," a movant "must show that the petition would present a substantial question and that there is good cause for a stay." Fed. R. App. P. 41(d)(1). That standard is easily satisfied here.

First, this case presents a substantial question warranting Supreme Court review. The Court invalidated the contribution requirements underpinning the universal service program, upon which millions of American consumers rely and which was created by federal statute in its current form more than a quarter of a century ago. In doing so, this Court expressed "grave concerns about" that statute's "constitutionality under the Supreme Court's nondelegation precedents." Slip op. 37. Any decision calling into question the validity of an Act of Congress on constitutional grounds is significant. *See Rostker v. Goldberg*, 453 U.S. 57, 64 (1981) (judging the constitutionality of an Act of Congress is "the gravest and most delicate duty that this Court is called upon to perform") (quoting *Blodgett v. Holden*, 275 U.S. 142, 148 (1927) (Holmes, J.)).

In addition, the ruling (if allowed to take effect) will disrupt the distribution of universal service subsidies on which millions of Americans depend. And the Court based its ruling on the novel theory that the universal service program involves an "unprecedented" "double delegation." Slip op. at 69. In light of the significant practical implications of the Court's decision and its adoption of a new framework for analyzing nondelegation claims, this case raises "an important question of federal law that has not been, but should be, settled by [the Supreme] Court." Sup. Ct. R. 10(c).

This Court's decision also conflicts with decisions by the Sixth and Eleventh Circuits rejecting identical nondelegation challenges to the universal service program. *See Consumers' Research v. FCC*, 67 F.4th 773 (6th Cir. 2023), *cert. denied*, 2024 WL 2883753 (U.S. June 10, 2024); *Consumers' Research v. FCC*, 88 F.4th 917 (11th Cir. 2023), *cert. denied*, 2024 WL 2883755 (U.S. June 10, 2024); *see also Rural Cellular Ass'n v. FCC*, 685 F.3d 1083, 1090-91 (D.C. Cir. 2012) (rejecting nondelegation challenge to section 254). "Given the conflict" among the courts of appeals on this important issue, "there is a reasonable probability" that "certiorari will be granted in this case." *California v. Am. Stores Co.*, 492 U.S. 1301, 1306 (1989) (O'Connor, J., in chambers). That conflict and the significant disagreement among the members of the en banc Court likewise indicate that there is at least a "fair prospect" the government will prevail on the merits in the Supreme Court. *See id*. at 1306.

Finally, there is good cause for a stay of the mandate here. Absent a stay, the continued operation of the universal service program will be seriously disrupted. Although the Court held that the contribution factor for the first quarter of 2022 is unconstitutional, its decision has broader implications beyond the factor for that particular quarter. Over the past two years, petitioners have filed a series of petitions with this Court seeking review of contribution factors from seven different quarters: the second and third quarters of 2022 (Nos. 22-60195 and 22-

10

60363), the last two quarters of 2023 (Nos. 23-60359 and 23-60525), and the first three quarters of 2024 (Nos. 24-60006, 24-60160, and 24-60330). The Court has held the first six of those petitions in abeyance pending a ruling in this case. If a stay is not issued in this case, carriers may well seek to hold the Commission liable for refunds for universal service fees collected during all of those quarters.

More importantly, issuance of the mandate is likely to throw into disarray future efforts to collect universal service contributions. The FCC and USAC have already begun taking the preliminary steps necessary to calculate the contribution factor for the fourth quarter of 2024. As a practical matter, the Supreme Court will not be able to act on any petition for certiorari in this case before the fourth quarter begins. If this Court issues the mandate before the start of the fourth quarter, carriers will likely argue that they are no longer obligated to make universal service contributions because the FCC and USAC lack authority to collect such payments. This would severely compromise the Commission's ability to ensure sufficient funding for universal service subsidies in the fourth quarter of 2024 and going forward. A stay is needed pending Supreme Court review to prevent significant disruption of a multi-billion dollar federal subsidy program "that has served millions of Americans for over a quarter of a century." Slip op. at 106 (Higginson, J., dissenting).

11

## CONCLUSION

For the foregoing reasons, the Court should grant respondents' unopposed motion to stay the mandate in this case.

Respectfully submitted,

/s/ *James M. Carr*

Mark B. Stern
Gerard J. Sinzdak
   *Attorneys*

UNITED STATES DEPARTMENT OF JUSTICE
950 Pennsylvania Ave NW
Washington, DC 20530

P. Michele Ellison
   *General Counsel*

Jacob M. Lewis
   *Deputy General Counsel*

James M. Carr
   *Counsel*

FEDERAL COMMUNICATIONS COMMISSION
45 L Street NE
Washington, DC 20554
(202) 418-1740
fcclitigation@fcc.gov

August 23, 2024

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1. This document complies with the type-volume limit of Fed. R. App. P. 27(d)(2) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

    ☒ this document contains <u>2,360</u> words, *or*

    ☐ this document uses a monospaced typeface and contains <u> </u> lines of text.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    ☒ this document has been prepared in a proportionally spaced typeface using <u>Microsoft Word in Office 365</u> in <u>14-point Times New Roman</u>, *or*

    ☐ this document has been prepared in a monospaced spaced typeface using <u>                   </u> with <u>           </u>.

<u>*/s/ James M. Carr*</u>

James M. Carr
Counsel

Federal Communications Commission
Washington, D.C.  20554
(202) 418-1740

## CERTIFICATE OF FILING AND SERVICE

I, James M. Carr, hereby certify that on August 23, 2024, I filed the foregoing Unopposed Motion to Stay Mandate Pending Petition for Writ of Certiorari with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the electronic CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

*/s/ James M. Carr*

James M. Carr
Counsel

Federal Communications Commission
Washington, D.C. 20554
(202) 418-1740