BOYDEN GRAY PLLC
800 CONNECTICUT AVE. NW, SUITE 900
WASHINGTON, DC 20006

August 29, 2025

Re: Remaining Issues in *Consumers' Research v. FCC*, No. 22-60008

On August 15, 2025, the Court ordered simultaneous letter briefs regarding remaining issues in this case. Petitioners respectfully submit this response.

In its recent opinion, the Supreme Court rejected the argument that the Universal Service Fund (USF)'s "contribution scheme generally is unconstitutional" under the nondelegation doctrine. *FCC v. Consumers' Rsch.*, 145 S. Ct. 2482, 2505 n.9 (2025). The Court did so by holding that 47 U.S.C. §§ 254(b) and (c)(1) imposed "qualitative" limits on what "universal service" means—and thereby limits how much tax revenue the FCC could raise for most aspects of the USF. *Id.* at 2501–07.

To find those qualitative limits, the Court construed "each" of the ten "criteria" in §§ 254(b) and (c)(1) as "separately mandatory," meaning they *must* "be met." *Id.* at 2505–06. Under this interpretation, a telecommunications service qualifies as universal service—and the FCC can raise taxes to support it—*only* if it is "essential to education, public health, or public safety" **and** "through the operation of market choices by customers, [it has] been subscribed to by a substantial majority of residential customers" **and** its rates are "just, reasonable, and affordable" **and** it is "provided in all regions of the Nation"—among half a dozen other requirements. 47 U.S.C. § 254(b), (c)(1).

But there are two provisions in § 254 that allow the FCC to raise tax revenue without having to comply with the ten commandments in §§ 254(b) and (c)(1). Section 254(c)(3) allows the FCC to raise taxes for services that are "[i]n *addition to* the services included in the definition of universal service." *Id.* § 254(c)(3) (emphasis added). And § 254(h)(2) allows the FCC to raise taxes for "*advanced* telecommunications and information services for all public and nonprofit elementary and secondary school classrooms, health care providers, and libraries." *Id.* § 254(h)(2) (emphasis added). Advanced services include things like "broadband networks." 145 S. Ct. at 2521 (Gorsuch, J., dissenting).

The remaining question in this particular proceeding is whether §§ 254(c)(3) and (h)(2) violate the nondelegation doctrine. The Supreme Court's majority opinion acknowledged it had "no occasion to address any nondelegation issues raised by Sections 254(c)(3) and (h)(2) in particular" because doing so was unnecessary to

reverse this Court's rationale (which did not cite those provisions), *id.* at 2505 n.9 (majority op.), plus the government's merits briefing at the Supreme Court never cited those particular subsections, let alone as a basis for overturning this Court's *en banc* decision. Accordingly, as Justices Gorsuch, Thomas, and Alito explained, Petitioners "remain free on remand, or in a future proceeding, to renew their attack on the constitutionality of whatever contributions the FCC demands for its subsection (c)(3) and (h)(2) programs." *Id.* at 2531 (Gorsuch, J., dissenting). The majority opinion never disagreed, and in fact it "remand[ed] for further proceedings." *Id.* at 2511 (majority op.).

This Court should hold that §§ 254(c)(3) and (h)(2) violate the intelligible-principle test because they do not contain the bevy of limits the Court found so critical for § 254's other provisions, and therefore "the boundaries of th[e] delegated authority" under §§ 254(c)(3) and (h)(2) are not "*clearly* delineate[d]." *Skinner v. Mid-America Pipeline Co.*, 490 U.S. 212, 219 (1989) (emphasis added). Indeed, as explained below, the FCC itself has long stated these two provisions are unlike any others in § 254.

**Section 254(c)(3)** states that the FCC can designate "additional services" for USF funding "[i]n addition to the services included in the definition of universal service." 47 U.S.C. § 254(c)(3). The FCC is thus expressly freed from the limits imposed by the scope of "universal service" in §§ 254(b) and (c)(1). *See TOPUC v. FCC*, 183 F.3d 393, 441 (5th Cir. 1999). The FCC need not even limit itself to telecommunications services under § 254(c)(3). "[T]here is no language restricting these 'additional' services to telecommunications services." *Id.*; *see In re Lifeline & Link Up Reform & Modernization*, 27 FCC Rcd. 6656, 6831 (2012). Taken together, this means § 254(c)(3) allows the FCC to impose taxes to pay for "a broad class of services" well beyond "universal service." *TOPUC*, 183 F.3d at 445. The FCC itself has long agreed. *See In re Fed.-State Joint Bd. on Universal Serv.*, 12 FCC Rcd. 8776, 8811 n.93 (1997) ("Pursuant to section 254(c)(3), the Commission may designate for support additional telecommunications services not included in the 'core' services designated under section 254(c)(1) for schools, libraries, and health care providers.").

**Section 254(h)(2)** says the FCC shall "enhance, to the extent technically feasible and economically reasonable, access to advanced telecommunications and information services for all public and nonprofit elementary and secondary school classrooms, health care providers, and libraries." 47 U.S.C. § 254(h)(2). Like § 254(c)(3), this is not limited to the standard definition of "universal service." The FCC has long stated this provision "is *notably broader* than the other provisions of

section 254." *In re Fed.-State Joint Bd. on Universal Serv.*, 12 FCC Rcd. at 9086 (emphasis added). It even allows the FCC to raise funds to give to entities that are *not* eligible telecommunication carriers, which would otherwise violate § 254(e). *Id.*

As Justice Gorsuch explained, the "additional" and "advanced" services authorized by §§ 254(c)(3) and (h)(2) thus "go above the baseline of what's been considered universal service" and are determined "without regard to whether they satisfy the four factors outlined in § 254(c)(1)" or the six factors in § 254(b). 145 S. Ct. at 2522 (Gorsuch, J., dissenting). "When it comes to deciding what programs to fund under § 254(c)(3) and § 254(h)(2), the FCC is unconstrained by any of the subsection (c)(1) factors the Court rewrites and leans on so heavily." *Id.* at 2531.

Given all this, the Supreme Court majority opinion was "unwilling to say that [§§ 254(c)(3) and (h)(2)] impose a 'qualitative' cap—and understandably so." *Id.* "[T]hat in itself is a notable development: Today marks the first time in a long time that the Court has confronted a statutory delegation and found no way to save it." *Id.*

Further, "experience illustrates just how uncapped the FCC's § 254(c)(3) and § 254(h)(2) programs really are." *Id.* "[I]n 2024, the FCC announced that it would … begin funding 'Wi-Fi hotspots and services to be used off-premises by students, school staff, and library patrons.' As far as the FCC sees it, subsections (c)(3) and (h)(2) might allow it to collect enough taxes to supply take-home hotspots to anyone with a library card. Or maybe even take-home Starlink devices for library patrons nationwide, to help shrink the 'digital divide between Americans with access to broadband at home and those without.'" *Id.* (cleaned up) (citing authorities). None of that satisfies the now-mandatory requirements in §§ 254(b) and (c)(1)—but the FCC can raise funds for it anyway, thanks to §§ 254(c)(3) and (h)(2).

The FCC has acknowledged that §§ 254(c)(3) and (h)(2) authorize programs that § 254 otherwise would not permit. For example, it created a Healthcare Connect Fund Program in 2012 "to promote the use of broadband services and facilitate the formation of health care provider consortia"—and cited § 254(h)(2) as the authority for doing so. *In re Report on the U.S. Universal Serv. Fund*, FCC 22-67, at 42 (rel. Aug. 15, 2022) https://docs.fcc.gov/public/attachments/FCC-22-67A1.pdf. And "[p]ursuant to th[e] directive [in § 254(h)(2)], the FCC established the E-rate program." *Hill v. FCC*, 496 F. App'x 396, 397 (5th Cir. 2012).

The power to spend money on these programs comes with a commensurate power to raise taxes to pay for them. As the Supreme Court explained, § 254(d)(1)'s dictate that the FCC raise "sufficient" taxes to pay for the USF means "the FCC

cannot raise less than is adequate or necessary to finance th[ose] programs." 145 S. Ct. at 2502. And that "sufficient" clause also reconfirms why §§ 254(c)(3) and (h)(2) fail nondelegation scrutiny: saying the FCC can raise "sufficient" funds "takes us only halfway, because it raises the question: Sufficient for what?" 145 S. Ct. at 2503. Sections 254(c)(3) and (h)(2) lack the qualitative limits—i.e., "for what?"— that were so critical to save the rest of § 254 from nondelegation demise.

Respondents may point to § 254(h)(2)'s language about the FCC being limited "to the extent technically feasible and economically reasonable." 47 U.S.C. § 254(h)(2)(A). That imposes no meaningful limit. Recall, the FCC itself has long stated that § 254(h)(2) "is *notably broader* than the other provisions of section 254." *In re Fed.-State Joint Bd. on Universal Serv.*, 12 FCC Rcd. at 9086 (emphasis added). Indeed, the "feasibility" clause of § 254(h)(2)(A) means the FCC can proceed all the way up to the point of literal impossibility. *See Feasible*, Merriam-Webster, https://www.merriam-webster.com/dictionary/feasible ("capable of being done or carried out"). The "economically reasonable" clause imposes no limit, either. Phrases like "reasonable" or "just and reasonable" might have a sufficient meaning when it comes "to setting rates for regulated monopolies like public utilities—a context where it incorporates 'concepts with a long history at common law.'" 145 S. Ct. at 2535–36 (Gorsuch, J., dissenting). "But outside that sphere, the same phrase may amount to little more than an instruction to go forth and do good." *Id.* at 2536. That is certainly the case here, where Congress expressly unmoored § 254(h)(2) from all historical and textual limits applicable to *other* USF services. Accordingly, "reasonable" here cannot have an established meaning. Or, as Judge Newsom aptly put it, words like "'reasonable' … cannot possibly constrain the FCC's policymaking discretion in any meaningful way. They leave the agency all the room it needs to do essentially whatever it wants." *Consumers' Rsch. v. FCC*, 88 F.4th 917, 931 (11th Cir. 2023) (Newsom, J., concurring in judgment).

Section 254(h)(2) is also distinguishable from § 254(h)(1)(A), on which the FCC has occasionally relied. The latter provides a formula for calculating a refund for providing services in certain narrow circumstances, which says nothing about what services can be authorized by § 254(h)(2)'s expansive language.

Sections 254(c)(3) and (h)(2) thus allow the FCC to raise tax revenues without even the flimsy qualitative limits the Supreme Court imposed to save other provisions in § 254. The lack of "clearly delineate[d] … boundaries" in §§ 254(c)(3) and (h)(2) puts them squarely within Petitioners' nondelegation challenge. *Skinner*, 490 U.S. at 219.

\* \* \*

This Court should hold that §§ 254(c)(3) and (h)(2) violate the nondelegation doctrine. The Supreme Court itself has already paved the way to do so. It saved most of § 254 by "rewrit[ing]" provisions to impose meaningful "qualitative" limits on raising revenue, but the majority saw no way to do so for §§ 254(c)(3) and (h)(2), even after the dissent highlighted the problems with those provisions. *Id.* at 2529 (Gorsuch, J., dissenting). That was an "unmistakabl[e]" "signal[]" that "there are some abdications of congressional authority, including in the very statute before us, that the present majority isn't prepared to stomach." *Id.* at 2519.

If it would assist the Court, Petitioners respectfully request that this matter be set for re-argument. *See, e.g.*, *Collins v. Yellen*, No. 17-20364 (*en banc* oral argument after remand from Supreme Court's review of prior *en banc* decision).[1]

Respectfully,

/s/ R. Trent McCotter
*Counsel of Record for Petitioners*

---

[1] In their Supreme Court briefing, Petitioners likewise expressly cited and explained § 254(c)(3)'s limitless nature, as well as how "§ 254(h) uses equally vacuous terms." Br. for Resp. 55, 59, No. 24-354. These arguments were also preserved both at the FCC and in the briefing before this Court. *See* Pet. En Banc Br. 47, 50–51; FCC En Banc Br. 34 n.13 & 40–42; JA7–8 (describing the services at issue in §§ 254(c)(3) and (h)(2), e.g., "advanced telecommunications and information services,'" citing the extensive regulations related to those programs, and arguing "Congress imposed no formula or limitation on how much money the Commission can raise through these mechanisms"). The FCC now inconsistently claims that Petitioners never addressed these issues but somehow also conceded the FCC is right about them. *See* FCC Supp. Letter Br. 1, 4. Neither is correct.

Anyway, the question is before the Court now, and agency exhaustion is not jurisdictional. The FCC has flatly ignored over thirty comments filed by Petitioners about USF's unlawfulness, except to criticize Petitioners for daring to file comments at all, calling them "uninvited" and "unsolicited." Br. for Resp. 28, *Consumers' Rsch. v. FCC*, No. 22-13315 (11th Cir. Dec. 22, 2022).

Alternatively, the Court could wait a few weeks and consolidate this case with a soon-to-be-filed suit challenging the Fourth Quarter 2025 Contribution Factor, which the FCC admits will squarely and properly present these issues. *See* FCC Supp. Br. 3. That suit will likely be filed in late September 2025 after the FCC issues a new Contribution Factor.

*Given that even the FCC agrees this Court will imminently have to resolve this exact issue, the Court should decide it now*: "[I]f we do not decide the constitutional questions presented in this case, we will have to decide them in a [soon-to-be] pending challenge" anyway. *Consumers' Rsch. v. FCC*, 109 F.4th 743, 756 (5th Cir. 2024) (*en banc*).